No. 97-334C
(Judge Charles F. Lettow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CCA ASSOCIATES, a Louisiana partnership,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S POST-TRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN M. SIMKIN
Assistant Director

KENNETH D. WOODROW
DAVID A. HARRINGTON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-0513

Dated: November 9, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**

DEFENDANT'S POST-TRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW . . . . 1

QUESTIONS PRESENTED . . . . 1

STATEMENT OF FACTS DEFENDANT ESTABLISHED AT TRIAL . . . . 2

I. STATUTORY BACKGROUND . . . . 2

A. The Section 221(d)(3) Program . . . . 2

B. Benefits Of Participating In The Section 221(d)(3) Program . . . . 3

1. Low-Risk, High Leverage Financing . . . . 3

2. Tax Benefits . . . . 4

3. Other Opportunities For Project Owners . . . . 5

C. The Preservation Statutes . . . . 6

1. ELIHPA . . . . 6

2. LIHPRHA . . . . 7

D. The HOPE Act . . . . 9

II. THE PLAINTIFF . . . . 10

A. The Initial Deal . . . . 10

B. Plaintiff's Failure To Participate In The Preservation Statutes' Administrative Process . . . . 14

C. CCA Failed To Seek Allowable Rent Increases And Failed to Diligently Submit Its Audited Annual Financial Statements . . . . 15

D. CCA's Eventual Prepayment Of Its HUD-Insured Mortgage And Conversion

To Market Rate Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

E. Economic Effect Of Remaining In The HUD Subsidy Program . . . . . . . . . . . . . 18

DEFENDANT'S CONTENTIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I. The As-Applied, Regulatory Taking Claim Asserted By CCA Is Not Ripe Because CCA Failed To Exhaust The Administrative Preservation Process . . . . . . . 19

A. CCA's Claim Is Not Ripe Because It Failed To Apply To Prepay Under The Preservation Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1. The Doctrine Of Futility Is Inapplicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

2. Applying To Prepay Would Not Have Been Futile . . . . . . . . . . . . . . . . . . . . 24

a. The Preservation Statutes Gave HUD Discretion To Determine When Prepayment Would Be Allowed . . . . . . . . . . . . . . . . . . . . . . . . . 24

b. Prepayment Under The Preservation Statutes Was "Possible" . . . . . . . . . 25

(1) A Well-Conceived Plan Of Action Would Not Have Resulted In A Material Hardship To Current Tenants . . . . . . . . . . . . . . . . . . . . . . . 25

(a) In 1991, The Rents Charged By CCA Were Close To Market . . . 25

(b) The Rents Actually Charged By CCA In 1991 Are Not The Correct Starting Point For Analysis Of A Plan Of Action To Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

(2) A Plan Of Action To Prepay Need Not Involuntarily Displace Current Tenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

(3) The Preservation Statutes' Provisions Concerning Low-Income And Very Low-Income Tenants Are Irrelevant . . . . . . . . . . . . . . . . 29

c. The Evidence Proffered By CCA Is Insufficient To Establish Futility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B. Even If It Were Futile To Apply To Prepay, CCA's Claim Would Still Not Be Ripe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

II. The Preservation Statutes Did Not Effect A Regulatory Taking Under Penn

Central . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

A. The Preservation Statutes Had Little Or No Economic Impact On CCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1. The Sale Option Eliminates Any Potential Economic Impact . . . . . . . . . . . . 33

2. Even Under Assumptions Favorable To CCA, The Preservation Statutes Did Not Result In A "Severe Economic Deprivation" . . . . . . . . . . . 35

3. CCA's Various Calculations Of Economic Impact Are Flawed And Should Be Disregarded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B. The Preservation Statutes Did Not Frustrate Investment-Backed Expectations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1. The Preservation Statutes Did Not Interfere With The Primary Expectations Of A Reasonable Developer . . . . . . . . . . . . . . . . . . . . . . . . . 40

a. Expectations Of Reasonable Developers . . . . . . . . . . . . . . . . . . . . . . . . 40

b. The Preservation Statutes Did Not Affect A Developer's Reasonable Expectations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

2. CCA's Supposed Original Expectations Were Not Reasonable . . . . . . . . . . . 44

C. The Preservation Statutes Do Not Have The Character Of A Taking . . . . . . . . . 46

1. The Preservation Statutes Promoted Important, Long-Standing Government Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

b. The Preservation Statutes Did Not Shift The Burden Of Providing Low-Income Housing On To CCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

III. CCA Is Owed No Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

A. Providing Compensation To CCA Would Be Unjust . . . . . . . . . . . . . . . . . . . . . 51

B. Even If The Pecuniary Benefits Available Under The Preservation Statutes Are Ignored, Dr. Ragas's Calculations Overstate Just Compensation . . . . . . . . . 51

1. CCA Incorrectly Assesses Compensation At The End Of The Alleged

Taking Period Using Ex Post Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

a. CCA's Approach Is Contrary To The Law And Will Lead To Bizarre Outcomes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

b. Dr. Dickey Uses An Appropriate Ex Ante Approach . . . . . . . . . . . . . . . . . 55

2. CCA's Calculation Of Just Compensation Contains Significant Errors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

a. CCA Fails To Take Into Account Its Own Failure To Seek Rent Increases From HUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

b. CCA's Estimated "Market Rents" Are Overstated . . . . . . . . . . . . . . . . . . 58

c. CCA's Calculations With Request To The Project's Three Bedroom Apartments Are In Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

3. CCA's Model Uses An Inappropriate Interest Rates To Compound Cash Flows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

# TABLE OF AUTHORITIES

**CASES** **PAGES**

Almota Farmers Elevator & Warehouse Co. v. United States,
409 U.S. 470 (1973) . . . . . . . . . . 53

Andrus v. Allard,
444 U.S. 51 (1979) . . . . . . . . . . 31

Bass Enterprises Production Co. v. United States,
381 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 34, 35, 47

Boise Cascade Corp. v. United States,
296 F.3d 1339 (Fed. Cir. 2002) . . . . . . . . . . 20

Chancellor Manor v. United States,
331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . passim

Cienega Gardens v. United States,
331 F.3d 1319 (Fed. Cir. 2003) . . . . . . . . . . passim

City Line Joint Venture v. United States,
71 Fed. Cl. 486 (2006) . . . . . . . . . . 38, 39

City of Monterey v. Del Monte Dunes at Monterey, Ltd.,
526 U.S. 687 (1999) . . . . . . . . . . 31

DLX, Inc. v. Kentucky,
381 F.3d 511 (6th Cir. 2004) . . . . . . . . . . 22

FCC v. Florida Power Corp.,
480 U.S. 245 (1987) . . . . . . . . . . 50

First English Evangelical Lutheran Church v. County of Los Angeles,
482 U.S. 304 (1987) . . . . . . . . . . passim

Gilbert v. City of Cambridge,
932 F.2d 51 (1st Cir. 1991) . . . . . . . . . . 22

Greenbrier v. United States,
193 F.3d 1348 (Fed. Cir. 1999) . . . . . . . . . . 19, 21, 23, 30

Herrington v. Sonoma County,
857 F.2d 567 (9th Cir. 1988), cert. denied, 489 U.S. 1090 (1989) . . . . . . . . . . . . . . . . . . 22

Howard W. Heck & Assoc. v. United States,
134 F.3d 1468 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 30

Kawaoka v. City of Arroyo Grande,
17 F.3d 1227 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Kinzli v. City of Santa Cruz,
818 F.2d 1449 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Kirby Forest Industries, Inc. v. United States,
467 U.S. 1 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Lingle v. Chevron U.S.A., Inc.,
544 U.S. 528 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 39

Loveladies Harbor, Inc. v. United States,
28 F.3d 1171 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 47

Lucas v. South Carolina Coastal Council,
505 U.S. 1003 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

MacDonald, Sommer & Frates v. Yolo County,
477 U.S. 340 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

MacLeod v. County of Santa Clara,
749 F.2d 541 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Maritrans, Inc. v. United States,
342 F.3d 1344 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Morris v. United States,
392 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Olson v. United States,
292 U.S. 246 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Palazzolo v. Rhode Island,
533 U.S. 606 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

Parkridge Investors, LP v. Farmers Home Admin.,

13 F.3d 1192 (8th Cir. 1994) . . . . . . . . . . 50

Penn Central Transportation Co. v. City of New York,
438 U.S. 104 (1978) . . . . . . . . . . passim

Pennsylvania Coal Co. v. Mahon,
260 U.S. 393 (1922) . . . . . . . . . . 31

Rose Acre Farms, Inc. v. United States,
373 F.3d 1177 (Fed. Cir. 2004) . . . . . . . . . . 32, 36

Ruckelshaus v. Monsanto Co.,
467 U.S. 986 (1984) . . . . . . . . . . 40

Seguin v. City of Sterling Heights,
968 F.2d 584 (6th Cir. 1992) . . . . . . . . . . 22

Seiber v. United States,
364 F.3d 1356 (Fed. Cir. 2004) . . . . . . . . . . 19, 20, 37

Southern Pac. Transp. Co. v. City of Los Angeles,
922 F.2d 498 (9th Cir. 1990) . . . . . . . . . . 22

Stearns Co. v. United States,
396 F.3d 1354 (Fed. Cir. 2005) . . . . . . . . . . 19, 31

Tabb Lakes, Ltd. v. United States,
10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . 52

Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,
535 U.S. 302 (2002) . . . . . . . . . . 32, 34

United States v. 50 Acres of Land,
469 U.S. 24 (1984) . . . . . . . . . . 52, 54

United States v. Dow,
357 U.S. 17 (1958) . . . . . . . . . . 53

United States v. Riverside Bayview Homes,
474 U.S. 121 (1985) . . . . . . . . . . 23

Webb's Fabulous Pharmacies, Inc. v. Beckwith,
449 U.S. 155 (1980) . . . . . . . . . . 40

Wyatt v. United States,
271 F.3d 1090 (Fed. Cir. 2001) . . . . . . . . . . 20

Yancey v. United States,
915 F.2d 1534 (Fed. Cir. 1990) . . . . . . . . . . 53, 54

Yee v. City of Escondido,
503 U.S. 519 (1992) . . . . . . . . . . 50

**STATUTES**

12 U.S.C. § 4101 . . . . . . . . . . passim

12 U.S.C. § 4101(a) . . . . . . . . . . 7

12 U.S.C. § 4102(a) . . . . . . . . . . 7

12 U.S.C. §§ 4103(b) . . . . . . . . . . 8, 33, 43, 51

12 U.S.C. §§ 4108 . . . . . . . . . . 21

12 U.S.C. § 4109 . . . . . . . . . . 8, 20, 30, 33, 50

12 U.S.C. §§ 4110(a) . . . . . . . . . . 34

12 U.S.C. §§ 4110(b) . . . . . . . . . . 34

12 U.S.C. § 4110(d) . . . . . . . . . . passim

12 U.S.C. § 4114 . . . . . . . . . . passim

12 U.S.C. § 4115 . . . . . . . . . . 9

12 U.S.C. §§ 4119(1) . . . . . . . . . . 9

12 U.S.C. § 4119(4) . . . . . . . . . . 29

42 U.S.C. § 1437a(b)(2) . . . . . . . . . . 29

42 U.S.C. § 12702 . . . . . . . . . . 47

12 U.S.C. § 1715l(d)(3) . . . . . . . . . . 2

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CCA ASSOCIATES, a Louisiana Partnership, | ) | |
| Plaintiff, | ) | No. 97-334C |
| v. | ) | (Judge Charles F. Lettow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

Pursuant to the Court's August 29, 2006 order, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law regarding the claims of plaintiff, CCA Associates ("CCA").

**QUESTIONS PRESENTED**

1. Whether CCA's as-applied, regulatory taking claim is unripe because the partnership failed to seek and obtain a final decision from the Department of Housing and Urban Development ("HUD") applying the challenged statutes to its property;

2. Whether CCA's failure to obtain a final agency decision is excused by the doctrine of futility where:

    a. CCA did not make a single application to HUD, and

    b. the application of the challenged statutes to the plaintiff's property is uncertain.

3. If the Court concludes that CCA has presented a ripe claim, whether the Emergency Low Income Housing Preservation Act or the Low Income Housing Preservation and Resident Homeownership Act effected a regulatory taking of CCA's property, and

4. If the Court concludes that a regulatory taking has occurred, what compensation, if any, is owed to CCA.

## STATEMENT OF FACTS DEFENDANT ESTABLISHED AT TRIAL

## I. STATUTORY BACKGROUND

### A. The Section 221(d)(3) Program

Modern national housing policy began in the New Deal era with the passage of the National Housing Act of 1934. Initially, the Federal Government sought to provide low-income housing by subsidizing projects developed, owned, and managed by local public housing authorities. By the 1960s, however, the Federal Government shifted its focus to private development, enacting legislation to encourage the construction, ownership, and management of moderate- and low-income housing by private owners. In 1961, Congress amended the National Housing Act to establish the section 221(d)(3) program. 12 U.S.C. § 1715l(d)(3). This program authorized the Federal Housing Administration (and subsequently HUD) to provide mortgage insurance and fund below-market interest rate loans to stimulate private development of moderate- and low-income housing. CCA's property was developed through to the section 221(d)(3) program. PX2.

