IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CCA ASSOCIATES, Plaintiff, | ) | |
| v. | ) | No. 97-334C Judge Lettow |
| THE UNITED STATES, Defendant. | ) | |

# PLAINTIFF'S POST-TRIAL MEMORANDUM

Elliot E. Polebaum
Albert S. Iarossi
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20004-2505
Tel: (202) 639-7000/Fax: (202) 639-7003

November 9, 2006

## TABLE OF CONTENTS


PAGE

I. INTRODUCTION ..... 1

II. PROPOSED FINDINGS OF FACT ..... 5

A. The Norman Brothers' Entry Into HUD's Low Income Housing Program ..... 5

B. The 1985 Transfer ..... 10

C. The Preservation Statutes ..... 12

1. Plan of Action for Prepayment ..... 13

2. Preservation Benefits ..... 16

D. The HOPE Act And CCA's Prepayment ..... 20

E. Economic Impact ..... 22

F. Just Compensation ..... 26

III. PROPOSED CONCLUSIONS OF LAW ..... 34

A. Plaintiff's Claim Is Ripe For Review ..... 34

B. ELIHPA And LIHPRHA Effected A Taking Of Plaintiff's Right To Prepay Its HUD-Insured Mortgage On The 20-Year Prepayment Date ..... 38

1. Enactment Of ELIHPA And LIHPRHA Has The Character Of A Taking ..... 38

2. ELIHPA And LIHPHRA Frustrated Plaintiff's Distinct And Reasonable Investment-Backed Expectations ..... 44

a. The Norman Brothers In 1969 And CCA In 1985 Relied On And Expected To Exercise The Prepayment Right On The Eligibility Date ..... 44

b. The Owners' Expectations To Prepay Were Reasonable ..... 46

3. ELIHPA And LIHPRHA Caused CCA To Suffer A Severe Economic Impact ..... 49

**PAGE**

C. CCA Is Entitled To Just Compensation For The Taking Of Its Property..............54

1. CCA Is Entitled To Just Compensation For The Damages It Suffered During The Period Of The Taking..............................................54

2. Plaintiff Is Entitled To Interest As An Element Of Just Compensation ..............................................................................58

IV. CONCLUSION...........................................................................................60

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*American Pelagic Fishing Co., L.P. v. United States*,
55 Fed. Cl. 575 (2003),
*vacated on other grounds*, 379 F.3d 1363 (Fed. Cir. 2004) ............................................56

*Armstrong v. United States*,
364 U.S. 40 (1960)............................................................................................38

*Cienega Gardens v. United States*,
67 Fed. Cl. 434 (2005)...................................................................................*passim*

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) .....................................................................*passim*

*Cienega Gardens v. United States*,
265 F.3d 1237 (Fed. Cir. 2001) ..................................................................1, 2, 34, 36

*City Line Joint Venture v. United States*,
71 Fed. Cl. 486 (2006)...........................................................................................1

*Hodel v. Irving*,
481 U.S. 704 (1987)..........................................................................................41

*Independence Park Apartments v. United States*,
449 F.3d 1235 (Fed. Cir. 2006) ..............................................................................1

*Independence Park Apartments v. United States*,
61 Fed. Cl. 692 (2004)...................................................................................*passim*

*Kimball Laundry Co. v. United States*,
338 U.S. 1 (1949)........................................................................................54, 55

*Kirby Forest Indus. Inc. v. United States*,
467 U.S. 1 (1994)............................................................................................58

*Loveladies Harbor, Inc. v. United States*,
28 F.3d 1171 (Fed. Cir. 1994) ............................................................. 38-39, 44, 49

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003 (1992).......................................................................................38

*Nollan v. California Coastal Comm'n*,
483 U.S. 825 (1987)..........................................................................................40

**PAGE**

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393 (1922)....................38

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978)....................38, 40

*Pennell v. City of San Jose*,
485 U.S. 1 (1988)....................40

*Prudential Ins. Co. of Am. v. United States*,
801 F.2d 1295 (Fed. Cir. 1986)....................41

*Rose Acre Farms, Inc. v. United States*,
373 F.3d 1177 (Fed. Cir. 2004)....................51

*Seiber v. United States*,
364 F.3d 1356 (Fed. Cir.),
*cert. denied*, 543 U.S. 873 (2004)....................51, 52-53

*Shelden v. United States*,
34 Fed. Cl. 355 (1995)....................58

*Suitum v. Tahoe Reg'l Planning Agency*,
520 U.S. 725 (1997).................... 53-54

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002)....................52

*United States v. General Motors Corp.*,
323 U.S. 373 (1945)....................54, 55

*United States v. Miller*,
317 U.S. 369 (1943)....................38, 54, 58

*United States v. Petty Motor Co.*,
327 U.S. 372 (1946).................... 54-55

*Vaizburd v. United States*,
67 Fed. Cl. 499 (2005)....................29

*Whitney Benefits, Inc. v. United States*,
30 Fed. Cl. 411 (1994)....................59

*Yancey v. United States*,
915 F.2d 1534 (Fed. Cir. 1990)....................49

**PAGE**

**STATUTES**

Emergency Low Income Housing Preservation Act of 1987,
Pub. L. No. 100-242, 101 Stat. 1877 (1988),
*codified at* 12 U.S.C. § 1715*l* .......... 1, 14

12 U.S.C. § 1715*l* note .......... 12, 16, 17, 40

ELIHPA § 202(b)(1) .......... 40

ELIHPA § 221(a) .......... 12

ELIHPA § 222 .......... 16

ELIHPA § 224 .......... 17

ELIHPA § 225 .......... 17

ELIHPA § 225(a) .......... 14, 42

ELIHPA § 225(a)(1) .......... 14

ELIHPA § 225(b) .......... 17

Housing Opportunity Program Extension Act of 1996,
Pub. L. No. 104-120, 110 Stat. 834 (1996) .......... 20

Low Income Housing Preservation and Residential Homeownership Act of 1990,
Pub. L. No. 101-625, 104 Stat. 4249 (1990),
*codified at* 12 U.S.C. § 4101 *et seq.* .......... 1, 37, 41

12 U.S.C. § 4108 .......... 13-14, 34, 42

12 U.S.C. § 4112(a)(2)(A) .......... 18

12 U.S.C. § 4112(c)(3) .......... 18

12 U.S.C. § 4121 .......... 19

**REGULATIONS**

24 C.F.R. § 207.253(a)(2) (1970) .......... 7

24 C.F.R. § 221.524(a)(1)(ii) (1970) .......... 6, 7, 47

24 C.F.R. § 236.30 (1970) .......... 6, 7, 47

24 C.F.R. § 248.141(a)(1) (1991) .......... 13, 14, 34, 42

**PAGE**

24 C.F.R. § 248.213(b) (1991) .......................................................................................17

24 C.F.R. § 248.213(b)(10) (1991) ..................................................................................17

# I. INTRODUCTION

1. With the enactment of the Emergency Low Income Housing Preservation Act ("ELIHPA" or "Title II")[1] and the Low Income Housing Preservation and Resident Homeownership Act ("LIHPRHA" or "Title VI"),[2] Congress confiscated the right of Plaintiff CCA Associates ("CCA" or "Plaintiff") to prepay its mortgage, to leave the Department of Housing and Urban Development's ("HUD") bw income housing program, and to operate its property on a conventional basis. For nearly ten years, the government has waged a seemingly interminable battle in the courts against CCA, denying liability at every point -- despite decisions by this Court and the United States Court of Appeals for the Federal Circuit addressing comparable claims and holding against the Government on the critical issues. In all respects material to this case, CCA's position is no different from that of the plaintiffs whose claims have been previously addressed by this Court and the Court of Appeals.

2. These prior decisions, particularly the decisions in *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ("*Cienega VIII*");[3] *Cienega Gardens v. United States*, 265 F.3d 1237 (Fed Cir. 2001) ("*Cienega VI*"); *Cienega Gardens v. United States*, 67 Fed. Cl. 434 (2005) ("*Cienega IX*"); and *Independence Park Apartments v. United States*, 61 Fed. Cl. 692 (2004) ("*Independence Park*"),[4] establish the legal framework applicable to CCA's claim. The

---

1 Pub. L. No. 100-242 § 202(a)(1), 101 Stat. 1877 (1988), 12 U.S.C. § 1715*l*.

2 Pub. L. No. 101-625, 104 Stat. 4249 (1990), 12 U.S.C. § 4101 *et seq*.

3 The recent decision in *City Line Joint Venture v. United States*, 71 Fed. C1. 486 (2006), is inconsistent with the Court of Appeals decision in *Cienega VIII*.

4 The Court of Appeals decision in *Independence Park Apartments v. United States*, 449 F.3d 1235 (Fed. Cir. 2006), did not disturb any aspects of this Court's *Independence Park* decision which are relevant to this case. All references to this Court's decision in *Independence Park* are to those parts of the decision that are unaffected by the decision of the Court of Appeals.

evidence presented at trial overwhelmingly establishes CCA's entitlement to relief and the quantum of its damages.

3. We discuss the relevant legal framework in detail below. At this point, we note the following legal rules from prior decisions:

- There was no requirement for CCA to make a futile request to HUD for permission to prepay. *Cienega VI*, 265 F.3d at 1244-48; *Cienega IX*, 67 Fed. Cl. at 460-61.

- There was no requirement for CCA "separately to seek incentives and receive a determination of whether those incentives would be funded." *Cienega IX*, 67 Fed. Cl. at 461.

- The enactment of ELIHPA and LIHPRHA has the character of a taking. *Cienega VIII*, 331 F.3d at 1337-40; *Cienega IX*, 67 Fed. Cl. at 466-71.

- The prepayment right specified in the Chateau Cleary transaction documentation and the prevailing HUD regulations presumptively created reasonable investment backed expectations. *Cienega VIII*, 331 F.3d at 1348.

- Economic impact is properly measured by the diminution in return on equity effected by ELIHPA and LIHPRHA. *Cienega VIII*, 331 F.3d at 1342-43; *Cienega IX*, 67 Fed C1. at 475.

- The percentage reduction in return on equity in the decided cases is, "even under the most conservative view, a 'serious financial loss,'" *Cienega VIII*, 331 F.3d at 1343, and is "the kind of expense shifting to a few persons that amounts to a taking," *id.* at 1338-39.

- Just compensation is appropriately measured first by determining the net cash flows of which the property owner was deprived. *Cienega IX*, 67 Fed. Cl. at 484.

- The net cash flows must be then adjusted forward to the end of the takings period by a factor that reflects what could have been earned in a reasonably prudent alternative investment. From the end of the takings period, the loss must be further adjusted to present value on a compound basis through the date of final judgment. *Id.* at 492-93.

4. In line with these precedents, it is beyond dispute that the enactment of ELIHPA and LIHPRHA has the character of a taking and frustrated CCA's distinct and reasonable investment-backed expectations. Also based on these precedents, it is beyond dispute that the government's actions caused Plaintiff to suffer a diminution in return on equity of between 80% and 85%, which is a severe adverse economic impact by any reasonable measure.

5. In response, the government ignored the decisions of this Court and of the Federal

Circuit and instead proffered a self-described principled, economic analysis showing what it considered to be an insufficient economic impact. Not only was the government's analysis inconsistent with this Court's and the Federal Circuit's prior rulings but also its analysis was anything but principled and consistent. Rather, the analysis, while claiming to be *ex ante* in character, actually cherry-picked the critical *ex post* fact -- that it was somehow known in 1991 that the HOPE legislation would be enacted in 1996 -- in order to reduce economic impact within the framework of its own model. Just as an *ex post* analysis may not disregard inconvenient actual facts in the real world, so too an *ex ante* analysis may not reach for helpful facts that were unknown and unknowable as of the valuation date.

6. Plaintiff also presented convincing evidence of the reasonable, investment-backed expectations both of the original developers in 1969 and of CCA in 1985 when it purchased the 50% equity interest of one of the original developers, J. Robert Norman. The government made no effort to dispute the expectations of the original developers in 1969 and of CCA in 1985. Mr. Norman's testimony went unchallenged in this respect. Moreover, the Federal Circuit has previously ruled that inclusion of the prepayment right in the transaction documentation and in the contemporaneous HUD regulations (both in 1969 and 1985) makes the investor's expectations presumptively reasonable. The government sought to rebut this presumption through the testimony of Mr. Malek, but failed miserably. Mr. Malek's analysis dealt with the supposed expectations of the owners of a "typical" project carried out through a syndication of limited partnership interests, without regard to what happened in the Chateau Cleary development. Even more stunning, Mr. Malek presented a mathematical analysis that was designed to show that the residual value of the property was a small portion of the total return the Chateau Cleary investors must have expected to achieve. To reach his pre-ordained conclusion,

however, Mr. Malek had to assume away the owners' actual equity contribution to the project at the outset by stripping out the Builder's & Sponsor's Profit and Risk Allowance. Once this flaw in Mr. Malek's analysis was exposed in Plaintiff's rebuttal case, Mr. Malek's analysis, for whatever it was worth on its own terms, collapsed.

7. Finally, Plaintiff established conclusively the damages that it suffered. The lost profits model presented by Dr. Ragas was compelling, followed this Court's and the Federal Circuit's prior guidance, and established the substantial losses that CCA suffered. While the government quibbled that CCA did not raise rents as high as it could have in the late 1980s while still a HUD property (presuming a level of precision that is not required as a matter of law), Dr. Ragas in any event debunked this assertion by explaining the constraining effect of actual market conditions both in the 1986-1990 time frame and again in 1999 and thereafter following CCA's prepayment on September 30, 1998. The reasonableness of Dr. Ragas' analysis was actually confirmed by Mr. Derbes' second report, DX 173 at 9, in which Mr. Derbes calculated CCA's lost profits during the period May 1, 1991 through May 31, 1996, as a result of continuing HUD restrictions. Mr. Derbes estimated the loss at $528,971, as compared to the $607,757 loss that Dr. Ragas found in the comparable period.

