IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CCA ASSOCIATES, Plaintiff, | ) | |
| v. | ) | No. 97-334C Judge Lettow |
| THE UNITED STATES, Defendant. | ) | |

**APPENDIX TO PLAINTIFF'S POST-TRIAL MEMORANDUM**

Part 1 of 5

Elliot E. Polebaum
Albert S. Iarossi
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20004-2505
Tel: (202) 639-7000/Fax: (202) 639-7003

November 9, 2006

Page 21

Mr. Norman cannot. But the moment of truth is now upon us. Thank you, Your Honor.

THE COURT: Thank you, Mr. Polebaum. Mr. Woodrow?

MR. WOODROW: Thank you, Your Honor. May it please the Court, this case is materially different from the other HUD cases this Court has previously heard. Here, unlike the property owners in Cienega Gardens and Chancellor Manor, the Court will hear that CCA sat on the sidelines of the preservation program for the entire five-year period when it would have been eligible to prepay in May of 1991 until the passage of HOPE in 1996.

THE COURT: Wasn't that one of the options that the government essentially provided?

MR. WOODROW: Certainly. But the Court will hear that Mr. Norman served as the president of the Louisiana Affordable Housing Management Association and was well educated about the preservation program, and yet CCA chose to do nothing and simply preserve the status quo.

Page 22

THE COURT: Wasn't -- I am asking again, wasn't that one of the options? Frankly, as long as Mr. Norman or anyone else in his position did that, the status quo would continue.

MR. WOODROW: And that's absolutely warranted here, Your Honor. But the important point is that the statute offered additional options aside from merely doing nothing and preserving the status quo. The statute offered owners the options of selling their property to a priority purchaser or nonprofit purchaser. They offered the option to the owner to attempt to seek to prepay. Or, finally, to seek incentives.

And in this case, despite Mr. Norman's and CCA's notice to HUD of its intention to either seek incentives or sell to a nonprofit entity, notice that it submitted to HUD in 1990 and reconfirmed subsequently, it chose to do nothing. And did --

THE COURT: What significance do you attach to the fact that you just mentioned?

MR. WOODROW: Well, perhaps the most significant thing is -- well, two items of

Page 23

significance, Your Honor. First is that despite having informed HUD of its intention to either seek incentives or sell to a nonprofit, CCA chose to do nothing.

And, second, CCA now is coming into Court and informing us that it always intended to prepay at its first date of eligibility and yet the contemporaneous evidence suggests otherwise, suggests that CCA intended to either seek incentives or sell to a nonprofit.

And the fact that CCA never submitted an application to prepay is important because it meant that HUD never acted upon any application to prepay, and HUD was never given an opportunity to decide whether CCA could have prepaid pursuant to either ELIHPA or LIHPRA.

THE COURT: So you are contesting really the standing to bring this action on the grounds that it isn't ripe?

MR. WOODROW: Yes, Your Honor. Unlike the previous cases the Court has heard, the plaintiff here will not be able to demonstrate that HUD would have denied an application to prepay had CCA submitted such an application. And as a consequence, CCA will not be

Page 24

able to meet its burden of proof of showing that its takings claim is ripe. Now --

THE COURT: Well, will we have evidence in this case of the situation in the New Orleans area respecting availability of low-income housing?

MR. WOODROW: Yes, Your Honor. CCA was eligible to proceed under either ELIHPA or LIHPRA, based upon its date of prepayment eligibility in 1991.

THE COURT: Well, that just means that it could take a use agreement.

MR. WOODROW: Well, Your Honor --

THE COURT: Or slightly different sales options but, in any event, --

MR. WOODROW: Well, there are actual important differences between the criteria, the statutory criteria for prepayment under ELIHPA and LIHPRA. For example, under section 225-A of ELIHPA, unlike section 4108 of LIHPRA, section 225-A does not include the bright line rule that rents may not increase more than 10 percent upon prepayment. Instead, the criteria turn upon discretionary factors. And in this case, CCA

Page 33

property as a conventional property.
THE COURT: Well, based on what the Court did in the Cienega and Chancellor cases, that would mean that there is a haircut or a deduction from the just compensation award in some way.
MR. WOODROW: Well, it could potentially mean – or it would mean that had they exercised the sale option and sold their property at a market price, that they would not have suffered economic impact that rose to the level of convincible taking.
THE COURT: The Court doesn't agree with that because the Court concludes – had concluded, and you have to convince me I was wrong in Cienega and Chancellor – that Congress cannot by putting an array of options forward curtail the fact that a taking occurred. It can make an adjustment to the compensation, but not that a taking occurred. So it really doesn't enter into the economic aspect of the thing at the time you are evaluating whether a taking occurred. It addresses just compensation thereafter.
MR. WOODROW: Well, Your Honor, it is

Page 34

our position that the entire statute must be viewed, and the application of the entire statute to the owner must be viewed when determining whether a taking has occurred. And when evaluating the Penn Central factors, the Court must look at the entire statute.
THE COURT: Well, that's an argument that you can make, you will make undoubtedly, are making.
MR. WOODROW: Absolutely.
THE COURT: To the Court of Appeals, both in the Independence Park case and Cienega and Chancellor.
MR. WOODROW: And the existence of those options and the owner's decisions, the owner's choices affect the economic impact of the statutes. And here, had the owner elected to sell its property, its economic impact would have been reduced. By how much, its impossible to say, because the owner didn't choose that option.
THE COURT: Well, but let's go back. If the owner exercised one of the options Congress made available.

Page 35

MR. WOODROW: If the owner had, then
–
THE COURT: Well, the owner did.
MR. WOODROW: Well, to simply do nothing, but the economic impact it claims and the just compensation that it seeks is a direct result of that choice. And the fact that Congress made available other choices that would have reduced the economic impact must be taken into account when deciding whether the application of the entire statute to the owner constituted a convincible taking. So for those reasons, we believe that the fact that the owner – and the Court will hear evidence that Mr. Norman was approached by a nonprofit purchaser prior to CCA's prepayment eligibility date, and that the nonprofit purchaser was interested in purchasing his property, but he elected to do nothing and not pursue that sale option, despite having told HUD that CCA intended to either seek incentives or a sale. And the Court will further hear that four HUD properties in the New Orleans area

Page 36

were successfully sold to nonprofit purchasers pursuant to the LIHPRA statute.
THE COURT: Maybe you could answer a question that I'm going to ask later. I will just ask it.
MR. WOODROW: Okay.
THE COURT: Did HUD grant prepayment under either ELIHPA or LIHPRA after the enactment of those statutes for any housing property, low income housing property in the New Orleans area?
MR. WOODROW: No, because no property in the New Orleans applied to prepay under either ELIHPA section 225-A or 4108. So HUD never had the opportunity or the need to apply those statutory provisions to an individual owner's plan of action. Now, looking beyond the question of ripeness, Your Honor, the evidence will show that CCA has not suffered a severe economic deprivation. With respect to economic impact, the plaintiff is all over the map. CCA's expert, Dr. Ragas, will present no fewer than six different proposed measures of economic impact, none of which shed light upon any

Page 37

economic impact of the preservation statutes upon CCA.
Plaintiff's various measures of economic impact range from just over 50 percent to nearly 90 percent, but comparing these percentages is meaningless unless you are comparing percentages of the same thing. And here plaintiff attempts to gauge the impact of the prepayment restriction by focusing only upon the period of the restriction, which is akin to attempting to define a word by using the word in the definition.
It is tautological. And the percentages offered by the plaintiff have no relationship to any impact upon the actual value of the plaintiff's property.
THE COURT: Remember our beach house, gold bar example, Mr. Woodrow?
MR. WOODROW: Yes.
THE COURT: All right. Thank you.
MR. WOODROW: The Court will hear expert testimony that all of CCA's measures of economic impact are fatally flawed. First, none of plaintiff's measures take into account the duration of the alleged taking.

Page 38

In fact, by some of plaintiff's measures, the alleged economic impact would decrease as the restriction gets longer, leaving to the nonsensical result that a longer restriction would produce less economic harm.
Moreover, none of the plaintiff's measures take into account risk or the time value of money. And, finally, none of the plaintiff's measures considered the value of the property.
The government's evidence will show, however, that the change in the value of the Chateau Cleary apartments resulting from a restriction upon prepayment lasting from May 1991 until the passage of the HOPE Act was no greater than 18 percent.
And significantly, the plaintiff has offered no alternative diminution in value measure. The evidence –
THE COURT: I thought you said they offered six?
MR. WOODROW: Well, those – none of those six measures, however, have anything to say about the value of the property or the impact of the statute upon the value of the

Page 39

property.
They all discuss the very narrow period of time when the restriction was in place, and they look either at diminution in rate of return, diminution in cash flow. All of them – or none of them actually discuss or contain any information about the impact of the statute upon the value of Chateau Cleary.
THE COURT: Now, that's back to the gold bar, beach house problem. If this is an income-producing property, and that's the beach house example, isn't the value really its ability to generate income?
MR. WOODROW: Yes. The income generating ability of an income-producing property and its value are two sides of the same coin.
But none of the plaintiff's measures look at all of the components of income that make up the value of an income-producing property. They look only at slivers of those components and, as a result, are misleading.
And our expert, Dr. Dickey, will explain why that is the case.
With respect to the plaintiff's

Page 40

original expectations, the Court will hear that a reasonable investor would have invested in a HUD section 221-D-3 property for multiple reasons. Each of which made the HUD subsidized projects more attractive to many investors than comparable conventional properties.
First, the HUD program offered investors a highly leveraged, 90 percent, low-risk loan, nonrecourse, so no personal liability, at a below-market interest rate. In this case, a 3 percent effective interest rate with an unusually long 40-year amortization.
This low debt service meant that lower rent – that the property could charge lower rents than conventional properties and, as a result, would generate higher occupancy, as CCA did.
THE COURT: Are you saying that the characteristics of the HUD loans or the HUD guaranteed loans, actually, in this particular case apply, even though CCA didn't invoke or seek to invoke all of those favorable options?
MR. WOODROW: Well, Your Honor, I believe the evidence will show that CCA did invoke most, if not all, of the favorable attributes of the section 221-D-3 program.

