IN THE UNITED STATES COURT OF FEDERAL CLAIMS

************************************

CCA ASSOCIATES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

************************************

No. 97-334C
Judge Lettow

**APPENDIX TO PLAINTIFF'S POST-TRIAL MEMORANDUM**

Part 2 of 5

Elliot E. Polebaum
Albert S. Iarossi
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20004-2505
Tel: (202) 639-7000/Fax: (202) 639-7003

November 9, 2006

Page 193

that they qualify.

Q. Did Chateau Cleary maintain a waiting list?

A. Yes, they did.

Q. Ms. Kizzier testified at her deposition that when she started at HUD in New Orleans, she said that there were long waiting lists for every family property in the New Orleans area and have been since I have been here, sometimes up to three to four years. Do you have any information inconsistent with that?

THE COURT: Mr. Harrington?

MR. HARRINGTON: I'm going to object to that, Your Honor. There is no foundation for Mr. Norman testifying as to what every low-income housing project in the New Orleans area might or might not have had.

MR. POLEBAUM: I wasn't going to ask that. I was going to ask whether he had any information inconsistent with that assessment.

MR. HARRINGTON: It is essentially the same question, Your Honor.

THE COURT: We don't have in evidence, Mr. Polebaum, the statement from Ms. Kizzier.

Page 194

So I can't allow that question.

BY MR. POLEBAUM:

Q. It is in her deposition, Your Honor.

THE COURT: It might be, but the Court doesn't know that.

MR. HARRINGTON: The appropriate person to ask about that would probably be Ms. Kizzier herself.

MR. POLEBAUM: Very well. I will ask her about that.

BY MR. POLEBAUM:

Q. Mr. Norman, if you had been allowed to prepay in 1991, what would have happened to your tenant who could not afford market rents? What would their housing options be?

MR. HARRINGTON: Objection, Your Honor. How is Mr. Norman to say what would have happened to his tenants, had they been able to prepay. Each tenant is going to have an individual situation, and Mr. Norman couldn't possibly have that knowledge, nor has there been any foundation established that he would have that knowledge.

THE COURT: Well, as the Court understands it, we have testimony – well, I'm

Page 195

not sure we do. We have statements by counsel that prepayment occurred in '97.

MR. POLEBAUM: In this case? September 1998, Your Honor.

THE COURT: '98. Okay. Because I know there was a stutter-step, there was a period of time for which you did not seek damages. That's what I was struggling with.

MR. HARRINGTON: We're in agreement, Your Honor, the actual prepayment did take place at the very end of September in 1998.

THE COURT: All right. If we can draw a comparable circumstance to, between '91 and '98, you might ask Mr. Norman.

BY MR. POLEBAUM:

Q. I was just asking – I'm sorry, I was just asking what were the housing options that your tenants faced in May 1991, had you been allowed to prepay your mortgage and raised rents to market levels?

MR. HARRINGTON: I think it is the same objection, Your Honor. He is asking what the tenants would have done. Mr. Norman is not in a position to say what his tenants would have done.

Page 196

THE COURT: He might be. Mr. Norman, if you know the answer to that of your own personal knowledge, you may answer.

THE WITNESS: I feel I know the answer to that. We have to certify everyone's income. We have a record of what they paid, what taxes they paid and the manager knew the condition that they had otherwise with relatives, friends, and so forth. So not that I can't say someone didn't have money stashed away or a rich old aunt somewhere, but if you took a swath of the tenants in that complex, by looking at their income, you could tell what they could afford to pay for rent.

BY MR. POLEBAUM:

Q. In light of that, what kinds of housing options would they have faced, had you prepaid and raised rents?

A. They could not have found comparable housing in our geographical area for the same price.

Q. Do you know of anyone in New Orleans who was granted permission to prepay?

A. No, I do not.

Page 197

Q. Now, did you file a notice of intent with respect to incentives at some point?
A. Yes, I did.
Q. All right. Let's look at Exhibit 42, please. Mr. Norman, what is Exhibit 42?
A. Exhibit 42 is a copy of a letter I sent to Joe Brinkley at HUD dated December 28, 1990.
Q. What is attached to the letter?
A. Notice of our intent pursuant to title 6.
Q. All right. And why did you submit this?
A. In the broadest statement, to protect our options.
Q. Meaning what?
A. Generally, we would file these intent – notices of intent to prepay to preserve our options to act under this, as opposed to letting those options expire. It didn't cost much to do this, even though the possibility and probability of us ever acting on it was slim to none, it didn't cost much to keep the option alive.
Q. Now, I move admission of Exhibit 42,

Page 198

Your Honor.
MR. HARRINGTON: No objection, Your Honor.
THE COURT: Admitted.
(Plaintiff's Exhibit Number PX-42 was received into evidence.)
BY MR. POLEBAUM:
Q. One of the options you say you would consider is to sell to a 501(c)(3). Do you recall that?
A. Excuse me?
Q. Let me direct your attention to page 3, 0003. And in the top portion of the form, you indicate that you would consider selling the property to a 501(c)(3). Do you see that?
A. Well, it was just answering a question.
Q. I understand, but did you –
A. It says some very preliminary discussion.
Q. Did you want to sell your property?
A. No, that was just another option. It is my duty to keep all options open.
Q. Did you want to go through the HUD process?

Page 199

A. No.
Q. And why not?
A. Because it wasn't the deal we had in 1969 to 1985.
Q. Did you have an understanding of – strike that.
In this notice, you also indicate that you are considering incentives.
A. Yes.
Q. Did you want to stay in the HUD program for an additional extended period of time?
A. No, we did not.
Q. Why did you file the notice of intent then?
A. As I stated before, it was just to keep options open.
Q. Did you want to obligate yourself to remain in the HUD program for an additional 50 years?
A. Or in some instances, the life of the project. No.
Q. Did you want to sell your property through the HUD process that HUD eventually made available?

Page 200

A. No. I wanted to get out of the HUD process.
Q. Did you consider a sale of Chateau Cleary through this HUD process to a qualified 501(c)(3) purchaser to be a fair and viable option?
A. No, we did not.
Q. Let me ask you to turn to Exhibit 48, please. What is Exhibit 48, Mr. Norman?
A. A confidential working document not for release, except to the working group, from Albert Pappalardo, who is an appraiser, to me.
Q. What is the date?
A. The date is June 3rd, 1992.
Q. And why did you have – strike that.
Move admission of this document, Your Honor.
MR. HARRINGTON: Your Honor, this document would appear to be hearsay, and I don't believe there has been sufficient foundation established to admit it in light of its characteristic hearsay.
THE COURT: Mr. Polebaum, there hasn't been enough foundation for admission of this document.
MR. POLEBAUM: All right.

Page 201

BY MR. POLEBAUM:
Q. Mr. Norman, what did you ask Mr. Pappalardo to do?
THE COURT: If anything?
BY MR. POLEBAUM:
Q. If anything.
A. I consulted Mr. Pappalardo, I've known him for many years and he is a respected appraiser in the New Orleans area, told him the situation we were in, the options that we had, and generally what was going on with -- and the things we didn't like about the situation we were in. And then just generally give me your feelings or your picture of what we're experiencing now and your thoughts. It was just that kind of asking for help. I paid him for it, but just asking for a third party opinion of what was going on.
MR. POLEBAUM: Move admission, Your Honor.
MR. HARRINGTON: Your Honor, there still hasn't been foundation that this is a business record or that it should come in under any other hearsay exception. It is certainly not the sort of document that's produced and

Page 202

done in the ordinary course of business.
THE COURT: Well, it depends on whether you call LIHPRA ordinary. I take it one of the things implied in Mr. Norman's last testimony was he was trying to look at his options under LIHPRA, but let's find out a little more before we act one way or the other.
BY MR. POLEBAUM:
Q. Mr. Norman, did you retain Mr. Pappalardo in connection with evaluating the various options that were open to you?
A. Yes.
Q. And did you ask Mr. Pappalardo to prevent a -- prepare a report for you?
A. Yes.
Q. Did you pay him for the report?
A. Yes.
Q. And is Exhibit 48 the report?
A. Yes, it is.
Q. And what did you finally decide to do after you received the report from Mr. Pappalardo?
A. I decided not to do anything regarding the new law or the old law. His recommendation, as I read it, was if you had to

Page 203

make a choice, you had no other choice between the old law and new law at this period of time, given that complex, he thought the new law would be a better way to go. He wasn't suggesting, in my opinion, that either way was the way to go compared to what I read in the first paragraph, which says the subject property is ideally suited for conversion to a market-based rental complex, which confirmed what we had been thinking all along.
MR. POLEBAUM: Move admission, Your Honor.
MR. HARRINGTON: No objection.
THE COURT: Admitted.
(Plaintiff's Exhibit Number PX-48 was received into evidence.)
BY MR. POLEBAUM:
Q. Let me ask you about a couple of the statements that Mr. Pappalardo makes in this report. On page 376, in the first paragraph, third sentence, "the property is considered to be in good to very good condition." Did you agree with that assessment?
A. Yes.

Page 204

Q. At the end of that paragraph, "there are no vacancies at the complex." Is that typical of your experience at this time?
A. Yes. To be clear, when I say no vacancies, I don't mean zero vacancies. I mean vacancies that might be in the 2 to 3 percent range, which normally accounts for move-ins and move-outs. I would not say no vacancies. I'm not intimating 100 percent occupancy at all times.
Q. Let's just clarify that. When you say no vacancy, there may be a temporary vacancy as somebody moves out and an apartment is being prepared for somebody else to move in?
A. Yes. Historically, that's correct.
Q. Next page, 377, bottom paragraph, first sentence. "The highest and best use of this property in the opinion of the writer is as a residential multi-family apartment complex." Do you share that view?
A. Yes, I do.
Q. The next page, 378, the bottom paragraph. "The location of the subject property certainly lends itself to an upwardly

Page 217

What did you understand this to mean?

A. These -- well, they added contingencies to the unfettered right to prepay that I understood the hold back gave us, the contingencies being we will let you know in the future what we will allow in this respect, and we will let you know what you have to do in the future. In relocation, the relocation situation.

