IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CCA ASSOCIATES, Plaintiff, | ) | |
| v. | ) | No. 97-334C<br>Judge Lettow |
| THE UNITED STATES, Defendant. | ) | |

**APPENDIX TO PLAINTIFF'S POST-TRIAL MEMORANDUM**

Part 3 of 5

Elliot E. Polebaum
Albert S. Iarossi
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20004-2505
Tel: (202) 639-7000/Fax: (202) 639-7003

November 9, 2006

Page 589

A. Yes.
Q. And as to these criteria, HUD had no statutory – had no discretion to waive the statutory requirements, they were mandatory, correct?
A. That is correct.
Q. Now, do you recall that in the period prior to the passage of ELIHPA and LIHPRA, whether there were studies done that showed in the absence of restricting an owner's prepayment right, there were going to be, in many areas, a lot of poor people without housing?
MR. WOODROW: Objection, Your Honor, vague as to studies done by whom. "And a lot of poor people without housing," again, it is vague and argumentative.
THE COURT: The Court will treat this as a compound question and sustain the objection on that ground.
BY MR. POLEBAUM:
Q. Mr. Alexander, are you aware that there were studies done that showed the effect of not restricting an owner's prepayment right on the housing opportunities for poor people,

Page 590

prior to ELIHPA and LIHPRA?
MR. WOODROW: Same objection, Your Honor.
THE COURT: Well, given Mr. Alexander's work history, I think he probably has a personal recollection to answer the question. But if he doesn't, he can say so. Mr. Alexander, you can answer if you know of your own personal knowledge.
THE WITNESS: I know that there were a number of studies done nationally, but I do not have specific recollection of the precise conclusions. I just recall that the study showed the nation faced a potential crisis if all of the apartments that had the right to prepay were to suddenly do so, Congress and HUD did not have a place to put all those tenants all at once, nor the voucher capability. But I cannot give you the name of any given study or any given numerical statistic. But as director of housing management for much of that period of time, this was a frequent theme of our conference calls.
BY MR. POLEBAUM:
Q. All right. In the New Orleans

Page 591

metropolitan area in the early 1990s, there were long waiting lists to get into 236 and 221-D-3 apartments, correct?
A. Yes.
Q. If an owner of a project has one, two, and three-bedroom apartments and it converts from HUD-assisted to conventional rental property, the housing stock itself does not change, those apartments are still physically there, correct?
A. That is true.
Q. The availability of the particular units may change for poor people, but the unit itself remains on the market?
A. Correct.
Q. Now, those units, speaking of those types of properties, after conversion, they could have remained available even for low-income people if the government made up the difference between HUD-assisted rents and fair market rents, correct?
A. Yes.
Q. In fact, after HOPE was passed, the government did something like that with its programs of enhanced vouchers, did it not?

Page 592

A. It did.
Q. And the idea behind these enhanced vouchers was to permit tenants who were in a HUD property that was converting to conventional status to be able to afford to stay in that property; is that right?
A. Um-hum, yes.
Q. And this program was specifically designed for people living in a HUD-assisted property that is going conventional, to permit the people to be able to remain in their apartments, right?
A. Yes, but it was more complicated than that. I want to add this one additional clarification. The recipient of an enhanced voucher could choose to move out of the property, but if he did, that enhanced voucher immediately turned into a regular voucher, which placed it under the lower payment standard administered by the local housing authority.
So tenants had a choice. Most tenants don't like to move around, so most who receive enhanced vouchers stayed in the place where they were.

Page 593

Q. Now, instead of proposing or sort of passing ELIHPA and LIHPRA, Congress could have chosen to use a program of enhanced vouchers to permit low-income people to remain in apartments converting to conventional status, couldn't it?

MR. WOODROW: Objection, Your Honor, calls for speculation about what Congress could have done. The witness has already testified that he can't read the mind of Congress.

THE COURT: Sustained.

BY MR. POLEBAUM:

Q. If Congress had decided to use enhanced vouchers in 1990 instead of passing LIHPRA and abrogating the prepayment right, the costs associated with those vouchers would have been borne by the taxpayers, correct?

MR. WOODROW: Objection, Your Honor, on the same grounds and it is argumentative.

MR. POLEBAUM: It is certainly not intending to read the mind of Congress. I think it is a logical conclusion.

THE COURT: The trouble is it is a conditional question and there is a big "if" there. And the "if" requires that the witness

Page 594

make an assumption. I am going to sustain the objection as to that question, but Mr. Alexander certainly. I will sustain the objection as to the area of questions, because Mr. Alexander undoubtedly knows what happened after the passage of HOPE.

BY MR. POLEBAUM:

Q. In fact, when the Congress passed HOPE and enhanced vouchers were used, the costs associated with assuring the ability of low-income tenants to remain in their properties, in their apartments, was borne by the taxpayers at large, rather than the individual property owners? Is that correct?

A. I presume so, but I have read a few analyses of congressional budgetary balancing mechanisms to know that sometimes they shift fee income from arenas that are available to them. And that's not technically taxes paid by the taxpayer. So in the main, I would say yes, but Congress has so many different revenue sources available to them, I would decline to answer the specific –

Q. All right. But the burden of supplying enhanced vouchers, though, falls on

Page 595

the Federal Government as a whole, does it not?

A. It does.

Q. And can you think of any reason why, practically, from a delivery of housing perspective, why enhanced vouchers could not have been used in 1990, '91, '92?

A. I'm aware over the past 15 years, Congress has increasingly been caught in the annual dilemma of how to raise sufficient revenues to cover the many competing domestic and foreign obligations that it considers our country must bear. And so there have been balanced budget amendments and amendments to those amendments, and so I know Congress has a difficult time every year how to find the moneys to carry out its various programs.

Q. In New Orleans between 1996 and the time that you retired from HUD, did HUD approve any requests to prepay mortgages on 221-D-3 or 236 properties?

MR. WOODROW: Objection, Your Honor, lack of foundation. I believe that Mr. Alexander testified he retired from HUD in 1997.

MR. POLEBAUM: 199 –

Page 596

MR. WOODROW: – 7.

BY MR. POLEBAUM:

Q. In New Orleans between 1988 and 1996, when HOPE was passed, did HUD approve any requests for permission to prepay with respect to any 221-D-3 or any 236 property?

A. To the best of my knowledge no. And to the best of my knowledge, no one submitted plans of action in that regard.

Q. Let me ask you, if you would, Mr. Alexander, to take a look at Exhibit 47.

A. Okay.

Q. This document is entitled CBO staff memorandum. Have you seen this before?

A. I don't have any recall of having seen it. It might have been one of the exhibits you showed me during the deposition, but I do not recall specifically, no, sir.

Q. I would like to move admission of this exhibit, Your Honor.

THE COURT: PX-47?

MR. POLEBAUM: It is PX-47, right.

THE COURT: Just a moment. Mr. Woodrow?

MR. WOODROW: Objection to lack of

Page 606

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CCA ASSOCIATES, Plaintiff ) Case No. 97-334C
vs.
THE UNITED STATES, Defendant

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday, September 7, 2006

VOLUME 3

The parties met, pursuant to the notice of the Judge, at 9:00 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

Page 607

APPEARANCES:
ON BEHALF OF THE PLAINTIFFS:
ELLIOT E. POLEBAUM, ESQ.
ALBERT S. IAROSSI, ESQ.
Fried, Frank, Harris, Shriver & Jacobson, LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2505
(202) 639-7067

ON BEHALF OF THE DEFENDANTS:
KENNETH D. WOODROW, ESQ.
DAVID A. HARRINGTON, ESQ.
BRIAN ERIC HENDERSON, ESQ.
SEAN DUNN, ESQ.
U.S. Department of Justice
1100 L Street, N.W. 8th floor
Washington, DC 20036

(Index appears at end of transcript)

Page 608

P R O C E E D I N G S

THE COURT: Good morning. Do we have any preliminary matters this morning. Mr. Polebaum?

MR. POLEBAUM: Nothing, Your Honor.

THE COURT: Mr. Woodrow?

MR. WOODROW: None from us, Your Honor.

THE COURT: Do we begin again with Mr. Alexander?

Whereupon--

JIM E. ALEXANDER

a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:

THE COURT: Mr. Alexander, welcome back.

THE WITNESS: Good morning, Your Honor.

THE COURT: You may proceed.

DIRECT EXAMINATION

Page 609

BY MR. POLEBAUM:

Q. Good morning, Mr. Alexander.

A. Good morning.

Q. Mr. Alexander, you testified yesterday that there were lengthy waiting lists to get into 221-D-3 and 236 properties in the New Orleans metropolitan area in the early 1990s, 1990, '91, and '92, as I recall; is that correct?

A. Yes.

Q. And that problem persisted through 1993, '94, 1995, I understand?

A. Yes.

Q. Okay. And that problem persisted up until the time that HOPE was passed?

A. Yes.

Q. Now, a prepayment on a 221-D-3 property, with that property going to market rents, would have added to the waiting list those people who could not afford to pay market rents, correct?

MR. WOODROW: Objection, Your Honor, assumes facts not in evidence. We don't have any testimony regarding the types of tenants

Page 610

that would have been on these waiting lists and whether the tenants in a 221-D-3 property would have been the types of tenants that would have been on the waiting lists.

THE COURT: Sustained.

BY MR. POLEBAUM:

Q. Mr. Alexander, if -- are you familiar with the types of tenants that were admitted into 221-D-3 properties?

A. Yes.

Q. And if those properties were converted to market rents, would those tenants have been able to afford to pay market rents under HUD formulas?

A. Market rents is a term that must be used very carefully. It has a very defined definition within HUD legislation. It has a totally different meaning on the street in terms of conventional real estate.

Q. Well, I'm speaking about, could those tenants have afforded to pay the rents charged by conventional properties?

A. Not without having received Section 8 vouchers, it is highly unlikely, no.

Q. So taking --

Page 611

A. Pardon me, without paying more than 30 percent of their adjusted income for rent, there were tenants who would choose to live in conventional housing and pay 40, up to 50 percent of their income for rent. But the congressional standard of reasonable allocation of household budget for rent is 30 percent of income, so they likely would have had to pay more than 30 percent of income if they chose to live in conventional housing, unless they received Section 8.

