IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CCA ASSOCIATES, Plaintiff, | ) | |
| v. | ) | No. 97-334C Judge Lettow |
| THE UNITED STATES, Defendant. | ) | |

**APPENDIX TO PLAINTIFF'S POST-TRIAL MEMORANDUM**

Part 4 of 5

Elliot E. Polebaum
Albert S. Iarossi
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20004-2505
Tel: (202) 639-7000/Fax: (202) 639-7003

November 9, 2006

Page 866

explain to us what you did.
A. If you look at 1996 interest rates, and you know that in an ex post sense there is a ten-year time period, and you look at the ten-year Treasury rate, the average annual rate in that year is approximately 6.44 percent. And this is a riskless rate. The funds are now accruing interest at the rate appropriate for the claim, the damage, for a riskless rate forward to today. It is a modest interest rate that I am awarding or suggesting be awarded to Chateau Cleary as a measure of bringing the 1996 dollars to 2006 dollars.
Q. And did you compound the interest when you brought it forward?
A. Yes, I did.
Q. Now, Dr. Ragas, did you also prepare calculations using an assumption that the taking actually ended on February 28th, 1997?
A. Yes. This total is 1,361,298, is the total damages to September 30th. And then I –
Q. But that's based on the May 31 end of taking.
A. It is, it is.

Page 867

Q. All right. Is this the analysis that takes the end of taking period to the end of February 1997?
A. Using the exact same cash flows by year, I then provided an alternative date for the end of the taking period of February 1997, the end of February 1997. These numbers as stated in the exhibit are the nominal numbers and I think my next one should have those restated as scenario 2. Yes? Oh, good, thank you. This is, again –
Q. This is on slide 31 now?
A. It is, yes, sir. Within the takings period, this is restating the damages all as of February, end of February 1997. Again, assuming a 10 percent rate. And that totals $841,839.
Q. And these calculations that we have seen, that we're seeing here on these slides, are these reflected in your report, which is the recent report, the one from June, Exhibit 125?
A. Yes, sir, these should all be numbers on which I was deposed.
Q. And let me direct your attention to

Page 868

pages 3022 through 3024 of Exhibit 125.
A. Bear with me a moment. It is a different book, I think. Just one moment, please. Say again the number we want?
Q. 3022. Yes, there are a number of –
A. Yes, sir, I have it. I'm sorry. I didn't need a third book. I was incorrect. I am there now, 3022.
Q. 3022 through 3024. These show the different –
A. Yes, sir.
Q. – calculations and adjustments to September 30th?
A. Right.
Q. And for your second scenario, the one that takes the end of takings period to February 28, 1997, on slide 31, which we have been looking at, that adjusts the damages each year to end of February 1997 dollars?
A. Yes. On page 3024, yes.
Q. And it is also on the slide 31.
A. Yes.
Q. And then did you adjust that amount forward to the end of September '06?
A. At a true riskless rate, based on a

Page 869

ten-year Treasury, yes, I did.
Q. And that's also table 32 in Exhibit 125 at page 3024?
A. Yes, it is. And that total is $1,528,629. And it is the estimated damages as of February 28, 1997 restated to September 30, 2006. It is restated to the end of this month.
Q. Okay.
MR. POLEBAUM: Move admission, Your Honor, of Dr. Ragas's two reports, the first report being Exhibit 106 with the subsequent exhibits 107 through 118, and then Exhibit 125.
THE COURT: Mr. Harrington?
MR. HARRINGTON: The first exhibit being moved into evidence is Plaintiff's Exhibit 106, as I understand it?
MR. POLEBAUM: Yes.
THE COURT: It is 106 through 118.
MR. POLEBAUM: Through 118.
MR. HARRINGTON: Your Honor, we don't have a problem with 106 itself, given the understanding that this is how we're going to proceed in this action at the pretrial conference. 106 is the report itself. The exhibits attached to it, I think

Page 1061

were tenants, were renters. So it produced a market with a sharp rise in vacancy rate. There were any number of apartment property failures in this period. We had numerous properties shifted to RTC ownership, and so that recession made it impossible to even talk about raising rents. The issue was, how do you preserve tenants and get collections. Bad debts became a significant issue for many people.

Q. How did the recession affect Chateau Cleary's operating costs?

A. Well, Chateau Cleary in the period up to 1985 was experiencing rising operating expenses. Many people -- there was kind of a slogan that had been going on, survive to '85, that the situation would get better, kind of a one-year tough period and the oil industry thought that in '85, it would sort of magically go away and that didn't happen.

And instead it got much worse. So what happens in the operating expenses of Chateau Cleary is that instead of them continuing to move upward with inflation, they now go flat and down. And by 1998 they have

Page 1062

slashed their expenses, the $240,000 from 284, about a 15 percent drop, while cost of living still was rising in the United States, although not very rapidly. And then very slowly as the recession ends and you begin to get some restoration in demand, they begin gradually restoring the slashes in operating expenses.

And while the recession is basically over in terms of the economic event, the aftermath, the recovery from it, is still going on in 1991.

So the recession was affecting those expenses and by 1991 you were not yet back to the 1986 operating cost.

Q. Now, this demonstrative also shows that there was a rent increase effective as of December 1st, 1984. Do you see that?

A. Yes.

Q. And so the benefit of that rent increase takes on its full force in 1985, I assume; is that correct?

A. It does, right.

Q. What is the relationship between that rent increase and the level of operating expense reflected for 1985?

Page 1063

A. Well, the '85 expenses are up and I would expect that there was justification given in '84 for the increase. And the '85 expenses suggest that the bulk of the funds from the rent increase flowed to the added expenses.

Q. Okay. Now, you mentioned in your testimony both in direct and on cross that there was a change in the market that became particularly noticeable in 1998 as these new class A buildings started opening.

How did that affect Chateau Cleary's ability to raise rents at that time?

A. Well, what occurs is what I have tried to explain. We did not have in the New Orleans market what other cities viewed as a national quality class A apartment property. Our properties were generally viewed as being of lower quality than was typical in the south for major cities.

Starting in around the 1997, 1998 period, our largest developer of apartments decides that he must move to an institutional grade apartment, a class A, that will be consistent with competition in other cities.

And in doing so, he begins aggressively

Page 1064

bringing to the marketplace high quality units, rich in amenities, and initially he does not highly price the product.

He prices it a little bit above the other housing, but not a lot above. He wants to bring people to him. He is using a loss leader, if you will, in marketing. And he brings them to the property and they begin to experience all the neat, new things that nobody else has.

And that word of mouth then is used to foster further growth of this new product line.

He then builds in one location more than 1,000 of those units. That location is immediately south of the trade area where Chateau Cleary is located.

Households throughout east Jefferson are aware now there is a new place to live that has lots of amenity value and is competitive on rents. It makes it very difficult for the existing older properties, no matter how well maintained, they can't offer the amenity package that's in the brand new properties. So they are at a marketing disadvantage. The result is it is harder for them to raise their

Page 1065

rents. It is harder for them to catch up.
I had to, before I left UNO, for several years, begin to publish a class A rent and a rent then for the rest of the market, because the rest of the market was lagging in not doing nearly the gains that the new class A units were achieving.

Q. And did these, just to be clear, did these buildings in the River Ridge area affect what the older buildings in West Metairie were able to do?

A. Yes, because we had almost no population growth. We're dealing with a Jefferson market which was experiencing virtually no population growth. So when one property gains tenants, they were taking it from others. That's what began happening in the 1998, '99 time period.

Q. Thank you, Dr. Ragas. Thank you, Your Honor.

THE COURT: Thank you, Mr. Polebaum. Mr. Harrington, redirect? Or, I'm sorry, recross?

MR. HARRINGTON: Yes, Your Honor. Allow me to pull an exhibit out. I have just a

Page 1066

couple questions.

RECROSS-EXAMINATION

BY MR. HARRINGTON:

Q. Dr. Ragas, can you look at Plaintiff's Exhibit 11.

A. Yes, sir.

Q. Turn to CCA 2811, please.

A. Yes, sir.

Q. What is this page?

A. This is what was true in overall market in 1998 by sub area, by submarket.

Q. And the first submarket on this page is West Metairie?

A. It is.

Q. And that's the area in which CCA was located?

A. It is.

Q. And this is from the University of New Orleans rent study for November 1998?

A. It is.

Q. And so the average price per square foot column would show the current average price per square foot for various categories of

Page 1067

units in the West Metairie area?

A. These are units that have been open more than a year, just as is done in most retail studies, brand new units that have just entered market are not addressed. Go ahead, sir.

Q. So what you are saying is that this particular study would not have included CCA in it?

A. CCA, as I indicated earlier, we did not include in our study properties which we knew to be HUD-restricted rents or nonmarket. And I do not recall them becoming part of our study subsequently. So I don't believe that they are included as part of the rents represented in the area H, West Metairie. They are all the other competing private operators.

Q. What was the per square foot rent for one bedroom apartments in West Metairie in November 1998?

A. November 1998? 64 cents per foot.

Q. Is that the 64.39 cent number there?

A. It is.

Q. What was the number for two-bedroom,

Page 1068

one bath, Dr. Ragas?

A. Two-bedroom, one bath flats were at 57.4 cents.

Q. What about two-bedroom townhouse units?

A. Two-bedroom townhouse units were at 55.8 cents.

Q. And that would be the two-bedroom, two bath units?

A. That's a two-bedroom, two bath unit, yes.

Q. Where would you look for two-bedroom, one and a half baths?

A. There isn't a separate category for one and a half. The one bath units are at 56.83 and the two bath units are at 55.85.

Q. How did you derive the numbers you used for a two-bedroom, one and a half bath townhouse from this sort of data?

A. I had to choose a number that I thought was indicative of that unit type. As you can see, these rents are very close together, and they generally are, so I would choose something that I thought was reasonable for a one and a half. The one and a half and

Page 1081

the staff.
Q. Generally speaking, did owners have choices regarding which options to proceed with under Title 2 or Title 6?
A. Yes. They had a lot of choices.
Q. Okay. And what choices?
A. They could choose not to come into the program. They could choose to come into the program and sell to a nonprofit. They could choose to take the incentive route.
Q. Do you know the circumstances under which an owner could terminate affordability?
A. Yes. They had to meet two conditions to -- they had to show that there was not going to be an adverse effect on the tenants, the residents, and also on the supply of low-income housing.
Q. Did any of the owners of low-income housing that was managed by the New Orleans HUD office attempt to go through the procedures outlined by the preservation statutes?
A. Yes.
Q. Okay. Do you recall any of the owners in the New Orleans area selling their properties?

