IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CCA ASSOCIATES, Plaintiff, | ) | |
| v. | ) | No. 97-334C<br>Judge Lettow |
| THE UNITED STATES, Defendant. | ) | |

**APPENDIX TO PLAINTIFF'S POST-TRIAL MEMORANDUM**

Part 5 of 5

Elliot E. Polebaum
Albert S. Iarossi
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20004-2505
Tel: (202) 639-7000/Fax: (202) 639-7003

November 9, 2006

Page 1542

THE COURT: That's helpful, because the Court has actually done calculations that take into account a day and you might end up with an 8th order function, but rounding in this way is just hard to understand. Anyway...

BY MR. POLEBAUM:

Q. All right. So, Mr. Derbes, do you understand then that on the Derbes analysis side of this –

A. Without doing each of the calculations and assuming that you have – I understand where the number comes from for your first line of 1991. And I'm assuming if I add all those up to get to the 556.7, that those numbers do add to that, then it does match my present value of the loss income during the additional five-year delay holding period of the $556,000.

Q. Right. And that $556,000 figure is in the chart on page 9 of your report in the box at the bottom, correct?

A. Yes, it is the fourth line from the bottom.

Q. All right.

A. The fourth number from the bottom.

Page 1543

Q. All right. Now, let's assume for purposes of our hypothetical that instead of the restrictions ending in 1996, we assume the restrictions end in 2001. And this is where we move to the right side of PDX-34. Do you see that?

A. Yes.

Q. And here –

THE COURT: Mr. Woodrow?

MR. WOODROW: Objection, Your Honor. We object to this hypothetical on the grounds of relevance. It is carrying – or appears to be carrying Mr. Derbes's analyses out to 2001. That's not relevant to the claim, the plaintiff's claims in this case, and nor is it within the scope of Mr. Derbes's direct testimony.

THE COURT: Mr. Polebaum?

MR. POLEBAUM: Well, Your Honor, I think it shows that the assumption that defendants have built their case on, that it was known in May 1991 with certainty that the restrictions would end in May 1996 is not an assumption that has any validity to it. And we want to challenge that assumption by showing

Page 1544

what the result would be if one made a different assumption, which is as equally plausible from the vantage point of 1991 as the assumption that the defendants have made.

THE COURT: It is just an expositional device, as I understand it, Mr. Woodrow. It doesn't reflect any sort of actual scenario.

MR. WOODROW: Well, with due respect to opposing counsel, Your Honor, that is not the assumption upon which Mr. Derbes has rendered his value opinions. As Mr. Derbes has explained, his value opinions were based upon the effect on value of a delay of prepayment of a set period of time. That set period of time was given as instruction by counsel. And so we continue to question the relevance of this proposed hypothetical.

THE COURT: Well, the objection is overruled on the ground that Mr. Polebaum actually is testing the – I take it is testing, and you may examine or cross-examine on this, I take it, directly exam, I guess is the better word for it, the validity of the set of assumptions about whether May 1996 was known sufficiently far in advance to plan for a

Page 1545

conclusion.

BY MR. POLEBAUM:

Q. Mr. Derbes, so for the periods on the right-hand side, 1991 to 1995, we have used your lost income figures, the same present value and the same – the same present value factor, and then the same present value loss for those periods. Do you see that?

A. Yes, I see that.

Q. And then to be conservative, we held '96 through 2000 constant at the same loss as was reflected in 1995. Do you see that?

A. Yes, I see that you have made that assumption.

Q. Right. And then we, again, applied the present value factor and calculated the present value lost. Do you see that?

A. Yes, I see that.

Q. And all of these present value losses for each year sum to $874,600. Do you see that?

A. I see it says sum, 874.6. I haven't checked the math to make sure it is correct.

Q. Now, using this assumption, that LIHPHRA stays in place until 2001 rather than

Page 1546

1996, the impact on CCA using your analysis would have been 317,900 larger, correct?

A. It is usually –

MR. WOODROW: Objection, Your Honor. It is an incomplete hypothetical and it calls for a legal conclusion, to the extent that it assumes LIHPHRA stays in place, rather than the restrictions upon prepayment.

MR. POLEBAUM: I am happy to substitute the words "restrictions on prepayment".

THE COURT: They are one in the same thing for the purpose. Overruled.

THE WITNESS: I see where you got your number and I can see that you have calculated a difference by it, so I say that – so I do understand what you did on the paper, if that's what you are asking me, yes.

BY MR. POLEBAUM:

Q. Okay. And if we turn to page 12 of your report, which is page 16 of Exhibit 173. Do you have that, Mr. Derbes?

A. I believe so. This is the final reconciliation page?

Q. Correct.

Page 1547

A. Yes, I have it in front of me.

Q. If you subtract $317,900 from $1,515,000, the amount is $1,197,000, right?

A. What's the math you are asking me to testify to?

Q. Your bottom line number, $1,515,000.

A. And you want me to subtract from that –

Q. $317,900 as shown on PDX-34.

A. Okay. The resultant number is $1,197,100.

Q. All right. And then if that had been the result of your analysis, if you had been instructed, for example, to use a May 2001 date rather than a May 1996 date, then that $1,197,000 number would have flowed into Dr. Dickey's analysis, correct?

A. I'm not sure. I have not seen Dr. Dickey's analysis, so I don't know how – what would have flown where.

Q. If we assume that the restrictions stayed in place beyond 2001. If you were back in 1991 trying to make an estimate of value and you want to assume that the restrictions stayed in place beyond 2001, the impact on CCA would

Page 1548

continue to increase under your analysis, right?

A. Yes. I think what we showed in my analysis between my first analysis, which was immediate conversion versus a five-year delay, that the delay in time does have an impact upon value, and did lower the value from the $1,850,000 to the $1,515,000. It would be illogical to assume that if you continued into the future under the exact same assumptions, that there would be a greater loss in value that would be there.

Q. Right. And the reality is that in May 1991, I believe you have already testified to this, nobody knew if the restrictions would ever be repealed, and if they were to be repealed, when and under what conditions that might happen, correct?

A. I'm not an expert on the Act at all, and I think I testified earlier that I was not familiar in May of 1991 with the Act. But based upon the testimony that has been given by others as I have sat in the courtroom, I understand that, yes, you would not have known, no one would have known in 1991 when you would

Page 1549

have been able to pay off, that's correct.

Q. Do you consider it to be an arbitrary assumption to assume that in May 1991 HOPE would be passed and go into effect in May 1996?

MR. WOODROW: Objection, Your Honor, argumentative.

THE COURT: Well, that objection is overruled, but the Court has another concern about the question. Mr. Derbes, you may answer it, if you have personal knowledge on this subject.

THE WITNESS: Please repeat the question. I'm not clear.

BY MR. POLEBAUM:

Q. All right. Standing from the vantage point of May 1991, is it an arbitrary assumption to consider with 100 percent certainty that the HOPE legislation will be passed and go into effect in May 1996?

MR. WOODROW: Objection, Your Honor. Mr. Derbes has already testified that he had no personal knowledge of this legislation at that time in 1991 and, therefore – and, furthermore, he did not make such an assumption in his valuation opinion and, therefore, this

Page 1682

A. Because Dr. Ragas's damages model is an ex post model. And so it stands here today and looks at what we know about what cash flows and expenses – what rents and expenses and other inputs would have been during that period of time.
But it doesn't tell you standing in May of 1991, given expectations about the market, whether or not from that point, from that perspective, it would have been in an owner's interest to prepay.
Q. So the information that Dr. Ragas relies upon in his model would not have been available to an owner standing in 1991 trying to make a decision about whether or not to prepay and convert?
A. That's correct.
Q. So his model implicitly assumes that the owner would have converted?
A. It does implicitly make that assumption by comparing the cash flows as a HUD property with the cash flows that they would have earned, had they converted immediately and operated as a market rate property, but it is incapable of testing whether that assumption

Page 1683

is, in fact, true.
Q. Now, looking at the second item on your list, how is Dr. Ragas's measure of just compensation inconsistent with compensation for a permanent taking?
A. Similar to the issue we talked about on economic impact, to the extent that the diminution in value measures is typically used to measure compensation for a permanent taking, and we used an ex post profits approach like Dr. Ragas has for temporary taking, you could yield results where the permanent and temporary taking conclusions are inconsistent, where, for example, you could conclude, as I know Dr. Ragas has acknowledged this for a temporary taking, it would award greater damages than it would had the taking been permanent.
Q. Now, why is that the case? How could that happen?
A. Because the diminution in value and ex post lost profits are fundamentally different. They have different perspectives and use different inputs. And then as we will get into in the third bullet, the diminution in value approach properly accounts for risk, but lost

Page 1684

profits approach essentially assumes that risk away.
Q. Now, your third point is that it fails to account for risk. Can you elaborate on this?
A. As we discussed, the value of cash flows depends on the risks associated with those cash flows. Dr. Ragas's model simply compares the difference between the actual cash flows and the market rate cash flows, essentially treats those as certain, doesn't account for the risks that would have been inherent in generating those cash flows, and uses that as the basis for damages.
Q. His approach assumes away risk?
A. Essentially, yes.
Q. How would one appropriately account for risk?
A. You would discount cash flows back to the beginning of the takings period, as a diminution in value approach does, at a discount rate that reflects the risks associated with the cash flows.
Q. Now, your fourth point is that Dr. Ragas incorrectly applies the ex post

Page 1685

methodology. What do you mean by that?
A. The first three points that are discussed on DDX-219 are all inherent in ex post methodology. The fourth bullet, the point I make there is even within the typical standard ex post methodology, Dr. Ragas applies that incorrectly.
Q. So even if the Court were to determine that an ex post approach is appropriate to measure compensation, Dr. Ragas's methodology is incorrect?
A. That's right.
Q. And what specifically is incorrect about Dr. Ragas's methodology?
A. The way he grows damages forward from the date of the lost cash flow to the date of judgment, and specifically his use of two different rates to do that.
Q. Now, what are the rates that he uses?
A. He grows cash flows forward from the point at which they are lost to the end of his damages period at a rate of 10 percent. And then grows them forward from that end of the damages period to the date of judgment at a risk-free rate of 6.4 percent.

