No. 97-334C
(Judge Charles F. Lettow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CCA ASSOCIATES, a Louisiana partnership,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S POST-TRIAL REPLY BRIEF

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN M. SIMKIN
Assistant Director

KENNETH D. WOODROW
DAVID A. HARRINGTON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-0513

Dated: November 21, 2006

Attorneys for Defendant

**TABLE OF CONTENTS**

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. CCA's As-Applied Taking Claim Is Not Ripe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. CCA's Taking Claim Never Ripened Because CCA Failed To Request HUD's Permission To Prepay Under The Preservation Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1. It Is Not Clear That HUD Would Have Concluded That Prepayment Would Have Had A Material Effect Upon Current Tenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

a. The 10 Percent Rent Increase Provision Would Not Have Prevented Prepayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

b. CCA Presented No Evidence About The "Monthly Adjusted Income" Of Its Tenants In 1991 . . . . . . . . . . . . . . . . . . . 6

2. Tenants Would Not Be *Involuntarily* Displaced By Prepayment And Conversion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

3. Prepayment By CCA Would Have Had No Effect Upon The Supply Of Low-Income Housing . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

B. CCA's Taking Claim Never Ripened Because Pursuing The Options Available Under The Preservation Statutes Was Not Futile . . . . . . . . . 10

II. The *Penn Central* Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

A. The Preservation Statutes Do Not Have The Character Of A Taking . . . . . . . . . 12

1. *Cienega VIII* Is Not Dispositive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

2. Whether The Government Could Have Achieved Same Ends By Alternative Means Is Irrelevant To The Character Inquiry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

3. The Preservation Statutes Did Not Impose A Disproportionate Burden On Private Property Owners . . . . . . . . . . . . . . 14

4. Preservation Statutes Did Not Have The Character Of A Physical Invasion . . . . . 16

B. The Preservation Statutes Did Not Frustrate CCA's Primary Investment-Backed Expectations . . . . . 17

1. CCA Misapprehends The *Penn Central* Test . . . . . 17

2. CCA Fails To Address The Significance Of The Norman Brothers' Expectations . . . . . 18

3. CCA Has Not Demonstrated That The Opportunity To Prepay Was The Primary Reason For The Norman Brothers' Investment In Chateau Cleary . . . . . 19

C. CCA Suffered No Significant Economic Impact . . . . . 22

1. CCA's Return-On-Equity Measure Of Economic Impact Is Fundamentally Flawed . . . . . 22

a. CCA's Approach Fails To Adequately Account For The Duration Of The Taking . . . . . 23

b. CCA's Measure Of Economic Impact Only Considers One Of The "Rights" In The Bundle Held By CCA . . . . . 24

c. CCA's Measure Of Economic Impact Produces Inconsistent Results For Permanent And Temporary Alleged Takings . . . . . 27

2. *Cienega VIII* And *Rose Acre* Provide No Support For CCA's Measure Of Economic Impact . . . . . 28

3. CCA Fails To Consider The Other Available Uses Of Its Property . . . . . 29

III. CCA Is Not Entitled To Just Compensation . . . . . 30

A. CCA Is Owed No Compensation . . . . . 30

B. Even If The Benefits Available To CCA Under The Preservation Statutes Are Disregarded, Dr. Ragas's Approach Does Not Provide Just Compensation . . . . . . . . . . 31

1. Compensation Should Be Based Upon The Value Of The Property Taken On The Date Of The Taking . . . . . . . . . . 31

2. Dr. Ragas's Approach Overstates Any Compensation Due CCA . . . . . . . . . . 33

3. Enactment Of The HOPE Act Ended Any Temporary Taking . . . . . . . . 35

C. Simple Interest At A Risk-Free Rate Running From The Date Of The Taking Should Be Awarded On Any Just Compensation Award . . . . . . . . . 37

1. Plaintiffs Are Entitled Only To Simple Interest . . . . . . . . . . 37

2. Plaintiffs Are Entitled To Only A Risk-Free Interest Rate . . . . . . . . . . . 38

3. Interest Should Run From The Date Of The Alleged Taking . . . . . . . . . 39

# TABLE OF AUTHORITIES

**Cases:**

Andrus v. Allard,
444 U.S. 51 (1979) . . . . . . . . . . 26, 27

Bass Enterprises Production Co. v. United States,
381 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 12

Calhoun v. United States,
453 F.2d 1385 (Ct. Cl. 1972) . . . . . . . . . . 37

Chancellor Manor v. United States,
331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . passim

Cienega Gardens v. United States,
67 Fed. Cl. 434 (2005), appeal docketed, No. 06-5051 (Fed. Cir.) . . . . . . . . . . 17, 28, 32

Cienega Gardens v. United States,
265 F.3d 1237 (Fed. Cir. 2001) . . . . . . . . . . 10

Cienega Gardens v. United States,
331 F.3d 1319 (Fed. Cir. 2003) . . . . . . . . . . 12, 13, 18, 28

City Line Joint Venture v. United States,
71 Fed. Cl. 486 (2006) . . . . . . . . . . 23

Commonwealth Edison Co. v. United States,
271 F.3d 1327 (Fed. Cir. 2001) . . . . . . . . . . 17

Corby Homes Ltd. Partnership v. United States,
38 Fed. Cl. 204 (1997) . . . . . . . . . . 16

FCC v. Florida Power Corp.,
480 U.S. 245 (1987) . . . . . . . . . . 17, 26

First English Evangelical Lutheran Church v. County of Los Angeles,
482 U.S. 304 (1987) . . . . . . . . . . 31, 39

Florida Rock Indus. v. United States,
791 F.2d 893, 905 (1986) . . . . . . . . . . 26

Forest Properties, Inc. v. United States,
177 F.3d 1360 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Gargoyles, Inc. v. United States,
37 Fed. Cl. 95 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Greenbrier v. United States,
193 F.3d 1348 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 10, 35

Heydt v. United States,
38 Fed. Cl. 286 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Howard W. Heck & Assoc. v. United States,
134 F.3d 1468 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

Independence Park v. United States,
449 F.3d 1235 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Independence Park v. United States,
61 Fed. Cl. 692 (2004), rev'd, 449 F.3d 1235 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . 32

King v. United States,
504 F.2d 1138 (Ct. Cl. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Kirby Forest Indus., Inc. v. United States,
467 U.S. 1 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Lingle v. Chevron U.S.A. Inc.,
544 U.S. 528 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

MacLeod v. County of Santa Clara,
749 F.2d 541 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Maritrans, Inc. v. United States,
342 F.3d 1344 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30

Miller v. United States,
620 F.2d 812 (Ct. Cl. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

NRG Co. v. United States,
31 Fed. Cl. 659 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Palazzolo v. Rhode Island,
533 U.S. 606 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 36

Paul v. United States,
21 Cl. Ct. 415 (1990), aff'd, 937 F.2d 623 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . 37

Penn Central Transp. Co. v. City of New York,
438 U.S. 104 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Pettro v. United States,
47 Fed. Cl. 136 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

Rite-Hite Corp. v. Kelley Co., Inc.,
56 F.3d 1538 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Rith Energy, Inc. v. United States,
247 F.3d 1355 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Rose Acre Farms, Inc. v. United States,
373 F.3d 1177 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24, 28

Rose Acre Farms, Inc. v. United States,
55 Fed. Cl. 643 (2003), vacated on other grounds, 373 F.3d 1177 (2004) . . . . . . . 38, 39

Seiber v. United States,
364 F.3d 1356 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Stearns Co. v. United States,
396 F.3d 1354 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Suitum v. Tahoe Regional Planning Agency,
520 U.S. 725 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Tabb Lakes, Ltd. v. United States,
10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,
535 U.S. 302 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18, 22, 24

Tulare Lake Basin Water Storage Dist. v. United States,
59 Fed. Cl. 246 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40

United States v. 50 Acres of Land,
469 U.S. 24 (1984)C . . . . . 31

United States v. Mendoza,
464 U.S. 164 (1984) . . . . . 13

United States v. Riverside Bayview Homes,
474 U.S. 121 (1985) . . . . . 1, 2

Wheeler v. City of Pleasant Grove,
833 F.2d 267 (11th Cir. 1987) . . . . . 39

Whitney Benefits, Inc. v. United States,
30 Fed. Cl. 411 (1994) . . . . . 37

Yaist v. United States,
17 Cl. Ct. 246 (1989) . . . . . 37

Yee v. City of Escondido,
503 U.S. 519 (1992) . . . . . 17

Yuba Natural Resources, Inc. v. United States,
904 F.2d 1577 (Fed. Cir. 1990) . . . . . 39

**Statutes:**

ELIHPA § 224 . . . . . 15

ELIHPA § 225 . . . . . passim

ELIHPA § 230 . . . . . 15, 16

Housing Opportunity Program Extension Act, Pub. L. No. 104-120, 110 Stat. 834
(March 28, 1996) . . . . . 35

12 U.S.C. § 4101 . . . . . 1, 3, 10

12 U.S.C. § 4103 . . . . . 11-12, 30

12 U.S.C. § 4108 . . . . . passim

12 U.S.C. § 4108 . . . . . 8

12 U.S.C. § 4109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

12 U.S.C. § 4110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

12 U.S.C. § 4114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 16, 30

12 U.S.C. § 4119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 U.S.C. § 258e-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

42 U.S.C. § 1437a(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CCA ASSOCIATES, a Louisiana Partnership, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 97-334C |
| v. | ) | (Judge Charles F. Lettow) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL REPLY BRIEF**

Pursuant to the Court's August 29, 2006 order, defendant, the United States, respectfully submits the following reply brief regarding the claims of plaintiff, CCA Associates ("CCA").

