IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CCA ASSOCIATES, Plaintiff, | ) | |
| v. | ) | No. 97-334C<br>Judge Lettow |
| THE UNITED STATES, Defendant. | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S POST-TRIAL MEMORANDUM**

Elliot E. Polebaum
Albert S. Iarossi
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20004-2505
Tel: (202) 639-7000/Fax: (202) 639-7003

November 21, 2006

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ........................................ 1

II. ARGUMENT ........................................ 2

A. PLAINTIFF'S CLAIM IS RIPE ........................................ 2

1. The Futility Doctrine Applies ........................................ 3

2. An Application By CCA To Prepay Would Have Been Futile ........................................ 4

3. Other Preservation Options Are Irrelevant To The Ripeness Issue ........................................ 8

B. ELIHPA AND LIHPRHA EFFECTED A REGULATORY TAKING OF PLAINTIFF'S PREPAYMENT RIGHT UNDER *PENN CENTRAL* ........................................ 8

1. The Preservation Statutes Have The Character Of A Taking ........................................ 9

2. ELIHPA And LIHPRHA Frustrated Plaintiff's Distinct And Reasonable Investment-Backed Expectations ........................................ 9

3. CCA Suffered A Severe Economic Impact ........................................ 12

a. The Statutory Options Do Not Affect Economic Impact ........................................ 14

b. There Is No Proof That A Statutory Sale Could Have Been Executed Or That Any Such Sale Would Have Been At Fair Market Value ........................................ 15

c. A Sale Or Incentives Would Not Have Compensated CCA For The Losses Incurred Prior To The Sale ........................................ 16

d. The Government's Remaining Arguments Are Unavailing ........................................ 17

C. CCA IS ENTITLED TO JUST COMPENSATION ........................................ 18

## TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Bass Enterprises Prod. Co. v. United States*,
54 Fed. Cl. 400 (2002),
*aff'd*, 381 F.3d 1360 (Fed. Cir. 2004) .......... 13

*Chancellor Manor v. United States*,
331 F.3d 891 (Fed. Cir. 2003) .......... 12

*Cienega Gardens v. United States*,
67 Fed. Cl. 434 (2005) .......... *passim*

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) .......... 1, 9, 10, 12

*Cienega Gardens v. United States*,
265 F.3d 1237 (Fed. Cir. 2001) .......... 1, 3, 4, 8, 18

*City Line Joint Venture v. United States*,
71 Fed. Cl. 486 (2006) .......... 2

*Greenbrier v. United States*,
193 F.3d 1348 (Fed. Cir. 1999) .......... 4

*Independence Park Apartments v. United States*,
449 F.3d 1235 (Fed. Cir. 2006) .......... 1, 13

*Kimball Laundry Co. v. United States*,
338 U.S. 1 (1949) .......... 19

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) .......... 14

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001) .......... 4

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) .......... 12

*Rose Acre Farms, Inc. v. United States*,
373 F.3d 1177 (Fed. Cir. 2004) .......... 14

*Seiber v. United States*,
364 F.3d 1356 (Fed. Cir.),
*cert. denied*, 543 U.S. 873 (2004) .......... 13

**PAGE**

*Suitum v. Tahoe Reg'l Planning Agency*,
520 U.S. 725 (1997) ........................................ 4

**STATUTES**

Emergency Low Income Housing Preservation Act of 1987,
Pub. L. No. 100-242, 101 Stat. 1877 (1988),
*codified at* 12 U.S.C. § 1715*l*

12 U.S.C. § 1715*l* ........................................ 7

ELIHPA § 225(a)(1) ........................................ 7

Low Income Housing Preservation and Residential Homeownership Act of 1990,
Pub. L. No. 101-625, 104 Stat. 4249 (1990),
*codified at* 12 U.S.C. § 4101 *et seq.*

12 U.S.C. § 4108 ........................................ 7

12 U.S.C. § 4108(a)(1)(A) ........................................ 7

12 U.S.C. § 4108(a)(1)(B) ........................................ 8

**REGULATIONS**

24 C.F.R. § 248.141(a)(1) ........................................ 7, 8

## I. INTRODUCTION

1. In its post-trial brief, the government studiously ignores the most relevant decisions of this Court and of the Federal Circuit. Indeed, it does not acknowledge the existence of *Cienega Gardens v. United States*, 265 F.3d 1237 (Fed Cir. 2001) ("*Cienega VI*"); *Cienega Gardens v. United States*, 67 Fed. Cl. 434 (2005) ("*Cienega IX*"); and *Independence Park Apartments v. United States*, 61 Fed. Cl. 692 (2004) (*"Independence Park"*).[1] Instead, it repeats arguments previously made and previously rejected. It then compounds its mistakes by ignoring uncontroverted evidence and by making factual assertions that are unsupported by the record. There is nothing in the government's brief that should deter this Court from following *Cienega VI, Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ("*Cienega VIII*"), *Cienega IX*, and *Independence Park* and holding for Plaintiff.

