IN THE UNITED STATES COURT OF FEDERAL CLAIMS

************************************

| | | |
|---|---|---|
| CCA ASSOCIATES,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 97-334C<br>Judge Lettow |

************************************

**APPENDIX TO**
**PLAINTIFF'S REPLY TO DEFENDANT'S POST-TRIAL MEMORANDUM**

Elliot E. Polebaum
Albert S. Iarossi
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20004-2505
Tel: (202) 639-7000/Fax: (202) 639-7003

November 21, 2006

Page 153

A. Not to my memory.

Q. Were there ever any drug activity issues related to the property, Chateau Cleary?

A. Not of any consequence.

Q. Did you ever get a report from the, any of the inspection companies that prepared reports over the years of drug-related activity at the property?

A. No.

Q. What was Chateau Cleary's practice with respect to dealing with units as they became vacant and available for re-rental because a tenant moved out?

A. Well, we would go ahead and refurbish the apartments as soon as possible, generally with on-site staff, and re-rent them usually within 30 days from the waiting list.

Q. Did you ever receive an evaluation in any of these reports that was critical, that evaluated the condition, maintenance, management of the property in a negative fashion?

MR. HARRINGTON: Objection, Your Honor. Any of these reports is vague and unintelligible.

Page 154

THE COURT: If the reference is taken to mean inspection reports generally by whom, ever, and whenever, the question is allowed.

THE WITNESS: No, it was -- most of the time, it was superior or words to that effect. At worst that I can remember, it might have been a satisfactory a time or two.

BY MR. POLEBAUM:

Q. All right. Was your property ever described as a model project?

A. Yes, it was.

Q. And was that information or that description of the property as a model project communicated to HUD?

A. It was.

Q. Over the course of the period that Chateau Cleary was subject to HUD restrictions, did Chateau Cleary get paid the full amount of the limited dividend that was authorized?

A. No, it did not.

Q. In the period prior to 1991, what was, in general terms, the overall experience that Chateau Cleary experienced with respect to payment of the limited dividend?

A. On the total amount of dividends that

Page 155

could have been distributed, based on the number of years times the $12,000 figure, we actually received during that period of time less than half of that figure.

Q. All right. And what was the experience after the prepayment date, up until the time that Chateau Cleary exited the HUD program?

A. We received some more money, but it was still less than half of the total.

Q. All right. Now, we were looking at Plaintiff's Demonstrative Exhibit Number 33 a few moments ago. We looked at the period 1971 to 1985.

Could you explain to the Court what happened starting in 1986, why there were no rent increases from 1986 until 1994?

A. Well, starting in about 1986, the New Orleans area experienced a recession caused by a decline, serious decline in the oil industry. At some point, conventional apartments in our area lowered their rents to our existing subsidized rents. We tightened our belts even more than we had before. We brought our expenses down.

Page 156

The idea of going in for a rent increase didn't make any sense, because from a marketing standpoint, even if HUD would have allowed it, we couldn't have instituted it. The competition was about where we were, and if we didn't have a swimming pool and someone had a swimming pool across the street charging the same rates, we raise the rents, they would go across the street. So we didn't think it was appropriate or make any sense during that period of recession to ask for any rent increases.

Q. All right. And in terms of the operating expenses that you were experiencing in the period after 1985, beginning in 1986, what was the relationship between your operating expense experience and your ability to ask HUD for a rent increase, based on operating expenses?

A. Well, except for perhaps 1989, generally, you had to prove a loss on your operating statement to be allowed an increase, rental increase by HUD. That was the primary source of the rent increase, would be to show --

Page 277

mortgagee and the lender that perhaps we would be better served not to effectuate this letter of credit at this time, you know, the commitment at this time. But to use our own funds to do less expensive repairs over the period of time, latter part of '57 – excuse me, '97, '98.
And then have the appraisal done, which Whitney would then use to make – we hopefully had a lot higher value appraisal, we then would get a higher loan, better rates, because of interest rates coming down, and at that point actually pay off the HUD mortgage.
BY MR. POLEBAUM:
Q. All right. So just so I understand the sequence then, after entering into this commitment with Whitney, you provided funds to Chateau Cleary Associates and the repairs were undertaken in the ensuing period of time?
A. Correct.
Q. Is that correct? All right.
Now, so you had Mr. Alexander's analysis. And you had these dealings with Whitney and you were in the process of making repairs. Did you retain any consultants to

Page 278

help you through the prepayment process?
MR. HARRINGTON: Your Honor, maybe this was intentional, but I don't believe the document, PX-80-A was ever admitted into evidence.
THE COURT: That's true.
MR. POLEBAUM: That's just an oversight. I apologize.
THE COURT: I was about to – I was thinking about it because I usually give one warning to counsel each way, because this happens during a trial. But not a second warning. And I was trying to figure this out myself.
MR. POLEBAUM: I appreciate Mr. Harrington's intervention and I move Exhibit 80-A.
THE COURT: Mr. Harrington?
MR. HARRINGTON: We have no objection beyond our continuing objection to the relevance of information pertaining to the post February 28th, 1997 date.
THE COURT: Thank you. What we will do is we will count that as your warning, once, Mr. Polebaum, and I am not going to do it

