IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CCA ASSOCIATES,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 97-334C<br>Judge Lettow |

**SUPPLEMENTAL REPLY BRIEF OF PLAINTIFF CCA ASSOCIATES**

Elliot E. Polebaum
Albert S. Iarossi
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20004-2505
Tel: (202) 639-7000/Fax: (202) 639-7003

December 6, 2006

CCA Associates submits this supplemental reply brief in accordance with the Court's order dated November 27, 2006.[1]

**1. <u>The Government's So-Called "Well-Conceived" Plan Fails On Its Own Terms</u>**

In its reply brief dated November 21, 2006 at pages 5-8 and footnote 5, Plaintiff explained how the government's "well-conceived" plan seeks to circumvent the requirement in 12 U.S.C. § 4108 that prepayment "not in any event result in . . . an increase in the monthly rental payment in any year that exceeds 10 percent . . . ." The natural meaning of this statutory language bars prepayment if a rent increase following prepayment and conversion to market rents would, when combined with rent increases authorized by HUD prior to prepayment, result in a total rent increase in excess of 10% in any year. For example, if an owner obtains HUD's permission to raise rents 8% and thereafter seeks permission to prepay, HUD's analysis must be whether the prepayment would result in a further increase which, together with the HUD-approved rent increase, constitute "an increase in the monthly rental payment in any year" in excess of 10%. Thus, in the example given, if prepayment would result in the same year in a rental increase of an additional 3% following conversion to market rents, then "implementation of the plan of action" will have "result[ed] in . . . an increase in the monthly payment in any year that exceeds 10 percent. . . . ." *Id.* An increase well in excess of 10% would have resulted in CCA's case if CCA had implemented the government's hypothesized "well-conceived" plan of action and then prepaid. *See* Closing Argument Tr. at 13-16.

---

[1] At the closing argument, the government made an oral motion to be allowed to reply to this brief. If the government renews its motion in writing, it should be denied. The government submitted a 60-page opening brief and an unauthorized 40-page reply brief. The court allowed Plaintiff to file the instant brief to level the playing field.

Regardless, even without counting the hypothetical 26% HUD-approved rent increase proposed by the government as part of its "well-conceived" plan, the rents at Chateau Cleary would have increased more than an additional 10% above the government's proposed adjusted base line upon conversion to market rents. That is because the market rents for the one-bedroom unit, for example (of which there were 44 such units at Chateau Cleary), were 39% above the Chateau Cleary HUD rents. PX 106; Tr. 841:3-16 (Ragas). Thus, if the HUD rents increased 26% as the government proposes, the market rents, upon prepayment, would still be 13% higher and, under the statute prepayment, could not be allowed.

A similar outcome would prevail in 1992. According to the government's plan, CCA should have sought and implemented a 26% rent increase in 1991, followed by a 3.22% rent increase in 1992 (per the government's theory, based on a 3.22% increase in 1991 operating expenses). Assuming CCA followed exactly the government's plan, market rents would still be substantially more than 10% above the new Chateau Cleary "baseline" rents. This is because market rents for one-bedroom units in 1991 were 39% higher than CCA's HUD rents, and market rents for one-bedroom units in West Metairie increased an additional 7.8% in 1992. PX 106, at CCA02693; Tr. 836:6-8 (Ragas).[2]

**2. <u>CCA Never Could Have Established That Prepayment Would Not Result In Tenants Paying More Than 30% Of Their Adjusted Income in Rent</u>**

As we explained in our opening and reply briefs, the government must reject a request for permission to prepay if it would result in "any current tenants" having to pay more than 30% of

---

[2] A plan of action seeking permission to prepay could take two to three years to work its way through the HUD labyrinth. By the time the HUD process had run its course, market rents would have continued to increase from year to year since the West Metairie market experienced strengthening rents in the 1991-1994 time frame. Thus, market rents for one-bedroom units in West Metairie increased an additional 9.1% from 1992 to 1993, and another 3.3% from 1993 to 1994. Market rents for all units in the West Metairie area increased an average of 4.5% per year during this period. PX 106, at CCA02693; Tr. 822:18-823:15; 836:6-8; 1940:3-17 (Ragas).

adjusted income in rent. 12 U.S.C. § 4108 (a)(1)(A). It is beyond dispute that this would have been the outcome for CCA tenants.

