# In the United States Court of Federal Claims

No. 97-334C

(Filed: January 31, 2007)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * <br>**CCA ASSOCIATES**,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES**,<br><br>Defendant,<br>* * * * * * * * * * * * * * * * * * * * * * | Post-trial findings and conclusions; Takings Clause of the Fifth Amendment; National Housing Act; Emergency Low Income Housing Preservation Act; Low-Income Housing Preservation and Resident Homeownership Act; temporary taking; *Penn Central* analysis; just compensation |

Elliot E. Polebaum, Fried, Frank, Harris, Shriver & Jacobson, LLP, Washington, D.C., for plaintiff. With him was Albert S. Iarossi, Fried, Frank, Harris, Shriver & Jacobson, LLP, Washington, D.C.

Kenneth D. Woodrow, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him at trial and on the briefs were David A. Harrington and Sean Dunn, Trial Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Also with them on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Brian M. Simkin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This case raises issues that reprise those addressed, tried, and decided in *Cienega Gardens v. United States*, 67 Fed. Cl. 434 (2005) ("*Cienega IX*"), on remand from *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ("*Cienega VIII*"), and *Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003). Plaintiff, CCA Associates ("CCA"), is a Louisiana partnership that owns an apartment complex in Metairie, Louisiana. CCA claims that the United States effected a temporary taking of its property without just compensation in contravention of the Fifth Amendment of the United States Constitution. Specifically, CCA avers that the Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242,

101 Stat. 1877 (1988) ("ELIHPA" or "Title II") (codified at 12 U.S.C. § 1715*l* note) and the Low-Income Housing Preservation and Resident Homeownership Act of 1990, Pub. L. No. 101-625, 104 Stat. 4249 ("LIHPRHA" or "Title VI") (codified in scattered sections of Title 12 of the U.S. Code, including 12 U.S.C. §§ 4101 to 4124), stripped the partnership of its contractual right to prepay its mortgage and thereby to exit the low-income housing program under which it was operating and begin to operate the apartment complex on a conventional basis.

A seven-day trial was held on September 5-8, 12, and 26-27, 2006, and a site visit was conducted on September 11, 2006. Following post-trial briefing, closing argument, and supplemental briefing, this case is now ready for disposition. For the reasons set forth, the court finds that the government's actions constituted a temporary taking of CCA's property for which CCA is entitled to just compensation.

## FACTS[1]

### A. *Statutory and Regulatory Framework*

1. *Evolution of the Section 221(d)(3) program.*

During the Great Depression, Congress sought to encourage private lending for home repairs and home construction by passing the National Housing Act, Pub. L. No. 73-479, 48 Stat. 1246 (1934). The Act created the Federal Housing Administration and authorized its administrator to insure home mortgages under two programs: one for residences designed for up to four families and another for multifamily housing units. *Id.* §§ 201, 203, 207, 48 Stat. at 1247-48, 1252. A more direct effort to aid low-income families followed three years later with the passage of the United States Housing Act of 1937, Pub. L. No. 75-412, 50 Stat. 888, which created a federally-funded public housing program. *Id.* §§ 9-11, 50 Stat. at 891-93; *see* HUD Historical Background, http://www.hud.gov/offices/adm/about/admguide/history.cfm (last visited Jan. 26, 2007).

Beginning with the Housing Act of 1949, Pub. L. No. 81-171, 63 Stat. 413, Congress also attempted to support low-income housing through various slum-clearance and urban-redevelopment projects. *Id.* §§ 101-10, 63 Stat. at 414-421. To aid families displaced by these urban redevelopment projects, Congress amended the National Housing Act in 1954 to add Section 221(d)(3), which authorized mortgage insurance for non-profit organizations and public

[1]This recitation of facts constitutes the court's primary findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

In this opinion, references to plaintiff's exhibits are to "PX __" and to defendant's exhibits are to "DX __." References to plaintiff's demonstrative exhibits are to "PDX __" and to defendant's demonstrative exhibits are to "DDX __."

housing authorities assisting such families. *See* Housing Act of 1954, Pub. L. No. 83-560, § 123, 68 Stat. 590, 599-601 (codified as amended at 12 U.S.C. § 1715*l*(d)(3)).

The Housing Act of 1961, Pub. L. No. 87-70, 75 Stat. 149, expanded the Section 221(d)(3) program by broadening the purpose of the program to include "moderate income families," not just families displaced by urban redevelopment projects, and by opening the program to private-sector investors. *Id.* §§ 101(a)(2), (a)(6), 75 Stat. at 149-50 (codified as amended at 12 U.S.C. § 1715*l*(a), (d)(3)); *see* S. Rep. No. 87-281, at 5, 96 (1961), *reprinted in* 1961 U.S.C.C.A.N. 1923, 1926, 2014. The Housing Act of 1961 restricted mortgage insurance under Section 221(d)(3) to projects containing five or more units, § 101(a)(12), 75 Stat. at 152 (codified, as amended, at 12 U.S.C. § 1715*l*(f)), but also provided two key incentives for investors: authorization for waivers of FHA mortgage insurance premiums and loans at below-market interest rates. *See id.* §§ 101(a)(6), (11), (c), 75 Stat. at 150, 152, 153 (codified, as amended, at 12 U.S.C. § 1715*l*(d)(5), (f)); *see* S. Rep. No. 87-281, at 97, *reprinted in* 1961 U.S.C.C.A.N. at 2016.[2] In 1968, Congress added a "Section 236" program, which subsidized owners' monthly mortgage payments and provided mortgage insurance. Housing and Urban Development Act of 1968, Pub. L. No. 90-448, § 201(a), 82 Stat. 476, 498-501 (codified, as amended, at 12 U.S.C. § 1715z-1(a), (j)).

---

[2]The Housing Act of 1961 did not authorize the FHA itself to make loans with below-market interest rates, but it effectively guaranteed those rates by granting the Federal National Mortgage Association ("Fannie Mae") the power to purchase mortgages insured under the Section 221(d)(3) program. § 101(c), 75 Stat. at 153. As the House report accompanying the 1961 Act explained: "The essence of the new proposal is to provide long-term loans at a very low interest rate, using the FHA insurance machinery and providing the necessary funds through the resources of the special assistance programs of [Fannie Mae]." H.R. Rep. No. 87-447, at 11 (1961); *see also* S. Rep. No. 87-281, at 8, *reprinted in* 1961 U.S.C.C.A.N. at 1930 ("The [Section 221(d)(3)] mortgage loans could be purchased from the lender under the special assistance program of [Fannie Mae]."). In practice, only Fannie Mae purchased these loans, so the Section 221(d)(3) program "amount[ed] to a[] [Fannie Mae] loan to FHA-approved cooperative projects." Note, *The Cooperative Apartment in Government-Assisted Low-Middle Income Housing*, 111 U. Pa. L. Rev. 638, 650 (1963); *see also* Nathaniel S. Keith, *An Assessment of National Housing Needs*, 32 Law & Contemp. Probs. 209, 214 (1967) (Under the Section 221(d)(3) program, "the permanent mortgage is purchased by [Fannie Mae]."). *See, e.g.,* PX 33 (Transfer and Contribution to Partnership from Ernest B. Norman, Jr. to CCA (Dec. 31, 1985)) ("Ernest B. Norman, Jr. transfer to CCA") at 3 (indicating that CCA's original mortgagee, Pringle-Associates Mortgage Corporation, had sold the mortgage to the Government National Mortgage Association ("Ginnie Mae"), a successor to the original Fannie Mae); *see also* 12 U.S.C. § 1717(a), (b)(1) (providing that the original Fannie Mae was split into Fannie Mae and Ginnie Mae, both of which have statutory authority to purchase mortgages insured under Section 221(d)(3)).

By statute, the Secretary of HUD has authority to condition participation in the Section 221(d)(3) program on an owner's agreement to restrictions on the use of his property. 12 U.S.C. § 1715*l*(b), (f). Under a regulatory agreement co-signed with HUD, participating owners were required to limit occupancy to low- or moderate-income families, charge rents in accord with a HUD-approved rental schedule, manage their properties "in a manner satisfactory to [HUD]," and refrain from conveying the property without HUD approval. PX 2 (Regulatory Agreement, signed by HUD, Ernest B. Norman, Jr., and J. Robert Norman (November 7, 1969)) ("1969 regulatory agreement"), ¶¶ 4(b), 5(c), 6(c), 9(a). Owners were subject to HUD audits and were required to submit annual financial reports to HUD. *Id.*, ¶¶ 9(c), (e). In addition, an owner's annual return was limited to six percent of the initial equity investment. *Id.* ¶ 6(e)(1).

Owners assented to these restrictions in part because they could borrow 90 percent of the purchase price on the basis of a forty-year amortization period, 12 U.S.C. § 1715*l*(d)(3)(iii), (*i*)(2)(A)(iv); Tr. 1161:3-6 (Test. of Kenneth Malek, a tax accounting expert called by the government),[3] and they also were given a Builder's and Sponsor's Profit and Risk Allowance ("Builder's Allowance") that, when coupled with the loan, typically reduced an investor's initial cash outlay to 1.5 to 3 percent of the cost of the project. Tr. 1160:12-19 (Test. of Malek).[4] Owners additionally were permitted to take out non-recourse loans, thereby avoiding personal liability for the debt. *See*, *e.g.*, PX 3 (secured note co-signed by Ernest B. Norman, Jr. and J. Robert Norman (November 7, 1969)) ("1969 note"); Tr. 94:23 to 95:1 (Test. of Mr. Ernest B. Norman, III, the managing partner of CCA). Lastly, although the Section 221(d)(3) program generally precluded prepayment of the forty-year mortgages without prior HUD approval, owners of so-called limited-dividend corporations were entitled to prepay their mortgages after twenty years. 24 C.F.R. § 221.524(a)(1)(ii) (1971); *see also* PX 3 (1969 note) (referring to prepayment by a "limited dividend corporation"); PX 5 (secured note co-signed by Ernest B. Norman, Jr. and J. Robert Norman (May 17, 1971)) ("1971 note") (same).[5] This prepayment right was dictated by

---

[3]The Housing Act of 1961 initially permitted owners of newly constructed projects to obtain no-equity loans under the Section 221(d)(3) program. §§ 101(a)(6), (c), 75 Stat. at 150-51, 153; *see also* H.R. Rep. No. 87-447, at 11 (stating that the Housing Act of 1961 broadened the Section 221(d)(3) program "to authorize a new program of long-term, low-interest-rate, 100-percent loans for rental and cooperative housing projects containing five or more dwelling units"). The Housing Act of 1964, Pub. L. No. 88-560, 78 Stat. 769, later limited the loan amount to ninety percent of the replacement cost of the property for governmental, non-profit, and other qualified owners. *See* § 114(c), 78 Stat. at 779 (codified as amended at 12 U.S.C. § 1715*l*(d)(3)(iii)).

[4]The Builder's Allowance was equal to ten percent of the total estimated cost of the project, exclusive of the value of the land. Tr. 1166:7-11 (Test. of Malek).

[5]HUD defined a "limited dividend mortgagor" as "a corporation, trust, partnership, association, other entity, or an individual . . . restricted by law (or by the [FHA] Commissioner) as to distribution of income and shall be regulated as to rents, charges, rate of return, and

regulation, 24 C.F.R. § 221.524(a)(1)(ii) (1971), was explicitly stated in the mortgage note, PX 3 (1969 note); PX 5 (1971 note), and was incorporated by reference in the mortgages. PX 4 (mortgage signed by Ernest B. Norman, Jr., J. Robert Norman, and Pringle-Associated Mortgage Corporation (November 7, 1969)) ("1969 mortgage"); PX 6 (mortgage signed by Ernest B. Norman, Jr., J. Robert Norman, and Pringle-Associated Mortgage Corporation (May 17, 1971)) ("1971 mortgage").[6] Prepayment removed the regulatory restrictions and allowed participation in the conventional rental housing market.

2. *Emergency Low Income Housing Preservation Act of 1987*.

By the mid-1980s, Congress realized that if owners of housing insured under Section 221(d)(3) began to exercise their prepayment rights, the stock of low-income housing units would decline in volume. H.R. Rep. No. 100-122(I), at 35, *reprinted in* 1987 U.S.C.C.A.N. 3317, 3351 (1987). Reciting that "in the next 15 years, more than 330,000 low income housing units insured or assisted under sections 221(d)(3) and 236 could be lost as a result of the termination of low income affordability restrictions," Congress enacted ELIHPA, § 202(a)(1), 101 Stat. at 1877 (codified at 12 U.S.C. § 1715*l* note). ELIHPA forestalled prepayment of Section 221(d)(3) mortgages by conditioning prepayment on HUD's prior approval, abrogating the unrestricted prepayment right specified in HUD's regulations and the owners' mortgage notes. ELIHPA § 221(a), 101 Stat. at 1878-79; 24 C.F.R. § 221.524(a)(1)(ii) (1971); PX 3 (1969 note); PX 5 (1971 note). In September 1990, HUD issued regulations implementing ELIHPA. *See* Prepayment of a HUD-Insure Mortgage by an Owner of Low-Income Housing, 55 Fed. Reg. 38,944 (Sept. 21, 1990) (codified at 24 C.F.R. §§ 248.101-248.261 (1991)).

Under ELIHPA, an owner seeking to prepay or to alter the terms of the mortgage or the regulatory agreement had first to file with HUD a notice of intent outlining his or her plans. ELIHPA § 222, 101 Stat. at 1879. After HUD received the owner's notice of intent, the department would provide the owner with information needed to file a so-called plan of action and a list of ELIHPA-established incentives available upon an agreement to extend the use of the owner's housing units for low-income tenants. ELIHPA § 223(a), 101 Stat. at 1879. Those incentives included HUD's agreement to increase the allowable annual distribution, alter the method of calculating an owner's equity in the property, increase the owner's access to accounts

---

methods of operation in such form and manner as is satisfactory to the Commissioner." 24 C.F.R. § 221.510(c) (1971).

[6]The pertinent regulation read: "A mortgage indebtedness may be prepaid in full and the [FHA] Commissioner's controls terminated without the prior consent of the Commissioner . . . [w]here the mortgagor is a limited distribution type . . . and where the prepayment occurs after the expiration of 20 years from the date of final endorsement of the mortgage." 24 C.F.R. § 221.524(a)(1)(ii) (1971).

it maintained for residual receipts and replacements,[7] provide insurance for a second mortgage, or facilitate the sale of the property to a non-profit organization, a public agency, or a tenant cooperative. ELIHPA § 224(b)(1)-(4), (7), 101 Stat. at 1880. The plan of action that the owner submitted to HUD was to include any proposed changes to the regulatory agreement, the mortgage, or the low-income affordability restrictions, as well as an assessment of the effect of proposed changes on existing tenants and the local supply of low- and very-low-income housing. ELIHPA § 223(b)(1),(3),(5)-(6), 101 Stat. at 1879.

Within 60 days of an owner's submission of a plan of action, HUD was to advise the owner of any "deficiencies" that prevented the plan of action from being approved and to suggest revisions to the plan that would lead to its approval by HUD. ELIHPA § 227(a), 101 Stat. at 1883. No later than 180 days after receipt of an owner's plan of action, HUD was required to notify the owner in writing whether HUD had approved the plan and, if HUD had rejected the plan, what steps the owner could take to obtain approval. ELIHPA § 227(b)(1), 101 Stat. at 1883. Before HUD could permit owners to prepay, the Secretary had to make written findings that:

> (1) implementation of the plan of action will not materially increase economic hardship for current tenants or involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available; and
> (2)(A) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect --
> (i) the availability of decent, safe, and sanitary housing affordable to lower income and very low-income families or persons in the area that the housing could reasonably be expected to serve;
> (ii) the ability of lower income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or
> (iii) the housing opportunities of minorities in the community within which the housing is located; or
> (B) the plan has been approved by the appropriate State agency and any appropriate local government agency for the jurisdiction within which the housing is located as being in accordance with a State strategy approved by the Secretary under section 226.

ELIHPA § 225(a), 101 Stat. at 1880.[8] If the submitted plan of action requested incentives in

---

[7]Section 221(d)(3) regulatory agreements required owners to maintain a "reserve fund for replacements" to cover repair expenses and a "residual receipts fund," which consisted of cash remaining after a limited dividend entity had declared and paid its distributions. *See* PX 2 (1969 regulatory agreement).

[8]In November 1988, Congress amended ELIHPA to clarify that the phrase "materially increase economic hardship" included "a monthly rental payment by a current tenant that exceeds

exchange for extending the low-income affordability restrictions, ELIHPA conditioned approval of the plan upon a Secretarial finding that: (1) the housing would remain affordable to very-low-, low-, and moderate-income tenants for the remaining term of the mortgage, (2) the owner would expend adequate funds for maintenance and operation of the property, (3) the current tenants would not be involuntarily displaced, except for good cause, (4) any rent increase would not exceed thirty percent of a tenant's adjusted gross income or the fair market rent for comparable Section 8(b) housing,[9] whichever was lower, (5) rent increases, except those based on increased operating expenses, would be phased in, and (6) any rent increases, to the extent practicable, would not decrease the proportion of low-income tenants for whom such housing units were available and affordable. ELIHPA § 225(b)(3), 101 Stat. at 1881. The approved plans locking in the affordability restrictions for the life of the mortgages were known as "use agreements." Tr. 627:23 to 628:18 (Test. of Jim E. Alexander, a former HUD employee); *Cienega Gardens IX*, 67 Fed. Cl. at 441-42.