Pursuant to the section 221(d)(3) program, private developers entered into a "regulatory agreement" with HUD whereby the owner accepted specific restrictions on the mortgaged property, including restrictions on tenant income, allowable rental rates, and cash distributions

that could be received from the project. See generally Cienega Gardens v. United States, 331 F.3d 1319, 1234-35 (Fed. Cir. 2003). The regulatory agreement remained in effect as long as the property was subject to the insured mortgage. The mortgage note prohibited prepayment of the mortgage without the Government's approval for the project's first 20 years. Consequently, it was only after 20 years that the owner could prepay without the Government's approval, dissolve the affordability restrictions, and realize any residual value (i.e., equity) in the project.

### B. Benefits Of Participating In The Section 221(d)(3) Program

The section 221(d)(3) program, as established by Congress, provided lucrative and immediate benefits to entice developers and investors to participate. It provided low-risk, highly-leveraged Government-insured financing that allowed developers to develop housing projects with a cash outlay as little as two to three percent of the project's total cost. Moreover, it allowed private developers to realize significant tax savings that could be used to offset income earned from other sources. In many cases, developers made back their cash investments within the first one to three years of their investment in the program. Tr. 1172-73d (Malek). These were the principal reasons that developers chose to construct and operate projects pursuant to section 221(d)(3). Tr. 1156-59 (Malek); DX176.

#### 1. Low-Risk, High Leverage Financing

The section 221(d)(3) program enabled developers to obtain low-risk, high-leverage financing that was far superior to that available for a conventional multi-family housing project. Tr. 1191 (Malek). Specifically, developers of section 221(d)(3) projects were able to obtain Government-insured, non-recourse loans at below market interest rates. Tr. 1160, 1164 (Malek). The loans were amortized over 40 years and financed a full 90 percent of the project's

replacement cost. Tr. 1161 (Malek). In addition, developers were entitled to a Government credit called the Builder's and Sponsor's Profit and Risk Allowance ("BSPRA"). The BSPRA further reduced a developer's cash outlay to between 1.8 and 3.0 percent of the project's replacement cost. Because HUD-insured loans were non-recourse, the developer never put at risk more than this small, initial cash investment. Tr. 1167 (Malek). By contrast, banks typically required developers to put down 20 to 35 percent to finance a comparable conventional project. Tr. 1160, 1164 (Malek). Favorable financing was a principal reason that developers chose to participate in the section 221(d)(3) program. Tr. 1191-93 (Malek).

**2. Tax Benefits**

The other principal reason developers chose to participate in the section 221(d)(3) program was tax benefits. Tr. 1191-92 (Malek). Section 221(d)(3) projects were entitled to use accelerated depreciation. Unlike conventional real estate investments, the highly-leveraged nature of the Section 221(d)(3) program – combined with accelerated depreciation – created a "multiplier effect" with respect to the tax deductions. Tr. 1161 (Malek). The projects generated a stream of tax deductions that typically ranged from 2 to 4 times the equity investment required in the project and the write-off ratio of these tax deductions were much higher per dollar invested than a comparable investment in a conventional housing project. Tr. 1177, 1182 (Malek). These losses could be passed through to the project's individual owners, who could use them to offset profits from other investments. Tr. 1174-77 (Malek). Typically, investors were accorded 99 percent of the tax losses that would be thrown off by the project, as well as 99 percent of the project's cash flow. Tr. 1158-59 (Malek).

### 3. Other Opportunities For Project Owners

Several other, less significant opportunities for profits also were available to developers of moderate- and low-income housing projects: annual cash distributions; management and other fees; and possible profit from the project's residual value.

Under the section 221(d)(3) program, budget-based rents were set at a level that allowed annual cash distributions to the owner. The regulatory agreement limited distributions to 0.6 percent of the project's total value. See PX2 (6 percent of the owner's 10 percent initial, stated equity). However, because of the low initial cash investment (typically 2 to 3 percent of the project's total value), this provided a generous, double digit return (often in excess of 25 percent) on the owner's original cash investment. Tr. 1172-73 (Malek).

Owners also were allowed to profit by selling a wide range of services, such as property management or building maintenance, to their own project. Developers typically formed related-party entities to perform these services and were paid for the services from cash flow generated by the property.

Finally, there existed the potential for profit from realizing the project's residual value (i.e., the owner's equity) after 20 years. As explained in a contemporary treatise, however, "there are several reasons why in normal course this [last] expectation might not be realized in federally assisted housing." Tr. 1192-93 (quoting PX176 (Charles L. Edson & Bruce S. Lane, A Practical Guide to Low- and Moderate-Income Housing (B.N.A. 1972)). For most investors, the potential for profit from realizing the project's residual value was not a primary consideration and most investments of this kind were marketed solely for their tax benefits. Tr. 1193-94.

### C. The Preservation Statutes

In the late 1980s, as the 20-year anniversary approached for many section 221(d)(3) and 236 properties, Congress became concerned that many owners would prepay their mortgages, triggering a dramatic drop in the nation's supply of low-income housing. See, e.g., H.R. Conf. Rep. No. 100-426, at 192 (1987) (estimating almost 950,000 low-income housing units lost through mortgage prepayments). Consequently, in 1988 and 1990, Congress enacted two statutes (collectively, the "Preservation Statutes") to preserve low-income housing.

#### 1. ELIHPA

In 1988, as a temporary measure, Congress enacted the Emergency Low Income Housing Preservation Act ("ELIHPA" or "Title II"), Pub. L. No. 100-242, 101 Stat. 1877-86 (1988). ELIHPA, which was enacted with a two-year sunset provision, instituted a permitting process under which owners interested in prepaying their mortgage were required to apply to HUD for approval. ELIHPA §§ 221-23. This enabled HUD, using the agency's knowledge and expertise, to assess whether a project's preservation as low-income housing was warranted.

As an alternative to prepayment, Congress authorized numerous benefits "to provide a fair return [to] the owner." Id. §§ 224-25. Financial benefits available to project owners under ELIHPA included a Government-insured equity take out loan funded by increased rents, increased annual cash distributions, Section 8 housing assistance contracts, and financing for capital improvements. Id. §§ 224(b), 231. In exchange for these financial benefits, owners executed a use agreement that extended the existing use restrictions on the property. Id. § 225(b). HUD also was authorized to provide assistance to facilitate the project's sale to a

qualified nonprofit organization, tenant cooperative, public agency, or other entity. Id. § 224(b). Participation by owners in the preservation process was voluntary.

Finally, to prevent prejudice to owners that chose to proceed under ELIHPA, Congress permitted such owners to switch to benefits authorized by any successor statute. ELIHPA § 230 (allowing owners to change course even after incentives under ELIHPA had been accepted).

**2. LIHPRHA**

In 1990, Congress replaced ELIHPA with the Low-Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA" or "Title VI"), Pub. L. No. 101-625, 104 Stat. 4249 (1990) (codified at 12 U.S.C. § 4101 et seq.). Like its predecessor, LIHPRHA asserted HUD's regulatory jurisdiction over prepayment, required owners to seek approval to prepay their HUD-insured mortgage, and provided opportunities to exit the program or seek monetary benefits in the event of a denial. 12 U.S.C. §§ 4101(a), 4108-10, 4114. Significantly, LIHPRHA authorized prepayment under two distinct avenues. 12 U.S.C. § 4101(a); see also 12 U.S.C. §§ 4108, 4114.

An owner interested in pursuing the options provided by LIHPRHA was required to file notices of intent, conduct appraisals, and then submit plans of action. 12 U.S.C. § 4102(a). Further, owners with regulatory plans pending under ELIHPA were given the option of continuing under that statute or switching to LIHPRHA. 12 U.S.C. § 4101 note; see also ELIHPA § 230. All aspects of the preservation process under LIHPRHA were voluntary.

Pursuant to LIHPRHA, HUD could approve prepayment if prepayment would not cause a material hardship for current tenants or adversely affect the availability of low-income housing in the area. 12 U.S.C. § 4108. As with ELIHPA, this enabled HUD to determine whether the

project's preservation as low-income housing was warranted. Id. (directing HUD to consider factors such as whether prepayment would "materially increase economic hardship for current tenants" or "affect . . . the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families").

LIHPRHA also allowed owners to sell their property to a "qualified purchaser" at the "fair market value of the housing based on the highest and best use of the property," i.e., the project's market value without HUD restrictions. 12 U.S.C. §§ 4103(b)(2), 4110(b)(1). To facilitate these sales, which released the owners from the program entirely, HUD funded virtually all transaction costs, provided mortgage insurance, and paid consultants to assist the parties. HUD also provided loans and grants that enabled non-profit organizations to acquire the project. 12 U.S.C. § 4110(d). An owner seeking to sell would be allowed to prepay and exit the program if it did not receive a bona fide offer within specified time frames, if HUD decided not to provide financial assistance in connection an approved offer, or if the purchaser was unable to consummate the transaction for any other reason. 12 U.S.C. § 4114(1)(B).

As in ELIHPA, LIHPRHA permitted HUD to provide owners financial incentives in exchange for extending their properties' use restrictions. 12 U.S.C. § 4109. HUD could provide owners rent increases, an increased rate of return based upon the property's market value as conventional rental housing, access to project equity through a Government-insured loan, and financing for capital improvements. Id.

Finally, LIHPRHA sought to ensure that owners were not disadvantaged by agency delay in processing applications or providing funds. The statute permitted owners to submit their first notice of intent two years before their original prepayment date to minimize any administrative

delays after prepayment eligibility. 12 U.S.C. §§ 4102, 4119(1)(B). Additionally, Congress ordered HUD to review applications within 180 days and, if the review extended beyond that, HUD was to provide retroactive incentives and assistance to owners. 12 U.S.C. § 4115(c). Federal district courts were empowered to enforce section 4115(c). Id. And if within a set period use agreement incentives were not provided, or a sale was not consummated, the owner was allowed to prepay the original mortgage and leave the program. 12 U.S.C. § 4114.

**D. The HOPE Act**

The Preservation Statutes were subject to frequent criticism due to their generous provisions and excessive cost to the Government. In the mid-1990s, Congress commenced hearings to explore alternatives. See PX60. HUD's Inspector General recommended, among other measures, that Congress "[d]iscontinue paying owners windfall profits for projects that threaten to prepay their mortgages and remove the low income character of the units." Hearing before the Subcommittee on VA, HUD, and Independent Agencies of the House Committee on Appropriations, 104th Cong., 1st Sess. (January 24, 1995) (statement of Susan Gaffney, HUD Inspector General). These concerns resulted in passage of the Housing Opportunity Program Extension Act of 1996 ("HOPE Act"), Pub. L. No. 104-120, 110 Stat. 834 (March 28, 1996). Although the HOPE Act did not expressly repeal LIHPRHA, it "restored the prepayment rights to owners" of moderate- and low-income housing. E.g., Chancellor Manor v. United States, 331 F.3d 891, 896 (Fed. Cir. 2003).

## II. THE PLAINTIFF

The plaintiff, CCA Associates ("CCA"), is a family-owned and operated partnership with its principal place of business in New Orleans, Louisiana. CCA owns Chateau Cleary Apartments, a moderate-income apartment complex developed in 1969 under HUD's section 221(d)(3) program. See DX3; DX9.

### A. The Initial Deal

During 1969, two brothers – Ernest B. Norman, Jr. and J. Robert Norman – decided to build and operate the Chateau Cleary housing project. Tr. 297 (Norman). The brothers were equal partners in the development. Id. On November 7, 1969, the Norman brothers executed a regulatory agreement pursuant to section 221(d)(3) of the National Housing Act. Compl. ¶ 8. Pursuant to the Regulatory Agreement, the Norman brothers received from HUD a firm commitment to insure a 40-year loan in the amount of $1,601,100, at a market interest rate of 7.5 percent and an effective below-market interest rate of 3 percent. Tr. 298-99 (Norman); DX3; PX3; PX4.

Under the 221(d)(3) program, the Norman brothers were entitled to receive an insurable mortgage of 90 percent of the project's estimated replacement cost. The resulting mortgage of $1,601,100 accounted for the bulk of the financing of the project. Tr. 302 (Norman); PX4. The Norman brothers were to finance the remaining $199,845 in costs. Id. However, as the project's developers, the Norman brothers were entitled to receive a Builder's and Sponsor's Risk Premium and Allowance ("BSPRA") equal to 10 percent of the "total estimated development cost," i.e., the estimated replacement cost, less land acquisition costs. Tr. 1165-68 (Malek); 302-03 (Norman). Due to the BSPRA ($143,968) and appreciation of the land value pursuant to an

FHA valuation ($24,000), the Norman Brothers were required to make an actual cash investment of only $31,877. Id. The Norman brother's total cash outlay, therefore, was only 1.8 percent of the estimated cost of the Chateau Cleary project. Tr. 1156 (Malek).