8. When the damages amount Dr. Ragas determined is adjusted forward, in accordance with the methodology approved in prior precedents, CCA's damages through September 30, 2006 amount to $1,361,298 using an assumed end-of-takings date of May 31, 1996. If the taking instead is found to have ended on February 28, 1997, as the evidence supports, then the amount due Plaintiff through September 30, 2006 is $1,528,629. Accordingly, Plaintiff is entitled to judgment in the amount of $1,528,629 as of September 30, 2006.

## II. PROPOSED FINDINGS OF FACT

### A. The Norman Brothers' Entry Into HUD's Low Income Housing Program

9. The developers of the Chateau Cleary apartment complex were Ernest B. Norman, Jr. and J. Robert Norman (the "Norman Brothers"). The Norman Brothers agreed to develop and operate the Chateau Cleary property under the HUD Section 221(d)(3) program and entered into a series of contemporaneous and interlocking contracts, which memorialized the transaction. Plaintiff's Exhibit ("PX") 1; Defendant's Exhibit ("DX") 1; PX 3-6.

10. The transaction documents included a Regulatory Agreement between HUD and the Norman Brothers, DX l, a mortgage between the Norman Brothers and the lender, PX 4 & 6, and a first Note between the Norman Brothers and the lender and a superseding second Note, both of which were endorsed by HUD,[5] PX 3 & 5.[6]

11. The Regulatory Agreement required the Norman Brothers, among other things, to construct and maintain the property in accordance with HUD specifications, to rent only to tenants meeting HUD eligibility standards, and to charge only HUD-approved rents. DX 1 ¶¶ 2 & 4. The Regulatory Agreement also limited the Norman Brothers to an annual return of 6% on their original equity investment. *Id.* ¶ 6(e)(1).

12. The Note made by the Norman Brothers and endorsed by HUD evidenced HUD's commitment to insure the mortgage. The Note had a 40-year term but expressly included the unrestricted right to prepay the mortgage and exit the HUD program after 20 years without government or lender approval. PX 5. The prepayment right guaranteed in the Note mirrored

---

5 The Notes were endorsed by the Federal Housing Administration which is now part of HUD. The FHA and HUD are referred to interchangeably herein.

6 The superseding second Note is hereinafter referred to as the "Note."

the prepayment right embodied in HUD regulations. *Id.*; 24 C.F.R. § 236.30 (1970); 24 C.F.R. § 221.524(a)(l)(ii) (1970); *Cienega VIII*, 331 F.3d at 1326.

13. The details of the Norman Brothers' entry into the HUD program are as follows. On October 6, 1969, the Norman Brothers acquired title to the land on which Chateau Cleary would be built. PX 1. The Norman Brothers purchased the land, and also importantly the plans for the development of Chateau Cleary, from the Tomeny Group which had begun development of the project at least a year earlier, but which did not have the financial means to complete the transaction. Trial Transcript ("Tr.") 54:1-6; 58:16-21 (Norman) (trial transcript references are in the appendix submitted herewith).

14. HUD was keen to have the Norman Brothers take over the development because they had a track record with, and an excellent reputation at, HUD from their earlier work with HUD in single-family home development. Tr. 54:7-14; 55:2-11 (Norman). Because the project had been languishing while the Tomeny Group was involved, HUD was anxious to move ahead quickly. Tr. 55:15-21; 62:1-17 (Norman). During the discussions with HUD, HUD representatives emphasized the availability and value of the right to prepay the mortgage without their prior approval after no more than 20 years. Tr. 57:18-58:3 (Norman).

15. On November 7, 1969, the Norman Brothers signed a note in the amount of $1,601,100. The note evidenced a loan that was secured by a mortgage on the Chateau Cleary property. On May 17, 1971, the lender increased the amount of the loan to $1,699,500, and a new note was made reflecting the increased loan amount (the "Note"). Additional funds were needed because the price of construction had increased during the period that the project languished while the Tomeny Group was trying to obtain financing, and HUD failed to take expected increased costs into account when the project finally went ahead. When the loan

amount increased, the Norman Brothers signed a new mortgage and a new note reflecting the higher loan amount. PX 1, 3, 4, 5 & 6; Tr. 85:4-86:24 (Norman).

16. Both the note signed in 1969 and the new Note signed in 1971 were printed on FHA Form 1734, a form prescribed by HUD. HUD reviewed and approved both notes. PX 3 & 5; Tr. 79:6-11 (Norman). Both notes included express language guaranteeing the Norman Brothers' right to prepay as follows: "The debt evidenced by this note may not be prepaid either in whole or in part, prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner except a maker which is a limited dividend corporation may prepay without such approval after 20 years from the date of final endorsement of this note by the Federal Housing Commissioner." PX 3 & 5.

17. The same prepayment right was embodied in HUD's regulations: The "mortgage indebtedness may be prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner where . . . the prepayment occurs after the expiration of 20 years from the date of final insurance endorsement of the mortgage . . . ." 24 C.F.R. § 236.30; *accord* 24 C.F.R. § 221.524(a)(1)(ii); *Cienega VIII*, 331 F.3d at 1326

18. In consideration of HUD's endorsement of the first note, the Norman Brothers also entered into a Regulatory Agreement with HUD. DX 1. This document, also prepared on the basis of a form prescribed by HUD, incorporated by reference HUD's then-existing regulations providing for prepayment after 20 years and sharply restricted the owners' use of the property. DX 1; Tr. 68:20-23 (Norman). These restrictions bound the Norman Brothers for as long as HUD insured the mortgage. Upon prepayment, HUD's insurance obligation would terminate and the owners' multifarious obligations under the Regulatory Agreement would end. See 24 C.F.R. § 207.253(a)(2) (1970); *Cienega VIII*, 331 F.3d at 1325-36.

19. The transaction documents between the Norman Brothers and HUD also set forth HUD's determination of the owners' original equity, which HUD calculated at $215,867. PX 106; DX 1. The maximum annual limited dividend was 6% of original equity, or $12,952. *Id.*

20. The 20-year prepayment right reflected on the Note was one of the primary inducements that HUD representatives highlighted to convince the Norman Brothers to participate in the program. "Every person involved on the other side of the entity, the Tomeny group, the mortgagees, the HUD personnel sold very hard, tried to sell my father and uncle and me very hard to get into the project." Tr. 55:2-6 (Norman). HUD representatives stressed the prepayment right. Tr. 58:1-3 (Norman).

21. The ability to prepay the mortgage and exit the HUD program was a critical, *sine qua non*, element for the Norman Brothers to develop the project. Although the absence of personal liability on the permanent financing was an important defensive element in deciding to proceed, the prepayment right was *the* critical strategic element in the decision to proceed. The Norman Brothers "wouldn't have done [the deal] without it," and they would not have gone forward with the project. Tr. 56:9-18; 57:18-23; 59:9-14; 91:18-23 (Norman).

22. The prepayment right was the essential strategic right because the Norman Brothers knew from the outset that they would be building in a fast-growing area of New Orleans. It is undisputed that the location of the property was in the path of expected future development, Tr. 1475:2-14 (Derbes), an assessment that the Norman Brothers not only made based on their own experience but also confirmed with other builders and consultants before deciding to proceed with the transaction, Tr. 60:3-62:21 (Norman).

23. In the late 1960s and early 1970s, the expectation in the marketplace was that West Metairie, where Chateau Cleary is located, was in the path of future development. The

government's own valuation expert acknowledged that Metairie was going to be "the major growth section of the city during that time." Tr. 1475:12-14 (Derbes).

24. In fact, the development toward (and beyond) Chateau Cleary occurred just as the Norman Brothers had expected. HUD's director of the Division of Housing Management in New Orleans pointed out that, by the 1990s, Metairie had the benefit of two large, popular shopping malls, one of the area's premier medical complexes, good public schools, a new regional library, easy access to Interstate 10, and close proximity to downtown New Orleans. DX 140; Tr. 562:13-563:7 (Alexander). HUD's current director of the Multi-Family Program Center in New Orleans stated that, by the mid-1990s when she first arrived in New Orleans, Metairie was an attractive location in the New Orleans area due to its higher income, better schools, low crime rate, and "great shopping." Tr. 1122:20-1123:11 (Kizzier).

25. Part and parcel of the Norman Brothers' strategy was to build a quality project that would be well maintained and then be ideally suited for conversion to market-rate apartments upon prepayment. Tr. 60:3-23; 61:12-17; 67:15-22 (Norman). The decision to develop the project in a middle class neighborhood and to operate a well-built and well-maintained property was made with the expectation that Chateau Cleary would increase in value and attract the higher rental rates and rate of return of a conventional apartment complex upon prepayment of the Note. Tr. 57:10-17 (Norman).

26. In line with this strategy, the Norman Brothers developed a well-built property and maintained it in fine condition. Chateau Cleary consistently received superior ratings during HUD-required inspections and was praised as being "a model complex" by HUD's own inspectors. PX 54 at G-CCA 5323; Tr. 153:18-154:15 (Norman). Well into its fourth decade of operation, Chateau Cleary sustained minimal physical damage from Hurricane Katrina in the fall

of 2005 -- a testament to the quality of its construction and maintenance. Tr. 52:5-13 (Norman).

27. That the Norman Brothers' strategy looked ahead to achieve substantial economic gains after 20 years is further confirmed by their decision not to syndicate the ownership of Chateau Cleary. Syndication would have meant relinquishing most of the ownership in the property and sacrificing the upside benefit they expected to achieve upon prepayment. While syndication may perhaps have been suitable for the "typical" low-income housing project, Tr. 1266:4-19 (Malek), the Norman Brothers had a different approach that depended on realizing the value of the investment upon the twentieth anniversary, Tr. 92:9-22 (Norman).

28. The Norman Brothers' expectation that they would be able to prepay the HUD mortgage in 20 years and convert Chateau Cleary to a conventional market rate apartment complex was based upon specific language in the Note. That language was approved and authorized by HUD and embodied in HUD's then-existing regulations which were explicitly referenced in the Regulatory Agreement that the Norman Brothers signed. DX 1; PX 3-6; Tr. 80:5-14; 91:22-92:8 (Norman) ("[T]hese documents, in our mind, obligated us to do certain things for the 20 years into the 40 year mortgage, and also obligated HUD to allow us to do certain things at the end of the 20 year period.").

29. In view of the express language in the Note and HUD's then-existing regulations, the Norman Brothers had no reason to believe that the government would eliminate the unconditional right to prepay the mortgage. Tr. 74:25-75:7 (Norman).

**B. The 1985 Transfer**

30. In 1985, in connection with personal succession planning, J. Robert Norman sold his 50% interest in Chateau Cleary to CCA. PX 28-28A & 30; Tr. 160:23-161:23 (Norman). The CCA partnership, a family partnership of Ernest B. Norman Jr. and his children and grandchildren, was established on March 27, 1985, and Ernest B. Norman III was named

Managing Partner in the partnership agreement. PX 30. The date of the sale by J. Robert Norman to CCA was April 12, 1985. PX 28A. The sale transaction was carried out with the full knowledge and approval of HUD. Tr. 168:11-22 (Norman). As part of the sale of J. Robert Norman's interest to CCA, HUD required CCA to execute a Regulatory Agreement. PX 29. Like the one executed in 1969, the Regulatory Agreement executed in 1985 incorporated by reference HUD's regulations, which continued to recognize the right to prepay on the 20-year anniversary of the final endorsement of the Note, and sharply restricted use of the property until prepayment. PX 29; Tr. 172:2-173:10 (Norman). In 1986, also with HUD's approval, Ernest B. Norman, Jr. transferred his 50% interest in Chateau Cleary to CCA. PX 33.

31. CCA purchased J. Robert Norman's interest for $677,550, reflecting an equity value of approximately $1,350,000 and a market value for Chateau Cleary in the range of $2,600,000. PX 28A; Tr. 163:7-164:21 (Norman). At the time of the 1985 purchase by CCA, the right to prepay was only six years away. The price paid reflected the value that was accumulating in the property as the prepayment date neared. Tr. 163:7-20 (Norman). In 1985, CCA fully expected that it would be able to pay off the mortgage in 1991, convert Chateau Cleary into a conventional complex, raise rents, and operate free of HUD restrictions. Tr. 174:21–175:25 (Norman). CCA's expectations were identical to those of the Norman Brothers in 1969, except the realization of those expectations was now only a few years away.

32. Had Congress already abrogated the prepayment right, CCA would not have paid a price even remotely close to $677,500 or indeed anything at all. If CCA had known in 1985 that it would be forced to continue operating under the HUD regulations until the 40th anniversary of the mortgage, the transfer to CCA in all likelihood would not have happened at any price because "there would have been nothing to buy." Tr. 175:17-25 (Norman).

33. Given the express language in the Note and Regulatory Agreement, HUD's then-existing regulations, and the proximity in time to Chateau Cleary's prepayment date, CCA had no reason to suspect that the government would eliminate CCA's unfettered right to prepay the mortgage only a few years later. Tr. 175:3-16 (Norman).

**C. The Preservation Statutes**

34. In 1987, Congress realized that "in the next 15 years, more than 330,000 low income housing units insured under Sections 221(d)(3) and 236 of the National Housing Act could be lost as a result of the termination of low income affordability restrictions." ELIHPA, 12 U.S.C. §1715*l* note. In response, Congress temporarily barred owners from prepaying their mortgages. ELIHPA § 221(a); Tr. 182:1-18 (Norman).

35. In 1990, Congress enacted LIHPRHA, which "made permanent ELIHPA's temporary ban on prepayment without HUD approval." *Cienega IX*, 67 Fed Cl. at 440. As a result, LIHPRHA permanently prevented CCA from exercising its right to prepay its HUD-insured mortgage without HUD approval. *Id.*; Tr. 185:13-22 (Norman).

36. By enacting ELIHPA and LIHPRHA, Congress shifted the burden of the low-income housing crisis from all taxpayers to the owners of properties in HUD's programs, including CCA. Tr. 594:8-595:2 (Alexander); *Cienega IX*, 67 Fed Cl. at 467. Congress also substantially interfered with CCA's right to use, transfer, and exclude others from its property. Tr. 185:23-186:6 (Norman). These statutes compelled the physical occupation of Chateau Cleary by government-approved tenants at government-dictated rents.