Page 49

day-to-day operations of the rental itself.
Q. Could you explain for us, please, what your educational background is?
A. Graduated with a B.S. in business administration in 1963 from Northwestern State University. Upon graduating there, I attended one year of law school at Tulane University, '63, '64. From there, I went to Michigan State University, took graduate studies in architecture and engineering from '64 to '65. Excuse me, I got the dates -- that's correct. And then that was the end.
Q. That concludes your education?
A. Yes.
Q. Did you go to work after that education?
A. Yes. After I left Michigan State, I went to work for a home builder in Metairie from 1967 until 1969. In 1969, I took employment with the Nigerian Gulf Oil Company in Nigeria, West Africa, and I was there for a little short of two years, at which time I was contacted by my father, I believe it was late June, early July of '69, where he told me that he and my uncle were looking at the possibility

Page 50

of building an apartment complex. They were investing in one. And also would I be home and interested in looking to come and look at them with him.
Q. We will come back to the details of those events shortly.
Now, can you tell us what other professional activities you have been engaged in over the years.
A. Well, with the apartment industry, I have been -- I served one year as president of the New Orleans Apartment Association, two years as president of the Louisiana Apartments Association, and two years as president of the Louisiana Assisted Housing Management Association, among other things that didn't have as much to do with housing. But also I was a multi-family chairman on the Board of Directors of the Louisiana Housing Finance Agency, a state agency, whose mission was to supply funds to build low and moderate income housing across the state of Louisiana.
As I mentioned, I did that for four years. And then from a community standpoint, I served on the Board of Regents of the Community

Page 51

College in New Orleans, Our Lady of Holy Cross for two years. And I served on the Board of Directors of a nonprofit in New Orleans called Start the Invention in Reading, which provides tutoring for disadvantaged inner city public school children.
Q. Thank you. Mr. Norman, who made the decision to file this lawsuit against the government?
A. I did.
Q. And why did you decide to undertake this litigation?
A. Because I felt that was the only way we would be compensated -- I am going to need some water, please -- that was the only way I felt we could be compensated for the loss of return on equity during the period of 1991 to 1996.
It went contrary to the plan we had in 1969, it went contrary to the plan we had in 1985, and we felt that we were hurt.
Q. All right. Can you describe for the Court the property, Chateau Cleary, as it is today?
A. It is a well-maintained three story

Page 52

walk up structure containing 22 one bedrooms, 22 two bedroom flats, 44 two bedroom townhouses and 16 three bedrooms. As I say, it is well-maintained.
Q. Did Chateau Cleary sustain physical damage from Hurricane Katrina?
A. Relatively slight damage. We have about 11, 12 air-conditioning units on the third story flat roofs that were blown over, one leak in one apartment, and I believe that was the bulk of it, and some appliances that had power surges that we had to replace because of the storm.
Q. Can you describe Metairie, the area in which Chateau Cleary is located as it is today?
A. It is probably still one of the prime places to live. The crime is low. The shopping is convenient. The traffic is heavy, since the hurricane, of course, which is a minus, but the schools are good. The schools are easy to get to. The shopping is easy to get to. And it is still a very desirable place for middle-class families to live.
Q. Okay. You alluded to the call you received from your father back in 1969 when you

Page 53

were overseas. Can you explain to us in general terms, and we will get into the details and the documents in a little while, can you explain in general terms how the Chateau Cleary project and the owners entry into the transaction with HUD came about?

A. Well, I did return and I was not –

THE COURT: Mr. Harrington?

MR. HARRINGTON: Your Honor, there is a lack of foundation at this point to this question. He hasn't established that he was involved in that, the last – from his testimony, he was in Nigeria and there has been no foundation he was involved in the decision to enter into the investment.

THE COURT: Overruled. He testified this was 1969. This is before anything actually happened as far as that goes. Let's find out.

BY MR. POLEBAUM:

Q. Mr. Norman, can you explain what happened in 1969 after you received the phone call from your father?

A. I returned to the United States and I would say within two days, full days of my

Page 54

return, I was in my father's office on a separate phone in a three-way conversation with Mr. Patrick Tomeny, the lead member of a team that had put together this project and could not proceed to go forward because of lack of funding on their part.

They were desirous to get out. They had bought the land. Mr. Tomeny knew about my father and uncle, they were well-known in the development circles in New Orleans. They had built many VA and FHA homes after World War II. They were the first developers of the city of New Orleans to ever build FHA low-income housing and it was very successfully done.

They got to know all the people that worked at FHA and vice versa. So whether – how exactly Mr. Tomeny got to my father, I don't know, but it could have been just as well from HUD because they had that relationship and reputation.

After the conversation and several conversations with Mr. Tomeny, we had meetings with the mortgagee. My father knew the president of Pringle Mortgage. We also had several meetings with old friends that they

Page 55

dealt with over the years from HUD.

The project – every person involved on the other side of the entity, the Tomeny group, the mortgagees, the HUD personnel sold very hard, tried to sell my father and uncle and me very hard to get into the project. They knew my dad and uncle's reputation. It was a new program coming into effect at HUD, HUD didn't really have much of a multi-family wing or section then, so they wanted to see these programs succeed with good developers.

They, Mr. Tomeny and his, had created some value because they had gone through a certain amount of process – of processes before I got into the States. But there was a time bomb kind of situation – I am not saying a bomb – meaning there was a limit on – something had to be done, because normally my father and uncle would not have operated in a three or four months span to make an investment of that kind.

Q. Can you tell us what your role was in the development of the project, the types of meetings you participated in, the discussions that you had with the relevant players?

Page 56

A. I was required to attend every meeting, be on every telephone conversation subsequent to my returning to the States. I was specifically instructed that I was to take over the project. This was an investment for them and they wanted me to do all the work and do all the – handle everything with HUD and the mortgagee and so forth.

Q. All right. When the decision was being made whether or not to go into the HUD program, can you explain what the important considerations were that you, your father, and your uncle looked at?

A. The two most important considerations was – were no personal liability on the permanent loan. They knew they would have to get personal liability on the construction loan. They were used to dealing with that, and in the home building development.

And no personal liability on the permanent loan would have been a necessary part of having developed anything market rate. So it didn't make any difference to them, whether it was HUD or not. They wouldn't have gone forward had – without a loan that had no

Page 57

personal liability on the permanent side.
The second most important thing was the prepayment right in 20 years. They thought that, yes, it was certainly a risk-free investment, meaning they were more likely to rent to low income people with low rents than they would if it was a market rent, but there was a prize at the end of the 20 years. There was a plan.
And the plan was you spend more money, you build a better product, you put it in an area where nobody else is building subsidized housing, you wait for the growth and the 20th year, you pay your dues to society, and you then take that asset that's grown and you nurtured, and you have turned it around and start realizing your equity on that value.
Q. All right. Did the prepayment right figure in the discussions that you participated in with HUD?
A. It was probably the most -- if we had not had that, the project would have not gone forward.
Q. Did the representatives from HUD explain that aspect of the program to you?

Page 58

A. The representatives of HUD stressed it. The mortgagee representative stressed it. The sellers stressed it.
Q. By the sellers, who are you referring to?
A. Tomeny. I didn't meet his partners, but he stressed it, the mortgagee stressed it, and Mr. Salvo and Mr. Vilhaus, Mr. Dimetri, who was the acting director at the time, they all -- I can't remember which person said what, but they were trying to get my dad and uncle to do, and me at the time, to do the deal. And, obviously, they used whatever selling points were available and that was a big one.
Q. And do you recall why the Tomeny brothers were getting out?
A. They were getting out because we were told they didn't have the wherewithal, the financial statement of a quality that HUD or the mortgagee would accept.
Q. Now, do you recall the right of prepayment in the HUD documentation that was relevant to the transaction at the time?
A. Yes.

Page 59

Q. And can you explain, just in general terms, what that was?
A. Well, I believe primarily it was in the secure note and it said that -- the bargaining was for 40 years. Prior to the 20th year, you could not prepay the mortgage without HUD's approval. And it said after 20 years, you did not need HUD's approval.
Q. All right. And was that right of prepayment important to the decision to proceed?
A. It was probably the most important, other than the no liability on the personal loan.
Q. Those were the two critical considerations?
A. Yes.
Q. Would the owners have gone ahead with the project if there had been no right of prepayment after 20 years?
A. There would have been no reason for them to. They would just as well have gone and built a market rate complex. Again, it was a chance to -- you know, I should mention the fact that the project was built in the path of

Page 60

growth, also made sense to give you some time to work toward the 20th year.
Q. What was -- you referred to the path of growth. Could you describe what Metairie was like in 1969 at the time that you, your uncle, and your father were considering this transaction?
A. It was the fastest growing area in the city of New Orleans. It was in the newspapers being such, the interstate had just been completed, going that way west toward Baton Rouge and then on to Houston.
The growth, the development was approximately eight -- I am guessing now -- ten blocks away from the site on which we built Chateau Cleary. At the time we broke ground, there was only a Holiday Inn -- we were on a service road for the I-10. There was only a newly built Holiday Inn between two major intersections between which we were.
So we were pioneers, but we felt that, you know, the timing was right, we would have to wait, but we were willing to wait.
Q. So what were the expectations of -- with respect to future development in Metairie

Page 61

and as it affected the property in question?
A. If it went like the area did between
where the growth was at the time in New
Orleans, the Orleans Parish line and continue
west, like everybody predicted it would, we
thought it would -- and it did -- then the
apartments that were being built, that was the
apartment area conventionally. The houses were
good houses. The shopping was being planned
and developed in a thoughtful, prudent and
proper way.
So the expectation was that in 20
years, if not sooner, we would be in an
established middle-class neighborhood that if
we maintained the property well, which we did,
we could convert to market rate apartments and
get out from under HUD.
Q. In the government's opening statement,
they made reference to the fact that there was
no written business plan. Can you explain for
the Court how you and your father and your
uncle went about collecting information, what
types of information you looked at and
considered in connection with the decision to
proceed?