Q. Let's turn to page 246. Question 4, answer 4. "Must owner request HUD approval prior to prepayment or termination?

"Answer: Yes, HUD needs to be assured that very low income and low-income tenants are protected."

What did you understand that HUD was doing with this question and answer?

A. Well, we still need HUD's approval, which was what we needed before the 20th year, so the prepayment, unfettered prepayment privilege was not really restored.

Q. At the bottom of 246, you have the question: "What are the steps to process a prepayment or termination of mortgage insurance?" And then going over to the next

Page 218

page, at the bottom of that first paragraph, it says, "the owner must request permission to prepay, terminate from the local HUD asset management branch."

What did you understand about what HUD says about HUD's permission to prepay must be requested?

A. We did not have an unfettered right to prepay without HUD's permission.

THE COURT: Mr. Harrington, I'm sorry?

MR. HARRINGTON: Your Honor, if I may, we did admit this document, but I just note for the record that it does have some handwriting on it where there is no foundation for that. And I would simply request that that be disregarded, since we never did get a foundation for the handwriting.

MR. POLEBAUM: No objection to that, Your Honor.

THE COURT: All right. It is the caveat then to the admission. It does not extend to the handwriting.

BY MR. POLEBAUM:

Q. And then on page 248, Mr. Norman, it says, about three-quarters of the way down in

Page 219

D-4, more detailed instructions will follow.

What did you take away from this?

A. Well, a disciplined person certainly couldn't make any definitive plans based on that.

Q. Well, Exhibit 65, please. What is Exhibit 65?

A. Preservation letter number 4.

Q. Did you receive a copy of this?

A. Yes, I did.

Q. Did you review it?

A. Yes, I did.

MR. POLEBAUM: I move admission of Exhibit 65.

MR. HARRINGTON: No objection, beyond our continuing objection, Your Honor.

THE COURT: Thank you, Mr. Harrington. Admitted.

(Plaintiff's Exhibit Number PX-65 was received into evidence.)

BY MR. POLEBAUM:

Q. Turning to page 259 of this exhibit. Question 5, "what are the rights of tenants in a low-vacancy area and special needs tenants."

Answer 5, "section 223-C 1 of LIHPRA requires

Page 220

that each owner that prepays terminates mortgage insurance on eligible low income housing in a low vacancy area or with special needs tenants, shall allow the tenants occupying units on the date of submission of the initial notice of intent to remain in the housing for a three-year period at rent levels existing at the time of prepayment, except for increases necessary for increased operating costs."

What did you understand from this requirement of keeping rents at the same levels for a three-year period?

A. That we were -- you could -- that you could prepay, but you still are under restrictions for three years, and did not have the unfettered right to raise rents to mortgage rents.

Q. Was Chateau Cleary in a low vacancy area?

A. It was.

Q. Question 6 at the bottom of the page. "Will relocation expenses be provided for tenants?

"Answer: The owner of a preservation

Page 221

eligible product who prepays or terminates the mortgage insurance contract is required by 24 CFR 248.165D to pay 50 percent of the moving expenses of each family which is relocated." Prior to reading this, had you ever heard of an obligation to pay moving expenses upon prepayment of the mortgage?

A. No.

MR. HARRINGTON: Objection, Your Honor.

THE COURT: Mr. Harrington.

MR. HARRINGTON: Mr. Polebaum said prior to reading this. There has not been any foundation that he did read this, so the question assumes facts not in evidence.

THE COURT: Well, just a moment, Mr. Polebaum. We have evidence that Mr. Norman received and read it. We just don't know when. Mr. Polebaum.

BY MR. POLEBAUM:

Q. Mr. Norman, did you read these preservation letters as you received them?

A. Yes.

Q. All right. Mr. Norman, prior to reading this preservation letter from HUD, had

Page 222

you been aware of any obligation to pay the moving expenses of tenants upon prepayment of the mortgage?

A. Unless I read it in a trade journal, this was the first official document that I saw anything to that effect.

Q. Page 261, question 2, answer 2. "Must an owner request HUD approval prior to prepayment or termination? "Answer: No." And then the answer continues on. What did you understand HUD was communicating at this -- in this portion of its letter?

A. Well, in layman's language, it said no, but yes. It said no, you don't need HUD's permission, but they still had ways to -- hurdles you had to go over to qualify to prepay.

Q. Exhibit 67, please. What is Exhibit 67?

A. Preservation letter number 6.

Q. Did you receive a copy of this?

A. Yes, I did.

Q. Did you read it?

Page 223

A. Yes, I did.

Q. Did you read it at about the time you received it?

A. Yes.

Q. On page 294, question 5, answer 5: "What are the rights of tenants in a low vacancy area" --

THE COURT: Now, Mr. Polebaum --

MR. POLEBAUM: Oh, I'm sorry. I move the admission of the exhibit, Your Honor.

MR. HARRINGTON: Your Honor, again, subject to our continuing objection as to this area of inquiry, no further objections.

THE COURT: Thank you, Mr. Harrington. Admitted.

(Plaintiff's Exhibit Number PX-67 was received into evidence.)

BY MR. POLEBAUM:

Q. Page 294, Mr. Norman, question 5: "What are the rights of tenants in a low vacancy area and/or special needs tenants?" Then it goes on to reiterate the three-year rent freeze for tenants in low vacancy areas that we saw previously. What was your understanding when you

Page 224

received and read preservation letter number 6?

A. That you would still be under the rent restrictions and that we will -- we were operating under HUD before the prepayment, for three years.

Q. Page 297. At the bottom, question 15, and answer 15. This relates, again, to the moving expense issue that we saw in a prior preservation letter that we looked at. What did you understand when you read this portion of the preservation letter?

A. Well, it changed it. Again, I think it was outright 50 percent. I would have to look at it, but there was always some nuance of change. If the same subject was carried forward in these letters, there was always a change to it. And this is typical of that kind of change. So it was a requirement or restriction put on unfettered prepayment.

Q. Exhibit 72, please. What is Exhibit 72?

A. A copy of preservation letter number 9.

Q. All right. And did you receive a copy of this letter?

Page 233

Mr. Norman's testimony just there further undermines the admissibility of this document. He said he might not have received this document, but he might have received a summary from a trade organization.

THE COURT: Well, I think he testified he did receive it. Now, we do have the relevance point. This is a month and a half, two months and a half before what you have told me the prepayment date is, so I think it is relevant. I will admit it. It is admitted.

(Plaintiff's Exhibit Number PX-75 was received into evidence.)

MR. HARRINGTON: Your Honor, one point of clarification.

THE COURT: That's right. The prepayment occurred – I keep doing that – in '98 and the 2/28, the last day of February '97 is what you are requesting; is that right?

MR. POLEBAUM: That's correct, Your Honor.

MR. HARRINGTON: That's correct.

THE COURT: Thank you. Thank you for the correction.

BY MR. POLEBAUM:

Page 234

Q. Mr. Norman, page 154, please. Page 154 of this exhibit, Exhibit 75.

A. Oh, I'm sorry. Yes.

Q. You will see question 3, answer 3. "Question: After prepayment of the mortgage, how high can the owner raise project rents? "Answer: An owner cannot raise the project's rent prior to 60 days following prepayment. After the 60 days, there is no limit to how high the owner can raise the rent."

When you saw this letter, what did you understand the situation was?

A. That there was still some limitations, but it looked like they were coming toward a solid basis for prepayment.

Q. Did these letters affect your planning with respect to the prepayment process?

A. Yes, it delayed the planning because with the constant changing of these letters, I'm not willing to start a process and waste time and money and have to redo it again. I'd like to see it play out, and then I will stop doing things. Interest rates change, a lot of things can happen, and I just assume that they

Page 235

have something, as I said, that I can sink my teeth in before spending time and money pursuing the program.

Q. Let me ask you to turn to Exhibit 73 now?

THE COURT: Before you do that, we're just about the time the Court likes to take an afternoon break.

MR. POLEBAUM: Fine, Your Honor.

THE COURT: Is this a stopping point?

MR. POLEBAUM: This is a perfect spot to stop.

THE COURT: Mr. Harrington?

MR. HARRINGTON: Certainly fine with me.

THE COURT: Mr. Norman? You are ready, okay. We're ready. We will take a 15-minute recess at this time.

(A recess was taken at 3:30 p.m., after which the trial resumed at 3:48 p.m.)

THE COURT: Mr. Polebaum, you may proceed.

MR. POLEBAUM: Thank you, Your Honor.

BY MR. POLEBAUM:

Q. Mr. Norman, please turn to Plaintiff's

Page 236

Exhibit 73.

A. All right.

Q. What is Exhibit 73, Mr. Norman?

A. Exhibit 73 is a copy of a letter from Eustis Mortgage Company to me dated October 14th, 1996.

Q. And can you explain why you were in touch with Eustis at this time?

A. I contacted them shortly before that to ask them to – to tell them that I was definitely going to prepay now, it looks like we were heading that way, based on what we were hearing and reading and could they, without too much money, give me a rough idea of what kind of financing we could expect on the open market to pay off the Chateau Cleary.

Q. And is this document then a response to that request that you made to Eustis Mortgage?

A. Yes, it is.

MR. POLEBAUM: Move admission of this exhibit, Your Honor.

MR. HARRINGTON: No objection, Your Honor.

THE COURT: Admitted.

Page 237

(Plaintiff's Exhibit Number PX-73 was received into evidence.)

BY MR. POLEBAUM:

Q. Plaintiff's Exhibit 74, please, Mr. Norman.

A. Yes.

Q. What is Exhibit 74?

A. Exhibit 74 is a copy of a letter or memorandum, I should say, from Eustis Mortgage to me from – dated November 26th, 1996.

Q. And what was the purpose of this memorandum?

A. This memorandum accompanied a copy of the letter appraisal which was ordered by Eustis, because that's the format you have to go through. The mortgagee orders it, even though I needed it to get the loan and I ended up paying for it.

Q. All right. So attached to the memorandum, then, is a copy of the appraisal?

A. Correct.

Q. Is that right? And this was done in connection with your request to Eustis to provide you information concerning financing?