Q. Given your experience at HUD, your knowledge of the types of tenants who inhabit 221-D-3 properties, if a particular 221-D-3 property were allowed to prepay and exit the program, would you have expected that at least some portion of those 221-D-3 tenants would have sought to live in other HUD properties and thus had gone on to waiting lists that were maintained?

A. Yes.

Q. Now, you recall yesterday we discussed the enhanced vouchers that were used after HOPE was passed to permit people to remain in their apartments once the properties prepaid. Do you

Page 612

recall that?

A. I do.

Q. In 1991, an alternative means to the preservation statutes to permit low-income people to stay in their apartments would have been the use of comparable vouchers, correct?

A. Yes.

Q. Now, I think you said yesterday also that Mike Mills was the person who reported to you who had principal responsibility for dealing with Chateau Cleary; is that right?

A. Yes. He reported to me through Byron Duplantier, his immediate supervisor.

Q. So it was Mills to Duplantier to you?

A. Yes, sir.

Q. And most of -- you focused your attention, and I think you testified yesterday, on what you described as problem properties?

A. Correct.

Q. And Chateau Cleary did not fall into that category?

A. Correct.

Q. Was it your practice to look at, to review all of the financial statements submitted by property owners each year as those

Page 613

financial statements came in, or were you just too busy doing other things to do that?

A. I concentrated my review on the financial statements of those troubled properties.

Q. Okay. So it was Mr. Mills, then, who would have had responsibility for reviewing the financial statement of Chateau Cleary as it came in?

A. Yes, and he would have presented his findings to Mr. Duplantier. And unless Mr. Duplantier found anything noteworthy to bring to my attention, it would have ended there.

Q. All right. Did -- approximately how many times did Mr. Duplantier find something noteworthy to bring to your attention with respect to the Chateau Cleary financial statements?

A. I would say approximately once a year, he would give me a list of owners who were delinquent in submitting their reports, and frequently Chateau Cleary was on that list. But that's about the only time that I recall him ever bringing it to my attention.

Page 614

Q. He didn't get into the details of the financial statements with you?
A. No, sir.
Q. Mr. Alexander, are you generally familiar with the process for applying for and obtaining incentives that was put into effect after the preservation statutes were enacted?
A. Yes.
Q. All right. And did the process involve the filing of a notice of intent?
A. It did.
Q. And then appraisals were prepared and submitted?
A. That is correct.
Q. And the appraisals were done on the basis of the highest and best use of the property?
A. Correct.
Q. If the – the owner would submit an appraisal in the first instance is what I understand happened; is that right?
A. Actually, the very first step would be to obtain a capital needs appraisal.
Q. Okay.
A. To establish what repairs were needed

Page 615

at the property. And then the second step would be to proceed with the appraisals.
Q. All right. And then the government might seek its own appraisal?
A. Correct.
Q. And if the –
A. Pardon me, not might, would.
Q. Would, okay. And so if the appraisals, the two appraisals that were submitted were not within 10 percent of each other, then a third appraisal was needed?
A. Would you restate the question?
Q. If there were – what was the magnitude of the discrepancy between the two appraisals that brought on the need for a third appraisal?
A. Okay. If the two appraisals were more than 10 percent apart, then a third appraisal, which would be binding upon the parties, would be obtained.
Q. Okay. And then after that third appraisal came in, did the parties; that is, property owner and HUD, proceed to prepare and work on a plan of action?
A. The plan of action was solely the

Page 616

responsibility of the owner, and it would – the time clock would start ticking once we established the preservation value, based on that third appraisal.
Q. But the plan of action had to be approved by HUD?
A. It did.
Q. And did that process entail sort of back and forth between the property owner and HUD?
A. It did.
Q. And did that tend to extend over a considerable period of time?
A. It did.
Q. And then if the plan was approved by HUD, what happened at that point?
A. If the plan were approved by HUD, then – and are we speaking incentives or sales?
Q. We're talking about incentives here.
A. Incentives? If the plan were approved by HUD, it then went on a funding queue in Washington, D.C., and then it depended on how much money Congress appropriated each year as to how many of the properties in that particular queue, the money would reach on the

Page 617

list.
Q. Okay. Now, in your experience in New Orleans, this process of notice of intent, appraisals, submission and approval of the plan of action and so forth, that took about three years to accomplish?
A. More or less, yes.
Q. Let me ask you if you would turn to Exhibit 96, Plaintiff's Exhibit 96, which is in one of the binders in front of you.
A. My third binder ends with tab 94, sir. All right, I'm at 96.
Q. Mr. Alexander, what is Plaintiff's Exhibit 96, please?
A. It is entitled a valuation report. And then in the lower right-hand corner, it says 2300, and at the bottom, Plaintiff's Exhibit 96.
Q. Is this a HUD document?
A. It appears to have been issued by the Office of Inspector General for HUD, yes.
MR. POLEBAUM: Move admission of this exhibit, Your Honor.
MR. WOODROW: Objection, Your Honor. There has not been an adequate foundation laid

Page 618

for the admission of this document. We haven't determined whether Mr. Alexander has ever seen the document before and whether he has any familiarity with it at all.
THE COURT: Mr. Polebaum, we have a similar problem that we had yesterday, in that this might be a government report.
MR. POLEBAUM: I believe this is a government report, Your Honor.
THE COURT: Mr. Woodrow, we have had under 803, Federal Rule of Evidence 803-8, this appears to be a public report, so it is not hearsay. A foundation in a sense was laid by Mr. Polebaum's questioning over the last several minutes about the steps leading up to a plan of action.
MR. WOODROW: Perhaps if Mr. Polebaum could elicit testimony from the witness about the author of the report. All we know is just what the cover of the report says.
THE COURT: Well, I don't know if that's going to advance life in this particular instance.
MR. POLEBAUM: It is a HUD official document. It deals with the multi-family

Page 619

preservation program. There is information in here that we have been discussing with Mr. Alexander since yesterday. And there are a couple of excerpts from this report that I would like to ask him questions about, questions which were asked of him at his deposition, by the way.
MR. WOODROW: We have no objection, Your Honor.
THE COURT: Admitted.
(Plaintiff's Exhibit Number PX-96 was received into evidence.)
BY MR. POLEBAUM:
Q. Mr. Alexander, let me ask you to turn, please, to page 2303.
A. I am there.
Q. In the last paragraph, it provides by fiscal year 1994, there were 3296 projects with 351,573 units eligible for prepayment. As of December 31, 1994, owners of approximately 54 percent of the projects had filed notices of intent. HUD has approved 296 plans of action, preserving housing for 37,000 low-income families.
Do you see that, Mr. Alexander?

Page 620

A. I do.
Q. Is that consistent with your understanding of the rate at which plans of action were being approved and funded?
A. I did not keep up with the national rates of approval, sir.
Q. All right. Let's look at 2316. The middle paragraph, "HUD's Boston office has estimated that personnel will spend approximately 600 hours or 15 weeks per application to process the POA for housing preservation."
POA, we understand, refers to plan of action?
A. Yes.
Q. Okay. "Based on these processing estimates, HUD will need 425 staff years to process the current pipeline of notices of intent, of NOIs. Given the reality of today's federal budget constraints, HUD needs to address the shortage of available staff resources."
Let me ask you, first, was the amount of 600 hours per application comparable to the amount of time that was spent in New Orleans on

Page 621

these applications?
A. I don't recall ever precisely tallying the number of total staff hours, but it does seem to me to be a reasonable ballpark figure.
Q. Now, with this backlog of plans of action in the pipeline requiring 425 staff years to process, was it practical in your estimation to process all the notices of intent that were in the pipeline?
MR. WOODROW: Objection, Your Honor. There has not been an adequate foundation for this question. The witness has already testified that he did not keep tabs on the national statistics for processing plans of action and this question goes precisely to that topic.
THE COURT: Mr. Polebaum, the objection is sustained. You have asked the question about the national program and I don't think you have laid a proper foundation with Mr. Alexander respecting anything but the New Orleans aspect of that program.
BY MR. POLEBAUM:
Q. Mr. Alexander, was there a hiring freeze under which HUD operated while you were

Page 622

employed by HUD?
A. There was.
Q. And did that begin as far back as 1981 when President Reagan came into office?
A. Yes.
Q. All right. And did that continue through your tenure at HUD?
A. There was a moderate lifting of the hiring freeze late in my tenure at HUD to hire a particular position known as community builder, but to the best of my knowledge, none of those individuals worked in the multi-family unit.
Q. Did you find it progressively more difficult to deal with notices of intent and to review plans of action because of the staffing levels in New Orleans?
A. The review of notices of intent was rather simple. We sent a lot of them in, they were a two or three-page document and we sent out appraisal guidelines.
The tedious part of the processing involved the review of the owner's appraisal, the contracting for the capital needs assessment, reviewing the capital needs

Page 623

assessment, reviewing the owner's appraisal, contracting for HUD's appraisal, reviewing HUD's appraisal, and reconciling. It was that stage that was very staff-intensive.
Q. And did you find it progressively more difficult to deal with the review of these plans of action in this process that you just described, as a result of the staffing limitations to which the New Orleans office was subject?
THE COURT: Mr. Woodrow.
MR. WOODROW: Objection, Your Honor. We object to this entire line of questioning on the grounds that the plaintiff has not made an administrative delay claim in this case, and we have already heard testimony that the plaintiff did not apply or submit any plan of action and, therefore, this line of questioning is irrelevant.
THE COURT: Well, the Court is going to take this testimony, this line of questioning, actually, questions and answers as, in effect, a response to the government's defense. So in a way, it is anticipating the government's defense.