Page 1082

A. Yes. We had four that sold.
Q. Which properties?
A. Tanglewood 1 and 2 in Westwego. Forest Park on the west bank of New Orleans, and Walnut Square in New Orleans East.
Q. Were they all located in New Orleans?
A. No. Westwego is in Jefferson Parish. They are all in the metro, New Orleans metro.
Q. Do you know who owned these properties?
A. Yes. Ed and John Arms.
Q. Were the sales ultimately consummated?
A. Yes. They were sold to National Housing Partnership, a national nonprofit.
Q. When could an owner start the preservation process?
A. They could start it two years before their 20th year. They could start when they had 18 years.
Q. Now, when a sale is consummated under the preservation statutes, were the owners at that point out of the preservation program and free from HUD restrictions?
A. Yes.
Q. Were they free to spend the money

Page 1083

generated from the sale as they pleased?
A. Yes.
Q. Did Mr. Arms ever express dissatisfaction to you about the terms of any of the sales?
MR. POLEBAUM: Objection, calls for hearsay, Your Honor.
THE COURT: It is not entirely clear that it calls for hearsay. Overruled.
THE WITNESS: No.
BY MR. DUNN:
Q. Are you familiar with the plaintiff in this lawsuit, Chateau Cleary Apartments Associates?
A. Yes.
Q. Are you familiar with the apartment project owned by Chateau Cleary Apartments Associates?
A. I have driven by it, but I have never been in it.
Q. Do you know where it is located?
A. Yes.
Q. Where is it located?
A. It is located on the I-10 service road in Metairie.

Page 1084

Q. Do you know what a low vacancy area is?
A. Yes. HUD defines low vacancy area as 3 percent or less.
Q. Do you know whether CCA was ever located in a low vacancy area?
A. In my opinion, I don't think so. Since I have been in New Orleans since 1995, all the way up to the storm, we have what we call a really tight market. It is really tough to be less than 3 percent.
Q. Do you know whether CCA ever applied to prepay and exit the preservation program?
A. No, they did not.
Q. Did any other properties in New Orleans seek to prepay and exit the program?
A. No, they did not.
Q. If CCA had --
A. I assume you mean the time frame with LIHPRA and ELIHPA, right?
Q. Yes.
A. No, they did not.
Q. If CCA had applied to prepay, under the preservation statutes, do you know sitting here today whether HUD would have granted them

Page 1085

permission?
A. No, I do not.
Q. Do you know what is referred to as a notice of intent under the preservation statutes?
A. Yes, I do.
Q. What is a notice of intent?
A. To start the process, the first thing the owners did was file a notice of intent. It was a form that they submitted to start the process.
Q. Did CCA ever file a notice of intent?
A. Yes.
Q. Did CCA do anything beyond filing a notice of intent?
A. No.
Q. Did CCA file a plan of action?
A. Pardon?
Q. Did CCA file a plan of action?
A. No.
MR. DUNN: Your Honor, may I approach?
THE COURT: Yes. You may do so without asking.
MR. DUNN: Thank you, Your Honor.
BY MR. DUNN:

Page 1086

Q. This is Plaintiff's Exhibit 97. I believe it has already been admitted. I just want to give it to the witness to make it easier.
MR. DUNN: Your Honor, I have an extra copy.
THE COURT: That's fine. We have it.
BY MR. DUNN:
Q. Ms. Kizzier, can you identify what's marked as Plaintiff's Exhibit 97?
A. Yes.
Q. What is this document?
A. This is just an e-mail from Jim Alexander talking about our goals. We have a management plan and we have goals every fiscal year and this was just one of our goal reports for plan of action approvals.
Q. And were you copied on this document?
A. Yes.
Q. So does this document discuss plan of action approvals?
A. Yes, it does.
Q. What types of plans of action does this document discuss?
A. I don't know. It discusses six

Page 1087

properties that have their plans of action approved, but I don't recall what kind of plans of action they had.
I assume there was incentives, because we only had four that went to sales, so these were -- in my opinion, they came in for incentives.
Q. The four properties that you mentioned earlier that were sales in the New Orleans area, are they mentioned in this document?
A. No.
Q. And as far as you know, the plans of action referenced in this e-mail were actually approved?
A. Yes. It says the approval date, plans of action approval date. They were all approval dates.
Q. Ms. Kizzier, are you familiar with what's called the HOPE Act?
A. Yes.
Q. What is your understanding of the HOPE Act?
A. The HOPE Act came out in March of '96, and what it said was 221-D-3 and 236 limited dividends can prepay after 20 years. And it

Page 1088

also provided rights for tenants. It gave vouchers to tenants.
Q. Ms. Kizzier, what was the next step after the initial notice of intent was submitted?
A. After the notice of intent, you need to get an appraisal and then file your plan of action.
Q. And who would appraise the project?
A. The other HUD certified appraiser.
Q. Would HUD also do an appraisal?
A. Yes, yes, HUD did appraisals, too.
Q. Why would both the owner and HUD do an appraisal?
A. To make sure that it was fair.
Q. What would happen if the owner's appraisal and HUD's appraisers did not agree?
A. Well, if it was more than 10 percent, then they hired another third-party independent review appraisal that would determine what the true value, the best use market value of the property.
Q. What if it was 10 percent or less?
A. Then -- I don't recall exactly, but I think they negotiated, HUD and the owner.

Page 1093

Q. Could –
A. It is moderate, I would call it moderate income.
Q. I have a feeling I know what the answer is, but could very low-income tenants have afforded to live there?
A. Not in my opinion. They would have had a hard time paying the rent.
Q. What do you mean by deep subsidy?
A. By deep subsidy, I mean Section 8, where a tenant already pays 30 percent of your adjusted gross income for rent and that includes utilities.
Q. Did the tenants at CCA receive direct rental assistance from HUD?
A. No.
Q. Did HUD regulate the rents for 221-D-3 properties?
A. Yes.
Q. How were the rents calculated for 221-D-3 properties?
A. They were budget-based.
Q. And what expenses could be included in an owner's budget?
A. Well, all the necessary operating, your general, your administrative fees, utilities, insurance, all kinds of, you know, ordinary expenses you would have with a rental income property.

Page 1094

Q. Could the owners of a 221-D-3 property get a distribution?
A. Yes.
Q. Okay.
A. 6 percent – they could get a distribution of 6 percent of the original equity per year.
Q. And was that distribution included in the budget?
A. Yes, it was.
Q. Could the owners apply for rent increases?
A. Yes. The regulatory agreement allows 221-D-3 owners to apply for a rent increase any time they need it. Could I go further than that?
Q. If it is responsive to my question, you are welcome to.
A. Okay. With budget-based, it is the best kind of rent increase, because you have a budget, you know what you are going to spend that year. You may know that the utilities are going up. You may know that you are going to have to spend money on deferred maintenance. So you can come into HUD any time that you see that. You need to bring in several things, such as your profit and loss statement from your last financial statement and then you – anything – a 5 percent rent increase is automatic. You don't have to justify a 5 percent. Anything over 5 percent, you need to justify. But you can get a 5 percent pretty easily.

Page 1095

Q. When could an owner get a distribution?
A. Once a year. If they had – well, what we call surplus cash, really, it is cash flow after you paid all your expenses and your mortgage payment, if there is money left over, you can take – but that's built into the rent increase also.
Q. Now, what could an owner do if the project did not have surplus cash?
A. They could defer it and they could take it when they did.

Page 1096

Q. Could they apply for a rent increase?
A. Yes.
Q. And when you say defer, what do you mean by that?
A. Well, if you didn't have surplus cash this year, you might have surplus cash next year, so you could take – if you had enough, you could take the distribution the next year for both years.
Q. Do you know if CCA entered into a Section 8 contract with HUD?
A. They did not.
Q. Do you know why not?
A. No.
MR. DUNN: Your Honor, if I could just have a moment.
THE COURT: Certainly.
BY MR. DUNN:
Q. Ms. Kizzier, I have one more question. If an owner needed to justify a rent increase beyond 5 percent, how would they do so?
A. They would need to document some evidence that maybe they have a contract that they were going to make some repairs at the property, they had gotten something from the

Page 1097

utility company saying they were going to have
a rate increase, and how much that was, or
insurance, they could get something from their
insurance agent saying that we're going to
raise the insurance next year, those kind of
things.
MR. DUNN: Your Honor, I have no more
questions.
THE COURT: Thank you, Mr. Dunn.
Mr. Polebaum?
MR. POLEBAUM: Thank you, Your Honor.
THE COURT: Cross-examination.
Ms. Kizzier and Mr. Polebaum and Mr. Dunn, I
propose that we take our afternoon break about
3:30 if that is convenient.
MR. POLEBAUM: Absolutely, Your Honor.
THE COURT: All right.