Page 1686

Q. What sources does Dr. Ragas use for these two rates?
A. The 6.4 percent rate is the rate on a ten-year Treasury strip, which is consistent with the risk-free rate that I have indicated was appropriate in diminution in value approach, the difference being that he is measuring – he is growing that forward from 1996 to 2006. And so using only the ten-year rate at a different point in time.
Q. So it is a ten year period he is looking at, so he uses a maturity, a Treasury with a maturity of ten years?
A. That's right. But the ten percent rate that he grows damages for within the damages period, in his expert reports, he indicated that that was a rate, I believe, a conservative rate, reflected a conservative rate for investments in real estate. His testimony at trial, I believe he suggested that that 10 percent was the rate on a conservative investment such as a utility bond or a corporate bond.
Q. But is that a risky rate, 10 percent?
A. It is – as reflected, the 6.4 percent

Page 1687

is the risk-free rate, he uses the 10 percent, which certainly has risk premium implicit in it.
Q. Do you believe it is appropriate to use two rates like this?
A. No, I don't. As I indicated, I believe the appropriate rate to use to grow it forward from the point of – the only rate to use to grow damages forward is a risk-free rate. Because the risks associated with those cash flows are at that point in time, the risks associated with the claim on the government.
Q. Can you illustrate what you mean by that?
A. If you look – I mean, let's just think of lost cash flows in Dr. Ragas's model in 1992. So he compares market rate cash flows, HUD cash flows, gets a difference, let's say that difference is $100,000. He will grow that $100,000 forward at a rate, at the 10 percent rate to the end of damages, arguing that during that period, it is appropriate to compensate plaintiffs for the returns that they could have potentially earned in alternative investments.

Page 1688

Then I believe he testified that at the end of the damages period, at that point CCA had claim on the government and the appropriate rate to grow cash flows forward associated with the claim of the government was at the risk-free rate. But CCA had a claim on the government at the point the cash flows were lost. That logic suggests that you should use the risk-free rate to grow damages forward from the point at which they were lost to the date of judgment. And that's the way the standard ex post approach works.
Q. So Dr. Ragas appears to be arguing that the claim didn't start until the end of the takings period, right?
A. That's what I heard him testify to, yes.
Q. But most economists believe that the claim starts when the cash flows are lost. Is that correct?
A. Well, there is certainly no difference as a matter of economics in what's happening – how to think about that cash flow during the damages period versus outside of the damages

Page 1689

period. The risks associated are the same, and so the same – the same logic applies that you should use the same rate for that entire period.
Q. Well, so if one rate is appropriate, why not use the 10 percent to compound lost cash flows forward from 1992 to 2006 in your example?
A. Again, because the relevant risks are the risks associated with the claim in the government. They didn't face – they didn't earn the returns on a real estate investment or on a utility bond or on a government bond during that period and they didn't face the associated risks, so they shouldn't be compensated for risks that they didn't face.
Q. Now, didn't Dr. Ragas point to a journal article which supported his use of two rates in temporary takings cases?
A. He did. I believe it was an article by Lanciliotti in the Journal of Accounting, Audit, and Finance.
Q. Now, does that article support his conclusions?
A. Not at all. I have gone back and

Page 1694

scenario, they wouldn't have had access to funds in an account until 1996, if you include that as well, you see a second line in table 1 shows that the economic impact increases to $363,365, in percentage terms, 18.9 percent.

Q. So that is approximately a .8 percent increase in economic impact brought about by the delay?

A. That's right. And then just compensation, because it is based on that measure of economic impact, would also increase.

MR. WOODROW: Your Honor, if I may have just a moment to confer with my colleagues.

THE COURT: Certainly.

BY MR. WOODROW:

Q. Dr. Dickey, I want you to take a look at a demonstrative generated by the plaintiffs that they have recently shared with us. It is labeled PDX-53. What is your assessment of this demonstrative?

A. A couple comments. First, they represent in the ex ante approach the damages

Page 1695

were unknown in 1991. As we described, the point -- the point of this diminution in value approach isn't that it was known in 1991, but rather simply that HOPE cut short the permanent taking. And so that's what the diminution in value measure I have put forward here would do, is to cut short the measure of economic impact with the passage of HOPE in 1996.

Then looking to the next three rows about rents, vacancy, and operating costs, this suggests that the ex post methodology is based entirely on market facts and comparables, whereas the ex ante approach is based entirely on an analyst's subjective estimations of expectations.

And ex post and ex ante measure, they are measuring two different things. Ex ante measures the value of property. The ex post approach is measuring the ex post loss in income.

Both look to some measure of market and comparable statistics to inform their opinions, but both rely heavily also on the estimates of the analyst to determine how those market factors and comparables should be used.

Page 1696

MR. WOODROW: Your Honor, that concludes our questions on direct testimony. We at this point would move into evidence both of Dr. Dickey's expert reports, which are Defendant's Exhibit 160 and 187, and we would also move into, as demonstrative exhibits, the demonstratives that we have used in connection with Dr. Dickey's testimony, including the handwritten chart that he drew, which has been labeled DDX-202. I would be happy to run through the numbers.

THE COURT: It is not necessary because the Court has them. It is DDX -- I am going to read out the last three numerical digits, 200, 201, 202, 204, 205, 207, 208, 209, 210, 211, 212, 213, 214, and you skipped 215, so I will not include that -- 219, and 221.

MR. WOODROW: That's correct, Your Honor.

THE COURT: Thank you. Thank you, Mr. Woodrow. Mr. Polebaum, can you get started? You have about eight minutes before we should take, probably, an afternoon break. You might be able to conclude in that time.

Page 1697

Who knows.

MR. POLEBAUM: Perhaps. Mr. Woodrow was exhorting me to do just that.

THE COURT: Or you might pass entirely.

CROSS-EXAMINATION

BY MR. POLEBAUM:

Q. Good afternoon, Dr. Dickey.

A. Good afternoon, Mr. Polebaum.

Q. Now, in your report, you have discussed a number of options that the owner could follow after passage of the preservation acts. Do you recall that?

A. Yes.

Q. And one that you mentioned is the possibility of prepayment.

A. Yes.

Q. Now, you don't know how many owners nationwide were allowed to prepay, do you?

A. Under that aspect of the preservation statutes?

Q. Correct.

A. No.

Page 1698

Q. But you do know that it was, at most,
a very small number?
A. That's my recollection.
Q. You don't know whether a prepayment by
CCA in 1991 would have led to an increase of
more than 10 percent in existing rents for CCA
tenants?
A. I haven't investigated that.
Q. You don't know whether a prepayment by
CCA in 1991 would have led to the involuntary
displacement of Chateau Cleary tenants?
A. I haven't investigated that either.
Q. So your report mentions the
theoretical option of prepaying, but you don't
know whether prepayment in 1991 could have been
available to CCA?
A. That's correct. I haven't
investigated that with respect to CCA in
particular.
Q. And you also discuss the availability
of incentives under the preservation statutes?
A. Yes.
Q. And it is your view, as I understand
it, that the potentiality of these incentives
had value for property owners?

Page 1699

A. Yes.
Q. Now, in your report, you made no
attempt to quantify the value of those
theoretical incentives?
A. That's correct.
Q. And you do not attach any probability
to the availability of these incentives for
CCA?
A. That's correct, I haven't done that
type of analysis.
Q. And you have no idea whether the value
of those incentives, if approved by HUD and
funded by Congress, would put a property owner
in the same economic position as the owner
would have been in, had the owner been allowed
to prepay and convert to conventional rentals?
A. I haven't done that comparison in this
case.
Q. So you don't know whether the
incentives, if received, would have compensated
the owner for 80 percent, 40 percent, or
10 percent of the economic loss he would have
suffered by remaining in the HUD program?
A. I haven't done that calculation.
Q. Now, you do recognize that to apply

Page 1700

for and get the incentives, assuming they are
funded, the owner has to agree to stay in the
HUD program, that's the quid pro quo?
A. Yes.
Q. And if the value of the incentives
were less each year than the value of operating
conventionally, then the operator would suffer
an adverse economic effect in each of the
ensuing years?
A. Comparing – to make sure I have this
right – comparing the value of the incentives
under the use agreement with the value of
operating the property as a market rate
property?
Q. Right.
A. Can you repeat?
Q. Then the owner would continue to
suffer an adverse economic effect in each year
pursuant to the use agreement?
A. If the value of the incentives was
less than the value of a market rate property
and the owner would have – in fact, would have
been in his interest to convert to a market
rate property, then yes.
Q. Now, you also discuss in your report,

Page 1701

you testified today about the option in the
legislation for an owner to sell the property
to a qualified buyer.
A. Yes.
Q. And, again, you are of the view that
this theoretical option had some value to the
property owner?
A. Correct.
Q. Now, again, in your report, you made
no effort to quantify the value of this
theoretical right to sell?
A. That's correct.
Q. And you do recognize that it is, in
fact, difficult to bring about that type of
sale?
A. There was a process for doing so and
that process took some time.
Q. And it required funding by the
Congress, among other things?
A. There was in many cases funding
provided by HUD as part of that transaction,
yes.
Q. Do you have any idea whether the value
of this right – strike that.
Now, you did not conclude in your

Page 1718

Q. All right. Now let's look at page 20 of your report. This is where one – you mention one of your criticisms of Dr. Ragas, and you mention that a diminution in value approach uses an ex ante perspective, examining expected cash flows at the time of plaintiff's prepayment eligibility date and how the market capitalized those cash flows into a measure of value.
Dr. Ragas, in contrast, adopts an ex post perspective, using information on how an average property in the Metairie submarket played out in order to estimate what profit plaintiff would have earned but for LIHPHRA.
So one of your criticisms of Dr. Ragas is that he uses an ex post approach, whereas you use or state that you use an ex ante approach?
A. I think that's generally correct, yes.
Q. And to do a proper diminution in value analysis, that needs to be done on an ex ante basis, that's your, that's your point of view?
A. Yes. Again, not just to suggest incorporating HOPE is improper.
Q. Once you start looking beyond the

Page 1719

prepayment date, you no longer are doing an ex ante approach?
A. If you – if you think of this approach as – an approach that is not necessarily pure ex ante, as you could characterize this approach, doesn't necessarily mean that it doesn't have meaning as a matter of economics. In fact, this is an ex ante approach. It measures the difference in value on an ex ante basis, but takes the fact of HOPE, that one fact that wasn't known at that point in time, to focus the measure of damages on the period of income that Dr. Ragas and I both agreed is at issue here.
Q. And that one ex post fact that you take is a very helpful fact for your analysis?
A. Well, it is a very relevant fact in measuring economic impact in this case.
Q. But it is a helpful fact, too?
A. In what way? What do you mean by helpful?
Q. Well, you know exactly – if you were doing the analysis as of May 1991 and didn't assume that HOPE was going to be passed in May 1996, you would have to assign a different

Page 1720

value to the second of the two valuations that Mr. Derbes supplied to you?
A. Most likely at that point in time, you would treat it as a permanent restriction.
Q. Right. Now, to do an ex ante analysis, you as an economist are of the view that one uses the information available to the market at that point in time, correct?
A. That's correct.
Q. And a corollary of an ex ante analysis is that one should not use subsequent or ex post information?
A. That's correct.
Q. One should not incorporate information about the market after the point in time which is the valuation date?
A. In general, that's correct, although, again, I go back to this doesn't necessarily – this doesn't invalidate using the fact that HOPE cut the permanent restriction short.
Q. But I take it you would agree that in doing a proper ex ante analysis, one should not cherry pick helpful ex post information that the analyst is not supposed to take into account from the perspective of May 1991?