**ARGUMENT**

**I. CCA's As-Applied Taking Claim Is Not Ripe**

The Preservation Statues established an administrative process that gave HUD discretion to determine whether the preservation of particular projects as moderate- or low-income housing was necessary. Owners who wished to exit the program through prepayment were required to seek HUD approval. ELIHPA § 225(a); 12 U.S.C. §§ 4101, 4108.

CCA asserts that the Preservation Statutes effected a taking by preventing CCA from exercising its "right to prepay its HUD-insured mortgage without HUD approval." Pl.'s Br. at 12 (emphasis added). Congress's decision to establish a permitting process for prepayment, however, did not itself effect a regulatory taking. Requiring an owner to seek approval for a given use of its property "does not itself 'take' the property in any sense." United States v. Riverside Bayview Homes, 474 U.S. 121, 128 (1985). After all, the very existence of a process to seek approval "implies that permission may be granted, leaving the [owner] free to use the

property as desired." Id. "Only when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the [property] in question can it be said that a taking has occurred." Id. at 127; see also Greenbrier v. United States, 193 F.3d 1348, 1357-58 (Fed. Cir. 1998) (using this analysis for taking claims concerning the Preservation Statutes).

CCA must, therefore, demonstrate that the statute, as applied to its property, constitutes a regulatory taking. However, because CCA never completed the administrative process required by the Preservation Statutes, the statutes were never applied. Put differently, CCA has failed to identify any Government action upon which to base its as-applied taking claim.

While conceding that it disregarded the administrative process established by the Preservation Statutes, CCA argues that applying to prepay would have been futile. The doctrine of futility cannot be invoked until a claimant has made at least one application. E.g., Howard W. Heck & Assoc. v. United States, 134 F.3d 1468, 1472 (Fed. Cir. 1998) (The futility exception serves only to "protect property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved.") (emphasis in original). Furthermore, CCA has failed to establish that it would have been futile to pursue the administrative process established by the Preservation Statutes. HUD possessed discretion under the terms of the Preservation Statutes to evaluate applications for prepayment.[1] See Chancellor Manor v. United States, 331 F.3d 891, 905 (Fed. Cir. 2003)

---

[1] CCA, citing testimony by James Alexander, argues that HUD had no discretion to allow CCA to prepay. Pl.'s Br. at 14 (citing Tr. 587-89). Rather, Mr. Alexander testified that HUD had no discretion to disregard the statutory criteria. Tr. 587-89 (Alexander). However, as explained in our post-trial brief, the statutory criteria vested HUD with substantial discretion. See Def.'s Br. at 24-25. Because CCA presented no testimony from HUD officials establishing how HUD would have exercised this discretion, it has failed to establish that applying to prepay (continued...)

(LIHPRHA "did not simply prevent prepayment," but rather "created a complex statute, which vested discretion in HUD"). Consequently, it is unclear that HUD would have denied a well-crafted plan of action to prepay. Equally unclear is the outcome that would have resulted from a plan of action to sell or to seek incentives. See ELIHPA § 225(b); 12 U.S.C. §§ 4109-10, 4114. Due to CCA's own inaction, it cannot be said that CCA was actually prevented from prepaying. See ELIHPA § 225(a); 12 U.S.C. §§ 4101, 4114. Nor is the economic effect of the challenged regulations upon CCA certain.

Due to CCA's inaction, HUD never was given the opportunity to make "a final decision regarding the application of the regulations to the property at issue." Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001). As a result, the effect of the Preservation Statutes upon CCA is uncertain and the as-applied taking claim asserted in this action is not ripe. See, e.g., Palazzolo, 533 U.S. at 618; Greenbrier, 193 F.3d at 1357.

### A. CCA's Taking Claim Never Ripened Because CCA Failed To Request HUD's Permission To Prepay Under The Preservation Statutes

Obtaining a final decision from HUD regarding the permissible use of the Chateau Cleary project was not futile and is necessary to establish a ripe claim. As explained below, a well-designed plan of action might well have satisfied the statutory criteria for prepayment. Furthermore, because of CCA's failure to exhaust the administrative process, the permissible uses of the project and the economic impact of the challenged regulations are uncertain.

[1](...continued)
would be futile.

### 1. It Is Not Clear That HUD Would Have Concluded That Prepayment Would Have Had A Material Effect Upon Current Tenants

#### a. The 10 Percent Rent Increase Provision Would Not Have Prevented Prepayment

CCA first argues that a plan of action to prepay would have caused monthly rents to increase by more than 10 percent.[2] Pl.'s Br. at 15, 35. As explained in our post-trial brief, a well-conceived plan of action need not have resulted in a rent increase exceeding 10 percent. Def.'s Br. at 25-28.

CCA bases its argument upon rent estimates made by Mr. Derbes and Dr. Ragas. Id. Both Mr. Derbes and Dr. Ragas assume significant expenditures for improvements and upgrades, which would in turn result in higher rents after prepayment. PX106; DX172; see also Pl.'s Br. at 26 (Dr. Ragas assumed "a moderate level of expenditure" for project upgrades). However, as explained in our post-trial brief, a well-conceived plan of action to prepay would include no project upgrades. Neither Mr. Derbes nor Dr. Ragas performed an analysis to estimate the rents at Chateau Cleary in such a scenario.

When CCA actually did prepay in 1998, it performed no major upgrades. Tr. 464-66 (Norman). The actual rent increase from HUD rents to unrestricted market rents in 1998 was only 10 percent.[3] Tr. 369-70 (Norman); PX111. Moreover, because the difference between

---

[2] ELIHPA, under which CCA chose to proceed, see PX51, does not contain this provision concerning monthly rent increases. Rather, under ELIHPA, HUD was merely required to find that prepayment would not work a "material hardship" on current tenants. ELIHPA § 225(a).

[3] Mr. Derbes explained that CCA's rents as a conventional project, without substantial improvements lagged 20 to 25 percent below the average market rents for West Metairie. Tr. 1359 (Derbes); DX173. This was principally due to the lack of amenities included in section 221(d)(3) projects such as Chateau Cleary. E.g., Tr. 1359 (Derbes), 682-92 (Alexander).

HUD rents and market rents increased during the 1990's, Tr. 466-67 (Norman), 969 (Ragas), the difference in 1991 would necessarily have been less than 10 percent.

Additionally, the rent increase percentages presented by CCA in its post-trial brief start from an inappropriate baseline. Prior to submitting a plan of action, a reasonable owner would have sought to maximize its HUD rents. See Def.'s Br. at 26. CCA had last requested a rent increase in 1984, based upon operating costs in its 1983 audited financial statement. Tr. 332 (Norman). Between 1984 and 1991, CCA's operating costs increased by 26 percent. See PX26 (FY1983); PX43 (FY1990). Thus, in 1991, CCA was eligible to receive a 26 percent increase in HUD rents. See Tr. 339-42, 353-55 (Norman), 1094-97 (Kizzier). Had CCA sought such a rent increase, its HUD rents in 1991 would have been within 10 percent of the "market rents" projected by Dr. Ragas, by Mr. Derbes, and by Mr. Norman himself.[4] See Def.'s Br. at 27-28; PX111.

CCA argues that HUD would not have approved a 26 percent rent increase in 1991. Pl.'s Br. at 31. However, no evidence supports such a conclusion. CCA was entitled to seek a rent increase at any time. Tr. 353-55 (Norman), 1095 (Kizzier); DX1. HUD routinely approved annual rent increases of five percent, and would approve larger increases supported by an owner's audited financial statements. E.g., Tr. 339-42, 353-55 (Norman), 1094-97 (Kizzier); DX1. CCA's audited financial statements established a 26 percent increase in operating costs. PX26; PX43; PDX33. And HUD approved each and every rent increase requested by CCA,

[4] Mr. Norman never attempted to determine what HUD would have considered market rents for the relevant market area. Tr. 442-43 (Norman). For this reason, his testimony about the supposed rent differential is without basis and should be disregarded.

including a 30 percent rent increase in 1995. See, e.g., PX17a; PX18a; PX20a; PX22a; PX25a; PX26a; PX59a.

CCA also argues that it could not have increased its HUD rents "without driving its tenants away." See Pl.'s Br. at 31, 57. CCA does not dispute that its HUD rents were near market rents during the period 1986 until 1990. Pl.'s Br. at 30; Tr. 155-56, (Norman), 1349-50 (Derbes); see also Tr. 964 (Ragas) (not until the early 1990's did the rental conventional market begin to recover). If raising rents to cover CCA's increased costs in 1991 would in fact have caused the project's tenants to "migrate" to "conventional apartment complexes," see Pl.'s Br. at 31, this is merely additional proof of the small difference between eligible HUD rents and market rents – a small difference that would have enabled CCA to obtain approval to prepay. See 12 U.S.C. § 4108(a)(1)(A). Furthermore, the ability of CCA's tenants to pay higher HUD-approved rents is immaterial. The purpose of obtaining a rent increase was to facilitate approval of a plan of action to prepay – not to charge higher rents while remaining in the HUD program. And in any event, CCA was not required to charge its tenants the full, approved-HUD rent – it simply could not charge a higher rent. DX1.