2. By way of preview of the legal issues resolved in the decided cases, which the government nonetheless again seeks to put in issue, we note the following:

- The government argues that the claim of Plaintiff CCA Associates ("CCA") is not ripe, contending that the Preservation Statutes gave the Department of Housing and Urban Development ("HUD") discretion to determine when prepayment would be allowed. The decisions in *Cienega VI*, *Cienega VIII*, and *Cienega IX* rejected this very argument.

- The government claims that CCA's decision not to pursue a statutory sale or incentives precludes a finding of futility, but again the decisions in *Cienega VI* and *Cienega IX* rejected such a contention.

- The government argues that the availability of a sale option in the Preservation Statutes means that CCA suffered no economic impact and consequently no taking. This Court rejected the same position in *Cienega IX*.

[1] All references to this Court's decision in *Independence Park* are to those parts of the decision that are unaffected by the decision of the Court of Appeals.

- The government contends that Plaintiff's economic impact methodology is flawed, but Plaintiff's expert used the same economic impact method approved in both *Cienega VIII* and *Cienega IX*.

- The government claims that the investment-backed expectations of Chateau Cleary's owners were objectively unreasonable, even though the decisions in *Cienega VIII* and *Cienega IX* held that the investors' expectations were presumptively reasonable in light of the written guarantees in their transaction documents and HUD's own regulations. The owners here had the same written guarantees.

- The government continues to maintain that the Preservation Statutes did not have the character of a taking, notwithstanding the unequivocal contrary rulings in *Cienega VIII and Cienega IX*.[2]

- The government advocates a damages model that is flawed on its own terms and fundamentally inconsistent with the damages approach approved in *Cienega VIII*, *Cienega IX*, and *Independence Park*, which approach Dr. Ragas followed scrupulously.

- The government continues to argue that, in a temporary regulatory taking of a stream of income, the damages must be measured as of the first day of the taking, notwithstanding this Court's correct, contrary ruling that just compensation must be measured at the end of the takings period.

3. In short, the legal framework for analyzing Plaintiff's claim in this case is largely settled. Within this framework, CCA presented abundant evidence at trial establishing the taking of its property and the compensation that is due.

## II. ARGUMENT

### A. PLAINTIFF'S CLAIM IS RIPE

4. Plaintiff established at trial that its claim is ripe for review. There was no requirement that CCA file futile requests for permission to prepay-- futile because CCA could not demonstrate that it satisfied all of the mandatory criteria that had to be fulfilled for permission to be granted. There was also no requirement that CCA run the HUD administrative

---

2 The decision in *City Line Joint Venture v. United States*, 71 Fed. Cl. 486 (2006), held that the Preservation Statutes have the character of a taking.

gauntlet to see if, after a multi-year process, a request for incentives or an effort to sell the property to a qualified purchaser might end in failure and thereby potentially result in an opportunity to prepay. *Cienega VI*, 265 F.3d at 1244-46; *Cienega IX*, 67 Fed. Cl. at 460-62.

**1. The Futility Doctrine Applies**

5. Notwithstanding the decided cases, the government argues that CCA's claim is not ripe because CCA did not apply for permission to prepay. Government Brief ("Gov't Br.") at 19. The government's argument ignores the Court of Appeals' ruling in *Cienega VI* that the claims of the Model Plaintiffs were ripe because they were not required to file futile prepayment applications. It is undisputed that CCA's rents as of the 1991 prepayment date were considerably more than 10% below market rents; accordingly, HUD had *no* discretion to permit CCA to prepay and exit the program.[3] Plaintiff's Exhibit ("PX") 106; Trial Transcript ("Tr.") 190:9-21 (Norman); 841:3-16 (Ragas); 587:18-589:6 (Alexander). Applying to prepay would have been futile.

6. Yet, the government insists that CCA was required to file an application to prepay at least one time to invoke the futility exception. The cases on which the government relies are inapposite: they concern government entities that had discretion to implement the regulation in question. In those cases, the plaintiffs could have applied for variances which the regulatory authority had power to grant and which might have resulted in a different outcome. Here, by contrast, HUD had no discretion to allow prepayment if CCA could not prove that it satisfied all of the statutory criteria. Regardless, the court in *Cienega VI* has already rejected the government's argument and ruled that a plaintiff that demonstrates the futility of making a

---

[3] The government's continued insistence (Gov't Br. at 24) that ELIHPA contained no bright-line rule regarding rent increases of 10% is, to put it charitably, misleading. At trial, counsel for CCA gave to counsel for the government a copy of ELIHPA, as amended nine months after its enactment, reflecting the 10% criterion.

prepayment request has a ripe claim.[4] In *Cienega VI*, the court relied on two Supreme Court decisions: *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725 (1997); and *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001). Both *Suitum* and *Palazzolo* make clear (and *Cienega VI* recognizes) that "the ripeness doctrine does not require a landowner to submit applications for their own sake." *Cienega VI*, 265 F.3d at 1246 (quoting *Palazzolo*, 533 U.S. at 622). When an agency has *no discretion* in the application of a contested regulation or statute, a party need not seek a final decision. *Id*. The Court of Appeals in *Cienega VI* concluded that the owners presented "an even more compelling case of futility than in *Suitum*, *Palazzolo*, and [other land use cases]" and, thus, did not require owners to submit an application to prepay. *Id*. This Court has in turn held that the *Cienega VI* holding on this issue is "binding precedent." *Cienega IX*, 67 Fed. Cl. at 460.