Page 279

again.
MR. POLEBAUM: I will try to remember, Your Honor.
(Plaintiff's Exhibit Number PX-80-A was received into evidence.)
BY MR. POLEBAUM:
Q. Exhibit 83, Mr. Norman. What is Exhibit 83, please?
A. It is a copy of that letter from Hampstead Partners to – actually, from Norm Root of Hampstead Partners to me dated April 29th, 1998.
Q. All right. And then on the following page, what accompanies this letter?
A. A prepayment service consultant agreement.
Q. And why did you engage these consultants?
A. Because I had read – and I knew Chris Foster, the head of this company, I met him at conferences and I knew they had experience going through the prepayment process which I found kind of hard to grasp when trying to do my job.
And I said it is cheaper for me to pay

Page 280

someone to do it who knows how to do it, and won't make any mistakes in dealing with HUD, to deal with the housing – the housing authority.
The manager knows what the timing and what notices to send to the tenants and so forth.
And my time would be better spent doing something else than becoming an expert in this only to use it one time.
MR. POLEBAUM: Move admission of Exhibit 83.
MR. HARRINGTON: No objection, Your Honor.
THE COURT: Admitted.
(Plaintiff's Exhibit Number PX-83 was received into evidence.)
BY MR. POLEBAUM:
Q. Approximately how long before you signed the consulting contract with Hampstead, were you in touch with Hampstead about potentially retaining them? What was the time frame?
A. I would say a month to two months.
Q. What is Exhibit 85?
A. Exhibit 85 – pardon me, may I have some water, please? It is a letter dated May

Page 345

the flow of my questioning, Your Honor.
THE COURT: You may object and
Mr. Polebaum, you may object to my question if you wish, and then we will rule on the objection before Mr. Norman answers.
Mr. Norman, in one of the years that's covered by this particular chart, I thought yesterday you had indicated there was an extraordinary increase in insurance costs? Do you recall that?
THE WITNESS: Yes, Your Honor.
THE COURT: Can you explain what it was and when it was?
THE WITNESS: To be very accurate, I would have to refer to my own documents, but roughly '94, '95. I even have copies of newspaper articles that appeared in the local newspapers where apartment owners generally were saying that my insurance cost in one year in that period, it could have been '94, '94-'95, went up, I think it was $26,000 just for the property insurance alone, the increase was $26,000.
THE COURT: Thank you. Thank you, Mr. Harrington.

Page 346

BY MR. HARRINGTON:
Q. Mr. Norman, that increase in insurance costs would be reflected in the operating expenses shown on this chart, wouldn't it?
A. It probably would have showed up more in 1995.
Q. But that would be an operating expense of CCA?
A. Correct.
Q. Turning to Defendant's Exhibit 9, Mr. Norman.
A. Yes.
Q. Could you look at the section on article 3 called payments. That section provides an estimated construction cost, correct?
A. I don't see the word estimated. I do see a figure of 1,227,655.
Q. Do you not know the derivation of that number?
A. I would have to study all these documents. Again, I have not paid much attention to them for this -- I have not studied them much for the trial. It was a long time ago.

Page 347

Q. Look above that. There is a line for additional profit, and it has the word waived next to it. Isn't that correct?
A. It doesn't say additional profit. It says a fee for something is waived. I don't know what that means.
Q. It is a line talking about an additional fee above and beyond costs?
A. I would assume so.
Q. And it says waived next to it, correct?
A. Yes.
Q. That would be a decision that your father and your uncle made, correct?
A. Yes.
Q. And nowhere in the payment section does the contract refer to the builders and sponsors profit and risk allowance, does it?
A. I'd have to study this document before I could knowledgeably and honestly answer you. I apologize for that.
Q. Please take a look at the document and try to answer my question.
A. It says that the maximum amount that the owner will pay the contractor for the

Page 348

construction of the complex. I don't know that it includes or does not include, without further study, the builders risk and profit.
Q. And there is no mention in the payment section itself of a builders and sponsors profit and risk allowance, is there?
A. I do not see any.
Q. Now, just talking generally about CCA, I believe you said yesterday that your father and your uncle had an equal stake in the development and operation of Chateau Cleary from its inception?
A. Yes, they did.
Q. And CCA Associates, the partnership itself, was formally established in 1985 at a time your father and uncle were getting older and wanted to facilitate their estate planning, correct?
A. It was formed in 1985, that's correct. I don't know -- it is complicated to say that it is accurate to say yes to the second part of your question.
Q. Well, this was a time that they were doing estate planning, wasn't it?
A. Yes, it was, but as I recall, the

Page 377

A. Based upon what I wrote, I would have to say that's what she believed.
Q. I am asking, Mr. Norman, what you believed. Do you believe that statement to be accurate?
A. I don't know.
Q. Mr. Norman, I have put in front of you a document which is a letter to you dated November 26th, 1990 from Andrea Lockett. Do you recognize this letter?
A. Vaguely. I haven't read it recently. It has the received stamp on it. It is incorrectly addressed to my father, but in any case, I'm sure that I read it at the time.
Q. This was a document you would have kept and maintained in your files?
A. I assume that's where it came from, yes.
MR. HARRINGTON: Your Honor, move to admit Defendant's Exhibit 124.
MR. POLEBAUM: It strikes me as hearsay, Your Honor.
THE COURT: We need some more foundation, I think, one way or the other, Mr. Harrington and Mr. Polebaum.