Mr. Alexander's testimony was unequivocal in this regard. As the HUD official responsible for 221(d)(3) properties in the New Orleans area, including, of course, Chateau Cleary, Mr. Alexander was well positioned to give this testimony. Tr. 496:19-498:12 (Alexander). He testified without qualification that he was familiar with the kinds of tenants that populate Section 221(d)(3) properties such as Chateau Cleary and that such tenants could not pay market rents consistent with the statutory criterion of not devoting more than 30% of their adjusted income to rent. Tr. 610:1-611:21 (Alexander).

Thus, in evaluating any plan of action seeking permission to prepay, Mr. Alexander, as the responsible HUD official, would have had to conclude that the 30% limit could not be satisfied upon prepayment and conversion to market rents and would have been bound to reject any request for prepayment.

### 3. HUD Rent Increases Are Not Based Solely On The Prior Year's Operating Expenses

Mr. Norman testified at trial that the HUD rent increase process included considerable back-and-forth negotiation between him (as the property manager) and HUD officials. Tr. 96:16-97:1; 156:13-157:8; 340:3-23; 356:16-25 (Norman). The information submitted to HUD included, but was not limited to, the most recent audited financial statement. Tr. 157:23-158:11; 340:3-23 (Norman). HUD also considered information that the property owner could put before HUD of future expected increases in operating expenses, for example, with respect to insurance, utilities, and taxes. Tr. 157:23-158:11; 340:3-23 (Norman).

A good example that demonstrates the point is the rent increase in December 1984. At that time, rents increased 11.4%. PDX 33. However, the 1983 operating expenses (the most

recently concluded fiscal year) *decreased* 1.07% from the prior year. *Id*. Necessarily, therefore, in approving an 11.4% increase, HUD took into account additional information, which, as Mr. Norman testified, could include expected future increases in expenses that could be demonstrated to HUD.[3] Thus, the increased operating expenses in 1985 necessarily reflected those expected future increases. Tr. 485:10-486:1 (Norman); 1062:23-1063:5 (Ragas). Thereafter, Chateau Cleary's operating expenses decreased in three successive years, and did not regain the 1985 level, on a permanent basis, until 1994. PDX 33.

### 4. CCA's Damages Should Not Be Reduced Based On The Government's Argument That Chateau Cleary's Rents Could Have Been Higher

The government maintains that CCA's recovery should be reduced by some unspecified amount because, according to the government, Chateau Cleary's HUD rents could have been higher. The contention is pure speculation and belied by Mr. Norman's track record in obtaining rent increases when operating expenses and market conditions so warranted. The government has put forward no credible alternative damages calculation to that of Dr. Ragas. The government's damages calculation, amounting to $1,036,130 as of April 29, 2005, is based on Dr. Dickey's flawed diminution-in-value approach. DX 160, at 16.[4] For the reasons set forth in our prior briefs and at closing argument, Dr. Ragas' analysis started with the proper rent baseline and reasonably calculated the losses that Chateau Cleary suffered from enactment of the Preservation Statutes.

---

3 One specific example that Mr. Norman gave related to expected large increases in insurance expenses in the 1994-1995 time frame. Tr. 157:23-158:11; 345:6-23 (Norman).

4 Under the alternative scenario presented by Dr. Stillman to test Dr. Dickey's approach -- where HUD restrictions are assumed to remain in effect until 2001 rather than 1996 -- the diminution in value, and thus the damages under that model, nearly double. PDX 34; Tr. 1857:16-1860:24 (Stillman).

Dated: December 6, 2006

Respectfully submitted,

By /s/ Elliot E. Polebaum

Elliot E. Polebaum
Albert S. Iarossi
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20004
Tel.: (202) 639-7000/Fax: (202) 639-7003

Attorneys for CCA Associates

282356

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that, on this 6th day of December 2006, I caused a copy of the foregoing Supplemental Reply Brief of Plaintiff CCA Associates to be delivered electronically to:

Kenneth D. Woodrow, Esq.
Commercial Litigation Branch
Civil Division
Attention: Classification Unit, Room 8012
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

/s/ Albert S. Iarossi
Albert S. Iarossi