In sum, after the enactment of ELIHPA, the owner of a property insured under Section 221(d)(3) had four options. First, he or she could do nothing and let the forty-year mortgage run its course with the regulatory restrictions remaining in place. Second, he or she could attempt to gain HUD approval for prepayment, a process that required the Secretary's certification that prepayment would not have adverse effects on the low-income housing stock or on current tenants. ELIHPA § 225(a), 101 Stat. at 1880. Third, an owner could agree to extend the affordability restrictions in exchange for HUD-provided incentives, such as increasing annual distributions. ELIHPA § 224(b)(1), 101 Stat. at 1880-81. Fourth, the owner could ask HUD to arrange for a sale to HUD-approved buyers. ELIHPA §§ 224(b)(7); 225(b)(3), 101 Stat. at 1880-81.[10]

---

30 percent of the monthly adjusted income of the tenant or an increase in the monthly rental payment in any year that exceeds 10 percent (whichever is lower), or . . . in the case of a current tenant who already pays more than such percentage, an increase in the monthly rental payment in any year that exceeds the increase in the Consumer Price Index or 10 percent (whichever is lower)." Stewart B. McKinney Homeless Assistance Amendments Act of 1988, Pub. L. No. 100-628, § 1024(1), 102 Stat. 3224, 3270-71.

[9]Section 8(b) of the United States Housing Act of 1937 provides rent subsidies via direct payments through public housing authorities to owners of low-income housing. *See* United States Housing Act of 1937, § 8 (codified, as amended, at 42 U.S.C. § 1437f(b)).

[10]The precise process for arranging for a HUD-assisted sale of the property was not specified either in ELIHPA or in HUD's implementing regulations. *See* ELIHPA, §§ 223(b)(4), 224(b)(7); 24 C.F.R. § 248.231 (1991) (noting only that HUD would facilitate such a sale, by providing an "expedited review of a request for approval of a transfer of physical assets").

3. *Low-Income Housing Preservation and Resident Homeownership Act of 1990.*

With the passage of LIHPRHA, § 601(a), 104 Stat. at 4249-50 (1990) (codified at 12 U.S.C. § 4101, *et. seq.*), Congress extended indefinitely ELIHPA's temporary requirement that barred owners of housing insured under Section 221(d)(3) from prepaying their mortgages and removing the attendant regulatory restrictions without HUD approval. LIHPRHA § 601(a), 104 Stat. at 4249; *Cienega Gardens VIII*, 331 F.3d at 1326. HUD promulgated regulations implementing LIHPRHA in April 1992. *See* Prepayment of Low Income Housing Mortgages, 57 Fed. Reg. 12,041 (Apr. 8, 1992) (codified at 24 C.F.R. §§ 248.1–248.319 (1993)).

LIHPRHA's restrictions on prepayment were similar, but not identical, to those in ELIHPA. As with ELIHPA, the owner had four options, three of which required HUD approval: do nothing, prepay the mortgage, seek incentives to extend the affordability restrictions, or sell the property to a HUD-approved buyer. 12 U.S.C. § 4101(a). The process for obtaining HUD's approval also began in the same way, *i.e.*, with the filing of a notice of intent.[11] Thereafter, HUD would provide the owner with information on the criteria for termination and the available incentives, and the owner would then submit a plan of action. 12 U.S.C. §§ 4101-02, 4106.

The LIHPRHA criteria for approval of prepayment were more stringent than those in ELIHPA. Prior to amendment of ELIHPA in the Stewart B. McKinney Homeless Amendments Act of 1988, *see supra*, at 6-7, n.8, ELIHPA had left the phrase "materially increase economic hardship" undefined, but LIHPRHA defined that phrase to include (1) monthly rental increases exceeding ten percent or exceeding thirty percent of a tenant's monthly adjusted income, whichever was lower, or (2) if a tenant already was paying more than such percentages, monthly rental increases exceeding ten percent or exceeding the increase in the Consumer Price Index. 12 U.S.C. § 4108(a)(1)(A). If prepayment would result in increases beyond these thresholds, the Secretary was not permitted to approve prepayment. 12 U.S.C. § 4108(a).

The procedures under LIHPRHA for receiving incentives or arranging for a sale were also more onerous than they were under ELIHPA. HUD was only permitted to approve plans of action seeking incentives or a sale upon the Secretary's finding that the housing would be retained for very-low, low-, and moderate-income tenants "for the remaining useful life" of the property in question. 12 U.S.C. § 4112(a)(2)(A). Owners were required to petition HUD for a determination of when the useful life of the property had expired, but the owner could not submit such a petition until 50 years after the approval of a plan of action for the property. 12 U.S.C. § 4112(c)(3). LIHPRHA also removed from ELIHPA's list of possible incentives an increase in the owner's annual distributions. *Compare* § 224(b), 101 Stat. at 1880, *with* 12 U.S.C. § 4109(b).

---

[11]Under LIHPRHA, owners seeking to sell their properties actually were required to submit two notices of intent – one to initiate the process and a second, 30 days after receiving from HUD information necessary to prepare a plan of action for the sale. 12 U.S.C. §§ 4102(a), 4106(b),(d).

Under LIHPRHA, owners seeking to obtain incentives in exchange for extending affordability restrictions or to sell their property to a HUD-approved purchaser had to overcome more hurdles than those required under ELIHPA. For an owner who had filed a notice of intent, LIHPRHA mandated a process for appraising the so-called "preservation value" of the property – *i.e.*, the fair market value of the property "based on [its] highest and best use," taking into account the costs of converting the property to market-rate rental housing. 12 U.S.C. § 4103.[12] An owner was not permitted to sell his or her property for more than the preservation value. 12 U.S.C. § 4110(b)(1).

For properties appraised under LIHPRHA, HUD also required calculation of the so-called "aggregate preservation rents" by a formula that estimated the "gross potential income for the project;" such an estimate entailed covering various costs, such as debt service and operating expenses, and, in the case of owners seeking incentives to extend the affordability restrictions, taking into account an annual authorized return. 12 U.S.C. § 4104(b). HUD then would determine if the aggregate-preservation rents for a property exceeded an aggregate statutory cap, which was determined by "multiplying 120 percent of the fair market rental (established [in accord with statutory procedures]) for the market area in which the housing is located by the number of dwelling units in the project." 12 U.S.C. § 4105(a).

If the aggregate-preservation rents exceeded the cap, the owner could: (1) request incentives, provided "the amount of the incentives [would] not exceed an amount that [could] be supported by a projected income stream equal to the [cap]," 24 C.F.R. § 248.127(a) (1993); 12 U.S.C. § 4105(b)(2)(A), (2) sell the property at a price that did not exceed the cap, 12 U.S.C. § 4105(b)(2)(B), or (3) file a second notice of intent indicating his or her desire to prepay the mortgage or voluntarily terminate the FHA insurance, on the condition that if a HUD-approved purchaser offered within fifteen months to pay the appraised "preservation value," the owner was required to make the sale. 12 U.S.C. §§ 4105(b)(2)(C), 4111(b),(c). If the preservation rents did not exceed the cap, the owner could file a plan of action to request incentives or seek a HUD-approved sale. 12 U.S.C. § 4105(b)(1).[13]

As noted, a HUD-approved sale required the owner to file a second notice of intent with HUD. 12 U.S.C. § 4106(d). For a year following HUD's receipt of this second notice of intent, an owner could sell only to so-called priority purchasers, which were limited to HUD-approved resident homeownership groups and non-profits agreeing to maintain the affordability restrictions "for the remaining useful life of the project." 12 U.S.C. §§ 4110(b)(1), 4116; 24 C.F.R.

---

[12]The owner and HUD each chose appraisers to assess the "preservation value" of the property. If neither the two appraisers, nor the owner and HUD, could agree on a value, the owner and HUD would jointly choose a third appraiser, whose appraisal would be binding. 12 U.S.C. § 4103(a)(1).

[13]HUD was required to consider the rent caps in determining whether to provide incentives to owners seeking them. 12 U.S.C. § 4109(a).

§ 248.101 (1993). For the succeeding three months, owners could sell only to so-called qualified purchasers, which included for-profit purchasers, but only those pledging to retain the affordability restrictions for the life of the property. 12 U.S.C. § 4110(c); 24 C.F.R. § 248.101 (1993). LIHPRHA authorized HUD to provide, in addition to incentives, direct financial assistance to facilitate a sale, under statutory conditions restricting the sales price and the potential buyers. *See* 12 U.S.C. § 4110(d).

In the event HUD did approve an owner's plan of action to obtain incentives or to sell his or her property, LIHPRHA permitted prepayment in particular cases in which the plan was not fulfilled. If HUD failed to satisfy any of three separate timelines for providing incentives it already had approved, the owner could prepay the mortgage. 12 U.S.C. § 4114(a)(3). Similarly, if HUD had approved the sale of the property, but the owner could not find a *bona fide* purchaser, the owner also could prepay. 12 U.S.C. § 4114(a)(2).

LIHPRHA also permitted owners whose properties would become "eligible low-income housing" before January 1, 1991, and who had filed a notice of intent by that date, to elect to follow the regulatory scheme under either ELIHPA or LIHPRHA. *See* LIHPRHA § 604(a), 104 Stat. at 4277 (codified at 12 U.S.C. § 4101 note). For purposes of this election, "eligible low-income housing" included properties whose mortgages or loans were insured under Section 221(d)(3) with a below-market interest rate and were eligible for prepayment within 24 months of LIHPRHA's enactment. 12 U.S.C. § 4119(1)(A)(ii), (1)(B).

4. *H.R. 2099.*

Five years after the enactment of LIHPRHA, Congress sought to change its approach to prepayment. On December 14, 1995, Congress passed H.R. 2099, which provided appropriations for various federal agencies, including HUD. The bill conditioned HUD's funding for assistance under ELIHPA and LIHPRHA on numerous requirements including that "an owner of eligible low-income housing [be able to] prepay the mortgage or request voluntary terminat[i]on of a mortgage insurance contract, so long as said owner agrees not to raise rents for sixty days after such prepayment." H.R. 2099, 104th Cong. (1st Sess. 1995) (undesignated second paragraph of Title II); 141 Cong. Rec. S18,657-58 (1995) (Senate passage of H.R. 2099). President Clinton vetoed H.R. 2099, *see* 141 Cong. Rec. H15,061 (1995), and the bill did not become law.

5. *The Housing Opportunity Program Extension Act of 1996.*

Within months of President Clinton's veto of H.R. 2099, however, Congress passed and President Clinton signed into law the Housing Opportunity Program Extension Act of 1996 ("HOPE"), Pub. L. No. 104-120, 110 Stat. 834. HOPE reinstated the prepayment rights of owners whose mortgages were insured under Section 221(d)(3). *Id.* § 2(b), 110 Stat. at 834-35 (March 28, 1996). HOPE did so expressly by incorporating the various conditions on HUD funding set out in H.R. 2099, including the condition making appropriations related to ELIHPA

and LIHPRHA contingent on HUD's permitting owners of eligible low-income housing to prepay their mortgages, provided the owners did not raise their rents for sixty days following prepayment. *Id*. HOPE thus lifted the prepayment restrictions imposed by ELIHPA and LIHPRHA. *See Cienega VIII,* 331 F.3d at 1326-27. HOPE provided that, except as otherwise stated in future appropriation acts, the conditions of H.R. 2099 would apply to ELIHPA and LIHPRHA funds "provided in any appropriation Act enacted after the date of the enactment of this Act." HOPE, § 2(b)(2), 110 Stat. at 834-35.[14] Subsequent appropriation acts reiterated HOPE's reintstatement of owners' prepayment rights. *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, 1321-267 (codified at 12 U.S.C. § 4101 note); Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1977, Pub. L. No. 104-204, 110 Stat. 2874, 2883-84

---

[14] In pertinent part, HOPE provided:

(b) Low-Income Housing Preservation. –

(1) Use of Amounts – Notwithstanding any provision of the Balanced Budget Downpayment Act, I (Public Law 104-99; 110 Stat. 26) or any other law, the Secretary shall use the amounts described in paragraph (2) of this subsection under the authority and conditions provided in the second undesignated paragraph of the item relating to "Housing Programs – Annual Contributions for Assisted Housing" in title II of the bill, H.R. 2099 (104th Congress), as passed [by] the House of Representatives on December 7, 1995; except that for purposes of this subsection, any reference in such undesignated paragraph to March 1, 1996, shall be construed to refer to April 15, 1996, any reference in such paragraph to July 1, 1996, shall be construed to refer to August 15, 1996, and any reference in such paragraph to August 1, 1996, shall be construed to refer to September 15, 1996.

(2) Description of Amounts. – Except as otherwise provided in any future appropriation Act, the amounts described under this paragraph are any amounts that –

(A) are –

(i) unreserved, unobligated amounts provided in an appropriation Act enacted before the date of the enactment of this Act;

(ii) provided under the Balanced Budget Downpayment Act, I; or

(iii) provided in any appropriation Act enacted after the date of the enactment of this Act; and

(B) are provided for use in conjunction with properties that are eligible for assistance under the Low-Income Housing Preservation and Resident Homeownership Act of 1990 or the Emergency Low Income Housing Preservation Act of 1987.

(codified at 12 U.S.C. § 4101 note); Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999, Pub. L. No. 105-276, § 219, 112 Stat. 2461, 2487-88 (1998).

6. *Preservation letters*.

Notwithstanding the enactment of HOPE, reinstating owners' rights to prepay their mortgages after 20 years *without* HUD approval, HUD sent to its regional offices a series of so-called preservation letters, asserting that certain restrictions on prepayment still were in effect. Less than a month after HOPE became law, a second preservation letter expressly asserted that prepayment required HUD approval. PX 63 (Mem. from Chris Greer, Acting Deputy Assistant Secretary for Multifamily Housing Programs, to Directors of Housing, et al. (April 12, 1996)) ("Preservation Letter No. 2") at 5; Tr. 216:18 to 218:9 (Test. of Norman). A subsequent preservation letter stated that owners need not obtain HUD approval for prepayment, but it set out other requirements, including: (1) that the owner notify HUD of its intention to prepay, (2) that the owner pay fifty percent of the relocation expenses of any tenant, (3) that the lender submit a form to HUD requesting prepayment of the mortgage, and (4) that owners of low-income housing located in low-vacancy areas – three percent or lower vacancies – not raise rents for three years except as necessitated by increased operating costs. PX 65 (Mem. from Nicholas P. Retsinas, Assistant Secretary for Housing, to Directors of Housing, et. al. (May 3, 1996)) ("Preservation Letter No. 4"), Preservation Questions and Answers, at 2-6; Tr. 219:22 to 222:19 (Test. of Norman). In the sixth preservation letter, HUD scaled back the requirement to pay tenant's relocation expenses to cover only moves "in the area where the project . . . is located," but reiterated the three-year restriction on rent increases for housing in low-vacancy areas. PX 67 (Mem. from Retsinas to Directors of Housing, et al. (July 1, 1996)) ("Preservation Letter No. 6"), Preservation Questions and Answers at 3, 6-7; Tr. 223:19 to 224:20 (Test. of Norman). With the constantly changing requirements of the preservation letters layered over the statutory mandate of HOPE, the prepayment process remained in a state of flux until HUD released Preservation Letter 97-1 on December 16, 1997, which Preservation Letter stated that, following the HOPE-mandated sixty-day moratorium on rent increases, there was "no limit to how high the owner [could] raise the rent." Tr. 234:4 to 235:3 (Test. of Norman); PX 75 (Mem. from Retsinas to Directors of Housing, et al. (Dec. 16, 1996)) ("Preservation Letter No. 97-1"), Attach. at 7.

**B. *CCA's Property***

Chateau Cleary Apartments ("Chateau Cleary") is a 104-unit apartment complex in West Metairie, Louisiana, just outside the city of New Orleans. PX 106 (Expert Report of Dr. Wade R. Ragas, an economist and real estate expert called to testify by CCA (May 30, 2005) ("second Ragas report") at 17; DX 140 (Management Plan of Chateau Cleary Apartments by Mr. Jim Alexander (May 31, 1997)) ("Alexander report") at 13-15. The complex consists of one-, two-, and three-bedroom apartments and is located in a residential neighborhood that boasts a low crime rate, good schools, major shopping centers, and hospitals and other medical facilities, plus access to major roads such as Interstate 10. Tr. 52:14-23 (Test. of Norman); 562:13 to 563:7

(Test. of Alexander), 1122:20 to 1123:11 (Test. of Ann Kizzier, a supervisory official in HUD's New Orleans office); DX 140 (Alexander report) at 22-24; PX 106 (second Ragas report) at 14, 17. The site visit and testimony at trial revealed that Chateau Cleary was sturdily built such that it suffered relatively minor damage from Hurricane Katrina, Tr. 52:5-13 (Test. of Norman); the site visit also revealed that the complex is well maintained and in good condition.