The Norman brothers profited both from the construction and management of the project. They contracted with their own construction company – Stratford Construction Company – to build the Chateau Cleary Apartments for an estimated cost of $1,227,655. Tr. 1171 (Malek); DX9. Stratford was formed specifically to construct the CCA project. Tr. 304 (Norman). To manage the property, the Norman brothers contracted with Apartment Management Corporation – another wholly-owned a company that was managed by Ernest B. Norman, III. Tr. 310-11 (Norman); 1172 (Malek); DX 8. Pursuant to the original management agreement, Apartment Management Corporation received a fee of 6 percent of the property's gross rental receipts. Id. The fees paid to these affiliated entities, including the construction costs and the management fees, were almost entirely funded by the Federally-backed mortgage, which provided leverage far in excess of what a conventional real estate investor could obtain. Tr. 1160 (Malek).

The Norman brothers were also able to profit from tax benefits associated with the section 221(d)(3) program. The tax shelter aspects of the CCA project were particularly valuable to the Norman brothers because of their investments in oil and gas projects. Mr. Norman testified that his family invested in oil and gas and that they expected to achieve annual returns of 15 to 20 percent from those investments. Tr. 292 (Norman). As the Governments' tax expert, Mr. Malek, explained, once an oil or gas well begins pumping product, then the value of the oil or gas is treated as taxable income and the oil or gas investment no longer serves a purpose as a tax shelter. Tr. 1169-70; 1205-06 (Malek). In the years following the development of the CCA

project, the Normans could have used the tax losses from accelerated depreciation of the CCA project to offset income they earned from their oil and gas investments. By employing "component depreciation" at CCA (a type of depreciation in which individual components of the building structure are depreciated at different rates), the Normans achieved the same effect as accelerated depreciation. Tr. 1178; 1180-81; 1183. The uncontroverted evidence demonstrates that the Normans employed component depreciation and were treating the CCA project as having a composite life of 17 years. Tr. 1178; 1181; 1220-21.

Based upon evidence that the Normans employed component depreciation in computing the tax writeoffs for the CCA project, and upon Mr. Norman's testimony that he and his family expected annual returns of 15 to 20 percent from their oil and gas investments, Mr. Malek demonstrated that the internal rate of return on the Normans' investment in CCA was at least 38 percent – regardless of the residual value left in the property at the end of the initial 20-year period. Tr. 1216-18 (Malek). As Mr. Malek explained in the demonstrative he prepared for the Court, the internal rate of return upon the Normans' CCA investment can be computed from the Normans' initial investment, the actual dividends paid out by the project during its first 20 years, and the tax losses incurred during the same time-frame (assuming a conservative 50 percent tax rate). See DDX3; Tr. 1216-17. Mr. Malek demonstrated that the tax losses alone – from 1972 to 1975 – significantly exceeded the amount of the Normans' initial investment. Tr. 1216. Moreover, Mr. Malek demonstrated that the internal rate of return upon the Normans' initial

investment was at least 38 percent, regardless of whether the property was worth $0, $1.9 million, or $4 million at the end of the initial 20-year period.[1] Tr. 1217-18.

Thus, in return for a minimal cash outlay of only 1.8 percent of the project's cost, the Norman brothers received (a) uniquely advantageous financing, (b) the ability to utilize the project's tax benefits to offset their other investments in oil and gas, (c) the ability to receive a high internal rate of return in excess of the returns expected from their oil and gas investments; (d) the ability to receive distributions of cash from operations, and (e) profits from awarding themselves contracts for construction and project management. Additionally, the brothers were entitled to any profits generated by the sale or other disposition of the project upon exiting the HUD program. Of course, at the time of project's development in 1969, the residual value of the Chateau Cleary apartments would have depended upon interest rates, property values, the renters' market, and other variables existing more than 20 years in the future. These variables would have been unknowable at the time of development.

In January 1985, to facilitate their estate planning, the brothers agreed that J. Robert Norman would sell his 50 percent share of the project to Ernest B. Norman, Jr., for $677,550. Subsequently, in March 1985, Ernest B. Norman, Jr., assigned his right to purchase his brother's interest to CCA Associates, a partnership comprised of Mr. Norman, his children and grandchildren, and their trusts. Ernest B. Norman, III, was appointed the managing partner of CCA Associates and remains in that role today.

[1] Mr. Malek's computation accounted for the effect of recapture taxes upon the sale of the CCA property at the end of the 20-year period.

### B. Plaintiff's Failure To Participate In The Preservation Statutes' Administrative Process

CCA was free to choose among the options available under the Preservation Statutes. Despite being advised that CCA was eligible to receive significant incentives, and despite being aware that a non-profit organization was interested in purchasing Chateau Cleary in order to preserve it as affordable housing, CCA chose to do nothing.

In December 1990, about five months before its prepayment eligibility date, CCA Associates filed a notice of intent under ELIHPA stating that it intended to request incentives or sell the project to a non-profit purchaser. Tr. 197 (Norman); PX 42. After passage of LIHPRHA, in June 1992, CCA filed a notice of election to proceed under ELIHPA. Tr. 205-06 (Norman); PX 51. Other than these two preliminary steps, CCA took no action to avail itself of the options available under the Preservation Statutes.

CCA's inaction did not result from ignorance. CCA's managing partner, Mr. Norman, was well aware of the options under the Preservation Statutes, and received advice and analysis regarding these options from several third-party consultants. DX11; DX123. For example, in November 1990, Mr. Norman had discussions with Andrea Lockett at USGI, the company servicing CCA's HUD-insured mortgage, during which USGI indicated that they had aligned themselves with a non-profit that was potentially interested in purchasing Chateau Cleary. Tr. 371-76 (Norman); PX38; PX41; DX124. Ms. Lockett estimated that, after paying off the old loan, the sale could potentially provide $1,900,000 in cash to the owners. Id. Similarly, Mr. Norman discussed the terms of a potential equity take-out loan with Ms. Lockett. Tr. 375

(Norman). Ms. Lockett's preliminary estimate indicated that an equity loan of roughly $1.3 million would be available under LIHPRHA. DX124; Tr. 375 (Norman).

On December 28, 1990, following his discussions with Ms. Lockett, Mr. Norman submitted a notice of intent on behalf of CCA pursuant to section 222 of ELIHPA. The notice stated that CCA would seek incentives or sell to a non-profit entity during 1991. PX42. Mr. Norman, however, took no further action at that time and failed to pursue either option under ELIHPA. Tr. 383-84 (Norman).

In May 1992, Mr. Norman learned of HUD's June 8, 1992 deadline for requiring property owners to make an election of whether to proceed under ELIHPA or LIHPRHA. PX53; Tr. 384-85 (Norman). Consequently, on June 5, 1992, CCA submitted its notice of election to proceed under ELIHPA and, on June 8, 1992, CCA submitted a revised notice. PX51. Although Mr. Norman continued to discuss the sale and incentive options under the Preservation Statutes by meeting with consultants in 1993 to discuss the LIHPRHA appraisal process and by obtaining information from additional consultants in 1994, DX126, CCA chose not to act upon any of the advice it received. Because CCA did not pursue the preservation process, HUD never issued a final decision regarding the preservation incentives available to CCA, or prepayment pursuant to ELIHPA or LIHPRHA.

### C. CCA Failed To Seek Allowable Rent Increases And Failed To Diligently Submit Its Audited Annual Financial Statements

In 1985, Mr. Norman assumed the role as the full-time managing partner of CCA Associates, a role that he continues in today. Tr. 350 (Norman). He also continues to manage

the day-to-day affairs of the two related-party entities, Apartment Management Corporation and Norman Company, that provide services to CCA. Tr. 310-14; DX8.

Under the terms of the regulatory agreement, CCA was eligible to request rent increases from HUD at any time. Tr. 1094-97 (Kizzier); PX2. In applying for rent increases, CCA decided the amount of any increase they sought. Tr. 339 (Norman). CCA's rents were established through a budget-based process. Tr. 330 (Norman). The project's operating budget included the allowable annual surplus cash distribution to the owners. Id.; Tr. 1094 (Kizzier). As the project's costs increased, HUD allowed project rents to keep pace. Tr. 340-41 (Norman); 1095 (Kizzier). Requests for rent increases were typically based upon the project's audited financial statements from the previous year. Tr. 340 (Norman). However, if the project could demonstrate that its expenses were expected to rise substantially in the next year – such as expenses associated with utilities or insurance costs – it could receive a larger rent increase than would have been justified simply based upon the audited financials. Tr. 340-41 (Norman). By allowing owners to seek rent increases based upon the budgeted costs of operation, HUD ensured that the owner would be able to cover increased costs and pay the allowed annual dividend. Tr. 1095-96 (Kizzier).

Between 1971 and 1985, CCA regularly applied to HUD for rent increases. PDX33. However, when Mr. Norman took over as the managing partner in 1985, CCA stopped seeking regular increases from HUD. Tr. 332 (Norman). CCA sought (and received) only one rent increase between 1985 and 1994, despite the fact that its annual operating expenses in every year between 1985 and 1994 were higher than they were in 1983, Tr. 342 (Norman), 996 (Ragas), and its expenses had gone up during that time by more than 37 percent. Tr. 996 (Ragas); PDX33.

According to Anne Kizzier, the Director of Multifamily Housing in HUD's New Orleans office, HUD "automatically" granted budget-based rent increases of 5 percent, provided that the owner brought in the appropriate documentation, such as the previous year's financial statement. Tr. 1095 (Kizzier). However, by 1991, CCA's rents were substantially lower than the rents that HUD would have allowed it to charge.

In addition to failing to diligently seek rent increases, CCA also failed to timely provide its annual financial statements to HUD. The regulatory agreement required CCA to submit its audited annual financial statements to HUD within 60 days of the end of the project's fiscal year. PX2. Because CCA's fiscal year ended on December 31st, its audited annual financial statements were due to HUD by the beginning of March of each year. Tr. 353-54 (Norman). However, from 1984 onward, CCA was routinely late in submitting its audited annual financial statements. Tr. 360 (Norman). In fact, there was not a single year between 1985 and 1998 when CCA put in its annual financial statement within 60 days, as required by the regulatory agreement. Id. In some years, there were significant time lapses between the time when CCA received the financial statements from its auditor and when CCA certified that statement and provided it to HUD. See Tr. 363-64 (4 months); 367. In at least one case, CCA did not provide its audited financial statement to HUD until more than 1 year after the end of its fiscal year. Tr. 365-66 (Norman).

### D. CCA's Eventual Prepayment Of Its HUD-Insured Mortgage And Conversion To Market Rate Operation

In June 1995, nearly one year before passage of the HOPE Act, CCA's managing partner, Ernest B. Norman, III, was informed that LIHPRHA was out of money and that Congress would likely reinstate the owners' ability to prepay without HUD approval. Tr. 446-47; PX60. He

learned that HOPE had been enacted on the very day of its passage. PX60. He also was aware of several consultants who could assist owners with prepayment. Tr. 456 (Norman). In October 1996, CCA received a letter from Eustis Mortgage offering a loan in the amount of $1,275,000 and stating that the loan could be closed before the end of the year. PX73. This loan would have been sufficient to pay off the remaining balance of CCA's mortgage. Tr. 457. In April 1998, CCA received a loan commitment from Whitney National Bank to prepay the mortgage and refinance CCA, but CCA chose not to act. PX80-A; Tr. 458. It was not until September 1998, more than two years after the passage of HOPE, that CCA prepaid its mortgage.

**E. Economic Effect Of Remaining In The HUD Subsidy Program**

The market value of Chateau Cleary Apartments without HUD restrictions on May 18, 1991 was $1,850,000. Tr. 1341-45 (Derbes); DX172; DX173. The property's value, if required to continue operations as a HUD-subsidized project through May 27, 1996, was $1,515,000. Tr. 1422-23 (Derbes); DX174. Thus, the economic impact to CCA of choosing to remain in the Federal housing program from May 1, 1991, through May 27, 1996, was only 18.1 percent. Tr. 1619-28 (Dickey).

## DEFENDANT'S CONTENTIONS OF LAW

### I. The As-Applied, Regulatory Taking Claim Asserted By CCA Is Not Ripe Because CCA Failed To Exhaust The Administrative Preservation Process

A property owner asserting a regulatory taking claim must establish that the regulation "has in substance 'taken' their property by going 'too far.'" Greenbrier v. United States, 193 F.3d 1348, 1357 (Fed. Cir. 1999). However, "a court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 350 (1986). Thus, an "as-applied" taking claim does not ripen "until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001). Additionally, where a regulatory restriction might be avoided by alternate avenues, an "as applied" taking claim does not ripen until each avenue has been exhausted. See Stearns Co. v. United States, 396 F.3d 1354, 1358 (Fed. Cir. 2005).