37. The Preservation Statutes and regulations promulgated thereunder presented an owner with three theoretical alternative courses of action, all of which required an owner to run the gauntlet of a multi-year bureaucratic process with no assurance of a specific outcome, except that the owner would certainly be far worse off than if the Preservation Statutes had not been

enacted. These theoretical options were to: (a) request permission to prepay the mortgage, by demonstrating that prepayment would not have an adverse effect on the existing tenant population or the supply of decent, safe, and affordable housing; (b) agree to maintain the property as affordable housing in exchange for certain financial incentives; or (c) sell the property through an artificial process at a below market, HUD-approved price to HUD-approved purchasers willing to maintain the low-income affordability restrictions. 12 U.S.C. § 4108; 24 C.F.R. § 248.141(a)(1) (1991); Tr. 587:18-589:6 (Alexander).

38. None of these options reimbursed owners for cash flows lost as a result of being prohibited from prepaying and converting to market rents on the original prepayment dates. 12 U.S.C. § 4108; 24 C.F.R. § 248.141(a)(1); Tr. 636:6-9(Alexander).

39. One other option that the owners retained was to abide their confiscation and do nothing. Tr. 1081:6-8 (Kizzier) ("They could choose not to come into the [Title 2 or Title 6] program."). In this case, an owner would be forced to continue to operate under the Regulatory Agreement and receive, at most, a 6% annual return on *original* equity for the remainder of the 40-year mortgage. 12 U.S.C. § 4108; 24 C.F.R. § 248.141(a)(1).

**1. Plan of Action for Prepayment**

40. To request and obtain permission from HUD to prepay under the Preservation Statutes, an owner was required to file a Plan of Action that would enable HUD to make written findings that, among other things:

> (a) (1) [I]mplementation of the plan of action will not—
>
> (A) materially increase economic hardship for current tenants, and will not in any event result in (i) a monthly rental payment by any current tenant that exceeds thirty percent of the monthly adjusted income of the tenant or an increase in the monthly rental payment

> in any year that exceeds 10 percent . . .; or[7]
>
> (B) involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available, determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and
>
> (2) The supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect—
>
> (A) the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families or persons in the area that the housing could reasonably be expected to serve . . . .

12 U.S.C. § 4108; *see also* 24 C.F.R. § 248.141(a)(1); Tr. 587:18-589:6 (Alexander); 1100:20-1101:2 (Kizzier).

41. ELIHPA and LIHPRHA prohibited HUD from approving a request for prepayment unless the owner could show that prepayment would satisfy all of these criteria. *See* 12 U.S.C. §4108; ELIHPA §225(a); Tr. 587:18-589:6 (Alexander). In fact, CCA could not satisfy *any* of these criteria for prepayment under the Preservation Statutes, let alone *all* of them. As a result, HUD was statutorily prohibited from granting a prepayment exception to CCA. HUD had no discretion to allow CCA to prepay. Tr. 587:18-589:6 (Alexander).

42. Conversion of Chateau Cleary to a market rent complex would have caused the current tenants' rents to increase by more than 10%. Mr. Norman's opinion, after having managed the property for more than thirty years, was that Chateau Cleary's HUD–regulated rents were more than 20% below market rents in 1991. Tr. 190:9-21 (Norman).

---

[7] At trial, the Government erroneously asserted that the 10% rental increase criterion did not apply to properties subject to ELIHPA. Tr. 24:16-25 (Woodrow). While that was true for a brief period immediately after the enactment of ELIHPA, within nine months of enactment, ELIHPA was amended to reflect the 10% criterion, with which CCA would have had to comply. ELIHPA § 225(a)(1), 12 U.S.C. § 1715*l*. Because the government was mistaken as to the applicable criteria, it presented no evidence controverting CCA's convincing evidence that its HUD rents were more than 10% below market rents.

43. As of CCA's prepayment date, May 17, 1991, HUD rates at Chateau Cleary were $264 for 1-bedroom units, between $303 and $310 for 2-bedroom units, and $335 for 3-bedroom units. PX 106. Dr. Ragas determined that the market rates for these units would have been $368, between $404 and $420, and $433, respectively. PX 106. The market rents for 1-, 2-, and 3-bedroom apartments at Chateau Cleary were thus 39%, 33% to 35%, and 29% higher, respectively, than the HUD-mandated rates at Chateau Cleary. PX 106; Tr. 841:3-16 (Ragas).

44. The suggested market rental rates for Chateau Cleary proffered by the government's own expert ($330 for 1-bedroom units, between $360 and $399 for 2-bedroom units, and $430 for 3-bedroom units) were between 16% and 28% (with an average of 22.5%) higher than Chateau Cleary's HUD–mandated rates. PX 100; Tr. 1492:17-1493:13 (Derbes).

45. CCA also could not satisfy statutory requirements for prepayment for the further reason that CCA's then tenants could not have afforded to pay the market rents charged by conventional properties without paying more than 30% of their adjusted income for rent. Tr. 610:7-611:11 (Alexander) (Chateau Cleary tenants could not have afforded rents charged by conventional properties without paying more than 30% of their adjusted income for rent).

46. In addition, if CCA prepaid its mortgage, the supply of low-income housing would have been materially affected and current CCA tenants would have been involuntarily displaced. It is undisputed that the New Orleans area had large numbers of low-income people in need of affordable housing in the early 1990s. There were three- to four-year waiting lists to get into HUD properties. Tr. 590:25-591:4 (Alexander); 1104:11-1105:9 (Kizzier). Chateau Cleary maintained its own waiting list. Tr. 193:2-4 (Norman).

47. Had Chateau Cleary been converted to a market rate complex, the housing stock itself would not change, but the availability of Chateau Cleary's units to poor people *would*

change. Tr. 591:5-15 (Alexander). Displaced tenants could not have found comparable housing in the same area because none existed and, instead, would have been forced to look about eight miles away for comparable housing, wholly apart from whether units were even available. Tr. 191:18-192:8; 196:17-22 (Norman). Given the large number of poor people in the New Orleans area and the long waiting lists to get into low income housing, Chateau Cleary could never have carried its burden of establishing that alternative housing would have been available.

48. HUD officials recognized that authority to approve prepayment applications under the Preservation Statutes was very limited. Prepayment in the New Orleans area was particularly difficult to accomplish. Tr. 1106:6-1107:1 (Kizzier). HUD did not approve a single prepayment request in the New Orleans area or the entire state of Louisiana. PX 124A; Tr. 1102:23-1103:1 (Kizzier); 596:3-9 (Alexander). In fact, owners undoubtedly knew they could not satisfy HUD criteria and did not even bother to request HUD's permission. PX 124A; Tr. 1102:23-1103:1 (Kizzier); 596:3-9 (Alexander). The New Orleans situation reflected that across the country -- there were extremely few, if any, prepayments throughout the entire United States. Tr. 1697:20-1698:3 (Dickey).

49. HUD had no legal authority to allow CCA to prepay its mortgage, unless CCA carried its burden of showing that prepayment would satisfy *all* of the statutory criteria, but CCA could not satisfy any of the criteria. CCA did not seek HUD's permission to prepay its mortgage because it understood that such a request could not, and would not, have been granted and that making the request would have been an exercise in futility. Tr. 187:2-9 (Norman).

**2. Preservation Benefits**

50. An owner who decided to go through HUD's "secondary permitting scheme" to seek incentives or a sale to a qualified purchaser was required to file a Notice of Intent with the Secretary of HUD describing the intended action. ELIHPA §222, 12 U.S.C. §1715*l* note;

Tr. 1085:8-11 (Kizzier). HUD would subsequently send the owner information about the relevant market area and a description of authorized options. ELIHPA §§ 224 & 225.

51. The owner then had to submit a detailed Plan of Action containing information about the property and the relevant housing market. The Plan of Action had to describe the state assistance that might be available to the owner, detail the proposed changes to the low-income affordability restrictions, describe any proposed changes in ownership, state the effect of the proposed changes on existing tenants, and provide an appraisal. 24 C.F.R. § 248.213(b) (1991). The owner was required to make affirmative representations in the Plan of Action "which would enable the owner to meet the criteria for approval of the proposed plan of action." 24 C.F.R. § 248.213(b)(10) (1991); Tr. 615:21-616:4 (Alexander).

52. LIHPRHA's transition provisions permitted owners whose properties would be eligible for prepayment before January 1, 1993 to submit a Notice of Intent prior to January 1, 1991. Submission of this notice allowed owners to proceed under either Title II or Title VI. CCA filed a Notice of Intent to preserve its options. PX 42; Tr. 197:4-199:17 (Norman).

53. To receive preservation benefits under Title II, owners were required to enter into Title II Use Agreements, which would extend the affordability restrictions for the remaining term of the owners' HUD-endorsed mortgages. ELIHPA § 225(b); 12 U.S.C. § 1715*l* note; *Cienega IX*, 67 Fed. Cl. at 441. Extension of the affordability restrictions was a non-negotiable term of the Use Agreements and was required to be included. Tr. 627:23-628:18 (Alexander).

54. The negotiation and processing of Title II Use Agreements was a laborious process, and, while a property owner was going through the process, the property continued to be subject to the 6% limited dividend provided in the Regulatory Agreement. Approval of a Plan of Action for incentives involved negotiations between the owner and HUD, which could take three

years to complete. Tr. 614:4-617:7 (Alexander); Tr. 1119:8-14 (Kizzier).

55. Each plan of action took HUD personnel approximately 600 staff hours to process. PX 96; Tr. 620:16-621:4 (Alexander). Throughout the early to mid-1990s, HUD operated under a hiring freeze that began as far back as 1981. As a result of the freeze, the New Orleans HUD office found it progressively more difficult to process Plans of Action as they were submitted. Tr. 621:24-622:7; 624:16-21 (Alexander). By 1994, on a nationwide basis, HUD would have needed 425 staff *years* to process the then-current pipeline of Notices of Intent. PX 96.

56. Title VI was similar in effect to Title II, but generally the incentives and restrictions were even less favorable to owners. Financial incentives were available but owners were required to agree to retain affordable housing for the remaining useful life of such housing. 12 U.S.C. § 4112(a)(2)(A). Petitions for the Secretary of HUD to determine that the useful life of the property had expired were not permitted until 50 years after the approval of a plan of action. 12 U.S.C. § 4112(c)(3); Tr. 658:17-24 (Alexander). In any event, Congress failed to allocate monies sufficient to fund owners whose plans of action were approved by HUD. Tr. 630:10-23 (Alexander); 1108:12-25 (Kizzier). In New Orleans, there were six properties that requested and received HUD approval for plans of actions with incentives. However, Congress funded none of these approved plans. PX 97; Tr. 630:10-23 (Alexander).

57. Because the receipt of incentives through funding by Congress was determined by position in a funding queue, Tr. 616:15-617:1; 627:5-10 (Alexander), even if CCA had applied for incentives, received approval from HUD, and found itself, among the New Orleans properties, in the number two position in the queue, it would not have received incentives in any event. Under the circumstances, a timely request for incentives, had it resulted in CCA's

occupying the second, or a lower, position in the New Orleans queue, would have been futile.

58. In addition, the so-called incentive options would have had the perverse effect of exacerbating CCA's losses. If CCA had applied for and obtained incentives, it would have been required to remain in the HUD program until at least the 40th anniversary of its mortgage. The analysis of the government's own experts and the analysis of Mr. Alexander show that remaining in the HUD program was a value-destroying, loss-enhancing proposition. Tr. 1457:15-21; 1545:3-1548:19 (Derbes); 1733:15-1734:9 (Dickey); 581:20-582:23 (Alexander).

59. In any event, the incentive option represented a "secondary permitting scheme" that an owner was not required to navigate. *Cienega IX*, 67 Fed. Cl. at 461.

60. Prior to the enactment of Title II and Title VI, CCA, like all property owners, possessed the right, upon prepayment, to sell its property to the highest bidder. Although CCA always intended to hold Chateau Cleary for the long term and operate the property conventionally after 20 years, the unrestricted ability to sell the property in a free market after 20 years is a valuable property right. Thus, the "sale option" offered under Title II and Title VI was a serious limitation on CCA's property rights. Tr. 640:13-18 (Alexander) (the sales option under the Preservation Statutes did not fit the definition of a fair market process); 1873:11-1874:1 (Stillman) (as a matter of economics, the sales option is not a fair market transaction).

61. Title II and Title VI permitted owners to sell their properties only to "qualified purchasers" at an artificially low price determined by HUD through a valuation process set by the statutes and regulations and ultimately subject to HUD approval. "Qualified purchasers," as defined in the statutes, had to agree to maintain the property as affordable housing, and HUD could not approve a sale to a non-qualified purchaser. 12 U.S.C. § 4121.

62. The sale option also represented a "secondary permitting scheme" that an owner

was not required to navigate. *Cienega IX*, 67 Fed. Cl. at 461.

**D. The HOPE Act And CCA's Prepayment**

63. On March 28, 1996, Congress enacted the Housing Opportunity Program Extension Act of 1996, Pub. L. No. 104-120, 110 Stat. 834 (1996) ("HOPE"). HOPE permitted owners to prepay their HUD-endorsed mortgages. However, owners were required to wait 60 days before raising rents. *Id.* This restoration of the prepayment right did not restore to CCA the income that it had lost in the prior five years as a result of being prohibited from prepaying and converting to market rents on its original prepayment date.

64. Notwithstanding the passage of HOPE, HUD attempted to extend ELIHPA and LIHPRHA administratively through the issuance of so-called preservation letters, which, among other things, informed owners that they still required HUD approval prior to prepayment and that HUD had imposed a three-year moratorium on rent increases on tenants in low-vacancy areas. PX 63, 65, 67 & 72. See *Cienega IX*, 67 Fed. Cl. at 480.