Page 62

A. Well, in 1969, again, I refer to the
short fuse that was involved. We had to move,
I think we had like 60 or 90 days to make a
decision, so they relied on the mortgage -- on
what they could glean from the seller. They
relied on what they could glean from the
mortgagee, who they trusted and knew. They
relied on what they could glean and were told
by the HUD personnel, with whom they dealt with
for years. They knew it from looking at the
newspapers. They knew it from driving around.
But they also contacted home builder
friends, apartment people in the conventional
area like I think people like Tonti. They
consulted with Bill Smolken, even if it was by
telephone. They didn't have time to have
written plans made.
Q. Who was Mr. Smolken?
A. Mr. Smolken was -- Bill Smolken was
considered the preeminent market analyst in New
Orleans at the time.
Q. All right. And what were the contacts
with Mr. Smolken concerning the development of
the HUD project?
A. I wasn't in on the conversation, but

Page 63

it was going like this, do you think as we --
MR. HARRINGTON: Objection, Your
Honor. He said he wasn't in on the
conversation. He has no factual basis of his
own personal knowledge to testify to it.
THE COURT: Sustained, but only on the
ground that we don't have a foundation
established as of now.
BY MR. POLEBAUM:
Q. Mr. Norman, did your father and your
uncle speak with Mr. Smolken?
A. My father did.
Q. Your father did. All right. And did
you come to learn what the discussion was that
your father had with Mr. Smolken?
MR. HARRINGTON: Objection, Your
Honor. If he learned it thirdhand, it is
hearsay, and there is no personal knowledge.
THE COURT: If -- well, let's find
out. As of now, we don't have an answer that
would indicate generally whether Mr. Norman
knew the topics discussed, without actually the
words that Mr. Smolken spoke, so let's find
out.
BY MR. POLEBAUM:

Page 64

Q. Do you know what the purpose of your
father's discussion was with Mr. Smolken?
A. It would have been, as with other
people, we have not built in Metairie, we have
never built a multi-family, is it in the path
of growth, that kind of thing.
Q. And, again, who was Mr. Smolken?
A. He was a market analyst in the city of
New Orleans.
Q. And did your father have prior
dealings with Mr. Smolken?
A. As a matter of fact, my father told me
on many occasions that he and my uncle gave
Mr. Smolken his first job in the city of New
Orleans.
Q. Over the course of the 20-year period
that followed the development, what actually
happened in the area around Chateau Cleary more
generally in Metairie in the way of development
throughout that period?
A. The next 20 years, Metairie developed,
except for maybe a slowdown in the western part
in the '80s, because of -- it was built out
even by the time the RBUS hit, but it developed
almost 100 percent as we hoped for, hopefully

Page 65

expected, and it really just filled out our expectations perfectly.

Q. And following 1991 through the time that the mortgage was prepaid, what was the further development, if any, in Metairie during that period, during the '90s?

A. During the '90s?

Q. Yes.

A. There wasn't much development in Metairie because there wasn't any land to speak of left.

Q. All right. Do you know Ann Kizzier?

A. Yes, I do.

Q. Who is she?

A. I don't remember her exact title, but she is the head of the local New Orleans HUD office.

Q. Now, in her deposition she described Metairie in the 1994 time frame, when she arrived in New Orleans, in the following terms, she said, "Metairie is a good area, it is probably the best suburb at that time in New Orleans."

Do you agree with that assessment?

A. Yes, I do.

Page 66

Q. All right. I would like to take you back now and ask you some more detailed questions concerning the Chateau Cleary development.

And I want to start with some documentation and ask you to turn to Plaintiff's Exhibit Number 1, please. Do you have that before you?

A. Yes, I do.

Q. What is Exhibit Number 1?

A. Exhibit Number 1 is a copy of an act of sale, cash sale probably by Patrick Tomeny to my father and my uncle.

Q. What is the date of this active sale?

A. The date is the 6th of October, 1969.

Q. Did you read this document at the time?

A. Yes, I did.

Q. Why is that?

A. I was required to read all the documents, as part of my job.

Q. All right. And who are the purchasers?

A. The purchasers were my father, Ernest B. Norman, Jr., and my uncle, J. Robert Norman.

Page 67

Q. And let me point you to page 1379. That's the little Bates Number in the lower right-hand corner of the page.

Can you tell us what the purchase price was that the purchasers paid?

A. It was $184,979.89.

MR. POLEBAUM: I move admission of Exhibit Number 1, Your Honor.

MR. HARRINGTON: No objection, Your Honor.

THE COURT: Admitted.

(Plaintiff's Exhibit Number PX-1 was received into evidence.)

BY MR. POLEBAUM:

Q. At the time of the purchase, then, of the property, which is reflected in Exhibit Number 1, what was the plan that you, your uncle and your father had?

A. The plan was to build a quality project, maintain it as a moderate income housing for a maximum of 20 years, and convert to a market rate apartment as of the 20th year.

Q. All right. Let me ask you now to turn to Exhibit Number 2, Plaintiff's Exhibit Number 2. What is this document, Mr. Norman?

Page 68

A. This is a copy of the regulatory agreement.

Q. And the date, please?

A. The date, it is dated the 7th of November, 1969.

Q. And who are the parties to the regulatory agreement?

A. The parties to the regulatory agreement are Pringle Associated Mortgage Company and Ernest B. Norman, Jr. and J. Robert Norman.

Q. Pringle is identified, I think, as the mortgagee?

A. The mortgagee. I apologize, it was between HUD and my father and uncle.

Q. All right. And did you read this document at the time?

A. Yes, yes, I did.

Q. Do you see at the top there is a reference to an FHA form. Do you know whether this regulatory agreement was prepared on the basis of a form prescribed by HUD?

A. It was.

Q. What is the reference to the note near the top of page 1381?

Page 73

begins –
A. Excuse me, what page number was that, Mr. Polebaum?
Q. It is the first page of Defendant's Exhibit Number 1 that I just handed up to you.
A. Okay. Thank you. Which paragraph?
Q. About a third of the way down the first page, beginning, "In consideration of the endorsement for insurance by the commissioner of the above-described note or in consideration or consent of the commissioner" –
THE COURT: We still haven't admitted this.
MR. POLEBAUM: I apologize, Your Honor. I thought –
THE COURT: No, we just haven't quite gotten there.
MR. POLEBAUM: I move admission of Defendant's Exhibit Number 1.
MR. HARRINGTON: Your Honor, we have no objection.
THE COURT: Admitted.
(Defendant's Exhibit Number DX-1 was received into evidence.)
MR. POLEBAUM: Thank you.

Page 74

BY MR. POLEBAUM:
Q. All right. Then turning to the paragraph that I indicated, Mr. Norman, "In consideration of the endorsement for insurance by the commissioner of the above-described note or in consideration of the consent of the commissioner to the transfer of the mortgage property, and in order to comply with the requirements of section 221-D-3 of the National Housing Act as amended and the regulations adopted by commissioner pursuant thereto, owners agree for themselves," and so on and so forth, and then you have a number of numbered paragraphs that follow.
Let me ask you, first, what did you understand this reference to the regulations to signify?
A. That the – that we as owners would have to, we are agreeing to abide by all the rules and regulations contained within the regulatory agreement, and that anyone coming after us, anyone who would inherit or buy our position, would have to agree to that as well, as long as this is, the mortgage was in effect.
Q. Now, did you have any understanding at

Page 75

the time one way or the other whether the regulations in effect at the time recognized a right to prepay the mortgage on the 20th anniversary of the mortgage?
A. At the time, I didn't see the Federal Register, but it was common knowledge and it was – I did see it in the note.
Q. All right. Beginning with item number 1, the paragraphs that follow that introductory language that I just read, I would like to ask you some questions about some of the specific paragraphs.
Can you tell us what you understood that paragraph 1 required?
A. That we should properly make all payments due under the note and the mortgage.
Q. All right. And how about paragraph number 2?
A. That we will – it mainly addresses maintenance of the reserve fund for replacements.
Q. All right. And what was your understanding of paragraph number 4 at the time?
A. That we were limited to whom we could

Page 76

rent, specifically to low or moderate-income people.
Q. How about paragraph 5-C, what was your understanding at the time?
A. It said we were limited to admitting only families of low to moderate income as defined by the commissioner.
Q. All right. On page 3 of the document, of the exhibit, at paragraph 6-E-1, it indicates that "all distributions shall be made only as of or after the end of the semi-annual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction, all such distributions in any one fiscal year shall be limited to 6 percent on the initial equity investment as determined by the commissioner and the right to such distribution shall be cumulative."
What was the – what was your understanding of this particular provision?
A. That in any one year, you would be limited to what the, what HUD came up with their formula of your equity position in the project after you finished building out the building and going to closing. And in our

Page 77

case, it was 6 percent of approximately 215 or 213 thousand dollars.

Q. And how did a 6 percent dividend on the original equity compare with what could have been earned in a market setting free of HUD restrictions at that time?

A. It was much less.

Q. Paragraph 7, the first sentence provides, "owners shall maintain the mortgage premises, accommodations, and the grounds and equipment pertinent thereto in good repair and condition."

What was the intent of the owners with respect to maintenance of the property? What was the plan for dealing with those kinds of issues?

A. The intent from day one, going back to the decision to get into the complex, would be to maintain the property as best we could possibly do. And this was the way my dad and uncle and I ended up doing it, it is the way we do business. It has nothing to do with whether it is a HUD property or not, especially in light of the fact that we had future plans for it, we weren't going to let it deteriorate so

Page 78

that we couldn't do what we wanted to do with it.

Q. And what, in fact, has been the practice with respect to maintenance from the outset of the program through the present time?

A. We have -- we have been able to maintain it in an excellent fashion.

Q. Let me ask you to turn, please, to Plaintiff's Exhibit Number 3, back in the volume now, Mr. Norman.

A. Yes.

Q. Can you explain to us what this document is, sir?

A. This is a copy of the secured note dated November 7th, 1969.

Q. And do you recognize the signatures on page 1389?

A. Yes, I do. The signatures of my father and my uncle.

Q. And did you read this document at the time?

A. Yes, I did.

MR. POLEBAUM: Move admission of Exhibit Number 3, Your Honor.

MR. HARRINGTON: No objection, Your

Page 79

Honor.

THE COURT: Admitted.

(Plaintiff's Exhibit Number PX-3 was received into evidence.)