A. Correct. They said that the first

Page 238

letter they sent me was verbal, based on verbal conversations with lenders, informal conversations with lenders, sketchy information, generalized information with lenders vis-a-vis – regarding our property. The appraisal then was – allowed them to focus more into more specific types of loans that may be available. And it would have been required by lenders they were talking to in any case, so that's the reason it was done.

Q. And what did the property appraise at?

A. $2,300,000.

MR. POLEBAUM: Move admission of this exhibit, Your Honor.

MR. HARRINGTON: Your Honor, it is our view that this appraisal is not a document, sort of document that's produced and prepared in the ordinary course of business, certainly by CCA. And as such, that it is actually hearsay.

THE COURT: Well, if one were to take the appraisal as setting a valuation, one would want to know a lot more about how the appraisal was performed, so we will put – but this is the type of appraisal that's used to obtain a

Page 239

loan, is the way I read it, and for that purpose, you still object, I take it?

MR. HARRINGTON: Your Honor, to the extent that this appraisal is simply being used to show a step in the process that CCA was going through, we would not have an objection because that's not for the truth of the matter asserted. To the extent the appraisal is going to be used for the substance of what the conclusions are in the appraisal, that would be a different matter and we do believe that using it as the truth of the matter asserted for the statements in the appraisal would be hearsay.

THE COURT: All right. Mr. Polebaum?

MR. POLEBAUM: Your Honor, our intention putting this document before the Court is simply to show the steps that were being taken in connection with the prepayment process that Mr. Norman was initiating.

THE COURT: All right. For that purpose, the document is admitted. But it is not admitted for the truth of the assertions respecting the appraisal itself because there the Court would have to have the appraiser

Page 240

actually here and testify. It is admitted.

(Plaintiff's Exhibit Number PX-74 was received into evidence.)

MR. POLEBAUM: Thank you, Your Honor.

BY MR. POLEBAUM:

Q. Now, Mr. Norman, as you are considering the prepayment process at this point in the fall of 1996, did Jim Alexander of HUD contact you at or about that time?

A. Yes, he did.

Q. And who was Mr. Alexander?

A. I believe his title was the head of the loan management branch, but he was the chief person under Ms. Kizzier as it filtered through multi-family, as I recall.

Q. Can you explain why Mr. Alexander contacted you?

A. We knew each other, of course, from prior meetings, but he called and knew what I was contemplating with Chateau Cleary, was familiar with the project, told me that he was trying to achieve a designation, I believe it was appraisal or mortgage designation, but it was a class, a course that he was going through to achieve a designation.

Page 241

And part of the designation process, training, testing was that people going through the course had to create a study of a real-life project, whereby they could get into some meat or it was a study thing, a requirement. And he asked, he thought Chateau Cleary to be a good candidate since it was contemplating prepayment and had options, as to which way to go with prepayment, what to do, how much to do, and he asked me if he could use Chateau Cleary as his example of a project as part of the process to get his designation.

Q. And did he ask for your cooperation in connection with that?

A. Yes, he did.

Q. Did he ask for access to the property?

A. He did.

Q. And did you grant it?

A. Yes, I did.

Q. Did he ask for information to be supplied to him?

A. Yes, he did.

Q. What was the type of information, just speaking generally?

A. Generally, as I recall, I told the

Page 242

management, maintenance people, even the people in my office that he was welcome to have anything we had, and there were no secrets. So we provided him, I believe, with everything he asked for. I don't recall him saying you didn't give me X and I asked for X.

Q. All right. Turn, please, to Exhibit 75-A.

A. All right.

Q. What is Exhibit 75-A, Mr. Norman?

A. It is a copy of a letter from me to Mr. Alexander dated December 19th, 1996.

Q. All right. And this is a letter that you signed on the second page?

A. Yes, it is.

Q. And in the first paragraph of the letter you referred to a discussion. Can you tell us what it is you are referring to?

A. Well, that was either during the initial discussion or a subsequent discussion between Mr. Alexander and myself regarding him doing the study or project, and so that would be the reference.

Q. Okay. And what was the purpose of your sending this letter to Mr. Alexander?

Page 243

A. It was my understanding that he needed something in writing, I don't know whether it was -- that he could feel -- I don't know whether it was because he needed to feel more confident about what he was going to do in this regard or whether it was from a legal or study standpoint, he needed this to -- as part of the process in doing it.

Q. So he asked you to send him a letter confirming that he could do the study?

A. Yes.

MR. POLEBAUM: Move admission of Exhibit 75-A, Your Honor.

MR. HARRINGTON: We have no objection, Your Honor.

THE COURT: Admitted.

(Plaintiff's Exhibit Number PX-75-A was received into evidence.)

BY MR. POLEBAUM:

Q. On the first page of this exhibit, Mr. Norman, in the second paragraph, you say, "Regarding our goals and objectives, we intend as soon as possible to pay off the existing mortgage, probably with a nonmortgage loan from a commercial bank for a term not to exceed one

Page 244

year."

Why were you emphasizing your desire to prepay to Mr. Alexander?

A. Because it was a simple reaffirmation of what we wanted to do.

Q. What was the purpose of the study that Mr. Alexander was going to prepare?

A. He was going to prepare, based on his knowledge of my feeling of what had once been before and on the property, the option, the viable options he thought, you know, without going into too many -- just to bring them down to a manageable number, which after he did his study, he thought was available to me and recommended to me the pluses and minuses of each.

Q. Okay. And did Mr. Alexander prepare a report for you?

A. He did.

Q. Let me ask you to turn to Exhibit 81, please. What is Exhibit 81?

A. Well, Exhibit 81 is a copy of the management plan produced and presented by Mr. Alexander dated March 31st, 1997.

Q. All right. And on page 1512 of this

Page 269

there are other things, capital improvements were also mentioned in his report, to varying degrees, depending on which prepayment scenario you took.

He recommended a lot more in the capital improvement area than I would. A good example I can give you -- but, again, I agree with a lot of deferred maintenance because we had deferred maintenance from '91 until '96. It was a lot better property in '90, '91, '92 and over time everything ages, but we knew about most of the things that Mr. Alexander pointed out in that regard. And we agreed with them.

But when it came to the capital improvements necessary to go conventional, one of the large items that he came up with -- by the way, one of the specs he used was a HUD spec, which I had no problem with, was replacing the air-conditioning units. If you go on convention, and go you up on the roof and replace 104 air-conditioning units, I know from the experience in business, I am not knocking Mr. Alexander's opinion, that I would never have done that.

Page 270

If an air-conditioning is cooling properly, it is safe, it could be 15 years old and people down in the apartments have no idea what it is like on the roof.

And if you can replace it and it goes bad, it shouldn't make any difference. Why spend the money? So those are the kinds of things I disagreed with him on the deferred maintenance or improved maintenance to go conventional.

And then there were a lot of things, in fact, I agreed with him in his report.

Q. All right. And he gave you four options, options 2, 3, and 4, with deferring degrees of enhancement of the property in connection with prepayment.

What did you finally decide to do?

A. We end had ended up doing a hybrid between option 2 and option 3. It was not the most prospective or profitable one, but there were reasons why I didn't go that route.

Q. All right. And so was Mr. Alexander's report helpful to you?

A. Yes, it was.

Q. Now, you referred to Mr. McLaughlin, I

Page 271

think?

A. Yes, that's his name.

Q. That's the HUD engineer or HUD appraiser?

A. I don't know. I don't remember what his title was.

Q. What was -- who was the individual that Mr. Alexander brought in to look at some of these engineering-related issues?

A. I think there were at least two individuals, possibly, from HUD that he brought in.

Q. So these were HUD employees?

A. As I remember, yes. Again, I had no problem with that.

Q. So those HUD employees participated at Mr. Alexander's request in connection with the preparation of this report?

A. I assume it was at his request, yes.

MR. POLEBAUM: Again, I would move admission of the document.

THE COURT: Well, Mr. Harrington.

MR. HARRINGTON: We object on the same basis, Your Honor. It is the same request that was made earlier.

Page 272

MR. POLEBAUM: There is more foundation.

THE COURT: The problem is there is more foundation. This is beginning to look much more like a HUD report all the time.

MR. HARRINGTON: Well, Your Honor, then the thing to do is ask Mr. Alexander about it. These HUD employees, possible HUD employees, if they were doing it in the course of their work with HUD, that obviously strengthens the argument. If they were not, that does not strengthen the argument one bit. If they were doing it as friends of Mr. Alexander, helping him out in putting together his report, to get this certification.

THE COURT: Well, we don't exactly even know why Mr. Alexander was trying to get the certification. There has been some indication that he was trying to do it at HUD's behest, but we will keep that in reserve.

BY MR. POLEBAUM:

Q. Mr. Norman, you indicated that Mr. Alexander pointed out some deferred maintenance to you in his report. Did you then act on that information as you prepared for

Page 273

prepayment?
A. Yes, we did. And we took care of it over a period of time because we were doing other things and we were doing a lot of it in-house, specifically things such as soffit repairs, mildew removal, things that were not considered capital improvements could be done with minimum expense and maximum of getting their money's worth, so to speak.
Q. All right. And what was the period in which you had these repairs done to the property?
A. I would say late '97, early '98.
Q. All right. And you received the report from Mr. Alexander -- the report from Mr. Alexander is dated March 31, 1997. When did you receive it?
A. Approximately the same day, I would assume.
Q. All right. And when in relation to your receipt of the report did you have the meeting with Mr. Alexander and these other discussions that you referred to with Mr. Alexander?
A. I don't have specific notes of the

Page 274

meetings, but I didn't read the report over night, obviously. It is pretty voluminous. I would expect, given the size of the report and the other things that he was doing, and I was doing, it was probably done over a three or four-week period at the most.
Q. Finally, with respect to Mr. Alexander's report, what was the ultimate -- strike that.
What was your understanding of the effect of remaining in HUD, with HUD, as a HUD assisted property?
A. That we would be always in a negative equity return position.
Q. All right. Let me ask you now to turn to Exhibit 80-A. What is Exhibit 80-A?
A. It is a commitment letter from the Whitney National Bank with a date, dated April 28, 1997, to me, managing partner of CCA Associates.
Q. And you received this communication from Whitney?
A. Yes, stamped received May 14th, 1997.
Q. All right. And what was the reason you were in touch with Whitney?