Page 624

MR. POLEBAUM: In a way, I agree with –
THE COURT: Sorry?
MR. POLEBAUM: I agree to some extent with what Mr. Woodrow said, but it is as a result of the points that the government has advanced in this case.
THE COURT: All right. So the objection is overruled.
THE WITNESS: Would you restate?
THE COURT: Once we have rebuttal in the case-in-chief.
THE WITNESS: Would you kindly restate the question?
BY MR. POLEBAUM:
Q. Mr. Alexander, so as a result of the staffing limitations to which the New Orleans HUD office was subject, did you find it progressively more difficult to handle and process the plans of action as they came in?
A. Yes.
Q. Page 2320 of this document. I call your attention to the chart, which displays in chart form the information that we looked at a few moments ago in the text, that over a

Page 625

four-year period, there were 296 projects throughout the United States that had approved plans, 307 were in progress and 1168 had filed notices of intent.
Is it your understanding that a number of owners who filed notices of intent did not go further, because they saw that the process was just taking far too long?
MR. WOODROW: Objection, Your Honor. Again, the question lacks proper foundation with respect to this witness's knowledge of the national – the national status of notices of intent, and calls for speculation in the sense that he is asking Mr. Alexander to guess what owners might or might not have done.
THE COURT: This is the sort of question that Mr. Alexander, you may answer, if you have your own personal knowledge.
THE WITNESS: I recall several owners complaining that the processing would take too long, and that they felt that if they were going to go forward with the process, it would require them to hire consultants.
And my response was it is an administrative process the government has set

Page 626

up, and many people are proceeding through the process and those that proceeded expeditiously in the very early stages are obtaining incentives. You may proceed if you wish, but out of all those that were eligible, I maybe had conversations of this sort with five or six.

BY MR. POLEBAUM:

Q. And when you say that those who were going through the process were obtaining incentives, I think what you mean to say – you correct me if I am wrong – is that they were getting their plans of action approved in New Orleans?

MR. WOODROW: Objection, mischaracterizes the witness's testimony and it is argumentative.

THE COURT: Well, it is a leading question, asking for a clarification of his testimony. Now, if you understand the question, Mr. Alexander, you may answer it.

THE WITNESS: I'm not certain I understand the question, sir.

BY MR. POLEBAUM:

Q. I thought – I thought you just

Page 627

indicated that those who were going through the process that you were aware of were getting incentives. Is that what you just indicated?

A. I did not mean – let me clarify my remarks. Late in my tenure at HUD, it was my understanding that some of the applicants who were in the national queue from outside New Orleans had indeed obtained incentives because they were being provided on a first come, first serve basis of those who were in the queue. And so the process, while it might have been slower than some would have hoped, the rewards that were being reaped by certain owners were those who were first to get in and get their plans of action approved and be first in line in a national queue.

Q. All right. With respect to those in New Orleans with which you are familiar, did any property owner who went through the process and get a plan of action approved actually get incentives?

A. No.

Q. Now, for those whose plans were approved, one of the counterparts or quid pro quos that the property owner had to agree to

Page 628

was to stay in the HUD program; is that correct?

A. Yes.

Q. Are you aware of any owner who applied for incentives and whose plan of action was approved, who was not required to stay in the HUD program?

A. As I stated a moment ago, none of the Louisiana owners whose plans of action for incentives were approved ever got the incentives. Therefore, none of those ever had to cross the threshold of signing the so-called use agreement.

Q. But had those incentives been funded, they would have been required to sign a use agreement and remain in the HUD program?

A. They would have been required to sign a use agreement, yes, sir.

Q. And the report that you prepared for Mr. Norman, of Mr. Norman's property that we looked at yesterday, that showed that the longer one stayed in the HUD program, the more economic harm was suffered by the property.

A. That's what it showed within the very specific set of criteria that I outlined for

Page 629

each of the four alternatives.

Q. Let me ask you if you would look at Exhibit 97. Do you have that before you, sir?

A. I do.

Q. And this is – is this an e-mail that you prepared?

A. It is.

Q. And you say – strike that. And to whom did you send this e-mail?

A. I addressed it to Joel Balsham and Michael Winiarski at headquarters, and also Mr. Elliot Johnson and a Ms. Alta Wilson at headquarters and copied my boss, Ann Kizzier, and the head of the housing – the head of the development cadre reporting to Ms. Kizzier, Richard Pierce, and included myself.

MR. POLEBAUM: I move admission of this exhibit, Your Honor.

MR. WOODROW: No objection, Your Honor.

THE COURT: Well, it is admitted. I presume it relates to this, but you haven't really established relevancy, Mr. Polebaum.

MR. POLEBAUM: Yes, I was going to go on to the substance of it now, Your Honor.

Page 630

THE COURT: All right. The Court hates to be a stickler, but let's see how this is relevant before it is admitted.

BY MR. POLEBAUM:

Q. In this message, are you communicating that a number of plans of action for various properties have been approved?

A. Yes, I am. That's one of several things that this e-mail is doing.

Q. And is it correct that there were six properties that had plans of action approved?

A. Yes.

Q. And that's what you are recounting, at least in part, in this e-mail?

A. Yes, that is what part of this e-mail is recounting.

Q. And as I take it from your earlier testimony, none of these properties actually got their incentives funded?

A. That is correct. They immediately obtained a place in the funding queue, but they were very deep or very low -- very far down in the funding queue.

Q. Now, one other option that an owner had under the preservation statutes was to try

Page 631

to sell the property to a qualified nonprofit. Do you recall that?

A. Selling the property such as the D-3 BMIR -- I'm sorry, 221-D-3 below market interest rate loan or section 236, selling it was one of the other options. It was not limited to being sold to a nonprofit. There were three categories of potential purchasers and nonprofits were one of those.

Q. There were priority purchasers?

A. Priority purchasers were the highest of the three categories of purchasers to whom you could sell.

Q. All right. And below them was a group called qualified purchasers?

A. Correct.

Q. Okay. And the process began with a notice of intent?

A. Yes.

Q. All right. And what happened then, in summary fashion?

A. We went through the same basic process, capital needs assessment, appraisals, in order to establish the transfer of preservation equity or the sales price, at

Page 632

which either of the three types of purchasers would be buying the project, a plan of action would be submitted, reviewed, and approved. And if, depending on the type of purchaser, if they needed federal assistance, they might obtain that in order to be able to afford the purchase. That was particularly the case for the top priority -- priority purchasers, because those were tenant-based organizations.

THE COURT: Mr. Polebaum and Mr. Alexander, PX-97 is admitted.

(Plaintiff's Exhibit Number PX-97 was received into evidence.)

MR. POLEBAUM: Thank you, Your Honor.

BY MR. POLEBAUM:

Q. So after the property owner would go through this appraisal process with HUD that you have described, and HUD -- at some point after the appraisal process was completed, a preservation value would be determined; is that right?

A. Correct.

Q. And then HUD would furnish information for the owner to prepare a plan of action?

A. Correct.

Page 633

Q. And then once that was done, the owner would file a second notice of intent?

A. What I recall happening next would be that there would be a marketing period during which the owner would see, during the first six months, if a priority purchaser, meaning a tenant group, stepped forward, a second six-month period during which any sort of nonprofit group would step forward, and a final three-month period for any type of purchaser to step forward. And that's it. So I am not recalling offhand this second notice.

Q. All right. But you do recall that there was a first period of time where priority purchasers were at the head of the pack, so to speak?

A. Right, the first six months of the 15-month offering period.

Q. And are you certain that it was six months or was it perhaps 12 months?

A. The priority purchasers, six months. They could still throw their hat in the ring up through the full 15 months, but for those first six months, it was for priority purchasers only, and, as I said, that was mainly tenant

Page 634

organizations.
Q. And was there a funding queue that was necessitated for this option under the preservation statutes?
A. If either of the three type of purchasers needed assistance instead of having their own independent financing, then, yes, there would be a queue for that as well.
Q. All right. And the priority purchasers tended to be tenant-based groups, correct?
A. Yes.
Q. And did they typically need funding assistance?
A. Yes, they did.
Q. And what about other charitable organizations to qualified purchasers, did they typically need funding assistance?
A. Not typically.
Q. Not typically, but some –
A. If they were nationally based, they typically had their own independent sources of financing.
Q. All right. And as I understand it, there was not an overabundance of nonprofits

Page 635

seeking to buy in New Orleans, correct?
MR. WOODROW: Objection, argumentative.
THE COURT: Sustain that, on the grounds that it is vague.
BY MR. POLEBAUM:
Q. Could you describe for us, then, Mr. Alexander, the degree of interest in – by priority and qualified purchasers, in seeking to buy in New Orleans?
A. I recall no tenant-based organization properly organized that was able to present itself as a proposed priority purchaser in New Orleans. I recall at least two nationally-based nonprofits who expressed strong interest in all of the properties that were available for purchase, and I don't believe any of the properties that eventually were sold during this process ever reaching the – that third category of wide open for any purchaser.
Q. All right. Now, about how long did it take to go through this process, start to finish?
A. From notice of intent or from the

Page 636

point of the offering period?
Q. Notice of intent, right from the beginning.
A. I would say about two and a half years.
Q. Now, the owner does not receive any compensation for the two or two plus years period that this process takes, correct?
A. Not per se. On the other hand, it was in the middle of this period when the preservation transfer equity was established, and that would be at the point in time or the publication date of the binding appraisal. So if he were continuing to make regular improvements to his property and seek the normal rent increases, and that were in place at the point in time the binding appraisal was made, he was capturing his transfer – he was capturing a sales price that reflected the condition at that particular moment in time.
Q. But the owner, for example, could not raise rents during the two or three year period that it took to get this – raise rents to market levels during the two or three year

Page 637

period that it took to get this process through?
A. Owners of section 221-D-3 below market interest rate loans were allowed under the regulatory agreement to approach HUD for a rent increase at any point in time that they could justify.
Q. All right. Now, this sales process that you have described that has these multi – multiple steps to it, and it takes approximately two and a half years, this is an arduous process, is it not?
MR. WOODROW: Objection, argumentative.
THE COURT: Sustained.
BY MR. POLEBAUM:
Q. How would you describe the process, Mr. Alexander?
A. I believe I described it earlier in my deposition in Dallas as arduous in terms of how the owners characterized it to me.
Q. All right. And it is certainly not a process that an owner would confront in a free market context, unconstrained by these HUD requirements?