CROSS-EXAMINATION

BY MR. POLEBAUM:
Q. Good afternoon, Ms. Kizzier.
A. Good afternoon.
Q. You discussed a few moments ago the
question of whether New Orleans is a low

Page 1098

vacancy area. With respect to the time frame
of June '96, let's say, until the end of
December of 1996, do you have data showing what
the vacancy rates were in New Orleans at that
time?
A. No.
Q. Mr. Dunn showed you Exhibit Number 97.
Could you take a look at that for me, please?
A. Is this it?
Q. Yes, Plaintiff's Exhibit 97. That's
it. This plan, this shows six plans of action
that were approved, correct?
A. Yes.
Q. They were not funded, were they?
A. No.
Q. Now, under the preservation statutes
as you understood them, HUD was obligated to
deny a request for prepayment unless the owner
could make certain showings about the effect of
prepayment on tenant displacement, rent levels,
and similar criteria. Correct?
A. Correct.
Q. And in 1991 and in the following
years, until HOPE was passed, HUD was required
to deny a request for prepayment unless an

Page 1099

owner could demonstrate that prepayment would
not result in an increase of more than
10 percent in existing rents, correct?
MR. DUNN: Your Honor, objection, that
calls for a legal conclusion.
BY MR. POLEBAUM:
Q. Was that your understanding,
Ms. Kizzier?
THE COURT: Just a moment.
MR. POLEBAUM: Pardon me.
THE COURT: Overruled.
THE WITNESS: I have only heard that
in the courtroom, since I have been listening
to the testimony. I didn't recall that on my
own, that it was 10 percent, so I don't know.
BY MR. POLEBAUM:
Q. Okay. Do you know whether HUD was
obligated to deny a request for prepayment
unless the owner could demonstrate that
prepayment would not result in the involuntary
displacement of current tenants where
comparable and affordable housing is not
readily available?
A. Would you repeat the question?
Q. Certainly. Was HUD obligated to deny

Page 1100

a request for prepayment, unless the owner
could demonstrate that prepayment would not
result in the involuntary displacement of
current tenants where comparable and affordable
housing is not readily available?
A. I would have said it differently. I
would have said as long as it doesn't adversely
affect the residents, so are you defining that
as the tenants could not be involuntarily
displaced? But if there was housing in the
area -- what if there were housing in the area?
I'm not supposed to be asking questions.
Sorry, Your Honor.
THE COURT: Ms. Kizzier, I think you
have just demonstrated the question might not
have been completely comprehensible.
THE WITNESS: I apologize.
THE COURT: No.
BY MR. POLEBAUM:
Q. Was HUD obligated in your
understanding to deny a request for prepayment,
unless the owner could demonstrate that
prepayment would not have a material effect on
the availability of low-income housing in the
area that the project could reasonably be

Page 1101

expected to serve?
A. Yes.
MR. DUNN: Your Honor, the question is vague and mischaracterizes the statute.
THE COURT: Well, the difficulty I'm having with the line of questions is that there is an obvious difference between ELIHPA and LIHPRA, and you have asked since 1991, and I think, I think the context -- I'm not sure that the witness gets the context, Mr. Polebaum. That's the trouble I'm having.
BY MR. POLEBAUM:
Q. What did you understand were the differences between ELIHPA and LIHPRA, if any, regarding the discretion or lack of discretion -- let me start again. Too many clauses there. Did LIHPRA apply different criteria from ELIHPA with respect to evaluating whether prepayment requests would be granted?
A. I don't know.
Q. Are you aware of studies that were prepared prior to the passage of ELIHPA and LIHPRA that showed in the absence of restricting an owner's prepayment right, there were going to be many -- in many areas, a lot

Page 1102

of poor people without housing?
MR. DUNN: Your Honor, vague and overly broad.
THE COURT: Just a moment. Overruled. Now, Ms. Kizzier, you may answer this question from your own personal knowledge.
THE WITNESS: I recall there were studies, but I couldn't name what the studies were or -- but I do know that -- am I allowed to elaborate?
THE COURT: Certainly.
THE WITNESS: I do know that people were worried, especially in areas where they were escalating prices, where the rents had really gone up, in areas of the country such as California, Seattle, Virginia, Boston, where the rents had really gone up, they were really worried about the 20-year period of the D-3s and the 236s. They were worried at the end of those times, that there would be a lot of displaced poor people.
BY MR. POLEBAUM:
Q. After you arrived in New Orleans, did HUD approve any applications for permission to prepay?

Page 1103

A. No, because we didn't receive any.
Q. Okay. For the --
A. Well, excuse me.
Q. Yes.
A. Could you clarify that? You said after I arrived in New Orleans until what period of time?
Q. Fair point. After you arrived in New Orleans up until the time that the HOPE Act was passed and went into effect, did HUD receive any requests for permission to prepay?
A. We did not receive any to prepay on 221-D-3, limited dividend, or 236 limited dividend. We did receive prepayments all the time on 221-D-4s which can prepay.
Q. In the prior period, and you will tell me if you don't have knowledge, but in the prior period, 1991 to 1994, did the HUD office in New Orleans receive any requests for permission to prepay?
A. I don't have knowledge of that either.
Q. After you arrived in New Orleans in 1994, there were, as I understand it, waiting lists to get into every family property operating under 221-D-3.

Page 1104

A. Could I clarify that? We have long waiting lists --
MR. DUNN: Your Honor.
THE COURT: Mr. Dunn.
MR. DUNN: I don't want to -- but there was no question pending. It was merely a statement by counsel.
THE COURT: Well, it is a declaratory statement. You are quite right, Mr. Dunn.
BY MR. POLEBAUM:
Q. I will rephrase. After you arrived in New Orleans in 1994, were there waiting lists to get into family properties operating under 221-D-3?
A. Yes. I'd like to clarify that, if I could.
THE COURT: Yes, certainly.
THE WITNESS: We have had long waiting lists from the time I got there until the end of '94 until today, even before the storm, for family housing. Especially housing with deep subsidy, Section 8. 221-D-3 with Section 8 or 236s with Section 8, we had four or five year waiting lists. Before the storm, we had 10,000 people on the waiting list for Section 8

Page 1105

vouchers.
Now, I don't know how many people were on the waiting list for 221-D-3 BMIRs or 236s without deep subsidy. I know they had waiting lists, but I don't know if they had four or five years like the deep subsidy, but we have a lot of poor people in New Orleans, in the metro, and we don't have enough housing for poor people.

BY MR. POLEBAUM:

Q. If you can't say whether the waiting list for these 221-D-3 or 236 properties were on the order of four or five years as for the others, do you have some sense of what the length of the waiting list was?

A. I really don't. I know they were doing well in – you know, they didn't have a lot of vacancies. But I don't know if they had as long. Because people had – because people had to earn enough money to live there, it wasn't as if – with a Section 8 property, you don't have to earn anything to live there. If 30 percent of your adjusted gross income is zero, then you pay zero. Well, I think today you pay $25, but in those days, it

Page 1106

was zero.

MR. POLEBAUM: Excuse me one minute, Your Honor.

THE COURT: Yes.

BY MR. POLEBAUM:

Q. Ms. Kizzler, do you agree with the assessment that prepayment could only be approved in very limited circumstances?

A. Prepayment of 221-D-3 in the LIHPRA program or ELIHPA program?

Q. Correct.

A. They could only be, in those two circumstances, if they did not adversely affect the residents or they did not materially decrease the low-income housing supply.

Q. And was it difficult to satisfy these criteria, Ms. Kizzler?

A. I think it was. But if you were going to satisfy it, you would probably do it better with a property like Chateau Cleary than you would one with – than another one, because the residents had to pay a certain amount of rent, but I think it was difficult to do it.

Q. And it was especially hard to do a prepayment in the New Orleans area, wasn't it?

Page 1107

A. Yes.

Q. Let me ask you if you would turn, please, to Exhibit 124-A. It will be in one of the binders before you. Do you have that before you, Ms. Kizzler?

A. I do.

Q. Is this the defendant's responses to plaintiff's second set of interrogatories to defendant?

A. Yes.

Q. And page 3491, please. Is that your signature on the verification page?

A. Yes, it is.

Q. So you reviewed and approved the answers in these interrogatory responses on behalf of the defendant?

A. Yes, I did.

MR. DUNN: Your Honor.

THE COURT: Just a moment. Yes, Mr. Dunn.

MR. DUNN: I would object to the use of these or this line of questioning regarding the interrogatories, which weren't the subject of direct examination, to the extent they cover any topics that weren't discussed in the direct

Page 1108

examination.

THE COURT: Well, we don't know that yet.

MR. DUNN: Yes.

BY MR. POLEBAUM:

Q. Ms. Kizzler, if you could look at the response to interrogatory number 1.

A. Okay.

Q. And that begins on page 2, you see a chart. Did you prepare this chart?

A. Yes. With the help of my staff.

Q. Yes. And this shows different properties that were within your purview in the HUD's New Orleans – in HUD's New Orleans office, correct?

A. Yes.

Q. And this shows that while some plans of action were approved, funds were not available, correct?

A. Yes.

Q. And particularly on page 2, you have identified Bobby Village, Redwood Park 1 and Redwood Park 2 that fall into that category, correct?

A. Correct.

Page 1117

MR. POLEBAUM: Not in exactly the same words, but in substance, yes, Your Honor.
THE COURT: Well, we do have a problem. Why don't you try asking your question again and we will see what happens. Not with respect to whether you asked that question at her deposition, but let's just get to the substance of it.
BY MR. POLEBAUM:
Q. Ms. Kizzier, is it your experience that most of the HUD properties, 221-D-3, 236 properties did not have enough cash to make even the 6 percent limited dividend payout?
A. I really don't know the answer. I would think that a lot of them did not.
Q. That was Mr. Norman's experience, as you understand it?
A. Yes.
Q. And that was typical?
THE COURT: Mr. Dunn?
MR. DUNN: I would object to him asking about Mr. Norman's experience.
THE COURT: Well, if she knows about Chateau Cleary, that's fine. If she doesn't, she doesn't.

Page 1118

THE WITNESS: May I amend my answer?
THE COURT: Yes, certainly.
THE WITNESS: I don't know about Chateau Cleary, because I wasn't doing the financial statements. I haven't been doing financial statements for a long time, so I really wouldn't know who is really getting what.
BY MR. POLEBAUM:
Q. Just a few questions --
MR. POLEBAUM: Your Honor, did you want to stop at this point?
THE COURT: I think we might, just to keep to a rigor order, if that's satisfactory.
MR. POLEBAUM: Yes, Your Honor.
THE COURT: Let's do that. Ms. Kizzier, is that fine with you?
THE WITNESS: That's fine with me.
THE COURT: Mr. Dunn?
MR. DUNN: Yes, Your Honor.
THE COURT: We're in recess for 15 minutes.
(A recess was taken at 3:34 p.m., after which the trial resumed at 3:53 p.m.)
THE COURT: Mr. Polebaum, you may

Page 1119

proceed.
MR. POLEBAUM: Thank you, Your Honor.
THE COURT: I should just say, after Ms. Kizzier has completed her testimony, we ought to talk a minute about arrangements because we do have some answers.
BY MR. POLEBAUM:
Q. Ms. Kizzier, I just want to ask you a few questions about the incentives process that HUD implemented for the -- with respect to the preservation statutes. And as best you understand it, it took about two to three years to get through the incentives process?
A. At least two.
Q. And the reason it takes that long is that there are many steps in the process?
A. Yes.
Q. Multiple appraisals are required, typically?
A. At least two.
Q. At least two. And you need to get what's called a capital needs assessment?
A. Yes.
Q. And you have to get the HUD economist to do a market analysis?