Page 1721

A. I would agree with that.
Q. Do you think it is accurate to label an analysis an ex ante analysis, but to actually include in it helpful bits of ex post information?
A. As I described, this analysis is an ex ante analysis. It stands and looks at rents and expenses and other issues from the perspective of May of 1991.
It uses the fact – it takes account of HOPE, because it is – essentially takes account of HOPE to accurately measure economic impact and just compensation in this case.
Q. But then it is no longer an ex ante analysis?
A. It is inherently an ex ante analysis.
Is it a pure ex ante analysis? Arguably, no, but it is still – its characteristics are that of an ex ante analysis. It is essentially an ex ante analysis of the income, lost income between 1991 and 1996.
Q. It is an ex ante analysis with a helpful fact?
MR. WOODROW: Objection, argumentative.

Page 1722

MR. POLEBAUM: I will withdraw the question.

BY MR. POLEBAUM:

Q. In 1991, Dr. Dickey, at the passage of LIHPHRA, and at the time of CCA's prepayment date, the unlimited right to prepay had been repealed on a permanent basis, correct?

A. That's how LIHPHRA was characterized, yes.

Q. Right. Nothing in the legislation that said the prepayment right comes back in five years or ten years or some other point in time?

A. That's correct.

Q. And you have no specific evidence from which to conclude that knowledgeable people in the market believed in May 1991 that the right to prepay would be taken for a five-year period from that date and then restored?

A. I'm not asserting that that was the expectation at that point in time.

Q. Let's take a look at paragraph 30 of your report on page 11. In here you refer to the work that Mr. Derbes did, correct?

A. Wait. Did you say page or paragraph?

Page 1723

Q. I'm sorry, paragraph 30 on page 11.

A. Yes.

Q. And, in fact, in your analysis, then, you used the two valuations that Mr. Derbes prepared?

A. Correct.

Q. And if there were any errors in Mr. Derbes's evaluations, they would flow through into your analysis, wouldn't they?

A. That's correct.

Q. Now, the first valuation is the market value of the property as of May 1991 free of HUD restrictions, right?

A. Yes.

Q. And that's Mr. Derbes's estimation of the property value in that circumstance?

A. Yes.

Q. And the second value is the value of the property in May of 1991 subject to the restrictions, but assuming that HOPE will be passed in 1996 and the restrictions lifted, correct?

A. Correct.

Q. And that analysis is depicted in table 1 on page 12 of your report, correct?

Page 1724

A. The results of these two valuations from these two analyses are contained in table 1.

Q. And the economic impact calculation you performed is dependent on those two valuations?

A. Yeah, the specific, the specific measure of economic impact I have put forth flows directly from those two valuations.

Q. You cannot do the diminution in value as a result of the effect of LIHPHRA without Mr. Derbes's second valuation?

A. As I laid out in the formula that both restricted and unrestricted measures are a part of coming up with a diminution in value.

Q. Mr. Derbes's second valuation purports to be as of May 1991, but it assumes that the prepayment right will be restored in May of 1996?

MR. WOODROW: Objection, Your Honor. Mischaracterizes Mr. Derbes's testimony.

THE COURT: Mr. Woodrow?

MR. WOODROW: The second assumption upon which Mr. Derbes rendered his second value conclusion was based upon conversion to market

Page 1725

rate operation in May of 1996. He expressed no opinion whatsoever about the effect of LIHPHRA or the effect of HOPE or any other legal matter. He simply said here is what the value of the property is if the owner had started its conversion process in May of 1996.

THE COURT: All right. For these factual purposes, a distinction without a difference. Overruled.

THE WITNESS: Can you read back the question?

THE REPORTER: "Question: Mr. Derbes's second valuation purports to be as of May 1991, but it assumes that the prepayment right will be restored in May of 1996?"

THE WITNESS: Mr. Derbes's second valuation is the value in May 1991 under the assumption that the restrictions on prepayment lasted until May of 1996.

BY MR. POLEBAUM:

Q. Basically, he is assuming a 100 percent certainty that as of May 1991, the prepayment right will be restored in May 1996?

A. That's the assumption in his model. And as I have described, the effect that that

Page 1730

THE COURT: Sorry, just a moment, Dr. Dickey.
MR. WOODROW: The testimony concerning solely the effect of – on cash flows of a delay in prepayment and the relative differences between a restricted – HUD restricted rents and potential projected market rents, he said nothing and his testimony had nothing to do with economic impact.
THE COURT: Well –
MR. WOODROW: That's drawing – that's making a leap in a legal conclusion that's not appropriate.
THE COURT: I'm sorry, excuse me.
MR. WOODROW: I was saying that leap to concluding this is economic impact is not appropriate, given the testimony this morning.
THE COURT: I don't think this relates to cash flows, actually. But, in any event, Mr. Polebaum?
MR. POLEBAUM: Yes, Your Honor. This took Mr. Derbes's model, the model by which he came to the second valuation, the one that is subtracted from the unrestricted, and just changed one assumption from a five-year period

Page 1731

of restrictions to a ten-year period, resulting in an additional damage of 317,000. So if –
THE COURT: Well, I thought, Mr. Polebaum, and Mr. Woodrow, that what he was doing was taking a net income stream.
MR. POLEBAUM: Yes, he was taking a net income stream.
THE COURT: That's not the cash flow analysis.
MR. POLEBAUM: This is the – correct, this is the taking all of the income amounts for the years in question and discounting them back to May –
THE COURT: It is a discounted cash flow in the sense of an income analysis.
MR. POLEBAUM: Correct.
THE COURT: It is just that we're used to saying discounted cash flow and we mean income. And Dr. Derbes or Dr. Ragas performed a separate cash flow analysis, which was not what we would ordinary think of as income. Dr. Ragas is nodding, but, I'm sorry, I don't want us to get off on the wrong track. Your objection is overruled. The question is fine, as long as we understand

Page 1732

that's what's going on.
THE WITNESS: Can you read back the question, please?
THE REPORTER: "Question: If the economic impact increases by $317,900 as shown in the box at the bottom. And this would increase the economic impact from the $335,000 that you use in your report to $653,000, correct?"
THE WITNESS: No, I don't think that's correct.
BY MR. POLEBAUM:
Q. If – assuming the calculations here are correct and that what we have done is use Mr. Derbes's model and just extended out the period that we're discussing ten years, but otherwise do exactly what he did, we end up producing a second valuation that is $317,900 less than the second valuation you relied on, correct?
A. This lost income analysis is a component of the valuation of Mr. Derbes's second valuation. I haven't reviewed his valuation and I'm not entirely sure how this exactly flows into his value calculations.

Page 1733

So without having more familiarity with it, I'm not sure that that 317,000 would necessarily flow directly to the bottom line.
Q. Well, I asked Mr. Derbes with respect to his supplemental report what the effect of this calculation was on his bottom line number of $1,515,000. And I thought he agreed that it would – that this would be subtracted from it and it would produce a number on the order of $1,150,000. And that would then be a second valuation number that would flow through into the table on page 12 of your report.
A. I don't recall that question and answer necessarily.
Q. All right. If we assume that Mr. Derbes's second valuation would produce a value $317,900 less than the second valuation that you used, then that lower valuation would flow into table 1 on page 12 of your report?
A. Correct.
Q. Okay. And if instead of – if instead of an impact of 335,000, the impact was 653,000 on page 12 of your report, that would almost double the economic impact, correct?
A. Close to it, yes.

Page 1734

Q. Okay. Now, this hypothetical we put
to Mr. Derbes was based on an assumption that
HUD – that HOPE was passed in 2001 rather than
1996. If the valuation were done in May 1991
on an assumption that the prepayment right had
been permanently repealed and not restored five
or ten years later, then that valuation would
be lower still, correct?
A. Yes.
Q. In fact, if a prospective purchaser
had to consider that the property would be HUD
restricted for the next 20 years, what value
would it have had above the outstanding
mortgage value?
A. The question is certainly it would
have value. There would be value to the cash
flows earned as a HUD property during that
period and potentially value from market rate
cash flows after 2011.
Q. I want to ask you whether the analysis
that is shown in PDX-34 is a way to actually
lead us to doing a proper diminution in value
analysis. Wouldn't you, in fact, have to do an
analysis of the type that's reflected on PDX-34
for each year after 1991 in order to see what

Page 1735

the probabilities – and then, and then assign
a probability factor to each year's result in
order to get some sense of what the property
was actually worth in 1991?
MR. WOODROW: Objection, Your Honor.
It is an incomplete hypothetical. There is no
discussion of – well, first, it asks the
witness to discuss a proper diminution in value
analysis, it is argumentative. And then I
don't understand what hypothetical conditions
counsel is posing in the question.
THE COURT: All right. Mr. Polebaum?
MR. POLEBAUM: I can try it again
differently.
THE COURT: Well, I think what you
have asked springs back to your ex ante
analysis and what you are basically asking him
is that, but are you asking something else or
not?
MR. POLEBAUM: Well, yes, it is
certainly related. Let me see if I can try it
in a different way.
THE COURT: All right. Thank you.
BY MR. POLEBAUM:
Q. Now, could you envisage doing the