**b. CCA Presented No Evidence About The "Monthly Adjusted Income" Of Its Tenants In 1991**

CCA next alleges that it could not have obtained permission to prepay in 1991 because its "then tenants could not have afforded to pay the market rents charged by conventional properties without paying more than 30 percent of their adjusted income for rent." Pl.'s Br. at 15. CCA misstates the statutory criterion. See 12 U.S.C. § 4108(a)(1)(A) (requiring HUD to conclude that "implementation of the plan of action will not" result in "a monthly rental

payment" that "exceeds 30 percent of the [tenants'] monthly adjusted income"). Neither ELIHPA nor LIHPRHA make any reference to "market rents charged by conventional properties." See ELIHPA § 225(a); 12 U.S.C. § 4108. Rather, the statutes refer to the rents expected to be charged under the owner's proposed plan of action. CCA elicited no testimony about the rents that would result from a well-designed plan of action, i.e., a plan of action that contains no improvements or upgrades to the project. Nor did CCA present evidence establishing the "monthly adjusted income" of its tenants in 1991. Consequently, CCA failed to demonstrate that a well-designed plan of action to prepay necessarily would have required current tenants to pay more than 30 percent of their "monthly adjusted income" as rent. 12 U.S.C. § 4108(a)(1)(A).

The sole basis for CCA's argument is a vague statement by former HUD employee, James Alexander. Pl.'s Br. at 15, 35 (citing Tr. 610-11). However, Mr. Alexander was not asked about the rents that would have been paid by Chateau Cleary tenants under some hypothetical plan of action. Nor was Mr. Alexander asked to address the situation in 1991. In fact, Mr. Alexander was not even asked about tenants at Chateau Cleary. Rather, the question posed to Mr. Alexander concerned the general ability of section 221(d)(3) tenants to afford the rents being charged by "conventional properties" at some unspecified point in time. Tr. 610 (Alexander). Moreover, the answer given by Mr. Alexander – that it was "unlikely" that section 221(d)(3) tenants would be able to afford rents at a "conventional housing" project – does not support CCA's ripeness argument. Tr. 610-11 (Alexander). It is not enough for CCA to establish that it was "difficult" to obtain HUD permission to prepay, that CCA was "unlikely" to meet the statutory criteria, or even that an application to prepay would almost certainly be

denied. Any possibility that prepayment might be allowed precludes a finding of futility. See, e.g., Heck, 134 F.3d at 1472. Accordingly, Mr. Alexander's vague testimony fails to establish that it would have been futile for CCA to apply to prepay.

### 2. Tenants Would Not Be *Involuntarily* Displaced By Prepayment And Conversion

CCA also argues that it would be unable to establish that "current tenants would not be displaced after a prepayment." Pl.'s Br. at 36. Again, CCA misstates the statutory criterion. The Preservation Statutes do not require HUD to conclude that tenants would not be displaced, rather that they would not be involuntarily displaced. 12 U.S.C. § 4108(a)(1)(B). A plan of action to prepay need not require the eviction of existing tenants. Indeed, when CCA did prepay in 1998, its existing tenants were not evicted. To the contrary, they were encouraged to stay. See Tr. 403 (Norman), 1776-77, 1783-84 (Root) (CCA voluntarily delayed prepayment to put in place vouchers to encourage current tenants to remain).

In its post-trial brief, CCA suggests that some tenants would have been unhappy about higher rents and, therefore, would have chosen to move to different housing accommodations. Pl.'s Br. at 36. Basic rules of supply and demand teach that this is the likely result of any rent increase. However, CCA's argument misses the point. The Preservation Statues do not prevent prepayment because tenants might choose to leave to rent an apartment elsewhere. The Preservation Statues prevent prepayment only where the plan of action will "involuntarily displace current tenants . . . where comparable and affordable housing is not readily available." 12 U.S.C. § 4108 (emphasis added). A well-designed plan of action – one that did not evict

tenants in order to convert to some new use – would not result in the involuntary displacement of current tenants.[5]

**3. Prepayment By CCA Would Have Had No Effect Upon The Supply Of Low-Income Housing**

The Preservation Statues contained certain limits on prepayment to protect "low-income" and "very low-income" renters. 12 U.S.C. § 4108(a)(2); 12 U.S.C. § 4119 (defining the terms "moderate income families or persons," "low-income families or persons," and "very low-income families or persons"); see also 42 U.S.C. § 1437a(b)(2) (defining the range of incomes that qualify as low-income and very low-income). CCA argues that its prepayment "would have materially affected the supply of low-income housing" and, therefore, was futile Pl.'s Br. at 35. Determining what constitutes a material effect is inherently discretionary, and CCA proffered no evidence establishing how HUD would have exercised its discretion. Furthermore, CCA was not a low-income housing project. E.g., Tr. 192, 426 (Norman); DX1. CCA rented to moderate-income families and persons. Id.; see also Tr. 1092 (Kizzier) (low-income and very low-income tenants could not afford to live at Chateau Cleary). Indeed, at trial, when CCA's attorney mistakenly suggested that Chateau Cleary was a low-income complex, he was corrected by his own client.

> Q. Was there any low-income housing in the area in and around West Metairie, apart from Chateau Cleary?
>
> A. We refer to ourselves as moderate income.

[5] Nor has CCA presented evidence about what HUD would have deemed "comparable and affordable" housing. Pl.'s Br. at 16 (citing testimony only by the project's owner). Interpretation of this broad requirement was left to HUD. HUD might well have concluded, for instance, that lower priced conventional projects were comparable and affordable. For this additional reason, CCA has failed to establish that applying to prepay was futile.

Tr. 192 (Norman). Because CCA was a moderate-income project, its prepayment would have had no effect upon the supply of low-income housing.

### B. CCA's Taking Claim Never Ripened Because Pursuing The Options Available Under The Preservation Statutes Was Not Futile

CCA asserts that it need not pursue the options provided by the Preservation Statutes to ripen its as-applied taking claim. Pl.'s Br. at 36-38. CCA does not contend that pursuing the sale or use agreement options would have been futile. Nor does CCA claim that pursuing these options was not necessary to ascertain the property's permissible use. To the contrary, CCA concedes, as it must, that pursuing the statutory sale and use agreement options might well have culminated in prepayment. Pl.'s Br. at 37; see also 12 U.S.C. §§ 4101, 4114.

Citing Cienega Gardens v. United States, 265 F.3d 1237 (Fed. Cir. 2001) ("Cienega VI"), CCA argues instead that the Federal Circuit has ruled that the options available under the Preservation Statues need not be pursued. Pl.'s Post-Trial Brief at 36-37. CCA is mistaken. The Cienega VI court did not discuss the sale option, the use agreement option, or the possibility that prepayment could occur under 12 U.S.C. § 4114. In Cienega VI, focusing solely upon section 4108, the court concluded that the plaintiffs' failure to apply to prepay was excused because "uncontested facts" established that any request would have been denied. 265 F.3d at 1248. By contrast, in an earlier decision, Greenbrier v. United States, 193, F.3d 1348 (Fed. Cir. 1999), the Federal Circuit held that plaintiff's takings claims were not ripe where, as here, there had been no final agency decision applying the Preservation Statutes. In Greenbrier, the Court expressly recognized the that prepayment could occur under one of two avenues. Id. at 1358 (citing 12 U.S.C. §§ 4101, 4114). Where a regulatory restriction can be avoided by

alternate avenues, an "as applied" taking claim does not ripen until each avenue has been exhausted. Stearns Co. v. United States, 396 F.3d 1354, 1358 (Fed. Cir. 2005).

CCA also argues that it need not pursue the sale option under by the Preservation Statutes because any sale that resulted would not have occurred "at a fair market value." Pl.'s Br. at 37. The trial record establishes just the opposite. LIHPRHA specifically states that any sale would occur at "the fair market value of the housing based on the highest and best use of the property." 12 U.S.C. § 4103(b)(2). A well-designed procedure was established to arrive at the property's "fair market value." 12 U.S.C. § 4103(a)(1) (providing for two appraisals, one by the owner's appraiser and one by a HUD appraiser). No witness with knowledge of the preservation process suggested that it would not arrive at a fair market value. See Tr. 1088-89 (Kizzier), 614 (Alexander), 1633 (Dickey); see also Tr. 920, 971 (Ragas) (agreeing that a private, off-market transaction could occur at fair market value and that appraisals are commonly used to determine fair market value); Tr. 1874-75 (Stillman) (admitting that an appraisal process could provide a fair market value and that he had no familiarity with the appraisal process used by the Preservation Statutes). Indeed, because HUD financed transaction costs, sale though the preservation process might well have been superior to an open market sale. Tr. 1633-36 (Dickey); 12 U.S.C. § 4110(d). CCA should not in any event be heard to complain about hypothetical shortcomings. CCA's unsupported assertion that the preservation process would not have arrived at a fair market value is pure speculation due to its own failure to exhaust the administrative process.[6] See Tr. 383-84 (Norman).

---

[6] Nothing obligated CCA to sell at a below market price if it pursued the sale option and concluded that the preservation appraisals did not arrive at the project's fair market value. See

(continued...)