**2. An Application By CCA To Prepay Would Have Been Futile**

7. Any request by CCA for permission to prepay would have been futile. CCA could not satisfy any of the mandatory statutory criteria. HUD would have had no choice except to reject such a request.

8. The evidence CCA adduced at trial was clear. Prepayment by CCA and conversion to market rents would have resulted in rent increases well in excess of 10%. PX 106; Tr. 190:9-21 (Norman); 841:3-16 (Ragas); 1492:17-1493:13 (Derbes). Moreover, as we demonstrated in our opening brief (¶¶ 112-116), the testimony established that (i) CCA's tenants could not have afforded market rents without paying more than 30% of their adjusted income for rent, (ii) prepayment would have materially affected the supply of low-income housing, and

4 The Court in *Cienega VI* distinguished the decision in *Greenbrier v. United States*, 193 F.3d 1348 (Fed. Cir. 1999), because the plaintiffs in *Greenbrier* had failed to show factually that applications for prepayment would have been rejected. 67 Fed. Cl. at 460.

(iii) tenants would have been displaced.

9. HUD's own officials recognized that HUD had no authority to waive these statutory criteria. Tr. 587:18-589:6 (Alexander). Yet, the government nonetheless argues in its brief that it is "possible" CCA would have been given permission to prepay. Gov't Br. at 25. The government cites as evidence for this assertion a memorandum that Mr. Norman had prepared in 1981, *seven years* before the Preservation Statutes were enacted, relating to a conversation he had with HUD officials. *Id.*; PX 23. However, HUD's attitude toward prepayment, long before mandatory criteria governing prepayment were enacted, is irrelevant.

10. The government then hypothesizes a purportedly "well-conceived plan of action" that it suggests could have resulted in approval by HUD to allow prepayment. Gov't Br. at 25-26. The government's scenario is conjectural, distorts the record evidence, and is inconsistent with the relevant statutory criteria.

11. The government's scenario departs from a false characterization. The government asserts multiple times throughout its brief that "when Mr. Norman took over as the managing partner in 1985, CCA stopped seeking regular rent increases from HUD." Gov't Br. at 27. Contrary to the impression the government seeks to leave, the evidence at trial was undisputed that Mr. Norman managed the Chateau Cleary project from inception. It was Mr. Norman who regularly and persistently sought rent increases from HUD between 1972 and 1985 and obtained nine rent increases during that period. There was no change in management in 1985 of the type that the government repeatedly and misleadingly suggests.

12. The reason there were no rent increases sought for several years after the December 1984 increase was not due to a change in management but, rather, to a change in the market. It is common ground that New Orleans went through a difficult recession beginning in

1986, and the recession lasted until about 1990, when the economy then began to strengthen. The multi-family housing market began to improve in 1990 and picked up steam going into 1991.

13. These facts are undisputed and important. During the recession, Chateau Cleary could not have passed on rent increases to its tenants. Tr. 155:15-156:12 (Norman). By May 1991, in an improving economy and strengthening real estate market, market rents had recovered and by then were well above the HUD rents at Chateau Cleary. The government's expert, Mr. Derbes, agrees that the Chateau Cleary HUD rents were, on average, 22.5% below market rents, and Dr. Ragas found a more substantial disparity. PX 100, 106.

14. Moreover, as of 1991, CCA's operating costs, which had experienced year-on-year declines from 1986 to 1987 to 1988, were still below the level of operating costs in 1985, the first year in which the December 1, 1984 rent increase went into effect. The record testimony is clear that rent increases are based on both prior operating expenses and the expectation of future increases in expenses. Tr. 144:2-16; 156:13-157:3; 340:3-23; 345:2-23 (Norman). Moreover, as a rent increase goes into effect, operating costs reflect the increase in costs earlier anticipated by the rent increase request. The 1985 Chateau Cleary operating costs thus reflect both prior increases in operating costs and increases that were expected when HUD's permission was sought. Tr. 485:10-486:1 (Norman).

15. Because the 1991 operating costs were still below the 1985 operating costs, it is pure speculation by the government to assert that, had Mr. Norman sought rent increases in this period, HUD would have approved. Given Mr. Norman's track record in assiduously obtaining rent increases over the years, it is reasonable to conclude that, if he believed that he could have obtained approval from HUD and obtained market acceptance, he would have raised rents.