Page 378

MR. HARRINGTON: Certainly.
BY MR. HARRINGTON:
Q. Mr. Norman, when you received letters of this type, is this something that you kept in the ordinary course in your files for CCA?
A. Yes.
THE COURT: Mr. Harrington, there was an assumption in your question, and that is that Mr. Norman did receive it. I think we ought to get to that point.
BY MR. HARRINGTON:
Q. Mr. Norman, it is your belief that you did, in fact, receive this letter based on the address and the received stamp on the letter, correct?
A. That's correct.
MR. HARRINGTON: Your Honor, we move to admit this as a business record of CCA.
MR. POLEBAUM: Well, I don't think it is a business record of CCA. It is a communication that Mr. Norman received, but I won't object further, Your Honor.
THE COURT: Well, I do think it is a business record of CCA, and accordingly, it is admitted.

Page 379

(Defendant's Exhibit Number DX-124 was received into evidence.)
BY MR. HARRINGTON:
Q. So Mr. Norman, we just spoke about some communications that you had already had with Mr. – Ms. Lockett. This is a further communication that you had with Ms. Lockett in November 1990 about the possible sale of CCA to a nonprofit corporation, correct?
A. I don't know that it was – I'm not trying to be difficult, but I asked her for this or whether she voluntarily sent this to me. I just don't recall, but I will admit based on the stamp, I don't recall the exact document, but it is not inconsistent – it is addressed, it was addressed to my address, it was my – it looks exactly like my received stamp, so I assume that I read this. And I vaguely remember it, but I'm not –
Q. And in the second paragraph, it says that Ms. Lockett represents a 501(c)(3) not for profit corporation, which is interested in purchasing low and moderate income properties, correct?
A. Yes.

Page 380

Q. And the possibility of purchasing Chateau Cleary was the reason that she was writing to you, and this letter was sent to you, correct?
A. I would assume that was the reason.
Q. And she requested additional information about CCA in order to analyze the potential for a sale, correct?
A. She did request additional information, that is correct.
Q. And there were nonprofits actively looking to purchase affordable housing under the preservation statutes at this time, weren't there?
A. It was my understanding that there were, a number of which I was not privy to or didn't know.
Q. Now, your various discussions with Ms. Lockett that we have just run through occurred more than six months before CCA was originally eligible to prepay, correct?
A. Yes.
Q. And the preservation statutes allowed the owner of a section 221-D-3 project to file a notice of intent and follow up with a plan of

Page 437

HUD, was it your practice the next month to raise the rents to the approved level?
A. Generally, it was. I remember a couple of instances that there was some delay. I don't remember offhand what the delay was, but it wouldn't be necessarily the next month. As I think I have testified, sometimes, depending on – it might be two months, because if you got the letter in the beginning of August, you couldn't raise the rents until the beginning of October, because of the 30-day notice requirement. We couldn't change rents in the middle of a contract, you know, monthly contract term with a tenant.
Q. Looking at Plaintiff's Exhibit 42 in your binder.
A. Yes.
Q. This is the notice of intent that we have already looked at. And you mentioned the possibility of seeking incentives or selling the property. What would have happened if you had diligently pursued incentives as is described in your December 28, 1990 notice of intent?
A. I don't know.

Page 438

Q. Do you know if they would have been funded?
A. I'm not sure. It didn't look like it would be. At some point, with the queues I saw and people complaining of lack of funding.
Q. Do you know how long it would have taken to get funding?
A. I understood it was taking those in line as much as two and a half, three years.
Q. Do you know if you would have been able to prepay as a result of a lack of funding?
A. No, I'm not sure of that, but I didn't proceed along those lines because, again, as I think I testified, it would not have given me what we planned on getting and should have gotten under normal prepayment. So it was just an option, but never really the intention of pursuing it at that point in time.
Q. Now, Mr. Norman, what you said you wanted was to be able to prepay, correct?
A. That's correct.
Q. And if funding for a use agreement didn't come through, you would have been allowed to prepay, isn't that right?

Page 439

A. I don't recall that particular aspect of it, but there was a lot of expense and time and uncertainty involved in – if it didn't happen, well, then, you could prepay. At some point, you keep your options open, but you don't keep them open with expenditures of time, effort, money. I mean, you run out of that at some point.
Q. Mr. Norman, you indicated that it was your understanding that HUD had limited funds with which to fund incentives; is that correct?
A. At some point in time, yes.
Q. Did HUD have discretion to figure out how to use that limited funding?
A. I don't know.
Q. Now, we talked about the incentives options. Do you know what would have happened if you had pursued the sale option diligently as described in your December 1990 notice of intent?
A. I'm not sure because it never came to – close to being fruition.
Q. So you don't know whether a sale would have been consummated?
A. Well, I could have sold anything if I

Page 440

wanted to, but I didn't pursue it, so it didn't happen.
Q. You could have sold the property through the preservation process?
A. Oh, yes, I could have.
Q. Do you know when you would have been able to complete a sale through the preservation process?
A. No, I didn't get that far along with it.
Q. Do you know what the transfer preservation value of the project would have been, if you had been able to sell?
A. I was told by different people, different things. And to a great extent, especially with people like Ms. Lockett who I never met in person, really had not much dealing with her, and others I talked to, I might have met at a meeting, that type of representation, quote, sales pitch, I took with a grain of salt as I would anything in business.
Q. Do you know if a sale to a nonprofit might not have occurred quickly enough, you would have been allowed to prepay under the