On October 6, 1969, Ernest B. Norman, Jr. and J. Robert Norman ("Norman brothers") purchased from New Orleans investors the land on which to build Chateau Cleary, as well as the plans that the selling investors had developed for the complex. Tr. 53:24 to 54:8, 55:12-15 (Test. of Norman); PX 1 (Cash Sale of Property, signed by the Norman brothers and Patrick J. Tomeny, Anthony D. Lewis, and Paul Atwood (October 6, 1969)). In conjunction with the sale, on November 7, 1969, the Norman brothers signed three interrelated documents: a secured note, a mortgage, and a regulatory agreement. The secured note was set out on HUD Form 1734 and was in the amount of $1,601,100.00. PX 3 (1969 note). The secured note was endorsed by HUD, explicitly referred to the mortgagor's right to prepay the mortgage after 20 years, and incorporated by reference a mortgage signed the same day by the Norman brothers and Pringle-Associated Mortgage Corporation. PX 3 (1969 note); PX 4 (1969 mortgage).[15] The mortgage was written on FHA Form 4123-D and incorporated by reference the terms of the secured note and the regulatory agreement. PX 4 (1969 mortgage), first undesignated paragraph, ¶ 3. The Norman brothers and HUD also signed on FHA Form 1730 an agreement entitled "Regulatory Agreement for Limited Distribution Mortgagor Projects Under Section 221(d)(3) of the National Housing Act, As Amended." PX 2 (1969 regulatory agreement), undesignated second paragraph. Under the regulatory agreement, in exchange for HUD's action to provide mortgage insurance, endorse the secured note, and agree to the transfer of the mortgaged property, the Norman brothers agreed to charge HUD-approved rents to HUD-approved tenants. *See id.* ¶¶ 4(b), 5(c), undesignated second paragraph. The regulatory agreement also incorporated by reference the mandates of Section 221(d)(3) and the implementing regulations, which included the right to prepay the mortgage after 20 years. *See id.*, undesignated second paragraph; 24 C.F.R. § 221.524(a)(1)(ii) (1969).

Due to an increase in labor costs in the New Orleans area from late 1969 to mid-1971, the Norman brothers requested and HUD approved an increased mortgage amount. As a result, on

---

[15]The provision in the note guaranteeing the Norman brothers' right to prepay read:

> The debt evidenced by this note may not be prepaid either in whole or in part, prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner except a maker which is a limited dividend corporation may prepay without such approval after 20 years from the date of final endorsement of this note by the Federal Housing Commissioner.

PX 3 (1969 note).

May 17, 1971, the Norman brothers signed on HUD forms a second secured note for $1,699,500.00 and a second mortgage. PX 5 (1971 note); PX 6 (1971 mortgage). The new note explicitly referred to the prepayment right and incorporated by reference Section 221(d)(3) and HUD's implementing regulations. PX 5 (1971 note); 24 C.F.R. § 221.524(a)(1)(ii) (1971). The new mortgage incorporated by reference the 1971 note and the original 1969 regulatory agreement. PX 6 (1971 mortgage), undesignated first paragraph, ¶ 3. HUD calculated the Norman brothers' initial equity investment as $215,867, entitling them to a maximum annual dividend of $12,952, in accord with the six percent cap on dividends contained in the regulatory agreement. *See* PX 106 (second Ragas report) at 54 (showing the "earned" but unpaid amount increasing by $12,952, less any dividend paid, each year); PX 2 (1969 regulatory agreement), ¶ 6(e)(1); *see also* Tr. 76:21 to 77:2 (Test. of Norman).[16]

On March 27, 1985, Ernest B. Norman, Jr. formed the CCA Associates partnership, with the partners consisting of him, his children, and a trust for his grandchildren. PX 30 (CCA Articles of Partnership). On April 2, 1985, with HUD's approval, J. Robert Norman sold his fifty percent interest in Chateau Cleary to CCA for $677,550. PX 28A (Act of Sale conveying J. Robert Norman's interest in Chateau Cleary to CCA) (Apr. 2, 1985)). CCA also assumed the Chateau Cleary mortgage. PX 28 (Assumption Agreement between Ginnie Mae and CCA (April 2, 1985)). As a consequence, HUD also required CCA to sign a new regulatory agreement for Chateau Cleary. PX 29 (Regulatory Agreement, signed by HUD and Ernest B. Norman, III, acting on behalf of CCA (Apr. 26, 1985)) ("1985 regulatory agreement"). The 1985 regulatory agreement mirrored that executed in 1969, *see generally id.*; PX 2 (1969 regulatory agreement), included the HUD restrictions related to tenants and rent, PX 29 (1985 regulatory agreement) ¶ 4, and incorporated by reference the mandates of Section 221(d)(3) and the associated regulations, which continued to include the right to prepay the mortgage after 20 years. *Id.*, undesignated second paragraph; 24 C.F.R. § 221.524(a)(1)(ii) (1985); Tr. 172:2 to 173:10 (Test. of Norman). Eight months later, on December 31, 1985, Ernest B. Norman, Jr. transferred his one-half interest in Chateau Cleary to CCA, giving CCA full ownership of the property. PX 33 (Transfer and Contribution to Partnership from Ernest B. Norman, Jr. to CCA (Dec. 31, 1985)).

Following the passage of LIHPRHA, CCA filed a notice of intent with HUD in December 1990 to preserve its options under ELIHPA and LIHPRHA. PX 42 (CCA Notice of Intent (Dec. 28, 1990)). In June 1992, CCA filed a notice of election to proceed under ELIHPA, while reserving its rights to proceed under LIHPRHA. PX 51 (CCA Notice of Election to Proceed (June 8, 1992)). Prior to the passage of HOPE, however, CCA never filed a plan of action with HUD seeking incentives or permission to sell the property. Tr. 383:8-16 (Test. of Norman). Following the passage of HOPE and despite the confusion caused by the preservation letters, by October 1996 CCA had begun inquiring into options for refinancing its mortgage loan,

---

[16]CCA's financial statements record the HUD-determined equity as $215,863, rather than $215,867 as used by Dr. Ragas, plaintiff's expert, in his second expert report. The minuscule difference is without consequence. Both the financial statements and Dr. Ragas's report cite an annual dividend cap of $12,952.

anticipating that the time when it might be able to prepay its mortgage was approaching. Tr. 236:7-16 (Test. of Norman). In November 1996, CCA also retained an appraiser who valued Chateau Cleary at $2,300,000, absent the HUD restrictions. PX 74 (Mem. from Ernest Norman[, III] to John Sibal, Vice President, Eustis Mortgage (Nov. 16, 1996)) (forwarding appraisal to potential mortgagee).

In late 1996, with CCA's permission, Mr. Jim Alexander, then a HUD employee, began a study to examine CCA's options after prepayment, including selling Chateau Cleary or refinancing the property with a conventional mortgage. PX 75a (Letter from Norman to Alexander (Dec. 19, 1996)); Tr. 240:6-10 (Test. of Norman), 557:22-558:1 (Test. of Alexander).[17] Ernest B. Norman, III, managing partner of CCA, awaited the results of Mr. Alexander's study, which he received in April 1997. Tr. 558:2-5 (Test. of Alexander). Mr. Alexander's study examined four "possible solutions" for CCA: (1) remain a HUD-insured property, (2) prepay the mortgage and sell the property in a year, (3) prepay the mortgage, make minimal upgrades to the property, and sell the property in seven years, and (4) prepay the mortgage, make major upgrades to the property, and sell the property in seven years. DX 140 (Alexander report) at 137.[18]

After reviewing the conclusions of the study and discussing them with Mr. Alexander, Tr. 247:21 to 248:7 (Test. of Norman), Mr. Norman adopted a hybrid of two options Mr. Alexander had proposed and began undertaking some improvements to Chateau Cleary. Tr. 270:13-19, 273:10-13 (Test. of Norman). On April 29, 1998, CCA signed a contract with Hampstead Partners to guide CCA through the prepayment process, delivered the required prepayment notifications to HUD, and after several months of HUD-related administrative delays, prepaid its HUD-insured mortgage on September 30, 1998. Tr. 1776:19-24, 1780:4 to 1782:15, 1793:4-12

---

[17]Mr. Alexander's report was not an official HUD report, Tr. 1077:11 to 1078:22 (Test. of Gladys Ann Kizzier, a HUD employee who supervised Mr. Alexander), but it was the culmination of a HUD-funded and HUD-approved course of study under which Mr. Alexander received the designation of "certified property manager" from the Institute of Real Estate Management ("IREM"). *See* Tr. 512:23-25, 514:17-20, 515:20 to 516:2, 520:13 to 521:5 (Test. of Alexander). Mr. Alexander's report listed his HUD work address and was forwarded to Mr. Ernest B. Norman, III, CCA's managing partner, with a cover letter on HUD letterhead. *See* DX 140 (Alexander report) at 1, 3; *but see* Tr. 1078:14 to 1079:1 (Test. of Kizzier) (indicating that Mr. Alexander did not have permission, and would not have received permission, from his direct supervisor to use the HUD letterhead).

[18]Although Mr. Norman had explained to Mr. Alexander that CCA planned to prepay its mortgage, PX 75a (Letter from Norman to Alexander (Dec. 19, 1996)), Mr. Alexander included in his report the option to remain in the Section 221(d)(3) program, DX 140 (Alexander report) at 137, apparently because the IREM curriculum required that the study include maintaining the *status quo* among the options being considered. Tr. 559:15-20 (Test. of Alexander).

(Test. of Norman Root);[19] 280:17-22 (Test. of Norman); PX 83 (Prepayment Service Consulting Agreement (Apr. 29, 1998)); PX 86 (letters from Hampstead Partners to HUD, the mortgagee, and a local councilman announcing CCA's intent to prepay its mortgage (May 11, 1998)); Pl.'s Post-Trial Br. ("Pl.'s Br.") at 22.

### C. *Procedural History*

CCA filed its complaint on May 13, 1997, alleging that the government had breached its contract with CCA by terminating its unconditional right to prepay its HUD-insured mortgage after 20 years and also seeking just compensation under the Fifth Amendment for the temporary taking of CCA's property. Compl. ¶¶ 3, 39, 42. The case was stayed for a considerable period pending decisions in the *Cienega* case. After the decision in *Cienega VIII* was rendered, the stay was lifted, *see* Order of November 25, 2003, and the case was prepared for trial. Trial was held on September 5-8, 12, and 26-27, 2006, followed by post-trial briefing, closing argument on November 30, 2006, and supplemental briefings by plaintiff on December 6, 2006, and by the government on December 13, 2006. The case is now ready for decision.

## ANALYSIS

### A. *Ripeness*

As a threshold matter, the government challenges the justiciability of CCA's claims on the ground that they are not ripe. *See* Def.'s Post-Trial Mem. of Contentions of Fact and Law ("Def.'s Br.) at 20. The government avers that CCA failed to exhaust a required administrative process because HUD never made a "final decision regarding the application of the regulations to the property at issue." *Id.* at 20-21 (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001)). Specifically, the government focuses on CCA's failure to (1) seek permission from HUD to prepay or (2) submit a plan of action to sell Chateau Cleary or seek incentives to remain in the Section 221(d)(3) program. Def.'s Br. at 20-21. CCA counters that any request to prepay would have been futile because CCA could not have satisfied the statutory criteria for prepayment in the preservation statutes, leaving HUD no discretion to approve prepayment. Pl.'s Br. at 34. CCA also contends that CCA was not required to pursue the statutory options to seek a sale or financial incentives. *Id.*

A regulatory takings claim is not ripe unless "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985); *Palazzolo*, 533 U.S. at 620 ("a landowner may not establish a taking before the land-use authority has the opportunity, using its own reasonable

[19]Mr. Norman Root, a real estate consultant with Hampstead Partners, did not testify at trial, but by agreement of the parties, his deposition testimony, taken on May 24, 2000, was read into the trial record. Tr. 1770:18-23.

procedures, to decide and explain the reach of a challenged regulation."); *see also Stearns Co. v. United States*, 396 F.3d 1354, 1358 (Fed. Cir. 2005). This principle generally requires a regulatory-taking claimant to seek an agency decision on the application of the pertinent statute or regulation to his or her property before asserting that the government has taken the property. *See Palazzolo*, 533 U.S. at 620; *Williamson*, 473 U.S. at 186. The Supreme Court has excepted from this general rule the circumstance where the agency "has no discretion to exercise over [the landowner's] right to use her land." *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 739 (1997). In a similar vein, the Federal Circuit has stated that "[o]nce it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." *Cienega Gardens v. United States,* 265 F.3d 1237, 1246 (Fed. Cir. 2001) ("*Cienega VI*") (quoting *Palazzolo*, 533 U.S. at 620)).

The government argues that ELIHPA and LIHPRHA gave HUD discretion to determine whether prepayment would be allowed and that this discretion renders CCA's futility argument unavailing. *See* Def.'s Br. at 24. HUD concededly had authority to determine whether an owner's prepayment would meet the statutory criteria; the pertinent question becomes whether those statutory criteria effectively barred CCA's prepayment. *See* ELIHPA § 225(a), 101 Stat. at 1880; 12 U.S.C. § 4108(a)(1)(B), (2); Tr. 586:2-5 ("HUD had the discretion under [LIHPRHA] to approve or deny, but there were two primary tests that Congress directed HUD to apply.") (Test. of Alexander); Stewart B. McKinney Homeless Assistance Amendments Act of 1988, Pub. L. No. 100-628, § 1024(1), 102 Stat. 3224, 3270-71 ("McKinney 1988 Act") (amending ELIHPA to specify numerical criteria by which to determine whether prepayment would "materially increase economic hardship" for tenants); 12 U.S.C. § 4108(a)(1)(A)(i) (same). Under ELIHPA, as amended in November 1988, and under LIHPRHA, the phrase "materially increase economic hardship" was defined with specificity as monthly rental increases exceeding ten percent or exceeding thirty percent of a tenant's monthly adjusted income, whichever was lower. McKinney 1988 Act § 1024(1), 102 Stat. at 3270-71; 12 U.S.C. § 4108(a)(1)(A)(i).[20] As the Federal Circuit explained in *Cienega VI*, "[S]ection 4108 sets forth strict numerical criteria that must be met before HUD may exercise any discretion it has to approve prepayment requests." 265 F.3d at 1246. If prepayment would run afoul of these strict numerical restrictions or the other statutory standards, HUD then had *no* discretion to permit prepayment. ELIHPA § 225(a), 101 Stat. at 1880 (Secretary may approve prepayment "*only* upon a written finding" that the statutory criteria would be satisfied) (emphasis added); 12 U.S.C. § 4108(c) (if the statutory criteria are not satisfied "the Secretary shall disapprove the plan"); *see also* Tr. 587:18 to 589:6 (Test. of Alexander) (HUD was required to abide by the statutory criteria).

The government's ripeness arguments run headlong into two fundamental facts about HUD-subsidized housing in the New Orleans area. First, not a single owner of such properties

---

[20]If a tenant already was paying more than these percentages, monthly rental increases were limited to ten percent or the increase in the CPI, whichever was lower. McKinney 1988 Act § 1024(1), 102 Stat. at 3270-71; 12 U.S.C. § 4108(a)(1)(A)(ii).

even sought to prepay under the preservation statutes. Tr. 596:3-9 (Test. of Alexander); 1103:10-13 (Test. of Kizzier). Second, by contrast, *after* enactment of HOPE, eight owners of Section 221 or 236 properties prepaid from February 1997 to June 2003. PX 124a (Def.'s Resp. to Pl.'s Interrogatories to Def. (July 5, 2005)) at 5-7. The government thus cannot show that other owners of Section 221(d)(3) properties in the New Orleans area succeeded in pursuing prepayment under the preservation statutes. The ripeness dispute consequently touches on peripheral aspects of plaintiff's proofs that an application to prepay under the preservation statute would have been futile.

The first set of contentions focuses on the requirement in ELIHPA and LIHPRHA that prepayment not lead to rental increases exceeding thirty percent of a tenant's monthly adjusted income, and refers to the testimony of Mr. Alexander. Pl.'s Br. at 35 (citing Tr. 610:7 to 611:11 (Test. of Alexander)); *see* § 1024(1), 102 Stat. at 3270-71; 12 U.S.C. § 4108(a)(1)(A)(i). In response to plaintiff's counsel's question as to whether tenants of Section 221(d)(3) properties could have "afforded to pay the rents charged by conventional properties," Mr. Alexander said: "Not without having received Section 8 vouchers, it is highly unlikely, no." Tr. 610:20-24 (Test. of Alexander). The government points out that the question Mr. Alexander was asked was neither specific to 1991 nor to CCA, and argues that his statement that such tenants would be "unlikely" to be able to afford market rents is not sufficient to establish futility. Def.'s Reply at 7-8. In this respect, viewed in the context of the immediately preceding questions, Mr. Alexander's testimony was focused on the period 1990 to 1995, *see* Tr. 609:5 to 610:19 (Test. of Alexander), and his answer covered the universe of tenants in Section 221(d)(3) housing in the New Orleans metropolitan area, CCA included. *See* Tr. 609:5 to 610:19 (Test. of Alexander). The government asserts that Mr. Alexander's answer – "highly unlikely, no" – is insufficient to prove ripeness, suggesting that only an unqualified "no" would satisfy the statutory criterion. Def.'s Reply at 7-8. Mr. Alexander's unrebutted testimony, however, was based on his experience as the director of the Division of Housing Management in HUD's New Orleans office from the late 1980s until January 1995, and his testimony showed that he was generally quite knowledgeable about the types of tenants living in Section 221(d)(3) properties and specifically familiar with Chateau Cleary. Tr. 496:25 to 497:24, 498:7-12 (Test. of Alexander).[21] LIHPRHA's plain language banned prepayment if the rent of "*any* current" CCA tenant would exceed thirty percent of her adjusted income as a result of prepayment. *See* 12 U.S.C. § 4108(a)(1)(A)(i) (emphasis added).[22] Mr. Alexander's testimony is sufficient to establish to "a

---

[21]Just as the Federal Circuit in *Cienega VI* relied, in part, on the opinion of a former HUD official as to whether the plaintiff would have met the preservation statutes' statutory criteria for prepayment, *Cienega VI*, 265 F.3d at 1243, 1246, this court bases its decision on this point on Mr. Alexander's unrebutted testimony.