CCA's claim that the Preservation Statutes effected a temporary taking does not alter these requirements. A temporary taking can occur in one of two ways: (1) by reason of extraordinary administrative delay in the Governmental decision making process; or (2) when what would otherwise be a permanent taking is temporally cut short. Seiber v. United States, 364 F.3d 1356, 1364 (Fed. Cir. 2004). CCA does not – and cannot – allege extraordinary administrative delay. CCA asserts instead that the Preservation Statutes effected a permanent, as-applied taking that was cut short by the HOPE Act. See Compl. ¶¶ 18, 37; see also Seiber, 364 F.3d at 1364 (a temporary taking can occur when the Government denies a permit and at some later point reconsiders the earlier denial or revokes the permitting requirement). The

"essential element" of this type of temporary taking "is a finite start and end to the taking." Seiber, 364 F.3d at 1364; Wyatt v. United States, 271 F.3d 1090, 1097 n.6. (Fed. Cir. 2001). Consequently, where, as here, a statutory permitting requirement is revoked, "the initial denial of a permit is still a necessary trigger for the temporary taking." Seiber, 364 F.3d at 1364; see also Boise Cascade Corp. v. United States, 296 F.3d 1339, 1347-48 (Fed. Cir. 2002) ("a taking occurs [only] after a permit has been denied") (applying United States v. Riverside Bayview Homes, Inc., 474 U.S. 121 (1985)).

The Preservation Statutes established a complex administrative process by which a project owner could prepay, sell or receive monetary incentives. See Chancellor Manor v. United States, 331 F.3d 891, 905 (Fed. Cir. 2003). The process had two basic stages. First, HUD determined if the project's preservation as low income housing was necessary. See Tr. 1100-01 (Kizzier); ELIHPA § 225(a); 12 U.S.C. § 4108. If HUD concluded that preservation was not required, the owner was allowed to prepay and exit the program. Second, if a project was to be preserved, the owner chose between (1) exiting the program by selling at the project's fair market value without HUD-restrictions, and (2) remaining in the program in exchange for valuable monetary incentives. ELIHPA §§ 225(b), 230; 12 U.S.C. §§ 4109-10, 4114. If the owner's chosen option did not promptly come to fruition, the owner was allowed to prepay. 12 U.S.C. § 4114.

CCA failed to pursue, much less exhaust, the preservation process. Tr. 1085 (Kizzier). CCA never applied to HUD for permission to prepay. Id. Nor did CCA submit a plan of action to sell or obtain incentives under the Preservation Statutes. Id. In short, CCA did nothing. As a result, HUD never made "a final decision regarding the application of the regulations to the

property at issue." Palazzolo, 533 U.S. at 618. Having failed to exhaust the preservation process, it cannot be said that the Preservation Statutes actually precluded prepayment by CCA. See ELIHPA § 225(a); 12 U.S.C. §§ 4101, 4108, 4114. Equally uncertain is the economic effect of the challenged regulations. Accordingly, the as-applied taking claim in this action is not ripe. See, e.g., Palazzolo, 533 U.S. at 618; Greenbrier, 193 F.3d at 1357.

### A. CCA's Claim Is Not Ripe Because It Failed To Apply To Prepay Under The Preservation Statutes

Under both ELIHPA and LIHPRHA, owners could apply to HUD to prepay.[2] See ELIHPA § 225(a); 12 U.S.C. § 4108. This first step in the preservation process enabled HUD, using the agency's expertise in low- and moderate-income housing, to determine if preserving a particular project was necessary. See Tr.1085 (Kizzier). CCA did not request HUD's permission to prepay under either ELIHPA or LIHPRHA. Id. Consequently, HUD never reached a final decision regarding the need to preserve Chateau Cleary. For this reason, CCA's as-applied taking claim is not ripe. E.g., Palazzolo, 533 U.S. at 618.

CCA concedes that it never sought HUD's permission to prepay. Tr. 383-84 (Norman). However, CCA asserts that its failure to apply to prepay should be excused by the doctrine of futility. See Pl.'s Pretrial Br. at 4, 22. CCA is mistaken. The doctrine of futility cannot be invoked until a claimant has made at least one application. Furthermore, under the respective statutory standards, it is far from certain that HUD would have denied a well-conceived plan of action to prepay the Chateau Cleary mortgage.

---

[2] The statutory standards, while similar, were different in important particulars. Compare ELIHPA § 225(a) with 12 U.S.C. § 4108.

### 1. The Doctrine Of Futility Is Inapplicable

A property owner must make at least one application to use their property before invoking the futility exception. Howard W. Heck & Assoc. v. United States, 134 F.3d 1468, 1472 (Fed. Cir. 1998). The futility exception serves only to "'protect property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved.'" Id. (emphasis in original) (quoting Southern Pac. Transp. Co. v. City of Los Angeles, 922 F.2d 498, 504 (9th Cir. 1990)); see also Morris v. United States, 392 F.3d 1372, 1376 (Fed. Cir. 2004). Thus, before invoking "futility," a property owner must give the Government the opportunity, using its own reasonable procedures, to decide and explain the reach of the challenged regulation. Indeed, this rule is uniformly established in takings jurisprudence. See DLX, Inc. v. Kentucky, 381 F.3d 511, 518 (6th Cir. 2004) ("the [futility] exception only applies where a landowner has 'submitted at least one meaningful application for a variance'"); Kawaoka v. City of Arroyo Grande, 17 F.3d 1227, 1232 (9th Cir. 1994) (the "futility exception does not alter a party's obligation to file at least one meaningful development proposal"); Seguin v. City of Sterling Heights, 968 F.2d 584 (6th Cir. 1992) ("at least one meaningful application must be submitted as a prerequisite to a plaintiff's attempt to benefit from the futility exception"); Gilbert v. City of Cambridge, 932 F.2d 51, 61 (1st Cir. 1991) ("the filing of one meaningful application will ordinarily be a necessary, although not alone sufficient, precondition for invoking the futility exception"); Herrington v. Sonoma County, 857 F.2d 567, 569 (9th Cir. 1988), cert. denied, 489 U.S. 1090 (1989) ("A property owner cannot rely on the futility exception until he or she makes at least one meaningful

application."); Kinzli v. City of Santa Cruz, 818 F.2d 1449, 1455 (9th Cir. 1987) ("at least one 'meaningful application' must be made" before futility may be raised).

Here, in order to claim futility, CCA had to apply to HUD for permission to prepay at least once. If CCA's plan of action was denied, then and only then would CCA be permitted to argue that further applications would be futile. As the Supreme Court explained in United States v. Riverside Bayview Homes, 474 U.S. 121 (1985), requiring an owner to seek approval for a given use of its property "does not itself 'take' the property in any sense." The Court explained that:

> even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

Id. at 127; see also Greenbrier, 193 F.3d at 1357 (approving this analysis for takings claims against the Preservation Statutes).

CCA declined to submit a plan of action seeking HUD's permission to prepay pursuant to the Preservation Statutes. Tr. 383 (Norman). Because CCA failed to apply to prepay even once, HUD never denied any request by CCA to prepay its mortgages and, consequently, CCA's claim that the Government took its property by restricting prepayment cannot fall within the futility exception and is not ripe for judicial review. Greenbrier, 193 F.3d at 1359; Heck, 134 F.3d at 1472; see also Chancellor Manor, 331 F.3d at 905 (LIHPRHA "did not simply prevent prepayment," but rather "created a complex statute, which vested discretion in HUD").

### 2. Applying To Prepay Would Not Have Been Futile

#### a. The Preservation Statutes Gave HUD Discretion To Determine When Prepayment Would Be Allowed

Under the Preservation Statutes, HUD is authorized to approve a plan of action terminating affordability restrictions through prepayment upon finding:

> (1) implementation of the plan of action will not–
>
> > (A) materially increase economic hardship for current tenants, and will not in any event result in . . . an increase in the monthly rental payment in any year that exceeds 10 percent . . . ; or
> >
> > (B) involuntarily displace current tenants where comparable and affordable housing is not readily available . . .
>
> (2) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect–
>
> > (A) the availability of decent, safe, and sanitary affordable housing to low-income and very low income families or persons in the area that the housing could reasonably be expected to serve. . . .

12 U.S.C. § 4108.[3] The Preservation Statutes, thus, gave HUD discretion to determine whether prepayment would be allowed. HUD was to decide what constituted "comparable and affordable housing," a "material increase in economic hardship," a "material affect" upon "the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families," and "the area that the housing could reasonably be expected to serve." See id. Even the proviso stating that implementation of the plan of action should not result in "an increase in the monthly

[3] ELIHPA did not contain the ten percent provision and, thus, gave HUD even greater discretion to allow prepayment. Emergency Low Income Housing Preservation Act of 1987, Pub.L. 100-242, Title II § 224(a), 101 Stat. 1877 (Feb. 5, 1988).

rent payment . . . that exceeds 10 percent" permitted HUD to exercise discretion in assessing what change in rents would be expected from the proposed plan of action. See id. At trial, CCA offered no evidence establishing how HUD would have exercised its discretion had CCA participated in the preservation process and submitted a well-designed plan of action to prepay. Indeed, at this juncture, any attempt to divine how HUD would have responded to such a plan would be pure speculation.

**b. Prepayment Under The Preservation Statutes Was "Possible"**

Under the Preservation Statutes, HUD-approved plans of action allowed some project owners to prepay and exit the section 221(d)(3) and 236 programs. Tr. 1692 (Dickey); DDX221. Moreover, CCA inquired about obtaining the possibility of prepaying some years prior to prepayment eligibility. CCA was informed that, with work, obtaining HUD consent was "possible." Tr. 398-99 (Norman); PX23. Thus, far from being futile, CCA was told that it might be possible to obtain HUD's permission to prepay. Id.

Because the evidence fails to establish that HUD was required to reject all possible plans of action to prepay the Chateau Cleary mortgage, CCA has not established that the preservation process was futile.

**(1) A Well-Conceived Plan Of Action Would Not Have Resulted In A Material Hardship To Current Tenants**

**(a) In 1991, The Rents Charged By CCA Were Close To Market**

During the late 1980's, the New Orleans economy was adversely affected by a crash in oil prices. Tr. 155 (Norman), 822 (Ragas), 1348-49 (Derbes). As a result, rents for multi-family apartments declined and approached the HUD-approved rents being charged by CCA. Tr. 155-

56 (Norman); 1349-50 (Derbes). Not until the early 1990's did the real estate market begin to recover. Tr. 964 (Ragas). Given this backdrop, HUD could have concluded that prepayment by CCA would not constitute a "material hardship" to current tenants. 12 U.S.C. § 4108. Furthermore, a well-conceived plan of action to prepay need not have resulted in "an increase in the monthly rental payment . . . that exceeds 10 percent." Id.

Under the Preservation Statutes, a plan of action to prepay would not be permitted if HUD concluded that the proposed plan of action would increase rents by more than 10 percent. 12 U.S.C. § 4108. An owner seeking to prepay would, therefore, take two steps. First, before submitting a plan of action, the owner would apply for a rent increase to maximize its HUD rents. See PX2 (allowing a request to increase rents "at any time"). Second, in its plan of action, the owner would propose no improvements or upgrades that would increase the project's rents after prepayment. In this way, the owner would minimize the rent differential and maximize the likelihood that its plan of action would be approved by HUD.

In 1991, the HUD rents being charged by CCA were within 10 percent of the market rent that the project would have commanded (assuming no upgrades) after prepayment. During the 1990's, market rents for properties in West Metairie were increasing more rapidly than were HUD-restricted rents. Tr. 969 (Ragas). And in 1998, when CCA raised the project's rents to market levels after prepaying, see tr. 369-70 ; 454-55 (Norman), CCA's rents increased only 10 percent, PX111. Given that the difference between market rents and HUD-rents were increasing during the 1990's, and given that difference between CCA's HUD rents and market rents in 1998 was only 10 percent, the differential in 1991 was necessarily less than 10 percent. Under the Preservation Statutes, therefore, HUD could have authorized prepayment by CCA.

**(b) <u>The Rents Actually Charged By CCA In 1991 Are Not The Correct Starting Point For Analysis Of A Plan Of Action To Prepay</u>**

The rents CCA actually charged in 1991 are not the correct baseline against which to measure any rent increase. Under the terms of the regulatory agreement, CCA was eligible to request rent increases from HUD at any time. Tr. 1094-97 (Kizzier); PX2. CCA's rents were established through a budget-based process. Tr. 330 (Norman). As the project's costs increased, HUD allowed project rents to keep pace. Tr. 340-41 (Norman); 1094 (Kizzier). In this way, HUD ensured that the owner would be able to cover increased costs and pay the allowed annual dividend. Tr. 1094-95 (Kizzier).

Between 1971 and 1985, CCA regularly applied to HUD for rent increases. PDX33. However, when Mr. Norman took over as the managing partner in 1985, CCA stopped seeking regular increases from HUD. Tr. 332 (Norman). As a result, by 1991, CCA's rents were substantially lower than the rents that HUD would have allowed it to charge. Tr. 1095 (Kizzier).

CCA's rents in 1991 were based upon a rent increase approved by HUD in 1984, which in turn was based upon CCA's 1983 audited financial statement. Tr. 332 (Norman). According to CCA's audited financial statements, between 1984 and 1991 CCA's operating costs rose 26 percent. PX26 ($208,865 in FY1983); PX46 ($262,379 in FY1990); <u>see also</u> PDX33. Consequently, under the budget-based process, had a request to HUD been made in 1991, CCA could have obtained a 26 percent increase in rents from HUD. Tr. 342 (Norman).