65. In its initial letters, HUD required that owners receive HUD approval prior to prepayment. PX 63; Tr. 217:10-218:9 (Norman). By the time of Preservation Letter #4, dated May 3, 1996, HUD had abandoned the approval requirement, but HUD still required notification. PX 65; Tr. 219:22-221:8. HUD also announced a three-year moratorium on rent increases for tenants in low-vacancy areas. PX 67; Tr. 223:19-224:19 (Norman). Because of the constantly changing prepayment guidelines, the prepayment process was in a state of flux. It was only in Preservation Letter #97-1, dated December 16, 1996, PX 75, that HUD gave up on its efforts to deflect administratively the full implementation of Congressional intent. Under these circumstances, CCA could have prepaid and operated conventionally as of February 28, 1997.

66. In the meantime and notwithstanding the confusion sowed by HUD, Mr. Norman began to prepare for prepayment. He contacted Eustis Mortgage Company to explore financing

options. PX 73; Tr. 236:3-20 (Norman). He also engaged an appraiser to conduct an appraisal of the property, which was completed in November 1996. PX 74; Tr. 237:7-25 (Norman).

67. In November 1996, James Alexander of the New Orleans HUD office, in fulfillment of a HUD-sponsored and approved course of study, commenced a detailed analysis of CCA's options. DX 140; PX 75A; Tr. 242:10-244:16 (Norman); 557:22-558:1 (Alexander). In discussing the scenarios to be studied, Mr. Norman told Mr. Alexander that CCA intended, "as soon as possible," to prepay the mortgage and exit the HUD program. PX 75A; Tr. 243:20-244:5 (Norman). Mr. Alexander understood that Mr. Norman was going to wait for the report before deciding how to proceed, and the two men remained in contact during the following months while Mr. Alexander prepared the report. Tr. 552:18-21; 557:22-558:19 (Alexander).

68. Mr. Alexander delivered his report to Mr. Norman on or about April 1, 1997. DX 140. The study was lengthy and detailed and presented four options for Mr. Norman to consider. *Id.*; Tr. 577:3-13 (Alexander). These options included remaining in the HUD program and then three variations on prepayment with differing degrees of investment in, and upgrade of, the property. DX 140 at G-CCA 6378; Tr. 726:15-24 (Alexander).

69. The *status quo* option -- remaining a HUD property for the next seven years, which was akin to what CCA had just gone through involuntarily as a result of enactment of the Preservation Statutes -- showed horribly negative rates of return and substantial value destruction. DX 140; Tr. 581:12-582:23 (Alexander). The three other options -- each of which involved rapid prepayment in tandem with varying degrees of expenditure to cure deferred maintenance and to upgrade the property -- all showed substantial positive rates of return and value enhancement. DX 140; Tr. 582:24-583:12 (Alexander).

70. Mr. Norman took several weeks to review and digest Mr. Alexander's study. The

two men met at least once to discuss it, some time in April or May 1997 and otherwise talked on the telephone. Tr. 558:2-19 (Alexander). Following his study of the plan and his discussions with Mr. Alexander, Mr. Norman determined that the best course of action for him was to fashion a hybrid of Mr. Alexander's second and third options, entailing a moderate level of expenditure to prepare the property for prepayment. Tr. 270:13-21 (Norman). Mr. Norman reached this decision in about June or July 1997. During the next six or seven months, Mr. Norman had the repairs made in furtherance of this plan. Tr. 272:22-273:13 (Norman).

71. In about February 1998, as the repairs were being completed, Mr. Norman was in contact with Hampstead Partners, a consulting firm. Tr. 279:7-280:22 (Norman). In April 1998, Mr. Norman signed a contract with Hampstead Partners to guide CCA through the prepayment process. PX 83; Tr. 279:7-280:8 (Norman). With the assistance of Hampstead Partners, CCA delivered the required prepayment notifications in May 1998. PX 85-86; Tr. 280:23-282:8 (Norman). Because the New Orleans office of HUD was inexperienced in dealing with prepayments and needed to consult "HUD Central" to determine what to do, CCA's ability to complete the prepayment process was delayed by several months. CCA ultimately acquired private financing and prepaid its HUD-endorsed mortgage on September 30, 1998. Tr. 1776:19-1777:4; 1780:4-1782:15; 1792:19-1793:12 (Root).

**E. Economic Impact**

72. CCA suffered a serious financial loss as a result of the Preservation Statutes. Dr. Ragas accurately measures the economic impact of these statutes as the percentage diminution in expected investment return. Dr. Ragas follows the methodology approved in *Cienega VIII* and *Cienega IX* and compares CCA's return on investment allowed as of the original prepayment eligibility date with the expected return under a market scenario.

73. Dr. Ragas properly did not consider the "value" of the so-called "incentives"

under ELIHPA and LIHPRHA. While Dr. Dickey testified that the incentives have "value," this is true only in the most theoretical sense and indeed Dr. Dickey did not attempt to quantify any value, which would be next to impossible. Tr. 1699:2-18; 1701:5-12 (Dickey). If the government could avoid paying just compensation by offering a percentage of the value of the property taken in partial compensation, such an outcome would perversely incentivize the government to accomplish its purposes through such actions. Tr. 1754:10-19 (Dickey).

74. For the period of the taking, Dr. Ragas used the maximum allowable dividend of $12,952 and the government's calculated equity figure for Chateau Cleary in 1991 of $746,300 to determine that the Preservation Statutes limited CCA to a 1.74% return on equity. PX 125; Tr. 794:7-798:21 (Ragas). Comparing this return to a risk-free return of 8.5% results in a diminution of 79.6%. PX 125; Tr. 794:7-798:21 (Ragas). The diminution is higher if one compares the maximum allowable dividend to the equity in the property that Dr. Ragas calculated or to a 10% rate of return (a conservative market rate available at that time), or to both. In all events, the diminution in return on equity is *at least* 79.6%, which is, "even under the most conservative view, a 'serious financial loss.'" *Cienega VIII*, 331 F.3d at 1343.

75. In response to Dr. Dickey's criticism that measuring the return on equity as of May 1991 presents only a "snapshot" at one point in time, Dr. Ragas also presented an analysis comparing the maximum allowable dividend to the equity at multiple points in time throughout the period of the taking. PX 125; Tr. 801:19-802:6 (Ragas). In this analysis, the diminution increased because each year the amount invested in the property increased as a result of principal repayments. The average diminution throughout the 5-year period of the taking was 82.5%. PX 125; Tr. 801:21-802:3 (Ragas).

76. Dr. Ragas also presented other indicia of economic impact, all of which

demonstrated that Chateau Cleary was very adversely affected. PX 125; Tr. 811:12-812:5 (Ragas). Moreover, Dr. Ragas' calculation of the damages suffered by CCA -- the amount of just compensation that is due -- is further confirmation that CCA was grievously harmed. The government mocks these multiple indicia as being "all over the map." Tr. 36:21-37:2 (Woodrow). *Au contraire*, the analyses demonstrate that, from every angle, CCA was seriously impacted by the loss of its prepayment right, an intuition to which common sense would bring the neutral observer in any event.

77. The government's assertion that CCA has not suffered a serious financial loss is not credible. Dr. Dickey attempts to obscure the adverse impact on CCA by measuring the economic impact of the regulations on the value of the property as a whole. Under this approach, a hypothetical owner who loses 100% of his $10 million per year income on a $100 million building for a four-and-a-half-year period of its 10-year useful life as a result of a legislative enactment, and thus suffers a loss of $45 million as a result of the legislation, would be deemed to have suffered a 45% diminution in expected returns. Tr. 1752:11-1753:10 (Dickey). Using Dr. Dickey's analysis, the government could purposefully take 100% of an owner's income or real property for several years without the owner being able to demonstrate sufficient economic injury to prove a compensable taking.

78. The government's model is fundamentally flawed. Purporting to be a principled economic analysis that examines the taking from an *ex ante* perspective, Dr. Dickey's analysis in fact mixes helpful *ex post* information into its purportedly *ex ante* analysis. Tr. 1718:25-1721:23 (Dickey); 1441:9-12; 1444:9-25; 1445:8-15; 1447:7-21; 1451:2-7 (Derbes).

79. Dr. Dickey's report repeatedly trumpets the advantages of an *ex ante* analysis using a diminution in value approach to damages and criticizes use of an *ex post* analysis. DX

160 at 4-5, 11, 19. But Dr. Dickey does not use only *ex ante* information. Rather, Dr. Dickey incorporates Mr. Derbes' two valuations into his analysis, but, in his second valuation, Mr. Derbes assumed that, as of May 1, 1991, it was known with 100% certainty that HOPE would be passed in 1996. Tr. 1723:3-10 (Dickey). In other words, Dr. Dickey takes Mr. Derbes' two valuations -- both done as of May 1, 1991, one of which values Chateau Cleary without HUD restrictions, the second of which values Chateau Cleary with HUD restrictions lasting until May 1996 only -- and then calculates impact by subtracting the second from the first. Of course, if the second valuation were done on the basis of what was known at the time, i.e., that LIHPRHA was permanent, the economic impact would materially increase. Tr. 1733:15-25 (Dickey).

80. Mr. Derbes admits that the use of a date certain for the passage of HOPE serves to prop up the amount of the second valuation with the result that the economic impact found by Dr. Dickey is reduced. Tr. 1453:25-1455:1 (Derbes). As Dr. Stillman demonstrated on the stand, if one assumed as of 1991 that HOPE would be passed in ten years instead of five, the resulting impact doubles in magnitude. Tr. 1859:5-1860:24 (Stillman). In reality, there was no information, as of May 1991, that HOPE would be passed in 1996, in 2001, or indeed at any time. Quite the contrary, LIHPRHA had recently been passed, and by its terms was permanent. Tr. 1450:7-16 (Derbes). Dr. Dickey's analysis depends on the worst sort of selective use of information in an unprincipled fashion.[8]

81. In all events, Dr. Dickey's analysis is fundamentally different from, and inconsistent with, the method upheld by the Federal Circuit in *Cienega VIII* and by this Court in *Cienega IX*.

---

8 Dr. Dickey testified in rebuttal that he has seen a litigation manual that approves use of *ex post* information in an *ex ante* analysis -- cherry-picking to call it what it truly is. Dr. Dickey's reference to this manual means only that one can usually find some expert who will say anything. Tr. 2011:9-2012:9 (Dickey).

**F. Just Compensation**

82. As a result of the enactment of ELIHPA and LIHPRHA and of CCA's resulting inability to prepay its mortgage and convert to conventional market-rent units upon its original prepayment date, CCA has suffered $1,528,629 in damages as of September 30, 2006, based on an end-of-taking date of February 28, 1997. PX 125. If the end-of-taking date were held to be May 31, 1996, then CCA's damages amount to $1,361,298 through September 30, 1996. *Id.*

83. Dr. Ragas' analysis seeks to put CCA in the position it would have been in had its property not been taken by the government. Dr. Ragas appropriately recognizes that the government took CCA's right to prepay its mortgage, causing it to lose a stream of income that was not reinstated when the prepayment right was restored.

84. Dr. Ragas measures CCA's damages as the difference between the cash flow CCA would have received had it been allowed to prepay its mortgage and operate the property as a conventional apartment complex ("the Market Scenario") and the cash flow CCA actually received from operating the property as a HUD-restricted property (the "HUD Scenario"). PX 106 & 125. Dr. Ragas' analysis takes into account rental income, other operating income, operating expenses, vacancy and credit costs, conversion costs, prepayment penalties, and debt service. PX 106 & 125; Tr. 815:11-817:21 (Ragas).

85. In the Market Scenario, Dr. Ragas reasonably concluded that, after conversion repairs, Chateau Cleary would be an average quality apartment complex in the West Metairie submarket. PX 106; Tr. 1927:4-1937:6 (Ragas). He reached this conclusion based on a number of considerations, including the average size and condition of the units. He determined, for example, that two of the unit types were larger than the average for those types in that submarket in 1991, one type was average size, and one type was slightly below average size. *Id.* He also determined that, with a moderate level of expenditure, which he took into account in his analysis,

the condition of the complex would be upgraded and achieve an average quality. Dr. Ragas then applied a rent increase factor in the following years based on the average rent increase factor in the submarket as the economy strengthened in 1991 following a grinding recession that had prevailed from 1986 to 1990. PX 106; Tr. 821:21-823:11 (Ragas).

86. To calculate operating expenses in the Market Scenario, Dr. Ragas relied on actual market operating expenses for comparable properties. He also applied appropriate vacancy and credit loss factors based on actual conditions in the market. PX 106, 111-113, & 116-117; Tr. 815:11-817:21 (Ragas). In his analysis, Dr. Ragas used data from reliable industry sources, including the University of New Orleans Real Estate Market Analysis which all witnesses qualified as authoritative. Tr. 570:5-571:7 (Alexander); 1393:8-12 (Derbes); 831:18-832:6 (Ragas).

87. To quantify the cash flows CCA received in the HUD Scenario, Dr. Ragas relied on the actual performance of CCA as reflected in its books and records and audited financial statements. PX 106; Tr. 815:11-817:21 (Ragas). There was no dispute from the government on the accuracy of Dr. Ragas' conclusions regarding the HUD Scenario cash flows.

88. Dr. Ragas then took the difference between the Market Scenario cash flows and the HUD Scenario cash flows and determined the unadjusted lost income that CCA suffered. In the period May 1991-May 1996, the unadjusted lost income amounted to $607,757. In the period May 1991-February 1997, the unadjusted lost income amounted to $686,363.

89. Mr. Derbes, as part of his analysis, also determined the amount of "loss of income during 5-year delay to market rental rate" that CCA suffered as a result of HUD restrictions from May 1, 1991 through April 30, 1996. DX 173 at. 9. Mr. Derbes calculated that loss as amounting to $528,971. DX 173; Tr. 1524:6-1525:23 (Derbes). This is $78,786 less than the

amount Dr. Ragas calculates for the comparable period. Mr. Derbes attributed the difference largely to differing assumptions about rent levels that he and Dr. Ragas made. Tr. 1526:4-1527:3 (Derbes). While Mr. Derbes used a different methodology, he unwittingly provided a sensitivity analysis that essentially validated Dr. Ragas' conclusions.