BY MR. POLEBAUM:

Q. On the first page of this exhibit, Mr. Norman, there is a reference at the top to FHA form reference. Was this secured note prepared on the basis of a form prescribed by HUD?

A. It was.

Q. Is this the note that is referred to in the regulatory agreement?

A. It is.

Q. About two-thirds of the way down on the first page, there is a paragraph that begins "the debt evidenced." Do you see that?

A. Yes.

Q. And it provides, "The debt evidenced by this note may not be prepaid, either in whole or in part, prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner, except a maker which is a limited dividend corporation, may prepay without such approval after 20 years

Page 80

from the date of final endorsement of this note by the Federal Housing Commissioner."

What was your understanding of the import of this language in the secured note?

A. Well, this is -- this was, to us, the legal linchpin to guaranteeing our right to prepay in 20 years. We possibly could prepay before 20 years, but they don't guarantee that, we needed HUD permission. So that was if any at best, if you wanted to.

But at 20 years, this solidified our agreement in our minds with HUD that we agreed that we would get out in 20 years and they said we could get out in 20 years.

Q. All right. Let me ask you now to turn to Exhibit 4, please. I'm sorry, a further question on Exhibit 3.

On the back page, there is some language at the very bottom. Can you explain to us what that is?

A. Can you refer to which --

Q. Yes. It is the language that is the very bottom language that appears, I guess, horizontally or I'm not sure whether it is horizontal or vertical, but it is the -- it is

Page 85

(Plaintiff's Exhibit Number PX-5 was received into evidence.)

BY MR. POLEBAUM:

Q. Mr. Norman, why was this note made in 1971?

A. This was done after the completion of construction and, if memory serves me correctly, it is part -- it is the final endorsement of the note by us and by the HUD representative.

Q. Is the amount of the note, is the amount of the 1971 note different from the amount of the 1969 note?

A. Yes, it is approximately $100,000 more.

Q. Can you explain why there is a difference in amount?

A. Yes. We went into -- with a request to HUD to increase the mortgage amount because of what we -- we had to go to Washington to find out if there was any cases that we could ask for increased mortgage amount. And our premise was that Mr. Tomeny had started this project sometime before I even got back into the United States.

Page 86

And I can't remember the date, but between that time and the time we actually got into construction and started in with the trades such as plumbing, framing and so forth, roofing, which come just after breaking ground, which I believe we did in November or December of '69, that the valuation department of HUD did not have a chance to take that -- the inflationary effect of that period, especially when you are dealing with wages that were essentially union wages, not normal in New Orleans for apartment construction. So that the inflation had gone on for that period of time, which had, if the underwriting by HUD had been done in, say, October of '69 instead of when it was done prior with Mr. Tomeny, they would have allowed more higher cost allowances in the construction. We presented that to the local office with advice of counsel from Washington, I can't remember the gentleman's name offhand, and they agreed with our assessment of the situation and agreed to increase the amount of the mortgage.

Q. Okay. Is the 1971 note prepared on a form prescribed by HUD?

Page 87

A. It is.

Q. Is the date of this note, May 17th, 1971, the date of final endorsement?

A. It is.

Q. On the first page of the note, about two-thirds of the way down, it is provided that the debt evidenced by this note "may not be prepaid either in whole or in part prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner, except a maker which is a limited dividend corporation may prepay without such approval after 20 years of the date of final endorsement of this note by the Federal Housing Commissioner."

What did you understand was the import of this language back in 1971?

A. This, again, cemented our right to prepay after 20 years. And the document showed that we agreed to be locked in for 20 years, unless they gave permission. But after that time, we did not need HUD's permission. It mirrored the previous document we had signed in '69.

Page 88

Q. All right. On the next page, please, again, the language that goes across the bottom of the page where you have the signature on behalf of the Federal Housing Commissioner. Can you explain what this is?

A. This is saying that this is the final endorsement on the note by the Federal Housing Commissioner or his representative, his representative -- his or her representative.

Q. All right. Let me ask you to turn, please, to Exhibit 6.

A. Yes.

Q. What is this document, Mr. Norman?

A. This is a copy of the mortgage dated May 17th, 1971.

Q. And do you recognize the signatures that appear on page 1400?

A. I do.

Q. And whose signatures are those?

A. The signatures of my father and uncle.

Q. And did you review this document at the time?

A. Yes, I did.

Q. Did you review all of these HUD transaction-related documents at the time?

Page 89

A. Always.
Q. Was this mortgage prepared on a form prescribed by HUD?
A. It was.
Q. And in the middle of the first page, 1397, you have the language at the end of the first paragraph that said note, and all of its terms are incorporated herein by reference.
THE COURT: Just hold on.
MR. HARRINGTON: Your Honor, we're starting to get into the substance of the note here and Mr. Polebaum hasn't yet moved this one into evidence.
MR. POLEBAUM: Right. I apologize, Your Honor. I move admission of Exhibit 6.
MR. HARRINGTON: Your Honor, we have no objection except for some handwriting on the fifth page talking about a true copy. There hasn't been any foundation for that and we would suggest that that handwriting be ignored, but we –
MR. POLEBAUM: We have no objection to ignoring that handwriting, Your Honor.
THE COURT: Admitted with that limitation.

Page 90

(Plaintiff's Exhibit Number PX-6 was received into evidence.)
BY MR. POLEBAUM:
Q. On the first page at the end of the first paragraph, the language, "said note and all of its terms are incorporated herein by reference, and this conveyance shall secure any and all extensions thereof, however evidenced." What did you understand that this language signified at the time?
A. Mr. Polebaum, if you will refresh me again, which document we're on?
Q. I'm sorry, it is Exhibit 6, on the first page.
A. Okay. The mortgage.
Q. Yes. At the end of the first paragraph, the last sentence, "said note and all of its terms are incorporated herein by reference and this conveyance shall secure any and all extensions thereof, however evidenced." Do you see that?
A. Yes.
Q. And what did you understand that this was referring to?
A. That the note would be – was being

Page 91

made part of the mortgage.
Q. And on page 1398, paragraph 3, it provides that "the regulatory agreement dated November 7th, 1969 executed by the mortgagor and the Federal Housing Commissioner, which is being recorded simultaneously herewith, is incorporated in and made a part of this mortgage." What did you understand that this language referred to?
A. That the regulatory agreement also was made part of the mortgage document.
Q. All right. Mr. Norman, we looked at the prepayment rights set forth in the notes, the incorporation of the notes in the mortgage and the reference to the regulations in the regulatory agreement. My question for you is, what was the importance of the prepayment rights set forth in these documents to the decision to go into the HUD program?
A. Well, the importance as I said before, we wouldn't have done this without it, but these documents in our mind obligated us to do certain things for the 20 years into the 40

Page 92

year mortgage, and also obligated HUD to allow us to do certain things at the end of the 20-year period. And besides all the verbal things and assurances that went before that, in our mind, this was the legal documentation that set the parameters by which we would operate vis-a-vis each other.
Q. Now, was the ownership of CCA syndicated?
A. No, it was not.
Q. Can you explain why not, please?
A. The reason it was not syndicated is because the benefits, we thought, of primary importance – one of the benefits to be gained after prepayment of the mortgage, was hopefully in the 20th year, if not sooner. If we had syndicated the property, those benefits would have gone to people whom we syndicated to. And that wasn't our purpose. That was not our plan. So there was no necessity to do that and there was no desire to do that.
Q. Did the owners take accelerated depreciation?
A. They did not.

Page 93

Q. Was the depreciation taken any different from that available on a conventional property?
A. No.
Q. What was the significance of the limited dividend on original equity that was allowed?
A. It was nice, but it was not something that made much difference.
Q. There was reference in the opening statement of the government to management fees and construction fees. Let me ask you, first of all, what was the significance in the decision to go ahead with the opportunity to obtain construction fees?
A. Again, it was not a consideration because it would have been something we would have done had we built a conventional complex. You work for that money, you earn the money and if you elect to take that money and put it back into the financing of the project, it is no different than money you made practicing medicine on the side. It is a job.
Q. All right. And what about the management fees?

Page 94

A. The same thing. If you build a conventional complex, and you want to manage it yourself, you can and you earn actually more money for less work, but it had – that's money that's earned. If you don't do it, you have to pay somebody else to do it.
Q. All right. So are you saying –
A. The management fee was probably the lowest thing on the totem pole.
Q. Did you have to provide construction services to get the construction fee?
A. Yes, we did. And that's – and we had to take risk because the interim loan with the bank was not nonrecourse.
Q. All right. Did you have to provide management services to get the management fees?
A. We did.
Q. How did these aspects, the limited dividend, the management fees, the construction fees, how did they compare in significance to the prepayment right?
A. They didn't compare with the prepayment right at all. They were – the prepayment right was the engine that drove this thing, assuming that you got a nonrecourse

Page 95

permanent loan.
Q. So when your family, when you, your father, and your uncle went into this transaction with HUD, what did you expect would happen over the next 20 years?
A. We expected that the community would – in which we built, Metairie, we were in the path of growth, the growth would come to us, as it did, and it would pass us by. We would be in a solid middle-class community that had apartments, shopping centers, hopefully low crime, which it had. And what happened fit our estimation of what would happen. And we were satisfied with that.
Q. All right. Did it ever cross your mind that the government would renege on its commitment to allow prepayment within 20 years?
A. As to what time period?
Q. Back when you went into the transaction in 1969. Did it ever cross your mind then that the government would renege on its commitment?
A. No.
MR. HARRINGTON: Objection. It is argumentative.