Page 275

A. To see about borrowing money to effectuate prepayment of the mortgage.
Q. Did Whitney provide a commitment to you?
A. Yes, they did.
Q. And is that commitment part of this document?
A. Yes, it is.
Q. Will you explain where that is?
A. I believe it is on page 02746.
Q. And following --
A. Excuse me?
Q. And the following pages?
A. Yeah.
Q. All right. And then on page 2748, does your signature appear?
A. Yes.
Q. And what were you doing on behalf of CCA Associates here?
A. We were agreeing to the commitment.
Q. All right. And what's the date of the agreement?
A. May 30th, 1997.
Q. All right. And then when in relation to this commitment did Chateau Cleary undertake

Page 276

the repairs to get the property in best shape for prepayment?
A. Subsequent to this commitment letter, but we did not borrow our money from Whitney based on that time.
Q. Who provided the funds to --
A. I did. The reason we delayed acting on this is because we were advised at that time by both Eustis Mortgage personnel and Whitney that we might be better served waiting to borrow the actual money to pay off the loan --
MR. HARRINGTON: Your Honor, I object. There is not a question pending. Mr. Norman is simply volunteering information. The question in the transcript said who provided the funds to -- and then there is testimony from Mr. Norman. There is simply not a question pending.
THE COURT: That's right. He said I did and he is explaining why. Mr. Norman, you may explain why you provided the funds.
THE WITNESS: Because we were -- this was set to go, but we also were talking about whether we should do this at this point in time. We were advised by the lender, the

Page 277

mortgagee and the lender that perhaps we would be better served not to effectuate this letter of credit at this time, you know, the commitment at this time. But to use our own funds to do less expensive repairs over the period of time, latter part of '57 – excuse me, '97, '98.
And then have the appraisal done, which Whitney would then use to make – we hopefully had a lot higher value appraisal, we then would get a higher loan, better rates, because of interest rates coming down, and at that point actually pay off the HUD mortgage.
BY MR. POLEBAUM:
Q. All right. So just so I understand the sequence then, after entering into this commitment with Whitney, you provided funds to Chateau Cleary Associates and the repairs were undertaken in the ensuing period of time?
A. Correct.
Q. Is that correct? All right.
Now, so you had Mr. Alexander's analysis. And you had these dealings with Whitney and you were in the process of making repairs. Did you retain any consultants to

Page 278

help you through the prepayment process?
MR. HARRINGTON: Your Honor, maybe this was intentional, but I don't believe the document, PX-80-A was ever admitted into evidence.
THE COURT: That's true.
MR. POLEBAUM: That's just an oversight. I apologize.
THE COURT: I was about to – I was thinking about it because I usually give one warning to counsel each way, because this happens during a trial. But not a second warning. And I was trying to figure this out myself.
MR. POLEBAUM: I appreciate Mr. Harrington's intervention and I move Exhibit 80-A.
THE COURT: Mr. Harrington?
MR. HARRINGTON: We have no objection beyond our continuing objection to the relevance of information pertaining to the post February 28th, 1997 date.
THE COURT: Thank you. What we will do is we will count that as your warning, once, Mr. Polebaum, and I am not going to do it

Page 279

again.
MR. POLEBAUM: I will try to remember, Your Honor.
(Plaintiff's Exhibit Number PX-80-A was received into evidence.)
BY MR. POLEBAUM:
Q. Exhibit 83, Mr. Norman. What is Exhibit 83, please?
A. It is a copy of that letter from Hampstead Partners to – actually, from Norm Root of Hampstead Partners to me dated April 29th, 1998.
Q. All right. And then on the following page, what accompanies this letter?
A. A prepayment service consultant agreement.
Q. And why did you engage these consultants?
A. Because I had read – and I knew Chris Foster, the head of this company, I met him at conferences and I knew they had experience going through the prepayment process which I found kind of hard to grasp when trying to do my job.
And I said it is cheaper for me to pay

Page 280

someone to do it who knows how to do it, and won't make any mistakes in dealing with HUD, to deal with the housing – the housing authority. The manager knows what the timing and what notices to send to the tenants and so forth. And my time would be better spent doing something else than becoming an expert in this only to use it one time.
MR. POLEBAUM: Move admission of Exhibit 83.
MR. HARRINGTON: No objection, Your Honor.
THE COURT: Admitted.
(Plaintiff's Exhibit Number PX-83 was received into evidence.)
BY MR. POLEBAUM:
Q. Approximately how long before you signed the consulting contract with Hampstead, were you in touch with Hampstead about potentially retaining them? What was the time frame?
A. I would say a month to two months.
Q. What is Exhibit 85?
A. Exhibit 85 – pardon me, may I have some water, please? It is a letter dated May

Page 281

8th to Mike Mills of HUD from me.
Q. What was the purpose of sending this letter to Mr. Mills?
A. To let him know that we had engaged Hampstead Partners to represent us in the prepayment process.
MR. POLEBAUM: Move admission of this exhibit, Your Honor.
MR. HARRINGTON: Your Honor, subject to the same continuing objection, we have no further objections.
THE COURT: Admitted.
(Plaintiff's Exhibit Number PX-85 was received into evidence.)
BY MR. POLEBAUM:
Q. Exhibit 86.
A. Yes.
Q. Can you tell us what Exhibit 86 is, please?
A. Exhibit 86 is a letter from Hampstead Partners to Mr. Mike Mills at HUD notifying HUD of Chateau Cleary Apartments' intention to prepay.
Q. All right. And then on the next page, page 117, what is this document?

Page 282

A. A notice of intent to prepay dated May 11 from Hampstead to the mortgagee, Reilly Mortgage Associates.
Q. And then the next page, page CCA 118, what is that?
A. The same date, same assignment, required notice to the councilmen in our area, the parish councilmen that we were prepaying.
MR. POLEBAUM: Move admission of Exhibit 86, Your Honor.
MR. HARRINGTON: My copy of the exhibit 86, Your Honor, contains multiple copies of a number of these letters, but with that, we have no objection beyond our continuing objection.
MR. POLEBAUM: Your Honor, I might note that Exhibit 87 and Exhibit 88 are additional copies of some of the material that is included already in Exhibit 86.
THE COURT: Well, let's just take Exhibit 86, because Mr. Harrington's correct. For example, 00118 appears to be identical to 00120. But eliminating duplicates, PX-86 is admitted.
(Plaintiff's Exhibit Number PX-86 was

Page 283

received into evidence.)
MR. POLEBAUM: May we also admit Exhibits 87 and 88? They will be easier to refer to if need be since they are stand alone copies of some of the letters that were just admitted. I apologize for the duplication.
THE COURT: Let's not have any duplication. We don't need that. Let's just stick with 86.
MR. POLEBAUM: Very well.
BY MR. POLEBAUM:
Q. Exhibit 91, Mr. Norman, what is Exhibit 91?
A. Exhibit 91 is a letter dated August 11th, 1998 from me to Mr. Mills at HUD.
Q. That's Exhibit 90. That's the one I meant to go to, Exhibit 90. I apologize.
THE COURT: You want 90?
MR. POLEBAUM: I'm sorry, Your Honor, I meant 90.
BY MR. POLEBAUM:
Q. What is Exhibit 90, Mr. Norman?
A. Exhibit 90 is a covering letter dated September 24th, 1998 from Kevin Hilbert of Latter & Blum, or actually --

Page 284

Q. That's not, that's not what I'm showing. I'm showing Exhibit 90 is a letter dated August 11. You are talking about what you have designated, Mr. Polebaum, as 91. 90 appears to be an appraisal letter.
MR. HARRINGTON: Your Honor, my copy actually has Plaintiff's 90 as the August 11, 1998 letter that Mr. Polebaum was referring to.
MR. POLEBAUM: That's what mine is too, Your Honor. Yours is different?
MR. HARRINGTON: It says Plaintiff's Exhibit 90 in print on the bottom.
THE COURT: Mr. Norman and are I are on the same page.
MR. HARRINGTON: Counsel appears to be on the same page as each other but a different page than the Court and the witness, regrettably.
THE COURT: We usually take the Court and the witness as the starting point.
MR. POLEBAUM: Maybe it is at 89 in yours, Judge. A letter dated August 11, 1998?
THE COURT: No, it is at 91, all right. That's Mr. Norman to Mr. Mills of HUD.
MR. POLEBAUM: That's at 91. And what

Page 337

And then when they lost their jobs, people below them economically would start losing it. So to some extent, I felt that we were always -- I can't quantify the time, but we were not -- it didn't affect us simultaneously at Chateau Cleary as it would the market rent apartments in our area.

Q. And you are saying that the effect at Chateau Cleary lagged behind the effect that would have been felt otherwise?

A. What I recall, it did.

Q. Let's compare the operating expenses that we're looking at during the alleged taking period with the operating expenses as of the last rent increase.

The operating expenses in 1992, which was the first full year after the alleged taking in this case were just over $294,000, correct?

A. Yes, yes, it is.

Q. And the last rent increase you had sought was based on operating expenses of $208,000, correct?

A. I don't know if that's exactly correct. We may have gone in and used in 19 --

Page 338

I'd have to look at documents -- 1983 for a rent increase, cranking in what you pointed out before was a request for an increase to make up for lost dividends.

Whenever we went in for lost dividend or rent increase based on lost dividends, almost always HUD would say: Well, we can't give you an increase to cover all these accumulated dividends. Let's use the '70s as an example. That would make the rents too onerous on the tenants. It wouldn't be fair.

We always had to amortize that.

That's the only way they would allow us to crank in the dividends into a rent increase was an amortization, if there was a buildup of accumulated dividends.

Q. Are you suggesting that HUD didn't give you all the dividend -- excuse me. Are you suggesting that HUD didn't give you the full increase that you sought in 1984?

A. I'm not saying in that particular year, but typically when we emphasized, give us a rent increase to cover accumulated dividends, if they did give it to us, we would have to give them an amortization of that.

Page 339

They would not give it -- if we had 100,000 in accumulated dividends, I'm using a round figure, they would say amortize that over ten years. We can't give you a rent increase to cover $100,000 in accumulated dividends that would give you that $100,000 this year. It would be: Well, we will give you an increase to cover 10 percent of that.