Page 638

A. It was a different process, but the, so to speak, total free market process itself involves numerous steps of due diligence, appraisals, negotiation, examinations, rent rolls, that sort of thing.

Q. But a sale in this sort of arduous, lengthy, regulated process does not produce the same value for the owner as a sale in a free market environment, correct?

MR. WOODROW: Objection, Your Honor, the question is leading, and, again, it is argumentative.

THE COURT: Overruled.

THE WITNESS: Would you restate again?

BY MR. POLEBAUM:

Q. Yes. A sale in this sort of arduous, lengthy, regulated process does not produce the same value for the owner as a sale in a free market environment?

A. It theoretically could. The process was different. In the classic free market sense, a fair market value is the sales price at which a willing owner – or willing seller agrees to sell his property and a willing purchaser agrees to purchase, neither party

Page 639

being under undue duress to sell or purchase, and in the absence of financing. The transfer preservation equity appraisal process, while it was constrained by regulatory procedures, and did not have that unfettered negotiation aspect to it, aimed at arriving at the same sort of fair price, but it was trying to reach that same goal through a totally different methodology.

Q. The process that an owner had to go through with these different categories of purchasers, what you have described here that you have characterized as arduous, that does not fit the definition as you understand it of a fair market process?

MR. WOODROW: Objection, Your Honor. The question misstates Mr. Alexander's testimony. Mr. Alexander never said that he personally described the process as being arduous. He said that that was how it was described to him by owners. The question, however, implies that Mr. Alexander has characterized the process in that fashion.

THE COURT: Well, rather than your objection, this picks up elements of Mr.

Page 640

Alexander's last answer, and I'm not sure that – I'm allowing leading questions, obviously, but this one I'm having a little trouble with. I will allow you to restate it again, Mr. Polebaum. I don't have any problem with the line of questioning, it is just the form of this question.

MR. POLEBAUM: All right.

THE COURT: Because you have put elements, but not the substance of Mr. Alexander's last answer in there.

BY MR. POLEBAUM:

Q. The process that an owner had to go through under the HUD scheme does not fit your understanding of the definition of a fair market process?

A. They are very different processes, yes, sir.

MR. POLEBAUM: Nothing further at this time, Your Honor.

THE COURT: All right. I have several questions for Mr. Alexander that I'm going to defer them until after Mr. Woodrow, you have completed your examination. Mr. Woodrow?

MR. WOODROW: Thank you, Your Honor.

Page 641

I think it might make sense at this point in time to raise with the Court the question of scheduling. We have just now completed the second of the plaintiff's witnesses, at least the direct examination of that witness. And as I'm about to go into questioning Mr. Alexander as a part of the government's case-in-chief, it doesn't appear to me that at this rate of progress that we're going to be able to complete the trial by Friday. And I don't think it was anybody's expectation that at this point in the week we would only be through the first of two witnesses or only through the first two witnesses, so perhaps we should address how the Court wishes to proceed in terms of completing the rest of the trial, whether we intend to go into the weekend, if there is – or if we intend to pick up in the following week. I think because we have witnesses whose travel schedules need to be considered, it might make sense to go ahead and address that at this point in time.

THE COURT: Why don't we do that after

Page 658

upon all of them being approved, would require an outlay in that particular federal fiscal year, and which ones might have a continuing federal outlay attached to it in subsequent fiscal years.

Q. After those determinations were made, would HUD then place that approved plan of action in some sort of national queue?

A. It would.

Q. And how was the queue – funding for projects within the queue determined?

A. Well, on a first come, first serve basis, as I understood it.

Q. If you know, on a national basis, did owners successfully navigate the preservation process and receive funded use agreements?

A. The reason I'm hesitating to answer is there is two parts to your question. The use agreements per se, I did not consider to be funded. The use agreements were a by-product of the overall process. The use agreement compelled the owner to maintain affordability, if I recall, for 50 years from the date of the agreement. The funding occurred – that was distinct in my mind from the funding, the

Page 659

incentives.

Q. But I guess my question went more to incentives, whether on a national basis, owners successfully received funded incentives.

A. I do recall reading occasional periodicals that in a particular fiscal year, a few owners had received funding and my telephone would ring off the hook for a few weeks, from Louisiana owners, how did those people get financed and I'm not? I said because they were near the top of the funding list. They started and completed the process years ago. You didn't start until very – you know, you started much later and you went through the process slower and so you have achieved a lower rank on the list.

Q. Mr. Alexander, I want to shift gears a little bit and turn to your dealings while you were at HUD with the Chateau Cleary property. What specifically do you recall about CCA's routine dealings with HUD?

A. As I believe I stated yesterday, Mr. Norman came to the office on infrequent occasions, generally met with Mike Mills who

Page 660

was on my staff and who reported to me through Byron Duplantier. When he was in the office, he would either be introduced to me on his way into the office or on his way out of the office, which was standard policy. There were occasions where, based on the nature of the topic that he was discussing with Mr. Mills, they would seek to call me into the meeting, or in dropping by for the courtesy exit conference, Mr. Norman would say, can we have a few moments? I would really like to discuss a point or two that Mike and I have gone over, just to make sure I have got it down straight. But he was not one of the more frequent visitors, in terms of my office association. When he was president of a group known as the Louisiana Association of Assisted Housing Management Agents, commonly known as LAHMA, he and I met, I believe, quarterly to plan those trade association meetings, where I and members of my staff would be invited by Mr. Norman to appear as panelists, so that property owners and property managers from around the state could ask us questions all day

Page 661

long at those meetings.

Q. In your experience, was CCA timely with its paperwork submissions to HUD?

A. As I believe I stated earlier, the few times that anything involving CCA paperwork was brought directly to my attention, it would be generally through the annual presentation to me of a list compiled by Byron Duplantier, my branch chief, for loan management, where it would show the deadline has passed for owners to submit their audited financial statement. And I would glance down the list and many years CCA would be on the list of delinquent filers.

Q. How late typically was CCA in submitting its audited annual financial statements?

A. I would say somewhere on the order of three to five months.

Q. Mr. Alexander, I'm going to turn your attention now to the operation of section 221-D-3 properties. And specifically four properties under that program. How were the rents set pursuant to the regulatory agreement for those properties?

A. For section 221-D-3 BMIR properties?

Page 726

properties tend to depreciate over a period of
time?
A. They do.
Q. And that the property necessarily was
in a different condition in 1991 from the
condition that you observed in 1997?
A. In all likelihood.
Q. The air-conditioning units that you
suggested replacing, that suggestion was based
on the age of the units, correct?
A. Yes, sir.
Q. You didn't observe that they were not
functioning, did you?
A. No, sir.
Q. Now, taking account of the deferred
maintenance, you concluded on page 192 of your
report, which is Bates Number 6378, that any of
the prepayment options was superior to
remaining in the HUD program.
A. I did.
Q. Each alternative that you considered
had varying degrees of dealing with these
repair and maintenance-type issues, correct?
A. Correct.
Q. What was the cost of the repairs that

Page 727

you anticipated if the low cost option – I
gather that's alternative number 2 – were
adopted?
A. I need to consult that option
momentarily. There were no basic repairs
anticipated under alternative 2. What
alternative 2 tested was merely the removal of
the restrictions imposed by the regulatory
agreement and allowing the D-3 below market
interest rate as-is condition to rise to
whatever the market would bear, unconstrained
by the rent controls that flowed from the
regulatory agreement.
Q. All right. So without making any
repairs then, alternative 2 presented a
superior option to alternative 1?
A. It did.
Q. Now, Mr. Norman testified that he
actually implemented a hybrid of your
alternatives 2 and 3, somewhere between 2 and
3, and that he undertook many of the repairs
that you proposed during the second half of
1997.
In that circumstance, would you expect
him to achieve a result that falls somewhere

Page 728

between the results in alternatives 2 and –
between alternative 2 and alternative 3?
MR. WOODROW: Objection, Your Honor,
it calls for speculation. I will leave it at
that.
THE COURT: Mr. Polebaum?
MR. POLEBAUM: Well, we have been
talking about his report and the different
scenarios and Mr. Woodrow certainly put to Mr.
Alexander a number of variations on the
analysis and elicited responses. I think it is
certainly appropriate for Mr. Alexander to
answer the question in that respect.
MR. WOODROW: Well, the principal
problem with the question is that the scenario
that Mr. Polebaum is asking about is not
contained in the report, and we have
established that Mr. Alexander was not an
expert in these matters. And as a result, it
calls for speculation and goes beyond what Mr.
Alexander as a fact witness would be expected
to know.
THE COURT: Well, the difficulty the
Court has with the question is that it is not
very specific as to where between alternative 2

Page 729

and 3 this falls, but, nonetheless, the
objection is overruled.
BY MR. POLEBAUM:
Q. You may answer, Mr. Alexander.
A. Would you kindly restate it?
Q. Sure. Mr. Norman testified that he
implemented a hybrid of 2 and 3, somewhere
between those two alternatives, and that he
undertook many of the repairs that you proposed
in the second half of 1997.
In that circumstance, would you expect
him to achieve a result that falls somewhere
between the results that you show for
alternatives 2 and 3?
A. Before I respond, may I ask, did he
also implement any change to his rent
structure? Because all of these tests are a
matrix of the intertwining, the
interrelationships between income and expenses.
Did he merely improve the property without
changing the rent structure?
Q. Well, I am asking you to – this is
really in the nature of a hypothetical, because
he didn't, as we know, he did not prepay until
1998. So holding all other things equal, if

Page 774

regulatory agreement governing Chateau Cleary starting in 1971. 110 is a proposed bank financing with Whitney Bank in 1997. 111 is a history of rents by unit type for Chateau Cleary from 1991 to 2004. 112 are the actual financial statements on Chateau Cleary from 1991 to 1997.