Page 1120

A. Yes.
Q. And it takes a long time to put all the pieces together?
A. Yes.
Q. And it is a lengthy, complicated process?
A. Could I elaborate on that?
Q. Can you tell me, is it a lengthy, complicated process?
MR. DUNN: Objection, Your Honor, that's vague. And the witness has already described it.
THE COURT: Mr. Dunn, as you have undoubtedly concluded by now, the Court's inclination is to let, at least the first time, let the witness answer the question in his or her own way with whatever explanation they think is appropriate. I will allow the same question to be asked at least twice. And once in a great while, three times, because I usually do apply a three-strikes rule, but in this instance I think what we really ought to do is let Ms. Kizzier explain.
THE WITNESS: Thank you. It is fairly

Page 1121

similar to our multi-family insurance processing. We have, always have a market review, so we always have -- we're used to having economists do a review, so that's just like we do with every property we insure. So -- and then we have appraisals that we review, so we're used to -- we were used to doing this kind of work. Yes, it does take time, but it takes time for the owner to go out and get the appraisal and it takes time for us to contract and get an appraisal. It takes time to review those, but it wasn't anything we weren't used to doing. You know, I had, at the time, I had three appraisers on staff. I had an architect, a construction analyst. We had an economist in the office, so it wasn't as if we weren't used to doing that kind of stuff. We were.

BY MR. POLEBAUM:

Q. Okay. But would you agree with the characterization that it is a lengthy, complicated process to go through?

MR. DUNN: Objection, Your Honor, it has been asked and answered.

THE COURT: It is not the third

Page 1122

strike, Mr. Dunn. Overruled.

THE WITNESS: I wouldn't say it is complicated. I would say it is lengthy.

BY MR. POLEBAUM:

Q. Now, from the time that you arrived in New Orleans, Chateau Cleary always had a good reputation, correct?

A. Yes. Could I expand on that?

THE COURT: Yes. Certainly.

THE WITNESS: The reason I know it had a good reputation is because I didn't know about it. Because I knew all the troubled properties. I knew all the ones that were a mess. And it never came before my radar screen.

BY MR. POLEBAUM:

Q. And you knew that, and know that, Chateau Cleary was and remains in a good area?

A. Yes.

Q. In fact, in the mid-90's time frame when you arrived in New Orleans, in your estimation was Metairie the best suburb in the New Orleans area?

A. Yes.

Q. Some of the things that made it such

Page 1123

an attractive area included that it was higher income?

A. Yes.

Q. And had better schools?

A. Yes.

Q. And that it had a relatively low crime rate?

A. Yes.

Q. Are there other features that you would point to?

A. Great shopping.

Q. On that note --

A. Being honest.

Q. On that note, Your Honor, I will stop.

THE COURT: Thank you, Mr. Polebaum. Mr. Dunn? Redirect?

MR. DUNN: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. DUNN:

Q. Ms. Kizzier, I just have a few questions. Opposing counsel discussed the circumstances under which a HUD property could, under which HUD could approve prepayment

Page 1124

pursuant to the preservation statutes. Do you recall those circumstances?

A. That they had approved prepayment?

Q. Yes.

A. You had to show that it was not going to adversely deplete the low-income housing supply, and it also was not going to adversely impact the residents of that property.

Q. Who had to make these -- who had to show these circumstances?

A. Well, the owner, when they came in with their plan of action, would have to show that they could meet those criteria.

Q. Okay. And who would decide whether the owner met those criteria?

A. We would, with our economists and with our experts.

Q. Now, looking back at the interrogatories that opposing counsel discussed with you.

A. Yes.

Q. There is a table at page 2.

THE COURT: This is PX-124A; is that correct?

MR. DUNN: Yes, Your Honor.

Page 1266

dollar above the outstanding mortgage balance?
Right?
A. That's correct.
Q. Now, you understand that this particular transaction involving Chateau Cleary was not syndicated?
A. That's my understanding. It was not syndicated.
Q. All right. So that your statement with respect to projects that were syndicated has no bearing on your – on the situation that we're dealing with here, correct?
A. No. I disagree with that statement.
Q. All right.
A. I state in my report that this was a typical low-income housing project, whether it was syndicated or not, and that projects that were syndicated were not materially different than this particular project.
And that it is my belief where a developer is making a representation in a prospectus to a potential unrelated third-party investor, that that is a valid point of reference in developing a conclusion as to the overall residual expectations of low-income

Page 1267

housing generally, because that's a statement made to a third party that has securities law implications.
Q. But there was no – there was no prospectus issue in this case?
A. No, there was not.
Q. And there was no syndication in this case?
A. That's correct.
Q. And there was certainly no assumption in 1985 that the property would have an equity value in 1991 of one dollar above the mortgage balance, correct?
A. I'm sorry, could we have the question read back? I want to make sure that I answer that correctly.
THE REPORTER: "Question: And there was certainly no assumption in 1985 that the property would have an equity value in 1991 of one dollar above the mortgage balance, correct?"
THE WITNESS: I'm not aware of any such assumption.
BY MR. POLEBAUM:
Q. And indeed the transfer price would

Page 1268

indicate that such an assumption would be off the mark, correct?
A. I agree.
MR. POLEBAUM: Your Honor, I could take a stop right here if the Court would like to take the morning recess.
THE COURT: That would be presumably a good idea. Mr. Dunn, do you have a view?
MR. DUNN: Your Honor, we agree to that.
THE COURT: All right. Mr. Malek? Do you concur?
THE WITNESS: That's fine with me, Your Honor, thank you very much.
THE COURT: We shall take a 15-minute recess at this time.
(A recess was taken at 10:59 a.m., after which the trial resumed at 11:09 a.m.)
THE COURT: Mr. Polebaum, you may proceed.
MR. POLEBAUM: Thank you, Your Honor.
BY MR. POLEBAUM:
Q. Mr. Malek, in your view, investors were largely motivated by the tax benefits offered by these types of investments in

Page 1269

low-income housing projects, correct?
A. I believe primarily by the tax benefits, and secondarily by the combination of the prospective distributions, management fees, and abilities to control the project with only roughly 2 percent and sometimes less equity investment. And then, lastly, by the prospect for a speculative future residual, if any.
Q. But you do say in your report that the investors were almost exclusively motivated by these tax benefits that you have identified, correct?
A. I believe that's primarily – do I use the word almost exclusively?
Q. Page 4, subparagraph D.
A. Subparagraph D relates to investors who were limited partner, nondeveloper owners.
Q. All right. Now, you are aware that the Norman brothers did not take sum of the digits depreciation, correct?
A. That's correct.
Q. And they didn't take double decline balance depreciation, correct?
A. That's correct.
Q. In 1969, you say investors generally

Page 1346

their anticipation of future occurrences that would occur.

Q. Now, can you briefly describe the market area in which CCA is located?

A. Yes. The submarket that the appraised property is located in is commonly referred to in the New Orleans area as the West Metairie market. That is the area that's bounded by Lake Pontchartrain on the north, the Airline Highway or old U.S. Highway 61 to the south, Causeway Boulevard to the east, and the Kenner City limits to the west.

And that submarket is part of the greater area called, known as the east bank of Jefferson Parish, which includes the city of Kenner, city of Harahan, as well as the "general" – the unincorporated area known as Metairie.

For purposes of analysis in the marketplace, we generally divide Metairie between east and west sectors, east being the east of Causeway Boulevard to the Orleans/Jefferson Parish line; west being the area west of Causeway Boulevard to the Kenner city limits line.

Page 1347

Q. Now, do you describe this market information or this, the market generally in your report?

A. Yes, a summary of the metropolitan New Orleans region area and the economy that existed in 1991 was taken from a report of the an apartment project in the immediate area that was done about that time. It was done – it was either one that was done March, April, May, June, July of 1991, was the information that was taken from that report.

The neighborhood data that begins on page, the big number 26, and runs through page, I guess, 32, was taken from a report that was done in the immediate area in 1991 and discusses, you know, the area around the property, the influences in the area, the major streets, where the shopping is, what types of developments are there, accessibility, public transportation, and it goes into detail into apartment market conditions that existed as of May 1991.

And actually, this one refers to the University of New Orleans real estate market data centers, July '91 report. So this must

Page 1348

have been one that was done probably July or August of 1991.

But this goes into detail as to exactly the apartment market conditions at the time, what bank prime lending rates were, what were 30-year mortgages averaging at that point in time and the entire status of the market relative to – it gives a ten-year overview from 1981 through '91 of the apartment market in New Orleans as a whole, and then the Jefferson Parish submarket and then the sub-submarket of West Metairie.

Q. Now, to help us put this into context, we have heard testimony during the last week about the oil bust in New Orleans. Can you just briefly tell us when that was in relative terms to 1991, and how it affected the conventional market, apartment market in New Orleans?

We will start with New Orleans generally, and then I will ask you as well about West Metairie specifically.

A. Yes. The oil bust started in the early '80s.

Q. Okay.

Page 1349

A. And carried through. And there was, within the marketplace as a whole, there was – the major impact was felt in 1986. And that's when the majority of job losses occurred and the market woke up to the fact that we were not still booming and that we were in a major bust.

Occupancy rates dropped from in the high 90s in 1981, '82, down to reported occupancies of near 80 percent or 81.4 percent by December of 1986. This is on page 30.

Q. Right. I was just going to ask. Can we see that in the data you reported here on page 30? First, what is the source of this data?

A. This is from the July 1991 real estate market, the University of New Orleans real estate market data center, July 1991 report on the metropolitan New Orleans market.