Page 1736

following type of analysis: An analysis of the
type that we have here on PDX-34 for each year
after 1991 until 2011, and then assigning for
each year some probability that HOPE will, in
fact, be passed in that particular year of
restoring the prepayment right in order to
arrive at a value in 1991 of some probability
weighted amount, since in May 1991, nobody
knows whether legislation will be passed.
A. I can envisage doing such an analysis.
I don't believe it would be helpful to the
issues in front of this Court.
Q. It would be very difficult to do,
wouldn't it, because you would be in the
position of having to assign some percentage
probability that in a particular year, the HOPE
legislation would be passed?
A. Certainly there would be difficulties
in determining probabilities. More
importantly, it would end up bringing in lost
income from years beyond the point at which
we're discussing in this, in this case.
Q. And it is also the case, I assume,
that if one were to do this type of probability
analysis over the 20-year period that remains

Page 1737

on the CCA mortgage as of 1991, there would
have to be at least some portion of the
probability that is assigned to the possibility
that Congress would not act at all, that there
would be no legislation restoring a prepayment
right?
A. Meaning LIHPHRA would be permanent at
least until the end of the mortgage?
Q. Correct.
A. And your question is would that, would
you need to assign some probability to that?
Q. Well, if one were doing a probability
analysis, one aspect of it might very well have
to be that there is less than 100 percent
chance over that 20-year period that HOPE will,
in fact, be passed.
A. Agreed.
THE COURT: Mr. Polebaum?
MR. POLEBAUM: Yes, Your Honor.
THE COURT: We're at 4:00 o'clock. I
know the questions you have just asked are
almost like asking Dr. Dickey to do an ex ante
analysis of a hedge fund at a given point in
time that runs out ten years after the fact. I
think we all understand the point. I am just

Page 1750

government's numbering.
THE COURT: That's what we have been using, Mr. Polebaum.
MR. POLEBAUM: Right.
BY MR. POLEBAUM:
Q. If you go back a few pages, about four pages, you will come to a chart. It is the first chart. I thought I had opened it up to the chart for you.
A. It looks like it is a chart. It is page 13, though.
Q. All right, page 13. Thank you. And you see about two-thirds of the way down, there is a loss of income there at a market rental rate?
A. Yes.
Q. And we discussed that with Mr. Derbes and that totaled up to about $525,000?
A. Over the –
Q. May 1, '91 through April 30, '96 period.
A. I haven't looked at this table in depth before. Is 19 – I see 1991 through the 1998.
Q. Right. The '97 and '98 columns

Page 1751

represent the conversion period in the scenario where the property remains restricted until HOPE was passed.
A. Okay.
Q. But in the '91 through '96 years, which is the period May 1, '91 through April 30, 1996, it shows loss of income during that period which we added up to about $525,000.
A. Are you adding up through the column labeled 1995, so the first five columns?
Q. Yes.
A. Okay. So the 1995 column, you are representing, goes through April of 1996?
Q. That covers the period May 1, '95 through April 30, 1996.
A. Okay. Under that assumption, certainly that's the order of magnitude, it looks like.
Q. Right. If you have – let's assume you have an owner of a building that has a ten-year remaining useful life and the annual income without restrictions is $10 million or $100 million over the remaining life of the building. And assume on day one of the ten-year period, Congress passes legislation

Page 1752

that precludes the realization of that $10 million amount per year, and those restrictions last for four and a half years.
A. I'm sorry, I am trying to keep this in my head.
Q. Is this related to this –
A. I'm sorry, I am moving on to something else.
Q. All right.
A. I'm sorry, can you start again now?
Q. Yes. An owner has a building with a ten-year remaining useful life and the annual income without restrictions is $10 million or $100 million over the remaining life of the building. Okay?
A. And that's valued at what point in time? Is that the expected income or the –
Q. Right.
A. Are we looking forward or looking back? Looking forward.
Q. Ten-year remaining useful life looking forward, annual income without restrictions, 10 million, 100 million over the remaining life of the building. Assume on day one of the ten-year period, Congress passes legislation

Page 1753

that precludes the realization of that $10 million per year and those restrictions last for four and a half years. So in effect, the owner loses $45 million of the $100 million in income.
A. Okay.
Q. Okay? So that would represent at least a 45 percent diminution of the expected return, correct?
A. I think that's correct, yes.
Q. And in addition, you would have to account for the time value of money?
A. And for risk.
Q. And for risk. And that could increase the diminution?
A. Since the diminution is in the early stages of the life of the property, yes.
Q. If the government were not required to compensate the owner in this hypothetical – you talked about incentives with Mr. Woodrow earlier.
If the government were not required to compensate the owner in this hypothetical, would such a system, as a matter of economics, incentivize the government to accomplish

Page 1754

various purposes through temporary regulatory takings?

MR. WOODROW: Objection, Your Honor, it calls for a legal conclusion.

THE COURT: Mr. Woodrow, this is exactly the same sort of question as reflected on DDX-202. Objection overruled.

THE WITNESS: Can you read back the question, please?

THE REPORTER: "Question: If the government were not required to compensate the owner in this hypothetical, would such a system, as a matter of economics, incentivize the government to accomplish various purposes through temporary regulatory takings?"

THE WITNESS: Relative to a system where they were required to compensate them for a system, yeah, or for such a taking, it would provide some marginal incentives, yes.

BY MR. POLEBAUM:

Q. All right. Paragraph 42 of your report, please. It is on page 16.

A. Okay.

Q. And in table 2 down below, you do a calculation that uses both simple and compound

Page 1755

interest, correct?

A. Correct.

Q. And in your opinion, as an economist, to fully compensate the victim of a regulatory taking, compound interest and not simple interest should be used, correct?

A. Correct.

MR. POLEBAUM: Your Honor, I have nothing further at this point.

THE COURT: All right. Thank you, Mr. Polebaum. Mr. Woodrow?

MR. WOODROW: Yes, Your Honor.

THE COURT: Redirect?

MR. WOODROW: Thank you.

REDIRECT EXAMINATION

BY MR. WOODROW:

Q. Dr. Dickey, did CCA pursue the sale option in this case?

A. No, they didn't.

Q. Did they pursue other incentives, for example, use agreements?

A. They filed a notice of intent. But beyond that, no.

Page 1756

Q. So in this particular case, why would it be difficult to quantify the effect of the sale option in this case?

A. A significant reason is that CCA didn't pursue the incentives. We don't have appraisals done under the preservation statutes that are indicative of the value that they might have received.

Q. And so would it be speculative – speculation then to try to quantify a sale option in this case?

A. It would be a very difficult analysis and one that I would say is, yeah, probably speculative.

Q. And that would be true as well for pursuit of other incentives?

A. Yes.

Q. Do you recall your discussion during your cross-examination with Mr. Polebaum about lost income, as well as the ability or as well as the discussion about certain higher costs associated with operating as a HUD property as opposed to a market rate property?

A. Yes.

Q. Now, are there other costs associated

Page 1757

with operating as a market rate property that might be higher in the market scenario than they would be in the HUD restricted scenario?

A. I believe that both Dr. Ragas's and Mr. Derbes's analyses have assumed that, say, advertising costs would increase with the move to a market rate property.

Q. And with respect to the differential between the income generated by Chateau Cleary as a HUD restricted property versus the income that it potentially could have generated as a market rate property, that gap could have been narrowed had Chateau Cleary sought increases, rent increases from HUD, and had HUD approved those rent increases; is that correct?

A. Yes. I think that would follow.

Q. Now, your diminution in value approach, Mr. Polebaum asked you a few questions about it, but as you depicted it here on DX – DDX-202, what does it measure? Does it measure – is it measuring an unrestricted value versus – or the difference between an unrestricted value and a restricted value?

A. It is.

Q. Okay. Just what in basic terms are

Page 1774

the period from April of 1998 through December of 1998?
A. We provided prepayment processing services for Chateau Cleary and Mr. Ernest Norman.
At the same time, we were either providing that same service or perhaps loan services or the other services that I delineated to other owners as well.
Q. Okay. As of April 1998, how many HUD-insured projects had Hampstead assisted with a prepayment pursuant to the Housing Opportunity Program Extension Act of 1996?
A. Up to that time approximately 15 or 16.
Q. And where were those projects located?
A. Various states around the country.
Q. Mr. Root, since what date have you been employed by Hampstead?
A. Since 1992.
Q. Okay. Are you presently a principal at Hampstead?
A. Yes, I am.
Q. Since what date have you been a principal at Hampstead?

Page 1775

A. Since we formed Hampstead Partners in 1994.
Q. Now, you testified that Hampstead provided consulting services to CCA Associates with respect to the prepayment of the HUD-insured mortgage loan for a project known as Chateau Cleary Apartments in New Orleans, Louisiana; is that correct?
A. That is correct.
Q. Would you identify the representative or representatives of CCA Associates with whom Hampstead dealt with respect to prepayment?
A. Primarily Ernest Norman. Secondarily, his assistants, secretaries.
Q. What was your involvement if any in the provision of prepayment services to CCA Associates with respect to the HUD-insured mortgage loan for Chateau Cleary?
A. I was the primary contact or service provider from Hampstead.
Q. When did CCA Associates first contact Hampstead regarding prepayment of the HUD-insured loan for Chateau Cleary?
A. My recollection would be vague. I know we signed our contract with them in April

Page 1776

of '98. It may have been a month before. It may have been some months before that. We may have been having preliminary conversation. I don't recall exactly.
Q. Now, the initial contact between CCA Associates and Hampstead with regard to prepayment of the HUD-insured mortgage loan for Chateau Cleary, who initiated that?
A. That would have been myself.
Q. So you contacted CCA Associates about a prepayment?
A. Yes.
Q. And how did that come about?
A. I would have called Ernest Norman along with other owners of similar properties letting them know that the prepayment right had been restored in 1996 and that prepayment was a possibility for their properties.
Q. During what period of time did Hampstead provide the prepayment services for the HUD-insured – or regarding the HUD-insured mortgage loan for Chateau Cleary?
A. Our contract was signed on April 29th, 1998, and that processing would have continued through the mortgage payoff, which happened on

Page 1777

or about October 1st of 1998, and would have continued approximately two to three months beyond that date to ensure that the vouchers for eligible residents were put in place.
Q. By vouchers, what are you referring to?
A. These are Section 8 rental assistance vouchers that are available to eligible tenants in these properties at the time of prepayment.
Q. Are these vouchers funded by the Federal Government?
A. Yes, they are.
Q. Are they provided by the Federal Government?
A. They are – it's federal dollars, but they're administered locally generally through a housing authority.
Q. And in the case of Chateau Cleary, was the vouchering agency the Jefferson Parish Housing Authority?
A. Yes, it was.
Q. Mr. Root, now showing you what has been marked for identification as Defendant's Exhibit 3, would you take a look at that document and can you tell us whether you