Lastly, CCA argues that it could disregard the preservation process because it did not provide compensation for administrative delays.[7] Pl.'s Br. at 37. CCA cites no authority for this proposition, and there is none. The mere potential for administrative delays has no bearing upon ripeness. Additionally, having failed to pursue and complete the administrative process, CCA lacks standing to complain about hypothetical delays that it might (or might not) have experienced. In any event, delays inherent in a complex regulatory scheme have "long been considered permissible exercises of the police power" and are not considered compensable under the Fifth Amendment. Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 335 (2002); Bass Enterprises Production Co. v. United States, 381 F.3d 1360, 1366 (Fed. Cir. 2004).

## II. The *Penn Central* Factors

### A. The Preservation Statutes Do Not Have The Character Of A Taking

#### 1. *Cienega VIII* Is Not Dispositive

CCA cites Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003) ("Cienega VIII"), to reach the erroneous conclusion that "the character of the government's action in enacting ELIHPA and LIHPRHA . . . has . . . been decided as a matter of law in this Circuit." Pl. Br. at 39. Cienega VIII is not a dispositive statement of the law regarding the character prong of the Penn Central test. The analysis in a takings case is an *ad hoc* factual inquiry based upon the

---

[6](...continued)
12 U.S.C. §§ 4103, 4110.

[7] As explained in our post-trial brief, the Preservation Statutes contains deadlines and other provisions to help minimize delays. See Def.'s Br. at 8-9 (explaining, for instance, that the administrative process could be started two years before the owner's prepayment eligibility date).

record at trial. The trial record in Cienega VIII was different than the record made in CCA – most notably, it was a record made in a breach of contract case and, as such, character of the government action was not at issue. In its remand, the Federal Circuit recognized this, stating that the remaining non-model plaintiffs would not be limited to the conclusions from Cienega VIII. Cienega VIII, 331 F.3d at 1353-54. Furthermore, the factual findings made in one case cannot be used against the Government in another action. United States v. Mendoza, 464 U.S. 164 (1984) (rejecting non-mutual offensive collateral estoppel against the government). By leaving open the application of the Penn Central test to the remaining plaintiffs upon remand, the Federal Circuit expressly preserved the character prong for further judicial determination.

### 2. Whether The Government Could Have Achieved Same Ends By Alternative Means Is Irrelevant To The Character Inquiry

CCA argues that the Government could have spread the burden of preserving affordable housing to the taxpayers as a whole rather than enacting restrictions that "disproportionately" affected private owners of affordable housing. Pl. Br. at 39. CCA's argument misses the point of Penn Central's character prong and is without basis in fact.

Whether Congress' means of preserving affordable housing is reasonable (over some alternative method, such as issuing "enhanced vouchers" to tenants (Pl. Br. at 39)) is a due process inquiry, not a takings inquiry. Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005) (holding that issue of whether government regulation "substantially advances" government interest is essentially a due process inquiry). Simply put, second-guessing Congress' decision to enact the Preservation Statutes is beyond the scope of the takings inquiry, as is inquiring whether

the Government could have achieved the purpose of preserving affordable housing by less restrictive means. When applying the character prong of the Penn Central test:

> the issue is not whether a less restrictive alternative to the government action existed or was "possible." It is whether there is a nexus between the regulation and its underlying public purpose.

Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1194 (Fed. Cir. 2004) (citing Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 837 (1987)). As the Supreme Court explained, the critical question is the "magnitude or character of the burden a particular regulation imposes upon private property rights," not whether the regulation "substantially advances" the Government interest. Lingle, 544 U.S. at 542. Therefore, CCA's argument that the Government could have acted to preserve affordable by some other means is irrelevant to the Penn Central inquiry.

### 3. The Preservation Statutes Did Not Impose A Disproportionate Burden On Private Property Owners

CCA argues that the Preservation Statutes singled out the owners of low-income housing and disproportionately imposed the burden of preserving affordable housing upon them. Pl. Br. at 39-40. CCA's argument ignores the Government's evidence that the taxpayers bore the brunt of the preservation burden and fails completely to consider the benefits afforded private owners by the Preservation Statutes. A proper balancing of the "benefits and burdens" of the Government's regulation reveals that the Preservation Statutes imposed a greater burden upon the taxpayers than private landowners. In fact, Congress eventually stopped funding LIHPRHA because of its drain upon the public fisc.[8]

---

[8] Congress repealed funding for LIHPRHA in 1996, after receiving testimony that the Preservation Statutes were "tax payer ripoffs" that allowed "windfall profits" because they paid costly incentives to owners who had no intention of prepaying their mortgages. Hearing before (continued...)

In Chancellor Manor, the Federal Circuit expressly directed the trial court to consider the benefits under the Preservation Statutes when considering the character of the Government's action. Chancellor Manor, 331 F.3d at 905 (holding that court should determine how HUD would exercise its discretion to provide incentives for project owners to remain in the program). As the Government demonstrated at trial, the Preservation Statutes allowed projects that were not necessary for the Congressional preservation strategy to exit the program through prepayment, tr. 1633 (Dickey), and also permitted project owners to realize their equity in a project (i.e., residual value) and exit the HUD program by selling at market value. Tr. 1633 (Dickey), 634-36 (Alexander); 12 U.S.C. § 4110; see also ELIHPA § 230. Indeed, this option was facilitated by HUD using taxpayer dollars. See 12 U.S.C. § 4110(d). The Preservation Statutes also allowed owners to obtain an increased return on their equity by applying for incentives from the Government in exchange for continued use restrictions on the project. ELIHPA §§ 224, 225(b); 12 U.S.C. § 4109. These benefits – the cost of which were all borne by the taxpayers generally – must be balanced against any burdens imposed upon the private owners.

Moreover, any analysis of the character of the Preservation Statutes must take into consideration the fact that the owners had been enjoying the benefits of the HUD program for years. These benefits were the initial inducements for private developers to enter into the HUD program and included low-risk, highly-leveraged initial financing and generous tax shelters. The Preservation Statutes had no impact upon the owners' enjoyment of these benefits. See

---

[8](...continued)
the Subcommittee on VA, HUD, and Independent Agencies of the House Committee on Appropriations, 104th Cong., 1st Sess. (January 24, 1995).

Tr. 1183-84 (Malek) (neither ELIHPA nor LIHPRHA prevented a developer from obtaining Government-insured financing or from taking advantage of the BSPRA); also tr. 1215-24 (tax benefits realized long before passage of LIHPRHA). Moreover, the Preservation Statutes did not affect even subsidiary expectations such as the ability to obtain management fees and the payment of annual cash dividends. Tr. 1171-72 (Malek).

Finally, CCA's analysis overlooks fact that many owners were not affected, including those with no intention to prepay and those for whom prepayment would not have been profitable. In fact, the loss of the prepayment opportunity is only important if (1) the owner had an intent to prepay; (2) prepayment would have been profitable at that time; and (3) the alternatives to prepayment would have been less profitable. Many owners actively sought the alternatives and even sued when HUD refused to fund them. See, e.g., Corby Homes Ltd. Partnership v. United States, 38 Fed. Cl. 204 (1997).

### 4. Preservation Statutes Did Not Have The Character Of A Physical Invasion

CCA argues that the Preservation Statutes had the character of a taking because they forced CCA to suffer a physical occupation of its property by Government-approved tenants. CCA's characterization is unsupported by fact or law.

Both ELIHPA and LIHPRHA allowed projects that were not necessary for the Congressional preservation strategy to exit the program through prepayment. Tr. 1787; ELIHPA § 225(a); 12 U.S.C. § 4108. The Preservation Statutes also permitted project owners to exit the HUD program by selling at market value. Tr. 1633 (Dickey), 634-36 (Alexander); 12 U.S.C. § 4110; see also ELIHPA § 230. Indeed, this option was facilitated by HUD using

taxpayer dollars. See 12 U.S.C. § 4110(d). If a sale could not be consummated, or incentives were unavailable, the owner was allowed to prepay. Tr. 1633 (Dickey); 12 U.S.C. § 4114. By permitting property owners various means of exiting the HUD program, the Preservation Statutes did not "compel" Chateau Cleary to house Government-approved tenants.

The character of the Preservation Statutes is more akin to standard rent control statutes than to a physical invasion. CCA maintained control of the apartments, including the ability to manage the property, to turn away prospective tenants, and to sell the property at market value. Tr. 426-28, 439-40 (Norman), 646 (Alexander). Thus, even if the Preservation Statutes had required CCA's continued participation in the HUD program (and they did not), the statutes would merely have limited CCA's ability to raise tenant rents. Rent control statutes are not generally considered to have the character of a taking. See Yee v. City of Escondido, 503 U.S. 519, 528-29 (1992); FCC v. Florida Power Corp., 480 U.S. 245, 251-52 (1987).

### B. The Preservation Statutes Did Not Frustrate CCA's Primary Investment-Backed Expectations

#### 1. CCA Misapprehends The *Penn Central* Test

CCA misapprehends the Penn Central test and misstates the relevant law governing whether the Preservation Statutes frustrated CCA's "primary expectation concerning the use" of its property. Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 136 (1976). The Federal Circuit requires two distinct inquiries for the investment-backed expectation analysis.

In Chancellor Manor, the Federal Circuit stated that the Penn Central analysis requires consideration of the reasonable expectations of an objective investor in the plaintiffs' properties. 331 F.3d at 904 (citing Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1348 (Fed.

Cir. 2001). In Cienega Gardens, the Court noted that plaintiffs could not recover if they did not have actual (subjective) expectations frustrated by the regulation. 331 F.3d at 1346. Thus, the caselaw calls for a two part test: first, to determine if a reasonable, objective investor would have considered the alleged expectation a primary reason to invest in the project; and second, to ensure that plaintiffs actually (subjectively) had such an expectation.