16. The government's suggestion that Chateau Cleary's actual 1991 rents are not the

appropriate baseline for comparison has no basis in the law. ELIHPA and LIHPRHA are unambiguous: HUD was obliged to reject any request for prepayment that would result in "an increase in the monthly rental payment in any year that exceeds 10 percent. . . ." ELIHPA § 225(a)(1), 12 U.S.C. § 1715*l*; LIHPRHA, 12 U.S.C. § 4108(a)(1)(A). There is no basis for claiming that a hypothetical rent level, rather than the actual HUD rents, should be compared to market rents for this purpose.[5]

17. Moreover, the government ignores the uncontroverted evidence of its own witness that Chateau Cleary tenants could not, in any event, have afforded market-rate rents without paying more than 30% of their adjusted income toward rent. Tr. 610:7-611:11 (Alexander). The Preservation Statutes contained a bright-line rule against prepayment in these very circumstances. This, standing alone, would have made any attempt at prepayment futile. 12 U.S.C. § 4108(a)(1)(A); 24 C.F.R. § 248.141(a)(1) (1991).

18. Nonetheless, the government argues that a "well-designed plan of action" would not have involuntarily displaced CCA tenants upon prepayment. Gov't Br. at 28. In support of its position, the government points to CCA's efforts in 1998 to ensure that tenants had vouchers enabling them to continue living in Chateau Cleary after it became a market rent property. The Preservation Statutes, however, expressly disallowed consideration of any additional housing assistance when determining whether current tenants might be involuntarily displaced. HUD could not approve a plan of action for prepayment where comparable and affordable housing is

---

5 The government's so-called "well conceived plan of action" fails for another basic reason. The Preservation Statutes were designed to prevent owners from gaming the system in precisely the way the government is now advocating. Both ELIHPA and LIHPRHA prevented HUD from allowing prepayment if rents would increase more than 10% "in any year." 12 U.S.C. § 1751*l*; 12 U.S.C. § 4108. Thus, even if CCA had sought and received a large rent increase in early 1991, after the recession had ended, it still could not prepay because, in the government's hypothetical, rents would already have increased more than 10% "in any year" and conversion to a conventional property would have led to a further increase in rents.

not readily available, "determined without regard to the availability of Federal housing assistance that would address any such . . . involuntary displacement." LIHPRHA, 12 U.S.C. § 4108(a)(1)(B); *see also* 24 C.F.R. § 248.141(a)(1). This clause applied to all income levels, not just low or very-low income tenants. 12 U.S.C. § 4108(a)(1)(B). CCA's practice in 1998 thus has no bearing on whether statutory criteria would have been satisfied in 1991.

**3. Other Preservation Options Are Irrelevant To The Ripeness Issue**

19. The government also argues that CCA's claims are not ripe because CCA did not pursue the incentives and sales options available under the Preservation Statutes. Gov't Br. at 30. According to the government, CCA was required to pursue a sale to a qualified purchaser or incentives under a new use agreement that would shackle CCA to the HUD program for at least the next 20 years. The Court of Appeals in *Cienega VI* rejected such a requirement when it held that the plaintiffs' claims were ripe. The court there did not require plaintiffs separately to seek incentives or a sale of their properties and await the outcome of that process. *Cienega VI*, 265 F.3d at 1248; *see also Cienega IX*, 67 Fed. Cl. at 461-62.

20. The government's argument, if accepted, would subject CCA to a Hobson's choice: either obtain incentives and remain in a loss-producing, value-destroying program (or sell the property to a purchaser approved by HUD at a price dictated by HUD) or go through a three-year bureaucratic process that fails, which then frees CCA to prepay but, in the government's version of the story, results in no compensation for the years of lost income.

**B. ELIHPA AND LIHPRHA EFFECTED A REGULATORY TAKING OF PLAINTIFF'S PREPAYMENT RIGHT UNDER *PENN CENTRAL***

21. Enactment of the Preservation Statutes effected a regulatory taking of CCA's right to prepay. The prior decisions of this Court and of the Federal Circuit lead inexorably to this conclusion.

**1. The Preservation Statutes Have The Character Of A Taking**

22. In our opening brief, we addressed this issue in detail and showed that the Preservation Statutes represented the kind of expense shifting to a few persons that amounts to a taking, effected a physical invasion of CCA's property, and sharply curtailed CCA's right to transfer its property.

23. The decision in *Cienega VIII* makes clear that enactment of ELIHPA and LIHPRHA has the character of a taking. "The character of the government's action [in enacting ELIHPA and LIHPRHA] is that of a taking of a property interest . . . ." *Cienega VIII*, 331 F.3d at 1338. The government's arguments that the Preservation Statutes did not shift the burden of providing low income housing on to a small group of property owners and that the value of the options meliorate the nature of the governmental action have been previously raised by the government and rejected by the courts. There are no circumstances particular to this case which would warrant another conclusion.

**2. ELIHPA And LIHPRHA Frustrated Plaintiff's Distinct And Reasonable Investment-Backed Expectations**

24. Plaintiff adduced uncontroverted evidence that the Norman Brothers in 1969 invested in Chateau Cleary in reliance on the prepayment right. Tr. 56:9-18; 57:18-23; 59:9-14; 91:18-23 (Norman). CCA had similar investment-backed expectations in the right to prepay when it purchased the 50% equity interest of J. Robert Norman in 1985, six years before the prepayment date, for $677,550. Tr. 174:21-175:25 (Norman).