Page 441

preservation statutes?
A. I don't recall the time frame, but it – it wasn't a viable option in my opinion or an attractive option.
Q. So you don't know whether or not you might have wound up being able to prepay after pursuing the sale option under the preservation statutes?
A. Well, people that did that, I know – I have read other complexes in similar situations that have gone through that process that way through a nonprofit, but I don't know whether it would have happened or not in my answers without having done it.
Q. Let's turn to Plaintiff's Exhibit 48. This is a document you talked about briefly yesterday. Focusing on the last page, the page under summary, the document reads, "exterior amenities such as swimming pool and deck, patio and individual tenant upgrades, such as ceiling fans, carpet, frost-free refrigerators, microwave ovens and possibly fireplaces are all improvements that should be considered in order to justify and validate the higher market rents that are achieved in the marketplace

Page 442

comparables."
Was that what was communicated to you by Mr. Pappalardo?
A. As a general statement, yes.
Q. And so the rents that he provided in this document were dependent upon upgrading the property; isn't that correct?
A. I really didn't focus on that. It was just – I have to look at it. Further on in that paragraph, he says to monitor the market on an ongoing basis, he doesn't say to do these things. And he doesn't say to do all of them, some of them. It was natural to understand that he covered the whole gamut. You could do a little, a few of those things, some of them, or all of them.
But he also said, you know, monitor the market, he also made recommendations between the two laws at that time. Just a general, my opinion of this is this. My opinion of that is that.
Q. Mr. Norman, this was a preliminary sort of report that Mr. Pappalardo put together for you, isn't it?
A. Yes.

Page 443

Q. And you didn't submit this to HUD?
A. No, I don't think I did.
Q. And you didn't determine what HUD would have considered the market rents for the relevant market area, did you?
A. Not vis-a-vis this report, no.
Q. Or otherwise?
A. I didn't do it at all, yes.
THE COURT: Mr. Harrington, it is about time for our luncheon break, but, on the other hand, are you at a decent stopping point?
MR. HARRINGTON: It would not disrupt things to stop now, Your Honor. I am largely through with the cross-examination of Mr. Norman at this time, but I think it would make sense to break now. It would probably go long enough that we would push ourselves a little bit too far.
THE COURT: Mr. Polebaum?
MR. POLEBAUM: That's fine with us, Your Honor.
THE COURT: Mr. Norman?
THE WITNESS: That's fine, Your Honor.
THE COURT: Are you ready for your luncheon?

Page 444

THE WITNESS: Yes.
THE COURT: Thank you. We will take our luncheon break now, one hour.
(Whereupon, at 12:32 p.m., a lunch recess was taken.)

Page 457

Cleary project?
A. It would have been enough to pay off the mortgage, but it wasn't enough.
Q. When you say "it wasn't enough," you are saying as a business person, you wanted to get a larger mortgage?
A. Well, for a ten-year loan, yes. That would have left no money for any improvements to speak of.
Q. Let's look at Plaintiff's Exhibit 75. This is a letter to Mr. Alexander, correct?
A. Excuse me.
Q. 75-A, excuse me.
A. Yes, it is.
Q. And this letter was written to his personal address in Kenner, Louisiana?
A. It was.
Q. And one of the options you asked Mr. Alexander to consider in his work pursuant to his CPM designation was selling the complex to a third party, correct?
A. That was an option.
Q. And that was one of the options you were suggesting that he consider?
A. Yes.

Page 458

Q. Let's look at Plaintiff's Exhibit 80-A, Mr. Norman.
A. 88?
Q. 80-A. As of April 28th, 1997 you received a commitment for a loan from Whitney; is that correct?
A. Yes.
Q. And you could have used that loan from Whitney to pay off the current mortgage on the Chateau Cleary project, correct?
A. Yes, as a bridge loan.
Q. The loan amount was sufficient to pay off your existing mortgage?
A. Yes.
Q. You chose not to do that, correct?
A. That's correct.
Q. Let's look at Plaintiff's Exhibit 83.
A. Yes.
Q. As of April 29, 1998, you retained Hampstead Partners to assist you with prepayment, correct?
A. This is correct.
Q. And this was over a year after you had received the mortgage commitment from Whitney, correct?

Page 459

A. Yes.
Q. And you didn't even enter into discussions about an arrangement with Hampstead until March 1998, correct?
A. The reason I didn't do that, the reason being that I spent that time improving the project. And I loaned some money, my own money to the complex to further enhance improvements as opposed to accepting the Whitney commitment.
Q. We have looked at a letter a while ago talking about low vacancy areas and special needs tenants. Chateau Cleary had no special needs tenants; isn't that correct?
A. I don't remember what the definition of special needs was. It doesn't strike me that we did, but we may have. I don't know.
Q. Not that you are aware of as you sit here today?
A. As I sit here today, I don't – I can't say that there were or weren't – there was or weren't.
Q. Now, Mr. Norman, let's talk about briefly, after – let's see, you did prepay in September 1998. Did CCA have a waiting list

Page 460

for its project after it prepaid?
A. I'd have to go to the records, if they still exist.
Q. Is it fair to say –
A. Typically, typically we had a waiting list.
Q. And that was as a HUD project?
A. Yes.
Q. Have you had waiting lists as a conventional project?
A. Yes.
Q. Is it fair to say vacancies is something you need to keep a close eye on with a conventional project?
A. Yes.
Q. Now, have you found your conventional tenants to be more or less demanding or about the same as the moderate-income tenants at Chateau Cleary prior to prepayment?
A. Demanding as to what, if I may ask?
Q. Well, as to maintenance, upkeep, condition of the property.
A. No more demanding because we act the same way we would, be it you, me, or anyone else living there.

Page 626

up, and many people are proceeding through the process and those that proceeded expeditiously in the very early stages are obtaining incentives. You may proceed if you wish, but out of all those that were eligible, I maybe had conversations of this sort with five or six.