[22]ELIHPA, as amended, barred prepayment if "*a* current tenant['s]" rent increased beyond thirty percent of her adjusted income. *See* § 1024(1), 102 Stat. at 3270 (emphasis added). The meaning is essentially the same as that in LIHPRHA – if a single tenant's rent would exceed the statutory cap, prepayment was not permitted. *Compare* 12 U.S.C. § 4108(a)(1)(A)(i) ("any

reasonable degree of certainty" that prepayment would have caused *one* CCA tenant's rent to increase beyond the threshold of thirty percent of her adjusted income. *See Palazzolo,* 533 U.S. at 620 ("once. . . the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened"); *accord Anaheim Gardens v. United States*, 444 F.3d 1309, 1315-16 (Fed. Cir. 2006); *Cienega VI,* 265 F.3d at 1246.

In addition, both plaintiff's economic and real estate expert, Dr. Ragas, and the government's real estate expert, Mr. Lewis J. Derbes, concurred that the rents CCA could have charged upon prepayment in May 1991 would have exceeded the ten percent threshold. *See* PX 106 (second Ragas report) at 39; PX 100 (Expert Report of Lewis J. Derbes (Mar. 7, 2005)) ("Derbes report") at 66; Tr. 841:3-16 (Test. of Ragas), 1492:17 to 1493:13 (Test. of Derbes). Dr. Ragas estimated CCA's market rents would have exceeded its HUD-restricted rents by between twenty-nine and thirty-nine percent, depending on the unit type, *see* PX 106 (second Ragas report) at 39; Tr. 841:3-16 (Test. of Ragas), while Mr. Derbes estimated a differential between sixteen and twenty-nine percent, depending on the unit type. PX 100 (Derbes report) at 66; Tr. 1492:17 to 1493:13 (Test. of Derbes).

The government objects that this evidence should be disregarded because both experts' estimates assumed that CCA would incur "significant expenditures for improvements and upgrades, which would in turn result in higher rents after prepayment." Def.'s Post-Trial Reply Brief ("Def.'s Reply") at 4. The government claims that a "well-conceived plan of action to prepay would include *no* project upgrades." *Id*. at 4 (emphasis added); *accord* Def.'s Br. at 26. Expenses for improvements were incorporated by Dr. Ragas and Mr. Derbes into their analyses. *See* PX 106 (second Ragas expert report) at 17-19; PX 100 (Derbes expert report) at 74. The improvements contemplated by Dr. Ragas and Mr. Derbes were relatively minor, *see* Tr. 857:11-16 (Test. of Ragas); Tr. 1402:20 to 1404:4 (Test. of Derbes), reflecting those accomplished by CCA upon prepayment, *see* Tr. 269:5 to 270:21; 272:22 to 273:9 (Test. of Norman), not even extending so far as the "minor rehabilitation" considered by Mr. Alexander in his third option.[23] These minor steps provide no basis to claim that the experts' analyses of rent increases on prepayment were inappropriate at Chateau Cleary. *See* DX 140 (Alexander report) at 139.

In a similar vein, the government attempts to graft another requirement onto the regulatory agreement and the preservation statutes by suggesting that CCA should have sought annual rent increases under the regulatory agreement. *See* Def.'s Reply at 4-5. If CCA had sought these increases prior to prepayment, the government argues, its HUD-regulated rents would have been within ten percent of market rents and prepayment would not have been precluded under ELIHPA and LIHPRHA. *See id.* The government then goes further: "Given

---

current tenant"), *with* § 1024(1), 102 Stat. at 3270 ("a current tenant").

[23]Instructively, even LIHPRHA's appraisal process for determining a HUD-regulated property's fair market value required the incorporation of the costs of converting the property to market-rate rental housing. *See* 12 U.S.C. § 4103(b).

that the difference between market rents and HUD-rents w[as] increasing during the 1990's, and given that [the] difference between CCA's HUD rents and market rents in 1998 was only 10 percent, the differential in 1991 was *necessarily* less than 10 percent." *Id*. at 26 (emphasis added). The government's argument implies that, at least if CCA planned to prepay, it was violating the relevant HUD regulations and its regulatory agreement by *not* seeking the maximum rent increases that were permitted, but not guaranteed, by the regulatory agreement. *See* Def.'s Br. at 4-5; PX 2 (1969 regulatory agreement) ¶ 4(c); PX 29 (1985 regulatory agreement) ¶ 4(f). However, the regulatory agreements placed a cap on CCA's annual distribution; they did not mandate that CCA seek rent increases. PX 2 (1969 regulatory agreement) ¶ 6(e)(1); PX 29 (1985 regulatory agreement) ¶ 6(e)(1). The evidence at trial also rebuts the government's conclusory statement that CCA's rents were "necessarily less than 10 percent" below market rents in 1991. The New Orleans area suffered a marked economic decline in the late 1980s due to difficulties experienced by the petroleum industry, and rents remained relatively constant due to the restricted ability of tenants to pay rents. Tr. 155:18 to 156:12 (Test. of Norman). Also, Dr. Ragas testified that the market in the West Metairie and surrounding areas in 1998 was far more competitive at the more expensive portion of the rental market than it was in 1991 due to an influx in the mid- to late-1990s of new apartment complexes with more attractive amenities than those in older properties, such as Chateau Cleary. Tr. 824:3 to 825:13, 829:2 to 830:20 (Test. of Ragas). The increased competition affected to some extent the rents CCA could demand after prepayment. Tr. 1063:13 to 1065:18 (Test. of Ragas). Thus, the link the government draws between market rents in 1998 and market rents in 1991 is unsupported by the trial record. In short, Mr. Alexander's testimony and CCA's proofs of market rental conditions in West Metairie and the New Orleans area show that CCA could not have satisfied the ten-percent requirement, and HUD would have had no discretion to allow CCA to prepay. *See* Tr. 610:20-24 (Test. of Alexander); PX 100 (Derbes report) at 66; PX 106 (second Ragas report) at 39; Tr. 841:3-16 (Test. of Ragas), 1492:17 to 1493:13 (Derbes); *see also Palazzolo,* 533 U.S. at 620-21; *Anaheim Gardens*, 444 F.3d at 1316; *Cienega VI,* 265 F.3d at 1246.

ELIHPA and LIHPRHA both also precluded prepayment if it would "involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available." ELIHPA, § 225(a)(1), 101 Stat. at 1880; 12 U.S.C. § 4108(a)(1)(B). CCA argues that Chateau Cleary could not have satisfied this statutory criterion for prepayment. *See* Pl.'s Br. at 36. The government concedes that higher rents following prepayment would have led some Chateau Cleary tenants to move to other housing, Def.'s Reply at 8, but argues that a "well-designed plan of action" to prepay would not have required the "eviction" of tenants, equating the statutory phrase "involuntarily displace" with "evict." *See id.* at 8-9; *see also* Def.'s Br. at 28.

The government's argument is without merit. The government's attempt to equate "involuntarily displace" with "evict" is unavailing. Although the terms "displace" and "evict" can both mean "to expel," *Webster's New Collegiate Dictionary* 241, 288 (7th ed. 1970), "evict" typically refers to the removal of a tenant by legal process. *Id.* at 288; *see also Black's Law Dictionary* 575 (7th ed. 1999). In any event, in housing statutes Congress drew a distinction

between the terms "evict" and "involuntarily displace." *Compare* ELIHPA, Pub. L. No. 100-242, § 225(a)(1), 101 Stat. 1815, 1880 ("involuntarily displace"); LIHPRHA § 601(a), 104 Stat. 4079, 4256 (1990) (same), *with* ELIHPA §§ 119(d), 122, 123, 101 Stat. at 1831, 1840, 1846 ("evict" or "eviction"); Cranston-Gonzalez National Affordable Housing Act, Pub. L. No 101-625, §§ 411, 424(g)(1), 445(e), 501, 503(a), (b), 601, 104 Stat. at 4155, 4167, 4178, 4181, 4184-85, 4269 (same). The focus on "involuntarily displace" in the preservation statutes thus focuses on the effects of rent increases upon conversion to conventional rental housing after prepayment, not on the legal process of eviction. That focus was confirmed by evidence adduced at trial.

Mr. Alexander testified that, given his experience in HUD's New Orleans office, he "would . . . have expected that [following prepayment] *at least some portion* of those 221[(d)(3)] tenants would have sought to live in other HUD properties and thus ha[ve] gone on to waiting lists that were maintained." Tr. 611:12-21 (Test. of Alexander) (emphasis added); *see also* Tr. 610:11 to 611:11 (Test. of Alexander). Moreover, Mr. Norman, CCA's managing partner, testified that in 1991 comparable subsidized housing was five to eight miles away. Tr. 190:12, 191:12-22 (Test. of Norman). This evidence suffices to establish that the involuntary displacement criterion in ELIHPA and LIHPRHA for prepayment could not have been satisfied, making an application by CCA for prepayment futile. *See Palazzolo,* 533 U.S. at 626; *Anaheim Gardens*, 444 F.3d at 1316; *Cienega VI,* 265 F.3d at 1246.

In sum, CCA has proven that it would have been futile to apply to HUD for prepayment of its mortgage under ELIHPA or LIHPRHA because HUD lacked the discretion to approve prepayment. Specifically, CCA proved that it could not have satisfied the statutory criteria mandating that prepayment was precluded where rent increases would (1) exceed ten percent or exceed thirty percent of a tenant's monthly adjusted income or (2) involuntarily displace current tenants. In this respect, CCA's experience appears to have been typical for owners of Section 221(d)(3) properties in New Orleans.

The government finally argues that CCA's claims are not ripe because it failed to seek incentives to remain in the HUD program or to pursue a sale to a HUD-approved buyer. Def.'s Br. at 30-31. CCA responds that it was not required to seek incentives or a HUD-approved sale and that any HUD-regulated sale would not have resulted in a fair market transaction at a fair market price. Pl.'s Br. at 37. As the Federal Circuit observed, "regulatory takings cases based on contracts containing key guarantees later negated by Congress may be fundamentally different from those involving only the generalized 'regulatory environment' seen in earlier statutes, regulations, agency policies and practices, and industry understandings." *Cienega VIII*, 331 F.3d at 1354. As the government would have it, even if the preservation statutes barred CCA from prepaying, CCA should have sought incentives or a HUD-approved sale. Def.'s Br. at 30-31. But CCA's suit is based on the government's failure to allow CCA to prepay, not on the government's failure to provide alternatives to prepayment. *See Cienega IX*, 67 Fed. Cl. at 461; Compl. ¶¶ 3, 14, 39, 42. CCA chose not to seek incentives or sell under HUD-imposed restrictions. Tr. 198:21 to 200:7, 207:12 to 208:25 (Test. of Norman.). As Mr. Norman explained:

> [Seeking incentives] didn't come close to what we thought we were entitled to, based on . . . living up to our end of the deal over the years. It would not have produced the return on equity, reduction in stress in management and expense that going market rent would have done . . . . It didn't equate to what we expected and lived up to all those years . . . . [W]e felt we had . . . no reason not to be able to enjoy the fruits of the 20th year. So, it just was not a viable alternative, and it didn't satisfy our desires or our expectations.

Tr. 207:12 to 208:25 (Test. of Norman.). In effect, the government is arguing that for CCA to vindicate its right to prepay, it must have applied to receive something it did not want – government-provided alternatives. Def.'s Br. at 30-31; Tr. 198:21 to 200:7, 207:12 to 208:25 (Test. of Norman.).

Neither the regulatory agreement nor the preservation statutes mandated that CCA seek incentives or a HUD-approved sale. *See* PX 2 (1969 regulatory agreement); PX 29 (1985 regulatory agreement); ELIHPA §§ 224(b)(1), (7); 225(b)(3), 101 Stat. at 1880-81; 12 U.S.C. §§ 4108-11; *see also* Tr. 1081:2-8 (Test. of Kizzier) ("[Owners] had a lot of choices [under the preservation statutes]. . . . They could choose *not* to come into the program.") (emphasis added). In short, CCA was not required "separately [to] seek incentives and receive a determination of whether those incentives would be funded." *See Cienega IX*, 67 Fed. Cl. at 462; *see also Cienega VI*, 265 F.3d at 1248. The government's argument to the contrary is unavailing.

CCA's claims are ripe for adjudication.

**B. *Takings Analysis***

The Takings Clause of the Fifth Amendment specifies that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause "was designed to bar [the] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960). In a regulatory takings case, a court must engage in a two-tiered inquiry. First, the court must examine whether the property owner possessed a "distinct property interest" at the time of the alleged taking. *Cienega VIII,* 331 F.3d at 1328; *Chancellor Manor,* 331 F.3d at 901. Second, the court must determine whether a compensable taking occurred. *Chancellor Manor,* 331 F.3d at 902. In the regulatory context, "[t]he general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). To determine whether the regulation has "gone too far," the court conducts an "essentially ad hoc, factual inquir[y]" focused on three factors: (1) the character of the governmental action, (2) the degree of interference with the reasonable, investment-backed expectations of the property owner, and (3) the economic impact of the action. *See Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124-28 (1978); *see also Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning*

*Agency*, 535 U.S. 302, 325-328 (2002); *Palazzolo*, 533 U.S. at 634 (O'Connor, J., concurring). None of the Penn Central factors is itself determinative, but rather all of the factors are to be weighed in a balance that takes into account all of the circumstances. *Palazzolo*, 533 U.S. at 635-36 (O'Connor, J., concurring).

1. *CCA's property rights in Chateau Cleary*.

An owner's property rights compensable under the Fifth Amendment are defined by "existing rules or understandings" and "background principles" derived from independent sources, such as state statutes or common law. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1029-30 (1992); *Maritrans v. United States,* 342 F.3d 1344, 1352 (Fed. Cir. 2003) (*citing Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). CCA is the owner in fee simple of the land on which Chateau Cleary is built. PX 1 (Tomeny sale to Norman brothers); PX 28A (J. Robert Norman sale to CCA); PX 33 (Ernest B. Norman, Jr. transfer to CCA). As an owner of land in fee simple, CCA possesses "inherent rights to rent [its] land at any price [it] can command." *Cienega VIII*, 331 F.3d at 1328-29.[24] By signing the regulatory agreement and assenting to HUD restrictions on tenants and rent, CCA agreed – for a limited time – to constrain the property rights it was otherwise entitled to exercise, all the while retaining a valid property interest for all purposes, including for the Takings Clause. *See Chancellor Manor*, 331 F.3d at 902-03; *Cienega VIII*, 331 F.3d at 1329; *Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001); PX 2 (1969 regulatory agreement); PX 29 (1985 regulatory agreement).

CCA also possesses contractual rights cognizable under the Takings Clause. *See Cienega VIII*, 331 F.3d at 1329 ("[T]here is also ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment"). CCA's regulatory agreement incorporated by reference the mandates of Section 221(d)(3) and the associated regulations, which included the right to prepay the mortgage after 20 years. See PX 2 (1969 regulatory agreement), undesignated second paragraph; 24 C.F.R. § 221.524(a)(1)(ii) (1969); PX 29 (1985 regulatory agreement), undesignated second paragraph; 24 C.F.R. § 221.524(a)(1)(ii) (1985). Under the regulatory agreement, CCA had "unequivocal contractual rights after twenty years to prepay [its] mortgage[]." *See Cienega VIII*, 331 F.3d at 1330. Those rights vested when the Norman brothers, and later CCA, signed the regulatory agreements in 1969 and 1985. *Cienega VIII*, 331 F.3d at 1330 ("contract rights vested when the contracts were signed"); *see* PX 2 (1969 regulatory agreement); PX 29 (1985 regulatory agreement).

[24]The government effectively concedes that CCA possessed vested property rights in Chateau Cleary by not disputing this fact at trial. *See* Def.'s Br. at i-iv; Def.'s Reply at i-iii; Def.'s Supplemental Post-Trial Brief at 1-3.

2. *Penn Central analysis*.

a. *Character of governmental action.*

In analyzing the first of the *Penn Central* factors, the character of the governmental action, a court must "consider the purpose and importance of the public interest reflected in the regulatory imposition[, and] balance the liberty interest of the private property owner against the [g]overnment's need to protect the public interest through imposition of the restraint." *Cienega VIII*, 331 F.3d at 1337-38 (quoting *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1176 (1994)). This analysis focuses not only on the intended benefits of the governmental action, but also on whether the burdens the action imposed were borne disproportionately by relatively few property owners. *Cienega VIII*, 331 F.3d at 1338-40; *see also Armstrong*, 364 U.S. at 49; *Cienega IX*, 67 Fed. Cl. at 466.

The government argues that the preservation statutes did not have the character of a taking because they promoted an important governmental objective – ensuring that subsidized housing remained in place for thousands of poor families. Def.'s Br. at 46-48. The government also avers that the preservation statutes did not institute improper burden-shifting because they offered owners alternatives such as a HUD-approved sale and financial incentives to remain in the HUD programs. *Id.* at 48-49. CCA counters that the preservation statutes disproportionately imposed the burden of maintaining low-income housing on CCA and other owners of subsidized low-income housing. Pl.'s Br. at 38-39.