As explained above, an owner, prior to submitting a plan of action to prepay, would have sought to maximize its HUD rents. Given the statutory criteria, this would maximize the likelihood of approval. <u>See</u> 12 U.S.C. § 4108. The starting point for an analysis of rent increases

resulting from a plan of action to prepay would, therefore, be the maximum rents allowable by HUD. In the case of CCA, its allowable HUD rents were at least 26 percent higher than the rents it actually was charging tenants in 1991. PX26; PX46.

If CCA's HUD rents had been increased by 26 percent, its rents in 1991 would have been as follows: 1BR $333; 2BR $382; 2TH $391; and 3BR $422. See PX111. These rents are within 10 percent of the putative "market rents" used by CCA's expert for 1991.[4] See PX99 at 36 (1BR $368 – 9.5% higher; 2BR $404 – 5.4% higher; 2TH $403 – 3.0% higher; 2BR $433 – 2.5% higher); Tr. 831-32 (Ragas) (testifying that he adopted the average rent for the West Metairie submarket as the market rent for CCA). Thus, if in the exercise of its professional judgment, HUD had concluded that the average rent in West Metairie would be the monthly rent at CCA following prepayment, HUD could have approved a plan of action to prepay.

**(2) A Plan Of Action To Prepay Need Not Involuntarily Displace Current Tenants**

Under the Preservation Statutes, HUD also was to consider whether the owner's plan of action would "involuntarily displace tenants where comparable and affordable housing was not available." This provision would not have affected prepayment by CCA.

CCA was a moderate-income project. E.g., Tr. 426 (Norman). It tenants held jobs and were paying their rent without Government subsidies. Tr. 426-28; 402-03 (Norman) (CCA did not enter into a Section 8 contract). As a result, a well-designed plan of action would not require the involuntary displacement of current tenants. Indeed, when CCA did prepay in 1998, CCA

[4] The rents used by Dr. Ragas disregard CCA's actual performance as a market rate project and, consequently, overstate the rents that CCA could have earned after prepaying. See section III.B.2.b., infra.

sought to ensure that current tenants would remain after prepayment. Tr. 403 (Norman); 1776-77, 1783-84 (Root).

Simply put, CCA could have submitted a plan of action that did not involuntarily displace its current tenants and such a plan of action could have been approved by HUD.

**(3) The Preservation Statutes' Provisions Concerning Low-Income And Very Low-Income Tenants Are Irrelevant**

The Preservation Statutes also contain provisions concerning "low-income and very low-income families."[5] 12 U.S.C. § 4108(2) (requiring a finding that the plan of action would not "materially affect . . . the availability of decent, safe, and sanitary affordable housing to low-income and very low income families or persons in the area"). Chateau Cleary was a moderate-income housing project that did not participate in the Section 8 program. Tr. 402-03; 426 (Norman); 1096 (Kizzier). Few, if any, low-income and very low-income tenants could afford to live there. Tr. 1092 (Kizzier). For this reason, prepayment by CCA would not have materially affect housing opportunities for low- and very low-income families. See 12 U.S.C. § 4108(2). Accordingly, HUD could have approved a plan of action to prepay consistent with provisions concerning low- and very low-income families in the Preservation Statutes.

**c. The Evidence Proffered By CCA Is Insufficient To Establish Futility**

It is possible, albeit not certain, that a well-conceived plan of action seeking prepayment would have been approved by HUD. HUD had significant discretion with respect to plans of action to prepay. At trial, CCA attempted to show futility through witnesses who opined that it

[5] "Low-income" and "very low-income" are defined terms that refer families with incomes of less than 80 percent and 50 percent of median income, respectively. See 12 U.S.C. § 4119(4); 42 U.S.C. § 1437a(b)(2).

would be have been "difficult" to obtain HUD approval to prepay. See Tr. 1106-07 (Kizzier). Testimony about the difficulty of obtaining approval to prepay is legally insufficient. As the Federal Circuit has explained, the mere fact "[t]hat HUD may have set a high hurdle by imposing stringent requirements for granting . . . permission does not excuse the Owners' failure to seek such permission." Greenbrier, 193 F.3d at 1359; see also Heck, 134 F.3d at 1472 (finding a claim had not ripened where the plaintiff had received "negative agency comments" and alleged that its application "surely would be denied"). It is simply not enough for CCA to assert that obtaining HUD permission to prepay was unlikely or difficult. Any possibility that HUD might have permitted CCA to prepay precludes a finding of futility. See id.

### B. Even If It Were Futile To Apply To Prepay, CCA's Claim Would Still Not Be Ripe

The Preservation Statutes provided project owners various options. As a result, even if HUD denied an application under section 4108 (or ELIHPA § 225(a)), mechanisms existed through which the owner could prepay and exit the program, 12 U.S.C. §§ 4101, 4114, realize the market value of the project and exit the program, 12 U.S.C. § 4110; ELIHPA § 230, or receive incentives that significantly increased annual returns, 12 U.S.C. §§ 4109; ELIHPA § 225(b). See Tr. 1631-37 (Dickey).

CCA would have the Court disregard this part of the preservation process. Yet, CCA does not allege that pursuing sale to a non-profit was "futile." Numerous owners across the country, and in the New Orleans area, consummated sales. Tr. 1081-82 (Kizzier); DDX221; PX57; PX59; PX93a. Indeed, CCA itself was approached by an interested purchaser six months before its prepayment eligibility date. Tr. 371-76 (Norman); PX38, PX41, DX124. CCA

never pursued the sale option – an administrative avenue that provided CCA the ability to exit the HUD program. Tr. 1632 (Dickey).

As a result of CCA's failure to exhaust the administrative process, HUD never reached a final decision with respect to the sale option or prepayment under section 4114. For this reason, the application of the Preservation Statutes to the Chateau Cleary project remains uncertain. Consequently, even if applying for prepayment under section 4108 (or ELIHPA § 225(a)) was futile, CCA's as-applied taking claim still is not ripe. See Stearns, 396 F.3d at 1358 (requiring exhaustion of all avenues that might avoid the regulation imposition). Put differently, CCA can identify no action by HUD to serve as the basis for this as-applied taking claim.

## II. The Preservation Statutes Did Not Effect A Regulatory Taking Under *Penn Central*

A "regulatory taking" only occurs when Government action, although not encroaching upon or occupying private property, "goes too far." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). Claimants must bear the costs of regulations that restrict some of the uses of their property, because "within limits, that is a burden borne to secure the advantage of living and doing business in a civilized community." Andrus v. Allard, 444 U.S. 51, 67 (1979) (internal quotes omitted).

To establish a regulatory taking, a plaintiff must provide evidence regarding: (1) the regulations' economic impact upon the claimant; (2) the extent to which the regulation has interfered with the plaintiff's reasonable, distinct investment-backed expectations; and (3) the character of the Government action. Penn Central v. , 438 U.S. at 124. The court must then balance these factors in an ad hoc analysis. City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 720 (1999); Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1005

(1992); see also Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 322 (2002) (Penn Central requires a "careful examination and weighing of all the relevant circumstances"). The aim of Penn Central is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 539 (2005). Consequently, although all three factors are to be balanced, "courts have traditionally rejected taking claims in the absence of severe economic deprivation." Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1195 (Fed. Cir. 2004).

### A. The Preservation Statutes Had Little Or No Economic Impact On CCA

The first prong of Penn Central addresses the severity of the economic impact of the challenged regulation. The consideration of economic impact is "intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." Loveladies, 28 F.3d at 1176. "What has evolved in the case law is a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation." Cienega Gardens, 331 F.3d at 1340 (citing Loveladies, 28 F.3d at 1177); see also Rose Acre, 373 F.3d at 1195 ("courts have traditionally rejected takings claims in the absence of severe economic deprivation"); Lucas, 505 U.S. at 1019 n.8 ("in at least some cases the landowner with 95% loss will get nothing").

### 1. The Sale Option Eliminates Any Potential Economic Impact

CCA alleges that the Preservation Statutes took its opportunity to prepay. Pl.'s Pretrial Br. at 28-29. The owner's opportunity to prepay, standing alone, has no intrinsic value. See Chancellor Manor, 331 F.3d 891, 903 (Fed. Cir. 2003). Prepayment is simply "a trigger for exiting the federal housing program;" that is, a means to the end of realizing and benefitting from equity in the property. Chancellor Manor, 331 F.3d at 905. The Preservation Statutes provided owners with several ways of achieving this end: (1) prepaying and converting the property to market-rate operation; (2) selling the property at a price based upon its appraised conventional market value; or (3) accepting an equity take-out loan and earning higher annual dividends based upon the project's appraised market-rate value. 12 U.S.C. §§ 4109, 4110, 4114. Thus, the Preservation Statutes did not prevent the owner from benefitting from the property's residual value. See Penn Central, 438 U.S. at 136 (no taking occurs where the regulation does not interfere with the ability to obtain a "reasonable return" on the owner's investment).

By pursuing the sale option, for instance, an owner could fully realize the project's residual value by selling to a qualified purchaser. 12 U.S.C. § 4110. While the sale did not occur on the open market, the sale price was the project's market value at its highest and best use. 12 U.S.C. § 4103(b); Tr. 1633 (Dickey); 634-36 (Alexander). Additionally, HUD funded transaction costs and otherwise facilitated the sale. 12 U.S.C. § 4110(d); Tr. 1633 (Dickey). Thus, economically, a sale under the Preservation Statutes was likely superior to an open market sale. Through the sale option, CCA was able to fully realize the residual value of the Chateau Cleary project and then invest that money in another multi-family housing project or in any other

way it wished. The Preservation Statutes, therefore, had no economic impact on CCA. See Tr. 1870-72, 1875-76 (Stillman).

Although the Preservation Statutes included other options, it is sufficient to focus upon the economic impact of a HUD-facilitated sale. The availability of other options could only decrease – not increase – economic impact on CCA. Tr. 1637 (Dickey), 1881-82 (Stillman). Nor can CCA's option to sell under the Preservation Statues be dismissed as a mere hypothetical. CCA's managing partner was aware of and considered the sale option, Tr. 371-76 (Norman), CCA was approached by interested buyers, id., and HUD provided funding to facilitate numerous other sales across the nation and in the New Orleans area, PX42; PX53; PX93a; DX124; DX125. In fact, Mr. Norman conceded that CCA could have sold the project through the preservation process. Tr. 439-40 (Norman). Furthermore, if for some reason a sale pursuant to the Preservation Statutes could not be consummated, CCA would have been entitled to prepay. 12 U.S.C. §§ 4110(b), 4114(a) (allowing prepayment if the owner did not receive a bona fide offer).[6]

CCA did not pursue the sale option through the plan of action process. Tr. 383-84 (Norman). However, the fact that CCA chose not to pursue a sale merely demonstrates that any economic impact felt by CCA resulted from its own decision to maintain the status quo – not

---

[6] The Preservation Statutes established an administrative process that had to be completed before prepayment under section 4114 would be allowed. See 12 U.S.C. §§ 4110(a) & (b), 4114(a) (allowing prepayment after 15 months after the owners submitted a second notice of intent). Because delays inherent in a complex regulatory scheme have "long been considered permissible exercises of the police power," the time required to complete the administrative process is not compensable under the Fifth Amendment. Tahoe-Sierra, 535 U.S. at 335; Bass Enterprises Production Co. v. United States, 381 F.3d 1360, 1366 (Fed. Cir. 2004). Moreover, having failed to pursue the administrative process, CCA lacks standing to complain about any delay that it might (or might not) have experienced in exiting the program.

from the challenged regulations. See Bass Enterprises Production Co. v. United States, 381 F.3d 1360, 1366-67 (Fed. Cir. 2004).

### 2. Even Under Assumptions Favorable To CCA, The Preservation Statutes Did Not Result In A "Severe Economic Deprivation"

CCA suggests that it would have prepaid at the first possible moment had the project not been subject to ELIHPA, and subsequently, LIHPRHA. CCA's management practices belie this suggestion.

Ernest B. Norman, III became the managing partner of CCA in 1985. Tr. 350. After 1985, CCA never acted with dispatch. Not once over the next 13 years did CCA submit annual financial statements on time, as required by the regulatory agreement. See PX2 (requiring audited financial statements within 60 days of the fiscal year); Tr. 360 (Norman). CCA's annual statements frequently were delinquent for six months or more. PX56 (7 months overdue); PX76 (9 months overdue). CCA likewise failed to request regular rent increases. Tr. 332 (Norman); see also PX2 (allowing request for rent increases "at any time"). Remarkably, only once during the 13-year period between 1985 and 1998 did CCA seek a rent increase from HUD. Tr. 342 (Norman). Indeed, even when the partnership generated insufficient revenues to pay its annual dividend, Mr. Norman was not stirred to action. See PDX33.

Nor was CCA's neglect confined to administrative tasks. Despite Mr. Norman's familiarity with the options available under the Preservation Statutes, Tr. 371-76 (Norman); PX41, and his knowledge that consultants were eager to assist owners with the administrative process, Tr. 384-85 (Norman); PX53, CCA did nothing. Tr. 383-84 (Norman). CCA's inaction is all the more noteworthy because Mr. Norman had been informed years earlier that HUD might

allow CCA to exit the 221(d)(3) program and Mr. Norman's own attorney suggested in May 1992 that CCA explore the possibility of prepaying. PX23; PX53.