90. After calculating CCA's lost cash flows, Dr. Ragas adjusted them forward to reflect end-of-taking values. Dr. Ragas applied a 10% factor based on his conclusion that the CCA ownership had prudent, alternative investments available that would have earned at least 10%. Tr. 863:11-865:10 (Ragas). Dr. Ragas' analysis followed the methodologies approved in *Cienega IX*, 67 Fed. Cl. at 491, and *Independence Park*, 61 Fed. Cl. at 710.

91. Nonetheless, the government criticizes Dr. Ragas' use of a 10% rate to adjust lost income forward to the end of the taking and asserts that 8.5% is more appropriate. Dr. Ragas found that 8.5% is a riskless rate, and, since CCA lost the opportunity to invest funds in an alternative investment, the use of the slightly higher rate is appropriate. Tr. 864:13-865:2 (Ragas). To make CCA whole, use of a 10% rate is necessary.

92. The government maintains that CCA's lost cash flows should be discounted at a high risk rate as part of its diminution in value analysis and then adjusted forward at the government's risk free rate. Tr. 1684:17-23; 1687:6-12 (Dickey). Such an analysis is misguided for a number of reasons. First, the government did not establish that it is materially more risky to operate a conventional property than it is to operate a HUD property. Given the regulatory risk CCA actually underwent, such an argument would be unavailing. Second, fairness would require discounting future cash flows and bringing forward past cash flows at the same rate. Applying a compounding rate that is identical to the discount rate is equitable and will eliminate the incentive for the government to continue to delay this case and not pay CCA the just

compensation owed. If cash flows were discounted at a higher rate than the rate at which damages are then brought forward, such an arbitrage would reward the government for its failure to compensate CCA over a very long period of time and would allow it to profit from an uncompensated taking in an amount that increases as the process drags on.

93. In any event, Dr. Ragas' approach, to adjust forward each year's loss of cash flow to the end of the taking using a 10% conservative alternative investment factor, recognizes that CCA had alternative investments open to it and follows the methodology approved in *Cienega IX*, 67 Fed. Cl. at 491, and *Independence Park*, 61 Fed. Cl. at 710.

94. After determining the amount of damages in end-of-taking adjusted dollars, Dr. Ragas then applies the ten-year Treasury STRIPS rate from the end of taking through September 30, 2006. Compound interest is required to place CCA in as good a position pecuniarily as it would have occupied if just compensation had been paid at the end of the taking. PX 106; Tr. 866:2-14 (Ragas). *See also Cienega IX*, 67 Fed. Cl. at 493. Additionally, use of the ten-year Treasury STRIPS rate reflects to some extent, but not fully, CCA's lost opportunities. CCA "would have reinvested the money in some manner had the government paid [it] at the end of the taking." *Id.* The government began the taking more than fifteen years ago and terminated it at least nine years ago. "Compounding is 'a routine means by which a reasonable person would protect [himself or herself], over an extended period of time, from erosion of [his or her] investment.'" *Id.* (*quoting Vaizburd v. United States*, 67 Fed. Cl. 499, 504 (2005)).

95. Accordingly, if the end-of-taking date is February 28, 1997, the damages award as of September 30, 2006 should be $1,528,629. If May 31, 1996 is held to be end-of-taking date, the amount due as of September 30, 2006 would be $1,361,298. Interest should continue to accrue from September 30, 2006 to the date of a final award of damages.

96. The government contends that CCA's damages must be reduced by some unspecified amount, arguing that Mr. Norman did not sufficiently raise Chateau Cleary rents. The government failed to prove this contention factually. Rather, the evidence established that Mr. Norman sought and obtained rent increases whenever it was feasible to do so. He persistently and repeatedly sought rent increases in the period 1972-1985, during which high inflation and rising operating expenses prevailed. As a result, Mr. Norman sought and obtained nine rent increases between 1972 and 1985. PX 9A, 10A, 14A, 16A, 17A, 18A, 20A, 22A, 25A & 26A; Tr. 107:15-108:11 (Norman). Mr. Norman used increased operating expenses and expected increases in future operating expenses to justify his requests for a rent increase. Tr. 143:14-144:16; 340:3-23 (Norman). In the period after a rent increase was effected, the operating expenses typically went up as the increased rent paid for additional expenses that had been anticipated. Tr. 485:10-486:1 (Norman).

97. It is undisputed that, in the mid-1980s, the collapse of the oil industry caused a severe recession throughout metropolitan New Orleans. Tr. 155:18-156:12 (Norman) (the recession caused conventional apartment complexes to lower rents to levels close to those of Chateau Cleary); 822:7-17 (Ragas) (The widespread decline in oil and gas prices translated into failures in the banking industry and "widespread failures in the apartment marketplace."). The government's valuation expert acknowledged that the recession caused a "major impact" in 1986, which affected Metairie occupancy rates "dramatically" and also impacted rental rates. Tr. 1349:1-1350:11 (Derbes). HUD's former Director of Housing Management admitted that there were many problem projects at that time and that "scores of other projects defaulted, went into bankruptcy, and were eventually foreclosed." DX 140; Tr. 502:22-25; 573:2-7 (Alexander).

98. Thus from 1985 when the last pre-recession rent increase was implemented until

1990, CCA could not have implemented a rent increase in view of market conditions. Because conventional apartment complexes had rents during part of that period approaching those at Chateau Cleary, renters would have migrated to those properties. Tr. 155:18-156:12 (Norman).

99. In addition, it is doubtful that rent increases in this period would have been approved by HUD in any event. Ms. Kizzier's glib assertion that an owner could get a 5% increase without having to justify it, Tr. 1095:5-13 (Kizzier), strains credulity. Mr. Norman explained that the process of getting HUD approval to increase rents required a considerable period of back-and-forth negotiations with HUD based on increased operating expenses and the expectation of future increases in operating expenses. Tr. 96:16-97:1; 156:13-157:8; 340:3-23; 356:16-25 (Norman). It was only after a period of weeks or months when Mr. Norman and HUD had reached an understanding of what would be allowed that Mr. Norman would then submit the required paperwork to HUD. *Id.* There is no basis for Ms. Kizzier's gratuitous comment that this process did not apply when an owner sought an increase of 5% or less.

100. After CCA's rent increase in December 1984, which reflected past increases in operating expenses and anticipated higher operating expenses in 1985, Chateau Cleary's operating expenses had three consecutive year-on-year declines and then did not permanently exceed the 1985 level of expenses until 1994. PDX 33. Mr. Norman promptly went to HUD in December 1994 for a rent increase, which was implemented in April 1995. PX 26A; PDX 33.

101. The government also maintains that, because CCA's market rents in *1999* and thereafter, following prepayment, lagged the average in the market, this somehow proves that Mr. Norman would not have implemented average market rents in *1991*. The argument is a complete *non sequitur* and entirely speculative.

102. The evidence at the hearing convincingly established that market conditions at the

end of 1998 when CCA prepaid, and thereafter, were entirely different from those that prevailed in 1991 when CCA should have been able to prepay. In 1991, the marketplace reflected the end of the recession. Tr. 822:18-22 (Ragas). Occupancy rates were trending up and rents were also on the rise. Tr. 822:18-823:9 (Ragas). Demand for market rate apartments strengthened markedly. *Id.* The government's own valuation expert admits that, in 1991 and thereafter, the recession was ending, the national economy was "on a tremendous roll," and "we went on one of the great expansions in the economy in the history of the country." Tr. 1352:8-15 (Derbes).

103. The area near Chateau Cleary was, in 1991, mature. There was no land available for multi-family development. The area surrounding the complex was fully developed, and there were no new apartment complexes under construction at that time. That was the competitive environment that Chateau Cleary faced. Tr. 824:3-825:13 (Ragas).

104. In contrast, the Metairie rental market had changed significantly by the end of 1998. In the 1995-1996 period, there was a substantial increase in the number of building permits issued, and new supply began to come on the market by 1997 in the area directly south of Chateau Cleary in the Elmwood Park and River Ridge areas. Tr. 829:2-15 (Ragas). Approximately 1,000 new units came into the market in 1997 and 1998, and an additional 1,000 units came on line between 1999 and 2002. Tr. 1063:13-1064:16; 1940:22-1941:19 (Ragas). Equally important, the new units coming onto the market after 1997 reflected an improvement in quality and amenities. Tr. 828:6-24 (Ragas). While Chateau Cleary was an average West Metairie property in 1991, by 1999, its first year as a market rate property, the new supply of high end units affected the rents it could attract.

105. The timing of the government's taking thus dealt CCA a twin blow. The Preservation Statutes prevented CCA from prepaying and converting to market rents in 1991 in a

rapidly improving market that had experienced no new supply in many years and in which Chateau Cleary was an average property. By the time the government had finally restored CCA's right to prepay, Chateau Cleary, while operating under HUD restrictions, had suffered an additional 5 years of deferred maintenance and now faced market conditions with a higher supply of units, including many new units with superior amenities. Tr. 829:16-830:20; 1063:20-1065:18 (Ragas). It is the changed market conditions after 1998 that led Chateau Cleary to lag market rentals in 1999 and thereafter, but those conditions were not present in 1991.

106. By enacting the Preservation Statutes, Congress prevented CCA from prepaying its mortgage and freeing itself from HUD regulations and HUD-restricted rents on its original prepayment date. In the absence of such legislation, CCA would have begun to take steps, in a deliberate fashion, during the two years before the original prepayment date to plan and prepare for prepayment. Tr. 177:7-178:4 (Norman). These steps would have included determining the amount of money to invest in the property for improvements, having repairs made, getting advice from consultants and other owners of similar properties, investigating financing options, and organizing lease terms to coincide with the date of prepayment. *Id.*

107. It was not until after the HOPE legislation was enacted and signed by the President, and after HUD ceased taking positions in its Preservation Letters that ostensibly undermined Congress's intent in passing HOPE, that CCA considered that it was appropriate to begin to incur the expense of planning and preparing for prepayment. During this period, Mr. Norman obtained and studied Mr. Alexander's report, had repairs made, investigated financing options, hired a prepayment consultant, and then completed prepayment.

108. Dr. Ragas calculated damages using an end-of-taking date of May 31, 1996 in light of HOPE's enactment and the sixty-day rent freeze it required. PX 106. Dr. Ragas also

presented an alternative analysis using the same methodology but extending the takings period through February 28, 1997. PX 125; Tr. 776:4-22 (Ragas). Accordingly, CCA's damages through September 30, 2006 are $1,528,629 based on a February 28, 1997 end-of-taking assumption and $1,361,298 based on a May 31, 1996 end-of-taking assumption.

## III. PROPOSED CONCLUSIONS OF LAW

### A. Plaintiff's Claim Is Ripe For Review

109. The government incorrectly argues that Plaintiff's claim is not ripe because CCA did not request HUD's permission to prepay or go through HUD's incentives labyrinth. The evidence at trial established that any request by CCA for permission to prepay would have been rejected, and thus was not required to be made, and the Federal Circuit has indicated and this Court has ruled as a matter of law that government incentives constituted a secondary permitting scheme that project owners were not required to undertake.

110. With respect to the regulatory option to seek HUD's permission to prepay, the Federal Circuit in *Cienega VI* held that property owners are not obligated to file futile requests for prepayment. This Court has reached the same conclusion. *Cienega IX*, 67 Fed. Cl. at 460. Accordingly, in this case, CCA need prove only that it would have been futile to apply to HUD for permission to prepay its HUD-insured mortgage. *Cienega VI,* 265 F.3d at 1248. To prove futility, CCA need establish only that it could not have satisfied any one of the statutorily-required criteria for prepayment: (i) market rents could not exceed HUD rents by more than 10%, (ii) prepayment would not cause a monthly rental payment by any current tenant that exceeds 30% of the tenant's monthly adjusted income, (iii) prepayment would not materially affect the supply of low-income housing, and (iv) prepayment would not displace current tenants. 12 U.S.C. § 4108; 24 C.F.R. § 248.141(a)(1).

111. The evidence at trial established that Plaintiff could not have satisfied *any* of the

foregoing statutorily required criteria for prepayment, let alone all of them. First, prepayment of Plaintiff's HUD-insured mortgage would have caused rents at Chateau Cleary to increase by more than 10%. Tr. 190:9-21 (Norman). The reports of both CCA's expert and HUD's expert agreed that market rents for Chateau Cleary exceeded Chateau Cleary's HUD rents at the prepayment eligibility date by substantially more than 10% for each unit type at Chateau Cleary. PX 100 & 106; Tr. 841:3-16 (Ragas); 1492:17-1493:13 (Derbes). Dr. Ragas' report showed 1991 market rents for Château Cleary between 29% and 39% higher than HUD rents depending on the unit type, PX 106, and Mr. Derbes' report showed 1991 market rents for Chateau Cleary between 16% and 28% higher than HUD rents depending on unit type, PX 100.

112. Second, CCA's current tenants could not have afforded to pay market rents without paying more than 30% of their adjusted income for rent. Tr. 610:7-611:11 (Alexander). HUD's former employee, Mr. Alexander, who was the top HUD official in New Orleans responsible for 221(d)(3) properties, including Chateau Cleary, readily admitted this fact. *Id.*

113. Third, prepayment by CCA would have materially affected the supply of low-income housing. As of CCA's prepayment date, the property was operating at capacity and any vacancies were attributable to normal turnover and the time to prepare vacated units for new tenants. Tr. 204:1-15 (Norman). There were no HUD properties within about an eight-mile radius of Chateau Cleary. Tr. 191:18-192:1 (Norman). HUD properties farther away, but in the New Orleans area, were also operating at capacity. The number of people in the New Orleans area on waiting lists for affordable housing ran into the thousands, and the lists were three to four years long. Tr. 590:25-591:4; 609:5-14 (Alexander); 1104:11-1105:9 (Kizzier). In these circumstances, withdrawal of 104 units from low income housing would have been material both in West Metaire and New Orleans.