Page 96

THE COURT: Overruled.
BY MR. POLEBAUM:
Q. All right. Mr. Norman, I want to ask you some questions now that relate to the actual operation of the property. First of all, who was responsible for overseeing construction?
A. I was.
Q. And after the project was built, what were your responsibilities?
A. To hire personnel, market the property, set up the rental apparatus for screening residents, training the personnel to perform the requirements of HUD and maintaining the property.
Q. Could you just describe for us in general terms what your experience was in dealing with HUD in the early years after May 1971?
A. We always had friendly dealings, but in the early years, the ability to get a rent increase was very difficult. It was difficult and admitted to by HUD personnel, they would – everybody was new at the game, but they had a shortage of personnel and the response to rent

Page 97

requested in the early '70s was, frankly, slow.
Q. I want to show you some documents that relate to some of these experiences. And let me ask you to turn to Exhibit 8, please.
A. Yes.
Q. What is Exhibit 8, Mr. Norman?
A. Exhibit 8 is a copy of a memorandum I dictated and wrote regarding – putting down my conversation or relating my conversation with Mr. Daly regarding a rent increase we had applied for.
Q. And what does this memorandum reflect?
A. It reflects that they were working on it.
MR. HARRINGTON: Your Honor, again, this has not been admitted into evidence and we're getting into the substance of the memorandum.
THE COURT: It is not a quote from it. It is just what does it reflect. That question is appropriate. All right.
MR. POLEBAUM: I move admission, Your Honor, of Exhibit Number 8.
MR. HARRINGTON: Your Honor, we object on the grounds of hearsay.

Page 98

BY MR. POLEBAUM:
Q. Mr. Norman, was this document prepared in the ordinary course of business?
A. It was.
Q. Did you maintain this document in the ordinary course of business?
A. Yes, I did.
MR. POLEBAUM: Move admission, Your Honor.
MR. HARRINGTON: We believe that this just jotting down of notes is not the sort of regularly-conduct business activity that falls within the business records exception, Your Honor.
THE COURT: Well, let me ask a question. Mr. Norman, who prepared this note?
THE WITNESS: I either wrote it myself or dictated it and a secretary would type it. And during this period of time, I always had to copy my father and mother, it was always done this way, almost every phone conversation.
THE COURT: The objection is overruled. The document is admitted.
(Plaintiff's Exhibit Number PX-8 was received into evidence.)

Page 99

MR. POLEBAUM: Thank you, Your Honor.
BY MR. POLEBAUM:
Q. Let's turn to Exhibit 9, Mr. Norman.
A. Yes.
Q. What is this document, please?
A. This is a letter to me from the Department of HUD dated June 1st, 1972 granting a 5 percent rent increase.
Q. Exhibit Number 9?
A. I'm sorry, too many pages.
Q. Number 9?
A. I apologize. This is a copy of a memorandum of a meeting I had with Mr. Mills at the HUD office dated April 28th, 1972.
Q. All right. And did you prepare this document in the ordinary course of business?
A. Yes, I did, but may I – looking at it further now, after a while, I didn't meet with Mr. Mills, I met with Mr. Jones.
Q. All right. But did this – did you prepare this in the ordinary course of business?
A. Yes, I did.
Q. And did you maintain this document in the ordinary course of business?

Page 100

A. Yes, I did.
Q. And did you either write or dictate the contents of this document?
A. I did.
MR. POLEBAUM: Move admission, Your Honor.
THE COURT: What exhibit are you on?
MR. POLEBAUM: Number 9.
THE COURT: Hold on. I have Number 9 as – there is a 9 and a 9-A. Now I am in the right page.
MR. POLEBAUM: There is a series of these memoranda to the file that Mr. Norman either wrote or dictated that we're dealing with, and this is just the next one in the series. Move admission of this document, Your Honor.
MR. HARRINGTON: Again, Your Honor, we believe it is hearsay and indeed it has statements that were made by persons written down in it so there is even hearsay within hearsay.
THE COURT: Let me just ask, Mr. Harrington, how you can maintain the hearsay, given the testimony that Mr. Norman

Page 105

Q. What is Exhibit 10, Mr. Norman?
A. 10 is a copy of a memorandum of a conversation I had with Mr. Mills of HUD dated July 12th, 1972.
Q. And did you either dictate or write this memorandum?
A. Yes, I did.
Q. How was that indicated to you on this memorandum, that you did it?
A. In this conversation, Mr. Mills told me verbally that he had approved the rent increase.
MR. POLEBAUM: Your Honor, I'm sorry, I was trying to ask.
BY MR. POLEBAUM:
Q. Referring to your -- the language on the letters above the reference at the bottom, copies to, where it says, "EBNIII:BG," what does that signify?
A. That was my initials as author of the document and the initials of the person who typed the document.
Q. All right. And did you prepare this course -- prepare this document in the ordinary course of business?

Page 106

A. Yes, I did.
Q. Did you maintain this document in the ordinary course of business?
A. Yes, I did.
MR. POLEBAUM: Move admission, Your Honor.
MR. HARRINGTON: No objection to this document, Your Honor.
THE COURT: Admitted.
(Plaintiff's Exhibit Number PX-10 was received into evidence.)
BY MR. POLEBAUM:
Q. Mr. Norman, what then does this document reflect?
A. It is -- it recaps the conversation I had with Mills regarding the rent increases in which he verbally said he had finished dictating a letter approving the rent increase.
Q. So how long did it take from the time, approximately, from the time you began the process until the time the rent increase was approved?
A. About five months.
Q. And following approval, how long would it take to actually implement the rent

Page 107

increase?
A. We were -- we leased on month to month leases, so you could not -- even if we could raise the rents, we couldn't do it without giving HUD -- excuse me, giving the tenant a 30-day notice. So if you got approval for a rent increase, in this case in the middle of July, we would then have roughly two weeks to put a notice out telling the tenants that as of September 1st, your rent will go up.
Q. All right. Was the rent increase allowed to be made retroactive for the prior seven-month period?
A. No.
Q. Now, in the years 1971 to 1985, what was your practice with respect to attempting to get rent increases from HUD?
A. To go in frequently and often, especially when we were dealing with the inflationary area, times of the '70s, we were constantly playing catchup and we never did get caught up. Because the rent increases were based on your costs, your costs were produced by a financial statement in, say, 2006, which would reflect the loss incurred in 2005.

Page 108

So from the time you got your financial statement, say, in the first quarter or so in 2006, from the time you went for a rent increase, from the time you were able to implement the rent increase, again, I am just using 2006 as an example, you could be 18 months into -- behind the loss that you experienced.
If you got the increase, you got it for the past year, but you didn't get that money back.
Q. So what was happening to your operating costs in the 1970s through about 1984, '85?
A. They were predictably increasing.
MR. POLEBAUM: Your Honor, we have a demonstrative that shows year by year the operating costs, the rent increases and when they went into effect. May I hand it up to the Court?
THE COURT: This was disclosed in advance to Mr. Harrington and his colleagues?
MR. HARRINGTON: Your Honor, we got this over the weekend. It was disclosed in advance. But we do have an objection to the

Page 141

appropriate, but I don't have the second set. I usually try to keep a cross-check. And the clerk does as well. So the clerk and I will have to take an extra seven minutes – I say seven – five to ten minutes for the luncheon.
MR. POLEBAUM: Okay.
THE COURT: Sorry.
MR. POLEBAUM: Shall we break now?
THE COURT: I think it is appropriate.
MR. HARRINGTON: Certainly appropriate, Your Honor.
THE COURT: Mr. Norman, is that satisfactory to you?
THE WITNESS: Yes, Your Honor.
THE COURT: We're in recess for let's say an hour and ten minutes.
(Whereupon, at 12:31 p.m., a lunch recess was taken.)

Page 142

AFTERNOON SESSION
(1:43 p.m.)
THE COURT: Mr. Polebaum?
MR. POLEBAUM: Thank you, Your Honor. I'd like to proceed with the presentation of this demonstrative that we prepared, to the witness with the Court's permission.
THE COURT: Yes.
MR. POLEBAUM: May I hand up a copy?
THE COURT: Yes.
MR. POLEBAUM: We would mark it for identification as plaintiff's demonstrative Exhibit 33.
(Plaintiff's Exhibit Number PDX-33 was marked for identification.)
THE COURT: Mr. Harrington?
MR. HARRINGTON: Your Honor, I would like to reiterate what I mentioned previously before the break, that it is our belief that there are at least a couple of errors in the demonstrative as it is being presented. And as the Court has quite correctly noted, this is really more akin to a summary exhibit under Federal Rule 1006 than it is a demonstrative. And if it had been presented under

Page 143

Rule 1006, we would have had considerably more time than since this weekend to now review it and confirm its correctness. But we have – and I would like to make the record complete, that there are errors, at least a couple of errors in the demonstrative itself.
THE COURT: Well, we will find out in due course. But this is PDX-33?
MR. POLEBAUM: For plaintiff's demonstrative exhibit.
THE COURT: Right. That's actually helpful. Please proceed.
BY MR. POLEBAUM:
Q. Mr. Norman, with reference to this chart that you have before you, can you – and I want to focus on the period 1971 to 1985. Can you explain what the practice was with respect to rent increases and just overall what this shows in that regard?
A. As mentioned before, especially during the '70s, the inflation rate was extremely high so the losses were very visible, obvious as they occurred. But the rent increases averaged, it looks to me, about every year and a half we went in for them during that period

Page 144

of time.
Q. And what was the relationship between your operating expenses and your decision to ask for a rent increase?
A. Generally, the biggest factor when you went into a rent increase for HUD was showing a loss vis-a-vis your operating expenses, so when there was a loss, when you were experiencing – or the financial statement would show a loss of any significance, that would spur you to ask for rent increases.
Q. Was there a relationship between increases in operating costs and your decision to seek a rent increase?
A. Generally, yes, that would be the spur that would get you going.
Q. We will come back to this chart in a few minutes, but I want to divert for a bit to a related subject. While we're on – talking about your dealings with HUD, was Chateau Cleary subject to periodic inspections that had to be reported to HUD?
A. It was.
Q. And what was the result of those

Page 153

A. Not to my memory.
Q. Were there ever any drug activity issues related to the property, Chateau Cleary?
A. Not of any consequence.
Q. Did you ever get a report from the, any of the inspection companies that prepared reports over the years of drug-related activity at the property?
A. No.
Q. What was Chateau Cleary's practice with respect to dealing with units as they became vacant and available for re-rental because a tenant moved out?
A. Well, we would go ahead and refurbish the apartments as soon as possible, generally with on-site staff, and re-rent them usually within 30 days from the waiting list.
Q. Did you ever receive an evaluation in any of these reports that was critical, that evaluated the condition, maintenance, management of the property in a negative fashion?
MR. HARRINGTON: Objection, Your Honor. Any of these reports is vague and unintelligible.