Q. Let's take a couple of steps back here, Mr. Norman.

In applying for rent increases, CCA decided what increase they wanted to request, correct?

A. Yes.

Q. And they would have done that in all of these years when they sought a rent increase, correct?

A. In that -- rephrase that question, please?

Q. It was CCA -- the demonstrative shows a number of years when CCA sought and obtained rent increases, correct?

A. Yes.

Q. And it was CCA that was choosing in each of these years how much of a rent increase

Page 340

to request?

A. To request, yes.

Q. And the requests were based on the audited financial statements that were prepared for CCA, correct?

A. For the most part. In some years, we were allowed later on, I don't know when, we never could project expenses per se. But in some years we were allowed to bring letters from utility companies, for example, or from an insurance industry source that said, in fact, over the last year, it doesn't show it, we knew going -- because if you started in January having expenses that didn't show up in the previous year's financial statement, we couldn't as owners project that, even though we had paid bills to show it. We had to get a third party industry source to verify that those fuel adjustment costs, as an example, for electricity were going up. And then HUD would allow, in some instances, that kind of calculation to be added to your loss for rent increase.

Q. So you might have actually been able to get a larger increase than would have been

Page 353

A. I would assume so, because they could always change the date on their letter so it didn't look like it was too skewed from delivery.
Q. And just to be clear about the process, after you would receive this, you would or the partners would certify the audited financials and then forward it to HUD?
A. That was generally the process.
Q. I think you mentioned this, but the audited financial – excuse me, the regulatory agreement requires that audited financial statements be submitted to HUD within 60 days following the end of each fiscal year, correct?
A. I believe that's correct. I remember there is a 60-day requirement. I assume it's in the regulatory agreement. If it is not, it is in subsequent regulations.
Q. So given CCA's fiscal year, its audited financial statement was due to HUD each year at about the beginning of March?
A. That was the stated date, correct.
Q. We have talked about applying for rent increases. I just want to be clear. CCA was free to request a rent increase at any time,

Page 354

weren't they?
A. No.
Q. Could you turn to Defendant's Exhibit 1, which was admitted yesterday. This is a copy of the regulatory agreement.
A. Okay. I apologize. Yes.
Q. Look at paragraph 4-D on the second page.
A. Yes.
Q. It says, "The commissioner will at any time entertain a written request for a rent increase, properly supported by substantiating evidence." Correct?
A. It says that, but going back to your question about whether we could apply for a rent increase at any time, as I read this, that's what it says, but the fact is there is another regulation that says you can only calculate surplus cash as a result of an annual or semi-annual audit.
Q. Now, surplus cash is what would be distributed to the partners under paragraph 6-E of this regulatory agreement, correct?
A. If it was available, that's correct.
Q. And that's something different than a

Page 355

request for rent increases, isn't it?
A. Yes.
THE COURT: Mr. Harrington, for some reason, neither the clerk nor I can locate our copy of DX-1. We have it marked yesterday, but we just can't seem to find it.
MR. HARRINGTON: I do remember what occurred, Your Honor. Let me go ahead – we have copies right now. I will go ahead and hand them up to the bench, if that's acceptable.
THE COURT: Yes, please.
MR. HARRINGTON: If Your Honor will recall, I believe what happened yesterday, it was that the plaintiffs proposed admitting a copy of the regulatory agreement that was missing a page and we substituted this in instead.
THE COURT: All right. Thank you.
BY MR. HARRINGTON:
Q. Now, you have testified, Mr. Norman, that you had problems getting timely action from HUD with respect to rent increase requests.
A. In the early '70s, specifically, it

Page 356

was.
Q. Let's look at Plaintiff's Exhibit 14-A, which was admitted yesterday.
A. Yes.
Q. The cover page of Exhibit 14-A shows HUD approving a request for a rent increase on April 11, 1974, correct?
A. Yes.
Q. And that was received by you on April 12, 1974?
A. Yes.
Q. Would you go to the last page of this document. Do you recognize the signature on the last page?
A. The signature is mine.
Q. And this is the application that you made for a rent increase, isn't it?
A. I don't believe that is correct. The date on the document that I signed is April 3rd, which is just a week before the rent increase was granted. Normally, what we would do is request the rent increase and you would come to an understanding, rather than writing letters back and forth, but letters did occur in the early '70s.

Page 477

he wishes that's appropriate to the scope of the testimony.
THE COURT: Well, ordinarily, Mr. Harrington, the Court waits until a direct examination has been completed and the cross-examination has been completed to ask its own questions. That's what I was proposing to do. I do have, usually, questions of a witness that counsel have not asked.
My questions on this occasion are entirely related to the physical surroundings of this particular project.
MR. HARRINGTON: And to the extent that under the circumstances related to the physical surroundings of the project at a relevant point in time, we don't have a relevancy objection, Your Honor.
THE COURT: Well, even if you had a relevancy objection, I would appreciate it if you would make it than dance around it.
MR. HARRINGTON: Your Honor, it is difficult to make the objection without the question, specific question being posed.
THE COURT: I thought you were objecting to my asking any questions of any

Page 478

kind whatsoever, Mr. Harrington.
MR. HARRINGTON: Not of any questions of any kind whatsoever, Your Honor.
THE COURT: All right, Mr. Harrington, let's give it a try.
Mr. Norman, let's just take the setting when this project was constructed, sometime between 1969 and 1971, I take it; is that correct?
THE WITNESS: Yes, it is.
THE COURT: Could you describe just the immediate locale of this project at that time?
THE WITNESS: There was a newly constructed interstate highway abutting the complex to the north. We were on the service road, the south service road.
THE COURT: Interstate 10, I take it?
THE WITNESS: I-10, correct. The closest main crossing of interstate 10 going toward the metropolitan area in the city of New Orleans was or is Causeway Boulevard. There was some development on Causeway and probably most of that area was fairly well built out, not completely, but that was the edge of growth

Page 479

on the south side of I-10.
On the north side of I-10, toward Lake Pontchartrain, there was growth in that area that preceded us in the form of some apartment complexes, primarily, as I recall, the singles apartments at the time and so forth.
So when you came from Causeway specifically on the south side of I-10, where we are located, there was only one building within reasonable eyesight of any consequence on the south side service road between Causeway and Clearview, which is where we are. But there is no interchange there.
This is the overpass going over I-10, and the next one to the west, which was the general direction of growth, which was Clearview Parkway.
So there was only one building to my memory on the service road between Clearview to the west, big intersection, Causeway to the east, big intersection, besides our apartment complex when we started construction in late 1969.
THE COURT: How far is this apartment complex from the Causeway intersection?

Page 480

THE WITNESS: I used to know it, but if I had to guess, it is a mile or two, two miles at the most.
THE COURT: And the Clearview intersection?
THE WITNESS: Possibly a little bit closer, but roughly the same distance, possibly a little closer.
THE COURT: In the early '90s, let's say the period '91 through '96, what was the locale of this particular project like?
THE WITNESS: Very stable. As I recall, there may have been an apartment complex, a four-plex or two that were doing something, but rents were trending up. And as far as the appearance of the area, I don't recall any dramatic change.
THE COURT: What was exactly physically located in the area at that time?
THE WITNESS: At that time we had houses to our east, apartments and houses to the south, generally apartments and office buildings to the west.
And if you went on the other side of Interstate 10 on the north service road, you

Page 481

would have a mix of commercial, and I am excluding on the south, things like small office buildings, which we also had, but you had more commercial on the north side with apartments and office buildings and shopping.

THE COURT: What were the types of apartments that were located in the area of – or apartment buildings that were located in this, in the locale? And we're talking about, again, in the early 1990s.

THE WITNESS: Right. There was a mix of generally two types of apartments, many four-plex, but there were also several, not many, spotty, including ours, apartment complexes that, while not looking exactly like ours architecturally, housed roughly the same square footages, pools, a couple houses excepted, where – put another way, if you didn't know the area and you drove by our complex and the other, there is another complex, I believe they have changed their name which was owned by Jim Fernon Bratton, about a block away on Clearview going south, you could not tell, the average person would not have known that Chateau Cleary was subsidized versus

Page 482

the complex a block away down that was not subsidized.

THE COURT: What's the height of the office buildings that are in the area?

THE WITNESS: I'd say there is a height limitation, and I don't know whether it is economic height or zoning height, but they generally are not high-rise. I will put it this way, they are low-rise, what we call medium-rise, no taller than I would say, and the experts could tell better than I, perhaps, five, six, seven, eight stories at the most.

THE COURT: Are there any shopping areas nearby?

THE WITNESS: Yes, there are. There is a major shopping center at the, close to the intersection of Clearview and I-10.

THE COURT: When was that built?

THE WITNESS: Oh, gosh, I think it succeeded us, but I'm not sure and perhaps Mr. Derby, who I didn't introduce, myself, Dr. Ragas, they might have access to that information. It was either shortly before or not too long after we built Chateau Cleary, so a major shopping center in the metropolitan

Page 483

area.

THE COURT: Let's ask one final question. In the period from the early to mid 1990s to now, what have been the changes to the locale?

THE WITNESS: I would say other than the hurricane, if you talk pre-Katrina, it is hard to talk about anything that happened after that because it is a different landscape. People painting things differently, they are still putting roofs on. And some apartments, I guess, if they have insurance, they are doing a lot. And others, they are doing nothing, but pre-Katrina, I would say it was the same as it was three or four years before that, and early to, more than that. There is no real change that I can think of in the area. There were no new apartments being built.

THE COURT: Well, I guess we will see the results of Katrina in the area. I take it they were significant?

THE WITNESS: They were.

THE COURT: Even in Metairie?

THE WITNESS: Yes. Most of the roofs

Page 484

of the buildings, including the large – not large condominium, attractive chalet looking condo, architecturally chalet, they lost most of their roofs. They are nothing but what we call blue roofs. And so do the four-plexes to the east of us were just, they were blown – the walls were still standing but the roofs were gone and windows were broken and –

THE COURT: All right. I have nothing further. Mr. Polebaum, you may proceed.