Q. Excuse me. These are excerpts from the financial statements?

A. They are. They are excerpts of the material that I thought was necessary to be able to estimate cash flows for that property and they include notes where those notes were appropriate to understanding the financial statement.

Q. Okay. What is 113?

A. 113 are excerpts from about seven years of individual market analyses that were published by the University of New Orleans, where I was one of the authors -- or the author, in some cases, providing information by submarket on rents and occupancy conditions in that market in as much detail by unit type as we could supply. And 114 are the as-built drawings of

Page 775

the individual units at Chateau Cleary as submitted by the architect. 115 is a recitation of various interest rates that may be relevant in determining the value of foregone profits. And I may be supplementing those from my own memory about other market conditions at that time. Exhibit Number 116 is excerpts from a report done by another appraiser on Chateau Cleary in May 1996, which are descriptive information about the property and comparables at that time. 117 moves into beginnings of another report that I tendered and is not -- perhaps that's not right.

Q. No.

A. 117 is in that original May report. This is a month by month analysis of the income that would be generated by transitioning Chateau Cleary from a property subject to the preservation restrictions to one that is under market rental terms. And I have done that both for rents I have used in this analysis, as well as what I believe to be a representation of the rents

Page 776

Mr. Derbes has used in his analysis. And then finally, 118 is my credentials in this matter.

Q. Can I ask you to tell us what Exhibit 125 is, please.

A. Exhibit 125 is a supplemental report issued this year. Pardon me while I get to it. 125 is a report supplemented June 22nd, 2006. And it is an analysis of damages with dates of the conclusion of the temporary taking being altered from May of 2006 to February 28th of 2007.

Q. Excuse me, did you mean May 1996?

A. I do.

Q. To February 1997?

A. Yes. I do. Thank you for correcting my faulty speech. And it is also a statement of the -- of a variety of measures of return on equity actually achieved by the property or theoretically available in the property versus market rates of return.

Q. I want to ask you next some questions about the tasks that you were asked to undertake. Do you have some slides that will

Page 777

help us through the discussion?

A. Yes, I hope so.

Q. I hope they are going to show on the screen in a second.

(Discussion off the record.)

THE COURT: I think given all the circumstances, even though it is not 2:45, we ought to take our recess now.

(A recess was taken at 2:43 p.m., after which the trial resumed at 3:00 p.m.)

THE COURT: Mr. Polebaum. You may proceed.

MR. POLEBAUM: Thank you, Your Honor.

BY MR. POLEBAUM:

Q. All right, Dr. Ragas. So we have the slides.

A. Yes, sir.

MR. POLEBAUM: Your Honor, I have copies for the Court, hard copies, including one set that has original demonstrative exhibit stickers on them.

THE COURT: Now, that set you ought to keep with Dr. Ragas, I'm going to suggest, if you want those admitted for a limited purpose, that is, demonstratives.

Page 794

incapable of even paying the small dividend that was approved under those restrictions. Alternatively, the property in a market environment, should have been able to earn, without great difficulty, in my view, a 10 percent rate of return on invested equity.

Q. Okay. In your supplemental report dated June 22nd, 2006, did you do a return on equity analysis using the maximum allowable dividend?

A. Yes, sir, I did do that.

Q. Let's take a look at that. That's Exhibit 125.

A. I am there, sir.

Q. That's at page 3025. That's table 33. Can you explain for the Court what table 33 shows?

A. Table 33, I had previously received an opinion of market value done by Mr. Louis Derbes with a valuation date on it of May 1991. And this was an estimate of value of the property as I appreciated it, not under the preservation statutes, and restricted value, of $1,850,000.

And I wanted to see if one took the

Page 795

equity from either, what would be true of Mr. Derbes's appraisal or equity defined as the HUD original capital defined in 1971, plus all principal payments, made by CCA up to May 1991, we would have two estimates of equity then.

Q. Is that what you are referring to when you had these columns, Derbes equity and Ragas equity?

A. It is. And the visual doesn't show -- there is not a visual showing these items, but I found that the equity that could be reasonably supported from the Derbes appraisal opinion was about $746,000. That is the 1,850,000 valuation, less the mortgage balance of 1,103,000, and that produces a $746,000 accumulated equity in the property as of May 1991.

Conversely, if one looks at the original HUD approved equity, plus principal repayment, you arrive at about $811,000 as an equity figure. So they are quite similar. I then wanted to see if you were granted the maximum dividend allowed under the preservation statute, what sort of rate of return on equity was allowed could be the most you could earn

Page 796

under the restrictions.

The maximum dividend was 12,952. That produces a maximum rate of return, using Mr. Derbes's equity definition, of 1.74 percent or using my slightly higher equity definition, 1.6 percent. That's the return on equity using the theoretical maximum paying every year the most that was allowed under the statutes and under the preservation restrictions.

If we look at an 8.5 percent rate of return as being indicative of a low risk or a riskless interest rate, that could be earned in the marketplace, then the diminishment here is around 80 percent, 79.6 to 81.25. That's very substantial.

And that's the maximum that could be earned. I also then looked at what was the diminishment, if instead the rate of return that was expected to be earned in the marketplace was 10 percent, slightly higher than a riskless rate.

At 10 percent the diminishment is 82.6 to 84 percent doing the same calculations. In other words, under the best outcome where the dividend was actually paid from cash surplus

Page 797

each year, the dividend paid would represent roughly 80 percent less than what the market rate of return would be, whether you use a riskless or a near riskless rate or you used a 10 percent rate that has some opportunity cost associated with it.

Q. Okay. Now, have you summarized these conclusions in some additional slides?

A. Yes, I tried to do that.

Q. Let's go to number 7.

A. Excuse me, say again?

Q. So there is slide 6. Why don't we walk through these quickly now.

A. Yes, sir. That would be fine. This is exactly what I just described, so I guess I got a head of myself a bit so that slide summarizes the items on page 3025 that we just discussed in Exhibit 125.

Q. Okay. And ultimately shows a diminution of 84 percent using the 10 percent market rate?

A. It does, sir, yes.

Q. And then slide 7.

A. This says using the Louis Derbes appraisal of $1,850,000 and the equity that

Page 798

would result, having subtracted the loan balance from that. And only using an 8 and a half percent rate of return requirement, one that is relatively riskless.
And using the maximum dividend that could be earned, we still have approximately an 80 percent diminishment, 79.6 percent diminishment from the 8.5 percent rate. The property is actually generating 1.74, if you can bank the 12,952 each year, which is generally not paid.
Q. Slide 8 reflects the 79.6 percent diminishment?
A. It does.
Q. Overall how would you describe the adverse economic impact represented in your return on equity analysis?
A. In the most optimistic circumstance, the property is generating only 20 percent of what should reasonably be viewed as a rate of return without these restrictions.
Q. Now, one of Dr. Dickey's criticisms of the type of analysis that you did is that it takes a snapshot at a particular point in time. Do you recall that?

Page 799

A. I recall it.
Q. Okay. So did you also do a return on equity analysis using multiple data points?
A. Yes, sir, I did do so.
Q. And why did you do that?
A. I wanted to see whether in some way there was hiding within this data some period with higher rates of return than I was aware of.
Q. Let's look at Exhibit 125, page 3027.
A. Yes, sir.
Q. Can you walk us through this table and explain what you have done.
A. Exhibit 3027 is a little bit lengthy, but I think it is a fairly easy to follow. I hope it is. It starts off by in December 1991, really it is the -- I am looking at year-end, using the May 1991 valuation of 1,850, subtracting out the loan balance that existed in December of '91 to yield an equity that was in the property at that time.
The actual dividend paid that year was none. The rate of return actually earned was zero. The accrued dividend that year was 12,952 and if they had been paid the 12,952,

Page 800

they would have had a rate of return on of 1.63 percent. That's using the equity in the property based on the $1,850,000 valuation and the existing loan balances.
In 1992 I have incremented the invested equity in the property by the amount of principal we paid, that this is cash payments into the property that were actually done. There is no use of this principal by CCA unless they can somehow sell the asset under the restrictions, that was highly unlikely for them to recover any of the principal, the principal is a further increase in equity.
And I noticed that Mr. Armstrong was referring to it in the same manner in his testimony as a further increase in equity.
That's what the principal payments were. So we had 800,000 or a little over that in equity.
Again, no dividend is paid. There is no rate of return, but if the hypothetical dividend had been paid, it would have been 1.62 percent return.
I have done that for each year. The dividends earned in these years are not what's paid. There are some cash payments made in

Page 801

these years. What are they for? They are for arrearages. The property had accumulated far in excess of $100,000 in unpaid dividends. Those dividends are or a small part is paid during 1991-'98 but the actual dividend for of the years '91-'98 is not what's being paid out, it is the accumulation that's being funded.
So even if they had been able, though, to make the payments from '91 to '96, you have a progressively lower rate of return. Why? The equity on the property is increasing and the amount of dividend is fixed.
So, yes, you have a declining rate of return. What did the average turn out to be?
Q. Are you going over to the top of the next page?
A. I am, sir. It is a continuation of that same information. I'm sorry.
Q. That's okay. So this is a continuation of table 35?
A. It is, at the top of that page. The average dividend, if they had paid the maximum amount allowed would have been 1.49 percent, gains of 8.5 percent mortgage backed security rate or a low -- a low risk rate of return,

Page 802

that's an 82 and a half percent diminishment. The property is, again, experiencing a loss of most of its rate of return.

Q. Okay. Have you also summarized this information in some slides?

A. I have attempted to do that, yes.

Q. All right. What does slide number 9 show then?

A. It is a year-by-year recount of that which I just testified to, showing that the average, if the maximum dividend were actually paid in each year, would – withholding average of 1.49 percent, when the base is the invested equity in the property, and so we are achieving very, very low rates of return as our best case, not our actual case.

Q. Okay. Slide 10 then, does that summarize it?

A. Slide 10 reiterates that which I just said, yes.

Q. Okay. You mentioned earlier, Dr. Ragas, that you also mentioned economic impact based on an analysis of cash flow before tax and principal. Let me ask you to turn next to Exhibit 125 again. That's the supplemental

Page 803

report.