Q. Okay. And how did that oil bust affect the West Metairie market for conventional apartments?

A. It impacted occupancy dramatically. It also had an impact upon rental rates. Rental rates were affected – it was delayed in its effect on the market until – you started

Page 1350

seeing major drops occur in '87, '88, and '89 and then started a recovery back after that. It was, at mid-1991, there were signs in the marketplace that we were finally coming out of this major recession. There were new jobs being created. There was some sense in the marketplace that things were going to get better.
We were still not at the end of the RTC days, though. There were still properties that were being foreclosed on. There were still significant apartment projects that were still in the bankruptcy courts at the time, working their way out of their problems, trying to do what we called cram-downs to the lenders to reduce the amount of their loans, reduce their payments, forgiveness of debt, restructuring of deals were still occurring in 1991 and still extended for a number of years, but on an overall basis, there was some sense at that point in time.
Dr. Timothy Ryan, who is now Chancellor of the University of New Orleans, but at the time was the dean of the business school out there, and is kind of the one known

Page 1351

in New Orleans as the economist for New Orleans, was the one who was starting to get on a soap box and preach, look, we see new jobs, you know, things are turning around. Things are getting better.
Q. Did the apartment market recover immediately or did it take some time for the apartment market to recover?
A. No, no, it took time. It took – and if you look at this, the raw data that is presented, which is just on occupancy averages, you can see where for the MSA, that's the entire New Orleans area, from December 1987 apartment occupancy, this is on page 31, was at 81.4 percent, and it didn't hit near 90 percent until July of 1991.
So you can see it was a very gradual point there of recovery and then the recovery continued after that. Historically, the New Orleans market had been in the – market-wide, had been in the mid-90s percent occupancy, that is.
Q. I was going to ask, how does this data fit into the context of the market generally, and I think you just answered it, does – MSA

Page 1352

stand for metropolitan statistic area?
A. Yes, that is roughly the seven-parish area, which are counties in Louisiana, that encompass the metropolitan statistical area.
Q. Now, carrying on beyond the years 1991, was the apartment market rising or falling from 1991 through 1998?
A. The market after 1991 continued to recover, as not only were we coming out of the oil bust, but also the national economy was on a tremendous role as interest rates continued to fall over a period of years, and we went on one of the great expansions in the economy in the history of the country, was in that period of time.
So that it continued to improve. And for the first time in many years, we started to see a few new apartment projects developed in the area, rental rates continued to increase, but New Orleans never fully covered from the oil bust.
Companies moved out of town or downsized their offices and moved. There was a consolidation to Houston that occurred, and every year in every one of the forecasts that

Page 1353

Dr. Ryan would prepare for the metropolitan area, they would talk about how we were picking up some jobs in that area but we were never going to hit the numbers that we saw in the early '80s.
Shell cut back. Mobil, Exxon, Amoco, we had buildings in downtown New Orleans named for everyone of them and today there is only one left and it is called One Shell Square and it is one division of Shell is there, whereas before they occupied the entire 50-story office building.
Q. What about after 1998, from 1998 up until 2005 before the Katrina storm?
A. Again, prior to Katrina, because that's another event that I think is outside the purview of here, the market was operating at a high level of occupancy, and rental rates, we were seeing modest increase in rental rates.
The problem that was occurring, and this isn't addressed in my report but is outside of the report itself, is what occurred in the population.
The metropolitan New Orleans area continued to lose population all the way up

Page 1354

until the time the storm hit. Each subsequent census showed a lower population than the prior census. And it wasn't just in Orleans Parish, but in the metropolitan statistical area as well.

Q. Now, Mr. Derbes, I want to bring us back from a discussion of the market generally to your conclusions regarding the condition of Chateau Cleary as of the 1991 valuation date of your appraisal.

And, first, if you can tell us where in your report we would find your description of the condition of the property?

A. On big number page 40, because there is two numbers, one over the other, my report itself, which has a dash in front of it and after it, it is page 34, improvement data. I have assumed condition at July 1991.

Q. Now, in just very general terms, how would you describe the condition of Chateau Cleary at that time?

A. Okay. Based upon the property inspection reports from HUD, as well as the, some of the statements that were made in the 1992 Pappalardo letter, as well as some

Page 1355

information gleaned from my inspection of the report in 2005 and questioning the manager, the owner's representative who was there, and walking the property, I assumed that the property in 1991 would have been in average condition for – average physical condition for the marketplace.

As I stated here, property manager and owners representatives stated that appliances and carpeting are replaced as needed and some upgrading has been done over the years to bathrooms, replacing freestanding wall sinks with sinks and vanities. In addition, at moveout, each unit is cleaned, painted, and appliances and carpet are replaced as needed.

During my inspection, I only was given access to one of each unit type, and I could tell some still had original appliances, original flooring, original bathroom fixtures in them, and some had been changed. So going back to the HUD property inspection reports that said that the property didn't display any needs of major deferred maintenance, et cetera, I could only conclude that it was in average condition at that time.

Page 1356

And so for purposes of my valuation, I considered that the assumed condition at July 1991.

Q. Did you reach any conclusions regarding the property's functional utility? And if you could first describe what functional utility means.

A. Yes. Functional utility is items within a property which are not physical in nature, which impact its value. This can be the layout of a room, an appliance that works but I think that this came out in Mr. Alexander's testimony, you know, the harvest gold appliance in an apartment in 2005 or in 1991, for that matter, too small of closets, no microwave ovens, so items like that. It was those that were not up to modern standards or current standards in the marketplace would be considered functional utility.

So my conclusions relative to it was that the one bedroom, one-bath flats are considered average when compared to its competition in the rental market. The layout of the two bedroom, one-bath flats would also be considered average. However, the bedrooms

Page 1357

have relatively small closets by modern standards, which would impact its rent.

The two-bedroom, one and a half bath townhouses are small by market standards with smaller than normal living room and little closet space when compared to its competition in the marketplace and, thus, likely will need to be priced at the lower end of the market.

And then the layout of the three-bedroom, one and a half bath flats are considered small when compared to its competition in the rental market and have a very small third bedroom, a small closet space, the living room/dining room area was smaller than normal and had a very small aisle kitchen, you know, the newer apartments were opening out into – and having one living room going right into the kitchen. So I said –

Q. How did the amenity package at Chateau Cleary compare to conventional competition?

A. Well, there was virtually no amenity package there. You had the two open court yards and two centrally located laundry rooms, very little landscaping, and very little private tenant areas. Most of the newer

Page 1358

projects were placing fencing around the first floor units with a walkout, paved courtyard on the first floor units and, you know, swimming pools, health clubs came into vogue in the 1990s, exercise rooms and party rooms, meeting rooms, that type of stuff for the common – for the tenants.

And this project did not have any of those. So my conclusion was that the overall layout in individual unit layouts are considered below average for a market rate project, which will likely place the apartment units near the lower end of the rental range in its submarket.

Q. And the submarket is West Metairie?

A. The West Metairie submarket.

Q. Now, Dr. Ragas described Chateau Cleary as a class B property of average quality. Are those terms of art in the appraisal profession?

A. No. I have heard them described many different ways, you know, A, B, C properties. I have heard them described as good, bad, and ugly and everything in between. Basically, I believe what he was

Page 1359

stating and what he considers an A property to be, the new construction, modern property, with all the conveniences, top of the market. A B property is going to be a former A property that has a little bit of age to it but has all of the amenity packages to it. A C property would be a property that has some age on it and has some functional problems. Therefore, not up to most modern standards.

Q. And where would Chateau Cleary fit into that strata?

A. It is my opinion that given its unit layout, the layout of the property itself, compared to the apartments immediately around it that it would be in the lower portion of the market. The immediate area is one of the best rental areas in the metropolitan area. A number of the projects were built after this property was built and had all of the amenities that residents are looking for, washer/dryer hookups in the larger units, large walk-in closets, health club, meeting room, swimming pools, tennis courts, and I can go on and on and on because of the projects that are in the immediate area, and what they have in it

Page 1360

compared to this property.

And, therefore, you know, again, I conclude that the highest and best use was to convert this to market rate. Where I differ from Dr. Ragas was that I believe that this property would have been at the lower segment of the marketplace and not the average of the market because the average of the market included the best properties in the data, as well as the worst properties in the market, and there weren't very many bad properties in this market.

Q. Right. And would its condition affect the rent levels it could achieve as a market rate property?

A. Yes, conditioning is a factor, which does affect market rent.

Q. Now, turning to your valuation itself, can you explain for us the typical approaches that an appraiser uses to reach a value conclusion?

A. Yes. The appraisal process for an improved property is generally broken into three approaches to value, three different ways of looking at value.

Page 1361

The first is the cost approach to value, which takes an estimate, underlying land value, as vacant and ready for development, adds to it the replacement costs of the improvements considered built new today and then deducts from it both all types of accrued depreciation, meaning physical deterioration, curable, deferred maintenance items, incurable items. The roof still doesn't leak, it is still okay, but it is not new and is going to have to be replaced, that's physical incurable depreciation.

And then deducts functional obsolescence, curable and incurable, and economic or external obsolescence, curable, incurable, to arrive at an estimate of value.

The economic theory behind this approach is that it is what someone would pay for a property in lieu of going out and buying vacant land and building a new project. That's the, in a nutshell, is the cost approach.