Page 1778

recognize it?
A. Yes, I do.
Q. Now, is Defendant's Exhibit 3 a copy of the prepayment service consulting agreement between CCA and Hampstead that has been executed by yourself as well as Ernest Norman on behalf of CCA Associates?
A. Yes.
Q. Now, Mr. Root, does Defendant's Exhibit 3 specify the services to be provided by Hampstead to CCA Associates with respect to prepayment of the HUD-insured mortgage loan for Chateau Cleary?
A. Yes, it does.
Q. And are the services to be provided by Hampstead under the prepayment service consulting agreement that is Defendant's Exhibit 3 set out in section 2 of that agreement?
A. Yes, they are.
Q. Did Hampstead provide any services to CCA Associates with respect to the prepayment of the HUD-insured mortgage loan for Chateau Cleary that are not covered by the description of Hampstead duties at section 2 of the

Page 1779

prepayment service agreement between CCA Associates and Hampstead, that is Defendant's Exhibit 3?
A. No. All duties that we provided are outlined here.
Q. In the case of the prepayment of the HUD-insured loan for Chateau Cleary, what were the required notifications to HUD?
A. The notification to HUD was a letter to the projects field office, the field office where the property was located.
Q. Okay.
A. Just giving your – or the owners' intention to prepay that mortgage.
Q. Now, directing your attention to subsection G of section 2 of Defendant's Exhibit 3, what does, quote, "coordination," close quote, by Hampstead of the cancellation of the regulatory agreement and termination of mortgage insurance entail?
A. The regulatory agreement will terminate or expunge itself as the mortgage is paid off. The termination of the mortgage insurance is completed by the mortgagee sending a form or a notice to HUD saying that our

Page 1780

mortgage has, in fact, been terminated. Therefore, HUD can then remove that property from their ownership records.
Q. Did CCA Associates prepay the HUD-insured mortgage loan for Chateau Cleary on May 30th, 1998?
THE COURT: Mr. Harrington?
MR. HARRINGTON: Your Honor, we do object to this portion of the testimony that refers to and discusses prepayment on and after May 30th, 1998 as irrelevant and as part of our continuing objection to the, to any testimony beyond February 28th, 1997, that that sort of material, given that it has not been alleged by the plaintiffs, would be prejudicial to our case.
THE COURT: Mr. Polebaum?
MR. POLEBAUM: I am going to try to flip to the page reference. Can you give that to me?
MR. WOODROW: Certainly. It is page 44 of the transcript.
THE COURT: This is a topic we have addressed weeks ago.
MR. POLEBAUM: Right. Well, again, I

Page 1781

think, as we previously discussed, this testimony is relevant. It –
THE COURT: It shows the fact of prepayment itself.
MR. POLEBAUM: Yes.
THE COURT: Overruled.
THE WITNESS: It did not.
BY MR. WOODROW:
Q. Do you know why not?
A. My recollection would be because of the lack of knowledge and experience in the local field office we were unable to close the loan at that time.
Q. Are you referring to the New Orleans HUD office?
A. Yes, I am.
Q. And what knowledge or experience did the field office lack that prevented closing – excuse me – prepaying the HUD-insured mortgage loan for Chateau Cleary on June 30, 1998?
A. The understanding of the process in general, what notices were required, what information was required, what residents would be eligible for vouchers, the lack of a computer program to process that tenant's

Page 1782

eligibility.
Q. Did you have conversations with anyone at the New Orleans HUD office regarding the intent to prepay the HUD-insured mortgage loan for Chateau Cleary on June 30, 1998?
A. If you're asking if I had any conversations with someone at the field office regarding the prepayment, yes. Mike Mills.
Q. Okay. And what specifically did Mr. Mills say or do that prevented prepayment of the HUD-insured mortgage loan for Chateau Cleary on June 30, 1998?
A. He just alerted us to the fact that they were unknowledgeable in this area and were going to have to seek counsel of HUD central.
Q. Did Hampstead prepare Defendant's Exhibit 15?
A. Hampstead prepared the notice. The notice was then put on management's letterhead for distribution to the residents.
Q. Okay. So it's accurate to say that Hampstead drafted the contents of Defendant's Exhibit 15?
A. Yes, it is.
Q. And is Defendant's Exhibit 15 the

Page 1783

required notice to the tenants referred to in subsections A and B of section 2 of the prepayment services agreement between Hampstead and CCA Associates?
A. Yes, it would be.
Q. Now, Defendant's Exhibit 16 – excuse me – Defendant's Exhibit 15 states that the owners of Chateau Cleary have decided to prepay the HUD-insured mortgage and terminate the mortgage insurance, quote, "effective on or about July 31, 1998." Is that correct?
A: That is correct.
Q. Now, CCA Associates, however, did not prepay the HUD-insured mortgage loan for Chateau Cleary on July 31, 1998, correct?
A. That is correct.
Q. Do you know why CCA Associates did not prepay the HUD-insured mortgage loan for Chateau Cleary on July 31, 1998?
A. My recollection would have been that we were still not in a position to close that loan to be able to provide the resident vouchers for those eligible residents.
Q. As of that time – as of July 1998, was it Hampstead's understanding that there was

Page 1784

a legal requirement that vouchers, Section 8 vouchers, rent subsidy vouchers for tenants be funded and in place and issued to tenants prior to the date upon which a prepayment of a HUD-insured mortgage loan could occur under the Housing Opportunity Extension Act of 1996?
A. My understanding is that it was not a legal requirement. In theory they were hoping to have those vouchers in those residents' hands prior to prepayment to give those residents as much opportunity to either exercise that voucher to stay living right there at Chateau Cleary or give them the time to go find other suitable housing.
Q. Is it your understanding that that's the reason that the prepayment of the HUD-insured mortgage loan for Chateau Cleary was delayed or postponed?
A. It would have been delayed per my recollection because the vouchers and the procedures to have the funding availability to the housing authority, the contract that would have had to have been initiated between the housing authority and the Federal Government to administer those vouchers, was still not in a

Page 1785

position at this time of this notice – in a position to be complete so that those vouchers could be ready.
Q. That's as of June 25, 1998?
A. Yes. That would be my recollection.
Q. And is that – was the situation the same as of July 30th, 1998?
A. That would be my recollection.
Q. I'm sorry. Do you know when the process for making Section 8 vouchers available to tenants of Chateau Cleary was completed?
A. It would have been – the vouchers were issued subsequent to the prepayment in October.
Q. October of 1998?
A. October of 1998.
Q. Mr. Root, are you aware of anything that prevented CCA Associates from initiating the process for prepayment of the HUD-insured mortgage loan for Chateau Cleary pursuant to the Housing Opportunity Program Extension Act of 1996 before April of 1998?
A. No.
Q. You referred in your earlier testimony to LIHPHRA or the Low-Income Housing

Page 1790

to the tenant, what kind of subsidy would be given to the residents, a series of questions that would – whenever there's new legislation, there seems like there's always a – subsequent amendments and things that hadn't been thought of initially that now start to come out. And that's what these preservation letters were addressing.

Q. So these preservation letters changed the actual process or procedures that the field offices had to go through in processing a prepayment request?

A. They were altering the process in some regards. Sometimes they were expanding it. Sometimes there was clarification of a point from one prepayment letter to another. Basically saying we said this last time, but we're not – forget that. Now this is the new way we're going to do this. There were new issues coming up, new expanded criteria for tenant voucher eligibility and so forth. So it was an evolving process.

Q. In the answer you just said from one prepayment letter to the next. Do you mean from one preservation letter to the next?

Page 1791

A. Thank you. Yes.

Q. So these letters – would it be accurate to say these letters not only changed the terms that were set forth in HOPE but sometimes actually there was a change – a subsequent letter that would change something that was in a previous letter?

MR. HARRINGTON: Objection, Your Honor, calls for a legal conclusion. It is asking if it changed the HOPE statute.

THE COURT: Mr. Polebaum?

MR. POLEBAUM: I think this is really directed at what this individual's understanding of these letters is all about. It does not call for a legal conclusion, Your Honor.

THE COURT: Well, if the Court had the witness in hand, he would – the Court would say please answer the question to the best of your personal knowledge, but let's go on.

THE WITNESS: Yes. What we were seeing were at times revisions of something that may have come out in a prior letter. Sometimes it was just an addition to what had been in a prior letter.

Page 1792

BY MR. WOODROW:

Q. So an owner such as CCA would have had to be familiar with all of the preservation letters that had come out since the passage of HOPE in order to go through the prepayment process?

A. Yes. They would – they would certainly have needed to know what the rules of the road were, of course, and those preservation letters were providing that as they came out.

Q. A field office – let me start again. The New Orleans field office when it was processing CCA's request for prepayment would have had to have been familiar with all of the preservation letters that had been issued since HOPE was passed; is that correct?

A. Yes. I would agree with that.

Q. Do you have a sense of the overall effect in your experience of these preservation letters on the efficiency of the prepayment process?

A. Well, sure. They would have – they would have slowed the process or lengthened the process in some cases.

Page 1793

Q. Do you think the preservation letters had that effect on the prepayment process for Chateau Cleary's mortgage?

A. It had that effect because the field office was inexperienced with regard to prepayment. My understanding was they hadn't had a prepayment prior to Chateau Cleary, and the staff person that I dealt with, Mike Mills, admitted his lack of experience and understanding this process. And so he was – he was getting his guidance then from that point from HUD Central.

Q. Could you take a look for a minute at Defendant's Exhibit 14 which is a fax from Mike Mills and Richard Pierce to Hampstead Partners dated May 9th, 1998.

A. I have got it.

Q. Now, you may have stated this in your earlier testimony, so forgive me if this is repetitive, but is it correct to say that each of the six points that are made here relate to the voucher process?