CCA's formulation of the test ignores the first inquiry and relies solely upon a subjective analysis of the original investors' alleged expectations. Pl. Br. at 44. CCA presented no evidence of the reasonable expectations of an objective investor in the HUD program. Instead, CCA's evidence focused entirely upon the expectations of the Norman brothers themselves. Pl. Br. at 46-47.

#### 2. CCA Fails To Address The Significance Of The Norman Brothers' Expectations

CCA's discussion of whether the Norman brothers had a reasonable expectation when they entered into the program that they could prepay does not address in any way the significance of the expectation. Pl. Br. at 48. CCA presented no evidence regarding any other expectations the Norman brothers may have had and how those expectations might have compared with the expectation to prepay. Accordingly, the trial court's analysis does not satisfy the investment prong of the Penn Central test.

The Supreme Court has held that there can be no "set formula" for considering investment-backed expectations. Tahoe-Sierra, 535 U.S. at 336. Instead, the Court requires a "careful examination and weighing of all the relevant circumstances." Id. at 322. CCA's arguments concerning the "reasonableness" of the expectation to prepay are based upon the

discussion of investment-backed expectations in Cienega VIII. Pl. Br. at 47-48 (citing Cienega VIII, 331 F.3d at 1347). The formulation of the investment-backed expectations test in Cienega VIII, however, was based upon the Government's argument that plaintiffs should have expected the rules to change given the existing regulatory regime. Cienega Gardens, 331 F.3d at 1349-50. In response to that argument, the Court considered what plaintiffs would have expected in light of the existing regulations. Id. at 1349-51. The Court, however, never intended this limited investigation to constitute the entire range of consideration under the Penn Central expectation prong. See id. at 1345-46 (citing Loveladies for the proposition that the investment had to have been made "in reliance" on the property right(s) affected by the challenged regulation).

CCA's evidence of the "reasonableness" of the Norman brothers' expectations does not address the significance of those expectations, nor does it address the circumstances of private investment in the HUD programs. CCA's arguments completely disregard the Government's evidence of leverage and tax benefits. Given that investors in the HUD programs invested little money up front and expected a substantial profit within one or two years of their initial investment, along with ownership in the property, it is doubtful that the possible opportunity to leave the program to sell or raise rents 20-years in the future played a significant role in the Norman brothers' decision to invest. See Tr. 1224, 1276 (Malek), 956-58 (Ragas).

#### 3. CCA Has Not Demonstrated That The Opportunity To Prepay Was The Primary Reason For The Norman Brothers' Investment In Chateau Cleary

The Penn Central analysis requires courts to consider whether the challenged Government conduct affected a plaintiffs' "primary expectation concerning the use" of the affected property. Penn Central, 438 U.S. at 136. Where multiple uses can be expected of

property, but the law does not interfere with an owner's "primary" investment-backed expectation, a taking will not lie. See Penn Central, 438 U.S. at 136; MacLeod v. County of Santa Clara, 749 F.2d 541, 547 (9th Cir. 1984). This is true even where Government regulation, while not disturbing primary use, nevertheless frustrates other, more profitable, expected uses. MacLeod, 749 F.2d at 547-48.

CCA cannot demonstrate that the opportunity to prepay in 20 years was the Norman brothers' primary expectation upon investing in the HUD program. Notwithstanding Ernest Norman's self-serving testimony regarding his father's and uncle's subjective expectations, Pl. Br. at 45, the actions of the Norman brothers tell a different story.

CCA does not dispute that the Norman brothers took advantage of the favorable initial financing afforded by the HUD Section 221(d)(3) program. The Norman brothers received from HUD an insurable 40-year mortgage of 90 percent of the project's estimated replacement cost at an effective below-market interest rate of 3 percent. Tr. 298-99 (Norman); DX3; PX3; PX4. As the project's developers, the Norman brothers received a Builder's and Sponsor's Risk Premium and Allowance ("BSPRA") equal to 10 percent of the "total estimated development cost," i.e., the estimated replacement cost, less land acquisition costs. Tr. 1165-68 (Malek); 302-03 (Norman). Due to the BSPRA and appreciation of the land value pursuant to an FHA valuation, the Norman Brothers were required to make an actual cash investment of only 1.8 percent of the estimated cost of the Chateau Cleary project. Tr. 1156 (Malek). Here, the Norman brothers took full advantage of the highly-leveraged nature of their investment in the HUD program. See Tr. 1191-93 (Malek) (explaining that the highly-leveraged nature of the investment was one of the principal inducements for private investors in the HUD program).

Moreover, it is undisputed that the Norman brothers profited both from the construction and management of the project. They contracted with their own construction company to build the Chateau Cleary Apartments. Tr. 1171 (Malek), 304 (Norman); DX9. To manage the property, the Norman brothers contracted with Apartment Management Corporation – another wholly-owned company that was managed by Ernest B. Norman, III. Tr. 310-11 (Norman); 1172 (Malek); DX 8. The fees paid to these affiliated entities, including the construction costs and the management fees, were almost entirely funded by the Federally-backed mortgage, which provided leverage far in excess of what a conventional real estate investor could obtain. Tr. 1160 (Malek).

Finally, it is undisputed that the Norman brothers employed component depreciation in order to maximize the tax shelter aspects of the HUD program. Tr. 1178; 1181; 1220-21 (Malek). The Norman brothers would have been able to use the tax losses from the CCA project to offset the taxable earning from their oil and gas investments. Mr. Norman testified that his family invested in oil and gas and that they expected to achieve annual returns of 15 to 20 percent from those investments. Tr. 292 (Norman). Thus, in the years following the development of the CCA project, tax losses from accelerated depreciation of the CCA project were available to offset the income being earned from these oil and gas investments. As a consequence, the internal rate of return on the Normans' investment in CCA was at least 38 percent – regardless of the residual value left in the property at the end of the initial 20-year period. Tr. 1216-18 (Malek). In fact, the tax losses alone – from 1972 to 1975 – significantly exceeded the amount of the Normans' initial investment. Tr. 1216 (Malek).

Thus, in return for a minimal cash outlay of only 1.8 percent of the project's cost, the Norman brothers received (a) uniquely advantageous financing, (b) the ability to utilize the project's tax benefits to offset their other investments in oil and gas, (c) the ability to receive a high internal rate of return in excess of the returns expected from their oil and gas investments; (d) the ability to receive distributions of cash from operations, and (e) profits from awarding themselves contracts for construction and project management. These considerations were the primary reasons for the Norman brothers' investment in the HUD program, not the speculative possibility of future profit from the residual value of the property at the end of 20 years. At the time of project's development in 1969, the residual value of the Chateau Cleary apartments would have depended upon interest rates, property values, the renters' market, and other variables existing more than 20 years in the future. These variables would have been unknowable at the time of development. Tr. 956-58 (Ragas).

### C. CCA Suffered No Significant Economic Impact

CCA's "return on equity" approach to measuring economic impact is without legal support and fundamentally flawed as a matter of economics.

#### 1. CCA's Return-On-Equity Measure Of Economic Impact Is Fundamentally Flawed

In this action, CCA offers a flawed return-on-equity metric that would have the Court consider only the property's annual cash distributions. See Pl.'s Br. at 22-23. CCA promotes this stunted return-on-equity approach to boost an otherwise anemic economic impact. See Tr. 1619-28 (Dickey) (18 percent diminution in value). CCA's return-on-equity approach cannot account for the duration of the challenged regulatory restriction and, therefore, is particularly

unsuitable where, as here, a temporary taking is alleged. Furthermore, CCA's approach disregards the well-established principal that the analysis of economic impact must consider the property as a whole. Tahoe-Sierra, 535 U.S. at 327 ("Taking jurisprudence does not divide a single parcel into discrete segments . . . . [T]his Court focuses rather . . . on the nature and extent of the interference with rights in the parcel as a whole.") (quoting Penn Central, 438 U.S. at 130-31); see also City Line Joint Venture v. United States, 71 Fed. Cl. 486, 499 (2006) (rejecting CCA's proposed approach because it "erroneously omits other returns on investment that plaintiff received"). Indeed, by focusing strictly upon annual cash distributions, and disregarding acknowledged increases in equity, see PX125 (table 35), CCA would have the Court ignore the very economic returns that, it claims, drove the decision to enter the HUD program in the first place. See Pl.'s Br. at 8.

**a. CCA's Approach Fails To Adequately Account For The Duration Of The Taking**

CCA's return-on-equity approach does not account for the duration of the alleged taking. CCA's measure of average annual return on equity is a "snapshot" – that is, it focuses on a single point in time (or an average over a period of time) – and, as such, is fundamentally incapable of factoring in the duration of any taking. Tr. 1650 (Dickey). As Dr. Dickey illustrated, CCA's measure yields inconsistent results depending upon the duration of the alleged taking, resulting in a measure that can go up or down as the duration of the alleged taking increases. Id. Moreover, CCA's measure of economic impact is flatly inconsistent with its measure of just compensation, because it shows economic impact decreasing as the duration of the alleged takings period increases, whereas CCA's measure of just compensation increases as the length of

the restriction increases. Tr. 1657 (Dickey). As a matter of both economics and common sense, the measured economic impact should increase as the length of the alleged taking increases. Tr. 1644 (Dickey). CCA's own expert agrees with this proposition. Tr. 1879-80 (Stillman). Yet CCA's return on equity approach does not produce such an outcome.