25. The significance of the prepayment right to the Norman Brothers is reflected in their investment strategy -- build a quality complex in the path of expected future development, maintain it in fine condition so that the property would be ideally situated to go conventional on the prepayment eligibility date, and retain rather than syndicate ownership of the property. The

government's brief does not challenge the actual expectations of the owners, either in 1969 or in 1985.

26. The focus of the government's brief is to argue that the actual expectations of the owners were somehow unreasonable. The government's arguments are unpersuasive. The expectations of the Chateau Cleary investors are comparable to those of investors in cases where the courts have already found investment-backed expectations to be reasonable. *Cienega VIII*, 331 F.3d at 1349; *Cienega IX*, 67 Fed. Cl. at 471-74. The Federal Circuit could not have been more clear when it held that the prepayment provision in Model Plaintiffs' contracts "would be presumptively material for any housing program participant with similar documents." *Cienega VIII*, 331 F.3d at 1349. Here, the owners have the same documents, and the government never rebutted this presumption. Moreover, the reasonableness of the owners' expectations was further confirmed by the particular investment strategy the owners adopted -- build a quality building in a promising area, maintain it in fine condition, and retain the equity for themselves. Given that HUD touted the value of the prepayment option to induce the Norman Brothers into the transaction, it is unseemly for the government to turn around and argue that what the government was touting was in fact worthless.

27. In actuality, the prepayment right was valuable and an essential condition for the Norman Brothers to proceed. While the tax benefits and the level of initial investment were attributes of the program, there is no gainsaying that the prepayment right had unique value. Indeed, the mathematical analysis put forward by Mr. Malek, which was intended to show that the residual value of the property was insignificant, actually showed the opposite once the proper

amount of initial equity was plugged into the model.[6]

28. The government makes much of the fact that the owners' construction company built the project and that their management company managed the property. That is true, but these entities had to perform services to receive compensation and were entitled to earn a reasonable profit. Tr. 1262:25-1263:15 (Malek).

29. In short, the government's bald assertion that the expectations of Chateau Cleary's original developers with respect to the prepayment right were not reasonable in light of the various program benefits identified by Mr. Malek ignores the mountain of contrary evidence, the collapse of his mathematical analysis, and the holding in *Cienega VIII* that make the owners' expectations presumptively reasonable, a presumption the government failed to overcome.

30. The government ignores the 1985 transaction entirely. Mr. Malek testified that he had no opinion on what CCA's expectations were when it purchased J. Robert Norman's 50% equity interest in 1985, Tr. 1250:10-1251:4 (Malek), or when it obtained the remaining 50% in 1986. The evidence is uncontradicted that, in 1985, CCA fully expected that it would be able to pay off the mortgage in 1991, convert Chateau Cleary into a conventional complex, raise rents, and operate free of HUD restrictions. Tr. 174:21–175:25 (Norman). As Mr. Norman stated in his testimony, absent the prepayment right in 1985, the purchase by CCA would not have happened because "there would have been nothing to buy." Tr. 175:17-25 (Norman).

---

6 The government quotes Dr. Ragas out of context to attempt to show that the expectations of the owners that the prepayment right was valuable were unwarranted. Dr. Ragas was asked about the value of the property in 2011, the 40th anniversary of the mortgage. The context of the question was whether, because the property had not been able to sustain payment of the limited dividend, the property would have any value at all. Dr. Ragas responded that he had "rendered no opinion on what might or might not be the value of the asset after the takings period." Tr. 957:1-4 (Ragas). He was then specifically asked about the value of the property in 2011 post-Katrina, not 1991, the original prepayment date.

### 3. CCA Suffered A Severe Economic Impact

31. In *Cienega VIII*, the Court of Appeals "compared the annual return on the owners' real equity in their properties to a conservative market return on Fannie Mae bonds." *Cienega IX*, 67 Fed. Cl. at 475; *see Cienega VIII*, 331 F.3d at 1343. The return on equity approach is "well grounded" and "best measures the impact of ELIHPA and LIHPRHA on the plaintiffs." *Cienega IX*, 67 Fed. Cl. at 475. The Court of Appeals further held that plaintiffs' evidence of diminution in return on equity was sufficient, as a matter of law, to demonstrate the serious economic impact required under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). CCA used the same diminution in return on equity model approved in *Cienega VIII* and *Cienega IX* and demonstrated a comparable adverse economic impact.[7] CCA's expert determined that the Preservation Statutes caused CCA to suffer a diminution in return on equity of between 80% and 85%. PX 125. The government does not, and cannot, dispute the accuracy of these calculations.[8] This diminution is, by any reasonable measure, a "serious" loss and is in line with the losses found sufficient as a matter of law in *Cienega IX*. 67 Fed. Cl. at 477-78.

32. Ignoring the relevant case law of this Court and of the Federal Circuit, the government resubmits its previously rejected diminution in value approach. While a diminution in value approach can be appropriate in connection with permanent takings, it is particularly

---

7 In *Chancellor Manor v. United States*, 331 F.3d 891, 905 (Fed. Cir. 2003) (emphasis added), the court instructed the trial court, on remand, to "calculate the *rate of return* on invested capital under the new statutes as implemented by HUD *and the reasonableness of that return*."