BY MR. POLEBAUM:

Q. And when you say that those who were going through the process were obtaining incentives, I think what you mean to say – you correct me if I am wrong – is that they were getting their plans of action approved in New Orleans?

MR. WOODROW: Objection, mischaracterizes the witness's testimony and it is argumentative.

THE COURT: Well, it is a leading question, asking for a clarification of his testimony. Now, if you understand the question, Mr. Alexander, you may answer it.

THE WITNESS: I'm not certain I understand the question, sir.

BY MR. POLEBAUM:

Q. I thought – I thought you just

Page 627

indicated that those who were going through the process that you were aware of were getting incentives. Is that what you just indicated?

A. I did not mean – let me clarify my remarks. Late in my tenure at HUD, it was my understanding that some of the applicants who were in the national queue from outside New Orleans had indeed obtained incentives because they were being provided on a first come, first serve basis of those who were in the queue. And so the process, while it might have been slower than some would have hoped, the rewards that were being reaped by certain owners were those who were first to get in and get their plans of action approved and be first in line in a national queue.

Q. All right. With respect to those in New Orleans with which you are familiar, did any property owner who went through the process and get a plan of action approved actually get incentives?

A. No.

Q. Now, for those whose plans were approved, one of the counterparts or quid pro quos that the property owner had to agree to

Page 628

was to stay in the HUD program; is that correct?

A. Yes.

Q. Are you aware of any owner who applied for incentives and whose plan of action was approved, who was not required to stay in the HUD program?

A. As I stated a moment ago, none of the Louisiana owners whose plans of action for incentives were approved ever got the incentives. Therefore, none of those ever had to cross the threshold of signing the so-called use agreement.

Q. But had those incentives been funded, they would have been required to sign a use agreement and remain in the HUD program?

A. They would have been required to sign a use agreement, yes, sir.

Q. And the report that you prepared for Mr. Norman, of Mr. Norman's property that we looked at yesterday, that showed that the longer one stayed in the HUD program, the more economic harm was suffered by the property.

A. That's what it showed within the very specific set of criteria that I outlined for

Page 629

each of the four alternatives.

Q. Let me ask you if you would look at Exhibit 97. Do you have that before you, sir?

A. I do.

Q. And this is – is this an e-mail that you prepared?

A. It is.

Q. And you say – strike that. And to whom did you send this e-mail?

A. I addressed it to Joel Balsham and Michael Winiarski at headquarters, and also Mr. Elliot Johnson and a Ms. Alta Wilson at headquarters and copied my boss, Ann Kizzier, and the head of the housing – the head of the development cadre reporting to Ms. Kizzier, Richard Pierce, and included myself.

MR. POLEBAUM: I move admission of this exhibit, Your Honor.

MR. WOODROW: No objection, Your Honor.

THE COURT: Well, it is admitted. I presume it relates to this, but you haven't really established relevancy, Mr. Polebaum.

MR. POLEBAUM: Yes, I was going to go on to the substance of it now, Your Honor.

Page 909

can hand up a corrected version of Plaintiff's Demonstrative Exhibit 20, if the Court will permit that.

THE COURT: Mr. Harrington?

MR. HARRINGTON: Your Honor, it is our view that this corrected demonstrative was never used during the course of the testimony with Dr. Ragas. There is no point in admitting a demonstrative after Dr. Ragas's testimony is over.

We have heard agreement with our point that there were errors in the demonstrative as it was presented to the Court and to Dr. Ragas.

There is certainly no basis for admitting PDX-20, and this new demonstrative, I haven't even seen a copy of it yet. It certainly hasn't been provided within 24 hours, as required by the parties' agreement.

THE COURT: Well, you will get it now and I guess Mr. Polebaum will hand it to you.

And, if necessary, Mr. Polebaum, you may address it during redirect of Dr. Ragas.

MR. POLEBAUM: Very well, Your Honor.

There was one other demonstrative where we did find a transcription error.

Page 910

THE COURT: Why don't you cover that.

You ought not to be testifying yourself.

MR. POLEBAUM: I understand. We will cover that now with Dr. Ragas?

THE COURT: No.

MR. POLEBAUM: On redirect?

THE COURT: Yes.

MR. POLEBAUM: Very well, Your Honor.

THE COURT: Now, are we almost ready for cross-examination by Mr. Harrington?

MR. POLEBAUM: I have nothing further, Your Honor.

THE COURT: Thank you.

Mr. Harrington, you may proceed.

MR. HARRINGTON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HARRINGTON:

Q. Dr. Ragas, I would like to start by running through a few particular things in your report. Could you turn to Plaintiff's Exhibit 106.

A. Yes, sir.

Page 911

Q. I would like to start by focusing on page 18 of your report, which is CCA 2687.

A. Yes, sir, I'm there.

Q. You have on that page a description of physical attributes of the Chateau Cleary property?

A. Yes, sir, I do.

Q. And among the attributes you have listed are the square footage of the various apartments based on the architectural plans?

A. Yes, I do.

Q. Are these the accurate square foot numbers for the apartments?

A. To the best of my knowledge, they are.

Q. And looking at the page before, page 17, you again list the square foot numbers for the respective apartments, correct?

A. Yes, I do.

Q. And they are the same as the ones on page 18?

A. They are.

Q. And to the best of your knowledge, these numbers would be correct, therefore?

A. I have twice gone to the property to remeasure in the field. I have reviewed the

Page 912

architectural drawings as drawn and I believe they are a reasonably accurate statement of the square footage of each unit, yes.