The expressly stated goal of ELIHPA and LIHPRHA was to extend the availability of low-income housing. *Cienega VIII*, 331 F.3d at 1338-40; *Chancellor Manor*, 331 F.3d at 905-06; ELIHPA § 202(b)(1)-(2), 101 Stat. at 1878; Tr. 1079:11-17, 1080:16-20 (Test. of Kizzier) ("Congress passed Title [II] to extend affordable housing. They had thought with prepayments, [Sections] 236 and [221(d)(3)], that there were going to be a lot of poor people out on the street without housing."). The method for implementing this goal was in effect to bar owners from prepaying their mortgages, forcing them to remain in the housing programs. *Cienega VIII*, 331 F.3d at 1335 ("ELIHPA and LIHPRHA directly and intentionally abrogated the contracts."). That retaining Section 221(d)(3) properties under HUD regulations was the key aim of the government was further emphasized after the passage of HOPE by HUD's issuance of preservation letters which sought to impede prepayment. *See* PX 63 (Preservation Letter No. 2) at 3 (prepayment required HUD approval); PX 65 (Preservation Letter No. 4), Preservation Questions and Answers, at 2-6 (three-year moratorium on rent increases for low-income housing in low-vacancy areas; owner required to pay fifty percent of the relocation expenses of any tenant); PX 67 (Preservation Letter No. 6), Preservation Questions and Answers at 3, 6-7 (three-year moratorium on rent increases for low-income housing in low-vacancy areas). The government argues that ELIHPA and LIHPRHA were promoting important government policies, Def.'s Br. at 47, but, as the Federal Circuit explained, that fact does not justify abrogating owners' prepayment rights:

> Congress' *purpose* in enacting the statutes may have been entirely legitimate but the government has not shown that the *actions* Congress took – the enactment of ELIHPA and LIHPRHA – were within its powers to exercise without also granting compensation. The disproportionate imposition on the Owners of the public's burden of providing low-income housing is not rendered any more acceptable by worthiness of purpose.

*Cienega VIII*, 331 F.3d at 1340.

The preservation statutes did not place the burden of maintaining low-income housing on all taxpayers, but instead targeted only the owners of low-income housing whose regulatory agreements included the right to prepay their mortgages after twenty years. *See Cienega VIII*, 331 F.3d at 1338-39; PX 2 (1969 regulatory agreement), undesignated second paragraph; PX 29 (1985 regulatory agreement), undesignated second paragraph; *cf. Centex Corp. v. United States*, 395 F.3d 1283, 1306 (Fed. Cir. 2005) (legislation deemed targeted when it "was directed at a small and specifically identified group of taxpayers having contracts with the government . . . and . . . was designed to reduce the cost of those contracts to the government.").

The Federal Circuit described the burden-shifting that ELIHPA and LIHPRHA imposed on owners of Section 221(d)(3) and Section 236 properties, such as CCA, as follows:

> The character of the government's action is that of a taking of a property interest, albeit temporarily . . . . Unquestionably, Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing), but just as clearly, the expense was placed disproportionately on a few private property owners. Congress' objective in passing ELIHPA and LIHPRHA – preserving low-income housing – and method – forcing some owners to keep accepting below-market rents – is the kind of expense-shifting to a few persons that amounts to a taking. This is especially clear where, as here, the alternative was for all taxpayers to shoulder the burden. Congress could simply have appropriated more money for mortgage insurance and thereby induced more developers to build low-rent apartments in the public housing program to replace housing, such as the plaintiffs', that was no longer part of the program.

*Cienega VIII*, 331 F.3d at 1338-39 (footnote omitted); *see also* S. Rep. No. 101-316, at 10, *reprinted in* 1990 U.S.C.C.A.N. 5763, 5869 ("the most cost-effective strategy available to the government" to resolve the low-income housing problem is to seek to retain existing owners in the HUD-subsidized programs). Mr. Alexander, the former HUD official, contrasted that chosen solution of the preservation statutes to the "enhanced vouchers" that HUD employed after the passage of HOPE, which vouchers spread the burden much more broadly. Tr. 594:8-23 (Test. of Alexander).

Despite the Federal Circuit's clarity in addressing the governmental action involved in the preservation statutes, the government avers that the preservation statutes did not inappropriately shift the burden of providing low-income housing to owners, such as CCA. Pointing to the financial incentives offered to remain in the HUD programs and the opportunity to sell the property to HUD-approved buyers, *see* Def.'s Br. at 48-49, the government contends that the benefits offered to owners under the preservation statutes offset any burden imposed on them. *Id.*[25]

The government's arguments are fatally flawed. First, the congressional materials actually demonstrate the inherent conflict between the public purpose of the preservation statutes – maintaining affordable low-income housing – and the owners' property rights. *See Cienega VIII*, 331 F.3d at 1340. Second, by allowing HUD to control CCA's tenant pool beyond the twenty-year mark, the preservation statutes created a situation analogous to a physical invasion or a holdover tenancy. *Cienega VIII*, 331 F.3d at 1338 ("We agree that the enactment of ELIHPA and LIHPRHA could fairly be characterized as akin to this type of physical invasion."); *Cienega IX*, 67 Fed. Cl. at 467; *see also United States v. General Motors Corp.*, 323 U.S. 373, 380 (1945) (addressing federal government's taking of temporary use of property held under long-term lease). By losing its right to prepay its mortgage, CCA effectively was forced to house HUD-approved tenants in Chateau Cleary, rather than tenants of its own choosing. *See Cienega IX*, 67 Fed. Cl. at 467; Tr. 186:4-6 (Test. of Norman) (the preservation statutes affected CCA's freedom to rent to "all categories of tenants"). This barring of CCA's right to exclude has the character of a taking. *Cienega VIII*, 331 F.3d at 1338; *Cienega IX*, 67 Fed. Cl. at 467.

Third, the incentives themselves had characteristics of a taking. ELIHPA and LIHPRHA took from CCA the right to sell its property on the open market to a buyer of its choosing. Tr. 186:1-3 (Test. of Norman). Under ELIHPA, before approving a sale of a Section 221(d)(3) property, the Secretary was required to make findings at least as stringent as those required for prepayment. *Compare* ELIHPA §§ 224(b)(7), 225(b), 101 Stat. at 1880-81, *with* ELIHPA § 225(a), 101 Stat. at 1880. Prospective buyers would have been required to rent at below-market rents. *See* ELIHPA §§ 224(b)(7), 225(b), 101 Stat. at 1880-81. Under LIHPRHA, a sale of Chateau Cleary would have required that Chateau Cleary be retained for very-low, low-, and moderate-income tenants "for the remaining useful life" of the property, *see* 12 U.S.C. § 4112(a)(2)(A), that Chateau Cleary not be sold for more than a HUD-regulated price, *see* 12 U.S.C. §§ 4110(b)(1), (c), 4105(b)(2)(B), and that Chateau Cleary only be sold to HUD-approved

---

[25]The government cites congressional committee reports on the bills that became the preservation statutes to support its contention that Congress was attempting to balance the private interests of the owners with the public interest, providing affordable low-income housing. The Senate committee report accompanying the bill that became LIHPRHA stated: "A Federal preservation strategy is, by far, the most cost-effective strategy available to the government and, if structured correctly, can be accomplished in a way that protects the interests of the owners, the tenants and the communities in which the housing is located." Sen. Rep. No. 101-316, *reprinted in* 1990 U.S.C.C.A.N. 5763, 5869.

buyers. *See* 12 U.S.C. §§ 4110(b)(1), (c), 4116. These restrictions on CCA's right to sell its own property constitute fundamental impingements on CCA's property rights. *See Cienega VIII*, 331 F.3d at 1338; *Cienega IX*, 67 Fed. Cl. at 467-68; *cf. Hodel v. Irving*, 481 U.S. 704, 716 (1987) (statute that virtually abrogated appellees' right to devise a portion of their land was an "extraordinary" governmental action amounting to a taking).[26]

Fourth, the fact that the owners of Section 221(d)(3) properties received various benefits from participating in the Section 221(d)(3) program, such as a below-market interest rate loan, *see* Def.'s Reply at 15-16, does not alter the character of the governmental action. CCA received those benefits in exchange for its agreement to abide by certain restrictions for twenty years. Those restrictions included limiting occupancy to low- or moderate-income families, charging rents according to a HUD-approved rental schedule, and refraining from conveying the property without HUD approval, *during the twenty-year period*. *See* PX 2 (1969 regulatory agreement); ¶¶ 4(b), 5(c), 6(c); PX 29 (1985 regulatory agreement), ¶¶ 4(b), (f), 6(c). The government in effect unilaterally expanded the bargain that it struck with the Norman brothers in 1969 and CCA in 1985 by extending its duration. The government thus claims that the benefits it provided to CCA (*e.g.*, a below market loan) were given in exchange for CCA's agreement to *two* types of restrictions: (1) those contained in the regulatory agreement, and (2) any subsequent ones the government chose to impose, such as abrogation of CCA's prepayment rights. In *Cienega VIII*, in rejecting the government's argument that the plaintiffs possessed no property interest cognizable under the Takings Clause, the Federal Circuit emphatically rejected the sort of retroactive alteration of CCA's contractual right to prepay that the government advocates here. *Cienega VIII,* 331 F.3d at 1331. The government's analogous argument that the incentives

[26]The government disputes CCA's assertion that under the preservation statutes CCA could not have sold Chateau Cleary at a fair market price. Def.'s Reply at 11. Putting aside that this issue is immaterial because CCA was not required to seek a sale under the HUD restrictions, the government's argument fails on its own terms. The government points to a provision in LIHPRHA stating that in a HUD-approved sale the "preservation value" would be determined through an appraisal process based on the "fair market value of the housing based on the highest and best use of the property." *Id.*; 12 U.S.C. § 4103(b)(2). Conducting an appraisal, however, particularly one under the strictures imposed by LIHPRHA, does not itself guarantee that a seller will receive fair market value. Tr. 1873:11 to 1874:8 (Test. of Dr. Robert Stillman) ("an appraisal process may or may not produce" a sale at fair market value); *see also* Tr. 640:13-18 (Test. of Alexander) (sales under the preservation statutes and sales under a "fair market process" were "very different processes"). Moreover, the HUD restrictions on the eligible buyers and on the future use of the properties, *see* 12 U.S.C. §§ 4112(a)(2)(A), 4110(b)(1), (c), 4116, would reduce the number of potential buyers and in all likelihood the price that CCA could have sought for Chateau Cleary.

available under the preservation statutes mitigated the taking character of those statutes is similarly unavailing.[27]

b. *Reasonable investment-backed expectations of Chateau Cleary's owners.*

Under the second factor identified in *Penn Central*, the court must consider "the extent to which the regulation has interfered with distinct investment-backed expectations." *Penn Central*, 438 U.S. at 124. Examination of this factor is intended to "limit recoveries to property owners who can demonstrate that 'they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'" *Cienega VIII*, 331 F.3d at 1345-46 (quoting *Loveladies*, 28 F.3d at 1177). Beyond these actual, subjective expectations, an owner must demonstrate that his or her expectations were reasonable. *Ruckleshaus v. Monsanto Co.*, 467 U.S. 986, 1005-06 (1984). Thus, a court must first verify that the property owner actually had investment-backed expectations and then examine whether those expectations were objectively reasonable. *Cienega VIII*, 331 F.3d at 1346; *but see Chancellor Manor*, 331 F.3d at 904 ("The subjective expectations of the [owners] are irrelevant."). In the context of the preservation statutes, the court must determine "whether a reasonable developer confronted with the particular circumstances facing the [o]wners would have expected the government to nullify the twentieth-year prepayment right in the mortgage contract and in the regulations." *Cienega VIII*, 331 F.3d at 1346; *Chancellor Manor*, 331 F.3d at 904 ("The critical question is what a reasonable owner in the [plaintiffs'] position should have anticipated.") (citing *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed. Cir. 2001) (en banc)).[28]

---

[27]To the extent that the government suggests that the incentives to remain in the Section 221(d)(3) program or to sell Chateau Cleary would have compensated CCA for the preservation statutes' abrogation of CCA's property rights, that argument, too, is rejected. The value of the options available under the preservation statutes might affect the just compensation due a plaintiff who has suffered a regulatory taking, to the extent the owner realized value from one or more options, but the existence of the options does not affect the takings analysis itself. *See Independence Park Apts. v. United States*, 449 F.3d 1235, 1246-48 (Fed. Cir. 2006) ("*Independence Park III*"), *on reconsideration*, 465 F.3d 1308, 1311-12 (Fed. Cir. 2006) ("*Independence Park IV*"); *Cienega IX*, 67 Fed. Cl. at 470 ("[V]alue provided by extrinsic means, as, for example, by statutory options that previously did not inhere in and with the property should not be made part of the takings analysis but rather should be part of the just-compensation calculus.").

[28]The relevant time frame for measuring an owner's investment-backed expectations is that "at which the [owner] entered into the activity that triggered the obligation, specifically when the [owners] entered the programs." *Chancellor Manor*, 331 F.3d at 904 (internal citations omitted). For CCA, the relevant time periods are 1969 to 1971, when the Norman brothers signed the relevant notes, mortgages, and the regulatory agreement, and 1985, when CCA signed the second regulatory agreement.

Mr. Norman stressed the importance of the prepayment right in 1969, when the Norman brothers – Mr. Norman's father and uncle – bought the land on which Chateau Cleary was constructed and signed the regulatory agreement with HUD. Tr. 54:1 to 57:23 (Test. of Norman). Mr. Norman testified that, coupled with the ability to obtain a non-recourse loan, the right to prepay the mortgage after twenty years was the central feature of the deal that the Norman brothers struck with HUD to take over the low-income housing project from a group of local developers. Tr. 54:1 to 57:23, 80:5-14, 94:23 to 95:1 (Test. of Norman) (noting the prepayment "prize at the end of the 20 years"). HUD officials highlighted the prepayment right as an inducement to convince the Norman brothers to accept the deal and enter the subsidized housing program. *See* Tr. 57:18 to 58:15 (Test. of Norman); *cf. Cienega VIII*, 331 F.3d at 1346-47 (the prepayment right "was one of the primary incentives HUD offered precisely to encourage [the owners'] voluntary participation in the . . . housing programs"). Noting the meager returns permitted to a limited dividend corporation under the Section 221(d)(3) program, Tr. 77:3-7, 93:5-9, 94:18 to 95:1 (Test. of Norman), Mr. Norman emphasized that the prepayment right was the "engine that drove" the Norman brothers' decision and that the brothers "wouldn't have done [the deal] without it." *See* Tr. 56:9 to 57:17, 80:5-14, 94:23 to 95:1 (Test. of Norman); *see also* Tr. 57:18-23 (Test. of Norman) (without the prepayment right "the project would not have gone forward").

For the Norman brothers, the ability to prepay the mortgage after twenty years was an integral part of a long-term strategy. Foreseeing that prepayment eventually would allow them to convert a HUD-restricted property to a conventional property, the Norman brothers chose in 1969 to invest in a property in West Metairie, then considered to be in the path of future development in the New Orleans area and an emerging middle-class neighborhood. Tr. 60:3 to 61:17, 95:7-12 (Test. of Norman), 1475:2-14 (Test. of Derbes). As Mr. Norman explained:

> There was a plan. And the plan was you spend more money, you build a better product, you put it in an area where nobody else is building subsidized housing, you wait for the growth and the 20th year, you pay your dues to society, and you then take that asset that's grown and you nurtured, and you have it turned around and start realizing your equity on that value.

Tr. 57:8-17 (Test. of Norman). In making this assessment of the long-term value of investing in West Metairie, the Norman brothers relied not only on their own experience, but also on the advice of local builders and consultants. Tr. 60:3 to 62:21 (Test. of Norman). In short, the Norman brothers planned, expected, and intended to prepay the mortgage on Chateau Cleary after twenty years. Tr. 67:15-22 (Test. of Norman).

In 1985, CCA acquired Chateau Cleary from the Norman brothers. PX 28A (J. Robert Norman's sale to CCA); PX 33 (Ernest B. Norman, Jr. transfer to CCA). CCA purchased J. Robert Norman's fifty percent interest for $677,550 "based on what it would be worth slightly discounted in 1991, when it would be converted to a market rate apartment complex," Tr. 163:17-20 (Test. of Norman), and signed a new regulatory agreement with HUD. PX 29 (1985

regulatory agreement). With prepayment eligibility only six years away when CCA purchased J. Robert Norman's share, CCA had the prepayment right firmly in mind. Tr. 174:15-20 (Test. of Norman). CCA's plan was the same as the Norman brothers' – to prepay the Chateau Cleary mortgage at the twenty-year point, raise the rents to market levels, and operate the apartment complex free of HUD restrictions. Tr. 174:21 to 175:25 (Test. of Norman). Thus, CCA's investment was backed by the partnership's subjective expectation that it would be able to prepay its mortgage. *See* Tr. 174:15 to 175:25 (Test. of Norman); *Cienega VIII*, 331 F.3d at 1346.[29]

CCA's investment-backed expectations also were objectively reasonable. The prepayment right was legally binding on the government. The secured notes in 1969 and 1971 were endorsed by HUD and referred specifically to CCA's right to prepay its mortgage after twenty years. PX 3 (1969 note); PX 5 (1971 note). The regulatory agreements referred to the requirements of Section 221(d)(3) and the associated regulations, which, in 1969 and in 1985, included the right to prepay the mortgage after twenty years. *See* PX 2 (1969 regulatory agreement), undesignated second paragraph; 24 C.F.R. § 221.524(a)(1)(ii) (1969); PX 29 (1985 regulatory agreement), undesignated second paragraph; 24 C.F.R. § 221.524(a)(1)(ii) (1985). The associated mortgages, completed on HUD forms, incorporated by reference the terms of the notes and the regulatory agreement. PX 4 (1969 mortgage), first undesignated paragraph, ¶ 3; PX 6 (1971 mortgage), first undesignated paragraph, ¶ 3. Given that the prepayment right was an integral part of the bargain that owners of Section 221(d)(3) housing struck with HUD, the expectation of the Norman brothers and CCA that the government would not abrogate this right, *see* Tr. 79:12 to 80:14, 175:3-8 (Test. of Norman), was reasonable. *See Cienega VIII*, 331 F.3d at 1348-49. Having the opportunity to terminate HUD-regulated rents at and after the twenty-year anniversary "would be a significant factor in the calculation of total profit that could be expected over the lifetime of the investment in the property." *Id.* at 1349.[30] HUD's role in the deal that led to the Norman brothers' entry into the Section 221(d)(3) program and HUD's use of the prepayment right as an inducement in that process, confirms that the prepayment right was a material part of the bargain. *See* Tr. 57:18 to 58:15 (Test. of Norman); *cf. Cienega VIII*, 331 F.3d

---

[29]The government generally does not contest CCA's claim that the Norman brothers and CCA expected to be able to prepay the Chateau Cleary mortgage after twenty years, but rather it disputes whether these expectations were objectively reasonable. *See* Def.'s Br. at 39-46; Def.'s Reply at 17-22; *but see* Def.'s Reply at 20 (referring to Mr. Norman's testimony as to the Norman brothers' investment-backed expectations as "self-serving.").