Most telling, however, is CCA's inaction when the unrestricted ability to prepay was restored by the HOPE Act in March 1996. Mr. Norman knew as early as June 1995 that legislation repealing restrictions on prepayment was working its way through Congress, PX60, learned that the HOPE Act had become law on the very day of its enactment, Tr. 446-47 (Norman), and had known for years that numerous, well-informed consultants were available to assist property owners with prepayment, Tr. 456 (Norman); see also Tr. 1794-95 (Root) (some owners prepaid immediately after passage of HOPE); Tr. 1692 (Dickey); DDX221. Once again, however, Mr. Norman did nothing. Indeed, it was not until a consultant, Norman Root, initiated contact with Mr. Norman in April 1998 – over two years after restrictions on prepayment were lifted – that Mr. Norman finally acted. Tr. 1776 (Root), 458 (Norman).

Actions speak louder than words. After 1985, CCA failed to act even when action was in its best interest financially. CCA did not seek rent increases from HUD. It failed to take advantage of beneficial options available under the Preservation Statutes. And it did not prepay promptly upon passage of the HOPE Act. This evidence contradicts CCA's claim that, but for the Preservation Statutes, the partnership would have prepaid immediately in May 1991.

However, even if we accept for the sake of argument the period used by CCA,[7] and even if the financial benefits available under the Preservation Statutes are disregarded, CCA has not established a "severe economic deprivation." Rose Acre, 373 F.3d at 1195 (court have typically

[7] The calculation of just compensation performed for CCA by Wade Ragas uses a period from prepayment eligibility to 60 days after enactment of the HOPE Act. PX106.

rejected taking claims in the absence of such a deprivation). Using the taking period initially alleged by CCA, and disregarding available financial incentives, the economic impact of the Preservation Statutes is not greater than 18 percent. Tr. 1619-28 (Dickey); DX160 (calculating diminution in value).

### 3. CCA's Various Calculations Of Economic Impact Are Flawed And Should Be Disregarded

The widely accepted method for determining the economic impact of a regulatory restriction is the diminution in value approach. E.g., Maritrans, Inc. v. United States, 342 F.3d 1344, 1358 (Fed. Cir. 2004) ("When considering Penn Central's economic impact factor, a court must 'compare the value that has been taken from the property with the value that remains in the property.'") (quoting Keystone Bituminous Coal Ass'n v. DeBenedictus, 480 U.S. 470, 497 (1987)) (emphasis added); see also Sieber v. United States, 364 F.3d 1356, 1371-72 (Fed. Cir. 2004) (dismissing plaintiff's claim "because [plaintiff] 'failed to introduce convincing evidence to show the amount, if any, by which the value of the relevant property . . . was reduced' by the alleged temporary taking"). At trial, CCA presented no estimate of what, if any, change in Chateau Cleary's value was attributable to the Preservation Statutes. Instead, ignoring the standard diminution in value approach, CCA offered an assortment of other possible measures of economic impact. Tr. 809-15 (Ragas); PDX16. CCA's principal witness, Wade Ragas, declined to endorse any particular approach for measuring economic impact in this matter. Tr. 811 (Ragas).

CCA's variants focus primarily upon calculations presenting an alleged diminution in return on equity. Tr. 811-15; PDX16. A diminution-in-return-on-equity approach is flawed for

several reasons. First, the diminution in return on equity approach merely provides a snapshot at a given point in time. It is for this reason that CCA's actual diminution in return on equity, as calculated by Dr. Ragas, varied from 21 percent to 100 percent between 1991 and 1996. Tr. 977-79 (Ragas). Second, the snapshot provided by the diminution-of-return-on-equity approach does not – and cannot – take into account the duration of the alleged temporary taking. Tr. 1644-59 (Dickey). This is contrary to the testimony of CCA's economics expert, who acknowledged that "the longer the duration of the restriction, the greater economic impact." Tr. 1879-80 (Stillman). Third, CCA's return on equity approach focuses solely upon the annual cash distributions paid by partnership and, thus, fails to take into account significant economic benefits that CCA obtained while operating as a HUD-subsidized project. Tr. 1659-66 (Dickey). CCA's misplaced focus on cash distributions results in a 100 percent "actual" diminution from 1993 to 1996. Tr. 979 (Ragas); PX125 (table 35). Yet principal payments on the outstanding mortgage and rising market values (among other things) inured to CCA's benefit during this period. See Tr.1661-65 (Dickey); DDX215; PX125 (table 35) (showing $209,000 increase in "invested equity"). Indeed, even CCA agrees that the project was not rendered worthless by the Preservation Statutes, as a 100 percent diminution would suggest. Tr. 944-45 (Ragas). By focusing solely upon annual cash distributions, and disregarding all other benefits that accrued to the partnership, the return on equity approach significantly overstates economic impact. City Line Joint Venture v. United States, 71 Fed. Cl. 486, 499 (2006) (plaintiff's return on equity approach "erroneously omits other returns on investment that plaintiff received"); Tr. 1661-65 (Dickey).

In addition, CCA's approach to economic impact is misleading. The diminution-in-value approach – long accepted as the standard for measuring economic impact – is commonly

expressed as a percentage of the property's unrestricted value. This serves two principal functions. First, it allows a case-to-case comparison of the economic impact necessary to support a regulatory taking. In this way, similarly situated claimants obtain similar results. Second, it helps courts to identify "regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property." Lingle, 544 U.S. at 539. CCA has used a completely different metric, but also expresses economic impact as a percentage. This is misleading because the economic impact of a 50 percent diminution in return on equity is not comparable to a 50 percent diminution in value. Tr. 1650 (Dickey). Indeed, here, while CCA claims an economic impact approximately 80 percent using return on equity calculations, see PDX16, the property's diminution in value is only 18 percent, Tr. 1628 (Dickey); DX160. We are aware of no case that has found a taking based upon a comparably low diminution in value.[8]

Because the return-on-equity approach fails to account for the duration of the taking, fails to consider all economic benefits that the owners received from the project's HUD-subsidized operations, and yields misleading results, it should be disregarded by the Court.

### B. The Preservation Statutes Did Not Frustrate Investment-Backed Expectations

The Penn Central analysis requires courts to consider whether the challenged Government conduct affected a plaintiff's "primary expectation concerning the use" of the affected property. Penn Central, 438 U.S. at 136. The expectation, moreover, "must be more than a 'unilateral

[8] Additionally, in those very few cases that have considered a return on equity metric, no court has found a taking where the diminution in return on equity did not exceed 95 percent. See Cienega Gardens v. United States, 331 F.3d 1319, 1343 (Fed. Cir. 2003) (96 percent); Cienega Gardens, 67 Fed. Cl. 434, 477 (2005) (96-97 percent); see also City Line, 71 Fed. Cl. at 495 (finding no taking for a 99 percent diminution in return on equity).

expectation or an abstract need;'" it must be reasonable. Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980)). Thus, a court must examine the expectations of a hypothetical, reasonable investor in the claimant's property. Chancellor Manor, 331 F.3d at 904 (citing Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1348 (Fed. Cir. 2001)). Additionally, in Cienega Gardens, the court noted that the plaintiffs could not recover if they did not have actual (i.e., subjective) expectations that were frustrated by the regulation. 331 F.3d at 1346. The caselaw, therefore, establishes a two part test: first, to determine if a reasonable, objective investor would have considered the alleged expectation a primary reason to invest in the project; and second, to ensure that plaintiffs actually (subjectively) had such an expectation.

**1. The Preservation Statutes Did Not Interfere With The Primary Expectations Of A Reasonable Developer**

**a. Expectations Of Reasonable Developers**

The primary motivation for developers participating in the HUD section 221(d)(3) program was the immediate subsidies and incentives available from the Government. Tr. 1191-93 (Malek). Participation in the section 221(d)(3) program enabled the developer to obtain a below-market, Government-insured loan, which provided financing for 90 percent of the project's replacement cost. Tr. 1161 (Malek). This low-risk, high-leverage financing was far superior to what could be obtained from banks for a conventional project. Tr. 1161, 1164 (Malek). In addition, HUD provided developers a credit called the Builder's and Sponsor's Profit and Risk Allowance ("BSPRA"). Tr. 1165 (Malek). The BSPRA further reduced the developer's initial cash investment. Tr. 1165-68 (Malek). As a result, the initial cash investment

for a HUD project was between 1.8 to 3.0 percent of the project's total cost, whereas developers were typically required to put down 20 to 25 percent of the purchase price to finance a comparable conventional project. Tr. 1164; DX175; DX176.

Equally, if not more significant, the development of a section 221(d)(3) property generated substantial tax benefits. Tr. 1191-92 (Malek). Congress established the low-income housing programs upon the assumption that the tax benefits were the primary economic incentive to develop low-income housing. Tr. 1182-83 (Malek). The availability of accelerated depreciation caused the HUD properties to produce significant tax losses. Tr. 1161 (Malek). Additionally, because of the high leverage available to developers in the HUD program, the tax losses were more generous (and were available with a lower initial investment) than for a comparable conventional project. Tr. 1177-82 (Malek). Together, favorable financing terms and tax benefits made the investment almost immediately profitable. Tr. 1174-77 (Malek).

Of lesser significance were annual cash distributions and the fees generated from sales of management and other services to the project. Tr. 1172-73 (Malek). The annual cash distribution was paid for by project rents, which were established by a budget that included a dividend of 6 percent of the developer's original stated equity (i.e., 10 percent). Id. However, because the developer's actual cash investment was substantially less than 10 percent, the annual return on the original cash investment was substantial. Id. Additionally, HUD allowed the owner to profit from the sale of services to the project. Owners typically profited from project management and various other services. Tr. 1157-58 (Malek).

Finally, there existed the possibility that the owner could realize profit from the project's residual value (i.e., owner's equity) 20 years or more in the future. Tr. 1295 (Malek). This was,

at most, a minor consideration for the reasonable developer. Tr. 1192-93, 1222-24, 1276 (Malek); DDX3; DX176 ("There are several reasons why in normal course" the expectation of "a profit on the sale of [a section 221(d)(3)] property at some time in the future . . . might not be realistic.").

**b. The Preservation Statutes Did Not Affect A Developer's Reasonable Expectations**

Under the Penn Central test, courts are required to consider "the extent to which the regulation has interfered with distinct investment-backed expectations." Penn Central, 438 U.S. at 124 (emphasis added). In extreme cases, regulation may "so frustrate" expectations that it amounts to a taking. Id. (citing Pennsylvania Coal, 260 U.S. 393). In contrast, where multiple uses can be expected of property, but the law does not interfere with an owner's "primary" investment-backed expectation, a taking will not lie. See Penn Central, 438 U.S. at 136; MacLeod v. County of Santa Clara, 749 F.2d 541, 547 (9th Cir. 1984). This is true even where Government regulation, while not disturbing primary use, nevertheless frustrates other, more profitable, expected uses. MacLeod, 749 F.2d at 547-48.

The Preservation Statutes did not frustrate the primary expectations of a reasonable developer. Neither ELIHPA nor LIHPRHA prevented a developer from obtaining Government-insured financing or from taking advantage of the BSPRA. Tr. 1183-84 (Malek); DX175. Nor did the Preservation Statutes affect the available tax benefits. Indeed, these benefits were realized long before passage of the Preservation Statutes. Tr. 1215-24 (Malek).

The Preservation Statutes did not affect even subsidiary expectations such as the ability to obtain management fees and the payment of annual cash dividends. Tr. 1171-72 (Malek). The

only expectation even potentially affected was the opportunity to realize any residual value in the project after 20 years. Tr. 1276 (Malek). Counting on a large increase in value 20 years in the future would not be reasonable. See Tr. 1224, 1276 (Malek), 956-58 (Ragas). Moreover, by allowing the owner to cash out at the project's fair market value, the Preservation Statutes protected that interest as well. See 12 U.S.C. §§ 4103(b), 4110 (enabling the owner to realize equity by selling at the market value without HUD restrictions). Because the Preservation Statues neither disturbed the property's primary use as low-income housing, nor frustrated primary expectations, the investment-backed expectations prong of Penn Central does not support the conclusion that a regulatory taking occurred. See Penn Central 438 U.S. at 136.

CCA has nevertheless argued that the Preservation Statutes took the owner's "right to prepay." See Pl.'s Pretrial Br. at 28-29. Prepayment, however, has no value in and of itself. Prepayment is significant only insofar as it enables the owner to realize the project's residual value upon exiting the HUD program. See Chancellor Manor, 331 F.3d at 903. The Preservation Statutes permitted owners to exit the program and realize the project's residual value through a HUD-financed and facilitated sale. 12 U.S.C. § 4110. Because CCA could have exited the section 221(d)(3) program via the sale option, the alleged unavailability of a different route to the same end (i.e., prepayment) is of no moment. Furthermore, as explained above, because CCA did not complete the administrative process, Tr. 383 (Norman), it cannot be said that the Preservation Statutes actually "took" CCA's right to prepay. CCA might well have been able to prepay under the Preservation Statutes. See ELIHPA § 225(a); 12 U.S.C. § 4101 (prepayment may occur under section 4108 or 4114).