114. Fourth, CCA never could have demonstrated to HUD's satisfaction that current tenants would not have been displaced after a prepayment and the consequent rent increases that would have followed. Mr. Alexander, HUD's own witness, testified that current tenants could not have afforded market level rents. Tr. 610:7-24 (Alexander).

115. It is hardly coincidental that not a single HUD owner in Louisiana obtained permission to prepay. PX 124A; Tr. 1102:23-1103:1 (Kizzier); 596:3-9 (Alexander). Indeed, the futility of requesting HUD's permission to prepay was so readily apparent that not a single property owner requested permission. Tr. 1102:23-1103:1 (Kizzier). After HOPE passed, eight owners prepaid, demonstrating the pent-up demand for an opportunity to prepay. PX 124A.

116. In short, CCA could never have satisfied any, let alone all, of these criteria and would not have obtained HUD's permission to prepay. Thus, it would have been futile for CCA to request permission to prepay, and CCA was not required to do so. Accordingly, CCA's takings claim is ripe for judicial review. *Cienega VI*, 265 F.3d at 1248.

117. The government made a half-hearted suggestion that, because CCA never applied for permission to prepay, we cannot know whether permission might have been granted. The argument is pure sophistry. HUD had no discretion to relieve CCA of the burden of demonstrating that it could have satisfied all of the foregoing criteria, and the government's defense never contested the specific underlying evidentiary facts that show HUD would have had no choice but to reject any application.

118. The government also contends that CCA's claim is not ripe because CCA did not go through the process of applying for incentives, either through entering into a new use agreement with HUD or by seeking to sell its property to a so-called qualified purchaser.

119. The Federal Circuit in *Cienega VI* and this Court in *Cienega IX* have already

rejected the very argument that the government rehearses. *Cienega IX*, 67 Fed. C1. at 461-62 ("The Court of Appeals did not require that the model plaintiffs also separately seek incentives and receive a determination of whether those incentives would be funded."). As this Court has correctly held, the government is not entitled to a "'secondary permitting scheme over the statute's primary *raison d'être*." *Id.* at 461.

120. The government's argument became a *reductio ad absurdum* when it actually suggested at trial that going through the incentives process was an available vehicle for gaining freedom to prepay. The government's theory was that, if HUD approved a plan of action but Congress then failed to fund incentives, CCA would be free to prepay after this multi-year bureaucratic process ended in failure. The irony of the argument appears to have been lost on the government. The greater risk to CCA was that the government would have actually funded the incentives and required CCA to remain in the HUD program until at least 2011. The evidence of the government's own witnesses established that the longer CCA remained in the HUD program, the greater its losses would have been. DX 140, 173 & 174; Tr. 1547:21-1548:12 (Derbes); 1733:15-1734:9 (Dickey); 581:20-582:23 (Alexander).

121. Similarly, if CCA had gone through the process of selling to a qualified purchaser, any sale that resulted would not have been a free market transaction at a fair market value. Tr. 640:13-18 (Alexander); 1873:11-1874:1 (Stillman).

122. Under either the use agreement option or the sale to a qualified purchaser option, the government pays no compensation during the 3-year process that the owner must endure. 12 U.S.C. § 4101 *et seq.*; Tr. 636:6-9 (Alexander). In order to constitute an adequate post-deprivation remedy, the remedy must provide just compensation, which is "the full and perfect equivalent in money of the property taken. The owner is to be put in as good a position

pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller*, 317 U.S. 369, 373 (1943) (footnote omitted). Incentives would not have provided an adequate post-deprivation remedy.

**B. ELIHPA And LIHPRHA Effected A Taking Of Plaintiff's Right To Prepay Its HUD-Insured Mortgage On The 20-Year Prepayment Date**

123. The government routinely regulates property interests, and it often may do so without affording compensation. However, "if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). Whether a regulation has "go[ne] 'too far'" and effects a taking is an "'essentially ad hoc factual inquir[y],'" *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992) (citation omitted), but the object of the inquiry is to determine whether the government has "forc[ed] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

124. To determine whether the government has gone too far, a court must examine (i) the character of the governmental regulation, (ii) the interference such regulation generates with the owner's distinct investment-backed expectations, and (iii) the regulation's economic impact. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

**1. Enactment Of ELIHPA And LIHPRHA Has The Character Of A Taking**

125. The Supreme Court's decision in *Penn Central* first "'require[s] that a reviewing court consider the purpose and importance of the public interest reflected in the regulatory imposition. In effect, a court [must] balance the liberty interest of the private property owner against the Government's need to protect the public interest through imposition of the restraint.'" *Cienega VIII*, 331 F.3d at 1337-38 (quoting *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1176 (Fed. Cir. 1994)) (language bracketed in original).

126. As the Federal Circuit stated in *Cienega VIII*:

> The character of the government's action [in enacting ELIHPA and LIHPRHA] is that of a taking of a property interest, albeit temporarily . . . . Unquestionably, Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing), but just as clearly, the expense was placed disproportionately on a few private property owners. Congress' objective in passing ELIHPA and LIHPRHA -- preserving low-income housing--and method--forcing some owners to keep accepting below-market rents -- is the kind of expense shifting to a few persons that amounts to a taking.

*Cienega VIII*, 331 F.3d at 1338-39 (footnote omitted). The character of the government's actions in enacting ELIHPA and LIHPRHA and appropriating CCA's prepayment right has thus been decided as a matter of law in this Circuit.

127. At trial, CCA demonstrated that the Preservation Statutes' elimination of the right to prepay and exit the HUD program, regain normal rights of ownership after 20 years, and realize the unrestricted value of Chateau Cleary disproportionately imposed on CCA (and other owners of HUD properties) the costs of the nation's need for low-income housing. For example, Mr. Alexander testified that the type of "enhanced vouchers" that the government made available after HOPE was enacted to assist tenants to remain in their apartments spread the burden of assisting such tenants on taxpayers as a whole. Tr. 594:8-23 (Alexander). The government could have done likewise in 1990 instead of enacting LIHPRHA.

128. Where the property that the government seeks to regulate did not contribute to the social problem addressed by governmental action, the government may have power to act, but it will be required to pay just compensation. *See Cienega VIII*, 331 F.3d at 1340 ("Congress' *purpose* in enacting the statutes may have been entirely legitimate but the government has not shown that the *actions* Congress took -- the enactment of ELIHPA and LIHPHRA -- were within its powers to exercise without also granting just compensation.") (emphasis in original).

129. There is no evidence that CCA caused or contributed to the social problem that

ELIHPA and LIHPRHA were enacted to address. *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 838 (1987).[9] Moreover, ELIHPA and LIHPHRA did not seek to spread the costs of addressing that problem "broadly over a large portion of the population" but rather placed it "particularly on a relatively few property owners." *Cienega IX*, 67 Fed. C1. at 466. ELIHPA and LIHPRHA imposed the cost of assisting those who did not have the financial resources to pay market-based rents on a narrow category of landlords by requiring *only* those landlords to charge below-market rents. *See Cienega VIII*, 331 F.3d at 1338-39. Indeed, the stated goal of ELIHPA was "to preserve and retain to the maximum extent practicable as housing affordable to low income families or persons those privately owned dwelling units that were produced for such purpose with Federal assistance," ELIHPA § 202(b)(1), 12 U.S.C. § 1715*l* note. *See Cienega VIII*, 331 F.3d at 1338-39 (ELIHPA and LIHPRHA effect "the kind of expense shifting to a few persons that amounts to a taking.").

130. CCA also adduced clear evidence showing that the character of the government's action in enacting ELIHPA and LIHPRHA is that of a taking because the government forced CCA to suffer a physical occupation of its property by government-approved tenants. The Supreme Court made plain in *Penn Central* that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124 (citation omitted).

131. After losing their unrestricted right to prepay, CCA was compelled to continue to

---

[9] To ensure that government regulation does not unfairly impose public burdens on individual property owners, the courts have required demonstration of a "cause-and-effect relationship between the property use restricted by the regulation and the social evil that the regulation seeks to remedy." *Pennell v. City of San Jose*, 485 U.S. 1, 20 (1988) (Scalia, J., concurring in part and dissenting in part).

use Chateau Cleary to house government-approved tenants and was prohibited from converting the property to other uses. *Cienega IX*, 67 Fed. Cl. at 467-68. With the passage of ELIHPA and LIHPRHA, the government dictated that CCA choose from the unsatisfactory options of operating under the original Regulatory Agreement or entering a new use agreement with HUD that prolonged restrictions for at least the next 20 years. *Id.*; 12 U.S.C. § 4101 *et seq.*

132. Preventing CCA from prepaying and forcing CCA to rent its apartments at below-market rents to government-approved tenants were comparable to a physical invasion of CCA's property. *Cienega VIII*, 331 F.3d at 1338 ("We agree that the enactment of ELIHPA and LIHPRHA could fairly be characterized as akin to this type of physical invasion."). In fact, the government action in this case is indistinguishable from a holdover tenancy. *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986) (government refusal to vacate property upon expiration of a lease is a taking); *Cienega IX*, 67 Fed. Cl. at 467 ("HUD effectively rented the plaintiffs' property beyond the agreed term for the benefit of its designated low-income tenants.").

133. The enactment of ELIHPA and LIHPRHA also sharply curtailed CCA's right to transfer its property. The right of an owner to transfer property is a basic attribute of ownership. In *Hodel v. Irving*, the Supreme Court held that a statute abrogating the common-law right to devise to one's heirs even a small portion of a property interest was a taking because the character of the government regulation was "extraordinary." 481 U.S. 704, 715-16 (1987). The government's cancellation of CCA's right to transfer its property, except on government-approved terms to government-approved purchasers, as part of a lengthy regulatory process that is not a market transaction, Tr. 640:13-18 (Alexander), likewise constitutes an extraordinary impairment of CCA's fundamental property rights. *See Cienega IX*, 67 Fed. C1 at 467-68

("Under LIHPHRA, purchasers were required to agree to maintain the property as low-income housing and could not pay more than the value determined by the statutory process . . . . This restriction severely limited plaintiffs' property rights to transfer.").

134. The government adduced no evidence that undermines the conclusion of the Federal Circuit and this Court that the enactment of ELIHPA and LIHPRHA has the character of a taking. The limited "options" provided by ELIHPA and LIHPRHA, in purported compensation for the taking of CCA's prepayment right, does not change the disproportionate burden imposed on it. None of the "options" gave CCA what ELIHPA and LIHPRHA took: the right to possess Chateau Cleary and to enjoy the fundamental property right to exclude others.

135. In fact, one of the "options," the option to prepay, did not exist at all for CCA. Under ELIHPA and LIHPRHA, HUD could approve prepayment requests only if certain conditions were met. *See* ELIHPA § 225(a); 12 U.S.C. § 4108 (LIHPRHA); *see also* 24 C.F.R. § 248.141(a)(1). As the evidence reviewed above conclusively demonstrates, CCA could not have qualified for this "option."

136. Additionally, the sale "option" itself constituted an extraordinary limitation on CCA's property rights, further underscoring that the government's action in enacting ELIHPA and LIHPRHA had the character of a taking. The sale "option" required that owners sell only to HUD-approved buyers at a HUD-approved price. Tr. 630:24-634:23 (Alexander). Such a transaction is certainly not a "free-market" sale. Rather, the sale "option" drastically curtailed CCA's right to transfer Chateau Cleary, a fundamental indicium of ownership.

137. Moreover, the existence of "incentives" under ELIHPA and LIHPRHA does not change the character of the government's action. As discussed above, the statutory "incentives" that HUD could offer fall far short of just compensation, extract continued participation in the

HUD program for at least the life of the mortgage, and would have resulted in increased harm to CCA, not less. Thus, the existence of such "incentives" does not alter the character of the government's action in enacting the statutes for purposes of the *Penn Central* analysis. As this Court wisely concluded in *Cienega IX:* "In effect, the government's argument translates into the question of whether the value of any options plaintiffs were offered under LIHPHRA should change the character of the governmental action or the way that the *Penn Central* takings analysis is applied. The short answer to that question is 'no.'" 67 Fed. Cl. at 470.

138. The "do-nothing option" that Ms. Kizzier cited offered CCA the "opportunity" to continue operating under the restrictions imposed by the original Regulatory Agreement, including limited annual dividends, tenant-occupation restrictions, and other regulatory requirements. The government's own witnesses demonstrate that this "opportunity," far from benefiting CCA, would have been destructive of value. DX 140, 173 & 174; Tr. 1547:21-1548:12 (Derbes); 1733:15-1734:9 (Dickey); 581:20-582:23 (Alexander). It was precisely the right to extricate itself from these destructive restrictions that ELIHPA and LIHPRHA took from CCA. The existence of this "option" in no way alters the character of the government's action in enacting the statutes. As the Federal Circuit concluded in *Cienega VIII*:

> [I]n abrogating the Owners' contractual prepayment rights, the statutes intentionally defeated the Owners' real property rights to sole and exclusive possession after twenty years and to convey or encumber their properties after twenty years, [and] . . . [t]he character of the government's action is that of a taking of a property interest, albeit temporarily. . . .

*Cienega VIII*, 331 F.3d at 1328; *see Cienega IX*, 67 Fed. Cl. at 458, 469.

139. Thus, the character of the government's action in enacting ELIHPA and LIHPRHA was, as the Federal Circuit and this Court have found, that of a taking.

### 2. ELIHPA And LIHPHRA Frustrated Plaintiff's Distinct And Reasonable Investment-Backed Expectations

140. The *Penn Central* test also "inquires whether the statutes interfered with the property owners' distinct, reasonable investment-backed expectations." *Cienega IX*, 67 Fed. Cl. at 471. This element of the *Penn Central* analysis is intended to "limit recoveries to property owners who can demonstrate that 'they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'" *Cienega VIII*, 331 F.3d at 1345-46 (*quoting Loveladies*, 28 F.3d at 1177). The key issue is "whether a reasonable developer confronted with the particular circumstances facing the Owners would have expected the government to nullify the twentieth-year prepayment right in the mortgage contract and in the regulations." *Id.* at 1346; *Cienega IX*, 67 Fed. Cl. at 471. This inquiry is "objective, but fact specific." *Cienega VIII*, 331 F.3d at 1346. "The analysis begins with the plaintiffs' actual expectations and then delves into whether they were objectively reasonable." *Cienega IX*, 67 Fed. Cl. at 471.