Page 154

THE COURT: If the reference is taken to mean inspection reports generally by whom, ever, and whenever, the question is allowed.
THE WITNESS: No, it was -- most of the time, it was superior or words to that effect. At worst that I can remember, it might have been a satisfactory a time or two.
BY MR. POLEBAUM:
Q. All right. Was your property ever described as a model project?
A. Yes, it was.
Q. And was that information or that description of the property as a model project communicated to HUD?
A. It was.
Q. Over the course of the period that Chateau Cleary was subject to HUD restrictions, did Chateau Cleary get paid the full amount of the limited dividend that was authorized?
A. No, it did not.
Q. In the period prior to 1991, what was, in general terms, the overall experience that Chateau Cleary experienced with respect to payment of the limited dividend?
A. On the total amount of dividends that

Page 155

could have been distributed, based on the number of years times the $12,000 figure, we actually received during that period of time less than half of that figure.
Q. All right. And what was the experience after the prepayment date, up until the time that Chateau Cleary exited the HUD program?
A. We received some more money, but it was still less than half of the total.
Q. All right. Now, we were looking at Plaintiff's Demonstrative Exhibit Number 33 a few moments ago. We looked at the period 1971 to 1985.
Could you explain to the Court what happened starting in 1986, why there were no rent increases from 1986 until 1994?
A. Well, starting in about 1986, the New Orleans area experienced a recession caused by a decline, serious decline in the oil industry.
At some point, conventional apartments in our area lowered their rents to our existing subsidized rents. We tightened our belts even more than we had before. We brought our expenses down.

Page 156

The idea of going in for a rent increase didn't make any sense, because from a marketing standpoint, even if HUD would have allowed it, we couldn't have instituted it.
The competition was about where we were, and if we didn't have a swimming pool and someone had a swimming pool across the street charging the same rates, we raise the rents, they would go across the street. So we didn't think it was appropriate or make any sense during that period of recession to ask for any rent increases.
Q. All right. And in terms of the operating expenses that you were experiencing in the period after 1985, beginning in 1986, what was the relationship between your operating expense experience and your ability to ask HUD for a rent increase, based on operating expenses?
A. Well, except for perhaps 1989, generally, you had to prove a loss on your operating statement to be allowed an increase, rental increase by HUD. That was the primary source of the rent increase, would be to show --

Page 157

Q. Now, this –
A. Excuse me, loss being an increase in expenses.
Q. Increased operating expenses?
A. If your operating expenses are going down, you don't show the loss, so, therefore, the prime mover for getting the rent increase didn't exist.
Q. All right. So beginning in 1986, your operating expenses, according to this demonstrative, began to decline; is that right?
A. Correct.
Q. And was this as a result of what was happening in the greater New Orleans economy as a result of the recession?
A. It is the only thing I can think of. Everybody was tightening their belts in those days.
Q. All right. And those operating expenses continued to decline for a period of time; is that right?
A. Yes.
Q. And then at what point did your operating expenses appear to permanently exceed the level of operating expenses in 1985?

Page 158

A. To me it was in 1994, because there was a blip in 1992. But right after '92 and '93, it went down again to something less than 1985. So by the time '94 came around – and I specifically remember that going through the records, the cost of property insurance during that time went out of sight for everyone. It was in the newspapers, it was everywhere. So that we had to get a significant increase in 1994 – for 1995, rather, because of property casualty insurance.
Q. So this last rent increase, when did that go into effect?
A. April of 1995.
Q. And when did you actually go to HUD to request the increase?
A. It would have been, I don't remember the exact date, it would have been late – it would have been after 1994, I assume, because it would have been based on the financial statement for '94.
Q. All right. Now, did you have any more success getting paid the limited dividend during the 1970s and 1980s when CCA was getting regular rent increases than in the late 1980s,

Page 159

early 1990s, when it was not?
A. I did not.
Q. And why is that?
A. Because we were playing catch-up. It just – we never caught up. And also if we did have extra cash and had discretionary cash, things were running so tight, we would put it back in the property rather than try to force a surplus cash.
Q. How did the regulatory agreement affect the rents that Chateau Cleary charged?
A. The regulatory agreement was the document that – whereby we agreed to let HUD control the rents.
Q. Would the Chateau Cleary rents have been higher than the HUD rents in the period after May 1991 if prepayment had been allowed?
A. Yes.
Q. How did the regulatory agreement affect Chateau Cleary's costs?
A. It increased costs, as well as kept the rents down. Because of the regulatory agreement, and we had agreed to do this, we had to obey certain HUD rules and regulations, specifically as it applies to administrative

Page 160

expenses. Management fees were higher. The biggest expense I can think of offhand is probably triple what it would have been – normally would have been in the financial statement.
All the reporting, what the manager had to do, recertifications. I think it was commonly known in the apartment industry, both subsidized and unsubsidized, that adhering to the HUD regulations, which we agreed to do, was more expensive administratively than operating a conventional apartment complex.
Q. In the period after 1991, if Chateau Cleary had been free of HUD restrictions, what would have happened to its rate of return?
A. It would have been greatly increased.
Q. What would have happened to its cash flow?
A. That would have been increased.
Q. What would have happened to its net operating income?
A. That would have been increased.
Q. All right. Mr. Norman, I want to ask you some questions about how the ownership of Chateau Cleary evolved. Prior to 1985, what

Page 161

was the ownership?
A. The ownership would comprise two individuals, our father, Ernest B. Norman, Jr., and my uncle, J. Robert Norman.
Q. What happened in 1985?
A. My father created a trust. And the trust with my father and my brother, my sister and I, formed a partnership which then proceeded to buy my uncle's 50 percent interest in Chateau Cleary apartments.
Q. So the partnership was created -- that was created, what was the name of the partnership?
A. CCA Associates.
Q. And that's the plaintiff in this case?
A. It was a regular partnership. Since then it has been converted to an LLC, with basically the same people.
Q. Now, after the partnership was created, you say that Chateau Cleary Associates purchased your uncle's equity interest in the Chateau Cleary property; is that right?
A. Right.
Q. Let's look at Exhibit 28-A, please.
A. 28-A?

Page 162

Q. 28-A.
A. Yes.
Q. What is Exhibit 28-A?
A. It is a copy of an act of sale of Robert Norman's interest in Chateau Cleary Apartments to CCA Associates.
Q. All right. And on page 3772, the last page of this document, do you recognize any of the signatures?
A. Yes, I do.
Q. Whose signatures are those?
A. The signatures of my uncle, J. Robert Norman and his wife, Sally Gray Parker Norman, and for some reason, the investment company, which was one of his companies -- I don't know why that was in there, and purchaser's representative, CCA Associates represented by me.
Q. That's your signature that appears?
A. Yes, it is.
Q. All right. And what is the date of this act of sale?
A. It is April 2nd, 1985.
MR. POLEBAUM: Move the admission of this exhibit, Your Honor.

Page 163

MR. HARRINGTON: No objection, Your Honor.
THE COURT: Admitted.
(Plaintiff's Exhibit Number 28-A was received into evidence.)
BY MR. POLEBAUM:
Q. Turning your attention to page 3769, the second page of this exhibit, about three-quarters of the way down, can you tell us what the purchase price was that CCA Associates paid?
A. The purchase price was $677,550.00.
Q. And what was CCA Associates purchasing for that amount of money?
A. CCA Associates was purchasing my uncle's 50 percent interest, but the value put on his 50 percent was based on what it would be worth slightly discounted in 1991, when it would be converted to a market rate apartment complex.
Q. But what was being purchased was Robert's equity interest in Chateau Cleary?
A. His equity interest in -- above the mortgage.
Q. And then a few lines below, where you

Page 164

were just looking at the purchase price, there is a reference to the outstanding balance of the mortgage as of the sale date. And what does that indicate?
A. Roughly 1,337,000, 1,336,000.
Q. And so what was -- as of the act of sale date, what was the approximate equity in the property as reflected by the act of sale -- by the sale price?
A. 2 million 8.
Q. No, what was the equity?
A. Oh, the equity, would have been double the 670, which would have been --
Q. Roughly 1,350,000?
A. 350, correct.
Q. And the outstanding mortgage is roughly 1,336,000?
A. Correct.
Q. So what was the market value of the property as of that time?
A. In excess of 2 million 600 --
MR. HARRINGTON: Objection, Your Honor, calls for an expert opinion on market value.
THE COURT: Not necessarily, but we do

Page 165

need an answer of the witness, his personal knowledge. Mr. Norman, if you would answer that question with your own personal knowledge.

THE WITNESS: Based on negotiations and our knowledge of the market, that was what we came up with as a fair price.

BY MR. POLEBAUM:

Q. Let me ask you now to turn to Exhibit 30, please.

A. Yes.

Q. Beginning on page 1428, can you tell us what that document is?

A. It is a copy of the articles of partnership of CCA Associates.

Q. All right. And when was CCA Associates formed?

A. On the 27th day of March, 1985.

Q. So that was prior to the purchase of Robert's interest?

A. Yes.

Q. And the first two pages of this exhibit, 1426 and 1427, can you just explain what they are?

A. 1426 is -- it is like a sealed thing that you get from the secretary of state. Most

Page 166

people file, I guess, but the second page is -- it doesn't -- it comes on the back as shown here, but it may -- and it lists the owners, excuse me, the partners in the partnership.

Q. And what is the date of this registration form, if you look about a third of the way down?

A. March 27th, 1985.

MR. POLEBAUM: I move admission of Exhibit 30.

MR. HARRINGTON: No objection, Your Honor.

THE COURT: Admitted.

(Plaintiff's Exhibit Number PX-30 was received into evidence.)

BY MR. POLEBAUM:

Q. Staying with Exhibit 30, on page 1428, who were the partners in CCA Associates?

A. The partners in CCA Associates were Ernest B. Norman, Jr., Ernest B. Norman, III, John H. Norman, Margaret Helen Norman Braking, the Ernest B. Norman, Jr. and Emma Couret Norman Grandchildren Trust.