MR. POLEBAUM: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. POLEBAUM:

Q. Just a few questions for you, Mr. Norman. Mr. Norman, Mr. Harrington asked you a number of questions about the rent increases, and I have put up on the display, Plaintiff's Demonstrative Exhibit Number 33. And it shows that in 1984 or 1983, your operating expenses were $208,000, and in 1984, they went up to $232,000. And in 1985, they went up to $284,000.

Page 485

This also shows that there was a rent increase that was effective as of December 1st, 1984. So, first, let me ask you if the rent increase was effective as of December 1st, 1984, what was the impact from that rent increase as it went into 1985 on the operating expenses for 1985?

A. Well, that late in the year, it would have helped pay for operating expenses.

Q. Right. What I'm trying to get at is what is the relationship between rent increase and then the operating expenses that one incurs, as that rent increase is implemented?

A. Well, generally, if you have more money to spend, we would spend it on the complex.

Q. Is it the rent increase that went into effect as of 12/1/84 that explains the increase in operating expenses from 1984 to 1985?

THE COURT: Mr. Harrington?

MR. HARRINGTON: No objection, Your Honor.

THE WITNESS: In lieu of going to the records to see that there was a big spike in some unusual expenditure, that would normally

Page 486

be the case.

BY MR. POLEBAUM:

Q. Mr. Harrington also asked you about dealings with HUD in obtaining rent increases. And you may recall that he asked you with respect to when you became the managing partner of CCA Associates, how that affected the – whether or not you went in for rent increases in the period after that. My question to you is, who was responsible on behalf of the property for dealing with HUD and requesting rent increases in the period 1971 to 1985?

A. I was.

Q. You were. And then you continued with that responsibility after you became the managing partner of CCA Associates in the ensuing years?

A. That's correct.

Q. You were also asked a number of questions about whether or not CCA could have obtained permission to prepay from HUD after the preservation statutes had been enacted. As you understood the position that you were in, that CCA Associates was in, could

Page 487

CCA have satisfied all of the prepayment criteria under the preservation statutes to obtain permission to prepay?

A. It is my understanding that we wouldn't satisfy any of the criteria.

Q. You were also asked a number of questions about the incentives option. And you may recall that Mr. Harrington asked you about the ability to prepay after filing a notice of intent, getting a plan of action, getting incentives approved, if Congress then did not fund the incentives. If Congress, by contrast, did fund the incentives and you were receiving the incentives, would CCA Associates have been able to prepay in that circumstance?

A. No, and we would have been forced to do something I didn't want to do in the first place.

Q. Plaintiff's Exhibit 51 in the volumes, please. The binders. Do you have that before you, Mr. Norman?

A. Is that the letter to Mr. Alexander?

Q. Right. Do you recall Mr. Harrington asked you about this letter?

Page 488

A. Yes.

Q. And about the box you checked on the next page?

A. Yes.

Q. In the cover letter to Mr. Alexander, second paragraph, you write, "please note that while we have checked box A on each form, we do so with the understanding that we preserve our right to proceed under Title 2 or Title 6 with both complexes."

What were you indicating to Mr. Alexander by that language?

A. That we were reserving our right to proceed under both. Because we signed that document did not mean we were giving up our rights to proceed under the other title.

Q. All right. And, again, just to be clear, what was the reason that you submitted these various communications indicating an intent to prepay, to seek incentives?

A. Almost exclusively, I have to say, because of – I wouldn't say instructions, but information that was passed on to us by trade organizations and people submitting information to them that Chuck Edson and even David Smith,

Page 501

he typically invited myself and members of my staff to make presentations to his trade group.
Q. All right. And did you and he meet in order to help plan the quarterly meetings?
A. We did.
Q. Did he come to your office from time to time for meetings?
A. Yes, he did.
Q. In connection with the Chateau Cleary property, did he deal principally with one of your subordinates?
A. Yes, he did.
Q. And who was that?
A. Mike Mills.
Q. And was he a loan management specialist; is that his position?
A. I believe that was his title, yes, sir.
Q. When Mr. Norman would meet with Mr. Mills, did Mr. Mills on occasion bring him by to say hello to you?
A. Oh, yes. That was standard procedure when people came in and met with members of my staff, either upon their arrival at the office, if my schedule allowed, they would tell me who

Page 502

was visiting, and I – and/or at the conclusion of the meeting with the staff person, they would bring them by and say here is what we discussed, and the client has one or two questions he would like to directly put to you.
Q. Okay. But as I understand it, it was – was it your policy that the property owners were to deal with their assigned representative, at least in the first instance?
A. Yes.
Q. And in the case of Mr. Norman, that was Mr. Mills?
A. Yes.
Q. Okay. Now, as I also understand it, Mr. Norman was not one of the individuals that took up a lot of your time?
A. Correct.
Q. And you tended to spend significant amounts of time on problem projects such as those that were in default, for example?
A. I did.
Q. Okay. And after the oil collapse in the mid-1980s, did you have a lot of problem projects?
A. Unfortunately so.

Page 503

Q. And did that take up a lot of your time?
A. It did.
Q. Did Mr. Norman's property ever present those kinds of issues?
A. It did not.
Q. Did you come to be familiar with Mr. Norman's reputation in the New Orleans business community?
A. Yes.
Q. What was that reputation?
A. A man of high integrity, always very polite at trade meetings, he would not be the one who would get up and, as some other members would, and give a thump the table speech about the policies coming out of Washington. If he had a question, he would tend to hold it to the end and approach me one on one or at a break. He was quiet, distinguished, reserved.
Q. All right. Now, with respect to the Chateau Cleary property, were there ever any problems relating to fights, drugs, prostitution and the like?
A. None that ever came to my attention.
Q. All right. And what were the kinds of

Page 504

tenants who populated the Chateau Cleary apartments?
A. I would call them working poor, the vast majority of his residents got up each morning, got in their automobiles and went to jobs. They might be minimum wage jobs or slightly higher, but most of them went to work each morning.
Q. Okay. Let me ask you if you would turn to Exhibit 54, which is in the binders before you.
A. Well, I have three. I don't know which one it would be.
Q. They should have numbers indicated on them, Mr. Alexander.
A. This one is called Plaintiff's Exhibit. That's the one I turn to?
Q. It is binder number 2, and there should be a tab that says Number 54, which will get you to the right exhibit number.
A. Okay, all right.
Q. Do you have that before you, sir?
A. Yes, I do.
Q. Now, let me ask you if you would turn to page 5321. What is the form that begins on

Page 549

though your law firm encourages and, in fact, may require you to continue to take CLEs so you can maintain your bar membership, that law firm, that course work you have done for that is not something that the law firm would claim as its own endorsed work or document.

THE COURT: Well, endorsement is something else. On the other hand, it was reviewed, certainly, by HUD personnel. The endorsement is something else. It is not necessarily something that has HUD's official stamp of approval. It will be admitted. It is admitted. And it is admitted, we will take off the limitation that we put on it before, but recognizing that it is not a HUD admission in any way. It reflects Mr. Alexander's personal work and it reflects Mr. Alexander's personal work with, as the Court has it, Messrs. McLaughlin and Schultz and Ms. Kizzier all contributed in some way or another to it.

(Defendant's Exhibit Number DX-140 was received into evidence.)

THE WITNESS: Your Honor, if I might add one thing, I apologize for interrupting

Page 550

you.

THE COURT: Yes, Mr. Alexander.

THE WITNESS: I was required by IREM to add page 234, which is Exhibit 6402, and I don't know if this helps you in making your final ruling or you have just ruled.

THE COURT: What was the page again, Mr. Alexander?

THE WITNESS: 6402S.

THE COURT: That's very helpful, Mr. Alexander, it does not change the Court's conclusions or determinations in any respect. Thank you. All right, shall we take our break now?

THE COURT: Let's take a 15-minute recess at this time. We're in recess.

(A recess was taken at 3:51 p.m., after which the trial resumed at 4:17 p.m.)

THE COURT: Mr. Polebaum, you may proceed.

MR. POLEBAUM: Thank you, Your Honor.

DIRECT EXAMINATION – RESUMED

BY MR. POLEBAUM:

Page 551

Q. Mr. Alexander, could you look, please, at Exhibit 75-A, in the binders that we have before you, tab 75-A.

A. Okay.

Q. And is this a letter from Mr. Norman to you dated December 19th, 1996?

A. Yes, it is.

Q. And does this confirm that you will study his property?

A. May I read the document? I don't recall seeing this.

Q. Sure. I point you in the direction of paragraph 1.

A. Yes, okay.

Q. And then in paragraph 2, Mr. Norman notes, "regarding our goals and objectives, we intend as soon as possible to pay off the existing mortgage, probably with a nonmortgage loan from a commercial bank for a term not to exceed one year."

Did you understand that Mr. Norman's objective was to prepay his HUD loan?

A. At this point in time, yes.

Q. Yes. And regarding your study, did Mr. Norman understand that it was going to take

Page 552

you a number of months to prepare it?

MR. WOODROW: Objection, Your Honor. Mr. Polebaum is asking for Mr. Alexander's –

THE COURT: Just a moment.

MR. WOODROW: He is asking for an opinion of Mr. Norman, he is asking Mr. Alexander for Mr. Norman's opinion.

MR. POLEBAUM: I will rephrase the question, Your Honor.

BY MR. POLEBAUM:

Q. Mr. Alexander, did you advise Mr. Norman that it would take you a number of months to prepare the study?

A. I did.

Q. And did Mr. Norman indicate to you that because your study was going to take a number – strike that.

Did you believe that Mr. Norman was going to wait for your study to be completed before deciding how to proceed?

A. I did.

Q. Now, as we discussed earlier, you selected Mr. Norman's property as the one you would like to study by first looking at the inventory of HUD properties. Is that right?

Page 557

merely the act of prepaying its mortgage and ending up with a conventional loan and extinguishing the HUD regulatory agreement, without making any improvements whatsoever, should be able to charge a noticeably higher rent within a very short period of time thereafter.

Q. Okay. Now, when you approached Mr. Norman, obviously he was agreeable to your undertaking the study?

A. He had two primary questions, as I recall, what is this going to cost me, and what kind of data are you going to need from me? And when I told him detailed financial data on the property, he then proceeded to a third question, can I be assured that this is going to be held confidential. I do not want any of my competitors having access to my property's information. And I was able to give him that assurance.