A. Yes.

Q. At page 3028, the last page of that report, table 36.

A. Yes, sir.

Q. And is this table also recapped in demonstratives 11 and 12?

A. Yes, sir, that's my understanding. Those, I believe, are the right numbers.

Q. Here is demonstrative 11. Can you explain what the table and the demonstrative indicate?

A. We will turn in a little while to the derivation of the cash flows, but these are a statement of what I believe to be the actual cash flows earned by the property from June 1991 to May 1996. They range from $31,370 to $48,653. They generated a total earned cash flow of $267,919. These cash flows are inclusive. The other cash flows before taxes and before payment of principal, they are inclusive of those items. What would be the market cash flows?

Q. Sorry.

Page 804

A. In a moment we will turn to that, and as to how I arrived at these numbers. But it is my belief that the market cash flows for the same period range from 19,532 in the year in which transition is occurring to market rates for rent and market operating conditions, followed by $167,265 and $188,438. These are, these total $884,000. So the diminishment here is approximately 69 percent.

Q. Is that also reflected on slide 12 then, that diminishment?

A. It is, it is.

Q. Now, you referred to the cash flow numbers that we were just looking at. Are they reflected in your May 30, 2005 report?

A. They are, sir.

Q. Exhibit 106. Let's just take a quick look at where they are. Page 2708, please. Page 2708 is a table for 1991?

A. Yes, sir, it is.

Q. Okay. And at the bottom, is that where the cash flow number appears?

A. Well, this is the harder one to understand, and perhaps it is easier because

Page 805

this is the transition year. If we look at 1992, it is probably a little easier to follow.

Q. Okay.

A. The 1992 number, for example, on page 2709, you will see there is a column labeled actual. These are the actual reported income and expenses of the property. And they have a before-tax cash flow of $30,768. That's for 1992. What happens in terms of the market? If this had been operated as a market rent, market operating expense property, with market vacancy rates, then – and market debt terms, then my expectation is that the market before tax cash flow is $167,265. So you can see there is a very large difference between the cash flows generated under the preservation restrictions or statutes.

Q. And do the following pages have that?

A. In the same manner, yes, they follow in the same manner, thank you.

Q. And so 2710. Is that for 1993?

A. It is.

Q. And 2711 for 1994?

A. It is.

Page 806

Q. And 2712 for 1995?
A. Yes.
Q. Then you have 2713. Did you prorate that year?
A. I did, because we only had a portion of the year, so I have prorated it for the time period from January to May, and I did a simple linear proration, because I think that's the easiest way to look at this estimate, so the prorated number based upon a before tax principal cash flow in the actual property of $116,768, the prorated number is $48,653.
Q. Okay.
A. And the corresponding number for the market rate, yes, sir.
Q. And going back to page 2708, that's for the year 1991. Is that also a prorated year?
A. It is, sir.
Q. All right. Now, Dr. Ragas, was CCA's net operating income also affected by the preservation statutes?
A. And what I just showed as a diminishment of about 70 percent, as this visual shows. Yes, I also looked at net

Page 807

operating income.
Q. Okay. Let's turn next to net operating income.
A. Yes, sir.
Q. In your May 30, 2005 report, Exhibit 106, did you show calculations for each year during the takings period of the net operating income for Chateau Cleary?
A. Yes, I did.
Q. Is that on those charts we were just looking at?
A. They are.
Q. Beginning on page 2708?
A. The charts are arranged in basically the HUD income statement format in terms of the major items, and net operating income is labeled in bold on each chart.
Q. Okay. And so beginning, again, on 2708, you have the NOI for 1991, is that right?
A. Yes, I do.
Q. And under both the actual and the market scenario?
A. Yes, I do. And there should be an exhibit I thought I had done. Yes.
Q. I will show you the demonstrative in

Page 808

one second.
A. All right. I'm sorry. All right.
Q. And then you have this calculation appearing then for each year in the succeeding charts?
A. I have done a side by side comparison, what was the actual NOI achieved, what was the likely market NOI that would be achieved, if we had a market rents, market vacancy, market operating costs, what would be the net operating income then on market conditions and I have compared those, yes.
Q. Let me not hold back further on you and show you the slide that you were referring to, number 13. What does this reflect, Dr. Ragas?
A. It is a recitation of those net operating income numbers, showing the diminution for the typical year – and, again, 1991 is a little more complicated to follow always because I have some transitional items to describe there, but if you look at 1992, for example, as a place to more easily follow, you will see that the 1992 net operating income under actual reported numbers is $93,033 and

Page 809

the market expected market NOI is $250,781.
How different are they?
The market number indicates that we had a 62.9 percent diminution, in other words, the actual NOI is 93,000. We would have expected it to be 250,000, very substantial reduction in NOI. NOI is the best indicator, usually, of a value of a property.
So this would also mean there would be a very large difference in what the properties are worth under the restrictions versus what they are worth in the market conditions.
Q. Okay. And on average, then, this shows a diminution of 56.89 percent over this multi-year period?
A. Yes, what I did was total the cash flow, the actual NOIs, and I totaled the market NOIs, and I compared the two totals, and the result is it is approximately 57 percent diminution.
Q. Okay. So we have looked at three different measures of economic impact and I think you have some slides that recast these, starting with 14.
A. And actually, I think it is somewhat

Page 810

more than three, but, yes, this is a summary.
I said that I looked at the actual return on equity during the takings period, and we found it to be 1.15 percent versus a 10 percent rate, what I feel is indicative of market rates of return, so that's an 88 percent diminution rate.
And then the second item I just testified to was that if they were allowed to earn the maximum, they would have been able to earn the maximum allowed dividend, the diminution then is still 84 percent.
Q. Let's look at demonstrative number 15. What do we have there?
A. Here, and I have tried to follow the Cienega 8 methodology in terms of how we have looked at this diminution. We have used the equity as determined from the Derbes appraisal at 1,850, less the mortgage amount to define equity and compared that to the maximum allowed dividend, and we find 1.74 percent rate of return versus a near riskless rate of 8 and a half percent. Again, a very large diminution, almost 80 percent has occurred.
Next, we looked at the diminution over

Page 811

the entire takings period a year at a time and found that to average 1.49 percent versus an 8 and a half percent rate. Again, an 82 percent diminution. Then I looked at actual cash flows and how they compared over the 6-year period and found almost a 7 percent diminution.
And then, lastly, I looked at net operating income to see if it told a different story and it really doesn't. Regardless of capital structure, the diminution here is about 57 percent.
Q. Okay. And then do you have it recapped here in this table?
A. Yes. Those are each of the points stated, again, from those two summary slides.
Q. The table being slide number 16.
A. And in looking at that, you know, there isn't going to be a single perfect right measure of diminution. And one of the reasons I looked at several was to see whether we had a consistent look, a consistent outcome in terms of was there a substantial loss on return on equity in this investment, because of the restrictions.
And what you can see is that in most

Page 812

instances, it is a diminution near 80 percent, that if you ignore things involving capital structure and go only to net operating income, then it is still a diminution of about 57 percent.
Q. Now, earlier in your testimony, you mentioned that the amount of damages, the amount of actual lost profits that CCA suffered is also a measure of economic impact and we will come to the details of your calculation in a little bit.
I think you indicated that the rough order of magnitude is about $700,000 in 1996 dollars. Can you explain how this measure also serves as a measure of economic impact?
A. Well, the equity investment in this property has gradually grown up to being close to $900,000, when one takes all of the principal contributions that have been made to the property and adds to it the original capital. And to lose an enormous portion --
MR. HARRINGTON: Your Honor.
THE COURT: Yes.
MR. HARRINGTON: Your Honor, I object to this question. Dr. Ragas is presenting a

Page 813

new measure of economic impact that is not discussed anywhere in his expert reports. He hasn't discussed any economic impact along these lines. It simply wasn't presented and we haven't had a chance to question him about this new form of economic impact he is about to testify to.
MR. POLEBAUM: Well, his report certainly presented the measure of damages and, I mean, it seems to be almost a truism that that is an impact that he has measured.
THE COURT: Mr. Harrington, the Court is a little mystified because all it seems is that Dr. Ragas has put down the equity contribution each year. He can clarify that if he wants, but that's what the Court understands. What are you driving at?
MR. HARRINGTON: He is about to perform a new calculation of economic impact, as I understand it, that is not presented in the course of his reports. He has presented, I think, nine different calculations of economic impact in his report, and we had an opportunity to take his deposition and question him about those. And he is now taking yet another

Page 814

approach to economic impact that was not included in his original report, his rebuttal report, or his supplemental report.

THE COURT: Overruled.

BY MR. POLEBAUM:

Q. Do you want me to repeat the question for you?

A. Why don't you. I don't want to miss the answer.

Q. Can you explain how this amount of lost profits, that's approximately $700,000 in 1996 dollars, serves as a measure of economic impact?

A. In my report on table 32, and as it has been since I first did the reports, table 32, I have a total shown for all of the estimated cash flows and those total now through February 28th, 1997, $686,363. That's on page 3024.

And the accumulated equity on the property is, as previously noted on page 3027, somewhat in excess of $978,000. Now, my observation is simply that 686,000 as compared to 978,000 approaches two-thirds. In other words, just the foregone cash flows that they

Page 815

have suffered are the equivalent of two-thirds of all the money they have already invested in the property. I think that's a very substantial diminution.

Q. I want to turn next, Dr. Ragas, to your analysis – or the details of your analysis of the lost profits that CCA suffered as a result of the enactment of the preservation statutes.

A. Yes, sir.

Q. Turning to slide 17, does that demonstrative show your overall methodology?

A. It does in the most summary of terms.

Q. Could you give us an overview then.

A. It may take me a moment to do this and I will try to be very brief. What was done in this analysis was, first, to look at the best available sources of information for what were market rents, and we can discuss those in more detail, if you wish. But I looked at both rents on actual properties, as well as rents as published repeatedly in my own market analysis that was distributed widely, in which I had plenty of public opportunity for response, if those numbers had been incorrect.