The sales comparison approach is an analysis of sales of competing properties that have sold in the recent past, compared to the subject property. The economic theory here is

Page 1390

occupancy aren't always the same figures?
A. Right. And the data that goes into the report is not always consistent from one property owner to another. So –
Q. Mr. Derbes, I'm sorry to interrupt. Is there a protocol for filling out the UNO survey reports for apartment owners who are completing the survey must follow?
A. There is no real consistency that we found over time.
Q. Okay.
A. But, at any rate, using that data, we looked at what was reported as physical occupancy and added a factor for the credit loss allowance. Credit loss allowance will be down units during the – where you don't get rent for a period of time, that's part of vacancy credit loss, is those units which are off the market for repairs and for other reasons where income is not generated from them, or where people are living in it and not paying rent.
So that's why my estimate of vacancy and credit loss allowance tends to be different than a physical study of the marketplace. And

Page 1391

it is virtually impossible to achieve, you know, a 97 or a 98 or a 95 percent occupancy unless the units are rented all the time because you are going to have down units, you are going to have problems over time. You have people living in units and not paying you rent.
Q. Okay. A quick question about the UNO survey while we're on that topic. Does the data – that's not the right word I'm looking for – does the number of apartment complexes filling out the survey change from year to year? In other words, does the sample size change from year to year with the study?
A. Yes, it does, and 1991 was a very interesting year. And that was, I started to allude to in the addenda to my report on page 2302, shows that the West Metairie market, the number of units that were in the survey in the prior period for the West Metairie market, it is about mid-page, for the prior period was 9,727 units. And for the current period, it was 8,875 units, or about 850 less units in the survey for that.
When we turn the page to 2303, and we start looking at rents, we see that in the

Page 1392

prior period, 6/90 to 12/90, for the West Metairie market, there were 3,358 units in the survey, whereas in the January '91 through 'June '96 survey, it almost doubled to 6,626 units.
Q. Does that mean more units reported or more units were constructed or both?
A. There was no new construction. It is just those that participated in the survey and turned in the numbers.
Q. Now, how might that affect the survey data?
A. Well, you have to know what your projects are in it, and what the range of rents are. Because what occurs is the actual product rent in the West Metairie market, the average for the market actually shows that it went down from the prior period from $396 to $392. But because you have a bunch of, twice as many units in the survey, that the average unit size dropped, so the rent per square foot is shown as having increased from 46 cents to 48 cents, or having gone up by 4.3 percent, whereas the gross rents, the average of all the rents, went down during the period.

Page 1393

So are we in a declining market? No, the sample changed. It is because you are dealing with big numbers, statistics have inconsistencies in them, and you have to watch it carefully.
So that's what – that was just a caution in using this as a Bible for information. It is a good source of data. We all rely upon it. If you look on the second page of the document, we participate in the study. We're one of the ones that contribute to the study. We all use it, and refer to it, but it can't be the be all and end all of data. And you have got to do your own homework in doing appraisal work. That's why we love to sell it to out of state people and get money going to UNO.
Q. Let's turn back to your constructed operating statement and turn to the expense side of the ledger. What were your sources for projected operating expenses?
A. The first thing that we did was we looked at the actual reported operating expenses for Chateau Cleary apartments. And I have reconstructed that, their data on page CCA

Page 1438

MR. WOODROW: Thank you, Your Honor.
THE COURT: Mr. Polebaum, you may proceed.
MR. POLEBAUM: Thank you, Your Honor

CROSS-EXAMINATION

BY MR. POLEBAUM:
Q. Good afternoon, Mr. Derbes.
A. Good afternoon.
Q. Let me ask you if you would turn to Exhibit 100, your report, page 113, CCA 02268.
A. Okay, I am there.
Q. And just so that I'm clear on what these different figures represent, the first bolded material and the $2,200,000 number reflects your estimate of the value of the property as of May 1991 based on an assumption that it is no longer part of the HUD program, it has been fully leased up and achieved stabilized occupancy; is that correct?
A. That's correct.
Q. And then you subtract $310,000 in conversion costs and leaseup, recognizing that you make an adjustment to that on your

Page 1439

corrective report, but conceptually that's what you have done?
A. Yes, conceptually, it is right, the number is wrong.
Q. Right. And then – so then when you arrive at the bottom line number of 1,900,000, if I understand you correctly, what you are saying is that a purchaser would be willing to pay $1,900,000 for the property on May 1, 1991, expend 310 or 350,000 in conversion costs to achieve a property that is then worth $2,200,000, does that summarize it?
A. Not fully. They would not spend the 350,000 in the correct report. He was only going to spend 104,000, – $204,000 of out of pocket costs. The rest is just foregone income.
Q. Foregone rent, okay. Thank you, sir, for that clarification. Now, you performed this valuation as of May 1, 1991, right?
A. That's correct.
Q. And you call it a retrospective analysis, right?
A. That's correct.
Q. What you tried to do was to put

Page 1440

yourself in the shoes of a prospective purchaser as of May 1, 1991?
A. That's correct.
Q. That was your assignment, you were asked to do that?
A. That's correct.
Q. And when you do a valuation as of May 1, 1991, you do not actually have available to you information based on events that happened in June or September or November 1991; is that correct?
A. That's correct. There are some contradictions in the report and that's because I was not clear on the date of the report, that effective date. I had in my mind, due to poor notetaking, in taking the assignment, the 60-day delay that occurred in 1996 was in my mind in 1991, and, therefore, when I started to pull information together, I had a July date as an effective date in my mind.
Q. Okay.
A. So that was the information that I had from files that we pulled, and all of the initial report that I had, thinking of a report, was all thinking that the effective

Page 1441

date was a July '91 date.
Then after I had completed a significant portion of the report, but prior to submitting even the draft, is when I was given the May date.
Q. All right.
A. To clarify, the May date was the true date to use, et cetera.
Q. But you used a number of, a variety of data from the period after May 1, 1991, correct?
A. Yes, very close time frame to that.
My cutoff point for reports was reports which had been done between 1989 and 1991, or the reports that I pulled to look at for this particular assignment.
Q. All right. Could I ask you to turn to page 54 of your report. Do you have that before you, sir?
A. Yes.
Q. This has a survey date of September 1991, right?
A. On that page. If you turn the page, there is an August 1990 survey date of that property.

Page 1442

Q. Right. But the September 1991 information would not have been available to you whether you did your report at May 1st or July 1st, 1991?

A. That's correct.

Q. Okay. And on page 71 of your report, please. If you could look at the line that is entitled year expenses reported. That's in the second box down.

A. Yes.

Q. Okay. So column 1, the year indicated is 1990. Would that data have been available to you on May 1, 1991?

A. Yes.

Q. Okay. Columns 2 through 7, year expenses reported, 1991, would that information have been available to you in May 1991?

A. It may or may not, because when we do an appraisal, quite often we annualize data by using the date of appraisal, so if we're doing an appraisal in May, we may use the last reported month, March, so we would go March back to the May 1 of one year – April 1 of one year to March 31st of the next year, and call that the year.

Page 1443

It is not – this is not necessarily calendar year data, so I would have to go back in my notes to determine how these were actually done. This was taken from a report that was done in mid-1991.

Q. Right. Mid-1991. So after May 1991?

A. I am thinking it was July 1 or something like that. I am not positive what report this one came out of right now, but it was done in 1991, it was a project that was done and it was done sometime by midyear.

Q. All right. Do you recall that we discussed this subject at your deposition?

A. Yes.

Q. And do you recall that you told me that this information, in fact, would not have been available until December 31, 1991 or some point thereafter?

A. I had a whole lot more pages with me when I walked into the deposition, and I don't remember what I said.

Q. Mr. Derbes, I ask you to take a look at Exhibit 103, which is your deposition transcript.

A. Okay.

Page 1444

Q. Do you have Exhibit 103 before you, sir?

A. Yes.

Q. And if you turn to transcript page 30, which is Min-U-Script page 9. And let me call your attention to lines 15 through 21. Why don't you take a look at that.

A. Yes.

Q. Does that refresh your recollection, Mr. Derbes, that the information in columns 2 through 7 would not have been available until December 31, 1991 or some point thereafter?

A. Yes.

Q. Now, when it came to looking at rent increases, you did not – you did not confine yourself to – strike that.
When it came to looking at rent increases, you did confine yourself to information that you had available as of May 1, 1991, did you not?

A. That's correct.

Q. You did not look at rent increases as they actually unfolded in the marketplace?

A. I did not use that in my thought process, no.

Page 1445

Q. You determined what you believed were the market rents as of May 1991 and you projected them forward at annual increases of 3 percent?

A. Yes, based upon what I anticipated – what was anticipated by investors at May of 1991, that's correct.

Q. Right. And similarly, when it came to actual credit losses and vacancy rates, you – for that, you put yourself in the shoes of somebody looking at the market as of May 1, 1991 and projecting forward, without looking to see what actually happened in the marketplace thereafter?

A. That's correct.

Q. Now, you produced this report on or about March 7, 2005, correct?

A. Yes, that was the date that I submitted the draft.

Q. All right. And then you recall that your deposition was taken on April 6th, 2005.

A. Yes.

Q. Correct? And then you submitted a supplemental report dated April 29th, 2005?

A. Yes.

Page 1446

Q. Now, let's take a look at your supplemental report, which is Defendant's Exhibit 173. And here let me ask you to turn to page 12 of that report, Mr. Derbes.
Now, on page 12, you are proffering a different valuation of the property, correct?
A. That's correct.
Q. This is also a valuation as of May 1, 1991, right?
A. That's correct.
Q. And as of May 1, 1991, you are valuing the property at $1,515,000, correct? I will strike the question. Let me ask it to you differently.
What you are saying here is that a purchaser would pay $1,515,000 to acquire the property, remain subject to HUD restrictions, for an additional five years, and then go through the conversion process, which would cost in combination of out of pocket expense and foregone rents 685,000 to arrive at a property with a value of $2,200,000? Did I say that right?
A. I think you started at 2 million – yes, you are correct, you started 1,515, added

Page 1447

685, to get to 2 million 2.
Q. All right. So this 1 million 515 number is a valuation in which you put yourself in the shoes of someone looking at the property on May 1, 1991?
A. That's correct.
Q. And you attempted to use information that was available and known to you as of May 1st, 1991?
A. Yes, I attempted to use that date.
Q. Right. Although there are some exceptions?
A. There are some exceptions, because of the confusion at the beginning of the assignment, which I think I pointed out in my deposition, I wasn't clear of the start date so I had pulled information from 1989 and 1990 and 1991, all the appraisals we did, pulled it all out and then started, then backed back and said, no, go to July of '91, and then backed back to May of '91.
Q. So you looked at some of the same post-May 1991 comparables that we were examining a moment ago in connection with your original report, relied on that same

Page 1448

information?
A. Yes.
Q. Again, though, you did not consider rent increases as they actually unfolded in the market, you made a projection based on May 1991 market rents, carried forward – strike that.
You made a projection – tell us – let me ask it to you differently.
How did you do the rents on this valuation?
A. Okay. For this valuation, as with the first valuation, we look at it through the eyes of someone at May of 1991 and their anticipation of future occurrences in the marketplace.
Q. And you did the same thing with the vacancy rate and credit loss criteria?
A. That's correct.
Q. Now, you did assume a delay in conversion until May 1996?
A. That's correct.
Q. And that represents the period until HOPE was enacted and presumably became effective?
A. That's correct.