A. Yes.

Q. So this is information that the field office had to get in order to complete the

Page 1858

will know I'm wrong.
So Mr. Derbes does an estimate of the value of CCA's restrictions and he gets a value, which initially is 2.2 million, but then he recognizes that there would be certain costs of conversion, so Mr. Derbes, after factoring in conversion costs, comes to a value of 1,850,000.
And then he does another calculation – and that's the work that Mr. Derbes does in his March report as amended. And then in his April report, he does another calculation where he analyzes the value of CCA, if it were known that the property was going to have the right to prepay in 1996 under – consistent with HOPE.
And in that calculation, what he does is he figures in the – he recognizes there would be a period of delay in being able to convert the property to a market rental property. And so page 9 of his report gives his work sheet.
And what he shows is the delay value would reduce the value by $556,000. And then he has some additional moneys involved in the

Page 1859

conversion cost. And so he works – when he works it out, he gets to a restricted value, 1,515,000 and it is the difference of those two, which is Dr. Dickey's 335,000 figure.
Now, what I have done in this PDX-34 is to say, well, first of all, I have replicated Mr. Derbes's analysis. So I have my estimate of his life losses, present value factors, and have come to the same present value number of 556 million – 557 – excuse me, 557,000 that Mr. Derbes has, so I know that I'm doing the same thing that Mr. Derbes was doing.
And then what I did was I said: Well, what if we assumed ten years instead of five years delay? How much difference would that make? And it would take – as is shown in the exhibit, it would – making a conservative assumption about losses and basically holding them in the out years of 6 through 10, to 1995, the present value of delay increases from 557,000 to 875,000, with rounding.
And that's a difference of about 318,000. And that would be an added – what this is showing is that if you were to use

Page 1860

Mr. Derbes's approach, that basically the value of the property would decline by about 318, around $300,000. And that is – so instead of having 1515 as the restricted value, he would be down another 300,000, roughly.
And so, therefore, the damages would, under Dr. Dickey's method, would be commensurately greater. And instead of 335,000, you would have a figure that was larger by about 300,000.
So it is just to illustrate that this decision to use the HOPE date matters a lot.
And I guess I just want to come back and say if one were to actually assume a market expectation in 1991 of no – that the prepayment right would not be restored, period, then the logic would say you should do this analysis out to 2011, which is the date when the mortgage would have, would be finished and then you would have the right to prepay, the right to convert to market rents, as I understand it, and the damages would be significantly greater than indicated, implied by this PDX-34.
Q. All right. Let me turn next to Dr.

Page 1861

Dickey's rebuttal report. And I have a few questions for you about that.
And this is Defendant's Exhibit 187.
Let's start first with paragraph 6, which is on page 3 of that report. Now, Dr. Stillman, is this where Dr. Dickey responds to your criticism of his use of post May 1991 information?
A. It is, yes.
Q. And could you summarize for us what you understand his response to be, and then what your comments are with respect to that response?
A. Yes. Dr. Dickey is saying in paragraph 6 that – he is basically taking the position that while he agrees that he did not use a pure ex-ante approach, that's appropriate. And it is appropriate, he says, because the fundamental problem, just quoting him, with a pure ex-ante approach is that it would likely result in a windfall to plaintiff as it completely ignores the fact that plaintiff's unlimited ability to prepay was restored by HOPE.
Now, I know that the plaintiff's right

Page 1870

A. That's correct.
Q. Now, you have testified that Dr. Dickey improperly considered ex-post information. The only ex-post information you have identified is the date that the regulatory restrictions were actually lifted by the HOPE Act, correct?
A. That's – yes, that's the only – "how was the play, Mrs. Lincoln", but yes.
Q. And there is no other information that you are referring to?
A. He uses Mr. Derbes's calculations which make assumptions about the losses during interim periods, but the fundamental piece of ex-post information that he uses in his ex-ante, so-called ex-ante analysis is the ex-post information that HOPE came along and restored the right to prepay.
Q. Now, in your report, you discuss, I believe, what you view as the correct way to assess the economic impact of the preservation statutes on an ex-ante basis as of May 1991. Is that correct?
A. Yes, I do.
Q. And in your report, you say the way to

Page 1871

do it would be to compare the estimated should-have-been value of the project in May 1991, assuming no legislative restrictions, and the actual value of the project as affected by the preservation statutes, correct?
A. Yes. And I go on to say in paragraph 18, and given whatever possibility existed as of May 1991, that these restrictions might be lifted at some unknown date in the future.
Q. Now, you agreed that you should consider the effect of the preservation statutes in their entirety and not just selected provisions?
A. I'm sorry, you are breaking up. That question did break up.
Q. You agreed that –
A. Can you restate it?
Q. Let me start over. You agreed you should consider the effect of the preservation statutes on the property in their entirety and not just selected provisions of the preservation statutes?
A. Yes, I agree with that.
Q. Now, the should-have-been value that you refer to is the property's fair market

Page 1872

value without the restrictions in ELIHPA and LIHPHRA, correct?
A. Correct. Essentially, the should-have-been value is one that assumes that either the legislation didn't pass, it was never enacted, or there were no aspect of the legislation that impacted the property.
Q. The actual value of the project that you are referring to would be the value of the project subject to the restrictions in the preservation statutes, in other words, the price at which CCA could have sold the Chateau Cleary project while subject to the preservation statutes?
A. Yes. You know, assuming all the usual conditions of a fair market value transaction, willing buyer, willing seller, reasonably informed, no fire sale, that kind of thing.
Q. So as long as the sale took place at a price that would be a fair market price, you would agree that that is the actual value that you referred to?
A. Yes. In other words, just to make sure we're saying the same thing, if Mr. Norman had turned around on May 1991 and sold the

Page 1873

property in the environment that existed under the cloud of the legislation, and that had not been in some sort of fire sale conditions, and then involves an arms length transaction with reasonably informed buyers and sellers, then I think you could take that sale price and compare that with some estimate of the should-have-been value to arrive at a measure of the impact as of May 1991 of the legislation.
Q. And as a matter of economics, it wouldn't matter whether the market value price occurred in an arms length sale or was determined by an appraisal process, would it? So long as the price is the same?
A. No, I think it would matter a lot. I mean, you really would want to make sure that you had a fair market value. And an appraisal process may or may not produce that. I would be much more impressed if I had market evidence of Mr. Norman actually selling or prices of comparable properties that one could make some sort of adjustment for. You know, appraisals are what people use in many settings, but I think it is too quick to say that that

Page 1874

appraisal equals market value.
Q. And an appropriately set up appraisal process could result in a market value, correct?
A. Well, could is the key word there. I mean, I believe appraisers frequently – typically are trying to estimate market value. The question is do they achieve it.
Q. And you don't know about the preservation process and what the appraisal process was as part of the preservation process?
A. All I know is that there were various options available, because we discussed this during my deposition, and Dr. Dickey talks about in his report. And, of course, there have been other conversations with counsel on these issues and I'm aware that there were certain options. There are big questions about, as I understand, how good these options were and whether there were sort of snags and difficulties that made these options not really viable.
I better stop there. That's what I can tell you about those options.

Page 1875

Q. But you don't have any opinions on the options itself?
A. I do not have – no, I do not have any independent opinion about those options.
Q. And as a matter of economics, it doesn't matter whether you are paid $2 million through an arms length sale or because that is the amount that was established through a preservation or through an appraisal process?
A. I didn't – I don't understand your question.
Q. Let me take a step back, Dr. Stillman. Assume with me that the Chateau Cleary project could be sold under the preservation statutes. You could use that sale price to determine the economic impact of the preservation statutes, correct, as one input?
A. Well, let me make sure we're saying the same thing. If you are saying assume – are you saying assume it was sold or assume it could be sold?
Q. I am saying assume it could be sold. We know it wasn't sold.
A. Yeah. So if we had an estimate of what the property could have been sold for in

Page 1876

May 1991, that would be one input to try to calculate damages as of May 1991. The other input would be what do we think the property would have been worth if there had been no restrictions.
Q. And how would you use those two inputs to calculate damages?
A. I would subtract the should-have-been value or the value but for the restrictions, I would start with that number and I would subtract an estimate of the value that Mr. Norman actually could have realized in May of 1991, subject to the cloud of the legislation.
Q. And if the two values were the same, then there would be no damages?
A. As a matter of arithmetic, that's correct, yes.
Q. Now, assume with me that if CCA was unable to sell the property, that it would have been allowed to prepay its mortgage after 15 months, assuming that a sale could not be consummated, as we were discussing. Should that be taken into account, in your view, in assessing the statute's economic impact and the

Page 1877

damages to be awarded?
A. Are we talking about an ex-ante or an ex-post measure? I think the general answer is these options should be considered, but how they are considered as a matter of just principle would vary depending on whether you are talking about an ex-ante or ex-post measure. You happen to be talking about both.
Q. Let's start by talking about an ex-post measure. Should it be considered as part of an ex-post measure?
A. Yes. Let me explain how I think it should be considered. I think what one would want to do is one would want to look at the projection of what the cash would have been if the legislation had been passed, and then I think one would want to consider the actual cash flows. And that would be the starting point for the damage calculation, would be the difference between the should-have-been and the actual cash flows.
Now, if it should turn out that one could demonstrate that Mr. Norman had certain options available to him that he was basically negligent for not pursuing, and that he could

Page 1926

just described show that the resale market value after removal of restrictions constituted a majority of the expected investment returns. That -- I don't see how CCA could have paid 677,000 in 1985 for a half interest, rationally, unless they expected the restrictions to be lifted. And then they would have the benefit of the value of the asset unrestricted, which would be substantially higher than what they could achieve under the restrictions.

And that would make that rational behavior on their part. And it would imply, though, that they would be approaching this as a long-term investment. They would need a number of years to allow a transition from restricted to unrestricted conditions and market rents, so that values would resume at a level appropriate for a normal market rate property.

Q. Let me turn now to a few questions about Mr. Derbes's testimony.

Now, you recall that Mr. Derbes's evaluation analysis depends on, among other things, his characterization of Chateau Cleary

Page 1927

as a below-average property? Do you recall that?

A. Yes, sir, I remember his testimony.

Q. And in your testimony, you characterized Chateau Cleary as an average property?

A. Yes, I did.

Q. Mr. Derbes characterized the property more negatively. Can you give us your overall response to Mr. Derbes's testimony in that respect?

A. Well, in broad terms, I looked at Chateau Cleary's unit sizes are similar to the market as a whole, in which it is located. It was in good condition. It is in an excellent location. It is structurally a very well-built structure.

I will go through a discussion of those attributes later, if you wish. Looking at his own reports, there are indications in his own documents that he treated it as at least an average condition property in his own analyses. So I don't see any basis for arguing that this property is somehow substandard. It offers the normal expected

Page 1928

accoutrements for a property of its size and type in 1991. And it is, in my opinion, indicative of the average property in the market.