CCA offers no justification for adopting an approach that ignores the duration of the alleged temporary taking. CCA's proposed approach cannot be reconciled with the Supreme Court's Tahoe-Sierra decision, in which the Court stated: "In our view, the duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim" under Penn Central. 535 U.S. at 342. The Federal Circuit has likewise directed the trial court to take into account the duration of the alleged temporary taking. Rose Acre, 373 F.3d at 1195; see also Seiber v. United States, 364 F.3d 1356, 1371-72 (Fed. Cir. 2004) (Penn Central requires "evidence to show the amount, if any, by which the value of the relevant property . . . was reduced" during the temporary delay period).

**b. CCA's Measure Of Economic Impact Only Considers One Of The "Rights" In The Bundle Held By CCA**

CCA's measure of economic impact considers only the maximum allowable dividend under the Regulatory Agreement as an economic benefit received by CCA. Pl. Br. at 50-51. The right to receive an annual divided, however, is only one of the economic benefits that CCA derived from the Chateau Cleary project. At trial, Dr. Ragas acknowledged that investors receive various kinds of returns from a property, including increases in equity. PX119; Tr. 1661-63 (Dickey) (discussing Dr. Ragas' cash flow measure of economic impact). Although CCA acknowledged these equity increases in its measure of just compensation, tr. 1662 (Dickey),

CCA's economic impact analysis completely ignores these same equity increases and their value to the property owners. Tr. 1662-65 (Dickey). In fact, CCA's approach shows a larger impact as a result of CCA's increased equity in the property, effectively turning the benefit of increased equity upon its head. Tr. 981 (Ragas).

CCA argues that the return-on-equity approach is more appropriate than a diminution in value approach when measuring the economic impact of a regulation of a going business concern. Pl. Br. at 51. CCA's assertion ignores the fundamental economics of real estate investments. CCA's own expert acknowledges that the value of an income-generating property is equivalent to net present value of its future cash flows. Tr. 917-19 (Ragas). Therefore, it is equally true that a measure of the diminution in value of a real estate asset should capture the effect of regulation upon the future cash flows being generated by the asset. Tr. 1621-24 (Dickey). For example, if the effect of the Preservation Statutes was to decrease cash flows for a period of time, the economic impact of those diminished cash flows would be measured by the net present value of the difference between the unregulated and regulated cash flows. Tr. 1621 (Dickey). This is precisely what is being measured by the Government's diminution in value approach. Id.

CCA's approach, however, measures only a portion of the economic value of CCA's real estate asset. There is a significant difference between the cash flows generated by a property and the cash flows distributed to the partners. Tr. 1633 (Dickey). In fact, when the full extent of cash flows generated by CCA are considered, the diminution in return on equity measured by CCA's own expert was less than 70 percent. Id. The cash flows generated by Chateau Cleary Apartments are economic benefits possessed by CCA that can be used to pay down the principal

on CCA's mortgage loan or to upgrade the property, thereby increasing CCA's equity position in the property. Tr. 1664 (Dickey). CCA continued to retain these benefits after the passage of the Preservation Statutes.[9] Tr. 1665 (Dickey). The Preservation Statutes even provided mechanisms for accessing these benefits, either through equity loans or sale. Tr. 1666 (Dickey).[10] These economic benefits must be considered when assessing economic impact. Tr. 1692 (Dickey).

CCA's dividends-based approach cannot substitute for demonstrating the degree of diminution in the property's total value. Forest Properties, Inc. v. United States, 177 F.3d 1360, 1367 (Fed. Cir. 1999) ("The profit that Forest allegedly lost does not necessarily reflect the reduction in market value the denial of the permit caused."); Florida Rock Indus., Inc. v. United States, 791 F.2d 893, 905 (Fed. Cir. 1986) (trial court erred in "assessing economic impact factor exclusively on the basis of a use value formula, and refusing to consider any fair market value remaining in the land and realizable by the landowner."); Maritrans, Inc. v. United States, 342 F.3d 1344, 1358 (Fed. Cir. 2004) (in considering economic "a court must compare the value that has been taken from the property with the value that remains in the property."). Moreover, CCA's approach violates Supreme Court jurisprudence holding that courts should measure the economic impact of an alleged taking on "the parcel as a whole." Keystone, 480 U.S. at 497; Penn Central, 438 U.S. at 130-31; Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993). "[W]here an owner possess a full 'bundle' of property rights, the destruction of one 'strand' is not a taking." Andrus v. Allard, 444 U.S. 51, 65-66 (1979).

---

[9] These benefits retained value even to the extent that the Preservation Statutes may have delayed CCA's ability to access them. Tr. 1665 (Dickey) (explaining that future cash flows have significant economic value today).

[10] CCA's expert expressly ignored the statutory mechanisms for accessing built-up equity in his calculations of economic impact. Tr. 928-83, 990 (Ragas).

Because CCA's approach bases its entire economic analysis on only one stick in CCA's bundle of rights, it overstates the Preservation Statutes' impact on CCA's property.

**c. CCA's Measure Of Economic Impact Produces Inconsistent Results For Permanent And Temporary Alleged Takings**

It is a fundamental principle of economics (and common sense) that a permanent taking of an income-producing property should result in a greater economic impact that a temporary taking of the same property. Tr. 1669 (Dickey). By extension, any reasonable measure of economic impact should treat both a permanent taking and temporary taking consistently. Id. The Government's diminution in value approach provides consistent measures of economic impact for both permanent and temporary takings, treating a temporary taking as a permanent taking that has been cut short. Tr. 2625-26, 1670 (Dickey).

CCA's returns-based approach, however, does not provide this consistency. Data provided by CCA's expert suggests that a permanent restriction would result in an economic impact of slightly more than 50 percent. Tr. 1671 (Dickey). However, CCA claims that the temporary restrictions imposed by the Preservation Statutes resulting in an economic impact of greater than 80 percent, a result that is flatly inconsistent with common sense. Indeed, both of CCA's experts admitted that, under CCA's measure of economic impact, a temporary taking could have a greater economic impact than a permanent taking of the same property. Tr. 934 (Ragas); 1897-99 (Stillman).

Adopting CCA's measure of economic impact would have severe negative policy implications. If the Government were required to pay more in just compensation for a temporary restriction than it would for permanent restriction, then there would be no incentive to end a

permanent restriction. Instead, the Government would be better off exercising its power of eminent domain and simply condemning the owner's property than it would by ending the restrictions it imposed on the owner's use of its property. Tr. 1672 (Dickey).

### 2. *Cienega VIII* And *Rose Acre* Provide No Support For CCA's Measure Of Economic Impact

CCA's relies upon references in Rose Acre, 373 F.3d at 1187-1191, and in Cienega Gardens, 331 F.3d at 1342-43, to support its return on equity approach. Pl. Br. at 51. These cases do not compel the use of the return on equity approach. Indeed, given the approach's economic deficiencies revealed at trial, these cases do not support any use for CCA's measure.

In Cienega Gardens – the first case to ever reference the "rate of return" analysis – the Federal Circuit expressly stated that it was adopting such an analysis solely "in view of the lack of any specific challenge by the government of the trial court's findings or of the Model Plaintiffs' methods and data." 331 F.3d at 1345. Significantly, the Federal Circuit did not express a preference for the rate-of-return analysis over the traditional approach long endorsed by the Supreme Court, when the data is available to perform such an analysis.

Similarly, in Rose Acre, the Court refused to endorse the rate-of-return analysis over the change-in-value analysis, but merely permitted the trial court to consider which approach provided the better insight into the economic harm. 373 F.3d at 1187-91. Thus, the rate-of-return method has never been adopted over a challenge to the methodology or after a trial that illustrated its shortcomings. In this case, the record before this Court demonstrates the serious deficiencies of the return on equity approach.

CCA has not offered any basis for ignoring the long standing change-in-market-value approach. Nor has it suggested that the application of the proper test would show sufficient economic impact to support its taking claims. Accordingly, the Court should conclude that the Preservation Statutes' impact upon CCA does not constitute serious financial harm.

**3. CCA Fails To Consider The Other Available Uses Of Its Property**

CCA relies upon Justice Scalia's concurring opinion in Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725 (1997), to support its argument that the sale and incentive options are relevant only to just compensation and should be ignored when considering economic impact. Pl. Br. at 53-54. CCA's reliance upon Suitum is misplaced. First, the Court's opinion in Suitum addressed only the threshold issue of ripeness and expressly avoided any inquiry into the merits of Suitum's takings claim. 520 U.S. at 739. The Court, thus, made no finding regarding whether Suitum's transferable development rights should be considered as part of the merits of her takings claim. Second, the transferable development rights in Suitum cannot be compared to the sale or incentive options in the Preservation Statutes. Unlike the statutory options at issue here, the transferable development rights had nothing to do with the owner's use of its property, but instead were separate rights granted to the homeowner by the agency. Id. at 747 (Scalia, J., concurring). By contrast, the statutory options to sell or seek incentives each relate to the permissible uses of the owner's property and, therefore, relate directly to the impact of the Preservation Statutes upon the owner's property rights.