8 The government trots out its "snapshot" argument contending that Dr. Ragas' analysis does not take into account the duration of the taking. As was shown at trial, and as we made clear in our opening brief, Dr. Ragas performed return on equity calculations at multiple points in time throughout the period of the taking, thereby capturing any duration concept. The evidence showed that, over the life of the taking, diminution increased from 80% to 85% and thus was in line with Dr. Stillman's point that, as a general matter, if not invariably, the longer the duration of the restriction, the greater the economic impact. Tr. 1879:19-22 (Stillman).

inapt to measure the impact of a temporary regulatory taking. Dr. Dickey's approach would, if accepted, so dilute the impact of the government's action as to license -- indeed incentivize -- confiscatory conduct by the government to circumvent constitutional protection of property rights. Indeed, it would immunize wholly confiscatory regulation, so long as the taking lasts less than half the useful life of the property at issue.

33. Courts thus virtually never employ the method proposed by the government when analyzing the economic impact of temporary takings. In advocating its diminution in value approach, the government cites three cases, only one of which even involved a temporary taking. That case, *Seiber v. United States*, 364 F.3d 1356, 1371-72 (Fed. Cir.), *cert. denied*, 543 U.S. 873 (2004), concerned the denial of a permit to harvest timber during a two-year period. In upholding the grant of summary judgment against plaintiffs, the court noted that the plaintiffs had not submitted "any evidence . . . of economic loss during that period," *id.* at 1371, and did not rule that economic impact in a temporary taking case need be shown by a diminution in value. In another case cited by the government for another purpose but involving a temporary taking, *Bass Enterprises Products Co. v. United States*, 54 Fed. Cl. 400, 404 (2002), the court emphasized that "[t]he [very same] property was still there at the end of the delay period," *aff'd*, 381 F.3d 1360 (Fed. Cir. 2004). In *Independence Park*, this Court recognized a fundamental distinction between *Bass* and the facts here when it noted that Model Plaintiffs

> could not simply recapture the property that had been foregone during the takings period and regain their position, losing only time in the process. Rather, the income generating opportunity the property provided had been entirely lost during the period of the temporary taking, not just postponed.

61 Fed. Cl. at 707. This Court thus rejected the government's reliance on *Bass* to support its proposed method of quantifying just compensation because "Bass had not lost any of the oil and gas. Bass had lost time." *Id.*

34. The Federal Circuit has observed that "where as here, the issue concerns the economic impact, albeit temporary, of government regulations on a going business concern" a returns based analysis is a more appropriate means of measuring economic impact than one based on diminution in value. *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1188-89 (Fed. Cir. 2004).

**a. The Statutory Options Do Not Affect Economic Impact**

35. The government argues that consideration of the sale and incentives options in the Preservation Statutes eliminates any economic impact caused by the prepayment prohibition. Gov't Br. at 33. This argument vastly overstates the benefits of the options and misconceives their relevance in the takings inquiry. Any value in the options has no bearing on the economic impact of the prepayment bar and could be considered, if at all, only in the calculation of just compensation. *Cienega IX*, 67 Fed. Cl. at 470.

36. The government's position that an owner suffers no economic impact where the owner had the theoretical opportunity to sell its property at a HUD-mandated price to a HUD-approved buyer is tantamount to requesting court-approved circumvention of the just compensation requirement. In essence, the government's position is that it should be permitted to compel the sale of CCA's property to a buyer of the government's choosing at a price the government dictates, and, even if the price is below fair market value, the government's action would not constitute a taking. This is not the law.

37. If the government directly appropriated CCA's property by eminent domain and then sold the property to a non-profit entity, the Court would find a *per se* taking and determine for itself whether additional compensation is due. *See, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434-35 (1982). The government's position that it could instead coerce an owner to sell its property directly to a non-profit entity is a distinction without a

constitutional difference. In either event, the government has effected a taking for which just compensation must be paid.

38. Moreover, the availability of incentives does not affect the severe economic impact CCA suffered. The evidence established that remaining in the HUD program and accepting incentives would have exacerbated CCA's losses, not reduced them. Tr. 1457:15-21; 1545:3-1548:9 (Derbes); 1733:15-1734:9 (Dickey); 581:20-582:23 (Alexander).

39. But even if the incentives would have reduced losses or even if a forced sale to a non-profit would have provided some measure of compensation to CCA after a three-year uncompensated bureaucratic process, Congress may not use such vehicles to provide value equal to forty, fifty, or sixty cents on the dollar for a taking, and thereby evade constitutionally-required compensation. *Cienega IX*, 67 Fed. Cl. at 470.

40. Finally, this Court has already made clear that any value derived from statutory options does not affect the *Penn Central* takings analysis. *Id.* Instead, "value provided by extrinsic means as, for example, statutory options that previously did not inhere in and with the property, should not be part of the takings analysis but rather should be part of the just-compensation calculus." *Id.* This conclusion has the virtue of being not only correct as a matter of law, but also fundamentally fair.