Q. Let's turn to page 39 of your report, if you would.

A. Yes.

Q. The one-bedroom on page 18 is listed as 722 square feet and that's the same listing on page 39, correct?

A. Yes, it is.

Q. And you are supposed to have the same numbers on both?

A. There is one minor difference in that group, we will go to that if you like.

Q. You don't use the 1064 square feet for the three-bedroom flat, do you?

A. No, when I ran the analysis here, I did use 1083, and that did stay in throughout the calculations, so there is a difference of 19 square feet between what I concluded as being a more exact measurement and what I had used in doing the calculations. And you are right, that 19 square feet out of this total group of units is still within my calculations. I have looked at that issue and it

Page 913

produces a very, very small change in any of the numbers.
Q. And that change would be an increase in the alleged damages, correct?
A. It is a three or four dollar a month number on only 16 units, yes.
Q. And so – let's run through the three-bedroom line here and see how it affects things.
A. All right.
Q. What you do on the three-bedroom line is take the actual rent of $335 and divide that by 1083, correct?
A. Well, actually, the way the rent was established was on a rent per foot of 31 cents times 1083, and that was $335.73. And I rounded it down to $335.
Q. How did you get the per square foot number for the actual rents?
A. Because I already was aware of what the actual rents were. I see your point, that that 31 cent number is a rounded number as well, probably, yes.
Q. Wasn't the actual – let's go to PX-111, if we could.

Page 914

A. PX-111. Just a moment, let me find PX-111. That's in my book. Go ahead, yes, I'm with you.
Q. These show the actual historical rents for Chateau Cleary apartments, correct?
A. Yes, you are correct. It is the historic rent. The 335, that was used, divided by the 1083, to result in a rent per foot, you are correct. And that was a rounded number, that worked out to be 30.9 cents, which has been shown here as 31 cents rounded to the nearest penny, you are correct.
Q. And if you divide by a smaller number, you will wind up with a larger per square foot number?
A. Yes.
Q. Let's go to the market side. You obtained from the University of New Orleans market rent studies, the per square foot number here, correct?
A. Yes.
Q. And then you multiplied that by 1083 to come up with the market rent?
A. I did.
Q. And if you multiplied the 40 cent

Page 915

number times a smaller number, you will come up with a lower market rent, won't you?
A. Yes, you would.
Q. So the effect of using a larger per square foot number is to both lower the actual rent and increase the market rent?
A. That would be true, and I think the difference we're talking about cumulatively is a gap of around $10 a square foot, on 160 units or about $160 a month.
Q. And you used this same 1083 square foot number for all five of the years you were analyzing, right?
A. I did.
Q. It really should be the 1064 number?
A. It should be. If – to be perfectly consistent, you are correct.
Q. Let's go to page 24 of your report, if we could. Table 3 on this page has some percent occupancy numbers.
A. Yes.
Q. Was the percent occupancy in West Metairie in 1996 94.3 percent?
A. Yes.
Q. Let's go, if we could, to page 54 of

Page 916

your report. On table 15 there –
A. Just a moment. I am getting there. Yes, go ahead.
Q. From 1971 to 1976, under the column of surplus cash, you have NA. Does that mean not available?
A. Yes. I don't believe I had that information.
Q. So you don't know if between 1971 and 1976, CCA had surplus cash that it simply chose not to distribute?
A. No, I don't know the answer to that, that's true. As far as chosen not to distribute, that's your qualification of it. Whether – but I don't have those records to allow me to know the surplus cash position.
Q. Let's talk about a few general principles that I think will not be terribly in dispute, Dr. Ragas.
A. Yes.
Q. The time value of money is a generally accepted principle in real estate, correct?
A. Yes.
Q. And the time value of money is taken into account using an interest rate or a

Page 957

the ownership after the takings period. I rendered no opinion about what might or might not be the value of the asset after the takings period, let alone during the takings period.
So if the hypothetical is, is it possible to sell the property after – in 2011, the answer is yes, it is. At what value? I have no idea or reasonable way to tell you.
Could that value be significantly different from zero? I have no idea.
Q. So you don't know and can't say if the residual value of the property in 2011 would have had any value or what value it would have had in 1991?
A. You had testimony here in this court showing that the accumulated deferred maintenance was growing on the property and that it had insufficient resources to be able to maintain itself properly.
I have no idea what 20 years of that would do during a period when operating costs are skyrocketing, as they have been now, to the operation of this property.
And I don't know what would be the relationship between rents and condition of

Page 958

property. I have no idea.
Q. And is that because it is 20 years out?
A. Yes, sir. I know what I don't know sometimes. And one of the things I know I don't know is that I can't opine on what will be true or not true 20 years from now.
But can I tell you that there will be a substantial value to this asset beyond its land value 20 years from now? No. It is possible that what we have is a teardown 20 years from now and we have a land reversion.
What will that land reversion be? I don't know that.
When the market in New Orleans experiences flooding events, which are altering the landscape of how property values look, I don't know. I don't think anybody can tell you that.
Now, the problem with that answer you just got from me is I don't know, then, how do you do the ex ante analysis because you actually do have to look at all those dates.
Q. Let's turn to your next approach, Dr. Ragas.