[30]The possibility that the Section 221(d)(3) program might be altered by statute or regulation does not undercut the reasonableness of a property owner's expectation. *See Cienega VIII*, 331 F.3d at 1349 ("Because without the prepayment right the developers might have earned more profit investing elsewhere and therefore have declined to enter the programs, abrogation of this right would not reasonably be expected simply because the regulations were amendable or subject to legislative alteration.").

at 1346-47 (the prepayment right "was one of the primary incentives HUD offered precisely to encourage [the owners'] voluntary participation in the . . . housing programs.").[31]

The objective reasonableness of the Norman brothers' and CCA's expectations was also evident from the site visit. Chateau Cleary is close to an interchange to Interstate 10, which provides a major transportation corridor to and from New Orleans proper. The property is located in a largely residential neighborhood made up of well-maintained homes. Two other conventional apartment complexes are nearby, one of which is relatively new and the other of which was constructed a few years after Chateau Cleary. Regional shopping centers and major hospitals are readily accessible. Schools are good, and the area has a relatively low incidence of crime. Moreover, Chateau Cleary was well built and is well maintained, the structural integrity of its construction having been demonstrated by, among other things, the fact that it suffered virtually no damage as a result of Hurricane Katrina in 2005. The Chateau Cleary complex is well positioned to be, and is, a viable competitor in the conventional rental housing market, reflecting its favorable location, design, and construction.[32]

Faced with this evidence, to shore up its contention that the owners' expectations were not objectively reasonable, the government contests the idea that a property owner would be interested in realizing a property's residual value after twenty years. The government defines such realization as the value of selling the property or converting it to more profitable use. Def.'s Br. at 44-45. In support of this argument the government quotes from a treatise on low-income housing:

> [N]ormally a developer of real estate hopes to make a profit on the sale of the property at some time in the future. He hopes that the property's residual value will be such that he is able to recover his total equity investment . . . , plus an additional profit by reason of appreciation. There are several reasons why in normal course this expectation might not be realized in federally-assisted housing.

---

[31]CCA possessed documents that are nearly identical to those in *Cienega VIII* and *Chancellor Manor* and that incorporated the twenty-year prepayment term. *Compare* PX 2 (1969 regulatory agreement), undesignated second paragraph; PX 3 (1969 note); PX 4 (1969 mortgage); 24 C.F.R. § 221.524(a)(1)(ii) (1969); PX 5 (1971 note); PX 6 (1971 mortgage); PX 29 (1985 regulatory agreement), undesignated second paragraph; 24 C.F.R. § 221.524(a)(1)(ii) (1985), *with Cienega VIII,* 331 F.3d 1325-26 *and Chancellor Manor*, 331 F.3d at 894-95; *see also Cienega IX*, 67 Fed. Cl. at 473 (citing deed of trust notes incorporating the plaintiffs' right to prepay their mortgage after twenty years).

[32]At the time of the site visit in September 2006, Chateau Cleary had cut off its waiting list for available apartments at 250 names. This reflection of high demand can be attributed in substantial part to the property's having withstood Hurricane Katrina.

Def.'s Br. at 44-45 (quoting Charles L. Edison & Bruce S. Lane, *A Practical Guide to Low- and Moderate-Income Housing* 11:6 (1972) (read into the record at trial, Tr. 1192:13-24)). The quoted text, however, does not adequately address the circumstances of this case, failing to identify *when* a sale is unlikely to recover the owner's total equity investment plus a profit (*e.g.*, after five years, twenty years, or forty years). Prepayment focuses explicitly on a twenty-year time horizon. The quoted passage also refers only to a scenario under which the owner of subsidized housing *sells* the property and does not consider the value of retaining the property after conversion into a market-rate property. The long-term plan for CCA was not to sell Chateau Cleary upon prepayment, but to convert it into a conventional apartment complex. *See* Tr. 60:3 to 61:17, 95:7-12 (Test. of Norman); *cf. Cienega IX*, 67 Fed. Cl. at 472 (citing plaintiffs' long-term plans to prepay and convert their properties to market-rate rentals). Most importantly, the government's argument fails for a far more fundamental reason: the pertinent question is not whether it was reasonable for CCA to expect "to recover [its] total equity investment" plus a profit at or by any given time, Def.'s Br. at 45, but rather whether it was reasonable for CCA to expect that the government would honor the prepayment terms of the contract. *See Cienega VIII*, 331 F.3d at 1348.

The government next repeats an argument made in *Cienega IX* – that CCA's investment-backed expectations were not reasonable because the principal motivating factors for a developer of a HUD-subsidized complex were the "immediate subsidies and incentives" HUD provided, not the right to prepayment. *See* Def.'s Br. at 40. The government cites the testimony of Mr. Malek, a tax accounting expert, who described various advantages of investing in Section 221(d)(3) housing.[33] The advantages Mr. Malek cited included the ability to obtain a highly-leveraged loan, to be credited for the Builder's Allowance that reduced an investor's initial cash investment, and to opt to use accelerated depreciation (which depreciation method could be applied to all buildings, subsidized or not, prior to tax legislation in 1986). Tr. 1160:12-19, 1161:3-6, 1166:7-11, 1173:20 to 1176:1 (Test. of Malek).[34] CCA does not dispute these benefits, but points to the very limited actual returns realized by Chateau Cleary during its HUD-subsidized tenure and argues that the prepayment right "had unique value" because it offered the prospect of much higher returns after prepayment when the property could enter the conventional market. Pl.'s Reply at 10. For conservative investors such as the Norman brothers and CCA, a very low immediate return was an acceptable price to pay for a much greater future return. The government's endeavor to give undue weight to instant economic gratification while according

[33]Mr. Malek was retained by the government and was qualified as an expert in tax accounting. Tr. 1155:3-10.

[34]The government also insists that among the benefits CCA received were the fees its affiliated construction and management companies earned in building and managing Chateau Cleary. Def.'s Reply at 21. This argument is without merit. When asked about the management fees CCA's affiliated company earned, Mr. Norman explained: "If you don't do it [yourself], you have to pay somebody else to do it." Tr. 94:5-6 (Test. of Norman).

none to longer-term horizons fails. Moreover, the paucity of the return available during the HUD-subsidized years undercuts even the government's short-term arguments. The investment-backed expectations of Chateau Cleary's owners were objectively reasonable.

c. *Economic impact.*

The third factor in the *Penn Central* test addresses the severity of the economic impact of the regulatory action on the property owner, *see Penn Central*, 438 U.S. at 124, and involves a "weigh[ing of] all the relevant considerations." *Yancey v. United States,* 915 F.2d 1534, 1541 (Fed. Cir. 1990). The consideration of economic impact is "intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners [will] result in a takings claim." *Cienega VIII*, 331 F.3d at 1340 (alteration in original) (quoting *Loveladies,* 28 F.3d at 1176). Although courts must determine whether the plaintiff has suffered a "serious financial loss," *Loveladies,* 28 F.3d at 1177, there is no "automatic numerical barrier" below which compensation must be denied. *Yancey,* 915 F.2d at 1541.

Conceptually, courts have employed three different methods of measuring economic impact, depending on the circumstances. One method measures the value taken from the property by regulatory action against the overall initial value. *See Maritrans*, 342 F.3d at 1358 (upholding a trial court's decision to evaluate economic impact based on "the change in fair market value of [plaintiffs'] vessels"); *Keystone Bituminous Coal Ass'n v. DeBenedictus*, 480 U.S. 470, 497 (1987) (When considering *Penn Central*'s economic impact factor, a court must "compare the value that has been taken from the property with the value that remains in the property."). A second measure looks to the claimant's ability to recoup its capital. *See Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1363 (Fed. Cir. 2001) ("In determining whether a taking is categorical, 'the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored.'") (quoting *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 905 (Fed. Cir. 1986)). The third method examines a claimant's return on equity under a given regulatory regime in comparison to the return on equity that would be received but for the alleged taking. *See Penn Central*, 438 U.S. at 129 ("capable of earning a reasonable return"); *United States v. Pewee Coal Co*., 341 U.S. 114, 115, 117-18, 119 (1951) (Black, J., plurality) (Reed, J., concurring in the judgment) (upholding award of just compensation to owner of a coal mine the government had occupied and operated for over five months); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7, 16 (1949) (referring to "the record of its past earnings" and holding that the "proper measure of compensation [for a temporary taking] is the rental that probably could have been obtained"); *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1188-89 (Fed. Cir. 2004); *Cienega VIII*, 331 F.3d at 1342-43; *Chancellor Manor*, 331 F.3d at 905. The task of a trial court is to determine which method best measures the economic impact of the governmental action. *Rose Acre Farms*, 373 F.3d at 1190.

In *Cienega VIII*, the Federal Circuit applied the return-on-equity approach to a temporary taking similar in all respects to that at issue here. In *Cienega VIII*, the Court of Appeals compared the annual rate of return on the owners' real equity in their properties to the 8.5 percent

return on "low-risk Fannie Mae bonds." *Cienega VIII*, 331 F.3d at 1342.[35] This approach "best measures the impact of ELIHPA and LIHPRHA on" the owners of Section 221(d)(3) properties because the alleged taking involves lost streams of income at an operating property, not the physical transfer of a piece of undeveloped property to the government and the subsequent return of that property to the owner. *See Cienega IX*, 67 Fed. Cl. at 475. As the Federal Circuit explained:

> The Owners' theory of recovery is *not* that their fee simple estates were taken or their land rendered "valueless." The Owners' entitlement to compensation is based on the taking of the real property interests reflected in the mortgage loan notes and the Regulatory Agreements. The difference is that the Owners' loss of the contractual prepayment rights was both total and immediate. They were barred from the unregulated rental market and other more lucrative property uses.

*Cienega VIII,* 331 F.3d at 1344; *see also Independence Park III*, 449 F.3d at 1246, 1248 (where property owners had entered into long-term use agreements, remanding for application of a compensatory model that would "determine what [the plaintiffs] lost by not being able to charge market-level rents" over the period covered by the use agreements); *Independence Park Apts. v. United States*, 61 Fed. Cl. 692, 707 (2004) ("*Independence Park I*") ("[T]he income-generating opportunity the property provided had been entirely lost during the period of the temporary taking, not just postponed."), *rev'd and remanded on other grounds*, *Independence Park III*, 449 F.3d at 1235. In the context of the preservation statutes, measuring the economic impact by assessing the change in fair market value runs the risk of substantially understating the effect on the owner's property interest. *Kimball Laundry*, 338 U.S. at 7 (noting that if the change in market value "were taken to be the measure, there might frequently be situations in which the owner would receive no compensation whatever because the market value of the property had not decreased during the period of the taker's occupancy.").

---

[35]The government argues that the Federal Circuit accepted the return-on-equity approach used by the plaintiffs' expert "solely 'in view of the lack of any specific challenge by the government of the trial court's findings or of the Model Plaintiffs' methods and data.'" Def.'s Reply at 28 (quoting *Cienega VIII,* 331 F.3d at 1345). This criticism is mistaken. The government quotes the Federal Circuit out of context and mischaracterizes the court's approach in *Cienega VIII*. First, the court did not modify the quoted phrase with the word "solely." It used instead the word "especially," meaning the court did not apply the return-on-equity approach merely because the government did not challenge that approach. *Cienega VIII*, 331 F.3d at 1345. Second, the Federal Circuit concluded that the trial court's findings of fact, which relied on the lost-profits analysis of the plaintiffs' expert, were "an appropriate foundation for the analysis of 'economic impact,'" and it rejected the government's diminution-in-value approach because it did not take into account that the plaintiffs had been "barred from the unregulated rental market and other more lucrative property uses." *Id*. 331 F.3d at 1341, 1344.

In resisting the return-on-equity approach and favoring the change-in-value method of economic analysis, the government manifestly errs by suggesting that in *Cienega VIII* the Federal Circuit broke new ground in Fifth Amendment Takings Clause jurisprudence. Def.'s Reply at 28 (citing *Cienega VIII* as "the first case to ever reference the 'rate of return' analysis."). The return-on-equity approach was relatively novel at one time – over fifty years ago – but not today. Actions taken by the government during World War II led to a series of temporary takings cases that posed the issue. Those cases primarily focused on rental value for the short-term taking period, *see Kimball Laundry*, 338 U.S. at 5-12; *United States v. Petty Motor Co.*, 327 U.S. 372, 374-81 (1946); *General Motors*, 323 U.S. at 379, treating the lost rental returns as an appropriate measure of the economic impact. In the last of the World War II cases, *Pewee Coal*, the Supreme Court confronted the takings claim of a plaintiff whose coal mine the government had occupied and operated in 1943. 341 U.S. at 115. The Court upheld a district court's award of just compensation to the plaintiff for a *negative* return; *i.e.*, "the portion of the operating loss which the court found attributable to Government operation of the mine." *Id.* at 115. Concurring in the judgment, and casting the vote that established a majority for the judgment, Justice Reed contrasted this focus on a return with the method that compared a change in market value:

> *Market value*, despite its difficulties, *provides a fairly acceptable test for just compensation when the property is taken absolutely*. But *in the temporary taking of operating properties, market value is too uncertain a measure to have any practical significance*. . . . The most reasonable solution is to award compensation to the owner as determined by a court under all the circumstances of the particular case.

*Id.* at 119-120 (Reed, J., concurring) (internal citations omitted) (emphasis added).[36] In short, for a temporary taking of an operating property, the Supreme Court looked to returns over the period of the taking, *not* changes in market value.

Lower courts have reached similar conclusions in other takings cases. In *Wheeler v. City of Pleasant Grove,* 833 F.2d 267 (11th Cir. 1987)*,* the Eleventh Circuit explained:

> In the case of a temporary regulatory taking, the landowner's loss takes the form of an injury to the property's potential for producing income or an expected profit. The landowner's compensable interest, therefore, is the *return* on the portion of fair market value that is lost as a result of the regulatory restriction.

[36]Justice Reed went on to say: "When, in a temporary taking, no agreement is reached with the owners, the courts must determine what payments the Government must make. Whatever the nature of the 'taking,' the test should be the constitutional requirement of 'just compensation.' However, there is no inflexible requirement that the same incidents must be used in each application of the test." *Pewee Coal*, 341 U.S. at 120-21 (Reed, J., concurring).

833 F.2d at 271 (internal citations omitted) (emphasis added). *See also A.A. Profiles, Inc. v. City of Fort Lauderdale,* 253 F.3d 576, 584 (11th Cir. 2001) (lost income is the proper measure of compensation "when the property owner's losses are limited to the temporary use of its property and the concomitant income."); *Wheeler v. City of Pleasant Grove*, 896 F.2d 1347, 1351 (11th Cir. 1990) ("The unconstitutional taking which this court found compensable was not a denial of all use of the Pleasant Grove property, as the district court's computation of damages would imply," but the lost income that the plaintiff suffered.).

Nonetheless, the government further avers that a return-on-equity analysis provides only a "snapshot" at a given point in time and does not adequately take into account the duration of the taking. Def.'s Br. at 38. However, the government's proffered metaphor is mistaken and misleading. Rather than a snapshot, the return-on-equity approach more closely resembles a composite, long-exposure photograph taken over the entire period of the temporary taking. Because it covers the period of the temporary taking, it addresses the economic results over the whole of the pertinent time, not merely an instant within that period. As the Federal Circuit has stated, "the period of the alleged temporary taking . . . is the relevant period for purposes of assessing the economic impact." *Seiber v. United States*, 364 F.3d 1356, 1371 (Fed. Cir. 2004). By contrast, as pointed out in *Cienega IX,* using the diminution-in-value approach in a case such as this could allow the government to take an owner's $10 million annual income stream from a $100 million property for four and a half years – yielding the government $45 million – and then assert that the owner had not suffered a severe economic impact because he or she had only been deprived of 45% of the value of his property. *Cienega IX*, 67 Fed. Cl. at 476. The estimate of Dr. Brett Dickey, an expert testifying on behalf of the government, provides a less extreme, but informative example. His diminution in value model estimated that CCA had only suffered an economic impact of 18.1 to 20 percent. DX 160 (Dickey report) at 12; Tr. 1627:16 to 1629:18 (Test. of Dickey). By its very nature, Dr. Dickey's model simply examined the decline in the value of Chateau Cleary caused by the preservation statutes, effectively assuming that the only value of Chateau Cleary to CCA was the value it could recover upon sale while ignoring the lost income streams.