### 2. CCA's Supposed Original Expectations Were Not Reasonable

The Chateau Cleary project is a family owned and operated apartment complex. Tr. 297 (Norman). The project was developed in 1969 and, subsequently, operated as a partnership between two brothers: Ernest B. Norman, Jr. and J. Robert Norman.[9] E.g., PX1-3. Chateau Cleary was the first and only multi-family housing project built by the Norman brothers. Tr. 305 (Norman).

The Norman brothers took advantage of the favorable initial financing, including the BSPRA, tax benefits through a form of accelerated depreciation, profits from management and construction fees, and periodic cash distributions. Tr. 92-94 (Norman). At trial, Mr. Norman characterized these well-recognized benefits – benefits that Chateau Cleary in fact obtained – as insignificant. See Tr. 91-92. According to Mr. Norman, the ability to prepay and exit the HUD program after 20 years was the economic consideration that "drove this thing." Tr. 94; PX6. Put differently, Mr. Norman maintains that profits from Chateau Cleary were to be obtained by realizing the project's residual value 20 years down the road.[10] See id. This supposed expectation is not reasonable. See Tr. 1183, 1222-24, 1276 (Malek); DDX3.

As a leading, contemporary treatise cautioned:

---

[9] It was not until 1985 that the brothers formalized this arrangement by drafting partnership documents. Tr. 161 (Norman). The partnership was named CCA Associates and the assets and liabilities of the Chateau Cleary project were formally transferred to CCA to facilitate estate planning. Tr. 294-95 (Norman). The current partners in CCA are surviving descendants of Ernest B. Norman, Jr. Tr. 121-22 (Norman).

[10] Prepayment was significant only as a means of realizing the project's residual value, which could be accomplished by selling the project or converting it to more profitable use. Tr. 1634-35 (Dickey). The project's market value is based upon its expected profitability and, consequently, these avenues are economically identical. Tr. 918-19 (Stillman), 1634-35 (Dickey).

> normally a developer of real estate hopes to make a profit on the sale of the property at some time in the future. He hopes that the property's residual value will be such that he is able to recover his total equity investment (after retiring the outstanding mortgage and paying income taxes and other costs arising from the sale), plus an additional profit by reason of appreciation. There are several reasons why in normal course this expectation might not be realized in federally-assisted housing.

Tr. 1192-93 (quoting Charles L. Edson & Bruce S. Lane, A Practical Guide to Low- and Moderate-Income Housing (B.N.A. 1972)). Mr. Malek confirmed that investors considered the ability to realize any residual value in a project after exiting the HUD program "a surprise." Tr. 1193.

This is particularly true in an area such as New Orleans, which is at risk of periodic, catastrophic flooding. Indeed, CCA's own expert, Dr. Ragas, who has made his career studying the New Orleans real estate market, explained that the value of a project 20 years in the future would be unknowable.

> Q. [I]f CCA could have sold at its market value in 2011, . . . that would have some value back in 1991, wouldn't it?
>
> A. [I]f the hypothetical is, is it possible to sell the property after -- in 2011, the answer is yes, it is. At what value? I have no idea or reasonable way to tell you. Could that value be significantly different from zero? I have no idea.
>
> * * *
>
> Q. And is that because it is 20 years out?
>
> A. Yes, sir. I know what I don't know sometimes. And one of the things I know I don't know is that I can't opine on what will be true or not true 20 years from now. But can I tell you that there will be a substantial value to this asset beyond its land value 20 years from now? No. It is possible that what we have is a teardown 20 years from

> now and we have a land reversion. What will that land reversion be? I don't know that.
>
> When the market in New Orleans experiences flooding events, which are altering the landscape of how property values look, I don't know. I don't think anybody can tell you that.

Tr. 956-58 (Ragas). Simply put, while free to hope that its project would appreciate, CCA had no reasonable expectation that the Chateau Cleary project would have a substantial residual value 20 years in the future.

### C. The Preservation Statutes Do Not Have The Character Of A Taking

The final prong of Penn Central concerns the character of the Government action. Describing the nature of the investigation into the character of the Government's action, the Federal Circuit explained:

> a reviewing court consider[s] the purpose and importance of the public interest reflected in the regulatory imposition. In effect, a court [must] balance the liberty interest of the private property owner against the Government's need to protect the public interest through imposition of the restraint.

Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1176 (Fed. Cir. 1994). Two significant factors considered when evaluating the character of the Government's action are: (1) the nature of the interest the Government pursued in implementing the regulation; and (2) whether the Government sought to shift the public's burden on to the shoulders of a few. See Bass Enterprises Production Co. v. United States, 381 F.3d 1360, 1369-70 (Fed. Cir. 2004).

Here, the Preservation Statutes were enacted to promote a significant Government objective and, moreover, the cost of achieving this objective was borne by the public fisc. Thus, the Government's actions do not have the character of a taking.

### 1. The Preservation Statutes Promoted Important, Long-Standing Government Objectives

The United States' national housing policy is based upon the long-established national commitment to decent, safe, and sanitary housing for every American. 42 U.S.C. § 12702. Ensuring that a wave of mortgage prepayments did not leave thousands of low income families homeless was a significant Government concern falling directly within the ambit of national housing policy. See Bass Enterprises Prod. Co. v. United States, 54 Fed. Cl. 400, 403 (2002), aff'd, 381 F.3d 1360 (Fed. Cir. 2004).

In the late 1980s, Congress and housing experts had become concerned that a large number of 221(d)(3) and 236 projects might prepay and exit the HUD programs, thus reducing the supply of low-income housing throughout the country. See S. Rep. No. 101-316 at 105 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5867. In 1986 and 1987, the House Committee on Banking Finance and Urban Affairs held hearings on the potential loss of units due to the prepayment of insured mortgages. H. Rep. No. 100-122, reprinted in 1987 U.S.C.C.A.N. 3317, 3351. According to the Committee, "[t]he facts clearly indicate to the Committee that elderly and low income tenants have no alternative but to be thrown in the street without further action by Congress." 1987 U.S.C.C.A.N. at 3370; see also ELIHPA § 202(a)(4). Congress enacted ELIHPA to provide an "interim solution to this very serious problem" while further investigation was performed and a long-term solution developed. 1987 U.S.C.C.A.N. at 3317, 3351; see also ELIHPA § 202(a)(10). In enacting ELIHPA, "every attempt was made to balance the contract rights of owners with the need to try to preserve the existing stock of housing for low income persons." 1987 U.S.C.C.A.N. at 3353. Thus, HUD was given discretion to allow project owners

to exit Government low-income housing programs, ELIHPA § 225(a), or to ensure that owners remaining in the programs received "a fair return on the investment," ELIHPA §§ 224, 225(b).

Following passage of ELIHPA, Congress established a Preservation Commission that estimated owners would terminate low-income affordability restrictions on approximately 243,000 units during the next 15 years. 1990 U.S.C.C.A.N. 5763, 5867-68. Congress determined that preserving the existing inventory of housing for low- and moderate-income tenants was a significant component of national housing policy. Id. Congress also concluded that a Federal preservation strategy was, by far, the most cost-effective approach to "protect[] the interests of the owners, the tenants and the communities in which the housing is located." Id. Thus, in 1990, Congress passed LIHPRHA to alleviate the anticipated crisis in the availability of low-income housing while protecting the pecuniary interest of private-sector, project owners.

In sum, both ELIHPA and LIHPRHA were enacted to further the Government's important, long-standing commitment to promote an adequate supply of low-income housing.

**b. The Preservation Statutes Did Not Shift The Burden Of Providing Low-Income Housing On To CCA**

In an as-applied, regulatory taking claim, "the complaining party must offer evidence to show that the government has improperly shifted a public burden to a small class of private parties." Cienega Gardens, 331 F.3d at 1328 (citing Armstrong v. United States, 364 U.S. 40 (1960)). The Preservation Statutes were designed and implemented to ensure that property owners did not bear the financial burden. Tr. 1786-87 (Root). As Congress explained:

> ELIHPA attempted to balance the interests and concerns of both owners and tenants. . . . Congress . . . recognized that because of an administrative decision to permit owners to withdraw from the programs after twenty years, some of the original sponsors or

> subsequent purchasers may have anticipated an opportunity to benefit from the residual value of the housing. For these reasons, Congress rejected the notion of an absolute moratorium on prepayments. Rather, the law authorized HUD to provide owners with a series of valuable incentives either to extend the low-income affordability for the remaining terms of the mortgage or to transfer the housing to tenant cooperatives nonprofits or public entities.

1990 U.S.C.C.A.N. 5763, 5867.

Congressional efforts to protect the financial interest of project owners is reflected not merely in legislative history, but also in the terms of the Preservation Statutes. For instance, ELIHPA and LIHPRHA allowed projects that were not necessary for the Congressional preservation strategy to exit the program through prepayment. Tr. 1787; ELIHPA § 225(a); 12 U.S.C. § 4108. The Preservation Statutes also permitted project owners to realize their equity in a project (i.e., residual value) and exit the HUD program by selling at market value. Tr. 1633 (Dickey), 634-36 (Alexander); 12 U.S.C. § 4110; see also ELIHPA § 230. Indeed, this option was facilitated by HUD using taxpayer dollars. See 12 U.S.C. § 4110(d). The Preservation Statutes also allowed owners to obtain an increased return on their equity by applying for incentives from the Government in exchange for continued use restrictions on the project. ELIHPA §§ 224, 225(b); 12 U.S.C. § 4109. Finally, in the event that a sale could not be consummated, or incentives were unavailable, the owner was allowed to prepay. Tr. 1633 (Dickey); 12 U.S.C. § 4114.

As explained above, the only expectation potentially affected by the Preservation Statutes was the opportunity to benefit from the residual value of the housing. See section II.B.1.a., supra; see also 1990 U.S.C.C.A.N. 5763, 5867. Under the sale option, however, project owners were entitled to realize the property's market value through a HUD-subsidized sale. See

Parkridge Investors, 13 F.3d at 1199 ("fair market value is exactly what the partnership would receive as a result of a statutorily compelled sale to a non-profit"). The sale option, by itself, ensured that the Preservation Statutes would not shift a public burden on to project owners such as CCA.

Furthermore, even if the sale and incentive options are disregarded, the character of the Preservation Statutes is akin to standard rent control statutes. The property owner maintained control of the apartments, including the ability to manage the property, to turn away prospective tenants, and to sell the property at market value. Tr. 426-28, 439-40 (Norman), 646 (Alexander). Thus, even if the Preservation Statutes had required CCA's continued participation in the HUD program (and they did not), the statutes would merely have limited the owner's ability to raise tenant rents. Rent control statutes are not generally considered to have the character of a taking. See Yee v. City of Escondido, 503 U.S. 519, 528-29 (1992); FCC v. Florida Power Corp., 480 U.S. 245, 251-52 (1987). The Preservation Statutes, likewise, do not have the character of a taking.

## III. CCA Is Owed No Compensation

### A. Providing Compensation To CCA Would Be Unjust

CCA chose not to seek pecuniary benefits that were available from HUD under the Preservation Statutes that would have enabled CCA to realize and benefit from the residual value in the Chateau Cleary project. Requiring the United States to compensate CCA for monies that it did not receive as a result of its own lack of diligence is not just.

Most notably, as explained above, under the Preservation Statutes, CCA was entitled to exit the low income housing program by selling to a qualified purchaser. 12 U.S.C. § 4110. The

sale price would have been the fair market value of the project without HUD restrictions. 12 U.S.C. § 4103. In addition, HUD would have funded transaction costs associated with the sale. 12 U.S.C. § 4110(d).

As early as 1990, CCA was approached by non-profit corporations interested in buying the project. Tr. 371-76 (Norman); PX38; PX41. Thus, CCA had the opportunity to realize the full market value of the project during the period of the alleged taking. See id. CCA should not be entitled to compensation where the failure to benefit from the project's residual value was the result of its own business decisions.

**B. Even If The Pecuniary Benefits Available Under The Preservation Statutes Are Ignored, Dr. Ragas's Calculations Overstate Just Compensation**

Even if the pecuniary benefits that were available under the Preservation Statutes are ignored, the approach used by CCA does not arrive at just compensation. Temporary takings "are not different in kind from permanent takings." First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 318 (1987). Disregarding this basic principle, CCA overstates just compensation by calculating compensation at the end of the alleged taking, rather than at the time the taking occurred, and by using an *ex-post* perspective. In addition, CCA's calculations ignore the project's failure to seek and obtain HUD rent increases after 1985, use overstated "market rents," use an inappropriate compounding rate, and contain other acknowledged errors. Combined, CCA's errors dramatically overstate any compensation due from the Government.