141. CCA adduced abundant and unrebutted evidence proving that the Norman Brothers in 1969 and CCA in 1985 invested in Chateau Cleary in reliance on the prepayment right. The owners' investment-backed expectations were reasonable because they were based on express language in the secured notes and HUD regulations and because representatives of HUD touted that specific feature of the HUD program.

#### a. The Norman Brothers In 1969 And CCA In 1985 Relied On And Expected To Exercise The Prepayment Right On The Eligibility Date

142. The first step in the analysis is whether the Norman Brothers and CCA expected to be able to prepay the mortgage on the 20-year prepayment date at the time they entered into the HUD program because the expectation "would not really be 'investment-backed' unless they actually believed in a certain outcome and entered the program in reliance on it." *Cienega VIII*, 331 F.3d at 1346.

143. As Mr. Norman, testified, when the Norman Brothers entered into the HUD program, they fully expected to be able to -- and intended to -- prepay the mortgage on the prepayment eligibility date. Tr. 67:15-22 (Norman). Mr. Norman made clear in his testimony that this right was essential and that the owners would not have gone into the program without it. Tr. 56:9-18; 57:18-23; 59:9-14; 91:18-23 (Norman). Indeed, the limited dividend payouts that were authorized would hardly have been a reason to go into the program even if payment were assured every year. Tr. 77:3-7; 93:5-9; 94:18-95:1 (Norman). Mr. Norman also testified that HUD officials touted this feature of the program when they sought to induce the Norman Brothers to take over the development of the project from the Tomeny Group. Tr. 55:2-6; 58:1-3 (Norman). The government never challenged Mr. Norman on these points.

144. The importance of the prepayment right, and the opportunity to realize significant value after 20 years, were embedded in the strategy the owners adopted. It is undisputed that Chateau Cleary was situated in the path of expected future development in Metairie. The government's own expert, Mr. Derbes, fully agreed. Tr. 1475:2-22 (Derbes). As a result, the Norman Brothers expected to have a valuable property after 20 years and to be able to attract tenants who would pay market rents significantly in excess of HUD rents.

145. In furtherance of these objectives, they developed the project in a middle class area, constructed a quality building, and maintained the building in excellent condition with the expectation that they would realize the appreciation and increased rental rates of a conventional apartment complex after prepayment. Tr. 57:10-17 (Norman). Again, the government did not challenge Mr. Norman on these points.

146. *In Cienega VIII*, the Federal Circuit found the selection of prime locations and the construction of high-quality buildings to be "revealing" evidence that "showed [the owners']

expectation that they would be able to prepay and exit the HUD programs after twenty years." *Cienega VIII*, 331 F.3d at 1347. Mr. Norman's testimony stood unchallenged that the Norman Brothers had the same expectation as the owners in *Cienega VIII*.

147. In light of the abundant evidence offered at trial, this Court should find here, as it did in *Cienega IX*, and as the Federal Circuit did in *Cienega VIII*, that "it would only be normal business judgment under the circumstances for [the owners] to plan from the start to terminate their Regulatory Agreements as soon as possible to take advantage of more profitable opportunities." *Cienega VIII*, 331 F.3d at 1347. Indeed, the Norman Brothers' "very participation in the program thus signifies their understanding that their option to exit the housing programs at twenty years would remain in effect." *Id.*

148. CCA's purchase of J. Robert Norman's 50% equity interest in 1985 for $677,550 was premised on the then-looming prepayment date six years hence. PX 28A; Tr. 162:3-165:6 (Norman). The documentation that CCA was required to execute and the obligations it was required to assume encompassed these same expectations, as did the then-existing HUD regulations. PX 28 & 29. It would have been economically foolhardy for CCA to make the purchase it did other than in reliance on the prepayment right. By this time, the development in West Metairie had unfolded as originally expected, and the value of the property had accordingly increased substantially. Tr. 64:16-65:2; 174:15-175:25; 480:9-483:1 (Norman).

**b. The Owners' Expectations To Prepay Were Reasonable**

149. The investment-backed expectations of the Chateau Cleary owners were also reasonable. In *Cienega VIII*, the Federal Circuit concluded that it was reasonable for owners to believe that "the twentieth year prepayment right was guaranteed by the regulations and that HUD 'authorized' and endorsed mortgage contracts expressly including it." *Cienega VIII,* 331 F.3d at 1348. The Court determined that a material contract term that was consistent with the

relevant regulation "gives rise to *reasonable* expectations of fulfillment of the contract term." *Id.* (emphasis in original). The Federal Circuit ultimately held that it was reasonable for owners to have expected the prepayment right to "remain unchanged because it was a material inducement." *Id.* at 1348-49.

150. The Federal Circuit in *Cienega VIII* noted that the prepayment term in Model Plaintiffs' contracts "*would be presumptively material for any housing program participant with similar documents*." *Id.* at 1349 (emphasis added). That presumption applies based on the evidence adduced in this case. In particular, the owners here had the same documents guaranteeing the same rights in both 1969 and 1985. DX 1 & 3; PX 4-6 & 28-30.

151. In short, the bases for the expectation that they would be able to prepay the mortgage included: (1) the express language in the Note, which stated that Plaintiff could prepay its mortgage after 20 years without HUD approval, and (2) HUD's regulations at the time, which also permitted prepayment after 20 years and which were incorporated by reference into the Regulatory Agreement. *See* 24 C.F.R. § 236.30; 24 C.F.R. § 221.524(a)(1)(ii) (1970). DX 1; PX 3-6 & 29; Tr. 80:5-14; 91:22-92:8 (Norman).

152. The Norman Brothers' expectations were also based on the importance of prepayment to the HUD programs, a feature that HUD representatives touted to the Norman Brothers when attempting to persuade them to take over the project from the Tomeny Group. Tr. 55:2-6; 58:1-3 (Norman); *see Cienega VIII*, 331 F.3d at 1347. The Norman Brothers had no reason to believe, and never expected, that a fundamental feature of the HUD program and a key inducement to their participation would be abrogated by legislative fiat. Tr. 79:12-80:14 (Norman). In short, the Norman Brothers are "the type of landowners who bought their property and entered into contracts in reliance on a different regulatory regime." *See Cienega VIII*, 331

F.3d at 1347.

153. A reasonable developer in the position of the Norman Brothers would have believed that the prepayment right was guaranteed by the mortgage contract and the Note. These instruments were reviewed and approved by HUD and expressly provided for an unconditional right to prepay the mortgage after 20 years. This prepayment right "matched the then-existing regulations" that expressly granted developers a free right to prepay their mortgages after 20 years. *Cienega IX*, 67 Fed. C1. at 473. The Federal Circuit has held that a prepayment term in a mortgage contract that "[gives] the duration of a business arrangement with limited profit" and "[is] consistent with (and identical to) the relevant regulation, if not also explicitly prescribed by the agency, is one that gives rise to *reasonable* expectations of fulfillment of the contract term." *Cienega VIII*, 331 F.3d at 1348 (emphasis in original).

154. The possibility of regulatory change does not make a developer's otherwise reasonable expectations regarding prepayment somehow unreasonable. A prepayment term in a binding contract is a

> [s]ignificant factor in the calculation of the total profit that could be expected over the lifetime of the investment in the property. The prepayment right specifies at what year revenue from the property could potentially be increased through higher rental rates, sale or refinancing. This total profit calculation would, in turn, determine whether a developer decided to participate in the program in the first place. Because without the prepayment right the developers might have earned more profit investing elsewhere and therefore have declined to enter the programs, abrogation of this right would not reasonably be expected simply because the regulations were amendable or subject to legislative alteration.

*Cienega VIII*, 331 F.3d at 1349.

155. Therefore, the expectation that the government would respect the contractual rights of the Chateau Cleary owners to prepay the mortgage after 20 years and exit the HUD program was both reasonable and investment-backed.

### 3. ELIHPA And LIHPRHA Caused CCA To Suffer A Severe Economic Impact

156. "The third prong of the *Penn Central* test measures the severity of the economic impact on the claimants." *Cienega IX*, 67 Fed. C1. at 474. Consideration of the "economic impact of the regulation on the claimant was intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." *Loveladies*, 28 F.3d at 1176. It is a "threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation." *Cienega VIII*, 331 F.3d at 1340 (*quoting Loveladies*, 28 F.3d at 1177).

157. There is no "automatic numerical barrier preventing compensation, as a matter of law, in cases involving a smaller percentage diminution in value." *Yancey v. United States*, 915 F.2d 1534, 1541 (Fed. Cir. 1990) ("[U]nder the modern *Penn Central* approach," a court must "weigh[] *all* the relevant considerations" to determine whether the economic impact is sufficient to constitute a regulatory taking.) (emphasis added).

158. In *Cienega VIII*, the Federal Circuit "compared the annual return on the owners' real equity in their properties to a conservative market return on Fannie Mae bonds." *Cienega IX*, 67 Fed. C1. at 475. This return on equity approach measured the economic impact of LIHPRHA's abrogation of prepayment rights by calculating the plaintiffs' percentage loss on their possible rates of return. "Measuring an owner's return on equity better demonstrates the economic impact on the owners of temporary takings of income-generating property than a measurement of the change in fair market value." *Id.*

159. The Federal Circuit calculated the economic impact on property owners by using the model developed by the Model Plaintiffs' expert. That model determined, first, the annual return on equity that plaintiffs were permitted under LIHPRHA (aggregate annual earnings allowed divided by aggregate equity, assuming no HUD restrictions, shortly after the original

prepayment date) and, then, compared that return to the return on low-risk Fannie Mae bonds. The Federal Circuit determined that LIHPRHA caused plaintiffs to earn a "return that was about 96% less than what they could have earned by investing their money elsewhere." The Court held that the plaintiffs' "loss of 96% of the possible rate of return on the investment is, even under the most conservative view, a 'serious financial loss.'" *Cienega VIII*, 331 F.3d at 1343.

160. Moreover, the Federal Circuit's analysis is fully consistent with the proper characterization of the property interest at stake: the owner's contractual right to prepay and then repossess the real property. *Cienega VIII*, 331 F.3d at 1345. As the Federal Circuit pointed out, the government was patently incorrect in arguing that "any economic impact could not be more than mere diminution in value" because the government misapprehended the true nature of the property interest in question. *Id.* Thus, any claim that the Federal Circuit's methodology is flawed because it calculated impact based on the return on equity represented by the allowable dividend ignores the true nature of the property right and the proper way of calculating the economic impact from the loss of that right.

161. This Court has also found the Federal Circuit's methodology from *Cienega VIII* to be reasonable and appropriate to determine the economic impact of ELIHPA and LIHPHRA. *Cienega IX*, 67 Fed. Cl. at 477. "This approach is well-grounded . . . [and] the return-on-equity approach best measures the impact of ELIHPA and LIHPHRA on the plaintiffs." *Id.* at 475.

162. Using the methodology approved by this Court and by the Federal Circuit, Dr. Ragas determined that the enactment of ELIHPA and LIHPHRA caused CCA to suffer a diminution in investment return of between 80% and 85%. PX 125. Dr. Ragas compared the maximum allowable dividend under the Regulatory Agreement to the equity in the property that Mr. Derbes, the government's expert, calculated to find an 80% diminution. In response to Dr.

Dickey's criticism that this calculation represented a "snapshot," Dr. Ragas made additional calculations of the diminution in return on equity at different points throughout the takings period and calculated a diminution that ranged from 80% to 85% and averaged 82.5%. PX 125. CCA's loss is, "even under the most conservative view, a 'serious financial loss.'" *Cienega VIII*, 331 F.3d at 1343. The severity of the economic harm to which CCA was subjected is confirmed by the lost profits in absolute terms and by the diminution in net operating income and cash flows that CCA suffered during the period of the taking. Therefore, ELIHPA and LIHPHRA caused CCA severe economic harm of the magnitude to constitute a taking.

163. The government did not contend at trial that Dr. Ragas did not accurately apply the measure of economic impact upheld in *Cienega VIII* and *Cienega IX*. Instead, the government offered arguments previously advanced and previously rejected. For example, the government argues that the economic impact analysis approved in *Cienega VIII* and *Cienega IX* is unsound because it is a "snapshot" look at the impact of ELIHPA and LIHPHRA. This argument is barred by the Court's holding in *Cienega VIII* and inconsistent with this Court's holding in *Cienega IX*, but, even if the issue were still open, the government's position should be rejected. CCA's lost return on equity during the period in which ELIHPA and LIHPRHA prohibited prepayment of its mortgage is the appropriate measure of the economic impact that the statutes had on CCA. *See, e.g.*, *Cienega VIII*, 331 F.3d at 1341-43; *Seiber v. United States*, 364 F.3d 1356, 1371 (Fed. Cir.) (the relevant period for assessing the economic impact of a temporary taking is the period of the taking), *cert. denied*, 543 U.S. 873 (2004); *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1188-89 (Fed. Cir. 2004) (a returns-based approach is more appropriate than a diminution in value approach when measuring the economic impact of a regulation on a going business concern). As this Court ruled in *Cienega IX*: "the return-on-

equity approach best measures the impact of ELIHPA and LIHPHRA on the plaintiffs." 67 Fed. Cl. at 475.

164. The government's "snapshot" criticism is baseless in any event. As noted above, Dr. Ragas undertook a return on equity analysis at varying points throughout the period of the taking and calculated severe impacts on the order of 80% to 85%. The government did not challenge the accuracy of these calculations. If the economic impact of the government regulations were measured in the fashion proposed by the government, such a methodology would incentivize confiscatory conduct by the government. Indeed, the rule the government suggests would immunize wholly confiscatory regulations so long as they last less than half the useful life of the property at issue and would deprive owners of all productive use of their real property for long periods without paying just compensation. Thus, under the government's method of calculating economic impact, an owner would suffer a 45% diminution in expected returns if the government enacted a statute that took 100% of the owner's $10 million per year income on a $100 million building for a four-and-a-half-year period. Tr. 1752:11-1754:19 (Dickey). If the law required proof of a 50% diminution in value, an owner who suffered a loss of $45 million could not demonstrate sufficient economic harm to prove a compensable taking. The Fifth Amendment does not permit such confiscatory conduct by the government.