Q. Is that the trust you referred to earlier in your testimony?

Page 167

A. Yes, it is.

Q. Page 1435, please, article 6 of the articles of partnership. What does this indicate with respect to your position in the CCA Associates partnership?

A. It names me as managing partner of the partnership and generally outlines my duties and powers.

Q. Let's turn next to Exhibit 28, please. What is Exhibit 28, Mr. Norman?

A. Exhibit 28 is a copy of a document entitled or titled assumption agreement. It is dated April 2nd, 1985.

Q. All right. And did you sign this document?

A. Yes, I did.

Q. Was that on page 1415?

A. Yes.

Q. All right.

MR. POLEBAUM: I move admission of this exhibit, Your Honor.

MR. HARRINGTON: No objection, Your Honor.

THE COURT: Admitted.

(Plaintiff's Exhibit Number PX-28 was

Page 168

received into evidence.)

BY MR. POLEBAUM:

Q. Mr. Norman, what was the purpose of the assumption agreement?

A. The purpose of the assumption agreement was to assume the obligation that my uncle had vis-a-vis HUD to the partnership, which in effect bought him out, so that now we were assuming all of his obligations vis-a-vis HUD.

Q. All right. On the first page of this document, under the word "witnesseth," it begins, "in consideration of the consent of the Secretary of Housing and Urban Development to the transfer of the mortgaged property to the owner," what does this language refer to?

A. This was required that HUD had to give its approval to transfer of a partnership interest or an ownership interest of this size.

Q. All right. So HUD's consent to this transaction was required?

A. Correct.

Q. A little further down in that paragraph, it goes on to say that "CCA agrees to assume, except as limited below, and be

Page 169

bound by said mortgage and note and that certain regulatory agreement dated November 7th, 1969."

What is this referring to?

A. This was referring to the tying together or acceptance of all three notes, which tied, they all intermingled, they referenced each other, and we agreed to assume those bound-together documents or agreements.

Q. But the obligations under the various transaction documents with HUD?

A. Correct.

Q. All right. Exhibit 29, please. What is Exhibit 29?

A. Exhibit 29 is a copy of the regulatory agreement between -- well, dated, excuse me, May 17th -- excuse me, April -- I don't have the date here, it is the same date, I would assume, as the other agreement, but early April.

Q. I think it says --

A. 1985.

Q. If you look a third of the way down on the first page, the agreement entered into this 26th day of April.

Page 170

A. 26th, I'm sorry, 26th day of April, 1985.

Q. And did HUD require that this regulatory agreement be made in order to secure its approval to the transaction that we have been discussing?

A. Yes, it did.

Q. On page 1422, whose signature is that on behalf of CCA Associates?

A. That is my signature.

MR. POLEBAUM: Move admission of Exhibit 29, Your Honor.

MR. HARRINGTON: No objection.

THE COURT: Admitted.

(Plaintiff's Exhibit Number PX-29 was received into evidence.)

BY MR. POLEBAUM:

Q. Now, this regulatory agreement that was entered into on the 26th of April, 1985, was this agreement prepared on a form presented by HUD?

A. Yes, it was.

Q. Now, look at the language on the first page of this agreement, page 1417, in the middle, where it begins, "In consideration of

Page 171

the endorsement." Do you see that?

A. Yes, I do.

Q. "In consideration of the endorsement for insurance by the commissioner of the above-described note, or in consideration of the consent of the commissioner to the transfer of the mortgage property, in order to comply with the requirements of section 221-D-3 of the National Housing Act as amended and the regulations adopted by the commissioner pursuant thereto, owners agree for themselves, their successors, heirs and assigns, and in connection with the mortgage property and the project operated thereon, so long as the contract of mortgage insurance continues in effect, and during such further period of time as the commissioner shall be the owner, holder, or reinsurer of the mortgage or during any time the commissioner is obligated to insure a mortgage on the mortgage property."

Is this language in sum and substance the same as the language that was in the 1969 regulatory agreement?

A. Yes, it was.

Q. And --

Page 172

A. Or is.

Q. And with respect to the following numbered paragraphs, some of which you may recall that we looked at when we were discussing the 1969 agreement, do the restrictions and requirements that are reflected in the 1985 regulatory agreement in sum and substance embody the same obligations that were required to be satisfied under the 1969 regulatory agreement?

A. It does.

Q. Was CCA Associates required to rent to HUD-approved low-income families?

A. It was.

Q. And to charge HUD-approved rents?

A. Yes.

Q. And was the same limited 6 percent dividend on original equity applicable?

A. Yes.

Q. Are you aware of any material differences in the text of the 1985 agreement from the 1969 regulatory agreement?

A. No, I am not.

Q. Now, when the new regulatory agreement was signed in 1985, what was your understanding

Page 173

of its reference to the original note and
mortgage?
A. In my understanding, that was –
nothing really had changed. Whatever one of
them had agreed to and expected in 1969, at the
very least that's what we agreed to. And we
certainly expected something closer in time,
i.e., being able to pay off the mortgage,
because of the amount of money we paid for the
50 percent interest.
Q. Let me ask you to look at Exhibit 31,
please. Beginning on page 1439, what is this
document, Mr. Norman?
A. This is a copy of a letter to
Mr. Charles Grandbouche, who is the executive
assistant to my father and me, from the manager
of the HUD office, Richard Franco, approving
the transfer of physical assets from my uncle
to CCA Associates.
MR. POLEBAUM: Move admission of this
exhibit, Your Honor.
MR. HARRINGTON: No objections, Your
Honor.
THE COURT: Admitted.
(Plaintiff's Exhibit Number PX-31 was

Page 174

received into evidence.)
BY MR. POLEBAUM:
Q. Then the transfer of Robert's interest
to CCA was approved by HUD; is that right?
A. Yes, it was.
Q. As the managing partner of CCA
Associates at the time of the transfer, were
you aware of the requirement that CCA operate
subject to HUD restrictions?
A. I was very aware of that.
Q. Did the note and the mortgage still
permit prepayment on the 20th anniversary, that
is, May 1991?
A. They did.
Q. Was that prepayment right important to
CCA in 1985?
A. It was more important because we put
out additional money after spending all that
time to – for the value that we thought we
were going to have in hand in 1991.
Q. What was CCA's investment expectation
in 1985 when it purchased Robert Norman's
interest?
A. Our expectations were to be able to
pay the mortgage off in May of 1991, turn the

Page 175

complex into a conventional complex, raise the
rents, and operate free of HUD restrictions.
Q. When CCA Associates entered into the
regulatory agreement and purchased this
interest, did you think that there would be any
adverse effect on CCA's right to prepay as a
result of the transfer in 1985?
A. None at all.
Q. What was your expectation as managing
partner of CCA with respect to the prepayment
right in 1985?
A. That it was unfettered and I
represented as much to my father when he was
making decisions to put up that money to buy –
basically it was his money through the trust,
et cetera, to buy his brother out.
Q. Would the 1985 purchase by CCA
Associates have gone ahead if there had been no
prepayment right?
A. It would not.
Q. And why not?
A. Because if we knew we were going to be
continuing to operate under the HUD regulations
with negative value, there would have been
nothing to buy.

Page 176

Q. Exhibit 33, please. What is this
document, Mr. Norman?
A. The document is a copy of the transfer
and contribution to partnership by my mother
and father to CCA Associates.
Q. And what is the date of this document?
A. The 31st of December, 1986.
Q. All right. And do you recognize the
signatures on page 1445?
A. Yes, I do.
Q. Does your signature appear there for
CCA Associates?
A. Yes, representing the partnership.
Q. And you see your father and mother's
signatures?
A. Yes, I do.
Q. Move admission of this exhibit, Your
Honor.
MR. HARRINGTON: No objection, Your
Honor.
THE COURT: Admitted.
(Plaintiff's Exhibit Number PX-33 was
received into evidence.)
BY MR. POLEBAUM:
Q. All right, Mr. Norman, after the 1985

Page 177

transfer, after the 1985 acquisition of Robert's interest by CCA Associates, you were coming up relatively soon on the prepayment date in the next several years, it was about six years away.
A. Correct.
Q. How did you plan to approach the process of prepayment? What type of information did you plan to collect? How did you plan to go about this?
A. Actually, the plan in my mind would have been to start about the beginning of 1989 -- '89, correct, about two years before the prepayment date, which would have given you ample time to study the market, try to make a determination about how much you wanted to put in the property, how much risk you wanted to take, because you could do so much improvements and charge so much rent, so much improvements, so much rent.
You'd also -- this would be critical to me, would be to give yourself time to study what other people with similar projects, not in New Orleans, because it didn't have any, but maybe in other areas of the state, other

Page 178

states, what their experiences had been and what they have to do to maximize the return on equity, transferring from a subsidized property to market rent property.
Q. Right. Would you have to have done anything with respect to the maturity dates of the leases in anticipation of prepaying?
A. That would be once you knew or had an idea within a couple, three months as to when you would do the repayment, you would most certainly at some point make sure everybody was on a month to month lease.
Q. When would you start that process of aligning people on a month to month lease? How far in advance?
A. If the majority are six month leases, you do it six months ahead of time. If they are year leases, you do it a year ahead of time.
Q. What did Chateau Cleary have, what was the mix of leases back in the '89, '90 time frame?
A. I don't know the exact proportion, but a lot of people were --
Q. Ballpark?

Page 179

A. I would say 50 percent, maybe, went on month and month and the others were on various -- or more. And the others were, again, I'm not sure, but the others would be various stages of six months, five months, three months, one month.
Q. So are you saying then that the leases ranged from one to six months in duration at that time?
A. Correct.
Q. Now, are you generally familiar with the Emergency Low Income Housing Preservation Act?
A. Yes, I am.
Q. And what did you understand that this legislation did to your prepayment right?
A. It took it away.
Q. Did the passage of ELIHPA, we will refer to it as ELIHPA, affect your thinking about preparing for prepayment as of May 1991?
A. Yes. Once we got over the disappointment phase, we said it would be futile to prepay under the circumstances we planned on prepaying, because there was no legal way to do it after passage of that Act.