Q. Now, in the process of speaking to Mr. Norman and preparing the report, what period of time did this entire process span?

A. It was the last few months of 1996 and

Page 558

the first three months of 1997.

Q. All right. So your report is dated March 31, 1997. Did you deliver a copy to Mr. Norman on or shortly after that date?

A. I believe shortly after that date.

Q. All right. And then did you go over the report with Mr. Norman subsequent to the delivery?

A. I did, but it was more or less a cursory review because there was so much information there, I primarily went over the executive summary portion of the report and suggested, after he digest the full contents, that he call me back to ask for any clarification. I told him that I had no way of knowing whether it would receive a passing grade or not, but that he was entitled to have a copy at that point in time.

Q. You did receive a passing grade, I take it?

A. I did.

Q. Was this course taken on a pass/fail basis or did you get a different type of grade?

A. Pass/fail, pass/superior. Those were

Page 559

the three categories.

Q. What did you get?

A. I got a pass.

Q. Now, you understood from Mr. Norman's letter to you that we just looked at a moment ago in Plaintiff's Exhibit 75-A that it was his objective to prepay. We have discussed that, correct?

A. Yes. I understood that from the – during the period of my report, his declaration.

Q. And some of the scenarios that you looked at in your report were predicated on this desire to prepay?

A. Yes. In fact, it was a requirement of IREM that the ownership objectives be stated in one of the first few pages of the report. And it was further required that all reports had to have one mandatory possible solution and that was the as-is, continuing the as-is situation. But if whatever the other alternatives that the candidate might come up with, they had to fit within the boundary lines, what the owner set out in his objective letter.

Q. Okay. And as it turned out, then, you

Page 560

looked at four scenarios, the first being the as-is remaining as a HUD property and the other three being prepayment of one sort or another?

A. Correct.

Q. Okay. And we will come to those in a moment.

Now, when you were looking at the property, you were looking at the property and market conditions as of the time you did the study; is that right?

A. Correct.

Q. And you made no effort to determine the value of the property as of May 1991, for example?

A. I did not.

Q. And you did not make an effort to determine what the condition of the property was in 1991?

A. No.

Q. And you are not aware, are you, of the repairs and upkeep that were undertaken between 1971 and 1991?

A. No.

Q. Nor are you aware of the repairs and upkeep that were undertaken between 1991 and

Page 561

1996 when you began your study?
A. No.
Q. Now, in connection with your study, did you interview Mr. Norman?
A. I did.
Q. And did you have interviews with the site manager?
A. I did.
Q. And the maintenance manager?
A. I did.
Q. And did you make a number of visits to the property?
A. Yes, I did.
Q. On how many occasions?
A. I do not recall a precise number, but I believe at least three occasions, once – the most significant one was the one with Mr. Joe McLaughlin accompanying me, but I believe I also met at the property on an earlier occasion with a site manager. I believe her name was Delores, I'm not certain if that was the first or last name, and a maintenance man. And I believe Mr. Norman met me at the site maybe one or all three of those occasions.
I also, however, as part of the IREM

Page 562

suggested protocol, I went by the property in the evening hours and in the early morning hours, as I did the comparable properties, to see how many – how full the parking lot appeared to be in the evenings and how empty the parking lots appeared to be in the morning hours during the business week. Those were very brief stops.
Q. Let me ask you to turn to your report, your number 4 in exhibit – Defendant's Exhibit 140 at page 6187.
A. Okay.
Q. At the very bottom of this page, you write, "the property is situated in a fully developed neighborhood of multi-family dwellings with 94 percent average occupancy. Within a three mile radius of Chateau Cleary, you will find two large popular shopping malls, one of the area's premier medical complexes, and a new regional library, and good public schools, good access to interstate 10 exists, with downtown New Orleans only eight miles away."
So is this a summary description of the area as you observed it at the time?

Page 563

A. Yes.
Q. And did you consider this to be a good area?
A. I did.
Q. And you believed the information that you wrote down in this report describing the area was accurate?
A. I do.
Q. Now, for the period after 1997, did you expect the Metairie area to be stable and to continue to prosper?
MR. WOODROW: Objection, Your Honor. This question goes to matters that are not relevant to this case because they pertain to the time period outside of the, of the claim of the plaintiff for the alleged date.
THE COURT: Overruled.
BY MR. POLEBAUM:
Q. You may answer the question, Mr. Alexander.
A. Would you kindly repeat?
Q. Surely. After 1997, did you expect the Metairie area to continue to be stable and to prosper?
A. Yes. From my IREM training and from

Page 564

two appraisal courses that I had earlier taken at Tulane University, I had learned that this area was properly characterized as a mature neighborhood, most of the developable land already had its land use in full bloom, and most of the properties, whether they were single family, residential, commercial, multi-family, were in – kept in general well repair.
Q. Was the Metairie area the strongest area economically of unincorporated Jefferson Parish?
A. Yes, it was.
Q. On page 1514, the first full paragraph.
A. 1514?
Q. I'm sorry, it is page 6188. Excuse me.
A. Okay.
Q. The first full paragraph states, "Financially, the property is achieving rents far less than market rents. This is because rents are controlled by a regulatory agreement with FHA. The interest rate on the 221-D-3 below market interest rate loan is 3 percent.

Page 569

Why was this material put in your report?
A. Another motivating characteristic for households in determining where they locate, for either purchase of a home or rental of an apartment is availability to shopping with a wide variety of amenities. This project was well positioned in that regard.
Q. Next on page 6213, please. At the top you say, "due to the many attractions of the West Metairie neighborhood where Chateau Cleary is located, the overall 2.98 percent upward trend in rent should continue for the foreseeable future. The rental market is particularly strong for one bedroom townhomes and two bedroom, one bath flats, with the percentage increases noted." This refers to the period May 1995 to May 1996, this period that you are analyzing of the rents?
A. I believe I am quoting those statistics from the preceding page, which was 6212, which was from a University of New Orleans real estate market analysis publication from July 1996 focused on area H, in which

Page 570

Chateau Cleary fell. And I have some statistics there from that report that led me to use those summary characteristics on page 6213.
Q. All right. And to support the point that you are making, you rely on this real estate study of the University of New Orleans; is that correct?
A. Yes, I did.
Q. And is that a report that real estate professionals in the New Orleans area rely on?
A. Heavily.
Q. And was that report held in extremely high regard at the time?
A. It was.
Q. And under whose direction were those reports prepared?
A. Dr. Wade Ragas.
Q. Do you know Dr. Ragas?
A. Yes, I do.
Q. Are you familiar with his reputation?
A. Yes, I am.
Q. And what is it, please?
A. He is a top flight real estate economist and market analyst. During this

Page 571

period of time, he annually, with the benefit of his graduate students and others supporting, would put on a session generally held at the New Orleans Convention Center or one of the major ballrooms in town that would draw 2 to 3,000 paid attendees to get his latest survey of the market.
Q. In the conclusory paragraph on page 6213, the last sentence you note, "this mature neighborhood has a well deserved reputation as stable, convenient, and safe." Does that pretty much sum up the area?
A. Yes, sir.
Q. All right. Turning next to page 6222, I will call your attention to the bottom paragraph regarding construction, where you say, "the buildings are frame construction on slab and are well built with average maintenance." How did you determine that the building was well built? Is that where Mr. McLaughlin played a role?
A. Yes, but also I had been on enough property inspections as a HUD supervisor to be able to walk around a building and look for

Page 572

foundation cracks. That's one of the more serious problems that you can have, and to inspect the upper story units and look to see if you see ceiling -- stained ceilings indicative of roof leaks, another very serious problem. So it is my own observation, supported by a true professional, Mr. McLaughlin.
Q. Page 6232, please. In the bottom paragraph, you note that "the two laundry rooms are clean and well maintained." Why is that significant?
A. Some apartments in New Orleans were experiencing problems at this point in time with muggings that would occur in the laundry rooms that were being poorly lit. It was also quite an aggravation to the average tenant if they went down to do their week's laundry and found half the machines broken and not properly serviced.
Q. All right. Page 6264, please. In the top paragraph, you note that "the project," referring to Chateau Cleary, "has maintained high and stable occupancy, 94 to 98 percent, by its moderate income residents, even through the

Page 573

collapse of the real estate market in the early 1980s. Scores of other projects defaulted, went into bankruptcy, and were eventually foreclosed. Chateau Cleary weathered the storm, considerably due to its relatively low debt load, sound management, good location, and a loyal tenant base."

Did you consider this to be a positive evaluation on these criteria?

A. A strong positive valuation.

Q. Turning next to page 6265, please. First full paragraph, you note that "expense-wise, this project runs in the 60 percent range, 8 percent under most of the comparable 221-D-3 BMIR apartments in this region, but with substantially higher expenses than conventional properties of similar size." What were you saying here?

A. That amongst similarly-financed properties, it was operating under the typical expense range, in other words, it was a frugal operation. But when you compared it to the conventional properties, the expenses as a percentage of the effective gross income was considerably out of alignment.

Page 574

Q. All right. And is the 12 percent disparity that you note between the expense rate of this property and conventional properties of similar size, is that significant?

A. It is significant, because it will have a dampening effect on net operating income.

Q. At the bottom of the page, you note that "prepayment would offer potential savings on administrative expenses of 9.5 percent of gross possible income." Would that be a significant savings?

A. Yes.

Q. And then continuing on to the top of the next page, 6266, you note that "taxes and insurance are 8 percent higher as a percentage of GPI for Chateau Cleary than for conventional garden apartments in the New Orleans area." Is that significant?

A. Yes, but I would like to call to your attention or emphasize the parenthetical phrase about all of these percentage statistics. You have to look at both the raw dollar figures before they are converted to percentages,

Page 575

because if a project is undercollecting income through raising rents only very episodically, but expenses, many of which are beyond your control, continue to rise, you can lead to skewed percentages. So you have to very carefully analyze both the actual dollar numbers as well as the derivative percentages.

Q. All right. Let's turn next to 6275, please. Near the middle of the page, it says, "statement and identification of the problems." And one that you mention is "suppressed rents and excessive operating costs, largely resulting from regulatory agreement controls on a government loan at 3 percent." Do you see that?