Page 816

Literally hundreds of firms paid to use that data. I would have heard if we had a problem. So we had a combination of firsthand market information and the published data to establish market rents in the marketplace and these would be rents for basically a class B property, an average quality property.

Operating expenses were taken from – I did a detailed study for the largest holder of apartments in the marketplace, First Lake Properties, from 1988 to 1990, using the actual internal records. And that gave me actual operating expense data for actually better quality, in some ways, properties. But in many instances equal quality property to Chateau Cleary.

I also had operating cost information for the 1997 period and I arrived at what I think is a reasonable representation of operating costs by year for the intervening years. Financing cost was taken from that which was publicly available to be verified, as mortgage interest rate terms in the 1991 and subsequent time periods.

Vacancy rates were taken from

Page 817

published information of actual vacancy rates as reported in the geography where Chateau Cleary is located. Not just from the market as a whole, but in that specific subgeography, by year, that data was collected.

Putting that together allowed me to use all the available market facts, so that in an ex post analysis using all the available known information, I could attempt to provide as accurate a measure as I could create of what would have been the likely rents, vacancy, and operating expenses and resulting debt structure that would have been available on the property and the cash flows that would flow from that.

So one of the strengths of an ex post analysis is it let's you use as much as possible of the actual market information, so that the opinion you are rendering is not as conjectural as it might otherwise be if you attempt to sort of guess of what might be true in the future.

Q. Now, Dr. Dickey has, in fact, criticized your analysis as an ex post analysis. Why did you do an ex post analysis?

A. Well, first, I think it is

Page 818

appropriate. This is a temporary taking. There is literature and a long history of ex post analyses being done for temporary takings. An ex post methodology gives you the most factual information on which to rely. It is less subjective than the analyst's thoughts of what might have been the market perceptions in the future. In this particular instance, doing an ex ante analysis also poses a very strange problem. The individuals –

Q. Let me just interrupt you. When you say an ex ante analysis, is that what Dr. Dickey did?

A. I believe so. Certainly that is how it is labeled. The ex ante analysis that he performs assumes you know with exactness the date at the end of the taking. But in an ex ante analysis, you are usually constrained to the information you knew as of the beginning of that date, in this case the May 1991 period. He would not know the end of the period. All he would know is the period could go on for 20 years.

I think that poses a very complicated problem to do an ex ante analysis in this

Page 819

instance, where the taking date is not – the end of the taking date is not, in fact, known doing an ex ante analysis in May 1991. But we can revisit that later in this discussion. From my perspective, the ex post analysis is both consistent with good finance principles and with existing literature. I think it is consistent with using the most verifiable factual situation and it is also the one that is easiest to test, whether or not what is being shown is reasonable or not. So for those reasons, I stayed with an ex post analysis.

Q. All right. Let's look at some of the details of your analysis in your May 30, 2005 analysis, that's Exhibit 106.

A. Yes.

Q. In that analysis, you assumed the taking ended as of the end of May 1996, right?

A. It was – that date was one that I thought was a reasonable assumption to make at that time, the May 1996 date was a reasonable assumption to make.

Q. All right.

A. Based on when the HOPE statute was, in

Page 820

fact, enacted.

Q. And did you do a second analysis that calculated the just compensation through February 28th, 1997?

A. I did.

Q. And why did you do that?

A. It was my impression that that date has been used in other matters before the Court and that that date might also, and I can discuss that later in this testimony, if you wish, might also be appropriate given the time that it takes to go from the change in restrictions to being able to actually take advantage of the change in restrictions.

MR. HARRINGTON: Your Honor, once again, I reassert my objection. Dr. Ragas is now testifying about why the February 28th, 1997 date would be appropriate. At his deposition he stated it was a request of counsel that he use that date, and, again, that he was not going to opine as to whether that date or a different date was appropriate. I ask that his last answer be stricken.

THE COURT: Denied.

BY MR. POLEBAUM:

Page 821

Q. Let's look at Exhibit 106, Dr. Ragas.

A. Yes, sir.

Q. Which is your first report.

A. Yes, sir.

Q. Pages 2680 to 2681, please.

A. Yes, sir.

Q. And this is entitled the New Orleans regional marketplace. Insofar as was relevant for your study of Chateau Cleary, what did you conclude?

A. Well, one has to have a context in which an investment operates. You can't define the risk of the investment, you can't define its expected operating characteristics, without having some understanding of the marketplace in which it operates.

And the way I have ordinarily approached that is I look at the broader economy in which the property is operating first, and then I look at the neighborhood and the immediate surroundings of the property. So what I have described on page 2680 are the general market conditions that were true for the New Orleans economy as of roughly the beginning of the taking period and which were

Page 822

indicative of the period shortly after that,
the 1991-'96 time period.
Do you want me to summarize that or
continue what I am doing?
Q. If you would just give us the high
points.
A. We were exiting from a very severe
recession. The New Orleans market, along with
Texas and other areas, had experienced a sharp
and prolonged fall in the price of oil and
natural gas.
That decline in price had produced
large scale failures in the oil and gas
industry, which translated into failures in the
banking industry and the savings and loans and
also to widespread failures in the apartment
marketplace.
We have just emerged from that
decline. It ends in 1987, '88, on an
employment basis, but the marketplace only
begins to realize that the recession is over
around '90, '91.
So we're in the beginnings of that
recovery. We're coming from a period of low
occupancy rates. We're beginning to trend up

Page 823

towards more normal occupancy rates, but we're
not there at all in 1991. Rents have begun to
rise, but they will rise much more later in
that decade.
Demand for market rate apartments is
beginning to strengthen markedly, because
households now have a rise in personal income
that is substantial and will prove to be long
lasting in this instance.
So those were the market conditions
that were there in 1991. They will be pointing
to a declining vacancy rate, rising rents,
rising interest of households in market rate
units. Those would be things you would expect
to see.
And we had another unusual item. We
just had a runup in interest rates and interest
rates were actually going to be entering a
period of significant decline from 1991 on to
1995. And that would affect capital structure.
Q. Okay. On the following pages, 2682,
2683, this is entitled neighborhood analysis.
Do you have some slides that identified some of
the key factors that you looked at in analyzing
the neighborhood?

Page 824

A. Yes, I do.
Q. Let's turn to slide number 18.
A. Yes. I too am a great believer in
understanding the surrounding environment
around the property. And I think it tells me a
lot about what you can and can't do with the
property. Chateau Cleary is located in what is
now a mature area. In 1991 most of the land
available around Chateau Cleary for family
development had been developed.
There was still some vacant parcels
suitable for commercial development but at
higher prices than was supportable for
residential development.
So it does not face many new
competitors. The area immediately surrounded
is basically fully developed. And there are no
new apartment complexes under construction at
that time. We're just exiting from this
recession. So '91 is a period where it faces
few new competitors and it is a rising market.
The area around is quite stable. It
has close proximity to two malls, which are
very strong malls in terms of the services
consumers want, Clearview and Lakeside. It is

Page 825

close to an on/off-ramp in two directions to
the interstate. It has a good school system
and a low crime environment.
It is an easy to reach suburban
environment with mostly market rate uses
surrounding it for several miles, very little
in the way of very low-income or highly deeply
subsidized properties being near it.
And I think those comments are – I
have been listening carefully here on others
who were trying to also recollect conditions at
that time, and I think mine and theirs are
coinciding to a large degree.
Q. Okay. And demonstrative number 19
summarizes some of this information as well?
A. Yes, sir, it does. And I think I made
the same points that I tried to inform the
reader of.
Q. Okay. Going back to your text –
A. Yes, sir.
Q. According to pages 2684 and 85, this
is called subject property neighborhood
description. What did you determine here,
Dr. Ragas?
A. There were no particular difficulties

Page 826

with any legal restrictions on the property. It is not an area that ordinarily experiences much flood difficulties at all, at least not this specific property has not. It has good access to highways, good visibility, and it faces little in the way of new competition in 1991. So it is in a very favored condition in 1991.
Q. Okay. And now let's continue on, pages 2686 through 2688, a description of improvements in your report. Can you explain what your findings are here?
A. I went to the property to ascertain the improvements that were there today. I looked at the architectural drawings to see what was built in 1971. I read Mr. Armstrong's report. I read –
Q. Did you mean Mr. Alexander?
A. Mr. Alexander's report, I'm sorry. I misspoke. I am tired, I guess. Mr. Alexander's report. I'm sorry.
And I read Mr. Hilbert's opinion of market value from 1998, which also had descriptions of the property. I went and measured individual units, and I also measured

Page 827

them from the plans and arrived at these measurements as being indicative of both the drawings as built and my measurements on site for the square footages of each unit.
Verified the unit mix was correct in terms of the manager present, looked for the features that were in the property to ascertain that they are correct as described here, and I believe they are correct as described.
And then went through a number of apartments. And did that on a couple of occasions. And then returned to the property on several occasions to see if I saw anything in the area that might suggest to me that there were some problem with this geography in terms of market acceptance.
I had lived in this area the whole past 30 years. My residence is only a few miles from this location. My office today is literally within a mile and a half. I'm quite familiar with this geography, but I had not, and I do not represent that I have, I had not inspected this property in 1991.
So I had to gather all the facts I could from as many other sources as possible.