Page 1449

Q. And HOPE allowed owners, once again, to prepay, correct?
A. Yes, that's my understanding.
Q. Okay. Now, in May 1991, you did not know that HOPE would be passed and would restore an owner's prepayment right in May 1996, did you?
A. I do not know that, no.
Q. There was no way to know that piece of information?
A. That's correct.
Q. And no purchaser in May 1991 would have known that if you bought the CCA property in May 1991, that he would be allowed to prepay in May 1996?
A. That's my understanding.
Q. In fact, LIHPHRA had just been passed about six months before at the end of 1990, correct?
A. That's correct. That's my understanding.
Q. And your understanding is that LIHPHRA permanently repealed the prepayment rights of owners when it was passed?
A. That under certain conditions, it –

Page 1450

and there I'm not clear between which one and the other, because I don't claim to be an expert in either one, but that it – it effectively took away their right at that point in time to prepay, unless they did certain other things.

Q. Right. It permanently repealed their unrestricted right to prepay, right?

A. That's my understanding.

Q. There was no sunset provision in the legislation, for example?

A. Not to my knowledge.

Q. No provision that said that the abrogation of the right to prepay ends in May 1996?

A. That's my understanding.

Q. So when you did this supplemental report, you were instructed to assume that the prepayment right would be restored in May 1996?

A. That's right. It was a hypothetical. It was something that did not exist, but was assumed for purposes of the analysis.

Q. Right. And you were told to make that assumption by people from LECG, correct, people who work with Dr. Dickey?

Page 1451

A. No, I believe it was from DOJ.

Q. From DOJ, okay. So your analysis then, your supplemental report, assumes a 100 percent probability, indeed, a certainty then that as of May 1991 the prepayment right would be restored by HOPE as of May 1996?

A. That's a good characterization.

Q. All right. Now, if you had assigned a 75 percent probability that in May 1991 the prepayment right would be restored in five years, your valuation would have been lower?

MR. WOODROW: Objection, Your Honor. It is an incomplete hypothetical question. It goes beyond the scope of Mr. Derbes's direct examination. There is no discussion of probabilities or anything of the sort.

THE COURT: Well, underlying this assessment is a hypothetical, Mr. Woodrow.

MR. WOODROW: Yes, a hypothetical that was given to Mr. Derbes by instruction of counsel.

THE COURT: That's correct. And Mr. Polebaum was changing the hypothetical. Is that allowed?

MR. WOODROW: Well, Mr. Derbes offered

Page 1452

no opinion regarding that hypothetical assumption. He simply took it as a given by instruction of counsel.

THE COURT: Well, but it is entitled an estimation of the retrospective hypothetical market value, and I hear Mr. Polebaum asking a question, and all he is doing is changing the hypothetical in one respect.

MR. WOODROW: But –

THE COURT: Are you saying he can't do that?

MR. WOODROW: My point is that Mr. Derbes was not asked or did not render an opinion regarding whether that hypothetical was true or not, or what probabilities might be attached to whether that hypothetical would be true or not. Mr. Polebaum is asking for an opinion on that very subject, and that is not within the scope of Mr. Derbes's direct examination or within any of his expert reports.

THE COURT: So you are saying the direct examination limits, because it only deals with one hypothetical, allows for absolutely no change in the hypothetical?

Page 1453

MR. WOODROW: Well, I guess what I'm saying, Your Honor, is that he offered no opinion regarding the hypothetical assumption. He was asked to accept, and because his direct testimony did not address the truth or the probability associated with that hypothetical, he simply offered no opinion on that hypothetical assumption. Therefore, it is proper to ask him about that hypothetical assumption, simply an instruction given to him and he rendered his opinions, assuming that instruction to be the case.

MR. POLEBAUM: I think I should be allowed to ask him what the effect would be on his valuation, if it were less than 100 percent certain that HOPE would be restored.

THE COURT: Well, Mr. Derbes might have a view in 1991 whether or not that hypothetical he was given had any validity, too, but let's – the objection is overruled.

MR. POLEBAUM: Do you need the question again, Mr. Derbes?

THE WITNESS: Please.

BY MR. POLEBAUM:

Q. If you had assigned a 75 percent

Page 1454

probability that in May the prepayment right would be restored by HOPE in May 1996, would your valuation have been lower?
A. What's the other 25 percent of the probability? Is it later or earlier? That's what I'm trying to figure out.
Q. We don't know.
A. I'm trying to understand your question. If there was – I guess you are saying my hypothetical was 100 percent certain that I assumed that it could be done at that point in time.
If we then assume it couldn't be done then, but it could be done at a later date, that would be allowed at some later date, then, yes, it would have changed my number. If it could have been done at an earlier date, it would have changed my number.
Q. All right. And if the probability assigned were 50 percent, then the variations would be stronger still?
A. Precisely.
Q. And if the probability were 25 percent, then the variations would be yet stronger?

Page 1455

A. That's correct.
Q. Can you identify any information that was known in May 1991, six months after LIHPHRA was passed, that suggested that Congress would repeal LIHPHRA in 1996?
A. No, I have no basis and do not consider myself an expert in either that Act or the HOPE Act.
Q. Do you have any information that would suggest that there was even a 5 percent chance that this might happen?
A. No. I just was not familiar enough with the legislation to render an opinion.
Q. Now, if you had done a valuation as of May 1991, six months after the passage of LIHPHRA, and made no assumption about whether and when Congress might reverse course and restore the prepayment right, your valuation would have been lower, correct?
MR. WOODROW: Objection, Your Honor. That is an incomplete hypothetical. I'm not entirely sure I understand the question.
THE COURT: Well, there is an element – it would have been lower than what? Mr. Polebaum?

Page 1456

MR. POLEBAUM: Yes.
BY MR. POLEBAUM:
Q. If you had done a valuation as of May 1991, Mr. Derbes, and made no assumption about whether and when Congress might reverse course and restore the prepayment right, your valuation would have been lower than the valuation reflected in your supplemental report?
MR. WOODROW: Objection, Your Honor. Again, the question is an incomplete hypothetical. There is no discussion about the other parameters of the valuation. Are we valuing a property as if it were already converted to market rent operation? Are we valuing a property that is under HUD subsidy and might potentially convert to market rent operation at some point in the future? The question itself does not adequately define the parameters of the hypothetical.
THE COURT: Well, overruled. The assumption is that at the relevant time in 1991, it is under HUD restrictions and that's what I hear Mr. Polebaum saying and whatever happens in the future is up to Mr. Derbes.

Page 1457

THE WITNESS: I believe I have some of the basis of this in the analysis in the supplemental report because we looked at it under the HUD restrictions continuing for five years going out.
I used the rents that existed at that point in time, which were less than market rents, my estimate of market rents. I also recognize that there were increased expenses for the project being a HUD project versus a market rate project and attempted to recognize that. The resulting net income is a lower number than the resulting income as a market rate project.
So, therefore, the estimated market value, subject to restriction, as a HUD project continuing into the future for an indefinite period of time would have been a lower number than my estimate of value in as-is condition, at those two different points in time, one immediately, one five years down the road.
BY MR. POLEBAUM:
Q. All right. Now, do you understand that the two valuation numbers that you came up with have flowed into the report that Dr.

Page 1474

You know, we had – typically a
security officer gets a free unit, manager or
assistant manager, maintenance man, that is all
within, in that loss of income that's there.
So you either put it above the line or
increase your expenses accordingly.
Q. Looking at the situation ex post, was
it, in fact, the case that average vacancy and
credit lost on economic terms was 8 percent
during the 1991 to 1996 period?
A. I do not know what their actual amount
was because I didn't check the numbers to see
whether they were basing their gross potential
income on 100 percent occupancy of all units at
market rates or whether they had taken out the
units and were basing it upon 100 units or 99
units, et cetera.
You have static vacancy that exists in
every apartment project. And it is – you have
down units, you have delays between the time
someone moves out and someone moves in, that
causes losses over time.
So that's why to say that there is a
physical occupancy at 95 percent in the
marketplace and report that is usually a false

Page 1475

assumption.
Q. Okay. In the late 1960s, and early
1970s, the expectation in the marketplace was
that Metairie was in the path of future
development; is that right?
A. That's correct. That with the opening
of Lakeside Shopping Center in 1960, the
opening of the Causeway in 1965, and the
extension of Veterans and the creation of the
3400 acre program that placed streets, water,
sewer into a large portion of the East Metairie
market, it was anticipated that was going to be
the major growth section of the city during
that time.
Q. Okay. So when Mr. Malek said this
morning that every developer in their
prospectuses was touting that their property
was in the path of future development, at least
with respect to Chateau Cleary, that was truly
the case, was it not?
A. Yes, it was – when it was developed
in 1971, it was in the path of growth.
THE COURT: Mr. Polebaum, the Court
notes that it is – well, it is 5:39.
MR. POLEBAUM: Yes, Your Honor.