Q. Do you recall Mr. Derbes's testimony where he divided the properties into sort of brand new, full package of amenities, and then similar apartments that had a number of years of age on them, and then average, and then below average? I guess it was a four-part distinction.

A. I recall that. And that wasn't generally done in the New Orleans market at that time. I actually, along with another realtor in the marketplace, began to define these class categories in 2002 in published work I did, but at that time, certainly, 1991, that was not the case.

And in 1991, there were very few of these newer properties. There had been a seven-year period with almost no construction, because of the oil bust.

Q. That seven-year period was 1986 to --

A. About '84, '85, up through 1991, early '92, very, very little in the way of

Page 1929

construction. So all of the properties on the market were at least six or seven years old. There had only been a handful built between 1980 and '84, so this was the group he had been referring to as A's, the ones that had been built in that little three or four-year window.

Then there was a group of properties that were constructed in the '70s, and those in the latter part of the '70s, I guess that's what he is trying to refer to as the B's. The reality is in an overall market, those A properties might have been 10 percent of the total stock and the B properties might have been another 10 or 15 percent of the stock, and the bulk of the stock was average-quality housing that had been built somewhere between 1960 and 1975.

That simply is the nature of that marketplace. So I'm at a loss to expect that my use of average rents for the market as a whole would be viewed as inappropriate for this property.

Q. Now, have you prepared a slide that compares the size of Chateau Cleary apartments compared to the market average?

Page 1930

A. Yes, sir, I have done that.
Q. Let me put up PDX-40.
A. And I want to –
Q. I understand that you want to indicate a different source for this material?
A. In the hurried preparation, apparently we got a sourcing off slightly. It is from PX-113, and it is from materials that already have been brought before the Court. There is nothing new here.
But it should have referenced, not volume – at the lower bottom source, it should not have referenced volume 22, it should have referenced volume 19 as of January 1993, and it is CCA page 2789 is where you would find this information.
Q. Okay. And, therefore, the title should be spring 1992 then; is that correct?
A. It is actually fall of '93.
Q. Fall of '93.
A. Excuse me, fall of '92, fall of '92, I'm sorry.
Q. All right. With that correction, can you walk us through PDX-40, please?
A. This is the published sample for the

Page 1931

unit types that are in – that were similar to those that are available at Chateau Cleary. We surveyed 2746 one-bedroom, one-bath units in the immediate geography of Chateau Cleary.
That survey was done in writing, where the Respondents saw exactly their unit count in the past, exactly the unit square footages we showed, and was urged to correct anything wrong on that written survey and then return it to the university.
On that, the result of that written survey was that the average size for a one-bedroom, one-bath was 656 feet. Chateau Cleary's one-bedroom, one bath units, as per the architectural drawings, are 722 feet. They are a little bit bigger.
The two-bedroom, one bath units in the market as a whole, we had almost 1100 of them respond to our written surveys. 897 feet was the average of those respondents. 919 is the average size of Chateau Cleary.
Again, it is a little bigger. So we have almost half the units a little larger than the market.
The two-bedroom, one and a half bath

Page 1932

unit at Chateau Cleary is 934 feet. There are very few of those. We did not have enough to report that size in our surveys. We had a two-bedroom, one bath category and a two-bedroom, two bath category. They range from 1022 to 1042 feet. So that the two-bedroom, one bath unit, one and a half bath townhouse is a little smaller than the market average. It is in a market unit type that's well sought after. The townhouse design offers more privacy for tenants and they tend to like it.
The three-bedroom units were a shortage supply unit, as Mr. Derbes indicated in his own testimony, 420 units, we were able to find in our sample. They averaged 1321 feet. Many of these are very old units. The ones at Chateau Cleary are 1084 feet.
The only place where Chateau Cleary units are much smaller than the units that are in the market as a whole is the three-bedroom, but it is in a unit type in which there is a general shortage condition in the market, because there are just so few properties that offer a three-bedroom unit to tenants at all.

Page 1933

So the size information here would place it solidly in the average group, not as a substandard design. Now, it is true these are not large units. And when one walks through them, you would realize, these are small units. Unfortunately, that is the nature of that housing market. They offer small units as a whole.
Q. All right. Now, if you could look at Plaintiff's Exhibit 119, which is the rebuttal report that we prepared, at page CCA 2870.
A. Yes, sir, I am trying to turn to that now. Yes, I am there. That's my item 5?
Q. Your item 5. And then on the next page, you also have a table. Do you see that?
A. Yes, I do.
Q. In your text, you seem to suggest that Mr. Derbes's own analysis undercuts his conclusion that CCA was a below-average property.
Can you explain why you believe his analysis suggests that the CCA property was in at least an average condition as of May 1991?
A. As an MAI appraiser, I have done large numbers of comparison grids of this type in my

Page 1934

career, and Mr. Derbes has found sales that are recent, or relatively so, at least, to compare here.

And what he points out in his collection of information is the size of the property, that's the rentable area row, the price it sold for, and how much he found out to be the curable depreciation, things that needed immediate repair.

So for each property, he has listed that -- for CCA, he lists $100,000 that he thought was immediate repair. The average of his comparables to CCA require $262,000 in repair.

I thought the way to think about this was to convert them to units because there are different numbers of units in each property.

So per unit maintenance costs are shown as a line of 1030, 949, 1801, 1486. Chateau Cleary had under, by Mr. Derbes's judgment, under a thousand dollars in required maintenance.

The average for the ones he chose as comparables required $1155 per unit. So Chateau Cleary did not have more deferred maintenance or a bigger problem than was

Page 1935

typical in the market for these that are the recent sales.

Then I looked at prices per unit, what was paid for these units. And, again, what we see is the average unit in the market sold for $18,600 in these recent sales. Mr. Derbes concluded 21. Why? He concluded Chateau Cleary deserved a 13 percent premium over the others that had sold. Again, not what you do if a property is inferior to the others or in the lower tier of the marketplace.

Some of these properties are owned by among the larger owners, Lake Apartments is owned by a very large owner who is known for maintaining their assets. And that one is at 20,253, very close to the 21.1, and it has a similar maintenance issue with it, about $949.

Gross income multipliers, this is another way we think about relating income to price. It is like a price earnings ratio. The higher the ratio, the more you pay per dollar of earnings in price.

Chateau Cleary is at 4.15. The average of his comparables, 4.26. Virtually alike. He actually specified the condition of

Page 1936

the comparables and said they were average or average to good.

When you look at this group, they are all average to good condition properties. Chateau Cleary, though, is now being categorized as something substandard, something in the lower quadrant of the quality of properties, and I just think it is inconsistent with the analysis he presented on table 19.

And what I believe to be the facts in the marketplace. These units average 923 square feet, these competing properties that sold. Chateau Cleary averages 906. It is averaging, its sizes are about the same.

As I said, it is unfortunate that over the years, because of high land cost in the New Orleans area, we have had rather small units built, but that is the nature of the marketplace.

Q. What was the relative quality of the Chateau Cleary construction? Can you address that point? Because there was some discussion of that yesterday.

A. Well, I mean, it is a brick veneer structure. It has got -- the panels that are

Page 1937

on it are with an aggregate material. It has got a very long life. The property, I mean, I did construction loans in the '70s. I was a construction loan officer for a region in the '70s, and this was good quality construction, I would say.

Q. I want to show you another couple of slides now and ask you to comment on those. PDX-41, entitled Chateau Cleary competitive advantages. Can you walk us through this?

A. It is a summary of my thoughts. I was trying to give an objective list of the features that describe Chateau Cleary vis-a-vis other properties in the market. I think everyone who has described it here in the course of the trial acknowledges its great location, with good proximity to jobs, services, schools, shopping.

Parking in this property is 1.6 spaces per unit. The typical in the marketplace is 1.5. It has adequate parking. It is just the same as most other properties.

Great visibility from the interstate, so if you wanted to advertise, you had a spot

Page 1938

to do it. Unit sizes are similar to the market as a whole. It had three-bedroom units, which is a shortage item in the marketplace. Interestingly, this property let an older person live on the first floor, before – the handicap issues and disabled issues weren't being as vigorously approached in 1991 as they are today. And households were anxious to find, who had any sort of impairment, locations where they could walk in and out without stairs. This property has both one, two, and three bedroom units on the first floor, which would make it very appealing to some older households in terms of a place to live. It is a very low crime area. Because of its design –

Q. Let me take you, then, to Exhibit PDX-42, which is the next one.

A. Thank you, sir. Because of its design, with no pool but with children playing areas, you could have small children on this property and they could reasonably feel safer than having them play around a concrete pool

Page 1939

area where there would be outdoor play areas. The units didn't have hookups, but for many households, not having to own a washer and dryer was a desirable item. It wasn't always an undesirable feature, particularly if the washer and dryer room was well maintained and affordably priced. This property had cable television, like any other in the market and it offered balconies or patios that were covered from the weather, which was not true for many properties. So it offered many marketing advantages. There were very little in the way of disadvantages. The disadvantages were, yes, it was 20 years old. Yes, it had appliances that were the color of 20-year old appliances. But the appliances were well maintained, and worked. So the property doesn't have any list of great detriments that I'm aware of. It is average. It is like the other properties in this, in this marketplace.

Q. Okay. Now, by 1998 when Chateau Cleary finally is able to prepay, how have the

Page 1940

market conditions that it faced changed?

A. It changes a lot. And I testified to that, but what happens in 1991 is there has been almost no new construction since 1985. And in 1991, for example, there is no multi-family building permits awarded for a five or more unit structure. This typical definition of multi-family, five or more units in a building. Construction doesn't really resume in any significant way until 1995. So the period up through 1993 is one of almost no competitors entering the market, no new construction, and it is a market in recovery, we're going to – we have shown you that the occupancy levels were going up rapidly, and Mr. Derbes agreed to that. So we have a recovering market with rapidly rising occupancy with almost no new competitors in the marketplace in the period '90 to '93, '94. When you go out beyond that, you begin entering a period where there is lots of new competitors, over a thousand units a year, by federal permit counts, see 20 construction

Page 1941

reports, you will find over a thousand units per year, a thousand units were built between 1995 and 1998. Then when you go after that period, 1999 to 2002, or '3, another thousand or so units. So as we move past 1996, the market conditions change. Many new properties entering the market, they are better quality, better design, more modern, and now Chateau Cleary has to compete against those. Where are they being built primarily? About, and I measured to see if I misspoke, about three and a half miles from Chateau Cleary is where they are being built. In the area that's the immediate submarket south of this one, off of Clearview. That's where they are mostly being built. So, of course, they would compete with Chateau Cleary.