For similar reasons, the "parade of horribles" claimed by CCA to result from allowing the Government to avoid liability for a regulatory taking by partially compensating an owner is a meaningless fallacy. Pl. Br. at 54. The statutory options are alternative uses available to the

owner, not separate rights to use another property or cash payments from the Government. As Justice Scalia explained:

> [t]he right to use and develop one's own land is quite distinct from the right to confer upon someone else an increased power to use and develop his land. The latter is valuable, to be sure, but it is a new right conferred upon the landowner in exchange for the taking, rather than a reduction of the taking."

520 U.S. at 747 (Scalia, J., concurring).

Here, the statutory options are different means by which an owner can realize the market value of its property, not new rights given in exchange for the opportunity to prepay and convert. As such, they cannot simply be construed as "compensation" for the alleged taking. Because the statutory options regulate the use of the owner's property, they necessarily must be considered in evaluating the value of the owner's property as regulated. As the Federal Circuit held in Maritrans, Inc. v. United States, in conducting the economic impact inquiry, "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored." 342 F.3d 1344, 1354 (Fed. Cir. 2004) (quoting Rith Energy, Inc. v. United States, 247 F.3d 1355, 1363 (Fed. Cir. 2001)).

## III. CCA Is Not Entitled To Just Compensation

### A. CCA Is Owed No Compensation

Under the Preservation Statutes, CCA was free to exit the program. Had CCA pursued the sale option available through the Preservation Statutes, it would have either been able to prepay, 12 U.S.C. § 4114, or would have realized the full fair market value of the project, 12 U.S.C. §§ 4103(b), 4110. CCA was well aware of the options it was afforded, but decided to maintain the *status quo*. Tr. 388 (Norman). Any economic harm was, thus, due to CCA's own

business decision – not the Preservation Statutes. Consequently, no compensation is owed to CCA.

**B. Even If The Benefits Available To CCA Under The Preservation Statutes Are Disregarded, Dr. Ragas's Approach Does Not Provide Just Compensation**

The approach used by CCA does not arrive at just compensation even if the pecuniary benefits available under the Preservation Statutes are disregarded. It is well-established that temporary takings "are not different in kind from permanent takings." First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 318 (1987). The approach used by Dr. Ragas discards this fundamental principle. Instead of calculating the value of the property right taken at the time that the taking occurred, Dr. Ragas mistakenly employs an *ex-post* perspective to calculate compensation at the end of the alleged taking. In addition, Dr. Ragas's calculation of just compensation contains numerous errors. Dr. Ragas fails to take into account CCA's acknowledged failure to request and obtain HUD rent increases, arrives at putative market rents by disregarding CCA's actual performance as a conventional project, uses an inappropriate compounding rate, and without justification assumes the alleged taking did not end until February 28, 1997. As a result, Dr. Ragas's calculations do not provide a valid basis for awarding compensation to CCA.

**1. Compensation Should Be Based Upon The Value Of The Property Taken On The Date Of The Taking**

The Supreme Court and the Federal Circuit have ruled time and time again that just compensation must be calculated at the time of the taking. First English, 482 U.S. at 320 (noting "the unexceptional proposition that the valuation of property which has been taken must

be calculated as of the time of the taking"); United States v. 50 Acres of Land, 469 U.S. 24, 29 (1984) (just compensation is the "'market value of the property at the time of the taking contemporaneously paid in money'") (quoting Olson v. United States, 292 U.S. 246, 255 (1934)); Kirby Forest Industries, Inc. v. United States, 467 U.S. 1, 10 (1984); Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 803 (Fed. Cir. 1993) ("Compensation is always measured from the time the taking occurs."). The established *ex ante* approach properly places the risk of subsequent changes in value upon the United States and enables the Government to evaluate the likely cost a proposed taking or condemnation. See Def.'s Br. at 53-55.

CCA would have the Court disregard this well-established body of controlling law in favor of an *ex post* perspective that assesses compensation at the end of the taking.[11] CCA maintains that Dr. Ragas followed the methodology approved in two recent Court of Federal Claims decisions. See Pl.'s Br. at 56 (citing Independence Park v. United States, 61 Fed. Cl. 692 (2004), rev'd, 449 F.3d 1235 (Fed. Cir. 2006), and Cienega Gardens v. United States, 67 Fed. Cl. 434 (2005), appeal docketed, No. 06-5051 (Fed. Cir.)). Decisions of this Court do not, however, trump precedential appellate court decisions. Indeed, the trial court in one of the cases cited by CCA has already been reversed, Independence Park, 449 F.3d 1235 (Fed. Cir. 2006); an appeal in the other case is pending, Cienega Gardens, No. 06-5051 (Fed. Cir.).

---

[11] An *ex post* approach takes into account information that is learned only after the taking has occurred. See Tr. 926-28 (Ragas). Thus, by its very nature, an *ex post* methodology does not value the property interest at the time of the taking.

Unlike Dr. Ragas's methodology, the approach used by Dr. Dickey is an *ex ante* analysis that evaluates the property interest at the time of the taking.[12] Tr. 1681, 1683-84 (Dickey). Further, Dr. Dickey's approach reflects the nature of the taking being alleged. CCA asserts that the Preservation Statutes effected a permanent regulatory taking of their property interest that was cut short by the HOPE Act. Where a permanent taking is cut short by Government action, compensation for the resulting temporary taking should be the same as the compensation due for that part of the permanent taking that actually occurred. This is precisely what Dr. Dickey's approach provides. See, e.g., Tr. 1673, 1681-84 (Dickey). Accordingly, if any compensation is awarded, it should be based upon the calculation of just compensation performed by Dr. Dickey.

**2. Dr. Ragas's Approach Overstates Any Compensation Due CCA**

Dr. Ragas's approach is also flawed because it overstates the rents that CCA could have obtained had it prepaid, and understates the rents that HUD would have allowed CCA to charge tenants as a section 221(d)(3) project.

In arriving at just compensation, Dr. Ragas uses the average rent for conventional, multi-family housing complexes in West Metairie based upon his conclusion that CCA would have been an "average" conventional project in West Metairie. See Pl.'s Br. at 26; Tr. 1000-02 (Ragas). CCA's actual performance after prepaying and converting to market rate operations in 1998 demonstrates that CCA was not an average project. Indeed, the very University of New

---

[12] While CCA asserts that Dr. Dickey did not perform a "pure" *ex ante* analysis, the only *ex post* information identified by CCA is the date on which the challenged restriction ended. Pl.'s Br. at 25. The date that the claimant alleges as the end of the taking must be taken into account in any analysis of just compensation. Further, CCA offers no reason that the manner in which the regulatory restriction ended (e.g., it had a five year sunset clause, or was terminated by subsequent legislative acts) should affect the just compensation owed to a claimant.

Orleans ("UNO") rent survey data upon which Dr. Ragas relies establishes that CCA was a low-end project commanding below average rents after its prepayment. Tr. 1424-28 (Derbes); DX189; DDX1; see also Tr. 1066-69, 1984 (Ragas); PX111; PX113. CCA argues that Chateau Cleary's actual performance as a conventional project should be disregarded, because market conditions "changed materially" in the late 1990s. Pl.'s Br. at 57. The only "material change" identified Dr. Ragas was that new luxury apartments were being developed in greater New Orleans. Tr. 829 (Ragas). Significantly, however, these apartments were not built in West Metairie. Tr. 1007, 1991 (Ragas). Consequently, while new construction elsewhere in the New Orleans metropolitan area might have affected the West Metairie submarket as a whole, the new construction had no effect upon the relative quality of CCA vis-a-vis other properties in West Metairie. See Tr. 1991-92 (Ragas). CCA was a below average property in the West Metairie submarket in 1998; it was likewise below average when compared to the very same competitors in the West Metairie submarket several years earlier.

This is hardly surprising. Chateau Cleary was built in 1969 as a section 221(d)(3) complex. DX3; DX9. Its apartments were plain and lacked many amenities. Tr. 1359 (Derbes), 682-92 (Alexander). Nor were major upgrades made during its years as a HUD project. See Tr. 389 (Norman). Indeed, after 1984, CCA neglected to seek rent increases from HUD to cover its increased operating costs. See PDX33. As one would expect, by the 1990's, CCA had substantial deferred maintenance and the functional obsolescence of its units was becoming more and more of a problem. E.g., Tr. 681-92 (Alexander); PX81. CCA simply was not an average project that could obtain average market rents.

CCA seeks to justify Dr. Ragas's rents by noting that CCA had larger apartments than some competitors. Pl.'s Br. at 26. Apartment size was factored into the UNO rent study – which provided rents on a per square foot basis. See PX113. Dr. Ragas used these floor rents as the basis for his calculations. PX106. Thus, apartment size is already taken into account and cannot used a second time to justify the conclusion that CCA was an average complex.

Furthermore, CCA failed to seek HUD rent increases after 1984. Consequently, Dr. Ragas starts from the wrong baseline when he uses CCA's actual HUD rents as opposed to the rents that CCA would have been eligible to charge. CCA suggests that, despite the complex's increased costs, its tenants would have been unable to afford the higher rents that HUD would have authorized between 1991 and 1996. CCA offers no direct testimony supporting this assertion. Pl.'s Br. at 31. Moreover, CCA's claim, if accepted, would merely demonstrate that allowable HUD rents were very near market rents, see Pl.'s Br. at 31 (stating that tenants would have migrated to conventional projects), and, therefore, that CCA would have been able to prepay if it had in fact pursued prepayment under the Preservation Statutes.