**b. There Is No Proof That A Statutory Sale Could Have Been Executed Or That Any Such Sale Would Have Been At Fair Market Value**

41. If the government wishes to argue that CCA did not suffer economic injury sufficient to prove a compensable taking because the statutory sale option protected the economic value of the property, then the government bears the burden of proving that CCA could have sold its property at fair market value. The government's evidence was woefully inadequate and showed only that non-profit organizations had expressed a generalized interest in

purchasing low and moderate income properties but without specific reference to Chateau Cleary. Tr. 379:20-25 (Norman).[9] The government produced no evidence that CCA ever received any offer, let alone a bona fide offer, to purchase its property. Even if there had been proof of a bona fide offer, there was no evidence that such an offer would have resulted in a completed transaction. The evidence in the record established that Congress appropriated only a fraction of the amounts necessary to fund plans of action that were in the HUD pipeline. PX 96 at 2320; Tr. 67:17-22; 634:2-15 (Alexander); 1108:12-25 (Kizzier). None of the six Louisiana properties that obtained HUD-approved plans of action were funded by Congress. Tr. 627:17-22 (Alexander). In short, the statutory sale option was at most a theoretical possibility.

42. Moreover, the government failed to prove that a statutory sale price would have reflected fair market value. HUD's former official, Mr. Alexander, recognized that the sale option under the Preservation Statutes was not a fair market transaction. Tr. 640:13-18 (Alexander). Dr. Stillman agreed. Tr. 1873:11-1874:1 (Stillman).

**c. A Sale Or Incentives Would Not Have Compensated CCA For The Losses Incurred Prior To The Sale**

43. In all events, CCA never would have been compensated for the stream of income lost during the three-year bureaucratic process it would have had to endure to pursue a statutory sale or incentives. This uncompensated loss would be on top of either the below market price that would have resulted from the statutory sale process or on top of the increased losses that would have resulted from signing a new use agreement and accepting incentives.

9 Mr. Norman testified that he considered the preliminary inquiry from USGI a "sales pitch," which he took with "a grain of salt," and that he did not consider the sale of Chateau Cleary to a non-profit to be "a viable option." Tr. 440:11-441: 4 (Norman).

**d. The Government's Remaining Arguments Are Unavailing**

44. The government makes a number of *ad hominem* attacks on Mr. Norman which seem to be designed to show that any losses CCA suffered were actually Mr. Norman's fault. This is a classic blame-the-victim gambit and will fool no one.

45. First, with respect to the government's contentions on rent increases, we have explained Mr. Norman's successful track record in getting rent increases during the 1972-1985 time frame and the different market conditions and operating expense trends that prevailed after 1985. Given his past record, if Mr. Norman could have obtained rent increases from HUD and passed them on to tenants, he certainly would have done so.

46. The government also blames Mr. Norman for not immediately prepaying as soon as HOPE was passed. The evidence at trial showed that, for a 7- to 8-month period after enactment of HOPE, HUD sought to sabotage Congressional intent through the issuance of Preservation Letters that purported to derogate HOPE's restoration of the prepayment right. However, once the path to prepayment was clear in late 1996, Mr. Norman took steps to effectuate prepayment. From November 1996 until about April 1, 1997, he was awaiting Mr. Alexander's report. After receiving the report, he discussed it with Mr. Alexander in April and May. In line with his decision to implement a hybrid of Mr. Alexander's recommendations, Mr. Norman implemented property improvements between July 1997 and February 1998. At that time, he was in touch with Hampstead Partners, formally retained them in April 1998, and sent out the prepayment notice letters in May 1998. Tr. 279:7-280:22; 458:19-22 (Norman).

47. Two further points are important. First, CCA does not seek damages for the period after February 28, 1997, so the government's argument is beside the point. Second, Mr. Norman's testimony was uncontroverted that, if the government had not abrogated his prepayment right by enactment of the Preservation Statutes, he would have begun the

prepayment planning process at least eighteen months before his original prepayment eligibility date in order to be ready to proceed in May 1991. Tr. 177:7-178:4 (Norman). Because of the government's wrongful actions, he only began this process in about the November 1996 time frame. His actions were entirely appropriate and reasonable.

**C. CCA IS ENTITLED TO JUST COMPENSATION**

48. CCA's just compensation analysis follows the model approved in *Cienega VIII* and *Cienega IX*. The government, by contrast, follows its discredited diminution in value approach -- discredited because the decided cases reject it and discredited because its purported *ex ante* analysis is irretrievably tainted by the inappropriate use of the decisive *ex post* fact that Congress enacted HOPE in 1996, a material point of information that was unknown as of the *ex ante* valuation date in May 1991. Dr. Dickey's analysis should be disregarded.[10]

49. The government launches a number of meritless attacks on Dr. Ragas' analysis.[11] The government argues first that it was erroneous for Dr. Ragas to measure just compensation at the end of the temporary takings period, rather than on the first day of the taking. The government, however, simply ignores this Court's decisions in *Cienega IX* and *Independence Park* and the sensible observation that "the end of the temporary taking sets a boundary for just compensation, and, apart from duration, events that transpired during the temporary takings

---

[10] The government ties itself in knots trying to justify the unprincipled, flawed analysis that Dr. Dickey proffered. His report repeatedly trumpets the virtue of an *ex ante* approach. It was only after the inherent contradiction between what Dr. Dickey did and what he said should be done became so obvious and he could no longer ignore it that he changed course and said he did not have to do a "pure" *ex ante* approach. What resulted was a pastiche of helpful information selected to achieve the desired outcome.