Page 959

MR. HARRINGTON: Your Honor, I'm drawing a blank on about when it is that we are taking our breaks in the morning.
THE COURT: About 11:00 o'clock, but there is room for play certainly, Mr. Harrington.
MR. HARRINGTON: If it was quarter of, I would suggest we take the break now, if it is 11, I will just go ahead and push on for 15 minutes.
THE COURT: It is completely up to you and Dr. Ragas and Mr. Polebaum. We're within the range.
THE WITNESS: I'm comfortable, Your Honor.
THE COURT: All right. Thank you.
BY MR. HARRINGTON:
Q. Let's go ahead and go on then.
Dr. Ragas, you have, in looking at the actual return on equity that you presented yesterday, come up with an 88.5 percent number.
I would point you to where that is in your report, but I'm not sure that an 88.5 percent number appears in your report.
A. Just a moment. Let me see if I can

Page 960

assist. That was a diminution that would occur if we used the actual return on equity. Let me find that exhibit for you. That exhibit –
Q. There is something similar, I believe, Dr. Ragas, at table 17 of your original report at page 57. Is that where we should be looking?
A. Just a moment and I will go there, too. I thought it would be easier to do it with the exhibits we tendered here in the court, but that's fine. In my original report, you want to go to page 17, yes, sir. Sir, you said page 17 of my – oh, you mean the supplemental report?
Q. Dr. Ragas, table 17.
A. I'm sorry.
Q. It is actually page 57.
A. I'm sorry.
Q. Or CCA 2726.
A. I will get there.
Q. No problem.
A. Yes, sir, page 2726, I'm with you, yes, sir. And – yes, that's the analogous outcome. Yes.
Q. So this is analogous to the

Page 1250

specific tax situation of Ernest Norman, Jr., in 1969?

A. The information that I have is based on the testimony that I have heard in court last week and my reading his deposition transcript. And if I might add to both this answer and my prior answer also, the document that's Exhibit 1 to my report, which is CCA 393.

Q. Now, let's take a look at your report, page 1, paragraph 1, please. Now, this indicates that you are addressing only investor performance expectations as of 1969, correct?

A. That's correct.

Q. And you did not examine investor expectations as of 1985?

A. That is correct.

Q. And as far as 1985 is concerned, you have no opinion on what the reasonable investment-backed expectations of CCA Associates were when it purchased Robert Norman's 50 percent equity interest for $677,550 plus assumption of debt?

A. I think it would be possible to make a computation of the actual returns based on the

Page 1251

information in the audited financial statements, but I have not made such a computation, nor would I hazard a guess as I'm sitting here.

Q. In preparing your report, were you aware that CCA Associates signed a regulatory agreement with HUD in 1985?

A. No, I'm not aware.

Q. Now, but you have come to learn in the course of the trial that there was this transaction in 1985, correct?

A. I'm aware of a transaction in 1985 in which the owner of the project became CCA Associates, which is an entity, and then that entity was, in turn, beneficially owned by various members of the Norman family.

Q. All right. Now, many of the considerations that you emphasized that investors in 1969 were looking at and considered critical are not applicable in 1985 at all; isn't that correct?

A. Well, I believe that in 1985, there was discussion of possible changes with respect to the tax treatment of so-called passive activity losses. It is possible that oil and

Page 1252

gas investments are passive activity income. And the general impact of what eventually became enacted as the Tax Reform Act of 1986 is that investors could claim passive activity losses from unrelated investments against other sources of passive activity income.

Q. All right. Well, one of the benefits that you have referred to as applicable to the investors in 1969 was the benefit of developing the property. That does not apply in 1985, does it?

MR. DUNN: Your Honor?

THE COURT: Mr. Dunn?

MR. DUNN: We object to questions about the 1985 time frame as beyond the scope of his direct testimony.

THE COURT: Overruled. Mr. Malek specifically addressed 1985 in his expert report.

BY MR. POLEBAUM:

Q. So Mr. Malek, as to Chateau Cleary in the 1985 transaction, the benefit that you have discussed as being a benefit available in 1969, that is the benefit of developing the project,

Page 1253

that does not apply in 1985, does it?

A. The development had already occurred, so the benefit of developing would not have applied. However, the benefit of continuing ownership would have, so I don't know whether those are two functional, distinct concepts or not.

Q. You distinguish between the benefit of developing and the benefit of continuing ownership?

A. I think they are interrelated concepts.

Q. But there is a benefit to continuing ownership is what you are saying?

A. Yes.

Q. Now, the tax benefits, as you have looked at them and as applicable in 1969, do not apply in 1985 either, do they?

A. I think that the tax losses that arose in 1969 through 1984 had already occurred, and except to any extent that those losses remained as carry-forwards because of shelter from other activities, there would be no continuing benefit from those historical losses.

Q. And were tax rates materially reduced

Page 1262

return on the actual cash invested.
Q. But the developers of conventional property have a right to receive cash distributions from operations, correct?
A. Correct. The difference is just a question of degree.
Q. And developers of conventional properties also have a right to tax benefits generated by their projects, correct?
A. Yes. Again, it is a question of degree. If, just using very simple – a very simple example, if a conventional project requires on the low end a 20 percent equity investment, then if there is a given amount of tax writeoff, with a 20 percent equity investment, if you decrease that to a 10 percent equity investment, you have doubled the tax writeoff ratio.
If you decrease that to a 5 percent equity investment, you have quadrupled the tax writeoff ratio. And if you decrease that to a 2 percent equity investment, you have multiplied the tax writeoff ratio for conventional real estate by 10.
Q. The third benefit that you mention on