In all the circumstances, the government's objections to use of the return-on-equity approach to measuring economic impact are not well received. Those objections in this case contravene the lessons of the temporary takings cases arising with operating properties during World War II, including *Pewee Coal* and *General Motors*, as well as the more recent decisions in *Cienega VIII*, *Chancellor Manor*, *Rose Acre Farms*, *A.A. Profiles*, *Wheeler*, and *Cienega IX.* Factually also, a return-on-equity method measures what happens during the entire period of the temporary taking, which is the relevant time span, not just at a single point in time. Moreover, it avoids the problem that, for an income-producing, operating property, a change-in-value approach tends to disregard the loss of the full income stream for a substantial period of time. For these reasons, the court determines that the return-on-equity approach provides the most appropriate measure of economic impact in this temporary taking case of an income-producing property.

Dr. Ragas measured the diminution in return on equity to CCA by dividing the maximum HUD-allowed annual dividend, $12,952, by the aggregate equity in the property at the time of prepayment, $811,700. PX 125 (Ragas updated expert report) (June 22, 2006) ("Ragas updated report") at 2, Table Thirty-Three. This methodology followed that employed in *Cienega VIII*. *See* 331 F.3d at 1342 (using the same approach); *Cienega IX*, 67 Fed. Cl. at 476 (same).[37] Under this measure, CCA received a 1.6% return on its real equity. PX 125 at Table Thirty-Three. Comparing this 1.6% return to a conservative 8.5% return on 15-year mortgage-backed securities, the comparative benchmark used in *Cienega VIII*, yields an economic impact of 81.25%. *Id.*; *see* PX 125 at Table Thirty-Three.

Dr. Ragas's calculation is based on the maximum annual return, *fixed by HUD*, that CCA could have received during the alleged temporary takings period – expressed as a percentage of the aggregate equity CCA had invested in Chateau Cleary at the time for prepayment. *See, e.g.,* PX 125 (Ragas updated expert report) at 2, Table Thirty-Three.

The government challenges Dr. Ragas's calculation of economic impact in two ways. First, the government claims that CCA's failure to pursue a sale of Chateau Cleary under the preservation statutes "eliminates any potential economic impact" to CCA because any adverse impact "resulted from [CCA's] own decision to maintain the *status quo* – not from the challenged regulations." Def.'s Br. at 33-35. This contention rests on the same faulty premise as the government's analogous argument that CCA's claims are not ripe: that to vindicate its right to prepay its mortgage, CCA was obligated to pursue the secondary preservation-option scheme established under the preservation statutes. CCA was under no such obligation, and in any event, any value these extrinsic options had would only be taken into account in determining just compensation. *See supra* at 27-28 n.27; *Cienega IX*, 67 Fed. Cl. at 478.

Second, the government avers that CCA's failure to request regular rent increases undercuts CCA's claim that, in the absence of the preservation statutes, it would have prepaid on schedule in May 1991. Def.'s Br. at 35-36. As the government would have it, because CCA allegedly would not have prepaid its mortgage in 1991, ELIHPA and LIHPRHA could not have caused CCA a severe economic deprivation. *See id.* This criticism disregards the fact that Dr. Ragas computed the *maximum* annual return CCA *could have received* and did not rely on the lesser actual returns that CCA earned. PX 125 (Ragas updated report) at 3, Table Thirty-Three. Moreover, that CCA did not seek rent increases from 1985 to 1994 is of no significance for the

[37]Dr. Ragas calculated the equity by adding CCA's cumulative principal repayments from 1976 to 1991, to its HUD-approved equity in 1976. PX 125 at Table Thirty-Three.

separate reason that the regulatory agreements did not mandate that CCA seek rent increases. *See supra*, at 22; PDX 33 (Chateau Cleary Operating Expenses and Rent Increases).[38]

The government also observes that after HOPE was enacted, CCA could have moved more expeditiously than it did to prepay its mortgage. Def.'s Br. at 36. CCA prepaid on September 30, 1998, well after the issuance of Preservation Letter No. 97-1, under which HUD halted its efforts to forestall post-HOPE prepayment. Pl.'s Br. at 22; PX 75 (Preservation Letter No. 97-1), Attach. at 7. This delay, however, has no effect on the economic impact of the alleged taking because CCA claims the takings period ended no later than February 28, 1997. *See* Pl.'s Br. at 60.

Based upon the evidence adduced, the court concludes that the methodology Dr. Ragas employed for calculating economic impact was reasonable and that the calculations he performed were accurate. The court accepts Dr. Ragas's estimate of an 81.25% diminution in value and concludes that this economic impact is a "serious financial loss" caused by ELIHPA and LIHPRHA. *See Cienega VIII*, 331 F.3d at 1343; *see also Cienega IX*, 67 Fed. Cl. at 477.

---

[38]CCA also had practical reasons for foregoing rent increases. From the mid-1980s until about 1990-1991, New Orleans was in the midst of a severe recession due to the decline of the oil and gas industries, resulting in bank failures and "widespread failures in the apartment marketplace." Tr. 822:7-22 (Test. of Ragas). The recession drove market-rate properties in West Metairie to lower their rents to levels near those at Chateau Cleary, causing CCA to "tighten [its] belt[]" and decrease its operating expenses. Tr. 155:18 to 156:12 (Test. of Norman). After receiving a rent increase in 1984, based on 1983 operating expenses, Chateau Cleary's operating expenses increased in 1985 and then decreased for three consecutive years. PDX 33 (Chateau Cleary Operating Expenses and Rent Increases). Operating expenses then increased every year from 1989 to 1992, declined in 1993, and rose again in 1994. PDX 33 (Chateau Cleary Operating Expenses and Rent Increases). CCA points out that not until 1992 did Chateau Cleary's operating expenses exceed in absolute terms the 1985 levels. Pl.'s Br. at 31. (The proofs at trial showed that HUD would approve rent increases generally on the basis that the property's operating expenses had increased. Tr. 155:18 to 156:25) (Test. of Norman). The government notes that CCA's operating expenses from 1985 to 1994 were higher in absolute terms than the 1983 levels. Def.'s Br. at 16. These arguments are beside the point. Even if HUD would have approved of rent increases for a property serving economically disadvantaged tenants during a recession, raising rent would not have been feasible for CCA. *See* Tr. 156:1-12 (Test. of Norman). Most importantly, Dr. Ragas's comparative use of *maximum* allowable returns on CCA's equity eliminates this consideration in all events.

d. *Takings synopsis.*

Having examined the three *Penn Central* factors and weighed all of the relevant circumstances, *see Tahoe-Sierra*, 535 U.S. at 322, the court concludes that ELIHPA and LIHPRHA effected a temporary taking of CCA's property. The preservation statutes have the character of a taking in that they disproportionately placed the burden of providing low-income housing on owners of Section 221(d)(3) properties, such as CCA. ELIHPA and LIHPRHA also frustrated the reasonable investment-backed expectations of the Norman brothers and, later, CCA. The prepayment right was the *sine qua non* of the deal the Norman brothers struck with HUD and the original developers. The Norman brothers purposely invested in a property located in an area, West Metairie, that possessed qualities ideal for eventual conversion of the property into a market-rate apartment complex, and they built a complex that would be an appropriate participant in a conventional rental housing market. Likewise, the expectation that the government would honor its commitment to allow CCA to prepay and exit the HUD program after twenty years was reasonable. CCA suffered a severe economic deprivation, losing more than eighty percent of the returns that a conservative financial investment would have earned during the takings period. Having shown through evidence that each of the three *Penn Central* factors has been satisfied, CCA has proven that it suffered a temporary regulatory taking.

e. *Duration of the temporary taking.*

The Norman brothers signed their second mortgage and the secured note on Chateau Cleary on May 17, 1971, PX 5 (1971 note); PX 6 (1971 mortgage), meaning that on May 17, 1991, CCA was eligible to prepay in the absence of the preservation statutes. The only dispute between the parties is the date upon which the taking ended. CCA advocates an end-of-taking date of February 28, 1997, Pl.'s Br. at 60, while the government argues that the taking ended on May 31, 1996, slightly over sixty days after the passage of HOPE. Def.'s Reply at 36.

HOPE reinstated the prepayment rights of owners whose mortgages were insured under Section 221(d)(3), § 2(b), 110 Stat. at 834-35, but the preservation letters, *see supra* at 12, were purposely intended to deter or delay prepayment of Section 221(d)(3) mortgages. *See* Tr. 1090:12 to 1091:1 (Test. of Kizzier). Mr. Norman also testified that the preservation letters – in part because of their ever-shifting standards – created significant uncertainty, leading CCA to delay its plans for prepayment. Tr. 234:17 to 235:3 (Test. of Norman). Preservation Letter 97-1, issued on December 16, 1996, finally ended that uncertainty. PX 75 (Preservation Letter No. 97-1), Attach. at 7. As noted earlier, CCA did not actually prepay until September 30, 1998. Pl.'s Br. at 22. In these circumstances, the court finds that following Preservation Letter 97-1, CCA reasonably could have prepaid by December 31, 1996. Factoring in HOPE's 60-day moratorium on rent increases, the court accepts CCA's end-of-taking date of February 28, 1997. *Cf. Cienega IX*, 67 Fed. Cl. at 481 (end-of-taking date of March 1, 1997 for plaintiffs in somewhat analogous situation).

3. *Just compensation.*

Just compensation "means the full and perfect equivalent in money of the property taken. The owner is to be put in as good [a] position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller,* 317 U.S. 369, 373 (1943); *see also Monongahela Navigation Co. v. United States*, 148 U.S. 312, 326 (1893) (there is "no doubt that the compensation must be a full and perfect equivalent for the property taken."); *Narramore v. United States*, 960 F.2d 1048, 1051 (Fed. Cir. 1992) ("The Fifth Amendment guarantees a property owner the right to seek damages for the full extent of a taking."). The proper measure of damages for a temporary taking of a going business concern can be the difference between the fair market rent the owner could have earned, but for the taking, and the rent, if any, the owner earned during the takings period. *See Kimball Laundry*, 338 U.S. at 7 ("the proper measure of compensation is the rental that probably could have been obtained [but for the taking]."); *Petty Motor*, 327 U.S. at 381 (just compensation measured by "the difference between the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew . . . less the agreed rent which the tenant would pay for such use and occupancy."); *see also Pewee Coal*, 341 U.S. at 117 ("Ordinarily, fair compensation for a temporary possession of a business enterprise is the reasonable value of the property's use," but the better measure on the facts was the operating losses suffered during the temporary period of governmental control.); *United States v. Commodities Trading Corp.,* 339 U.S. 121, 123 (1950) ("This Court has never attempted to prescribe a rigid rule for determining what is 'just compensation' under all circumstances and in all cases.").

a. *Net rental value.*

CCA's model of damages, developed by Dr. Ragas, measures "the difference between the cash flow CCA would have received had it been allowed to prepay its mortgage and operate the property as a conventional apartment complex ('the [m]arket [s]cenario') and the cash flow CCA actually received from operating the property as a HUD-restricted property (the 'HUD [s]cenario')." Pl.'s Br. at 26. Dr. Ragas first determined under the market scenario the gross income, operating expenses, and financing costs for CCA. PDX 17 (Damages Calculation Methodology); *see also* Tr. 815:16 to 817:14 (Test. of Ragas); *see generally* PX 106 (second Ragas report). To calculate gross income, Dr. Ragas used *The New Orleans and South Central Gulf Real Estate Market Analysis*, a survey done under the auspices of the University of New Orleans ("UNO"), that Dr. Ragas had conducted at least once every year since 1978. PX 106 (second Ragas report) at 20, 23.[39] The UNO survey reported apartment rents in the New Orleans area by unit type and geographic submarket, enabling Dr. Ragas to derive market rents and occupancy levels based on properties comparable to Chateau Cleary and located in the same

[39]For approximately thirty years, Dr. Ragas conducted the survey while serving as a professor and the director of a real estate research center at UNO. Tr. 743:1-7 (Test. of Ragas).

submarket. *See id.* at 20, 22-23. Dr. Ragas concluded, based on the property's construction, amenities, and unit sizes, that Chateau Cleary was an average quality apartment complex in the West Metairie submarket. Tr. 1927:12 to 1928:3, 1930:25 to 1933:8 (Test. of Ragas).[40] In a similar fashion, Dr. Ragas estimated Chateau Cleary's operating expenses based on Chateau Cleary's experience and that of comparable properties, also incorporating the initial costs for converting the property to a market-rate complex. PX 106 (second Ragas report) at 19, 26-30, 35; Tr. 837:4-8 (Test. of Ragas). Financing costs were based on market interest rates. PX 106 (second Ragas report) at 31-32. From these figures, Dr. Ragas derived CCA's estimated net cash flows under the market scenario. *See* Tr. 817:6-14 (Test. of Ragas); PDX 17 (Damages Calculation Methodology).

Second, Dr. Ragas calculated for each year of the takings period the difference between the market-rate net cash flows and the net cash flows CCA actually received during the temporary takings period under the HUD restrictions. *See* PDX 17 (Damages Calculation Methodology); PDX 30 (Damages Totals, June 1991 - February 1997, Scenario 2) ("Damages Totals").[41] Third, Dr. Ragas then applied a ten percent discount rate to those unadjusted net amounts to determine the present value of the lost rents at the end of the taking, February 28, 1997. PX 125 (Ragas updated report) at Table Thirty-Two; PDX 31 (Adjustment of Damages – Scenario 2). Applying a ten-year Treasury STRIPS rate of 6.4 percent from the end of the taking to an estimated judgment date of September 30, 2006, Dr. Ragas arrived at a final damages calculation of $1,528,629. PX 125 (Ragas updated report) at Table Thirty-Two; PDX 32 (Calculation of Interest – Scenario 2 (Feb. 28, 1997 takings period end date)). The court finds that Dr. Ragas's methodology is reliable and provides a sound basis for determining damages.[42]

---

[40]Based on a survey of apartments in the West Metairie submarket, Dr. Ragas found that Chateau Cleary's 22 one-bedroom, one-bath units and its 22 two-bedroom, one-bath units were slightly larger than average. Chateau Cleary's 44 two-bedroom, one-and-a-half-bath townhouses were smaller than average, but in high demand because of the increased privacy they offered due to their design. The complex's 16 three-bedroom, two-bath units were also smaller than average, but were in short supply in the area and thus in high demand. Tr. 1930:25 to 1933:8 (Test. of Ragas); PX 106 (second Ragas report) at 40.

[41]Dr. Ragas calculated lost rents for the following seven time periods: June 1991 to December 1991 (-$20,293); 1992 ($136,497); 1993 ($134,744); 1994 ($164,987); 1995 ($148,151); 1996 ($104,810), and January 1997 through February 1997 ($17,467). PDX 30 (Damages Totals). The sum of these unadjusted damage totals is $686,363.

[42]The soundness of Dr. Ragas's methodology can be seen by a comparison of comparable lost-rent estimates performed by Dr. Ragas and the government's expert, Mr. Derbes. Dr. Ragas calculated unadjusted net rental income from May 1991 to May 30, 1996 as $607,757. PDX 28 (Adjustment of Damages – Scenario 1). Mr Derbes calculated CCA's "loss of income" from May 1991 to April 30, 1996 as $526,971, only $80,786 less than Dr. Ragas's estimate. DX 173

The government contests Dr. Ragas's calculation of just compensation on several grounds. First, the government argues that CCA is owed no compensation because "CCA was free to exit the [original HUD] program" in the limited sense that it could invoke options under the preservation statutes to sell or seek incentives. *See* Def.'s Reply at 30-31. The court has rejected this contention in the context of other issues addressed in this opinion, but the argument cannot be rejected summarily when addressing just compensation because the value of any options that were exercised properly relates to just compensation. *See supra*, at 27-28 n.27. The government in effect contends that CCA is owed no compensation because of the mere existence of the options, even though CCA did not exercise any of them. Def.'s Reply at 30-31. The shortest answer to the government's contention is that CCA had no obligation to seek incentives or sale options it manifestly did not want. *See* Tr. 198:21 to 200:7, 207:12 to 208:25 (Test. of Norman.). By filing a notice of intent, CCA kept open the possibility that at a later time it might choose to seek a sale or a use agreement under the preservation statutes, but at least during the temporary takings period when the prepayment bar of the preservation statutes remained in effect, any action it would have undertaken to pursue those options would not have been a voluntary choice. *See Independence Park IV*, 465 F.3d at 1311-13; *Cienega IX*, 67 Fed. Cl. at 482. After HOPE was enacted, CCA had no reason to pursue those options because prepayment was near at hand. Moreover, the options were not attractive to CCA. A use agreement would have locked Chateau Cleary into the HUD program for a long period. And, despite LIHPRHA's language calling for determining the "fair market value" of a sale, 12 U.S.C. § 4103(b)(2), the testimony at trial established that the preservation statutes provided no guarantees of the owner receiving fair market value. *See supra*, at 27 n.26.