### 1. CCA Incorrectly Assesses Compensation At The End Of The Alleged Taking Period Using *Ex Post* Approach

#### a. CCA's Approach Is Contrary To The Law And Will Lead To Bizarre Outcomes

The overstatement of compensation stems in large part from CCA's basic approach. If any principle is well-settled in takings law, it is that the proper date for valuing property taken by government action – whether by condemnation, occupation, or regulation – is the date on which the taking occurred. See, e.g., First English, 482 U.S. at 320 (noting "the unexceptional proposition that the valuation of property which has been taken must be calculated as of the time of the taking"); United States v. 50 Acres of Land, 469 U.S. 24, 29 (1984) (just compensation is "'market value of the property at the time of the taking contemporaneously paid in money'" (quoting Olson v. United States, 292 U.S. 246, 255 (1934)); Kirby Forest Industries, Inc. v. United States, 467 U.S. 1, 10 (1984); Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 803 (Fed. Cir. 1993) ("Compensation is always measured from the time the taking occurs.").

This "time of the taking" rule, moreover, embodies important public policy judgments. It means, for example, that the Government must bear the risk of diminutions in property value after the taking. United States v. Dow, 357 U.S. 17, 24 (1958); see also Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 477-78 (1973). At the same time, the certainty afforded by the rule allows Government officials to make informed decisions about the likely cost to the public fisc of a proposed taking or condemnation.

CCA nevertheless contends that the relevant date for valuing plaintiff's prepayment rights should be the end of the temporary takings period.[11] Pl.'s Pretrial Br. at 19. CCA offers no explanation why different valuation dates should be used for temporary and permanent takings. Id. Both the Supreme Court and the Federal Circuit have firmly rejected the notion that temporary takings and permanent takings are somehow subject to different valuation rules. In First English, itself a temporary takings case, the Supreme Court made clear that temporary takings "are not different in kind from permanent takings," 482 U.S. at 318, and referred to "the unexceptional proposition that the valuation of property which has been taken must be calculated as of the time of the taking," id. at 320. Similarly, the Federal Circuit explained in a regulatory takings case that "[f]air market value under the Fifth Amendment is normally ascertained at the date the governmental restrictions are imposed, which is the date of the taking." Yancey v. United States, 915 F.2d 1534, 1543 (Fed. Cir. 1990). Indeed, like the plaintiff in this case, the plaintiffs in Yancey urged a more flexible, case-by-case approach to valuation. The Federal Circuit rejected that argument, observing: "We are aware of no cases allowing the flexibility that the Yanceys advocate." Id.

CCA offers no justification for departing from this settled law, and none exists. CCA's approach would produce odd and unjust results. For instance, in cases where market values fall after the taking, the Government would owe compensation only for the value remaining in the property at the end of the period, not for the value that the Government originally took from the owner. Tr. 1886, 1890-91, 1904 (Stillman). In other circumstances, a claimant would be paid

[11] The alleged taking in this matter ended 60 days after passage of the HOPE Act. Chancellor Manor v. United States, 331 F.3d 891, 896 (Fed. Cir. 2003) (the HOPE Act "restored the prepayment rights to owners").

less for a permanent taking than for a temporary taking of the very same property. Tr. 934 (Ragas); 1897-99 (Stillman). The Court should eschew an approach that, according to CCA's own experts, will result in such nonsensical outcomes.

Moreover, CCA's approach is flatly contrary to the policies underlying the "time of the taking" rule. The effect of the CCA's logic is to deny the Government the ability, ex ante, to estimate the cost to the public fisc of proceeding with a temporary taking, because the compensation award will depend not on the market value of the plaintiff's property at the time on the taking but on unknowable events occurring during the takings period. Tr. 1886-87 (Stillman), 930-37 (Ragas). That result cannot be reconciled with the principle that "just" compensation is no more or less than "the market value of the property at the time of the taking contemporaneously paid in money." United States v. 50 Acres of Land, 469 U.S. 24, 29 (1984) (emphasis added). Under that standard, the determinative question in calculating just compensation is "what a willing buyer would pay in cash to a willing seller at the time of the taking." 564.54 Acres, 441 U.S. at 511 (internal quotation omitted) (collecting cases). That test logically precludes the notion that post hoc fluctuations in value affect compensation.

The practical effect of CCA's choice of valuation date is to cause a material increase in the compensation award to plaintiffs. That is because the plaintiffs' nominal damages in each year of the takings period must be discounted to real-dollar terms to calculate a final total. Tr. 938, 1026 (Ragas). Using the end of the takings period as proper valuation date, CCA adjusts its nominal losses upward by the discount rate. Tr. 1026 (Ragas). But because valuation must occur as of the time of the taking, all such nominal losses should have been adjusted downward by the

discount rate.[12] And as noted above, CCA's ex post methodology permits plaintiffs to seek compensation based upon actual market increases that occurred after the time of the taking and, indeed, could require greater compensation for a temporary taking than for a permanent taking. Tr. 934-35 (Ragas), 1897-99 (Stillman). A proper ex ante valuation – based upon information available to the parties at the time of the taking – could not result in such a nonsensical outcome. Tr. 1648-50, 1657 (Dickey); DX160.

Accordingly, because "the valuation of property which has been taken must be calculated as of the time of the taking" using an ex ante approach, First English, 482 U.S. at 320, the compensation sought by CCA in this case is overstated and would not be "just."

**b. Dr. Dickey Uses An Appropriate *Ex Ante* Approach**

In this action, CCA alleges that the Preservation Statutes effected a regulatory taking that was cut short by the HOPE Act. Dr. Dickey provides an ex ante calculation of compensation that is based upon the nature of the taking alleged. See DX160; Tr. 1676-80 (Dickey). If any compensation is due, the Court should use Dr. Dickey's approach.

CCA has argued that Dr. Dickey did not use a "pure" ex ante methodology and that his approach should, therefore, be disregarded. See PX124. Specifically, CCA objects that Dr. Dickey takes into account passage of the HOPE Act in 1996. Id. However, CCA offered no testimony that Dr. Dickey's approach is contrary to accepted economic principles. See Tr. 1893-

---

[12] This difference arises because the discount rate used in the valuation process (here 10 percent, see PX99) is greater than prejudgment interest rate. Discounting CCA's nominal losses forward (and thus upward) at 10 percent to the end of the alleged takings, and then applied the prejudgment interest rate, is erroneous. The correct approach is to discount nominal losses backward (and thus downward) to the time of the taking, and then apply the lower prejudgment interest rate going forward.

95 (Stillman). As Dr. Dickey explained, economic literature allows such an approach in appropriate circumstances. Tr. 2011-12 (Dickey).

Moreover, where a permanent taking is cut short by Government action, compensation for the resulting temporary taking should be the same as the compensation due for that part of the permanent taking that actually occurred. The approach used by Dr. Dickey is consonant with the approach used for awarding compensation for permanent regulatory takings. Tr. 1673, 1681-83 (Dickey). As explained above, however, the approach used by Dr. Ragas is not. See Tr. 931-35 (Ragas), 1886-87 (Stillman).

### 2. CCA's Calculation Of Just Compensation Contains Significant Errors

Even if CCA's ex post approach were acceptable, CCA has failed to properly calculate just compensation. To arrive at a compensation figure, CCA projects the net profits that allegedly would have been earned as a market rate complex, and subtracts the net profits that were actually earned as a HUD project. PX106. The difference is almost entirely attributable to the difference between HUD rents and projected market rents. Tr. 1004-05 (Ragas). However, because the HUD-restricted rents used by CCA are too low, and the market rent estimates used by CCA too high, CCA's calculations significantly overstates the compensation payable.

#### a. CCA Fails To Take Into Account Its Own Failure To Seek Rent Increases From HUD

In calculating compensation, Dr. Ragas uses the rents actually charged by CCA as a HUD project between 1991 and 1996. PX117; PX111. Dr. Ragas fails to acknowledge, and take into account in his calculations, that CCA could have sought and obtained higher rents from HUD.

HUD rents are established through a budget-based process. Tr. 330 (Norman), 1094 (Kizzier). HUD routinely grants annual increases of 5 percent and, if supported by audited financial data, will approve a larger increase. Tr. 1094-97 (Kizzier). In 1984, CCA sought and obtained a rent increase based upon its 1983 audited financial statement. Tr. 332 (Norman); PX25a. At trial, Mr. Norman testified that despite significant increases in its operating costs, see PDX33, CCA waited 11 years to seek another rent increase from HUD. Tr. 332. Under HUD's budget-based process, CCA could have obtained approval to charge 26 percent more in 1991, 30 percent more in 1992, and 41 more in 1993 and 1994. PX26; PX43; PX46; PX55; see also PDX33. Even when CCA did request a rent increase in 1995, it could have justified a larger increase.[13] PDX33 (showing a 38 percent increase in costs from FY1983 to FY1994, but only a 30 percent increase in HUD rents); see also Tr. 343-44 (Norman) (stating that he could identify no instance when a requested rent increase was denied by HUD).

CCA's low HUD rents were not the result of the Preservation Statutes, but rather of CCA's own decision not to seek regular rent increases as allowed by the regulatory agreement. See DX187. The proper baseline for an analysis of just compensation, therefore, is the rents that CCA could charged if it had diligently requested annual rent increases. By using CCA's actual HUD rents, Dr. Ragas uses an incorrect starting point for his analysis of the compensation owed.

**b. CCA's Estimated "Market Rents" Are Overstated**

Dr. Ragas uses the average rent charged by conventional multi-family housing complexes in the "West Metairie submarket" as the market rent for Chateau Cleary after prepayment. CCA

---

[13] Under HUD's budget-based process, after taking into account the rent increase in 1995, CCA could have obtained permission to charge 11 percent more in 1995 and 27 percent more in 1996. PX26; PX55; PX61; see also PDX33.

was not an average project and, after prepaying in 1998, has never charged the average market rents for West Metairie. Tr. 1424-28 (Derbes); DX189.

CCA is not an average multi-family housing complex in West Metairie, Louisiana. It was built as a HUD section 221(d)(3) project and, as such, has substantially fewer amenities than other projects in the area. Tr. 1359 (Derbes), 682-92 (Alexander). Thus, it is not surprising that CCA, after prepaying in 1998 and raising its rents to market, Tr. 318 (Norman), charged substantially less than the average project in West Metairie. Tr. 1359 (Derbes); DX173. Indeed, after prepaying, CCA's rents consistently lagged 20 to 30 percent below the rents charged by the average market-rate projects in the area. Id.

Dr. Ragas testified that in his opinion Chateau Cleary was an average or above average project. Tr. 816. Yet Dr. Ragas fails to reconcile his opinion with the undisputed fact that CCA never commanded average market rents after prepaying and converting to market operations. See Tr. 369-70 (Norman) (CCA began charging market rents in 1998). Indeed, Dr. Ragas's projected market rents for 1993 were not charged by the project until after 2000. DDX1; see also PX111.

In sum, use of the average market rent in West Metairie as the basis for calculating just compensation is unwarranted. By using the West Metairie average, Dr. Ragas inflates the compensation owed to CCA.

**c. CCA's Calculations With Respect To The Project's Three Bedroom Apartments Are In Error**

Dr. Ragas conceded that his calculations regarding three bedroom apartments are in error because he used an incorrect square foot figure for three bedroom apartments. Tr. 911-15. This

error has the effect of lowering the actual HUD rent and raising the projected market rent. Tr. 915. By inappropriately increasing the difference between HUD rents and projected market rents, Dr. Ragas's error increases the claimed compensation. Despite acknowledging this error, Dr. Ragas failed to present corrected calculations at trial.

### 3. CCA's Model Uses An Inappropriate Interest Rates To Compound Cash Flows

CCA uses a discount rate of 10 percent to compound cash flows from both conventional and HUD-subsidized operations of Chateau Cleary to the end of the alleged taking. PX99. As explained above, compounding cash flows to the end of the alleged taking is inappropriate – the appropriate date to value a taking is the date on which the taking occurred. Furthermore, the appropriate discount rate is based upon the risk of the pertinent cash flow. Because an ex post approach utilizes the property's (or the market's) actual performance, the plaintiff bears no risk and a risk-free discount rate should be employed.[14] Tr. 1684-1691 (Dickey), 1867-69 (Stillman).

CCA's approach suffers from an additional shortcoming. There exists no justification for compounding cash flows at one rate to May 1996 (or February 1997) and a different rate to September 2006. Tr. 1684-91 (Dickey), 1869 (Stillman). The interest rate used to bring cash flows forward to the date of judgment, i.e., prejudgment interest, should be the defendant's debt rate. Tr. 1684-91 (Dickey), 1867-69 (Stillman). Because the United States is the defendant in this action, a risk-free interest rate is appropriate. Tr. 1689 (Dickey). Indeed, Dr. Ragas offers no economic justification for using a higher interest rate during the alleged taking period.

[14] The risk of operating conventional housing projects is significantly greater than the risk of operating subsidized, moderate-income housing. Therefore, under an ex ante approach, discount rates of 14 percent for conventional, market-rate housing and 12 percent for HUD-subsidized housing should be used for projected, future cash flows. DX160.

Tr. 1026-31 (Ragas) (stating only that rate reflects CCA's opportunity costs). CCA's use of a higher 10 percent compounding rate is, therefore, in error.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

s/ Kenneth D. Woodrow
KENNETH D. WOODROW
DAVID A. HARRINGTON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 353-0513

November 9, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 9th day of November, 2006, a copy of the foregoing "DEFENDANT'S POST-TRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Kenneth D. Woodrow