165. The decisions in *Cienega VIII and Cienega IX* properly recognize that "the concepts of 'fairness and justice . . . underlie the Takings Clause." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 336 (2002). A measure of economic impact that prohibits the finding of a taking when regulation causes an owner serious economic harm is inappropriate. Thus, the Federal Circuit has gauged the economic impact of the regulation during the period of the taking. *See Seiber,* 364 F.3d at 1371 (the relevant period for assessing

the economic impact of a temporary taking is the period of the taking).

166. Moreover, the character of the government's action demonstrates that an approach that measures the economic impact during the period of the regulation, and not an approach that measures the diminution in the total value of the property, is the appropriate measure of ELIHPA and LIHPRHA's economic impact on CCA. Here, the government intentionally abrogated a targeted group of owners' rights to prepay their HUD-insured mortgages in order to force the owners to continue housing government-approved tenants at HUD rents. The character of the government's action in enacting ELIHPA and LIHPRHA was akin to a physical invasion by the government, for which economic impact is irrelevant to the determination of taking. *See, e.g.*, *Cienega VIII*, 331 F.3d at 1338. The use of a diminution in value measure that assesses the economic impact of the statutes over the indefinite life of real property, and thus inappropriately dilutes the impact of the restriction, is thus particularly inapt here.

167. The government also criticized Dr. Ragas' analysis for not considering the supposed benefits of the options and incentives available under ELIHPA and LIHPRHA. This contention is misguided. First, Dr. Dickey himself was unable to quantify the benefit, if any, those options had. Second, this argument fails because, "a cash payment from the government would not relate to whether the regulation 'goes too far' (*i.e.*, restricts use of the land so severely as to constitute a taking), but rather to whether there has been adequate compensation for the taking." *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 747 (1997) (Scalia, J., concurring). A contrary rule would permit the government to evade the constitutional command of the Fifth Amendment.

> If money that the government-regulator gives to the landowner can be counted on the question of whether there *is* a taking (causing the courts to say that the land retains substantial value, and has thus not been taken), rather than on the question of whether the compensation for the taking is adequate, the government can get

away with paying much less.

*Id.* at 748. Indeed, if the value of incentives were taken into account in the economic impact analysis, the government could avoid paying just compensation by merely offering a percentage of the value of the property taken. The Fifth Amendment's guarantee of full and fair compensation cannot reasonably be read to allow this type of confiscatory behavior by the government.

### C. CCA Is Entitled To Just Compensation For The Taking Of Its Property

#### 1. CCA Is Entitled To Just Compensation For The Damages It Suffered During The Period Of The Taking

168. Just compensation under the Fifth Amendment is "the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." *Miller*, 317 U.S. at 373. The proper measure of just compensation for a temporary taking is the fair market rent that the landowner could have earned on the property during the takings period. *See United States v. Petty Motor Co.*, 327 U.S. 372, 381 (1946); *United States v. General Motors Corp.*, 323 U.S. 373, 379 (1945); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5-7 (1949); *Cienega IX*, 67 Fed. Cl. at 483.

169. To determine fair market rental value, courts employ different methods to achieve the ultimate objective of making the plaintiff whole. *See, e.g., Cienega IX*, 67 Fed. Cl. at 483 ("assessing the value of a temporarily-taken, income-producing going concern as the foundation for measuring compensation due in a temporary taking"); *Independence Park*, 61 Fed. Cl. at 706-08 (the proper measure of compensation is the difference between the rents Model Plaintiffs received under the HUD programs and the rents they could have received had they been permitted to prepay their HUD-insured mortgages); *Petty Motor*, 327 U.S. at 381 (The

appropriate measure of damages for the plaintiff's leasehold interest in a building where it was operating its business is the difference between "the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew . . . less the agreed rent which the tenant would pay for such use and occupancy."); *General Motors*, 323 U.S. at 382 (the fair market rent for General Motor's right, pursuant to a long-term lease agreement, to occupy a building that was equipped for its business is "the market rental value of such a building on a lease by the long-term tenant to the temporary occupier").

170. Even if there is no ready market for the type of property taken by the government and the determination of a market rent is a speculative endeavor, market rent is nonetheless the proper measure of just compensation for a temporary taking. *See Kimball Laundry*, 338 U.S. at 6 ("[S]ince a transfer brought about by eminent domain is not a voluntary exchange, this amount can be determined only by a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place."). "When the property taken is of a type for which there is not an easily identifiable market or determination of a fair market value cannot be readily made, courts may look to other available sources to determine what measure of compensation would most accurately compensate the plaintiff." *Independence Park*, 61 Fed. Cl. at 707. "[W]hen the property temporarily taken is an income-generating property, the value of the going concern must be taken into account." *Cienega IX*, 67 Fed. Cl. at 484.

171. The fair market value of the property taken from CCA is the rental income it lost as a result of its inability to prepay its loan on the original prepayment date. *See, e.g.*, *Cienega IX*, 67 Fed. Cl. at 484 ("[T]he court finds that the plaintiff's model is conceptually sound as a basis for measuring compensation . . . ."); *Independence Park*, 61 Fed. Cl. at 708 ("plaintiffs' foregone rent increases are the best available indicator for determining just

compensation"); *Kimball Laundry*, 338 U.S. at 9 ("The market value of land as a business site tends to be as a high as the reasonably probable earnings of a business there situated would justify . . . ."); *American Pelagic Fishing Co., L.P. v. United States*, 55 Fed. Cl. 575, 594 (2003) ("In a competitive market, the revenue stream that [the plaintiff's fishing vessel] probably could have achieved is equivalent to the amount that a potential lessee would have been willing to pay in order to rent the vessel."), *vacated on other grounds*, 379 F.3d 1363 (Fed. Cir. 2004).

172. As described above, Dr. Ragas' model properly calculates the amount of CCA's damages during the period of the taking. He followed the methodology approved by this Court in *Independence Park*, 61 Fed. Cl. at 706-11, and *Cienega IX*, 67 Fed. Cl. at 483-94. The government does not dispute that Dr. Ragas' analysis follows these precedents.

173. There is also no one more knowledgeable of the New Orleans multi-family real estate market and its development and condition during the relevant period or more experienced in undertaking the type of damages analysis in that market that Dr. Ragas performed. The government did not challenge Dr. Ragas' credentials or experience in any respect.

174. Dr. Ragas' use of an *ex-post* model was particularly well suited to the task at hand. He had complete data from CCA's books and records from which to calculate CCA's actual performance during the taking. His Market Scenario analysis took, as a starting point, Chateau Cleary's actual performance and then projected what its performance would have been if the property had operated conventionally. His analysis was anchored in actual market data for the West Metairie submarket throughout the taking. His conclusion that Chateau Cleary would have attracted average market rents was entirely reasonable. It was based on his findings that the units were comparable in size to average units and that with modest expenditures to improve the property, which amounts were accounted for in his model, Chateau Cleary would be comparable

to average properties in the market. Mr. Derbes, by contrast, incorporated materially inaccurate unit sizes into his analysis and, in his testimony, incorrectly compared Chateau Cleary to buildings constructed in the late 1990s rather than to the great mass of units which in actuality comprised the average of the market in the early 1990s. Tr. 1357:19-1360:17 (Derbes); 1933:17-1937:6; 1939:24-1943:9; 1951:4-1953:25 (Ragas).

175. To try to reduce CCA's recovery in this case, the government has vaguely suggested, without any specification, that CCA did not charge rents as high as CCA could have achieved. This argument is unavailing. First, as shown above, Mr. Norman persistently and repeatedly obtained rent increases in the 1972-1985 timeframe, achieving nine increases during that period. But during the period 1986 until 1990, Dr. Ragas and Mr. Derbes both agreed that the bottom fell out of the real estate market in New Orleans. Thus, Mr. Norman could not have increased rents to his tenants during that period without driving them away.

176. The government's contention that because CCA rents in 1999 and thereafter lagged market rents means that CCA would have lagged market rents in 1991 is specious. No inference about 1991 behavior can be shown from 1999 behavior because, as Dr. Ragas explained (and Mr. Derbes did not disagree), the marketplace had changed materially.

177. The government's argument is utterly speculative and seeks to impose a level of precision that the law does not require. As the Supreme Court noted in *Kimball Laundry*, all that is required is a "well informed" estimate. Dr. Ragas' analysis easily satisfies that standard.

178. The reasonableness of Dr. Ragas' conclusion is confirmed by Mr. Derbes' own estimate of CCA's lost profits caused by the Preservation Statutes. In his Supplemental April 29, 2005 analysis (DX 173 at 9), he determined, using a different methodology from that of Dr. Ragas, that CCA's lost profits for the period May 1, 1991 through April 30, 1996 amount to

$528,971, which is about $78,706 below Dr. Ragas' estimate for the period June 1, 1991 to May 31, 1996. Mr. Derbes explained that the difference was largely attributable to their differing estimates of market rents during that period. Mr. Derbes' analysis, however, does not use actual market data to determine market rents, makes excessively negative assumptions about vacancy and credit loss by failing to use actual market data, and unreasonably treats Chateau Cleary as a subpar, rather than an average, middle-of-the-road property.

179. Dr. Ragas has followed the damages methodology approved in the precedents most directly on point.[10] His analysis uses market data and does not suffer from the speculative flaws that afflict Mr. Derbes' analysis. Accordingly, Dr. Ragas' model accurately measures "the full and perfect equivalent in money of the property taken." *Miller*, 317 U.S. at 373.

**2. Plaintiff Is Entitled To Interest As An Element Of Just Compensation**

180. Plaintiff is entitled, as an element of just compensation, to pre-judgment interest. When the government takes property and does not compensate the owner at the time of the taking, "the owner is entitled to interest [on the compensation] sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1994). "Owners of property taken by the government are entitled to interest from the date the taking became effective until paid by the government." *Shelden v. United States*, 34 Fed. Cl. 355, 378 (1995).

181. Plaintiff should be awarded interest from the end of the takings period until the date of payment based on the ten-year Treasury STRIPS rate. This is an acceptable rate because

---

[10] Dr. Dickey's diminution-in-value methodology for calculating just compensation is inconsistent with these precedents and should be disregarded both for that reason and due to the deep methodological flaw in his analysis.

it reflects CCA's lost opportunity cost. "In determining an appropriate interest rate, courts rely on the 'prudent investor rule,'" which measures how a reasonably prudent person would have invested the funds to produce a reasonable return while preserving principal. *Cienega IX*, 67 Fed. Cl. at 492. Additionally, this rate compensates Plaintiff for the uncertainty surrounding when it will be compensated by the government for the taking of its property. Plaintiff has been waiting fifteen years, and it is not at all clear when the government will finally pay Plaintiff its just compensation, even after an award of damages in the present proceeding.

182. The interest should be compounded to compensate CCA for the delay in payment. This Court has held that, when payment of an award is delayed for a long period of time, compound interest is required to fully compensate the owner. *See, e.g., Independence Park*, 61 Fed. Cl. at 717-18 (a delay in excess of a decade requires the award of compound interest); *Whitney Benefits, Inc. v. United States*, 30 Fed. Cl. 411, 415 (1994) ("[B]ecause of the long delay since the date of taking in this case, the award of compound interest is not only proper, but its denial would effectively undercut the protections of the fifth amendment to our Constitution."). Compound interest is particularly appropriate where, as here, 15 years have elapsed since the government first took Plaintiff's property. Failing to allow for compounding would "'retroactively reduce the value of just compensation'" due to Plaintiff. *Id.* at 415.

183. Additionally, the property taken from Plaintiff was income-producing property and the taking of income producing property necessitates the award of compound interest. *See, e.g., Whitney Benefits*, 30 Fed. Cl. at 415-16 ("Income-producing property would generate an income stream that would be available for continual reinvestment, at compound rates. Just compensation requires the payment of compound interest to replace the investment opportunities plaintiffs lost when the government took their property.").

184. In *Cienega IX*, 67 Fed. Cl. at 493 (citations omitted), this Court aptly wrote: "Plaintiffs in this case must be awarded compound interest to satisfy the constitutional requirements of just compensation. They would have reinvested the money in some manner had the government paid them at the end of the taking . . . . Given the use to which plaintiffs could have put the award, and that some of the takings ended eight years ago, compound interest is appropriate." These conclusions are as warranted in this case as they were in *Cienega IX*.

## IV. CONCLUSION

185. For the foregoing reasons, CCA should be awarded damages in the amount of $1,528,629 based on an end-of-taking date of February 28, 1997 and representing interest calculated through September 30, 2006.[11] The government should also pay interest calculated from September 30, 2006 to the date of judgment. Other appropriate relief as determined by this Court, including costs, attorneys' fees, expert fees, and other expenses should be determined at a later date.[12]

Dated: November 9, 2006

Respectfully submitted,

By /s/ Elliot E. Polebaum

Elliot E. Polebaum
Albert S. Iarossi
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20004
Tel.: (202) 639-7000/Fax: (202) 639-7003

Attorneys for CCA Associates

281301

11 Damages representing an end-of-taking date of May 31, 1996, plus interest through September 30, 2006, amount to $1,361,298.

12 In *Cienega IX*, this Court held that the plaintiffs therein were entitled to an award of attorneys' fees. 67 Fed. C1. at 494. Plaintiff CCA is equally entitled to such an award.

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that, on this 9th day of November 2006, I caused a copy of the foregoing Plaintiff's Post-Trial Memorandum to be delivered electronically to:

Kenneth D. Woodrow, Esq.
Commercial Litigation Branch
Civil Division
Attention: Classification Unit, Room 8012
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

___________/s/ Albert S. Iarossi_________
Albert S. Iarossi