Page 180

Q. Was there any reason -- after the passage of ELIHPA, did it affect your thinking about the planning process that you just described a few moments ago, and whether or not to bother to undertake it at this juncture in light of the passage of ELIHPA?
A. If you are talking about the two-year prep period, I did not start that at all.
Q. And why was that?
A. Because of ELIHPA, it would have been wasted energy.
Q. Let me ask you to turn to Exhibit 38, please. What is Exhibit 38, Mr. Norman?
A. It is a copy of the memorandum I wrote or dictated based on a conversation -- dated October 1st, 1990, based on a conversation I had with, let's see, I forgot the lady's name there.
Q. Are you referring to Ms. Lockett?
A. Ms. Lockett with USGI.
Q. All right. And at the very end of the document, it shows copies to George Booster, John Norman, III, above which the initials EBN/SLG. What does the EBN/SLG signify?
A. Again, EBN stands for me. For some

Page 181

reason, the third wasn't put on. And SLG stands for my secretary at the time, who is still my secretary.

MR. POLEBAUM: I move admission of this exhibit, Your Honor.

MR. HARRINGTON: Your Honor, there is some handwriting at the very bottom of this document. There has been no foundation for that laid. It looks like a continuation of the note. Perhaps Mr. Polebaum would like to lay the foundation before moving its admission.

BY MR. POLEBAUM:

Q. Is that your handwriting, Mr. Norman?

A. Yes, it is.

Q. Can you read what it says for us?

A. Yeah, it says, "I agree but will await the outcome of the equity situation with HUD."

MR. POLEBAUM: I move admission, Your Honor.

MR. HARRINGTON: No objection, Your Honor.

THE COURT: Admitted.

(Plaintiff's Exhibit Number PX-38 was received into evidence.)

BY MR. POLEBAUM:

Page 182

Q. In the second paragraph of the first page, Mr. Norman, you write, "as the readers are probably aware, the regulatory agreement stated that we could pay off the mortgage after the 20th year without HUD's permission. In order to keep us and others from exercising our contractual rights, Congress passed the prohibition to prepayment without HUD's approval by the plan of action after the 20th year. These so-called plan of actions are almost impossible to get approved."

What are you referring to in this paragraph, Mr. Norman?

A. I was referring to what I have been hearing about and reading about, how hard it was to get through this process. It was expensive, it was difficult, it was time-consuming.

Q. Did this -- does this paragraph relate to an attempt -- strike that.

Does this paragraph relate to the possibility of getting permission to prepay or does it relate to incentives or something else?

A. I assume -- it says -- I mention prepayment there, it would apply to prepayment

Page 183

because I know at one point we did discuss, you know, the necessity to meet certain requirements that HUD had in order for them to approve prepayment.

But since I didn't go down the road in any of these offers that were being made at the time, like the ELIHPA and LIHPRA, it is hazy the me about plans of action. I just didn't get familiar with that, other than what people were telling me and I would repeat it.

Q. What was Ms. Lockett proposing to you?

A. She was proposing that we go after an equity takeout loan.

Q. All right. Did you decide to go ahead with that?

A. No.

Q. And why not?

A. Because, first of all, it wasn't the deal that we thought we had and it didn't fit the plan. But beyond that, from a monetary standpoint, she was talking about a $500,000 equity takeout loan when we had just paid, shortly, a couple years before, my uncle almost $700,000 for 50 percent.

So monetarily, it wasn't a good deal

Page 184

and it didn't fit what I think would be a better situation, if we could fulfill our plan of action from '69 to '85 to be effective in '91.

Q. Now, the government has suggested in one or more of its submissions that this document indicates that you could have prepaid your mortgage, notwithstanding the legislation. Is that what you understood at the time?

A. Well, you might prepay the existing mortgage, but I don't think it is -- whatever the financing vehicle, you would still be under the control of HUD.

Q. Maybe my question wasn't clear. The government has suggested that you could have obtained permission to prepay your mortgage, notwithstanding the legislation that had gone into effect. What was your understanding at the time?

A. Forgetting this document or in conjunction with this?

Q. No, just tell us what your understanding was as to whether or not you could prepay your mortgage in light of the

Page 185

legislation.
A. We could prepay the mortgage if we could show that the area in which the complex was located, I don't know whether it was West Metairie or zip code, people refer to different things, was it a low vacancy area. And the rents wouldn't be, I think, raised above 10 percent.
There may have been other requirements that we would have had to meet, but those two alone would have killed the ability to pass HUD's test for prepayment.
Q. All right. Well, I will come back to those in a little more detail in a moment.
Are you generally familiar with the Low-Income Housing Preservation and Residential Homeownership Act of 1990, LIHPRA?
A. Yes.
Q. And what did you understand that LIHPRA did to your prepayment right?
A. It prohibited it, but beyond that it made it permanent.
Q. Did ELIHPA and LIHPRA affect CCA's right to use the property?
A. Yes, it did.

Page 186

Q. Did it affect CCA's right to transfer the property?
A. It did.
Q. Did it affect CCA's right to rent to all categories of tenants?
A. Yes, it did.
Q. You referred a moment ago to the permanent aspect of LIHPRA, that LIHPRA made the ban on prepayment permanent. What was your understanding in that regard?
A. That it was open ended and there would be no end to it.
Q. Was there anything in the legislation that you believe provided for LIHPRA to expire after a specified number of years?
A. None.
Q. Did you know in May 1991 that the ban on prepayment would be lifted in 1996?
A. No idea at all.
Q. As of May 1991, did you have an expectation that the ban would be lifted at any time?
A. No.
Q. When the May 1991 prepayment date, in fact, arrived, were you able to prepay?

Page 187

A. No, I was not.
Q. Did you ask HUD for permission to prepay?
A. No, I did not.
Q. Why not?
A. Because as I mentioned before, we didn't fit any of that criteria. I think you have to fit -- you had to satisfy all of them to be able to qualify.
Q. All right. Let me ask you about some of the specific criteria.
Did you have an understanding on whether prepayment would be allowed if market rents were more than 10 percent above your HUD rents?
A. It would not be allowed.
Q. In May 1991, were the market rents more than 10 percent above your HUD rents?
A. They were.
MR. HARRINGTON: Objection, calls for an expert opinion, calls for knowledge that only an expert would have on what the market rents are.
MR. POLEBAUM: He is in the business of running this property. I think he knows

Page 188

what the market rents were. He knows what his HUD rents were. He knows what the comparison is.
MR. HARRINGTON: Your Honor, the market rents are a technical, specific term. It is used in the statute, in the technical and specific way. And Mr. Norman does not have requisite background, the requisite knowledge of how HUD interpreted the term, to opine as to whether or not his property might have been able to achieve market rents as of a particular point in time.
THE COURT: As the manager of this property, and as the manager of the property for an extended period of time, Mr. Norman ordinarily would be considered to have the necessary personal knowledge to answer this question.
But the Court will allow voir dire on your part right now if you wish it, Mr. Harrington.
MR. POLEBAUM: Maybe I can get at it a slightly different way.
THE COURT: Let's just deal with what we have got.

Page 189

MR. HARRINGTON: Well, Your Honor, maybe we can save time if Mr. Polebaum is going to approach it in a different way. We do have a limit of four days, obviously.

THE COURT: You aren't that limited.

BY MR. POLEBAUM:

Q. Are you familiar with the analysis that CCA's expert, Dr. Ragas, did on the amount by which market rents exceeded CCA's HUD rents?

A. Yes.

Q. And do you recall approximately what he concluded?

MR. HARRINGTON: Your Honor, I object if he is simply going to try to endorse what the expert did. That should be proper testimony for the expert himself to explain how he arrived at it.

THE COURT: That – in that respect, you are on the right track.

MR. POLEBAUM: I'm not going to ask him to endorse that. I'm going to ask him if he has any basis for concluding that the market rents and HUD rents are actually otherwise.

THE COURT: Mr. Polebaum, why don't you just ask Mr. Norman what he believes market

Page 190

rents mean and we will take it from there.

BY MR. POLEBAUM:

Q. All right. Mr. Norman, what did you understand market rents to be?

A. Market rents are what you can rent your product for, given the condition it is in at that period of time, and are considering doing so.

Q. And did – what was the relationship of the market rents that CCA could have charged, had it prepaid its mortgage, and the HUD rents that were in effect in May 1991?

A. We could have charged – it is at least 20, 25 percent higher, at least. It was easy enough to figure out because we had so many market rent complexes that all you had to do is say we don't have a pool, if we don't have a pool, we don't charge for a pool. It's not hard to do a market survey in order to figure out what you should be charging.

Q. If CCA had been allowed to prepay, was there comparable, vacant, low-income housing in the area to absorb tenants who could not afford market rates?

Page 191

MR. HARRINGTON: Objection.

THE COURT: Mr. Harrington?

MR. HARRINGTON: It is vague, in that he is talking about comparable vacant low-income housing. He is also asking Mr. Norman, in effect, what HUD would have concluded with respect to this inquiry. And Mr. Norman does lack the knowledge to know what HUD would have concluded with respect to comparable property, what the appropriate area to consider is, and so on.

THE COURT: Well, as the Court understands it, Mr. Norman has been involved with this property for 35 years. And he certainly knows the market in the sense of apartment dwellings in the area. And so, you know, the objection is overruled.

THE WITNESS: Geographically, someone would have had to go to, in my opinion, Kenner to the west, which is, I don't know the exact mileage, but it would be at least, I would say, five, six, eight miles away, and certainly not be in the market zone of Dr. Ragas or the University of New Orleans, nor would it be anywhere near the zip code that Chateau Cleary

Page 192

was in.

So at some point, they might have been able to find something in some comparable rent structure units, but they wouldn't have had the same product for the price and they would not have had it in the same location with the same ability to get to shopping and jobs and so forth.

BY MR. POLEBAUM:

Q. Was there any low-income housing in the area in and around West Metairie, apart from Chateau Cleary?

A. We refer to ourselves as moderate income.

Q. All right.

A. No, to my knowledge, there was not.

Q. Did CCA have full occupancy at that time in the early '90s, 1990, 1991?

A. Yes.

Q. All right. When you had the occasional vacancy because a tenant moved, how did you handle that?

A. As I stated before, we would send our maintenance people in, refurbish the apartment, move someone in off the waiting list, assuming