A. Yes, I do.

Q. Is that a strong reason to prepay, to get out from under those circumstances?

A. Yes.

Q. All right. And in your experience, is it a feature of HUD properties, even those located in good neighborhoods like Metairie, that they have suppressed rents and excessive expenses?

MR. WOODROW: Objection, Your Honor, the form of the question. It is argumentative.

Page 576

THE COURT: Overruled.

THE WITNESS: Would you kindly restate?

BY MR. POLEBAUM:

Q. In your experience, Mr. Alexander, is it a feature of HUD properties, even those that are in good neighborhoods like Metairie, that they have suppressed rents and excessive expenses, to use the terminology you use in your report?

A. If the type of HUD financing is that of Chateau Cleary's, meaning a 221-D-3 BMIR or a section 236, yes. It is not the characteristic of a section 221-D-4, unsubsidized loan, which closely approximates conventionally financed properties.

Q. Okay. But for 221-D-3 and 236 properties, you would agree with that?

A. Yes, I would.

Q. Let's turn, please, to -- turn to your summary chart, Mr. Alexander, which is page 192 in your volume, Bates Number 6378. Now, this chart is a summary of the analysis that you prepared, correct?

Page 577

A. Let me reexamine it for a moment, please. Yes, it is.
Q. And this shows the four options that you studied, correct?
A. Correct.
Q. And alternative number 1 is the option of staying in the HUD program and not making any changes at all; is that right?
A. Yes.
Q. And then alternative 2, alternative 3, and alternative 4 represent different prepayment scenarios. Is that correct?
A. Yes.
Q. Now, alternative 1, which is the one remaining in the HUD program, that shows a negative internal rate of return, does it not?
A. It does.
MR. WOODROW: Objection, Your Honor. These questions lack foundation. We have not established that this witness knows what the internal rate of return is, what a net present value is, or any of these other financial terms. We have not established that he is an expert in these types of financial analyses. And there is simply not adequate

Page 578

foundation for any discussion of these particular conclusions.
THE COURT: Mr. Polebaum?
MR. POLEBAUM: Well, I will ask a different question, Your Honor. I will try to go at it somewhat differently.
BY MR. POLEBAUM:
Q. Mr. Alexander, did you – you prepared this summary chart, correct?
A. I did.
Q. It reflects the analysis that you undertook with respect to Chateau Cleary; is that right?
A. It does.
Q. And it encompasses your conclusions with respect to the four different scenarios that you examined; is that right?
A. That is right.
Q. And you examined different financial measurements under each of these four different scenarios; is that correct?
A. That is correct.
Q. And when you were looking at these different financial measurements, did you understand what the financial measurements were

Page 579

that you were analyzing?
A. Yes.
Q. All right. So you know what an internal rate of return is?
A. I did at the time.
Q. Okay. And at the time, you understood what the term net present value meant?
A. Yes.
Q. And at the time, you understood what return on investment meant?
A. Yes.
Q. And at the time, you understood what value enhancement meant?
A. Yes.
Q. And you also understood at the time what the payback period concept was?
A. Yes, and I would add, using the materials that I had obtained from those four earlier courses, I was required to recite the textbook definition of each of those prior to getting to this summary chart. As I think I had also earlier testified this afternoon, this is the only time I prepared an exhibit of this nature, but I spent three or four intensive months. This is not the type of work that I

Page 580

presently do, but I apparently applied the test successfully, based on the passing grade from the graders.
Q. And at the time, you did this analysis to the best of your ability?
A. I did.
Q. You worked very hard at it?
A. I did.
Q. And you concluded that remaining in the HUD program – strike that. I think you looked at remaining in the HUD program for a seven-year period as the first scenario. Correct?
A. Um-hum, eight years.
Q. Eight years, okay. And you concluded that if Chateau Cleary remained in the HUD program for a seven or eight-year period, it would achieve a 21.5 percent negative internal rate of return; is that what you found?
MR. WOODROW: Objection, Your Honor.
THE COURT: Mr. Woodrow, grounds?
MR. WOODROW: Again, the question lacks adequate foundation. Although we have established that Mr. Alexander at the time he prepared the report knew what an internal rate

Page 581

of return was, we have not looked at any of the underlying data that he analyzed in reaching this conclusion, nor have we heard how the analysis itself was conducted. And merely stating the conclusion or asking him to state the conclusion is not sufficient without the underlying analysis.

THE COURT: Well, you will have an opportunity for cross-examination, Mr. Woodrow. Overruled.

BY MR. POLEBAUM:

Q. I think you answered the question, but I will ask you again because it may have gotten lost in the shuffle. You concluded that if Chateau Cleary remained in the HUD program for an eight-year period, it would achieve an internal rate of return of negative 21.5 percent; is that correct?

A. Correct.

Q. And what did you conclude with respect to the net present value for Chateau Cleary if it remained in the HUD program for the next eight years?

A. Using a discount rate of 13.25 percent, that it would be negative

Page 582

$833,376.

Q. And what did you conclude was the impact on return on investment of remaining in the HUD program for the next 7 or 8 years?

A. It would be an average over that eight-year period of negative 0.44 percent.

Q. And with respect to the value enhancement measurement, what did you conclude was the effect on value enhancement of Chateau Cleary's remaining in the HUD program for the next seven or eight years?

A. It would be a negative 1,207,032.

Q. So is it fair to say that you concluded when you did this study that remaining in the HUD program was actually destructive of value with respect to the property?

A. Not merely by remaining in the program per se, but with the characteristic of very few rent increases having been obtained, having a very flat trend line on income, and with an accelerating trend line on expenses, given the age of the property, I made those conclusions.

Q. All right. And in scenarios, alternatives 2, 3, and 4, those were all

Page 583

prepayment scenarios, correct?

A. Correct.

Q. And all of those showed substantial positive returns on investment or internal rates of return; is that correct?

A. That is correct.

Q. And also substantial enhancements of the net present value; is that correct?

A. That is correct.

Q. And substantial enhancements of value overall; is that correct?

A. Yes.

Q. If -- I take it you did not look to see what the negative value enhancement would have been if you had chosen a different period to analyze, if you had looked at 1994 to 2000 or 1991 to 1998. You didn't study the negative value enhancement that one might have observed in those periods; is that correct?

A. Correct.

Q. If your alternative number 1 would change to continuing in the HUD program for 20 more years, rather than eight more years, would the result have been even more detrimental to

Page 584

CCA?

MR. WOODROW: Objection, Your Honor, calls for speculation, asking a fact witness a hypothetical question.

THE COURT: Mr. Alexander, you may answer if you know.

THE WITNESS: I do not feel comfortable answering that question, Mr. Polebaum, because as I have said earlier, I was a novice at this type approach, this was an educational training document. And one of the things I have learned in real estate is there are sundry factors that are so interrelated that one that's not present in your mind, that maybe, for instance, some other developer developing something, but the public news is not yet known, may have an impact. There are just too many variables and this is not my skill area, this was an educational exercise, so I don't think I can give you a valid answer to your question.

BY MR. POLEBAUM:

Q. Very well. Now, you will recall, Mr. Alexander, that LIHPRA was enacted in 1990?

A. Yes.

Page 585

Q. And one of the things that LIHPRA did was to remove the unlimited right to prepay that HUD regulated property owners had up until that point.
A. Yes.
Q. And when LIHPRA was enacted in 1990, there was no end date or expiration date on LIHPRA, was there?
A. No.
Q. In 1990 or 1991, did you know that LIHPRA would be repealed in 1996?
A. No.
Q. You had no way of envisioning what Congress might or might not do in the future in that regard, did you?
A. I am totally unable to read the mind of Congress.
Q. Now, did LIHPRA allow for the, at least the theoretical possibility of obtaining permission to prepay?
A. Yes.
Q. Under LIHPRA, was HUD obligated to deny a request for prepayment, unless the owner could make certain showings about the effect of prepayment on tenant displacement, rent levels,

Page 586

and the like?
A. I would phrase it differently. HUD had the discretion under the statute to approve or deny, but there were two primary tests that Congress directed HUD to apply in using its administrative discretion.
Q. What were those two tests?
A. It should not approve -- or before making its final conclusion, let me say it this way, it should reach a determination as to whether there would be a material adverse effect upon the existing tenant population either in terms of rents escalating to a point that they could not afford or resulting in their likely displacement.
So that was the tenant focus. The other primary thing that Congress wanted HUD to evaluate was would allowing an individual property to prepay and convert to conventional housing have a material adverse effect on the supply of decent, safe, and affordable housing primarily for very low-income and low-income households.
Q. And if HUD determined that these impacts would, in fact, be felt as a result of

Page 587

prepayment, then HUD was obligated to deny the request for prepayment, wasn't it?
A. That was the strong inference, but I -- it was my understanding from the training I had that HUD had the discretion to call the owner in and to see if -- to see if there were any mitigating or accommodating circumstances in terms of how much the rents might rise, what would be the phase of the phase-in of the new rents, et cetera.
But the overall sweep of it was if we did conclude that it was a badly-needed resource, we would deny, and if it was going to have a material adverse effect, that as the federal housing agency we could find no solution for, that I guess in those instances we would deny the prepayment.
Q. And in 1991, HUD was required to deny a request for prepayment unless an owner could demonstrate that prepayment would not result in an increase of more than 10 percent in existing rents, correct?
A. That is true.
Q. And HUD was also obligated to deny a request for prepayment unless the owner could

Page 588

demonstrate that prepayment would not result in the involuntary displacement of current tenants where comparable and affordable housing is not readily available, correct?
A. Correct.
Q. In 1991, HUD was also obligated to deny a request for prepayment unless the owner could demonstrate that prepayment would not have a material effect on the availability of low-income housing in the area that the project could reasonably be expected to serve, correct?
A. Yes, sir.
Q. And HUD was also obligated in 1991 to deny a request for prepayment unless the owner could demonstrate that prepayment would not have a material effect on the ability of low-income families to find affordable and safe housing near employment opportunities, correct?
A. Right.
Q. And HUD was also obligated to deny a request for prepayment unless the owner could demonstrate that prepayment would not have a material effect on the housing opportunities of minorities in the community in which the project is located, correct?