Page 828

Q. On page 2688, just after point 17, you refer to a study that was done that was required and that found that the CCA property was in a superior condition. What was the significance of that information point?
A. I felt that it was relevant to know how the property was perceived by personnel at HUD. And how it was received in the 1991-'92 time period. It is difficult sometimes, I have to say this, as time has progressed, what we take to be a normal apartment property has had a rapid rise in standards from the period around 1998 onward, in the New Orleans market. We have had a large introduction of what I would call national class A property. So the standards that we now judge property by in the 2006 time period are quite different than what was generally accepted as an average quality property in 1991, before national quality class A properties were being built in that market by basically Favrot and Chain, which were the largest developers of apartments there, and I'm quite familiar with their products.
Q. So they started building these

Page 829

apartments in the –
A. The late 1990s, basically in the middle 1995-'96 time period, we have a huge wave of brand new units entering the market, not immediately at Chateau Cleary, but affecting all of the Jefferson market as they entered an area on Clearview in an area called Elmwood. It is some miles off from Chateau Cleary, but they do draw from that entire east Jefferson area and there are a large number of units that have been constructed there, all of much higher quality than the market faced before.
This happens, though, affecting the conditions in the market in 1996-1997.
Q. So how does this construction of new sort of top quality apartment buildings not in the immediate neighborhood, but in the surrounding area, how does that affect the market?
A. What will happen, what happens to a property like this one is it will take much more planning by 1996 to deal with the transition to market conditions than it took in 1991. Because I have now this new tougher

Page 830

competitor in the marketplace and the amenities they offer are richer than what I would have found available to me in 1991 in making this conversion.
So it is going to be a more complicated process. The market conditions are tougher and there are a lot more competitors with new units out there that were not present in 1991, whose existing property had been through the recession, lots of people have deferred maintenance, lots of people had struggled to survive, the developer I mentioned, Favrot and Chain, came perilously close to bankruptcy back in the middle of the 1980s and certainly was struggling with their own cost control issues in the end of the 1990 period, ending '90 period.
So these much stronger competitors are present, '96, '97, '98 that are not present at all in 1991 and '92.
Q. If I can ask you to turn next to pages 2689 and 2690. This is where you begin your discussion of gross income.
A. Yes, sir.
Q. Can you explain what this part of the

Page 831

analysis is?
A. My thought process was to identify the actual rents for Chateau Cleary, which are stated for you in 1991 dollars on page 21, 2690. I then looked at reports that were done in 1998, later in this time period, to see what was viewed as comparables for this property by Kevin Hilbert, who is a well regarded MAI in the New Orleans market.
I agreed that these were reasonable selections of comparables and I compared those rents in 1998 to what I found to be true in the published UNO data from that same time period and found that the UNO average quality was also fairly well tracking the rents that were true, looking at these individually selected comparables.
In other words, that gave me confidence that the UNO data in general was a reasonable representation of an average quality property, not of superior properties, not of inferior properties, but a class B average quality property.
I decided that since we have a published data set based on thousands of units,

Page 832

the UNO sample covered over 40,000 apartments at that time, including well in excess of a thousand in the immediate area of Chateau Cleary, that it was reasonable to use that data to estimate the likely market rents that could be achieved by Chateau Cleary.
And I established those rents, per foot. The published data had rents per foot. It gave me both rent and square footages. So I wasn't having to make up a new estimate. It was the published data that was already there per foot.
I applied those rents per foot to the actual sizes of the Chateau Cleary units to result in an estimated market rent by unit type, by year.
And those are presented for you on page 2693. And I also, from that same source, looked for what occupancy conditions were actually reported to have been from 1991 to 1996 as reported by managers and owners for occupancy in the area surrounding Chateau Cleary, what is termed West Metairie in that survey.
And those are reported also on page

Page 833

2693. So that gave us rents and vacancy.
Q. On 2691 you have a table which compares, I gather, Chateau Cleary to the comparable properties?
A. It does.
Q. And you have reference to the UNO report. That's a report you prepared each year?
A. It is, based upon -- it is not my numbers, though, it is the numbers as reported by managers and owners for market rate properties aggregated by geography, based on their written responses or if they would not respond in writing, it was a telephone survey verifying the information.
And then those were distributed and published, so that if there were issues with the accuracy or veracity of the information, the people who paid for it sure would have told me about it.
Q. And at the bottom of that page, 2691, you have a phrase that says "the subject's market rent is best bracketed by comparison to Posada del Rey and the UNO report." Can you explain what you meant by that?

Page 838

people aware of your property.
In other words, just like a new property would have to do, it would go through this premarketing program. You would do the same thing with Chateau Cleary. If you do that, they should get results much like the market. In my view, that's around ten units per month. That would absorb 100 unit property in ten to 12 months, which is what I have assumed here, that after they were allowed to transition to market rents, that in a 10 to 12 month period thereafter, they would have completed that transition.
Q. Now, so we have looked at the actual and the market data that you have at the top of table 8.
A. Yes.
Q. And do you have comparable information for each of the succeeding years on the succeeding pages?
A. The tables in each case are meant to be done in the same exact format, except for some anomalies that I will have to discuss later on page 2708. Because of the transition we just talked about, there is a little extra

Page 839

column there, but in general, the top of the tables are exactly alike in all cases. And it allows you to look at what was the actual rent versus the market rent, assuming that they got rents consistent with a moderate quality class B property and average quality property during this 1991 to '96 time period.
Q. Okay. And in each year that you examined, was the actual rent, the actual HUD rent more than 10 percent below the market rents that were available at that time?
A. Oh, yes. Much more than 10 percent.
Q. Let me show you slide 20. Can you explain to us what this indicates?
MR. HARRINGTON: Your Honor, we would object to slide 20 as it does not accurately reflect the information in Dr. Ragas's report. I would be happy to point out examples of it but the percentages calculated here are not the percent actual rents are below the market rents, according to the numbers in Dr. Ragas's report.
THE WITNESS: If I have an error on the tables, I will immediately alter it. If we

Page 840

made a mistake.
THE COURT: Dr. Ragas and Mr. Harrington and Mr. Polebaum, I think the best thing to do is to deal with that issue when we come to the question of admitting for a limited purpose PDX-20 as a demonstrative. Let's take the examination and the cross-examination and then cross the bridge you pose, Mr. Harrington.
BY MR. POLEBAUM:
Q. Subject to that, could you explain what this chart reflects, Dr. Ragas?
A. The chart is intended to reflect the diminishment in rents. And what it should be reflecting would be if the rent per foot was 37 cents, for example, in 1992, the market rent is 55 cents. And we were – what it should be reflecting is that percentage diminishment. And I will certainly address any error that I may have in that visual.
Q. Okay.
A. What's the point, though? One can fairly easily see that. If you look at in 1992, for example, monthly rental income, you

Page 841

will see it for actual, it totals 31,474.
Q. Is this on page 27?
A. Page 2709 – excuse me, 1992, 2709, page, 31,474 would be the maximum rent that could be collected at the HUD or the restricted rents. The maximum rent that could be collected at the market rents is 45,316. You can see that the rents that could be collected actually are about two-thirds, they are over 30 percent below the rents that could be earned in the marketplace. In other words, we generally had rents here that were approximately 30 percent below the rents that were being charged in the marketplace.
Q. Now, you have the actual and market rent data and that flows into what we have just been talking about, the monthly rental income and the maximum annual rental income, both in the actual and the market scenarios?
A. Right.
Q. Did you then make certain adjustments to the rental income in certain instances?
A. Well, the adjustments that we have

Page 862

accrued to Chateau Cleary but for the restrictions.

Q. And does this chart show the lost amounts for each year then?

A. It does.

Q. Of the damages period?

A. It summarizes them by year, yes, it does.

Q. All right. Now, do you then do an analysis to restate the year-by-year damages to 1996 dollars?

A. Yes, sir, I have.

Q. Let's look at pages 2714 to 15 of Exhibit 106, your report. And demonstrative 28, which reflect that analysis. Can you explain, Dr. Ragas, what you have done?

A. Would you prompt me again to the page?

Q. Yes, I'm sorry, 2714 and 15.

A. I'm sorry, I wasn't listening carefully. Yes.

Q. We also have the information summarized on demonstrative 28, which is, by the way, table 14 from your report.

A. Yes, sir, it is, it is table 14,

Page 863

that's correct. And that appears on 2717. In my opinion, for an ex post analysis, using an interest rate of 10 percent, which allows for a small opportunity cost, above an 8 and a half percent, more or less, riskless rate for long-term investment activity is appropriate. And I have applied a 10 percent rate to bring the lost profits to a common date of the end of the taking.

Q. Why did you take each year's lost profits and adjust it forward to the end of the taking?

A. Well, first, let's look at it from the perspective of keeping -- of being able to measure the true damages suffered by the party. The party had the use of the funds. For example, in 1992, if the damages in '92 were $136,497, the damaged party had the right to reinvest that capital. And would have ordinarily done so. We have heard testimony that this damaged party had very high rates of return available to them in the oil and gas business, but I didn't feel that was an appropriate rate

Page 864

and at least an institutional quality investment rate, one that would be indicative of a very low default rate risk, but would still provide a reasonable low risk rate of return on equity for a prudent investment by CCA of 10 percent was appropriate. I applied that 10 percent rate to the damages and estimated what would be the amount of money that would accrue from the 136,497 by, when, May 31st, 1996. I am now stating all damages in May 31st, 1996 dollars. That's what's occurring.

Q. All right. Now, you are aware that Dr. Dickey has argued that the proper rate to use is the Treasury strip rate. You went in a different direction. Can you explain why?

A. Well, the 8 and a half percent rate has merit, but it is basically a riskless rate. And there is some opportunity lost here that the private investor would have an opportunity to seize. They would not be required to have to engage in purely an investment at the riskless rate. They would have the opportunity to invest in an extremely lower security, like a

Page 865

utility bond or a corporate bond, and achieve a modicum of higher interest rate. And I think that the literature has pointed to at least allowing them to achieve a low opportunity cost rate of return. But if you used 8 and a half percent in this example versus 10, the total damages really don't change very much. They do change some, they are a little bit lower. They don't change dramatically. If you are applying an ex post model that takes the incidence of damages to a single end of taking date, which in this case is May 1991.

Q. '96?

A. '96, May 1996. So I have restated the nominal damages in 1996 dollars from 1991 to 1996. They total $714,430 at a 10 percent rate of return. Now, from that point forward, though --

Q. Well, let me ask you this, did you then adjust that damages amount forward to the present time?

A. Yes, I have done that.

Q. Let me show you a slide. Can you