Page 1476

THE COURT: And we are supposed to be
finished with Mr. Derbes.
MR. POLEBAUM: I suppose it depends on
what close means. I'm at least halfway
through.
THE COURT: Right. That's what I
mean.
MR. POLEBAUM: I think I have been at
it for about 50, 55 minutes or so.
THE COURT: That's why we have the
26th and the 27th.
MR. POLEBAUM: Did the Court want to
stop now?
THE COURT: Yes. What we might do, I
think, is usefully spend a few minutes talking
about our schedule for the 26th and the 27th.
MR. POLEBAUM: Yes.
THE COURT: Because maybe I was too
optimistic.
MR. POLEBAUM: Judge, I beg you,
please –
THE COURT: But even I, optimist that
I am, would have thought we would have finished
before the end of the day on the 27th. I'm not
utterly confident of that. Because we have,

Page 1477

what the Court projects, at least several hours
of Mr. Derbes left.
MR. POLEBAUM: From my perspective,
I'm estimating an hour, roughly an hour, give
or take.
THE COURT: Right. And the Court has
several questions, you know, invariably, I wait
until direct and cross before I ask, unless I
have got something kind of an administerial
nature, just to clarify.
And by the time we finish redirect, we
have a couple of hours left. And then we have
Dr. Dickey. And then we have Dr. Stillman and
–
MR. POLEBAUM: I can tell you, his
direct will be very short.
THE COURT: I understand that. But I
am just trying to project ahead what's going to
happen.
MR. WOODROW: Our estimate of Dr.
Dickey's direct would be about three hours,
Your Honor.
THE COURT: Oh, my. Actually, that's
what the Court guessed, at least.
MR. POLEBAUM: Personally, I'm

Page 1490

location. location determines value and long-term trends. And so if you would put it in a good. growing neighborhood. you would anticipate that your property would grow faster than in an area that you would possibly be in a declining area. if that's what you are asking.
BY MR. POLEBAUM:
Q. Yes. Is it easier to convert a building from HUD-controlled rents to market rents if the building is in a good area rather than a bad area?
A. I would think so. yes.
Q. Now. you did your valuation as of May 1991. If you were valuing Chateau Cleary. let's say as of 2005 when I took your deposition pre-Katrina. at that point. the value of the property was worth more than it was in 1991?
A. Yes.
Q. Right. And at the time I took your deposition. you expected real estate in Metairie to continue to appreciate?
A. Yes. At that point in time. we would have anticipated that it would continue to move as rents moved upward and expenses were

Page 1491

controlled.
Q. And back in 1971, would you have expected the value of Chateau Cleary to be greater in 1991 than it was in 1971, as long as the owner maintained the building?
MR. WOODROW: Objection, Your Honor. The question is vague in the sense that it doesn't take into account the time value of money.
THE COURT: Overruled.
THE WITNESS: Between 1971 and 1991, over that 20-year period, just the dollar itself changed dramatically, inflation -- with inflation, et cetera. So as a whole, being a function of the dollar, an investment in real estate did increase over that period of time.
BY MR. POLEBAUM:
Q. Would an assumption in 1971 that Chateau Cleary would be worth one dollar in 1991 be a ridiculous assumption, in your view?
A. Are you asking -- I'm not sure where this is leading. One dollar or one dollar more than land value? That's what I'm not clear on.
Q. Well, one dollar.
A. Oh, that it would be worth one dollar?

Page 1492

Yes, I would say that it would be anticipated in 1971 that in 20 years, that the building would still have some economic life left to it. As long as it was maintained over that period of time, it would be greater -- it would be worth more than one dollar.
Q. Let me ask you to turn to your report, which is Plaintiff's Exhibit 100. I believe that's the one that was entered as an exhibit into evidence.
And I ask you if you would, please, to turn to page 2220, which is page 66 of your report.
A. Yes.
Q. Do you have that before you?
A. Yes, I have it before me.
Q. Now, on this page, this is a table that shows your view of the difference between CCA's HUD rents and the market rents that you believed Chateau Cleary could have attracted.
A. That's correct.
Q. Okay. And according to your table here, the one-bedroom unit goes up about 25 percent, correct? Do you need a calculator there?

Page 1493

A. Yes.
Q. All right. And the two-bedroom goes up about 29 percent, right?
A. That's correct.
Q. And the two-bedroom, one and a half bath goes up about 16 percent?
A. Correct.
Q. And the three-bedroom goes up about 28 percent; is that right?
A. Correct.
Q. And the average goes up about 22.5 percent?
A. 22.5, correct.
Q. Okay, thank you. Now, if you could turn to page 2233, which is page 79 of your report.
A. Yes.
Q. Now, you have columns in your report that reflect what you label a going-in capital rate and a terminal cap rate, correct?
A. That's correct. This is taken from a survey which was, a quarterly survey in investment criteria for the second quarter of 1991 performed by Real Estate Research Corporation.

Page 1522

Q. Okay. Let's look at page 9 of your report, which is a chart that follows the text. In the government's exhibit, it was their numbered page 13.
A. Okay, I have got it in front of me.
Q. Now, this chart shows your analysis, among other things, of the loss of income that CCA undergoes because of the five-year delay to market rental rates, correct?
A. That's correct. That's one of the headings.
Q. Right. And just so we understand how this works, your analysis is done in the top line on a May 1 to April 30 year; is that right?
A. That's correct.
Q. So in column 1991, that's May 1, '91 to April 30, '92?
A. That's correct.
Q. Okay. And so on for the succeeding years, right?
A. That's correct.
Q. And you, therefore, have columns representing the period of HUD restrictions from May 1991 to May 1996, right?

Page 1523

A. The projection is from May 1991 through April of 1999.
Q. Right. But maybe my question wasn't clear, and I apologize.
These first five columns that you have identified, '91 through '95, corresponds to the period of the HUD restrictions from May 1991 to May 1996?
A. To April 1996.
Q. End of April 1996, right?
A. Yes.
Q. And this corresponds pretty closely to the period for which Dr. Ragas did one of his damages computations. Do you recall that?
A. No.
Q. Now, about two-thirds of the way down this chart, Mr. Derbes, you have a line called loss of income during five-year delay to market rental rates. Do you see that?
A. Yes.
Q. Okay. And then for each year, then, you have an estimate of the lost income, correct?
A. Yeah, it is the difference between the estimate of net operating income for the year

Page 1524

based upon it remaining as a HUD restricted project and my estimate in the report of the net operating income, assuming it was operating as a rental rate project.
Q. Right.
A. So it is the difference between the two. It is a subtraction to arrive at loss of income during the five-year delay.
Q. Right. And you characterize that as loss of income during five-year delay to market rental rate?
A. That's correct.
Q. And that five-year delay to market rental rate is the result of the legislation that Congress passed eliminating the prepayment right of the property owner, correct?
A. That was what the attempt was, was to recognize a five-year delay.
Q. Okay. So for the first year, you estimate $101,710 in lost income, correct?
A. That's correct.
Q. And in the second year, it is a little hard to read, but I think it is $103,708, correct?
A. That's correct.

Page 1525

Q. And the third year is $103,755. Am I reading that properly?
A. I am not positive. I can't read it either.
Q. Pretty close, though?
A. Yeah, right. It is either 103 or 105 thousand and some change.
Q. For the fourth year, is that $103,761 in lost income?
A. No, I believe it is $107,761.
Q. 107,000, okay. And for the fifth year, 1995, which covers a period May '95 through end of April '96, is that $110,037?
A. That's correct.
Q. Okay. And this adds up to roughly 520 to 525,000 dollars?
A. It looks like about $530,000, something like that.
Q. So that's your analysis of what CCA lost due to the five-year delay in converting to market rates until HOPE is passed and the prepayment right is restored?
A. That's correct.
Q. Now, Dr. Ragas's foregone business income model for the period June 1, 1991 to May

Page 1526

31, 1996 comes to about $607,000. Do you
recall that?
A. No, I don't.
Q. You don't, all right. So can you --
are you aware, then, of what explains the
differences between your computation of
$530,000 in lost income and Dr. Ragas's
computation of $607,000 in lost income during
that period?
A. Yeah. I think I know where the
difference is.
Q. You make different assumptions on
rates of rental increases, for example; is that
right?
A. Right. I think that almost all of the
difference is in the estimate of market rent,
that's correct.
Q. Right. There is some difference --
does some difference flow from the differing
estimates of what the delay period would be in
transitioning the property?
A. Not in these calculations here that
I'm aware of, because we haven't gotten to
those in my estimates. But just in the
five-year period, I think that the basic

Page 1527

difference between Dr. Ragas's conclusions and
mine was on the gross income side and effective
gross income side.
Q. Okay.
A. I think we were fairly consistent on
the expenses between the two, if I remember
right. And I think that the difference was
that he felt that this project would move to
the middle of the market and would have a lower
vacancy rate than I projected.
So I think it is the combination of
those two is the reason for the differences in
our estimates.
Q. And that covers more or less the
$77,000 and change difference between them?
A. If that's what the difference is.
Again, I'm not aware of the difference. I
didn't go -- I don't recall what he did in his
analysis.
Q. Fair enough. Now, your estimate of
the rental income is based on your calculation
of the square foot size of the units, correct?
A. No, that's not correct.
Q. That's not correct? You did not take
into account the square foot size of the units?

Page 1528

A. I recognized that, but I recognized
the unit layout, et cetera. If you go back to
my report, and the pages that we discussed
where the estimates were, such as on page CCA
02216 of Exhibit, Plaintiff's Exhibit 100, the
adjustments are made on a gross dollar basis.
So that the UNO study of -- the average current
monthly rate was $320.
The Natchez Landing comparable that
was most similar was $345. And the adjustments
are made for size and layout, 15, 20, 25, 40,
25, condition and quality, amenities,
appliances, baths, landscaping and location,
running to the composite adjustments to arrive
at a projected rent for the subject unit. And
it was a gross dollar basis that I was looking
at.
Q. But --
A. It was, it was -- I did the
calculation of average monthly rent per square
foot up top and projected rent below, but it
was not based on -- it wasn't the -- the
criteria wasn't strictly size. Those are just
the results of the estimates.
Q. All right. But did the size of the

Page 1529

units go into your overall analysis of the rent
that the unit would attract?
A. Yeah, that was one of the factors that
was considered, that's correct.
Q. And when you visited Chateau Cleary,
did you measure the units?
A. I did not physically measure the
units, no.
Q. Now, let's go back to your April 29th
report, Defendant's Exhibit 173, Plaintiff's
Exhibit 103-A. And I am going to stick with
this chart that we were looking at.
A. What page now? I'm sorry.
Q. I'm sorry, it is page 9 of your
report. It is the chart we were focusing on
before that shows the loss of income in the
five-year delay period.
THE COURT: Page 13 of Defendant's
Exhibit 173.
MR. POLEBAUM: Thank you, Your Honor.
THE WITNESS: Got it.
BY MR. POLEBAUM:
Q. Now, you also have a line that shows
net operating income, correct? It is a couple
of lines above the loss of income --