Q. Is that the River Ridge area that you are referring to?

A. River Ridge is a generic term, but these are mostly in the northern edge of River Ridge in the area called Elmwood Park. And they are close to the Earhart Expressway, the

Page 1942

new construction.
Q. How did this – summarize how all this new construction affected the rents that Chateau Cleary could charge after 1996.
A. It had higher quality competitors, tougher market. It is going to be tougher to raise rents. It is going to be tougher to command a high rent. They are going to be facing just a lot more competition after 1996.
Q. Okay. Now, do you recall Mr. Derbes's testimony that the new construction in the River Ridge area had a filtering-down effect on the properties in the marketplace? He also said that the property there in which he had invested came to market at the highest point they could, but the market was depressed. This is the, you know, post-'96 period. He goes on to say that these apartments are not economically feasible to do for someone else to come in and pay all those fees to – a developer fee to someone, a contractors fee to someone, they have somebody else manage them. Does this – how does this testimony relate to what you were just discussing?

Page 1943

A. He is agreeing that the market conditions were different in 1996 and that there was a lot more competition and that limited the rents. And it made feasibility on projects that they had to compete very vigorously. That's – I don't see how else to interpret his statement. He is agreeing. And he is agreeing on a property that's not far from Chateau Cleary.
Q. Okay. Now, in his rebuttal report, you may recall, Mr. Derbes contends that the Chateau Cleary rents after prepayment, in the 1998 period and beyond, are below the average in the UNO survey. Can you explain why that's the case?
A. Well, Chateau Cleary doesn't really come free of the restrictions until in '98. And then it has to go through the transition period when it is confronting lots of other competitors, and they are newer than they are. We have had seven more years of wear and tear on the property during that period. And so it is harder. It is not easier. It is a tougher market and they are older units and they are having to come to

Page 1944

market at a time when there is no surge in demand. In 1991, '92, the oil bust has reversed and now we're bringing people back home and there is lots of new jobs entering the market. In 1988, '89, '90, and people were returning to New Orleans area. That's not the situation in 1998. By then the market stabilized and, as Mr. Derbes pointed out, the long-term history of Jefferson Parish for the last 15 to 20 years has been one of no population growth on the east bank of Jefferson, a flat population marketplace. It is hard to rent new units in that environment. The easiest is when they are trying to come home, when people are returning.
THE COURT: Mr. Polebaum, I am going to make a somewhat unusual suggestion. The Court gets the sense that you are about mid course in your direct of Mr. Ragas.
MR. POLEBAUM: Yes, mid to perhaps a little more.
THE COURT: All right. I am going to suggest that we take our luncheon break now,

Page 1945

somewhat surprisingly, and that we convene, reconvene about, I don't know, ten to 1, five to 1. We try to give ourselves a couple of extra minutes. I am at your pleasure, of course, but is that satisfactory? Mr. Harrington?
MR. HARRINGTON: That's satisfies us, Your Honor.
THE COURT: Which do you prefer? Do you prefer something like ten to 1 or five to 1? I don't know exactly where we stand. 3:15, we are going to stop for the day.
MR. POLEBAUM: Hopefully we're going to finish by 3:15.
THE COURT: Well, I understand that. Let's reconvene at five to 1. All right. We're in recess for luncheon.
(Whereupon, at 12:05 p.m., a lunch recess was taken.)

Page 1950

if one converted that to value, 4,000 divided by the 10.2 cap rate, it would have changed Mr. Derbes's evaluation by about $39,000. So it would not have been an enormous impact. But we're going to see there is a whole series of judgments like this that cumulatively do produce some fairly significant changes.

Q. All right. On Exhibit 119, which is your rebuttal report, at page 2878, paragraph 10, and continuing, this discussion relates to the vacancy questions, does it not?

A. It does. And this is a recitation of the actual West Metairie occupancies. And Mr. Derbes's assertion that 8 percent was more reasonable.

One must bear in mind that the normal lease had in it provisions for, in case of eviction, that the damage deposit was seizeable, that in the time period we're looking at, it wasn't a widely-done practice, that large numbers of units were provided free to maintenance personnel or managers. At least that's certainly not my recollection of that market condition.

Page 1951

However, there is a small difference. The actual market occupancy rates are a little higher than Mr. Derbes's 92 percent.

Q. Let me show you next PDX-45. Can you explain to us what you have here?

A. This has been in my report and pointed out now for more than a year. The actual architectural drawings were included in the appendices, and I think they are Exhibit Number -- perhaps 114?

Q. 119.

A. 119, I'm sorry.

Q. 2874, the exhibit we were just looking at, can you confirm those are the architectural drawings you are referring to? In Exhibit 119, 2874?

A. Yes. They also appear in the addendum of this document, architectural addendum, and they are in the rebuttal as well, same documents.

So on page 2874, I have hand annotated the architectural drawings, which I went to the field twice to verify for multiple units, show that the ten house unit was 14 feet wide and the first floor of it is 32 feet long. And on

Page 1952

the second floor, it is 37 feet long. I think just a human error happened here, and in Mr. Derbes's report, it gets picked up as 866 feet. Apparently the 32-foot length on the first floor was repeated on the second in his analysis, and then he removed the stairwell once, which I felt was appropriate, so he had 866 feet.

The correct number was 934. I'm not meaning to quarrel over trivia, but in terms of this difference, 68 feet, that materially makes it seem that these units were small and inferior, when, in fact, they are not very much smaller than the ones typical in the market at all.

More importantly, size does affect rent. The most important relationship between rent and the amount of it per month is the size of the unit. We always do comparisons by rent per foot.

If you took Mr. Derbes's rent per foot, which is at 43 cents in 1992, just exactly as he proposed it, but just corrected the error, went from 866 to 934 feet, it is $29.24 a month and when we adjust for vacancy

Page 1953

at his vacancy rate, it is about $323 a year per unit.

Chateau Cleary has 44 of these. This isn't a one or two-unit item. So it is 44 times 323, so that's $14,200 in a year. The 323 is one unit, one month -- is the amount a unit affects this during the course of a year.

So we have a $14,000 omission in rents. Well, over a period '92 to '96, with his 3 percent increase in rents, that's $57,000 in rents that are not here. Those would have traveled through to his bottom line, the NOI would be higher by this $57,000.

If you created an average of it, thought about how much its impact was per year, it is about $14,300. At his cap rate of 10.2, it is $140,000 change because of an omission. It is human error, but it is there.

Q. Okay. Did you also discuss this calculation flaw in your rebuttal report, Exhibit 119 at page 2872?

A. Oh, yes. I have not hidden my acknowledgment of this issue.

Q. All right.

A. For a year or more.

Page 2010

In an ex-post approach, the owner could sue for ex-post damages in the case where the owner would have made money. In the case where the owner would have lost money, as I think Dr. Stillman testified, the owner would not sue, and essentially the downside risk of losing money on that investment isn't picked up in an ex-post approach. Because those cases would never get brought to trial.

Secondly, an ex-post approach – focusing on the one we have here, an ex-post approach is trying to measure what would have happened had the property been operated as a market rate property between 1991 and 1996. It wasn't. So we don't know what would have happened. Dr. Ragas makes some assumptions that the property would have behaved on average like the market would have. It would have earned average rents. Vacancies would have been average, et cetera.

We don't know that. There would have been risks associated with that. It is likely some could have done slightly better, it could have done slightly worse. There is risk. There is fluctuation involved that's assumed

Page 2011

away in the ex-post approach.

Q. Is the essence of risk uncertainty?

A. I would say that's true, yes.

Q. And an ex-post approach for all intents and purposes eliminates uncertainty?

A. It treats the actual and, particularly, the but-for cash flows as if they were received with certainty.

Q. Now, in your experience and based on your review of economics literature, is it true that there is – the only two methods recognized for assessing damages are a pure ex-ante or a pure ex-post approach?

A. No. I disagree with that. One of the things that Dr. Stillman mentioned in his testimony is our practitioner handbooks. I think he said he hadn't reviewed those in preparation of his testimony, but he wasn't aware of anything there that indicated methodologies other than ex-ante or ex-post. In fact, one standard practitioner handbook is something called the litigation services handbook. It is – it discusses issues relevant to economists and financial analysts in the context of litigation.

Page 2012

And there was a supplement to that handbook a couple years ago, 2003, 2004, examining this issue, ex-ante versus ex-post, advantages, disadvantages, whatever they used. It talked about the ex-ante approach. It talked about the ex-post approach. And then it has a section on the hybrid approach, which it said is frequently used in cases involving elements of ex-ante and ex-post.

Q. Now, in Dr. Stillman's advocacy – well, that's a mischaracterization. I shouldn't say that. In his testimony discussing both the ex-ante and ex-post approaches, did he grapple with or even address the criticisms of the ex-post approach as applied to this case, that you explained during your direct testimony?

A. His discussion was entirely in the context of – well, it was a general discussion and not specifically related to these issues in this case.

His discussion was entirely about how to measure damages on – whether on an ex-ante or ex-post basis, and nothing in his testimony addressed how he would measure economic impact

Page 2013

in a case like this, and whether or not there would be flaws with an ex-post approach to doing so.

Q. Dr. Stillman described a way to measure the effects of a taking on an ex-ante basis and how one might go about isolating the effects of a permanent taking on an ex-ante basis, how one might go about isolating the first five years of that permanent taking. Is that, in essence, what you have done in your diminution of value approach?

A. That's exactly what I have done as DDX-202 lays out. It is – it analyzes the effect of a permanent taking on an ex-ante basis and looks at the first five years of that measure between 1991 and 1996.

Q. Now, you recall Dr. Ragas's recent testimony a few minutes ago about – or responding to one of your criticisms of the ex-post approach. And I will just put up DDX-211 to remind you and the Court of that. After Dr. Ragas discussed this demonstrative, what is your response to his testimony?

A. What I understood him to be saying, my criticism here is really just a criticism of an

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that, on this 9th day of November 2006, I caused a copy of the foregoing Appendix to Plaintiff's Post-Trial Memorandum to be delivered electronically to:

Kenneth D. Woodrow, Esq.
Commercial Litigation Branch
Civil Division
Attention: Classification Unit, Room 8012
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

/s/ Albert S. Iarossi
Albert S. Iarossi