### 3. Enactment Of The HOPE Act Ended Any Temporary Taking

The Housing Opportunity Program Extension Act of 1996 (the "HOPE Act") was enacted on March 28, 1996. Pub. L. No. 104-120, 110 Stat. 834 (March 28, 1996). Although the HOPE Act did not expressly repeal LIHPRHA, it "restored the prepayment rights to owners" of moderate- and low-income housing. Chancellor Manor, 331 F.3d at 896 (Fed. Cir. 2003); see also Greenbrier, 193 F.3d at 1353 ("HOPE authorized low-income housing owners to prepay their mortgage loans without HUD's prior approval"); see also Pl.'s Br. at 20 ("HOPE permitted

owners to prepay their mortgages."). Passage of the HOPE Act, thus, ended the challenged statutory restriction and ended the taking alleged by CCA.

CCA nevertheless offers two calculations of just compensation: the first appropriately uses a May 31, 1996 end date for the alleged taking; the second uses a February 28, 1997 end date. See Pl.'s Br. at 26. Although Dr. Ragas offered no opinion as to the correct end date, Tr. 929 (Ragas), CCA suggests half-heartedly that the Court should find that the alleged taking continued to February 1997. Despite acknowledging that "HOPE permitted owners to prepay their mortgages," CCA argues that "HUD attempted to extend [restrictions on prepaying] administratively through the issuance of so-called preservation letters." Pl's Br. at 20.

The preservation letters were non-binding publications concerning the application of the HOPE Act. CCA does not have standing to assert that application of the HOPE Act to Chateau Cleary effected a regulatory taking. CCA did not attempt to prepay until mid-1998. Because it made no attempt to prepay in 1996, CCA never obtained a final agency decision. CCA's claim that HUD would have prohibited prepayment in the post-HOPE period is simply not ripe. Palazzolo, 533 U.S. at 618.

Nor is there any evidence that HUD would not have allowed prepayment during 1996. The expert consultant who CCA retained to assist with prepayment acknowledged that CCA faced no barrier to prepayment after passage of HOPE. Tr. 1772-75, 1785 (Root). Indeed, dozens of owners prepaid between March 1996 and February 1997. Tr. 1692 (Dickey); DDX21. In addition, the preservation letters were merely agency guidance, not binding statutory or regulatory provisions. See PX65; PX67.

In any event, the preservation letters cited by CCA do not support its claim. CCA notes, for instance, "a three year moratorium on prepayments on rent increases for tenants in low-vacancy areas." Pl.'s Br. at 20 (citing PX67). CCA was not, however, in a low vacancy area. Tr. 1084 (Kizzier), 816-17, 1949 (Ragas); PX106. CCA also points out that as of May 3, 1996, a preservation letter "still required notification" of prepayment be given to HUD. Pl.'s Br. at 20 (citing PX65). A notice requirement does not prevent prepayment. To the contrary, it demonstrates that HUD's consent was not required. See Pl.'s Br. at 20 (admitting that HUD had "abandoned" any "approval requirement" by May 3, 1996). Put simply, the trial record provides no basis for finding that passage of the HOPE Act in March 1996 did not end the alleged taking.

**C. Simple Interest At A Risk-Free Rate Running From The Date Of The Taking Should Be Awarded On Any Just Compensation Award**

When a taking is found, an owner is entitled to interest sufficient to place it in the same financial position it would have occupied if the payment had coincided with the appropriation. Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984). In Whitney Benefits, Inc. v. United States, 30 Fed. Cl. 411 (1994), the Court explained the basis for the interest award that typically accompanies a takings award:

> Where the government has taken plaintiff's property and returns a payment worth an identical amount at a subsequent date, the plaintiff still suffers an economic loss. Such a conclusion follows from the fact that when the government merely returns an identical sum as compensation, the plaintiff loses the opportunity to earn interest on its principal.

Id. at 413.

### 1. Plaintiffs Are Entitled Only To Simple Interest

Traditionally, the Court of Claims permits only simple interest for just compensation claims. Calhoun v. United States, 453 F.2d 1385, 1396 (Ct. Cl. 1972) ("simple interest (as part of just compensation) is to accrue"); see also Paul v. United States, 21 Cl. Ct. 415, 428 (1990), aff'd, 937 F.2d 623 (Fed. Cir. 1991); Yaist v. United States, 17 Cl. Ct. 246, 262 (1989). In 1995, the Federal Circuit provided the trial courts some discretion on whether to award simple or compound interest. Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1555 (Fed. Cir. 1995) (en banc).

In exercising this discretion, the courts have considered the nature of the property taken as well as the manner in which the taking affected plaintiffs' investment opportunities. See Rose Acre Farms, Inc. v. United States, 55 Fed. Cl. 643, 665 (2003), vacated on other grounds, 373 F.3d 1177 (2004); see also Heydt v. United States, 38 Fed. Cl. 286, 314 (1997) (plaintiff entitled to simple interest on temporary taking). If the Court were to conclude that compensation is owed to CCA, the interest should be simple. CCA's *ex post* model purports to provide the profits CCA would have made had it pursued the opportunity to prepay and convert in 1991. As CCA bears no risk, this model more than captures the full investment opportunity at the time of the alleged taking. This weighs against the plaintiff receiving compound interest.

### 2. Plaintiffs Are Entitled To Only A Risk-Free Interest Rate

The Court should base any interest awarded to the plaintiffs on the risk-free rate at which the Government borrows. The courts have repeatedly recognized a "'strong judicial policy in just compensation cases which favors uniform interest rates in order to avoid discrimination among litigants.'" Tulare Lake Basin Water Storage Dist. v. United States, 59 Fed. Cl. 246, 266

(2003) (quoting Pettro v. United States, 47 Fed. Cl. 136, 154 (2000)); see also Miller v. United States, 620 F.2d 812, 838 (Ct. Cl. 1980).

In response to this interest, the courts have repeatedly applied the interest rate set forth by Congress in 40 U.S.C. § 258e-1 (recodified as 40 U.S.C. § 3116) to inverse condemnation cases, even where that rate is not legally controlling. Under the formula set forth in 40 U.S.C. § 258e-1, the calculation of interest includes the average of the 52-week Treasury bill rate for the period prior to December 21, 2000, and the weekly average 1-year constant maturity Treasury yield for the period after that date. Tulare Lake, 59 Fed. Cl. at 266-67.

Courts, moreover, routinely provide plaintiffs with interest calculated at the Government's rate of borrowing. Rose Acre, 55 Fed. Cl. at 665; NRG Co. v. United States, 31 Fed. Cl. 659, 670 (1994); Pettro, 47 Fed. Cl. at 155 ( 1-year Treasury bill); Tr. 1867-69 (Stillman) (interest should be based upon the defendant's debt rate); Tr. 1035 (Ragas) (same). This rate is particularly appropriate in takings cases because the obligation to pay the deficiency is an obligation of the United States, a creditor whose obligation embodies no risk of default. See King v. United States, 504 F.2d 1138, 1143 (Ct. Cl. 1974) (holding that government bonds is an appropriate measure for interest); Gargoyles, Inc. v. United States, 37 Fed. Cl. 95, 109 (1997) (concluding that the 52-week Treasury bill was an appropriate basis for interest); see also Tr. 1034-35 (Ragas) (acknowledging that a risk free interest rate is appropriate).

Alternatively, if the Court chooses to award compound interest, it should do so using the 10-year Treasury STRIPS rate. See Tr. 864, 866 (Ragas), 1686-87 (Dickey).

### 3. Interest Should Run From The Date Of The Alleged Taking

Damages for takings are properly measured at the time the property was taken. See First English Evangelical Lutheran Church v. Los Angeles, 482 U.S. 304, 320 (1987). Such a policy is both economically and legally sound. As a matter of law, the property's owner has no control over the property after the date of taking, and should not be held accountable for the property's loss in value, nor rewarded with the property's increase in value. Courts have repeatedly refused to award damages based upon changes in the property's value over the course of the temporary taking. See Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1581-82 (Fed. Cir. 1990); Wheeler v. City of Pleasant Grove, 833 F.2d 267, 269-271 (11th Cir. 1987).

Dr. Ragas's model nevertheless fails to measure damages as of the initial prepayment date. Tr. 2246 (Peiser). Rather, contrary to his own admission that a risk-free interest rate is appropriate, Dr. Ragas "compounds" cash flows forward to the end of the alleged taking at a 10 percent interest rate. Dr. Ragas provides no basis for this using a 10 percent rate, which is significantly higher than the risk-free rate used from May 1996 (or February 1997) to the date of judgment, other than to say he is providing an increased payment for CCA's "opportunity costs." Tr. 1027-29 (Ragas). Dr. Ragas's two rate approach, which is based upon the plaintiff's unique opportunity costs, is unjustified economically and contrary to the law. See Tr. 1684-91 (Dickey), 1867-69 (Stillman); Tulare Lake, 59 Fed. Cl. at 266 ("strong judicial policy in just compensation cases . . . favors uniform interest rates in order to avoid discrimination among litigants"). A single risk-free interest rate should be employed.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Brian M. Simkin

BRIAN M. SIMKIN
Assistant Director

s/ Kenneth D. Woodrow

KENNETH D. WOODROW
DAVID A. HARRINGTON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 353-0513

November 21, 2006

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on this 21th day of November, 2006, a copy of the foregoing "DEFENDANT'S POST-TRIAL REPLY BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Kenneth D. Woodrow