[11] The government's argument that CCA is entitled to no recovery because it did not pursue a speculative, below market statutory sale option is erroneous as a matter of law. *Cienega VI,* 265 F.3d at 1244-46; *Cienega IX,* 67 Fed. Cl. at 470. Moreover, HUD presented no evidence at trial that the statutory process would have resulted in a transaction or that any transaction could fairly be described as a "fair market" transaction. On the contrary, Mr. Alexander and Dr. Stillman confirmed that the sale option was not a "fair market" process. Tr. 640:13-18 (Alexander); 1873:11-1874:1 (Stillman).

period have to be taken into account in setting a valuation." *Cienega IX*, 67 Fed. Cl. at 490. Events during the temporary takings period provide an objective, non-speculative basis for assessing value. *Id.*[12] Contrary to the government's argument that Dr. Ragas' approach does not compensate the owner for what the government took, Gov't Br. at 53, Dr. Ragas' analysis does exactly that -- no more, no less. By taking into account what happened during the takings period, the owner is compensated for his actual loss. As a result, the government is not obligated to pay any more than what the owner in fact lost. Nothing could be more fair.

50. The government quarrels both with Dr. Ragas' use of CCA's HUD rents and with Dr. Ragas' estimate of the market rents that CCA would have been able to attract. The premise of the government's arguments overlooks the important admonition that, in view of the nature of the valuation exercise undertaken, absolute precision is not attainable. What is required is "a guess, as well informed as possible, as to what the equivalent would have been . . . ." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 6 (1949). Thus, as concerns the Chateau Cleary HUD rents that he used, Dr. Ragas' "well-informed" estimate rests on (i) Mr. Norman's long and successful track record of obtaining and implementing rent increases when operating expenses (past and anticipated) and market conditions warranted them, (ii) his deep knowledge of the multi-family market in New Orleans, and (iii) the prevailing market conditions during the 1986 to 1990 period and thereafter. His "well-informed" estimate of market rents rested on, in addition to these factors, his understanding of the comparability of Chateau Cleary to other

12 The government's argument that Dr. Ragas' and this Court's approach overcompensates property owners by using an end-of-takings date is transparent. What the government seeks to achieve is an adjustment back to the first date of taking at a risky discount rate and a forward adjustment to the date of judgment by a risk-free rate and thereby gain on the arbitrage.

properties in the market[13] and his unparalleled knowledge of what was happening in the market throughout the relevant period in question.[14]

51. Finally, the government disputes Dr. Ragas' use of a 10% rate to adjust damages to the end of the taking and a lower risk-free rate to adjust damages from the end of the taking to present value. Again, Dr. Ragas used the methodology approved in prior cases. *Cienega IX*, 67 Fed. Cl. at 491. Use of a 10% rate to adjust losses to the end of the takings period is conservative and reflects the owners' lost opportunity during that period. For the adjustment from the end of the taking to the current time, the government presumably does not argue for a higher rate and thus does not dispute that the risk-free rate used to adjust value from the end of the takings period to the present is proper.

Dated: November 21, 2006

Respectfully submitted,

By /s/ Elliot E. Polebaum

Elliot E. Polebaum
Albert S. Iarossi
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20004
Tel.: (202) 639-7000/Fax: (202) 639-7003

Attorneys for CCA Associates

281847

13 Regarding the three-bedroom apartment model at Chateau Cleary, in his final computation, the square foot figure that Dr. Ragas used had a small error in it (which had been caught and corrected elsewhere in his report). On the stand, Dr. Ragas explained that the error amounted to 19 square feet as to 16 of the 104 units in the complex, the resulting impact of which is no more than $1,800 per year. Tr. 912:15-913:6 (Ragas); PX 106 at 2690, 2708-13.

14 The government's reliance on CCA's rent levels in 1999, following prepayment, which lagged market rents, ignores Dr. Ragas' explanation of the change in market conditions from the conditions that prevailed in 1991. Approximately 1,000 new units came into the market in 1997 and 1998, and an additional 1,000 units came on line between 1999 and 2002. Tr. 1063:13-1064:16; 1940:22-1941:19 (Ragas). The new units reflected an improvement in quality and amenities. Tr. 828:6-24 (Ragas). While Chateau Cleary was an average West Metairie property in 1991, by 1999, its first year as a market rate property, the new supply of high end units affected the rents it could attract.

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that, on this 21st day of November 2006, I caused a copy of the foregoing Plaintiff's Reply to Defendant's Post-Trial Memorandum to be delivered electronically to:

Kenneth D. Woodrow, Esq.
Commercial Litigation Branch
Civil Division
Attention: Classification Unit, Room 8012
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

/s/ Albert S. Iarossi
Albert S. Iarossi