Page 1263

page 3 of your report is the right to manage the project. Do you see that, Mr. Malek?
A. Yes, I do.
Q. Developers of conventional projects would also have the opportunity to manage the project, correct?
A. Yes.
Q. And whoever is managing the project has the obligation to perform those services, correct?
A. Yes.
Q. And if a company performs management services, that company has a right to be paid and to earn a profit, does it not?
A. That's correct. The only difference, again, is a question of degree, because if you read the entire sentence rather than just the clause, it says – it talks about the small cash investments, so that it is the small cash investment that's much smaller than would be required for a conventional development that gives rise to all these three benefits.
Q. All right. Now, you then go on to mention a fourth benefit, and that is the potential opportunity to receive the residual

Page 1264

value. Do you see that?
A. Yes, I do.
Q. And developers of conventional projects also have the right to receive the residual value, correct?
A. Yes. Again, it is a question of degree, how much up front cash is required to receive that value, and what are the prospects of appreciation for conventional property by comparison to the prospects for appreciation of low-income housing projects, the latter as illustrated by residual assumptions presented in typical investment prospectuses for low-income housing.
Q. So all four of the benefits that you have identified here on page 3 of your report as inuring to the benefit of the developers of HUD-assisted projects, also inure to the benefit of developers of conventional projects, correct?
A. That's correct. The only difference is one of degree.
Q. And we have seen that a number of these benefits that we have been talking about have no relevance at all to the 1985 transfer?

Page 1265

A. Well, I think that developing the project is a required precursor to owning the project, so I said previously those were interrelated concepts. Although the development certainly by 1985 had long since occurred, I believe there were expectations of cash distributions in 1985. There were expectations of some stream of tax deductions. And there was an expectation of management fees with respect to rent collections and otherwise managing the projects – the project.
Q. Okay. Let me ask you to turn to page 24 of your report, please. I want to call your attention to the top of the page, where you refer to your experience with qualified low-income housing projects that were syndicated prior to 1986.
Do you recall that analysis? Do you see where I am?
A. Yes.
Q. And you believe that with respect to those that were syndicated, the primary residual assumption was that the project would be sold for an amount equal to one dollar, one

Page 1878

have mitigated his losses, he could have reduced his economic damage by pursuing these options, if one could demonstrate that, then I think it would be appropriate to take that into account and to base the damage calculation on a comparison of the should-have-been cash flows with no restriction, versus the cash flows that he would have realized if he had mitigated his losses by pursuing these options.
So I think the ex-post, you would want to consider it, but the key point would be you would require evidence or showing that there were things Mr. Norman could have done that he didn't do, which if he had done them would have mitigated and reduced his losses. I think as a general matter, mitigation should be taken into account in damage calculations.
Q. Let me give you an example of something. Let's assume that Mr. Norman, while operating as a HUD project, could have requested and received additional rent increases from HUD and that he didn't get those rent increases.
Is that something that would be appropriate to consider?

Page 1879

A. If you could demonstrate that he basically sat on his hands and didn't do things that he could have done to mitigate his losses, then that should be, in my view, a factor taken into account in the damage calculation and would reduce damages. But the key question is, you know, can you really present persuasive evidence that there were these options that, such as seeking rent increases, that he could have and should have pursued?
A subject on which I have no opinion.
Q. Let's talk a little bit about economic impact generally. All else being held constant, the economic impact of a ten-year suspension of the ability to prepay is going to be greater than a five-year suspension; is that your view?
A. Yes.
Q. And all else being held constant, the longer the duration of the restriction, the greater the economic effect?
A. Yes.
Q. And, again, all else being held constant, the effect of a permanent restriction would be greater than a temporary restriction?

Page 1880

A. Yes, that's correct.
Q. Now, we have talked generally about the options in very general terms available under the preservation statutes. And I just want to talk about options even a little more generally.
Providing additional options to the owner of a housing project is not going to increase economic impact, correct?
A. Well, I know you are trying to make it really general, and I can probably answer that question, but I guess I wish you would take it down one notch from that little generality and maybe give me an example, or just maybe get a little more specific.
Q. Sure. Let's assume that a regulatory scheme has three different options and the economic impact under the first option is 20 percent of the property's value.
The fact that there are additionally two options that are available to be pursued cannot increase that 20 percent, correct?
A. I'm sorry, I asked for the example but I am not following the example.
Q. Let me try one more time. And I will

Page 1881

simplify it a little bit. Let's assume that a regulatory scheme has two different options that an owner can pursue.
If the owner pursues the first option, the effect on the property's value – let me start over again.
There is a regulatory scheme that has two options. Considering the first option alone and disregarding the second option would provide an economic impact of 20 percent.
A. Okay. Let me make sure I understand what you are saying there. If we thought about the property unrestricted, that's sort of one number, and then we say under scenario A, given whatever sort of rights and options the property holder has, the value of the property is going to be only 80 percent of that, it is going to be 20 percent lower than the unrestricted value. That's what we mean.
Q. That's correct. Now we come to considering the second option. Without knowing any more about it, the one thing that we do know is that having an additional option will not increase the economic impact of the regulation as a whole.

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that, on this 21st day of November 2006, I caused a copy of the foregoing Appendix to Plaintiff's Reply to Defendant's Post-Trial Memorandum to be delivered electronically to:

Kenneth D. Woodrow, Esq.
Commercial Litigation Branch
Civil Division
Attention: Classification Unit, Room 8012
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

/s/ Albert S. Iarossi
Albert S. Iarossi