Second, the government argues that Dr. Ragas inappropriately used an *ex post* analytical approach, by "calculat[ing] compensation at the end of the alleged takings," rather than at the start of that period. *See* Def.'s Reply at 31. In support of this argument, the government cites cases that conclude that *where a permanent taking occurs*, just compensation must be measured "as of the time of the taking." Def.'s Br. at 52. The government takes this to mean that *in all temporary taking cases* the time of the taking is the point in time at which the taking begins. However, in the case of a temporary taking, such as this one, the "time of the taking" is the *full* period during which the governmental action constrained the owner's property rights, not just the start of that period. Therefore, the valuation date for temporary takings is appropriately designated as the end of the takings period because "the end of the temporary taking sets a boundary for just compensation and, apart from duration, events that transpired during the temporary takings period 'have to be taken into account in setting a valuation.'" *Cienega IX*, 67 Fed. Cl. at 490 (quoting *Independence Park I*, 61 Fed. Cl. at 709). The Federal Circuit implicitly approved of this methodology when it ruled on appeal in *Independence Park III* that an owner who signed a use agreement during the takings period was entitled to just compensation for the

---

(Derbes Supplemental Report) (April 29, 2005) at 13; Tr. 1523:16 to 1525:23 (Test. of Derbes). The similarity in the two estimates provides a useful sensitivity test and reinforces the court's decision to accept Dr. Ragas's methodology as reliable.

term of the use agreement. *See* 449 F.3d at 1248 ("[T]he calculation of damages should be adjusted in the case of [owners who signed use agreements] to treat the ban on prepayment as lasting as long as the use agreements provided for, with the amount of damages adjusted to account for any benefits [those owners] obtained as a result of the use agreements."); *see also Independence Park IV*, 465 F.3d at 1312 (same on reconsideration).[43]

Third, the government argues that CCA is a below-average property, not an average property, as Dr. Ragas concluded. Def.'s Br. at 57-58. The government relies, in part, on the fact that after prepayment in 1998, CCA did not charge the average rents for the West Metairie submarket. *Id.* However, the apartment rental market changed substantially from 1991 to 1998. New complexes with better amenities were coming on the market in areas just south of West Metairie beginning in 1996, shifting the average upward. Tr. 824:3 to 825:13, 829:2 to 830:20, 1063:13 to 1065:18, 1942:2-9, 1991:2-9 (Test. of Ragas). Noting that these new complexes were not built in West Metairie itself, the government disputes the effect they could have on CCA's rents. Def.'s Reply at 34.[44] Mr. Derbes, the government's expert, opined that the newer complexes had not affected CCA's rents because CCA served a different class of tenants, Tr. 1429:11 to 1432:2 (Test. of Derbes), while Dr. Ragas believed that the newer projects had affected CCA. Tr. 1063:13 to 1065:18, 1942:2-9, 1991:2-9 (Test. of Ragas). Indeed, Dr. Ragas testified that the entry of the newer complexes immediately south of West Metairie had a significant impact on the *overall* New Orleans market – leading him to begin to publish one annual rental survey for these higher-quality apartments and one for the rest of the market

---

[43]In an argument related to the government's critique of Dr. Ragas's so-called *ex post* approach taking into account the end of the taking, the government avers that the court should use the *ex ante* approach advocated by its expert, Dr. Dickey. Def.'s Br. at 55. However, while initially purporting to be an *ex ante* analysis, Dr. Dickey's damages calculation incorporated a valuation performed by Mr. Derbes that *assumed* that an owner, as of May 1, 1991, knew with certainty that HOPE would be enacted in 1996. DX 160 (Dickey report) at 4; Tr. 1723:3-23, 1725:21-24 (Test. of Dickey). Dr. Robert Stillman, CCA's economics expert, criticized Dr. Dickey's methodology by arguing that a proper *ex ante* analysis should be based only on the facts and circumstances known at the time of the start of the taking (*i.e.*, May 1991). Tr. 1852:11 to 1853:14 (Test. of Stillman). From a perspective as of May 1991, Dr. Dickey should not have "peek[ed]" at the so-called *ex post* fact of HOPE's enactment. *See* Tr. 1861:14 to 1862:24 (Test. of Stillman). When the government's counsel asked Dr. Stillman whether Dr. Dickey's assumption about HOPE was the "*only ex post* information" that he had incorporated into his analysis, Dr. Stillman responded: "[Y]es, that's the only – 'how was the play, Mrs. Lincoln,' but yes." Tr. 1870:2-9 (Test. of Stillman) (emphasis added).

[44]The government objects to another minor aspect of Dr. Ragas's damages calculations – an error he made as to the square footage of the three-bedroom units at Chateau Cleary, leading to a difference of "$1,000 a year out of some $350,000 in rent." Def.'s Br. at 58-59; Tr. 1985:5-21 (Test. of Ragas). This error is insignificant, and the court will disregard it.

"because the rest of the market was lagging in not [experiencing] nearly the gains that the new[er] . . . units were achieving." Tr. 1063:6 to 1065:7 (Test. of Ragas). The court credits Mr. Ragas's testimony, given his greater detailed knowledge of the rental housing market throughout the New Orleans area.

Dr. Ragas also criticized Mr. Derbes's conclusion that Chateau Cleary was a below-average property. *See* Tr. 1927:8 to 1928:4 (Test. of Ragas); *see also* Tr. 1424:6 to 1429:10 (Test. of Derbes). He faulted Mr. Derbes for using his own *forecasts* of market rents based on comparable properties given that *actual* data on market rents was available from the annual UNO survey. PX 119 (Ragas rebuttal report) (May 30, 2005) at 10. Dr. Ragas also pointed out that Mr. Derbes had characterized the comparable properties he used in his analysis as being in average to good condition and yet characterized Chateau Cleary as below-average. *See id.* at 4. Finally, Dr. Ragas noted that in estimating per-unit sales prices, Mr. Derbes assigned Chateau Cleary a higher market value per unit than the average comparable per-unit sales price. *Id.* Based upon these factors, the court adopts Dr. Ragas's testimony that Chateau Cleary was at least an average property in the relevant market. First, Mr. Derbes' own sales estimates support the fact that Chateau Cleary should be valued as a better-than-average property. Second, the site visit showed Chateau Cleary's quality construction, good overall average room size, the value of having three-bedroom units, which were in short supply, and ideal location. *See also* Tr. 1927:12 to 1928:3, 1930:25 to 1933:8 (Test. of Ragas). Lastly, Dr. Ragas had long-standing expertise in this area and the breadth of the survey data he used based on *actual* market rents charged in the West Metairie submarket during the takings period supported his observations over those of Mr. Derbes. Chateau Cleary was an average property.[45]

b. *Discounting*.

To put an owner of a going business concern in as good a position as it would have been in if its property had not been taken, *see Miller*, 317 U.S. at 373, a court must apply a discount rate to the foregone stream of net rents. *See Whitney Benefits, Inc. v. United States*, 18 Cl. Ct. 394, 412-13 (1989), *aff'd*, 926 F.2d 1169, 1178 (Fed. Cir. 1991). "[T]he discount rate performs two functions: (i) it accounts for the time value of money; and (ii) it adjusts the value of the cash flow stream to account for risk." *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1333 (Fed. Cir. 2002). The discount rate "reflects returns required to attract investment capital" and incorporates a risk premium "to account for the potential investor's uncertainty about future events." *Cienega IX*, 67 Fed. Cl. at 490. For temporary takings, the valuation date is the end of the takings period, giving full consideration to events that transpired during the takings period,

[45]The government also objects to Dr. Ragas's use of the rents CCA actually charged for the actual HUD-restricted case during the years from 1991 to early 1995 because CCA failed to seek rent increases. Def.'s Br. at 56-57. For the reasons cited *supra*, at 37-38 & n.38, this argument is rejected.

including the finite end to that period. *See Seiber*, 364 F.3d at 1364; *see also Cienega IX*, 67 Fed. Cl. at 490.[46]

Dr. Ragas applied a ten percent discount rate at the end of the takings period, February 28, 1997. PX 125 (Ragas updated report) at Table Thirty-Two; PDX 31 (Adjustment of Damages – Scenario 2). The ten percent rate reflected a slight premium over the relatively riskless rate of 8.5 percent to account for the "opportunity cost" CCA lost due to the preservation statutes. *See* Tr. 863:2-10 (Test. of Ragas). Mr. Norman testified that had CCA received the extra cash flows that market rents would have brought, it would have invested them with the goal of a fifteen to twenty percent annual return. Tr. 291:25 to 292:9 (Test. of Norman). Dr. Ragas believed that a discount rate based on these alternative investments was too high, but that a rate that reflected some risk, such as that found in utility bonds, corporate bonds, or real estate investments in comparable properties in the Jefferson Parish submarket, was appropriate. Tr. 863:2 to 864:14 (describing ten percent discount rate for a nominal takings period that ended in May 1996), 867:1 to 869:19 (indicating use of an identical approach for the takings period ending in February 1997) (Test. of Ragas); PX 106 (second Ragas report) at 45, 51. Based on these considerations, Dr. Ragas arrived at a ten percent discount rate. *See* Tr. 863:2-10 (Test. of Ragas).

Relying on the testimony of the government's and CCA's economics experts, Tr. 1687:6-12, 1688:1-13 (Test. of Dickey), 1867:4-13, 1869:9-20 (Test. of Stillman), the government argues that a single, risk-free rate interest rate should be used to bring cash flows forward, not only to the date the taking ended or to the date the judgment is entered, but to the date the judgment is paid. *See* Def.'s Br. at 59; Def.'s Reply at 40. Specifically, the government contends that the defendant's debt rate should be used because an owner's claim at the time of the taking is against the government, and such a claim bears no risk. Def.'s Br. at 59; Tr. 1687:6-12, 1688:1-13 (Test. of Dickey).[47] The government's approach, however, does not adequately

---

[46]The government again argues that the proper valuation date is "the time of the taking," but it means only the beginning of the takings period, not also the time to the end. *See* Def.'s Br. at 54-55 & n.12; *see also* Def.'s Reply at 31. In this connection the government contends that CCA's damages should be adjusted *downward* by the discount rate using the finite starting time as a measuring point. Among other things, the government avers that the market-rate rents that CCA could have charged in the absence of the preservation statutes consist of inappropriate *ex post* information. This argument is unavailing because "the time of the [temporary] taking" is *not* a single point in time, but rather the entire time period. *See supra*, at 36, 42.

[47]The government also asserts that the discount rate for rents earned as a conventional property should be higher than those earned while under HUD restrictions. Def.'s Br. at 59 n.14; *see also* DX 160 (Dickey report) at 34, 37. The government discounts Chateau Cleary's quality of construction, the value of its three-bedroom units, which were in short supply, and its ideal

"adjust[] the value of [CCA's lost] cash flow stream to account for risk." *See Energy Capital*, 302 F.3d at 1333. Therefore, the court accepts Dr. Ragas's proffered ten percent discount rate.

Applying a ten percent discount rate to the year-by-year lost rents for CCA, to the end of the temporary takings period, yields the following values:

| time period | lost rents | value as of Feb. 28, 1997 |
|---|---|---|
| 6/91 – 12/91 | ($ 20,293) | ($ 33,102) |
| 1992 | 136,497 | 202,412 |
| 1993 | 134,744 | 181,648 |
| 1994 | 164,987 | 202,198 |
| 1995 | 148,151 | 165,059 |
| 1996 | 104,810 | 106,156 |
| 1/97 – 2/97 | 17,467 | 17, 467 |
| | | $841,839 |

*See* PX 125, Table Thirty-Two. Accordingly, the just compensation due CCA as of February 28, 1997, not including interest, is $841,839.

c. *Interest.*

"If the Government pays the owner before or at the time the property is taken, no interest is due on the award . . . [b]ut if disbursement of the award is delayed, the owner is entitled to interest thereon." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984) (internal citation omitted). If the government does not pay compensation at the time of the taking, the Takings Clause requires a payment of interest. *Seaboard Air Line Ry. v. United States*, 261 U.S. 299, 306 (1923); *see also Library of Congress v. Shaw*, 478 U.S. 310, 317 n.5 (1986) *superseded on other grounds by statute*, Civil Rights Act of 1991, Pub. L. No. 102-66, 105 Stat. 1071;

---

location, as well as testimony at trial of the "scores" of defaults of HUD-restricted properties in the New Orleans area during the recession from the late 1980s through the early 1990s. Tr. 1927:8 to 1928:4, 1930:25 to 1933:8 (Test. of Ragas), 502:22-25 (Test. of Alexander); DX 140 (Alexander report) at 80 ("scores of other projects defaulted, went into bankruptcy, and were eventually foreclosed."); *cf. Cienega IX*, 67 Fed. Cl. at 491. Dr. Ragas's estimate that the risk rates under either the market scenario or the HUD scenario would be roughly the same is accepted.

*Cienega IX*, 67 Fed. Cl. at 492. Because the government did not compensate CCA at the time of the taking, CCA is owed interest on the present value of the damages CCA suffered from and after February 28, 1997, the end of the temporary taking.

Dr. Ragas applied a compound interest rate of 6.4 percent, the ten-year Treasury STRIPS rate, from the end of the taking, February 28, 1997, to an estimated judgment date of September 30, 2006. PX 125 (Ragas updated report) at Table Thirty-Two (referring to a 6.4 percent rate); PDX 32 (Calculation of Interest – Scenario 2 (Feb. 28, 1997 takings period end date)) (same); *see also* Tr. 865:21 to 866:14, 868:23 to 869:1 (Test. of Ragas). The government argues that the single riskless interest rate it advocates should be applied using simple, not compound interest, but, in the alternative, concurs that the ten-year STRIPS rate is appropriate. *See* Def.'s Br. at 59; Def.'s Reply at 39-40.

(i.) *Interest rate.*

The determination of an appropriate interest rate is based on the so-called "prudent investor rule," which measures "how 'a reasonably prudent person' would have invested the funds to 'produce a reasonable return while maintaining safety of principal.'" *Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed. Cl. 624, 627 (2004) (quoting *United States v. 429.59 Acres of Land*, 612 F.2d 459, 464-65 (9th Cir. 1980)). In *Cienega IX*, this court, under similar circumstances, applied the ten-year STRIPS rate for three key reasons: (1) Treasury STRIPS reflect the minimal risk that the United States government will default on its obligations, (2) in that case, the ten-year STRIPS rate roughly approximated the length of time from the end of the taking to the date of judgment, and (3) the court has a strong judicial policy in favor of uniform interest rates for similarly situated plaintiffs. *Cienega IX,* 67 Fed. Cl. at 493; *Georgia-Pacific Corp. v. United States*, 640 F.2d 328, 365-66 (Ct. Cl. 1980) (favoring uniform interest rates); *Tulare Lake*, 61 Fed. Cl. at 627 (same); *Independence Park I*, 61 Fed. Cl. at 716-17 (applying ten-year STRIPS rate). These reasons are equally applicable to CCA's case; here also, approximately ten years have passed since the end of the takings period. Therefore, the interest rate represented by ten-year STRIPS is appropriate.

(ii.) *Compounding.*

Dr. Ragas's damages model employed compound interest, but the government claims that simple interest would provide adequate compensation to CCA because CCA allegedly bore no risk and its damages model "more than captures the full investment opportunity at the time of the alleged taking." Def.'s Reply at 38. A first principle of Takings Clause jurisprudence is that the just compensation should put CCA in as good a position as if its property had never been taken. *See Miller,* 317 U.S. at 373; *Monongahela Navigation*, 148 U.S. at 326; *Narramore*, 960 F.2d at 1051. The Federal Circuit has said that in some cases compound interest may be necessary "'to

accomplish complete justice'" under the Takings Clause. *Dynamics Corp. of Am. v. United States*, 766 F.2d 518, 520 (Fed. Cir. 1985) (quoting *Waite v. United States*, 282 U.S. 508, 509 (1931)).

In this case, compounding is necessary to satisfy the mandate of the Takings Clause. "Income-producing property would generate an income stream that would be available for continual investment, at compound rates. Just compensation requires the payment of compound interest to replace the investment opportunities plaintiffs lost when the government took their property." *Whitney Benefits, Inc. v. United States*, 30 Fed. Cl. 411, 415-16 (1994); *see also Vaizburd v. United States*, 67 Fed. Cl. 499, 504 (2005) ("Compounding we view as a routine means by which a reasonable person would protect [himself or herself], over an extended period of time, from erosion of [his or her] investment."). Had the government properly compensated CCA in February 1997, CCA would have reinvested that money. The lengthy passage of time since the end of the taking also is a pertinent factor in this determination. *See Whitney Benefits*, 30 Fed. Cl. at 415 ("[B]ecause of the long delay since the date of taking in this case, the award of compound interest is not only proper, but its denial would effectively undercut the protections of the fifth amendment to our Constitution."). In light of these facts, compound interest is an appropriate and just means of compensating CCA. *See Cienega IX*, 67 Fed. Cl. at 493.

**CONCLUSION**

For the reasons stated, the court finds that CCA has suffered a temporary taking for which just compensation is due. The amount of just compensation awarded CCA is $841,839 as of the end of the temporary takings period, February 28, 1997, plus compound interest at the ten-year STRIPS rate from that date to the date the judgment is actually paid.

Final judgment to this effect shall be issued under RCFC 54(b) because there is no just reason for delay. In due course, the court will also award costs to plaintiffs, including an award of attorneys' fees and expenses under Section 304(c) of the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4654(c). Given the high likelihood of appeal in this case and in the interest of efficiency, proceedings on award of attorneys' fees and costs should be deferred until after any appellate process has been concluded.

The clerk shall enter final judgment as specified above.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge